# Exhibit A

**EFiled: Mar 11 2026 09:26AM EDT**
**Transaction ID 78689748**
**Case No. 2026-0307-PAF**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD D. PAISNER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 2026-0307-PAF |
| | : | |
| LIP-BU TAN, FRANK D. YEARY, | : | **Original Version Filed:** |
| CRAIG H. BARRATT, JAMES GOETZ, | : | **March 5, 2026** |
| ANDREA J. GOLDSMITH, ALYSSA H. | : | |
| HENRY, ERIC MEURICE, BARBARA | : | **Public Version Filed:** |
| NOVICK, STEVE SANGHI, GREGORY D.: | : | **March 11, 2026** |
| SMITH, STACY J. SMITH, DION J. | : | |
| WEISLER, HOWARD LUTNICK, as | : | |
| Secretary of the United States Department | : | |
| of Commerce, and the UNITED STATES | : | |
| DEPARTMENT OF COMMERCE, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| INTEL CORPORATION, | : | |
| a Delaware corporation, | : | |
| | : | |
| Nominal Defendant. | : | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Richard D. Paisner ("Plaintiff"), by and through his undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Intel Corporation ("Intel," or the "Company"), and makes the following allegations in this Verified Stockholder Derivative Complaint against the current members of the

Company's Board of Directors (the "Board"),[1] Howard Lutnick, as Secretary of the United States Department of Commerce (the "Secretary"), and the United States Department of Commerce (the "DOC").  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief derived from the investigation of counsel, which included, without limitation, (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review of internal Intel documents obtained pursuant to 8 *Del. C.* § 220 (the "Demand"); and (iii) review and analysis of press releases, news reports, industry reports, and other information available in the public domain.

## NATURE OF THE ACTION

1.      This stockholder derivative action is brought on behalf of Nominal Defendant Intel to address the Board's breach of its fiduciary duties of loyalty, due care, and good faith regarding its uninformed approval of an unlawful contract that gives the U.S. government $11 billion worth of Intel stock for no meaningful consideration in response to extortionary threats by the government.  In that

---

[1]      The Board is composed of Lip-Bu Tan, Frank D. Yeary, Craig H. Barratt, James Goetz, Andrea J. Goldsmith, Alyssa H. Henry, Eric Meurice, Barbara Novick, Steve Sanghi, Gregory D. Smith, Stacy J. Smith and Dion J. Weisler (collectively, the "Director Defendants").

transaction, the Board included for itself a voting agreement that compels the government to vote its 9.9% Company stake as directed by the Board.

2.      No law authorizes the U.S. government to acquire stock in Intel or any publicly held company.  Accordingly, the Board had no authority to enter into such an unlawful contract or to issue 9.9% of Intel's equity to the DOC for no meaningful consideration.  For that same reason, the government had no right to demand shares of Intel stock for any purpose, including through the pretextual advancement of disbursements Intel has already earned or had a right to receive under a November 2024 direct funding agreement with the DOC that emanated from the CHIPS Act. The resulting contract is therefore void for illegality and must be cancelled.

3.      The Board was coerced and extorted into giving the DOC 9.9% of Intel stock, as well as a Warrant for an additional 4.9% of stock, for no meaningful consideration.  The genesis of the unlawful contract began on August 7, 2025, when President Donald Trump publicly claimed that Intel's CEO, Lip-Bu Tan, was highly conflicted and must be fired immediately.  That demand was followed by a private White House meeting on August 11, after which the President publicly stated that he and Tan had made a "little deal" for a 10% stake in Intel so that Tan could keep his job.  That White House meeting was followed by ██████████████████ ████████████████████████████████████ ████████████████████████████████████

3

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.

4.      In extraordinary and expedited fashion, the Board, operating under the shadow of the President's threats, and advised by legal counsel that itself was conflicted due to its *pro bono* promises to the President, caved to the government's extortion.  On August 22, 2025, the Board approved the unlawful contract with the DOC that is the subject of this derivative action, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ The Board's failures to be properly informed and explore potential options in response to the government's coercive demands are a further breach of their duties of care and good faith.

5.      Days after the Board approved the unlawful contract, President Trump put lie to the pretense that Intel received any consideration in return for the stock that it gave to the DOC:



Donald J. Trump ✔ ➕
@realDonaldTrump · Aug 25, 2025

I PAID ZERO FOR INTEL, IT IS WORTH APPROXIMATELY 11 BILLION DOLLARS. All goes to the USA. Why are "stupid" people unhappy with that? I will make deals like that for our Country all day long. I will also help those companies that make such lucrative deals with the United States States. I love seeing their stock price go up, making the USA RICHER, AND RICHER. More jobs for America!!! Who would not want to make deals like that?

🔍 1.77k          🔁 5.5k          ♡ 23.4k          🔖          ↑          ...

6.    Because of the threats made by the Administration to Intel's CEO, and, by implication, to the remainder of the Board, the entire Board was conflicted by well-founded fears over their personal and professional relationships, rendering them unable to exercise their independent and disinterested business judgment when the unlawful contract came before the Board for its approval.

7.    The Board's own failures, breaches of fiduciary duty and reluctance to stand up to the U.S. government prevents it from independently and disinterestedly considering any demand by Plaintiff to address these issues.

8.    The unlawful contract with DOC also contained a voting agreement that required the DOC to vote its 9.9% of stock as directed by the Board.  This provision

---

[2]    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 25, 2025), https://truthsocial.com/@realDonaldTrump/115089582863713336.

produced a non-ratable benefit for the Board members, not shared by any other Intel stockholders.   Instead of issuing nonvoting stock to the DOC or otherwise neutralizing the voting power of 9.9% of the Company's voting stock, the Board grabbed the voting power for itself.  The voting agreement undermines the Board's independence and disinterestedness in its approval of the unlawful contract and constitutes a further breach of the duty of loyalty.

9.     For all of these reasons, it would be futile to make a demand on the Board that approved the unlawful contract under such disabling conflicts.

10.    Plaintiff, through this derivative action, is the only means by which Intel may vindicate its right to be free from government extortion and extricate itself from this unlawful contract through cancellation of the shares issued to the DOC and obtain related declaratory and injunctive relief.

### JURISDICTION

11.    This Court has jurisdiction to hear and determine this action pursuant to 10 *Del. C.* § 341 and over Intel pursuant to 10 *Del. C.* § 3111, as a Delaware corporation.

12.    As directors and officers of a Delaware corporation, the Board members have consented to the jurisdiction of this Court pursuant to 10 *Del. C.* § 3114. Because the DOC entered into the agreement that is challenged herein to acquire

6

common stock of Intel, a Delaware corporation, it is subject to jurisdiction in this Court.

13.    Venue is proper in this forum because this action involves significant issues of Delaware corporate law, including the fiduciary duties of care, loyalty, and good faith, and is therefore suitable for adjudication before the Delaware Court of Chancery.

## **PARTIES**

14.    Plaintiff Richard D. Paisner is currently and has been a stockholder of Intel at all relevant times.

15.    Nominal Defendant Intel Corporation is a Delaware corporation, with its principal offices located in Santa Clara, California.  Intel is "a global designer and manufacturer of semiconductor products."

16.    Defendant Lip-Bu Tan is the Chief Executive Officer ("CEO") of Intel and a member of the Board.  He was appointed as CEO in March 2025.  He is also a founding managing partner of Walden Catalyst Ventures and chairman of Walden International Singapore, a venture capital firm (collectively "Walden").  Prior to being named CEO of Intel, Tan had served as CEO of Cadence Designs Systems, Inc. ("Cadence") from 2009 to 2021 and Executive Chairman of Cadence from 2021 until 2023.  Tan previously served on the Board of Intel from 2022 to 2024.

17.    Defendant Frank D. Yeary is a current member of the Board which he joined in March 2009 and was named chairman of the Board in January 2023.

18.    Defendant Craig H. Barratt is a current member of the Board which he joined in November 2025.  Mr. Barratt was not a member of the Board at the time the unlawful contract being challenged in this action was approved by the Board.

19.    Defendant James J. Goetz is a current member of the Board which he joined in November 2019.

20.    Defendant Andrea J. Goldsmith is a current member of the Board which she joined in September 2021.

21.    Defendant Alyssa H. Henry is a current member of the Board which she joined in January 2020.

22.    Defendant Eric Meurice is current member of the Board which he joined in December 2024.

23.    Defendant Barbara G. Novick is a current member of the Board which she joined in December 2022.

24.    Defendant Steve Sanghi is a current member of the Board which he joined in December 2024.

25.    Defendant Gregory D. Smith is a current member of the Board which he joined in March 2017.

8

26.    Defendant Stacy J. Smith is a current member of the Board which he joined in March 2024.  Mr. Smith was employed by Intel for more than thirty years in various leadership positions before retiring from the Company in 2018.

27.    Defendant Dion J. Weisler is a current member of the Board which he joined in June 2020.

28.    Defendant Howard Lutnick is the Secretary of Commerce of the United States Department of Commerce.  Secretary Lutnick is charged with implementing the CHIPS Act, the law at issue in this case.

29.    Defendant the United States Department of Commerce is an agency of the executive branch of the United States of America.  The DOC is responsible for the administration for the CHIPS Act.  The DOC is a party to the contract being challenged in this action and is the owner of the shares of Intel common stock and the Warrant at issue in this action.

30.    Non-party Skadden, Arps Meagher & Flom LLP ("Skadden") is an international law firm that advised Intel on the unlawful contract being challenged in this action.  Upon information and belief, in March 2025, Skadden had entered into an agreement with the Administration, and the DOC specifically, to provide $100 million worth of *pro bono* legal services to the government and/or persons approved by the government.

9

# BACKGROUND

## A.   Intel and The CHIPS Act.

31.   Once the dominant player in the semiconductor industry, by 2024 Intel had fallen from glory due to a plethora of missteps, including, among others, declining to provide chips that would power Apple's now ubiquitous iPhone and largely missing out on the AI boom (including by declining to invest in OpenAI in 2017).

32.   For more than two decades, Intel was the world's largest manufacturer of semiconductor chips but, by 2017, had ceded that role to Taiwan Semiconductor Manufacturing Company ("Taiwan Semiconductor").   Taiwan Semiconductor originated the "foundry" model — manufacturing chips for "fabless" companies (companies that design chips but do not manufacture them) such as NVIDIA.  As the semiconductor industry split between the foundry and fabless models, Intel remained dogged in its determination to manufacture only chips of its own design, eschewing both foundry and fabless models.  This changed in 2021 when Intel's then CEO Pat Gelsinger announced the "IDM 2.0" strategy that contemplated Intel both utilizing other foundries for chip manufacturing, as well as establishing its own foundry business.

33.   However, IDM 2.0 and the move into the foundry business required a massive investment to expand Intel's manufacturing capacity.  Fortuitously, as Intel

10

determined its move into the foundry business, the U.S. government was becoming increasingly concerned about the perils to national security posed by the sharp decline in domestic chip manufacturing relative to the rest of the world, notably Taiwan.

34.    This confluence of interests was apparent during President Biden's 2022 State of the Union speech, when the President singled out Gelsinger, his invited guest, for favorable comment, based on Intel's plans to build a semiconductor manufacturing facility near Columbus, Ohio, while urging Congress to pass the bill that became the CHIPs Act.[3]

35.    On August 9, 2022, the Creating Helpful Incentives to Produce Semiconductors Act of 2022, Public Law 116-167, 136 Stat. 1366, 15 U.S.C. § 4651, (the "CHIPS Act") became law.  Among other things, the CHIPS Act was intended to encourage semiconductor research, development, manufacturing, and workforce development by providing more than $52 billion in incentives and federal support for the domestic semiconductor industry in the form of grants and loan guarantees.

36.    Not surprisingly, given Intel's (and particularly Gelsinger's) role in supporting its passage, Intel became the largest single beneficiary of the CHIPS Act.

---

[3]    Joseph Biden, President of the United States, "State of the Union," Address to Congress, Mar. 1, 2022, https://rollcall.com/factbase/biden/transcript/joe-biden-speech-state-of-the-union-address-march-1-2022/).

11

37.     Nothing in the CHIPS Act contemplates the U.S. government acquiring an equity interest in any of its beneficiaries.

**B.      Intel's Direct Funding Agreement and Award.**

38.     On March 20, 2024, Intel announced that it had signed a non-binding preliminary memorandum of understanding with the DOC pursuant to which Intel would receive up to $8.5 billion in CHIPS Act grant funding to advance Intel's commercial semiconductor projects in Arizona, New Mexico, Ohio and Oregon.[4] Upon information and belief, nothing in the memorandum of understanding contemplated the U.S. government acquiring an equity interest in Intel.

39.     In DOC's own announcement, it stated that the direct funding would "help[] to incentivize over $100 billion in investments from Intel – marking one of the largest investments ever in U.S. semiconductor manufacturing, which will create over 30,000 good paying jobs and ignite the next generation of innovation."[5]

40.     On November 25, 2024, Intel and DOC finalized the previously announced direct funding agreement (the "DFA") pursuant to which the DOC agreed to award Intel up to $7.8 billion (the "DFA Award") in direct grant funds in consideration of work done to construct or modernize, as well as operate, microchip

---

[4]     https://newsroom.intel.com/corporate/intel-celebrates-chips-act-funding-livestream-replay.

[5]     https://www.nist.gov/news-events/news/2024/03/biden-harris-administration-announces-preliminary-terms-intel-support.

facilities in Arizona, Oregon, New Mexico and Ohio.  **Exhibit A** (INTEL_000407-629).

41.    The DFA generally provides that the DOC will disburse funds to Intel when certain milestones towards completion of a project are met.  ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████.  Ex. A at INTEL_000488.

42.    If Intel fails to complete a project by its Project Completion Clawback Date, such failure constitutes an event of default under the DFA and allows the DOC to, among other things, suspend or withhold a disbursement or suspend or terminate any portion of the DFA Award.  Ex. A § 9.3(h) (INTEL_000450).

43.    Nothing in the DFA contemplated the U.S. government acquiring an equity interest in Intel.

**C.    The Secure Enclave.**

44.    On September 16, 2024, the U.S. Department of Defense (the "DOD") and the DOC jointly announced that Intel had been awarded "up to $3 billion in direct funding under the CHIPS and Science Act for a project known as the 'Secure

13

Enclave.'"[6]

45.    The Secure Enclave is a $3.5 billion fund derived from money originally intended to be part of the larger CHIPS Act program.  It purports to be a national security initiative that would make and package microchips in a special facility for defense and intelligence applications, including classified projects.[7]

46.    The award to Intel (the "Secure Enclave Award") was made to "support the manufacture of microelectronics and ensure access to a domestic supply chain of advanced semiconductors for national security."[8]

47.    Unlike the DFA Award, whose terms and conditions were memorialized in a publicly filed DFA, the specific terms and conditions of the Secure Enclave Award have not been publicly disclosed.  Upon information and belief, the Secure Enclave Award also contains bespoke terms and milestones that Intel must meet to receive distributions.  Also, upon information and belief, nothing in the Secure Enclave Award contemplated the U.S. government acquiring an equity interest in Intel.

---

[6]    https://www.war.gov/News/Releases/Release/Article/3906926/department-of-defense-department-of-commerce-joint-statement-announcement-in-su/.

[7]    *Id.*

[8]    *Id.*

14

48.    Plaintiff requested that Intel provide any definitive documentation concerning the Secure Enclave Award (or, if none exist, a description of its material terms and conditions), but Intel has declined to produce any documents in response to that request, citing confidentiality restrictions.

49.    To date, Intel is the only recipient of a Secure Enclave award.

**D.    Intel Reports a $16.6 Billion Quarterly Loss; Pat Gelsinger Departs**

50.    On October 31, 2024, Intel reported a loss of $16.6 billion for the quarter ended September 30, 2024.

51.    By December 2, 2024, the trading price of Intel Common Stock had declined approximately 52% since the start of the year.

52.    On December 3, 2024, Intel announced that Mr. Gelsinger had retired as CEO and left the Board.

**E.    Intel Receives Disbursements Pursuant to the DFA**

53.    Intel began receiving disbursements from the DFA Award during the fourth quarter of 2024.

54.    In its Quarterly Report on Form 10-Q for the quarter ended June 30, 2025 (the "2Q25 10-Q"), Intel reported that, through June 28, 2025, it had received an aggregate of $2.2 billion in disbursements pursuant to the DFA, and had

15

submitted requests for an aggregate of $850 million of additional disbursements that has been earned but not yet paid.[9]

**F.      President Trump and the CHIPS Act**

55.      Following President Trump's election in November 2024, the future of many Biden Administration programs and policies, such as direct funding under the CHIPS Act and the Secure Enclave program, was in question, if not outright jeopardy.

56.      Nonetheless, during a December 4, 2024 presentation at UBS' Global Technology and AI Conference, when Intel's interim co-CEO, Executive Vice President and Chief Financial Officer ("CFO"), David A. Zinsner, was asked whether the DFA "is [ ] a piece that you see as maybe a risk potential[?]"[10]   Mr. Zinsner responded, "I don't think so.  *I mean we signed an agreement.  It's an ironclad agreement.*  It lays out all the milestones.  …  [W]e're already actually 1/3 of the way probably through the milestones, quite honestly.  ...  There's always potential for some adjustment and thinking from the administration.  And if that's the case, we'll work with them."[11]

---

[9]      https://www.sec.gov/Archives/edgar/data/50863/000005086325000109/intc-20250628.htm.

[10]      https://seekingalpha.com/article/4742201-intel-corporation-intc-ubs-global-technology-and-ai-conference-transcript.

[11]      *Id*. (emphasis added).

16

57.    In a joint address to Congress on March 4, 2025, after lauding Taiwan Semiconductor's commitment to invest $165 billion in a chip manufacturing facility in the United States, President Trump told Congress: "Your CHIPS Act is a horrible, horrible thing.  We give hundreds of billions of dollars, and it doesn't mean a thing;" and "You should get rid of the CHIPS Act."[12]

58.    On March 28, 2025, Skadden, Intel's legal adviser on the contract challenged in this action, entered into an agreement with the DOC to provide $100 million of *pro bono* legal services to the DOC—an agreement that later came under Congressional scrutiny.

59.    On March 31, 2025, President Trump issued an Executive Order establishing the United States Investment Accelerator (the "USIA") within the DOC to be responsible for the CHIPS Program Office (the "CPO") and to focus on "negotiating much better deals [regarding the CHIPS Act] than those of the previous administration."[13]

---

[12]    President Donald J. Trump, Address to Joint Session of Congress, Mar. 4, 2025, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-joint-session-congress-2025-march-4-2025/.

[13]    Exec. Order No. 14255, 90 Fed. Reg. 14701 (March 30, 2025).

60.    Following the establishment of the USIA, Bloomberg reported that Secretary Lutnick "has signaled that he could withhold promised CHIPS Act grants." **Exhibit B**.[14]

61.    In response to actions and statements by the Trump Administration, Intel disclosed in its Current Report on Form 10-Q for the quarter ended March 29, 2025 (the "1Q25 10-Q") that "recent U.S. government actions create uncertainty regarding the timing of the US government fulfilling its obligations under our CHIPS Act agreements."[15]

## G.    Lip-Bu Tan Is Named CEO

62.    Tan served on the Board from September 2022 until his abrupt resignation on August 19, 2024.  Contemporaneous news reports indicated that Tan had resigned in frustration over Intel's bloated workforce and layers of bureaucracy.[16]

---

[14]    Mackenzie Hawkins and Ian King, *US Chip Grants in Limbo as Lutnick Pushes Bigger Investments*, Bloomberg, Mar. 31, 2025.

[15]    https://www.sec.gov/ix?doc=/Archives/edgar/data/50863/000005086325000074/intc-20250329.htm.

[16]    https://www.reuters.com/technology/intel-board-member-quit-after-differences-over-chipmakers-revival-plan-2024-08-27/.

63.    In March 2025, Tan was appointed as CEO and returned to the Board to guide Intel through a turnaround after it reported a $19 billion loss in 2024.

64.    On July 24, 2025, Tan announced a three-pillar turnaround plan that included Intel being "deeply committed to investing in the U.S." for its foundry business while also "slowing construction in Ohio to ensure our spending is aligned with demand[.]"[17]

## H.    President Trump Calls for Tan's Immediate Resignation, Then Changes His Tune

65.    On August 5, 2025, Senator Tom Cotton sent a letter (the "Cotton Letter") (**Exhibit C**) to Frank Yeary, chairman of the Board, expressing concern about "the security and integrity of Intel's operations and its potential impact on U.S. National Security."  Specifically, Senator Cotton questioned Intel's ability to fulfill certain security regulations in connection with the $7.8 billion grant Intel had received pursuant to the CHIPS Act, in light of CEO Tan's (i) alleged "control" of "dozens of Chinese companies" and Tan's "stakes" in "hundreds of Chinese advanced-manufacturing and chip firms," eight of which "reportedly have ties to the Chinese People's Liberation Army" and (ii) Tan's prior tenure as CEO of Cadence, which had recently "pled guilty to illegally selling its products to a Chinese military university and transferring its technology to an associated Chinese semiconductor

---

[17]    https://newsroom.intel.com/corporate/lip-bu-tan-steps-in-the-right-direction.

19

company without obtaining licenses."

66.    On August 7, 2025, the day after the public release of the Cotton Letter, President Trump called for Tan's resignation, posting on social media:



Donald J. Trump ✓
@realDonaldTrump

The CEO of INTEL is highly CONFLICTED and must resign, immediately. There is no other solution to this problem. Thank you for your attention to this problem!

**6.95k** ReTruths  **29.6k** Likes                    Aug 07, 2025, 7:39 AM  [18]

67.    Like other CEOs (as well as heads of state) before him, Tan made a hurried pilgrimage to Washington in hopes of soothing the President's very public ire.

68.    On August 11, 2025, Tan visited the White House and met with the President, Secretary Lutnick and the Secretary of the Treasury.

69.    After the meeting, President Trump posted:

---

[18].    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 7, 2025), https://truthsocial.com/@realDonaldTrump/posts/114987288040725570.



**Donald J. Trump** ✔ ⬛
@realDonaldTrump

I met with Mr. Lip-Bu Tan, of Intel, along with Secretary of Commerce, Howard Lutnick, and Secretary of the Treasury, Scott Bessent. The meeting was a very interesting one. His success and rise is an amazing story. Mr. Tan and my Cabinet members are going to spend time together, and bring suggestions to me during the next week. Thank you for your attention to this matter!

**5.37k** ReTruths  **28.4k** Likes          Aug 11, 2025, 4:57 PM  [19]

## I.    Questions Surround the August 11 Meeting and the August 14 Board Meeting

70.    The Board met on August 14, 2025, joined by Skadden, ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████" **Exhibit D** INTEL_000001-6 at INTEL_000001.

71.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ *Id.*

---

[19]    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 11, 2025), https://truthsocial.com/@realDonaldTrump/115012131343690532.

72.



.[20]

73.    President Trump's later characterizations of the August 11 meeting

.

74.    The Wall Street Journal reported President Trump as later saying, with regard to the August 11 White House meeting:

_____

[20]



22

He came in, he saw me, we talked for a while. I liked him a lot, I thought he was very good. Trump said of Tan from the Oval Office. "I said, 'You know what? I think the United States should be given 10% of Intel.' And he said, 'I would consider that.'"[21]

75. In a similar vein, Reuters reported President Trump as later saying: "He [Tan] walked in wanting to keep his job and he ended up giving us $10 billion for the United States. So we picked up $10 billion."[22]

76. The totality of President Trump's comments indicates that the "deal" was finalized between the President and Tan at the August 11 White House meeting, ███████████████████████████████████████ ██████████████  Thus, by all appearances, the "deal" was done during Tan's meeting with the President, and the Board's subsequent actions in approving the unlawful contract challenged in this action was mere window dressing and did not involve any actual informed business judgment by the Board.

---

[21]   Robbie Whelan, Amrith Ramkumar, Lauren Thomas and Josh Dawsey, *Inside Intel's Tricky Dance with Trump*, THE WALL STREET JOURNAL, Aug. 24, 2025, https://www.wsj.com/tech/inside-intels-tricky-dance-with-trump-c03f729c?gaa_at=eafs&gaa_n=AWEtsqeqNRhsEaVUp4WhM2Zz1sDLoShaExwp0duxoMusVF-MrcsM4NDZufYMa5H4YkI%3D&gaa_ts=696d1fb1&gaa_sig=F0DMUletKtkorhepmuXCoYfJI3Yii8aI9dD-Vq-mpkEFV_ZQfYO1dFkHcsS0H1PkVYvr3KidtoOEaGPqDc0IvQ%3D%3D.

[22]   Aditya Soni, David Shepardson, Andrea Shalal and Max A. Cherney, *US to take 10% equity stake in Intel, in Trump's latest corporate move*, REUTERS, Aug. 22, 2025,   https://www.reuters.com/business/us-take-10-equity-stake-intel-trumps-latest-corporate-move-2025-08-22/.

77.

" *Id.*

78.

## J.    The August 20 Board Meeting

79.    On August 20, 2025, the Board met again, with Skadden in attendance,

*See* Ex. E.

80.

24

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]. *See* Ex. E.

81.    This whirlwind series of events is summarized in a page from materials prepared for the August 20 Board meeting:

[REDACTED]

Ex. E at INTEL_000012.

82.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

25



Ex. E at INTEL_000019.[23]

83.    The August 20 minutes reflect that ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████.

## K.    The August 22 Board Meeting: A Rush to Announce the Stock Agreement

84.    The Board met for a third and final time to discuss the Administration's demands on August 22, 2025.  **Exhibit F** INTEL_000020-32.  Skadden also attended the meeting.

85.    The same day the Board met, Intel announced that it had entered into the unlawful contract with the DOC ("the Stock Agreement") (**Exhibit G**), which

23

Intel touted as a "historic agreement."[24]  Secretary Lutnick remarked that "Intel is excited to welcome the United States of America as a shareholder[.]"[25]

86.    Pursuant to the Stock Agreement, Intel agreed to issue the DOC 9.9% of the shares of Intel common stock, along with a Warrant, exercisable only if, prior to August 25, 2030, Intel ceased to own at least a 51% direct or indirect interest in its foundry business, to purchase an additional 4.9% of the Intel common stock at $20 a share.  Ex. G at 1.

87.    Notably, ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████.  *See* Exs. D-F.

88.    President Trump announced the Stock Agreement in his own words, boasting that there was "ZERO" consideration given by the U.S. government for $11 billion in Intel Common Stock.

---

[24]    https://newsroom.intel.com/corporate/intel-and-trump-administration-reach-historic-agreement.

[25]    *Id.* (emphasis added).

27



I PAID ZERO FOR INTEL, IT IS WORTH APPROXIMATELY 11 BILLION DOLLARS. All goes to the USA. Why are "stupid" people unhappy with that? I will make deals like that for our Country all day long. I will also help those companies that make such lucrative deals with the United States States. I love seeing their stock price go up, making the USA RICHER, AND RICHER. More jobs for America!!! Who would not want to make deals like that?

[26]

## L.  Flaws in The Stock Agreement.

### i.  *The Issuance of the Common Stock and the Warrant Are Without a Basis in the Law*

89.    Under the CHIPS Act, Congress created a multi-billion-dollar fund to be used by the DOC to provide financial assistance in the form of grants and loan guarantees to enable companies such as Intel to produce semiconductors. The funds are to be used "to incentivize investment in facilities and equipment in the United States for the fabrication, assembly, testing, advanced packaging, production, or

---

[26]    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 25, 2025), https://truthsocial.com/@realDonaldTrump/115089582863713336.

research and development of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment."[27]

90.    The CHIPS Act does not authorize or direct the DOC to demand, let alone take, an equity stake in a private company such as Intel in connection with any financial assistance provided to that company by the DOC.  Nor is there any provision in any other law that authorizes the President, the DOC, or any other person or agency to acquire stock in a public traded company such as Intel in these circumstances.

91.    In a country based on private enterprise, only Congress may authorize the President or a federal agency to become a partial owner of a publicly traded company, and Congress has not done that in the CHIPS Act or any other law. Accordingly, the provisions of the Stock Agreement providing for Intel to grant the DOC 9.9% of its common stock, and for the issuance of a Warrant for an additional 4.9% of Intel's common stock, are without a legal basis and hence are void.

92.    The Stock Agreement describes and provides for the purported exchange of (i) the acceleration of the remaining $5.695 billion of the DFA Award and disbursements of $3.174 billion pursuant to the Secure Enclave Award—in other words, money that Intel either had already earned or had a right to receive—for (ii) 433,323,000 shares of Intel common stock, representing 9.9% of the outstanding

---

[27]    15 U.S.C. § 4653(a)(1).

29

shares as of June 28, 2025, along with a warrant to purchase up to 240,516,150 shares of Intel's common stock, or 4.9% of the outstanding shares on a pro forma basis as of June 28, 2025 (the "Warrant"). Ex. G at 1.

93.    Section 1.1(b) of the Stock Agreement provides that the DOC "agrees that to the maximum extent permissible under applicable Law, Intel's obligations pursuant to the DFA shall be considered discharged (other than with respect to Secure Enclave)." Ex. G. Because Intel had already satisfied the DFA with respect to a substantial portion of the funds subject to the DFA, this provision provided no meaningful consideration for the issuance to DOC of Intel's common stock and the Warrant.

94.    Section 1.1(b) of the Stock Agreement also provides that "[t]he US Government shall also make the disbursements in respect of, and on the terms and conditions of, Secure Enclave[.]" Ex. G. The U.S. government had already agreed to make "the disbursements in respect of, and on the terms and conditions of, Secure Enclave" when the Secure Enclave Award was announced in September 2024, and therefore this provision provided no meaningful consideration for the issuance to DOC of Intel's common stock and the Warrant.

95.    DOC's agreement to do what it had already agreed to do— to pay Intel money it was already owed or had a right to receive—was not meaningful consideration for the transferring of 9.9% of Intel's common stock and the additional

30

shares under the Warrant—a point recognized by President Trump himself" "I PAID ZERO FOR INTEL[.]"[28]

96.     Even if Intel had received consideration for its stock and the Warrant, the transaction would not be lawful because neither the CHIPS Act or any other law authorizes the U.S. government, including the DOC, to obtain stock or warrants in a publicly traded company.  Moreover, ██████████████████████ ██████ the Board had no basis to believe the Stock Agreement was lawful.

97.     When it announced the Stock Agreement, Intel acknowledged the questionable legality of the transaction by disclosing that the "the legislative, judicial or executive branches of the U.S. government could determine in the future that all or a portion of the transactions were unauthorized, void or voidable.  …  Further, while the DOC is contractually bound under the Purchase Agreement, no other agency or branch of the US Government has made commitments to support, refrain from challenging or otherwise impeding the transaction."[29]

### ii.     The Voting Agreement Undermines the Board's Objectivity

98.     Pursuant to Section 4.6 of the Stock Agreement, the DOC agreed to vote the DOC shares, as well as any shares of Intel common stock issued as a result

---

[28]    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 25, 2025), https://truthsocial.com/@realDonaldTrump/115089582863713336.

[29]    https://www.sec.gov/Archives/edgar/data/50863/000005086325000129/intc-20250822.htm.

of the exercise of the Warrant "(x) in favor of each nomination and proposal recommended by the Board of Directors and (y) against any other nomination or proposal not recommended by the Board of Directors," at any meeting of Intel's stockholders, subject to limited exceptions (the "Voting Agreement"). Ex. G.

99.    Both the August 20 minutes and August 22 minutes . This benefit to the Board members created a further conflict of interest in their decision on whether to approve the Stock Agreement and provided the Board with a non-ratable benefit in return.

### iii.    Intel's Conflicted Legal Advisor.

100.    The Company was advised on the Stock Agreement by Skadden, which suffered a conflict of interest which was also not discussed by the Board in its decision-making to approve the Stock Agreement.

101.    Skadden had previously agreed to contribute $100 million towards *pro bono* initiatives backed by the U.S. government, including for legal services to the DOC and other federal agencies.

102. Skadden's agreement with the government—and the President, in particular—is the subject of multiple investigations by Congressional committees to determine the specific details of that agreement and whether it comports with existing law, as well as Skadden's ethical obligations.

103. On April 6, 2025, Senators Richard Blumenthal and Representative Jamie Raskin, of the Senate Permanent Subcommittee on Investigations and the House Judiciary Committee, respectively, sent Skadden a letter seeking information and records about "an agreement whereby [Skadden] committed to providing $100 million in pro bono legal services to causes the President supports and acceded to the President's demands as to [Skadden's] selection of clients and the employees it chooses to hire, promote, and retain."[30]

104. On September 24, 2025, Senator Blumenthal, joined by Senator Adam D. Schiff, and Representative Raskin sent another letter to Skadden stating that Skadden's response to the April 6, 2025 letter "failed to provide any of the requested records or information" preventing Congress from investigating "why [Skadden] promised $100 million in pro bono legal services to causes hand-picked by President Trump[.]"[31]

---

[30]    https://www.hsgac.senate.gov/wp-content/uploads/2025-4-6-Blumenthal-Raskin-Letter-to-Skadden.pdf.

[31]    https://www.hsgac.senate.gov/wp-content/uploads/2025-9-24-Letter-from-Sen.-Blumenthal-Congressman-Raskin-Sen.-Schiff-to-Skadden.pdf.

105.    The Congressmen questioned whether adequate disclosures of these conflicts have been provided to Skadden's clients and requested further information from Skadden, including, *inter alia*, "a detailed description of the scope and duration of Skadden's work for the Commerce Department and an explanation of "whether Skadden notified clients adverse to the Administration of Skadden's work for the U.S. Government."[32]

106.    The allegations set out in these Congressional inquiries further raised Plaintiff's concerns about Skadden's conflicts of interest and the overall fairness of the Stock Agreement.

107.    In sum, Intel was being advised in a transaction with the DOC by a law firm that simultaneously represented the DOC as a result of a similar shakedown by the Administration. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████. *Id.*

## M.    The Board's Flawed and Tainted Process.

108.    The process by which the Board approved the execution of the Stock Agreement was flawed and tainted.

---

[32]    *Id.*

34

### i.    *The Board Failed to Inform Themselves of All Material Information Regarding the Stock Agreement.*

109.

" *See*

*generally* Exs. D-F.

110.

111.

:    the

Board's process was not merely flawed, it was entirely lacking in any business

35

judgment and was tainted by the following personal considerations of the Board members.

### ii. The Board's Decision Was Tainted by Personal Considerations.

112. Measuring reputational damage is not an exact science, but precision is not needed to realize that President Trump's August 7, 2025 post declaring that Tan was "highly CONFLICTED" and "must resign immediately" caused grievous injury to Tan's reputation, as well as the anxiety and discomfort attendant to being in the President's crosshairs. That demand followed on the heels of the Cotton Letter, which called out Tan's tenure as Intel CEO as a risk to national security.

113. It would be impossible for any member of the Board to avoid questioning whether, if the Board rejected the DOC's demand, President Trump would publicly attack them as well, ███████████████████████████ ███████████████████████████████████████ ████████████████████████████. The President's post was, therefore, as much of a threat to the other members of the Board as it was to Tan.

114. Given President Trump's *modus operandi*, it would be understandable if the members of the Board feared that rejecting the DOC's demand would materially and adversely affect their personal interests (including, but not limited to, their interests in protecting their personal reputations, being free from attacks by President Trump and his supporters on social media and elsewhere, preserving

36

business and social ties, and not jeopardizing possible future business, financial and other opportunities). Those understandable fears tainted and undermined the Board's decision-making process in approving the Stock Agreement.

**N.        Demand on the Board Would be Futile.**

115.    Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

116.    Plaintiff has not made a demand on Intel's current Board to institute this action against the Defendants. Any such demand would be a futile because a majority of the Board (a) approved the Stock Agreement at a series of meetings in August 2025 and there is no basis to conclude that they would change their minds, particularly since the Company's response to the Demand stated that the Stock Agreement was in the best interests of Intel; (b) were cowed by the Administration's threats and could not independently determine whether to approve the transaction; (c) acted without adequate information or basis to approve the transfer of 9.9% of Intel's equity to the U.S. government for no meaningful consideration, in a transaction which they had no good faith basis to believe was lawful; (d) received a material, non-ratable personal benefit from the transaction in the form of the Voting Agreement; and (e) face a substantial likelihood of personal liability for their actions.

37

**O.    Plaintiff's Demand to Inspect Intel's Books and Records.**

117.    On November 20, 2025, Paisner made a demand under Section 220 to inspect Intel's books and records related to the Stock Agreement.  **Exhibit H**.

118.    On December 15, 2025, the Company issued a response to the Demand and refused to produce the requested books and records.  **Exhibit I**.

119.    Subsequent correspondence amongst counsel for the parties led to an agreement by the Company to produce certain Board materials relating to the Stock Agreement.

120.    On December 23, 2025, Plaintiff executed the Company's confidentiality agreements and received a limited number of Board meeting minutes and director questionnaires.

121.    To date, despite follow up from Plaintiff, Intel has refused to produce any additional books and records that are substantively responsive to the Demand.

## COUNT I
**(Derivative Breach of Fiduciary Duty Claim Against the Director Defendants)**

122.    Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

123.    The Director Defendants owed and owe Intel fiduciary duties.  By reason of their fiduciary relationships, the Director Defendants must exercise care, loyalty and good faith in the management and administration of Intel's business and affairs.

38

124.   The Director Defendants violated and breached their fiduciary duties of care, loyalty and good faith by failing to analyze and be fully informed about the legal basis for President Trump's demands for an equity interest in the Company in exchange for release of previously awarded grant funding, or to consider any alternatives to caving into the Administration's demands.

125.   The Director Defendants violated and breached their fiduciary duties of care, loyalty and good faith by putting their own interests ahead of the long-term interests of the Company by negotiating for the Voting Agreement which guaranteed that the DOC would vote in favor of all nominations and proposals presented and supported by the Board and would vote against any nominations or proposals not presented or supported by the Board, which was a non-ratable benefit personal to the Director Defendants.   The Director Defendants also failed to consider any alternatives to the Voting Agreement.

126.   As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Intel has sustained and will continue to sustain significant risks and damages from the Stock Agreement.

127.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company for their breaches of fiduciary duties.

128.   Plaintiff, on behalf of Intel, has no adequate remedy at law.

39

## COUNT II
### (Derivative Waste Claim Against the Director Defendants)

129.   Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

130.   As detailed above, the Director Defendants improperly entered the Stock Agreement because any benefits received by Intel cannot reasonably be viewed as meaningful consideration for the transactions contemplated thereby.

131.   The Director Defendants wasted Intel's corporate assets by knowingly authorizing or permitting the Company to issue billions of dollars' worth of Intel stock to the DOC, to which the DOC had no legal right to demand or obtain, in exchange for federal funding that it had already been awarded to Intel, had already been earned by Intel or for which Intel had a contractual right to receive under the DFA and Secure Enclave.

132.   The Director Defendants wasted Intel's corporate assets by failing to review and analyze any potential alternatives to the Stock Agreement, including but not limited to, refusing the Administration's demands, seeking alternative financing, and considering potential legal claims under the DFA and Secure Enclave.

133.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

40

## COUNT III
### (Derivative Claim to Invalidate Stock Agreement Against All Defendants)

134.   Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

135.   The CHIPS Act does not authorize or direct the DOC to demand, let alone take, an equity stake in a publicly traded company such as Intel in connection with any financial assistance provided to that company by the DOC.  Nor is there any provision in any other law that authorizes the President, the DOC, or any other federal officer or agency to acquire stock in a publicly traded company such as Intel in these circumstances.

136.   Only Congress may authorize the President or a federal agency to become a partial owner of a publicly traded company, and Congress has not done that in the CHIPS Act or any other law.

137.   As such, the Secretary and the DOC knew or should have known that the Stock Agreement was an unlawful agreement.

138.   The unlawful Stock Agreement conferred an inequitable benefit on the DOC which it cannot retain.

139.   Director Defendants knew or should have known that the Stock Agreement was an unlawful contract as evidenced by the lack of legal opinion certifying the Stock Agreement.  Accordingly, the Board could not represent to stockholders that the Stock Agreement was lawful, but instead chose only to disclose

41

risks that the Stock Agreement could ultimately be found to be void, voidable or unenforceable.

140. The Stock Agreement is therefore without a legal basis and is void.

## COUNT IV
### (Direct Claim Against Director Defendants)

141. Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

142. The Director Defendants breached their fiduciary duties to Plaintiff by entering into the Voting Agreement which diluted the voting rights of all stockholders and conferred those voting rights upon the Director Defendants.

143. Plaintiff has been harmed through the Voting Agreement's dilution of his voting rights.

144. Plaintiff is entitled to damages for the Director Defendants' breaches of fiduciary duty.

WHEREFORE, Plaintiff respectfully prays for the following relief:

A. An order finding that the Director Defendants have breached their fiduciary duties to Intel in approving the Stock Agreement;

B. A declaration that the Stock Agreement is void due to its illegality, unenforceability and/or the Director Defendants' breaches of fiduciary duties;

42

C.      A declaration that the DOC had no legal right to demand or accept Intel stock and that Intel's Board had a legal obligation not to offer its stock or a warrant for its stock to the DOC or any other agency of the U.S. government;

D.      An order finding that the Director Defendants committed waste by approving the Stock Agreement;

E.      An order cancelling all of Company shares of common stock and the Warrant issued to the DOC pursuant to the Stock Agreement;

F.      An order releasing to the Company the escrowed stock that is being held for future distribution to the DOC in connection with the Warrant authorized in the Stock Agreement;

G.      An order awarding damages in an amount to be proved at trial;

H.      An order awarding Plaintiff his costs and expenses, including reasonable attorneys' fees, incurred in the prosecution of this action; and

I.      An order granting Plaintiff such other relief as this Court deems just and appropriate.

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

/s/ Kurt M. Heyman
Kurt M. Heyman (# 3054)
Gillian L. Andrews (# 5719)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
(302) 472-7300
anelson@hegh.law
gandrews@hegh.law
Attorneys for Plaintiff Richard D. Paisner

OF COUNSEL:

GW LAW
Alan B. Morrison
2000 H Street NW
Washington D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

Dated:  March 5, 2026

44

EFiled:  Mar 05 2026 09:54AM EST
Transaction ID 78608572
Case No. 2026-0307-

# EXHIBIT B

## TO VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Title:**
US Chip Grants in Limbo as Lutnick Pushes Bigger Investments.
**Authors:**
Hawkins, Mackenzie (AUTHOR)
King, Ian (AUTHOR)
**Source:**
Bloomberg.com. 4/1/2025, pN.PAG-N.PAG. 1p.
**Document Type:**
Article
**Subject Terms:**
*Semiconductor manufacturing
*Federal aid
*Federal legislation
*Capital allocation
*High technology industries
Bipartisanship
**Geographic Terms:**
United States
**Company/Entity:**
United States. Dept. of Commerce
**NAICS/Industry Codes:**
334413 Semiconductor and Related Device Manufacturing
**Abstract:**
The article discusses how Commerce Secretary Howard Lutnick is pushing companies to expand their US projects in order to receive federal semiconductor subsidies. Lutnick aims to generate additional semiconductor investment commitments without increasing federal grants, potentially withholding promised Chips Act grants. The bipartisan law set aside $52 billion to revitalize the American semiconductor industry, with major companies like TSMC, Intel, and Micron slated to receive over $1 billion in grants. President Trump and Lutnick have differing views on the Chips Act, with Trump advocating for tariffs as a better incentive for companies to build factories in the US. [Extracted from the article]

*Copyright of Bloomberg.com is the property of Bloomberg, L.P. and its content may not be copied or emailed to multiple sites without the copyright holder's express written permission. Additionally, content may not be used with any artificial intelligence tools or machine learning technologies. However, users may print, download, or email articles for individual use. This abstract may be abridged. No warranty is given about the accuracy of the copy. Users should refer to the original published version of the material for the full abstract. (Copyright applies to all Abstracts.)*
**Full Text Word Count:**
1333
**Accession Number:**
184177427

# US Chip Grants in Limbo as Lutnick Pushes Bigger Investments

(Bloomberg) -- Commerce Secretary Howard Lutnick has signaled he could withhold promised Chips Act grants as he pushes companies in line for federal semiconductor subsidies to substantially expand their US projects, according to eight people familiar with the matter.

The Commerce chief wants firms that won awards from the 2022 Chips and Science Act to follow in the footsteps of Taiwan Semiconductor Manufacturing Co., which recently announced it will invest another $100

billion in US plants on top of a previous $65 billion pledge, the people said. Lutnick's goal is to generate tens of billions of dollars in additional semiconductor investment commitments without increasing the size of federal grants, said the people, who asked not to be named discussing private conversations.

As he negotiates, Lutnick's team has suggested that he could scrap disbursement of subsidies that have already been agreed upon, according to some of the people. At the same time, Lutnick has expressed interest in expanding a separate 25% tax credit from the Chips Act, some of the people said. That's worth more to most companies than the direct funding awards. Major changes to the tax credit would require an act of Congress.

The Commerce Department didn't respond to requests for comment.

Listen to the Here's Why podcast on Apple, Spotify or anywhere you listen

Lutnick has previously said that he intends to review Chips Act awards in order to get what he calls the "benefit of the bargain." President Donald Trump — who has called on Congress to repeal the law — on Monday signed an executive order focused in part on "negotiating much better Chips Act deals than the previous administration."

The directive established a new office within Commerce to encourage companies to make large investments in the US. The United States Investment Accelerator will facilitate projects of more than $1 billion and also administer semiconductor subsidies, the White House said.

"This rebrand gives the president a permission structure to support the underlying policy despite previously attacking the Chips Act," said Jim Secreto, who served as deputy chief of staff to former President Joe Biden's commerce secretary.

The bipartisan law set aside $52 billion to revitalize the American semiconductor industry after decades of production shifting to Asia. The majority of that is for direct funding awards to companies, which are designed as reimbursements for private expenditures and are supposed to be doled out over time as projects hit negotiated milestones.

Many companies haven't hit any new benchmarks since Trump took office, meaning they haven't yet expected to receive any money under the new administration. But there are signs that Lutnick's team is slow-walking the eventual disbursement of that funding as he reviews award agreements.

In one case, a small manufacturer that signed a binding Chips Act agreement was wrapping up discussions around payment timing before Trump took office, some of the people said. Those talks are now delayed, and it's unclear when the money might come.

There's also a host of firms that reached preliminary agreements under Biden but didn't sign final accords, and are now unsure about when — or whether — they'll receive funding. One of them, North Carolina-based Wolfspeed Inc., said last week that its $750 million deal is likely to evolve, but did not provide more specifics, according to the Triangle Business Journal.

Wolfspeed shares fell as much as 9.8% after markets opened in New York on Tuesday. The struggling US chipmaker Intel Corp. was down as much as 2.6%.

TSMC, meanwhile, hit a milestone in late February that corresponds to a $750 million disbursement from its larger Chips Act award, people familiar with the matter said. The status of that payment, which was originally expected in early March, is unclear. A TSMC spokesperson declined to comment on whether the company has received the money.

Federal spending data shows that Commerce Department expenditures had been relatively flat since Trump took office, until a roughly $770 million outlay late last week.

Biden's team doled out around $4.3 billion in Chips Act funds and announced several dozen preliminary and final awards before leaving office, in a blitz of deals that the previous administration hoped would limit

Case 1:26-cv-00414-RGA    Document 1-1    Filed 04/10/26    Page 49 of 92 PageID #: 55

disruptions to the program once Trump took over.

Major beneficiaries include TSMC, Intel, Micron Technology Inc., Samsung Electronics Co., GlobalFoundries Inc. and Texas Instruments Inc., all of which are slated to receive more than $1 billion in grants. Together, those companies account for the lion's share of more than $400 billion in pledged private-sector investments that the Chips Act has spurred.

But Trump, who argues tariffs are a better incentive for companies to build factories on American soil, wants Congress to scrap the initiative — an unlikely prospect given strong bipartisan support for the program on Capitol Hill.

Trump and Lutnick both credited the threat of tariffs on foreign-made chips with TSMC's decision to expand from three to six plants in Arizona, plus other investments in chip packaging and research. TSMC, though, has said its latest investment is based on US market demand.

Trump is poised to unveil tariffs targeting other countries on April 2, and he's teased duties on chips "down the road." Whether companies respond to those threats by announcing more investments is an open question.

Samsung last year downsized its planned Texas investment, which led to a smaller Chips Act grant than originally anticipated. The company's semiconductor division has struggled in recent months as it loses ground to rivals. Samsung representatives declined to comment.

Micron, meanwhile, originally planned as many as four facilities in New York, but last year began slow-walking plans for the third plant as it talked with Japanese officials about standing up a similar facility there. Micron has publicly committed to the first two New York facilities plus another plant in Idaho, all of which are covered by its Chips Act award. Micron declined to comment.

Thomas Caulfield — the executive chairman at GlobalFoundries, where he previously served as chief executive officer — has said that tariffs, combined with Chips Act grants and a 25% investment tax credit also offered from the program, could "create the dynamics to make the demand want to come home."

In almost all cases, Chips Act grants are the lesser of the subsidies companies will receive. The much bigger chunk of money comes from the 25% tax credits, which also aren't contingent on environmental or labor conditions that Republicans have long argued should not be part of the grant application process.

Lutnick has indicated he's open to expanding the tax credit, people familiar with the matter said, but he has yet to offer specifics.

The current guidelines allow companies to claim the credit for projects — including chip and wafer production — that break ground by the end of 2026. A bipartisan group of lawmakers has introduced a bill that would extend the credits to semiconductor R&D in addition to manufacturing, and would also apply the credits to any projects that break ground by the end of 2036 — giving companies another decade to get started.

"The credit is essential," Peter Cleveland, a senior vice president at TSMC, said at an event last week. Developing the US semiconductor industry "depends on continued collaboration with this administration and future administrations," he said — "and the form that that collaboration should take, should be through extension of the credit in the code."

There is no legislative cap on the amount companies can claim, so the fiscal implications of any expansion are potentially quite significant. The Peterson Institute for International Economics estimated in June 2024 that the credit could cost around $85 billion in foregone revenue — more than three times the original projection of the Congressional Budget Office. That's a function of how much investment the law has spurred.

--With assistance from Yoolim Lee, Jane Lanhee Lee and Dina Bass.

(Updates with share moves in the 12th paragraph.)

©2025 Bloomberg L.P.

~~~~~~~~

By Mackenzie Hawkins and Ian King

Reported by Author; Author

©2026 EBSCO Industries, Inc. All rights reserved

EBSCO | 10 Estes Street | Ipswich, MA 01938

# EXHIBIT C

**TO VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

**TOM COTTON**
ARKANSAS

326 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
PHONE: (202) 224–2353

**United States Senate**

COMMITTEES
SELECT COMMITTEE ON INTELLIGENCE
CHAIRMAN
SENATE ARMED SERVICES COMMITTEE
JOINT ECONOMIC COMMITTEE
ENERGY AND NATURAL RESOURCES

August 5, 2025

Mr. Frank D. Yeary
Chairman of the Board of Directors
Intel Corporation
2200 Mission College Blvd
Santa Clara, CA 95054

Dear Mr. Yeary:

I write to express concern about the security and integrity of Intel's operations and its potential impact on U.S. national security. In March 2025, Intel appointed Lip-Bu Tan as its new CEO. Mr. Tan reportedly controls dozens of Chinese companies and has a stake in hundreds of Chinese advanced-manufacturing and chip firms. At least eight of these companies reportedly have ties to the Chinese People's Liberation Army.[1]

Mr. Tan was most recently the CEO of Cadence Design Systems, a company that makes electronic design automation (EDA) technology, which is a key enabler of advanced chip design. Last week, Cadence pleaded guilty to illegally selling its products to a Chinese military university and transferring its technology to an associated Chinese semiconductor company without obtaining licenses.[2] These illegal activities occurred under Mr. Tan's tenure.

Intel was awarded nearly $8 billion from the CHIPS and Science Act, the largest grant to a single company.[3] Intel is required to be a responsible steward of American taxpayer dollars and to comply with applicable security regulations. Mr. Tan's associations raise questions about Intel's ability to fulfill these obligations. In the interest of transparency and national security, I respectfully request a response to the following questions by August 15, 2025.

1. Was the Board aware of Cadence's subpoenas before hiring Mr. Tan as CEO? If so, what measures were taken to address concerns about Cadence's activities under Mr. Tan?
2. Did the Board require Mr. Tan to divest from his positions in semiconductor firms linked to the Chinese Communist Party or the People's Liberation Army and any other concerning entities in China that could pose a conflict of interest for Intel's CEO?
3. Given Intel's contract under the Secure Enclave program, has Mr. Tan disclosed any remaining investments, professional roles, or other ties to Chinese companies to the U.S. government?

Thank you for your attention to this matter. I look forward to your response.

Sincerely,

Tom Cotton
United States Senator

---

[1] https://www.reuters.com/technology/intel-ceo-invested-hundreds-chinese-companies-some-with-military-ties-2025-04-10/
[2] https://www.justice.gov/opa/pr/cadence-design-systems-agrees-plead-guilty-and-pay-over-140-million-unlawfully-exporting
[3] https://www.nist.gov/chips/chips-america-awards?sort_by=date&page=2

JONESBORO
300 SOUTH CHURCH, SUITE 338
JONESBORO, AR 72401
(870) 933–6223

ROGERS
3333 S. PINNACLE HILLS PKWY, SUITE 425
ROGERS, AR 72758
(479) 751–0879

LITTLE ROCK
1401 WEST CAPITOL AVENUE, SUITE 235
LITTLE ROCK, AR 72201
(501) 223–9081

EL DORADO
106 WEST MAIN STREET, SUITE 410
EL DORADO, AR 71730
(870) 864–8582

EFiled:  Mar 05 2026 09:54AM EST
Transaction ID 78608572
Case No. 2026-0307-

# EXHIBIT H

## TO VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT



222 DELAWARE AVENUE • SUITE 900 • WILMINGTON, DELAWARE 19801
TEL: (302) 472.7300 • WWW.HEGH.LAW

DD:   (302) 472-7307
Email:   gandrews@hegh.law

November 21, 2025

**VIA HAND-DELIVERY**
The Board of Directors
Intel Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801

**VIA EMAIL**
April Miller Boise, Executive VP,
Corporate Secretary, Chief Legal Officer
april.boise@intel.com

**VIA EMAIL**
Andrew Dupre, Esq.
AKERMAN LLP
222 Delaware Avenue, Suite 1710
Wilmington, DE 19801

**Re:      Demand for Inspection of Books and Records Pursuant to 8 *Del. C.* § 220**

To the Members of the Board of Directors of Intel Corporation:

We make this demand (the "Demand") to inspect books and records, pursuant to 8 *Del. C.* § 220 ("Section 220"), on behalf of our client, Richard D. Paisner (the "Stockholder"), a current stockholder of Intel Corporation ("Intel," or "the Company").   The Stockholder presently owns 500 shares of Intel common stock and has held such stock since December 5, 2022.   A true and correct copy of the Stockholder's open holdings statement demonstrating Stockholder's ownership of Intel stock is attached hereto as **Exhibit 1**.   Also enclosed as **Exhibit 2** is the verification on behalf of the Stockholder, confirming that the statements in this letter are true and correct to the best of Stockholder's knowledge, information, and belief.   A power of attorney duly executed by the Stockholder authorizing this firm to act on his behalf in connection with this demand is attached hereto as **Exhibit 3**.

I.      **FACTS GIVING RISE TO THE DEMAND**

The Stockholder became aware of the issues and facts described below and decided to make this Demand to inspect books and records pursuant to Section 220.   The Demand is related to potential breaches of fiduciary duties by the members of the Company's Board of Directors (the "Board") in connection with the events and circumstances described herein.



November 21, 2025
Page 2

### A.    The CHIPS Act and Intel's Direct Funding Agreement and Award.

On August 9, 2022, the Creating Helpful Incentives to Produce Semiconductors Act of 2022 (the "CHIPS Act") became law.  Among other things, the CHIPS Act was intended to encourage semiconductor research, development, manufacturing, and workforce development by providing more than $52 billion in incentives and federal support for the domestic semiconductor industry.   As evidenced by the name of the act, the CHIPS Act was enacted to provide "incentives" for firms to invest in semiconductor manufacturing, production and research and development.[1]

On March 20, 2024, Intel announced that it had signed a non-binding preliminary memorandum of understanding with the U.S. Department of Commerce (the "DOC") pursuant to which Intel would receive up to $8.5 billion in CHIPS Act Funding to advance Intel's commercial semiconductor projects in Arizona, New Mexico, Ohio and Oregon.  The DOC lauded this announcement, noting that the direct funding would "help[] to incentivize over $100 billion in investments from Intel – marking one of the largest investments ever in U.S. semiconductor manufacturing, which will create over 30,000 good paying jobs and ignite the next generation of innovation."[2]

On September 16, 2024, the U.S. Department of Defense (the "DOD") and the DOC jointly announced that Intel had been awarded "up to $3 billion in direct funding under the CHIPS and Science Act for a capability known as the 'Secure Enclave.'"[3]  The award (the "Secure Enclave Award Commitment") was to "support the manufacture of microelectronics and ensure access to a domestic supply chain of advanced semiconductors for national security."[4]

On November 25, 2024, Intel entered into a direct funding agreement (the "Direct Funding Agreement") with the DOC pursuant to which the DOC agreed to award Intel up to $7.8 billion in direct funding in consideration of work done to construct or modernize, as well as operate, microchip facilities in Arizona, Oregon, New Mexico and Ohio (the "DFA Award").   The Direct Funding Agreement specifically awarded Intel up to (i) $3,940,000,000 as direct funding for the

---

[1]    See 15 U.S.C. § 4652(a)(1) (DOC to establish a program to provide Federal financial assistance to firms "to incentivize investment in facilities and equipment in the United States for the fabrication, assembly, testing, advanced packaging, production, or research and development of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment.").

[2]    https://www.nist.gov/news-events/news/2024/03/biden-harris-administration-announces-preliminary-terms-intel-support.

[3]    https://www.war.gov/News/Releases/Release/Article/3906926/department-of-defense-department-of-commerce-joint-statement-announcement-in-su/.

[4]    It does not appear that any definitive documentation regarding the Secure Enclave Commitment has been made publicly available.



November 21, 2025
Page 3

Arizona Projects (as defined in the Direct Funding Agreement), (ii) $1,860,000,000 as direct funding for the Oregon Project (as defined in the Direct Funding Agreement), (iii) $500,000,000 in direct funding for the New Mexico Project (as defined in the Direct Funding Agreement), (iv) $1,500,000,000 in direct funding for the Ohio Project (as defined in the Direct Funding Agreement), and (v) $65,000,000 for workforce activities relating to the projects.  The Direct Funding Agreement sets forth detailed procedures for payment of the DFA Award.  That same day, an office of the DOC announced that Intel had been awarded up to $7.865 billion in direct funding to support the fabrication and advanced packaging of semiconductor chips at Intel's facilities in Arizona, New Mexico, Ohio and Oregon and that Intel's expansion plans for those facilities was estimated to support approximately 10,000 manufacturing jobs and 20,000 construction jobs in those states.[5]

On December 4, 2024, during a presentation made at the UBS Global Technology and AI Conference, the following exchange took place:

Timothy Michael Arcuri, UBS Investment Bank, Research Division – Managing Director and Head of Semiconductors & Semiconductor Equipment

And Dave, how much -- I get asked this question a lot with the new administration coming in.   There are some questions, maybe the CHIPS Act money probably doesn't get pull the grants, but there's some potential renegotiation of the milestones you have to hit to get that money.  And I know you have the SCIPs, but the CHIPS grants are a fairly big piece.   And of course, the credits are going to be not just as how do you spend the money, you get the credit.   *But the grant piece, is that a piece that you see as maybe at risk potentially?*

David A. Zinsner Intel, Corporation – Interim Co-CEO, Executive VP & CFO

*I don't think so.   I mean we signed an agreement.   It's an ironclad agreement.*   It lays out all the milestones.  And when the payments come, it's – we're already actually 1/3 of the way probably through the milestones, quite honestly.  So we should start -- as soon as we can get the payments processed, we'll start receiving them.   There's always potential for some

---

[5]     https://www.nist.gov/news-events/news/2024/11/biden-harris-administration-announces-chips-incentives-award-intel-advance.



November 21, 2025
Page 4

adjustment and thinking from the administration.   And if that's the case, we'll work with them.   (Emphasis added).[6]

As of January 31, 2025, the DOC had made total 19 awards for up to $30.7 billion in direct funding and $5.5 billion in loans for commercial semiconductor fabrication facilities to Intel and other companies operating semiconductor fabrication facilities, including Taiwan Semiconductor, Micron, Samsung, Texas Instruments, and GlobalFoundries, all of whom received direct funding in amounts ranging from $1.587 billion to $6.565 billion.[7]

In its Annual Report on Form 10-K for the year ended December 28, 2024, Intel made the below disclosures regarding the basis of the presentation in its financial statements:

> Government incentives, including cash grants and refundable tax credits, are recognized when there is reasonable assurance that the incentive will be received and we will comply with the conditions specified in the agreement or statutory requirements.   We record capital-related incentives as a reduction to property, plant, and equipment, net within our Consolidated Balance Sheets and recognize a reduction to depreciation expense over the useful life of the corresponding acquired asset.   We record operating-related incentives as a reduction to expense in the same line item on the Consolidated Statements of Operations as the expenditure for which the incentive is intended to compensate.[8]

**B.       The Stock Agreement.**

On July 24, 2025, Intel filed its Quarterly Report on Form 10-Q (the "2Q25 10-Q") for the quarter ended June 28, 2025, and disclosed that:

> In November 2024, we signed a Direct Funding Agreement with the US Department of Commerce for the award of $7.9 billion in government incentives pursuant to the CHIPS Act, from which we have received $2.2 billion of cash to date, $1.1 billion of which was received in Q1 2025.   We expect to continue to benefit from government incentives, though recent US government actions create uncertainty as to whether the US government

---

[6]     https://www.bamsec.com/transcripts/19a1895f-fc78-42ec-bb97-b2f9bf2d1102 (emphases added).

[7]     https://www.oversight.gov/sites/default/files/documents/reports/2025-06/OIG-25-021-I%20%28SECURED%29.pdf.

[8]     https://www.sec.gov/Archives/edgar/data/50863/000005086325000009/intc-20241228.htm.



November 21, 2025
Page 5

> will fulfill its obligation under our CHIPS Act agreements, and support future awards in the US. These government incentives typically require that we make significant capital investments in new facilities or expand existing facilities, and our related workforce, prior to submitting a claim for reimbursement. As of the end of Q2 2025, we have submitted claims for $850 million pursuant to our Direct Funding Agreement for which we have not received reimbursement.[9]

Absent from the 2Q25 10-Q is any disclosure that would indicate that Intel was not in compliance with the terms or anticipated that it would be unable to meet its obligations under the Direct Funding Agreement.

On August 18, 2025, Intel announced that it had entered into a securities purchase agreement with SoftBank Group Corp. ("SoftBank") pursuant to which SoftBank would purchase $2 billion of Intel's common stock at a purchase price of $23 per share. Intel stock closed trading on August 18, 2025, at $23.66 per share.

Despite having an "ironclad agreement" with the DOC, and despite there being no indication that it was in non-compliance with the Direct Funding Agreement, on August 22, 2025, Intel reported in a Form 8-K (the " August 2025 8-K") that it had entered into a Warrant and Common Stock Agreement (the "Stock Agreement") with the DOC that had the effect of modifying the terms of the Direct Funding Agreement.[10]

The Stock Agreement reflects that Intel requested that the DOC (i) accelerate disbursements of $5,695,000,00 (the "Accelerated Disbursements") previously awarded to Intel pursuant to the Direct Funding Agreement and (ii) make additional disbursements of $3,174,800,000 (the "Secure Enclave Disbursements" and, together with the Accelerated Disbursements, the "Disbursements") previously awarded to Intel pursuant to the Secure Enclave Award Commitment.[11]

---

[9]    https://www.sec.gov/Archives/edgar/data/50863/000005086325000109/intc-20250628.htm.

[10]    *See* https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000129/intc-20250822.htm.

[11]    Note that the Stock Agreement merely contemplates that the Secure Enclave Disbursements will be made "on the terms and conditions of" the Secure Enclave Commitment. While there is a vague reference to the DOC agreeing "to work with the Company to make appropriate amendments and modifications to the [Direct Funding Agreement] to release Intel from certain of its obligations," the Secure Enclave Commitment is not governed by the Direct Funding Agreement. In other words, as far as the Stock Agreement pertains to the Secure Enclave Commitment, the DOC has done nothing more than agree to fulfill its prior agreement.



November 21, 2025
Page 6

In addition, the Stock Agreement reflects that "as ***appropriate compensation*** to the Federal Government of the United States of America (the 'US Government') for, and as a condition to Commerce's willingness to permit, the Disbursements, Intel agreed to issue 433,323,000 shares (the "Newly Issued Shares") of its common stock, representing approximately 9.9% of outstanding shares on a pro-forma basis, along with a warrant (the "Warrant") to purchase up to 240,516,150 shares of Intel's common stock, or approximately 5.5% of all outstanding shares on a pro forma basis. The Warrant, at $20 per share, for an additional 5% of Intel's stock is only triggered if Intel no longer owns at least 51% of its manufacturing foundry business. Absent from the Stock Agreement is any representation, acknowledgment or allegation that Intel had failed to comply with the terms of the Direct Funding Agreement or the Secure Enclave Award Commitment or the existence of any facts or circumstances that would reasonably be expected to allow the DOC to withhold any amount of award made pursuant to the Direct Funding Agreement or the Secure Enclave Award Commitment.

In addition, pursuant to the Stock Agreement, Intel agreed to register, and has registered, for resale the Newly Issued Shares, the Warrant, and any shares of Intel common stock that may be issued upon exercise of the Warrant (together the "Registerable Securities"). The DOC may sell the Registerable Securities in broadly syndicated offerings beginning on the one-year anniversary of the closing of the stock and Warrant issuance contemplated by the Stock Agreement.

In its press release announcing the Stock Agreement, Intel announced that the DOC had agreed "to purchase 433.3 million primary shares of Intel common stock at a price of $20.47 per share," despite the fact that the only amounts to be received by Intel were amounts previously awarded to Intel pursuant to the Direct Funding Agreement and the Secure Enclave Award Commitment. Indeed, the Stock Agreement itself does not refer to the issuance of the Newly Issued Shares as part of any "purchase," nor is there any reference to a "price" for those shares.[12] Under the Stock Agreement, the DOC, a department of the US Government, was issued a 9.9% equity stake in the Company for around $8.86 billion in disbursements from grants the Company was ***previously awarded***, but not yet paid.

Intel did not sell to the DOC, and the DOC did not purchase from Intel, the Newly Issued Shares at a price of $20.47 per share. There is no indication that the price, which represents a discount of almost $4 from the closing share price of $24.80 on August 22, 2025, was determined in any way other than by dividing the Disbursements (i.e., amounts awarded (but not yet paid) to Intel pursuant to the Direct Funding Agreement and the Secure Enclave Award Commitment) by the number of shares of Intel's common stock that would represent a 9.9% ownership interest.

---

[12]    The 8-K also misleadingly defines the Stock Agreement as the "Purchase Agreement" despite that term not appearing anywhere in the title or the Agreement itself.



November 21, 2025
Page 7

In addition, Intel's later disclosures expose the characterization of the transactions contemplated by the Stock Agreement as the sale of 433.3 million shares of Intel common stock at a price of $20.47 as false and misleading.

Intel stock closed at $24.80 per share on August 22, 2025.

While the CHIPS Act contemplates that the DOC "may require a person or other entity to make payments to the Department of Commerce upon application and as a condition for receiving support through an award of assistance or other transaction,"[13] it does not contemplate requiring a person to make payments to the DOC *after* such person has received an award.   In addition, the CHIPS Act requires that any funds received from such a payment "be credited to and merged with the account from which support to the person or entity was made."[14]   The CHIPS Act does not permit the DOC to demand payment after an award is made, nor does it permit any allowable payment to be treated as a windfall for the DOC or the US Government.

To date, no other firm that has received awards pursuant to the CHIPS Act has been required to agree to issue the DOC an equity interest in return for receiving disbursements with respect to previously granted awards.

In addition, pursuant to the Stock Agreement, the DOC agreed to vote at any annual or special meeting of Intel's stockholders in favor of each nomination and proposal recommended by the Board, subject to limited exceptions regarding actions implicating the Stock Agreement and Intel's relationship with the US Government.   While making the DOC into Intel's largest stockholder, the Board also ensured that Intel's largest stockholder would vote as it recommended, including with respect to the election of directors, likely precluding the possibility of any successful proxy contest.   The voting agreement contained in the Stock Agreement is not limited by any set term of years.

## C.    Intel's Disclosures Regarding the Stock Agreement

As the Company admits and cautions in its August 2025 8-K, the Transaction carries significant risks to the Company and its stockholders[15]:

---

[13]    15 U.S.C. § 4659(a)(3).

[14]    15 U.S.C. § 4659(b).

[15]    *See*    https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000129/intc-20250822.htm.   The Stock Agreement refers to the DOC as the "US Government."   The below quotations from the August 2025 8-K retain that reference.



November 21, 2025
Page 8

- "The issuance of shares of common stock to the US Government at a discount to the current market price is dilutive to existing stockholders, and stockholders may suffer significant additional dilution if the conditions to the Warrant are triggered and the Warrant are [sic] exercised."

- "The transactions contemplated by the Purchase Agreement may result in the US Government becoming the Company's largest stockholder.   The US Government's interests in the Company may not be the same as those of other stockholders.   The Purchase Agreement requires the US Government to vote its shares of common stock as recommended by the Company's board of directors, subject to applicable law and exceptions to protect the US Government's interests.   This will reduce the voting influence of other stockholders with respect to the selection of directors of the Company and proposals voted on by stockholders.   The existence of a significant US Government equity interest in the Company, the voting of such shares either as directed by the Company's board of directors or the US Government, and the US Government's substantial additional powers with respect to the laws and regulations impacting the Company, may substantially limit the Company's ability to pursue potential future strategic transactions that may be beneficial to stockholders, including by potentially limiting the willingness of other third parties to engage in such potential strategic transactions with the Company."

- "Sales outside the US accounted for 76% of the Company's revenue for the fiscal year ended December 28, 2024.  Having the US Government as a significant stockholder of the Company could subject the Company to additional regulations, obligations or restrictions, such as foreign subsidy laws or otherwise, in other countries."

- "Given the scarcity of recent US precedents for transactions such as those contemplated by the Purchase Agreement and of the US Government becoming a significant stockholder of a company like the Company, it is difficult to foresee all the potential consequences.  Among other things, there could be adverse reactions, immediately or over time, from investors, employees, customers, suppliers, other business or commercial partners, foreign governments or competitors.  There may also be litigation related to the transaction or otherwise and increased public or political scrutiny with respect to the Company."[16]

---

[16]    https://www.intc.com/filings-reports/all-sec-filings/content/0000050863-25-000129/intc-20250822.htm.



The Company admits that ***it did not complete*** an "initial analysis of the financial, tax and accounting implications of the transaction[s]" and that "there could be adverse accounting or other impacts, including the recognition of additional costs or losses, that may materially impact the Company's reported financial results in future periods."[17]

A few days later on August 27, 2025:

- Intel and the DOC entered into an amendment to the Direct Funding Agreement that, among other things, removed the prior project milestone requirements and certain other conditions to disbursements under the Direct Funding Agreement;

- Intel received from the DOC the $5.7 billion of remaining potential Disbursements under the Direct Funding Agreement;

- Intel issued 275,000,000 shares of its common stock (the "Common Share Issuance") to the DOC;

- Intel issued the Warrant to the DOC; and

- Intel issued into escrow 159,000,0000 shares of its common stock (the "Escrowed Shares") for the benefit of the DOC to be released as the Company performs, invoices and receives disbursements from the US Government under the Secure Enclave Commitments.

### D.    Intel's Conflicted Legal Advisor.

The Company was advised in the August 2025 Stock Agreement by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), a law firm that had previously agreed to contribute $100 million towards pro-bono initiatives backed by the US Government.  That agreement is the subject of multiple investigations by Congressional committees to determine the specific details of that agreement and whether it comports with existing law as well as applicable ethical and legal obligations.

On April 6, 2025, Senators Richard Blumenthal and Representative Jamie Raskin, of the Senate Permanent Subcommittee on Investigations and the House Judiciary Committee, respectively, sent Skadden a letter seeking information and records about "an agreement whereby [Skadden] committed to providing $100 million in *pro bono* legal services to causes the President

---

[17]    *Id.*



November 21, 2025
Page 10

supports and acceded to the President's demands as to [Skadden's] *selection of clients* and the employees it chooses to hire, promote, and retain."[18]  The Congressmen noted that Skadden's agreement with the President was not reached because of any direct action against Skadden but from the "possibility that President Trump might levy similar sanctions against Skadden" which "was 'the first time a law firm has preemptively gone to the White House to negotiate with the administration.'" [19]   The agreement "raises the troubling prospect that the President has successfully and unlawfully coerced [Skadden] into spending $100 million in law firm resources to support his pet issues, making statements that support his agenda, and reversing law firm policies he disagrees with."[20]   The letter requested information, including the "circumstances surrounding your March 28, 2025 agreement with President Trump[;]" the specific terms of the deal, and any threatened executive orders that may have led to the negotiations and agreement.[21]

On April 28, 2025, Representatives Gerald Connolly and David Min of the House Committee on Oversight and Government Reform sent their own letter to Skadden requesting information to determine how the "agreement and the activities surrounding it might fall under existing law; how those activities might be treated under the ethical and legal obligations of the federal officials and other individuals involved in reaching and implementing the agreement."[22]

On September 24, 2025, Senator Blumenthal, joined by Senator Adam D. Schiff, and Representative Raskin sent another letter to Skadden stating that its response to the April 6, 2025 letter "failed to provide *any* of the requested records or information" preventing Congress from investigating "why [Skadden] promised $100 million in *pro bono* legal services to causes hand-picked by President Trump[.]"[23]   Of greater concern was the letter's reference to an August 13, 2025 New York Times article that reported that Skadden was also "connected with the U.S. Department of Commerce … in order to provide the Commerce Department with legal services pursuant to the deal."[24]   The Congressmen inquired how Skadden's free representation of DOC

---

[18]    https://www.hsgac.senate.gov/wp-content/uploads/2025-4-6-Blumenthal-Raskin-Letter-to-Skadden.pdf (emphasis added).

[19]    *Id.* (citations omitted).

[20]    *Id.*

[21]    *Id.*

[22]    https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/04.28.25-gec-to-law-firms.pdf.

[23]    https://www.hsgac.senate.gov/wp-content/uploads/2025-9-24-Letter-from-Sen.-Blumenthal-Congressman-Raskin-Sen.-Schiff-to-Skadden.pdf.

[24]    *Id.*



November 21, 2025
Page  11

comports with ethical rules, statutory laws and Skadden's own *pro bono* mission statement. "Equally troubling, these bargains with President Trump have created what appear to be ***glaring conflicts of interest***[,]" noting that providing the President "with free legal services, … may prove ***difficult for [Skadden] to also zealously represent a client, pro bono or otherwise, adverse to the Administration***."[25]   The Congressmen questioned whether adequate disclosures of these conflicts have been provided to Skadden's clients and requested further information from Skadden, including, *inter alia*, "a detailed description of the scope and duration of Skadden's work for the Commerce Department[]" and an explanation of "whether Skadden notified clients adverse to the Administration of Skadden's work for the U.S. Government."[26]   The allegations set out in these Congressional inquiries further raise Stockholder's concerns about Skadden's conflicts of interest and the overall fairness of the Stock Agreement.

### E.       Further Transactions.

On September 15, 2025, Intel entered into a Securities Purchase Agreement (the "NVIDIA Purchase Agreement") with NVIDIA Corporation "pursuant to which NVIDIA agreed to purchase 214,776,632 shares of [Intel's] common stock, … at $23.28 per share, representing an aggregate purchase price in cash of $5.0 billion."[27]   Unlike the Stock Agreement with DOC, the NDIVIA Purchase Agreement "does not provide for any governance or information rights [to NVIDIA] beyond those applicable to Intel shareholders generally."[28]   Intel stock closed at $24.77 per share on September 15, 2025.

On November 6, 2025, the Company filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2025 (the "3Q25 10-Q") and made further disclosures about the Stock Agreement.   It also alleged that certain consideration for the share issuances to the US Government, included amounts that had already been paid to the Company prior to August 22, 2025.[29]   Those disclosures lack sufficient information to determine whether that consideration is illusory, particularly in light of the President's August 25, 2025, post stating:   "I PAID ZERO

---

[25]     *Id.* (emphasis added).

[26]     *Id.*

[27]     https://www.sec.gov/ix?doc=/Archives/edgar/data/0000050863/000005086325000155/intc-20250915.htm.

[28]     *Id.*

[29]     https://www.sec.gov/Archives/edgar/data/50863/000005086325000179/intc-20250927.htm.



November 21, 2025
Page  12

FOR INTEL, ITS WORTH APPROXIMATELY 11 BILLION DOLLARS."[30]   For example, nothing is explained about why "removing prior project milestone requirements and other conditions to disbursement under" the Direct Funding Agreement were necessary for Intel to receive its funding under the DFA Award.   Nor does it explain how those requirements applied to the $2.3 billion of funding Intel had previously received.

In the 3Q25 10-Q, Intel provided the following explanation of its accounting for the issuance of the Newly Issued Shares and the Warrant:

> We accounted for the $5.7 billion of accelerated disbursements under the amended DFA as being attributable to our issuance of three freestanding instruments: the 275 million share Common Stock Issuance, the 159 million Escrowed Shares, and the Warrants to purchase 241 million shares.   We have concluded that the Common Stock Issuance and the issuance of the Warrants should be classified within permanent equity.   We classified the Escrowed Shares as a derivative liability, which was recorded at fair value at inception with subsequent changes in fair value recorded through interest and other, net within our Consolidated Condensed Statements of Operations until settlement.   Accordingly, we have allocated the $5.7 billion in cash proceeds received at the closing date to the Escrowed Shares at fair value of $3.9 billion, with the remaining proceeds allocated to the Common Stock Issuance and Warrants of $1.6 billion and $110 million, respectively, based on their relative fair values.   During the three months ended September 27, 2025, we recognized $1.7 billion related to the net change in fair value of the Escrowed Shares as of the settlement date for Escrowed Shares that were released during the period and as of the reporting date for Escrowed Shares that were not released.   At September 27, 2025, the fair value of the Escrowed Shares was $5.6 billion, which we have recognized within other accrued liabilities and other long-term liabilities.[31]

In other words, Intel only allocated $5.81 per share for the 275,000,000 shares of Intel common stock issued to the DOC on August 22, 2025.[32]

---

[30]    Donald J. Trump, Truth Social (Aug. 25, 2025, 9:14 AM), https://truthsocial.com/@real-DonaldTrump/posts/115089582863713336.

[31]    https://www.sec.gov/Archives/edgar/data/50863/000005086325000179/intc-20250927.htm.

[32]    The Company ascribed $1.6 billion to the issuance of 275 million shares which equates to a price of $5.81 per share.



November 21, 2025
Page 13

The Company acknowledged in the 3Q25 10-Q that the pre-August 22, 2025 funding "remained subject to our government grant accounting policy."[33]

However, the Company disclosed that the Stock Agreement "is complex and for which we voluntarily initiated an accounting consultation with the staff of the SEC[,]" which is currently pending. [34]    The Company acknowledged significant risks and "limited precedent for the accounting treatment of such transactions. While we believe we have selected the appropriate accounting approach for these transactions in our Consolidated Condensed Financial Statements in this Form 10-Q, there are other potential approaches that, if applied, would result in ***materially different financial results*** for our third quarter of 2025 and could also ***materially and adversely impact our results for future periods***."[35]   The Company disclosed risks of the Transaction in its 3Q25 10-Q, in addition to those enumerated in its prior August 22, 2025 8-K, including that:

- "The accelerated CHIPs Act funds we received from the U.S. government connected to the issuance of our equity securities to the U.S. government may be subject to risks from changes in laws, regulations, or their interpretations, as well as shifts in federal administration and congressional priorities."

- "The transactions eliminate our contractual rights to receive future funds under the commercial CHIPs Act agreement in the form of a grant and may limit our ability to secure grants from government entities in the future."

- "The transactions are dilutive to existing stockholders.'

- "The U.S. government's equity position in our common stock reduces the voting and other governance rights of our other stockholders and may limit potential future transactions that may be beneficial to our stockholders."

- "Our non-U.S. business may be adversely impacted by the U.S. government being a significant stockholder."

---

[33]    https://www.sec.gov/Archives/edgar/data/50863/000005086325000179/intc-20250927.htm (emphasis added).

[34]    *Id.*

[35]    *Id.* (emphasis added).



November 21, 2025
Page 14

- "We may experience other adverse consequences resulting from the announcement or completion of the transactions.'[36]

In the same 3Q25 10-Q, the Company noted that it has "ongoing authorization, originally approved by our Board of Directors in 2005 and subsequently amended, to repurchase shares of our common stock in open market or negotiated transactions.   No shares were repurchased during the quarter ending September 27, 2025. ***As of September 27, 2025, we were authorized to repurchase up to $110.0 billion, of which $7.2 billion remained available.***"[37]   The purpose for these repurchases has not been disclosed by the Company.   Nonetheless, stockholders are entitled to understand whether these repurchases were used to offset any dilution from the Stock Agreement.

### F.      The Stockholder's Legitimate Concerns Regarding the Stock Agreement.

Both the price and the process of the Stock Agreement appear to be unfair to the Company's minority public stockholders.   As noted above, the shares were granted: (1) at a discount; (2) for prior or already owed consideration; (3) without the benefit of an initial – let alone a robust – financial, accounting and tax analysis; (4) based on the advice of a potentially conflicted legal counsel; and (5) in exchange for giving the Intel board voting control over the sizeable interest held by the DOC.   The quick announcement, together with the lack of transparency on the Stock Agreement and significant risks, also suggests that the DOC pressured the Company to accept its offer and enter into the Stock Agreement quickly for a deal that, according to the President, "the United States ***paid nothing*** for[.]"[38]   Mr. Lip-Bu Tan, the CEO of Intel, had other potential conflicts while negotiating this deal as the President suggested that he "walked in wanting to keep his job, and he ended up ***giving us*** $10 billion for the United States."[39]   In fact, Mr. Tan faced significant pressure to resign from the President and US Senator Bernie Moreno of Ohio in the weeks leading up to the Transaction, purportedly stemming from Intel's progress (or perceived

---

[36]      *Id.*

[37]      *Id.* (emphasis added).

[38]      *See* Donald J. Trump (@realDonaldTrump), Truth Social (August 22, 2025 5:04 P.M.) ("It is my Great Honor to report that the United States of America now fully owns and controls 10% of INTEL, a Great American Company that has an even more incredible future. I negotiated this Deal with Lip-Bu Tan, the Highly Respected Chief Executive Officer of the Company. ***The United States paid nothing for these Shares***, and the Shares are now valued at approximately $11 Billion Dollars. This is a great Deal for America and, also, a great Deal for INTEL. Building leading edge Semiconductors and Chips, which is what INTEL does, is fundamental to the future of our Nation. MAKE AMERICA GREAT AGAIN! Thank you for your attention to this matter.") (emphasis added).

[39]      *See Intel Agrees to Sell U.S. a 10% Stake in Its Business*, THE NEW YORK TIMES (August 22, 2025), https://www.nytimes.com/2025/08/22/technology/trump-intel-stake.html.



November 21, 2025
Page 15

lack thereof) on its Ohio semiconductor facility project.[40]   The President and US Senator Tom Cotton publicly accused Mr. Tan of having "alleged financial ties to the Chinese Communist Party and its military arm." [41]   In addition, Sen. Moreno claimed Intel had "failed to meet its commitments it made" to Ohio and called for an investigation into Intel for fraud.[42]   In response to the President's comments, Intel's stock fell 3%.[43]

When compared to the bookend transactions with SoftBank[44] and NVIDIA, and the public attacks on the Company and Mr. Tan by its eventual counterparty, the Stock Agreement raises significant red flags about which stockholders have legitimate concerns, i.e., that Intel's fiduciaries prioritized their own interests over those of the minority stockholders. These circumstances provide a credible basis to investigate the fairness of the Stock Agreement and whether Company fiduciaries complied with their duties.

## II.      THE STOCKHOLDERS' PROPER PURPOSE

To obtain books and records under Section 220 for the purposes set forth in this Demand, the Stockholder must articulate a credible basis from which to *infer* wrongdoing sufficient to warrant investigation.[45]   Meaning, to obtain access to the books and records, the Stockholder is "not required to prove any wrongdoing actually occurred."[46]   The Stockholder has carried his burden and identified publicly available facts, including reputable media reports, transaction documents, and regulatory filings of Intel which demonstrate that the Demand is not based on mere "suspicion" or "accusations."[47]

---

[40]      https://www.wosu.org/2025-08-07/intel-ceo-lip-bu-tan-faces-scrutiny-from-trump-ohio-elected-officials.

[41]      *Id.*

[42]      *Id.*

[43]      https://www.businessinsider.com/intel-ceo-trump-demand-resign-stock-price-2025-8.

[44]      Given the sizeable and almost immediate dilution that SoftBank, who agreed to pay a price per share of Intel's common stock that represented a negligible discount to the prior day's closing price, it is highly unlikely that, were SoftBank aware that Intel would *later that same week* issue shares representing a pro-forma 9.9% equity stake, agree to purchase shares of Intel's common stock without insisting on some form of anti-dilution protection.   Conversely, if Intel anticipated entering into the Stock Agreement but did not disclose this fact to SoftBank, such failure may give rise to claims of fraud.

[45]      *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006).

[46]      *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997).

[47]      *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 2009 WL 3086537, at *4, 5 (Del.



November 21, 2025
Page  16

Based on the aforesaid, it is reasonable for the Stockholder to investigate whether the Company's senior officers and/or directors have fulfilled their fiduciary duties.   The Stockholder makes this Demand for the proper purposes of, but not limited to:

- Investigating mismanagement, wrongdoing, possible violations of positive law, corporate misconduct, breach of fiduciary duties of loyalty, good faith, and due care, waste, and entrenchment on the part of the Company's officers and/or directors with respect to the above-described matters;

- Investigating the disinterestedness and independent ability of the Board to consider a demand to initiate and maintain litigation related to any breaches of fiduciary duties;

- Investigating whether to file stockholder litigation or take other action to seek appropriate relief;

- Seeking an audience with the Board to discuss proposed reforms or, failing in that, the ability to prepare a stockholder resolution for the next annual meeting; and

- Determining whether the Company's current directors are fit to continue serving on the Board.

## III.    BOOKS AND RECORDS REQUESTED

Pursuant to Section 220, the Stockholder hereby demands the right (by Stockholder's attorneys, consultants, or other agents), during the usual hours of business, to inspect the following books and records of the Company for the period from March 1, 2024 to the present and to make copies or extracts therefrom.

1.     Board Materials[48] relating to or reflecting:

---

Ch. Sept. 28, 2009).

[48]     The term "Board Materials" means all documents, regardless of whether they are in hard copy or electronic form, that were prepared, provided, disseminated, or discussed in connection with, in anticipation of, or as a result of any meeting of the Board or any regular or specially created committee thereof (including, without limitation, all meeting minutes, agendas, transcripts, notes, summaries, presentations, Board packages, recordings, memoranda, charts, drafts of meeting minutes where final forms do not exist, exhibits distributed at meetings, or Board resolutions).



November 21, 2025
Page  17

a.    The Stock Agreement, including but not limited to, (i) the Board's determination to ask the DOC to accelerate the disbursements contemplated by the Direct Funding Agreement and the Secure Enclave Commitment, (ii) the Board's determination that the Newly Issued Shares and the Warrant constituted "appropriate compensation" for the Accelerated Disbursements;

b.    The Direct Funding Agreement, including but not limited to, (i) the Board's determination to enter into the Direct Funding Agreement, (ii) whether Intel was in compliance with the Direct Funding Agreement, (iii) any actual, alleged or anticipated instances of non-compliance with the Direct Funding Agreement by Intel, (iv) the likelihood of the DOC honoring its commitments under the terms of the Direct Funding Agreement, (vi) the failure of the DOC to reimburse Intel for claims of $850 million made pursuant to the Direct Funding Agreement during the second quarter of 2025, and (v) any consideration of whether to enforce the terms of the Direct Funding Agreement rather than enter into the Stock Agreement;

c.    The transaction with SoftBank, including but not limited to, a copy of the SoftBank Purchase Agreement and any disclosures, notices, or other information provided to SoftBank regarding the Stock Agreement;

d.    The transaction with NVIDIA, including a copy of the NVIDIA Purchase Agreement and any disclosures, notices, or other information provided to NVIDIA regarding the Stock Agreement;

e.    Meetings and communications between the CEO of Intel, Mr. Lip-Bu Tan, the Board, and/or Intel senior management and/or its advisors on one hand, and the DOC and/or the US Government and/or its advisors on the Stock Agreement on the other;

f.    The Board's determination to not complete an initial financial/tax/accounting analysis before entering into the Stock Agreement;

g.    Any Direct Funding Disbursement Requests or Direct Funding Disbursement Approval Notices made or given pursuant to the Direct Funding Agreement, as well as any similar requests or approvals made or given pursuant to the Secure Enclave Award Commitment, along with any related correspondence between Intel, on the one hand, and any instrumentality of the US Government, on the other hand;

h.    Any financial analysis, including any iterations, alternative or draft financial projections analyzing or illustrating (i) any need to request the

acceleration of the Accelerated Disbursements or (ii) the value of accelerating the Accelerated Disbursements;

i.  Any discussion of the Company's inability to satisfy, in full or in part, the "prior project milestone requirements and other conditions to disbursement under the [Direct Funding Agreement]" prior to August 22, 2025;

j.  Any accounting analysis of the Stock Agreement, including any iterations, alternative or draft accounting projections and recommendations from the Company's auditor;

k.  Any discussion of the voluntary outreach to the Securities and Exchange Commission regarding the Company's proposed method for accounting for the Stock Agreement;

l.  Any discussion of the share repurchases that have been executed since September 27, 2025, and/or the use of share repurchases to mitigate the dilution caused by the Stock Agreement;

m.  Any actual or potential conflicts of interest faced by any member of the Board, Intel management, or any of the foregoing parties' legal advisors, in connection with the Stock Agreement;

n.  All engagement or retainer agreements, including all addenda, exhibits and/or amendments thereto, between the Company and Skadden related to the Stock Agreement, including all conflicts of interest disclosures and all related information, in whatever form, that Skadden provided to the Company regarding its representation of the DOC and its March 28, 2025, agreement with the US Government;

o.  Any assessment of any conflicts of interest that Skadden might have, including as a result of any agreements or arrangements between Skadden and the US Government, whether or not disclosed by Skadden, and/or taking into account statements made by representatives of the US Government regarding Skadden or similarly situated law firms, such as "Big Law continues to bend the knee to President Trump;"[49]

p.  Any advice regarding the financial fairness of the Stock Agreement or any strategic alternatives to the Stock Agreement; and

---

[49]  *See* https://www.nytimes.com/2025/04/09/us/politics/trump-law-firms-orders.html.



November 21, 2025
Page 19

    q.    Any side deals between Intel or its officers or directors, on the one hand, and the DOC and/or the US Government, on the other hand, in connection with or related to the Stock Agreement;

2.    The following Documents concerning the independence of the Board:

    a.    The most recent director independence questionnaire(s) for each current member of the Board, and any other independence questionnaire(s) referenced therein;

    b.    Any questionnaire(s) completed by a current member of the Board in connection with the purchase or renewal of any director and officer liability insurance policy;

    c.    Documents concerning any evaluation of the independence of the Board members reviewed by the Board and/or any of its committees;

    d.    Documents provided by the Board and/or any of its committees to a stock exchange concerning the independence of any current member of the Board; and

    e.    Policies concerning independence and/or related-party transactions applicable to current members of the Board.

3.    Any definitive documentation of the Secure Enclave Commitment as well as any documentation reflecting any amendments or modifications thereto made pursuant to the Stock Agreement.

4.    Copies of all payments made to Intel pursuant to the Stock Agreement, including the date(s) and amount(s) of any payments.

5.    Copies of all books and records provided to or referred to by the individuals who drafted the 8-K filed with the SEC on August 22, 2025 (and/or any amendments thereto).

6.    Copies of all books and records provided to or referred to by the individuals who drafted the 10-Q filed with the SEC on November 6, 2025 (and/or any amendments thereto).

7.    Any Documents regarding whether the SEC would agree with how Intel's accounting treatment of the Stock Agreement, including but not limited to any correspondence with the SEC.



November 21, 2025
Page 20

8.    All Documents provided by Intel to its financial or other advisors regarding the Stock Agreement and/or considerations of strategic alternatives.

9.    All Documents received by Intel from its financial or other advisors (*e.g.*, Board books prepared by the financial advisors before or after they were officially engaged) regarding the Stock Agreement and/or considerations of strategic alternatives.

10.   All Documents received by Intel from its accounting and/or tax advisors (*e.g.*, Board books prepared by the accounting and/or tax advisors before or after they were officially engaged) regarding the Stock Agreement and/or considerations of accounting and/or tax alternatives.

11.   Books and records sufficient to show the interests, financial or otherwise, of any director or officer of the Company in the Stock Agreement.

12.   All Documents produced to any other stockholder or their counsel in response to a demand to inspect books and records or in connection with any stockholder litigation that relates to the events described herein.

## IV.    <u>INSTRUCTIONS FOR COMPLIANCE</u>

The Stockholder requests that the Company provide or otherwise make available all such information up to the date on which the Company actually and fully complies with this Demand and the requests enumerated herein.   The Stockholder further requests that the Company provide or otherwise make available all additions, changes, and corrections to any of the requested information from the time of this Demand to the time (by written confirmation) that this inspection has concluded.   Finally, the Stockholder requests that all information, to the extent possible, be produced in PDF-text searchable format organized by date, and to the extent the Company wishes to redact any such documents for privilege, that a privilege log be promptly provided.

The Stockholder agrees to treat any materials produced as "attorneys' eyes only" pending the execution of a confidentiality agreement.   The Stockholder requests that the materials identified above be made available **within five (5) business days from the date of receipt**. Please feel free to contact me within the requisite timeframe to advise when and where the items requested above will be made available for inspection.   Should the Company refuse to comply, the Stockholder will promptly file a complaint in the appropriate jurisdiction.

Stockholder reserves the right to withdraw, modify, and/or supplement this Demand at any time.



November 21, 2025
Page 21

We look forward to your prompt response.

Sincerely,

*/s/ Gillian L. Andrews*

Gillian L. Andrews

GLA/lmd
Enclosures

cc:     Abbott Cooper, Esq. (via email)
        Seamus Kaskela, Esq. (via email)
        Adrienne Bell, Esq. (via email)
        Alan B. Morrison, Esq. (via email)

# EXHIBIT 1



**E✶TRADE** from Morgan Stanley

Accounts   Pay & Transfer   Trading   Markets & Ideas   Planning   What We Offer

🔍 Search

Complete View   Portfolios   Watch Lists   Orders   Balances   Transactions   Banking   Tax Center   Documents ⌄   Dividend Reinvestment   Open Account

# Portfolios

↻ Refresh Nov 19, 2025 12:42 PM ET   ❓ Help   🖨   ⬇

Positions   Allocation   Performance   Historical value   Margin   Gains & Losses   Risk Assessment   Estimated Income   Shareholder Actions

Account
richard paisner -4565

⌄ Show less   Transfer money

ℹ️ Have you taken your required minimum distribution yet? Yes No, learn more   ✕

⌄ Filters   View: All Positions   Filter by Symbol / CUSIP   Security type: All securities   Edit Lots  Reset Sort   Wash sale adjustment ①   ⚙ Customize

| ≫ Symbol ▲ | Actions | Last Price $ | Change $ | Change % | Qty # | Price Paid $ | Day's Gain $ | Total Gain $ | Total Gain % | Value $ |
|---|---|---|---|---|---|---|---|---|---|---|
| ＞ INTC ① | Trade ⌄ 🔔 ⬚ | 34.64 | 0.31 | 0.90% | 500 | 29.40 | 155.00 | 2,620.00 | 17.82% | 17,320.00 |

# EXHIBIT 2

## VERIFICATION

STATE OF CALIFORNIA )

                          ) SS.

COUNTY OF ALAMEDA )

I, Richard D. Paisner (the "Stockholder"), hereby declare as follows:

1.       I am a stockholder of Intel Corporation (the "Company").

2.       I have reviewed the *Inspection Demand Pursuant to 8 Del. C. § 220* (the "Demand") prepared by my counsel. The statements in the Demand as to me and my actions are true and correct and as to other statements of fact and matters set forth therein, are true and correct to the best of my knowledge, information and belief.

3.       Proof of my stockholdings in the Company are appended as Exhibit 1 to the Demand.

I declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

_____
Richard D. Paisner

SWORN TO and SUBSCRIBED before
me this _19_ day of November, 2025.

_____    See CA Jurat Attached
Notary Public

# California Jurat Loose Certificate

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Alameda_____ } ss.

Subscribed and sworn to (or affirmed) before me this 19th day of November, 2025

by _____Richard Paisner_____,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared

before me.

_____
Notary Public Signature

Seal

EDWIN E. GRULLON
COMM. #2459185
Notary Public - California
San Francisco County
My Comm. Expires Aug. 15, 2027

───────── Optional Information ─────────

To help prevent fraud, it is recommended that you provide information about the attached document below.
***This is not required under California State notary public law.***

Document Title:_____Verification_____ # of Pages:__1__

## Notes

©2014 Golden State Notary, Inc.          www.Notary.net          (888) 263-1977

# EXHIBIT 3

## SPECIAL POWER OF ATTORNEY

KNOWN BY ALL PERSONS BY THESE PRESENTS that Richard D. Paisner (the "Stockholder"), does hereby make and appoint, Kurt M. Heyman, Esq., of Heyman Enerio Gattuso & Hirzel LLP at 222 Delaware Avenue, Suite 900, Wilmington, DE 19801, Abbott Cooper, Esq., of Abbott Cooper PLLC, and Alan B. Morrison, Esq., 2000 H Street NW, Washington D.C. 20052 (the "Attorneys") as the Stockholder's true and lawful attorneys-in-fact, and in Stockholder's name, place, and stead and on Stockholder's behalf, for the Stockholder's use and benefit, to make the *Demand for Inspection of Books and Records Pursuant to 8 Del. C. § 220* (the "Demand") on Stockholder's behalf as a stockholder of Intel Corporation (the "Company") from the Attorneys to the Company, to discuss the demands and factual assertions described in the Demand with any representative of the Company, or such other counsel as may be designated by the Company, to modify or supplement the demands set forth in the Demand, to reach such agreements with respect to the scope of the demand set forth in the Demand, and to commence any litigation on the Stockholder's behalf, as the Attorneys deem appropriate.

The Stockholder further grants to the Attorneys full power to do and perform all and every act that they may legally do through attorneys-in-fact, and every proper power necessary to carry out the purposes for which this power is granted,

with full power of substitution and revocation, hereby ratifying and affirming that which the Attorneys or their substitutes shall lawfully do or cause to be done by virtue of the power conferred herein upon them.

The rights, power, and authorities of said attorneys-in-fact herein granted shall commence and shall be in force and effect from the date hereof, and such rights and powers shall remain in full force and effect until the Stockholder tenders a written notice of termination.

I declare under penalty of perjury under the laws of the State of Delaware and the United States that the foregoing is true and correct.

_____
Richard D. Paisner

# EXHIBIT I

**TO VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**



Andrew S. Dupre

Akerman LLP
222 Delaware Avenue
Suite 1710
Wilmington, DE  19801

T: 302 596 9200
F: 302 596 9300

December 15, 2025

**VIA U.S. MAIL AND**
**EMAIL TO gandrews@heghlaw.com**

Gillian Andrews
HEYMAN, ENERIO, GATTUSO & HIRZEL LLP
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801

> **Re:    November 21, 2025 Demand for Inspection of Books and Records Pursuant**
> **to 8 Del. C. § 220**

Gillian:

As you know, our firm represents Intel Corporation (the "Company"). As such, all further communications regarding this matter should be directed to the undersigned.

This letter responds to Richard D. Paisner's ("Stockholder") November 21, 2025 letter requesting inspection of certain books and records of the Company pursuant to 8 *Del. C.* § 220 (the "Demand"). The Demand states that the Company entered into an agreement to issue approximately 433.3 million shares (about 9.9% pro forma) to the U.S. Department of Commerce ("DOC") and to grant a contingent warrant for up to an additional 240.5 million shares in exchange for the DOC's agreement to accelerate disbursements of previously awarded CHIPS Act and Secure Enclave funding commitments totaling roughly $8.87 billion (the "Transaction").

As set forth herein, the Demand fails to set forth a credible basis for a court to infer wrongdoing or mismanagement by the Company's directors and officers related to the Transaction, and, therefore, does not state a proper purpose for the requested inspection. Additionally, the Demand exceeds the scope of records eligible for inspection pursuant to the 2025 amendment to 8 *Del. C.* § 220. As a result, the Demand appears to be defective, as stated. If the Stockholder wishes to revise the Demand to state a proper purpose and to comply with 8 *Del. C.* § 220, the Company will consider such revision in good faith.

84703357;2

Gillian Andrews
December 15, 2025
Page 2

_____

1.      **<u>The Demand Fails To State A Proper Purpose Under Section 220.</u>**

A stockholder seeking to inspect a corporation's books and records must establish a "proper purpose" for the inspection. 8 *Del. C.* § 220(c); *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 618 n.23 (Del. 2013). In the context of Section 220, a "proper purpose" means "a purpose reasonably related to such person's interest as a stockholder." 8 *Del. C.* § 220(b); *Rock Solid Gelt Ltd. v. SmartPill Corp.*, 2012 WL 4841602, at *3 (Del. Ch. Oct. 10, 2012).

The Stockholder's stated purposes for the Demand are: (1) investigating mismanagement, wrongdoing, possible violations of positive law, corporate misconduct, breach of fiduciary duties of loyalty, good faith, and due care, waste, and entrenchment on the part of the Company's officers and/or directors with respect to the above-described matters; (2) investigating the disinterestedness and independent ability of the Board to consider a demand to initiate and maintain litigation related to any breaches of fiduciary duties; (3) investigating whether to file stockholder litigation or take other action to seek appropriate relief; (4) seeking an audience with the Board to discuss proposed reforms or, failing in that, the ability to prepare a stockholder resolution for the next annual meeting; and (5) determining whether the Company's current directors are fit to continue serving on the Board. The Stockholder's second through fifth stated purposes are part and parcel of the first stated purpose. Because the first stated purpose is improper, for the reasons set forth below, the remaining stated purposes also fail.

Before a stockholder can obtain books and records to investigate potential mismanagement or wrongdoing, the stockholder must show by a preponderance of the evidence a credible basis to suspect mismanagement or wrongdoing. *See, e.g.*, *NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys., et al.*, 282 A.3d 1, 12 (Del. 2022) ("[W]here a stockholder seeks to investigate wrongdoing, the stockholder must 'show, by a preponderance of the evidence,' a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation…"). Neither "'mere suspicion' of wrongdoing or mismanagement . . . nor an interest in investigating 'general mismanagement, without more' is sufficient." *Robotti & Co., LLC v. Gulfport Energy Corp.*, 2007 WL 2019796, at *2 (Del. Ch. July 3, 2007) (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 122–23 (Del. 2006)). A stockholder's burden in this regard is meaningful and not "a mere speed bump." *Hoeller v. Tempur Sealy Int'l, Inc.*, 2019 WL 551318, at *1 (Del. Ch. Feb. 12, 2019); *see also Simeone v. Walt Disney Co.*, 302 A.3d 956, 968 (Del. Ch. 2023) ("credible basis" standard "is neither a formality nor inconsequential") (citation omitted). A stockholder must make "a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing." *AmerisourceBergen Corp. v. Lebanon Cty. Emps.' Ret. Fund*, 243 A.3d 417, 426 (Del. 2020). "If the stockholder cannot present a credible basis from

Gillian Andrews
December 15, 2025
Page 3

_____

which the court can infer wrongdoing or mismanagement, it is likely that the stockholder's demand is an 'indiscriminate fishing expedition.'" *Id.*

The Demand fails to provide any credible basis for a court to infer wrongdoing or mismanagement by the Company's directors or officers in entering into the Transaction. As an initial matter, in the absence of any credible allegations of conflicts or bad faith, the business judgment rule strongly protects the Board's decision-making related to the Transaction, and a stockholder cannot obtain inspection under Section 220 merely to second-guess decisions that fall within the Board's informed, good faith discretion. *See AmerisourceBergen Corp.*, 243 A.3d at 426 ("'[M]ere disagreement with a business decision' will fail to establish a proper purpose."). Here, the Demand argues nothing more than the Stockholder's disagreement with the Company entering into the Transaction.

The Demand is devoid of any allegation of self-dealing or conflicts of interest on the part of the directors. Indeed, there is no allegation that any director stood on both sides of the Transaction or received a non-ratable personal benefit. Instead, the Demand's own description frames the Transaction as a corporate-level exchange between Intel and the DOC involving the issuance of new shares and a contingent warrant in connection with, and in exchange for, accelerated disbursements of CHIPS Act funds and Secure Enclave funds. Moreover, the assertion that Intel's CEO "faced significant pressure to resign" is personal to him and does not implicate any other director or officer or suggest any misconduct by the directors who approved the Transaction.

There is likewise no allegation or evidence that the Company's directors acted to entrench themselves or perpetuate their control. Although the Demand notes a DOC voting commitment to support Board-recommended proposals, it does not allege any basis to infer the directors had any motivation to, much less acted primarily to, entrench themselves or perpetuate their control. The referenced voting term is presented as part of a broader financing arrangement, not as a defensive measure adopted to thwart stockholder rights or a contest for control.

Similarly, the suggestions of unfair price or corporate waste are baseless. The Demand itself acknowledges that receipt of money under the Direct Funding Agreement ("DFA") was not guaranteed and there were "detailed procedures for payment of the DFA Award." The Transaction created a permanency of capital that was not previously present. Indeed, in exchange for entering into the Transaction, the DOC also released the Company from its obligations under the DFA, thereby removing any conditions on the Company's access to capital. This was memorialized by an August 27, 2025 amendment to the DFA, which the Demand acknowledges as well, noting that the amendment, "among other things, removed the prior project milestone requirements and

84703357;2

Gillian Andrews
December 15, 2025
Page 4

_____

certain other conditions to disbursements." These facts foreclose any credible inference that the Transaction was so one-sided as to constitute waste.

The Demand's assertions regarding the possibility of conflicted advice from Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") are entirely speculative and cannot justify inspection under Section 220. While the Demand references Congressional inquiries and media reports concerning Skadden's pro bono agreement with the U.S. Government and alleged interactions with the Administration, it does not identify any facts connecting Skadden's purported conflicts to its advice to the Company or to the Transaction.

Lastly, the Demand misconstrues the disclosure that "an 'initial analysis of the financial, tax, and accounting implications of the transaction[s]'" had not been completed. The disclosure simply stated that certain potential future "impacts" of the Transaction "are being evaluated and are uncertain." It did not relate to whether the Board was informed about the economic structure and substance of the Transaction when approving it.

**2.**     <u>**The Demand Is Overbroad.**</u>

Even if the Demand had stated a proper purpose, its requests are overbroad in light of the definition of "books and records" set forth in the amended Section 220(a). We set forth the definition below for ease of reference:

The term "Books and records" means all of the following:

     a. The "certificate of incorporation," as defined in § 104 of this title, including a copy of any agreement or other instrument incorporated by reference in the certificate of incorporation.

     b. The bylaws then in effect, including a copy of any agreement or other instrument incorporated by reference in the bylaws.

     c. Minutes of all meetings of stockholders and the signed consents evidencing all action taken by stockholders without a meeting, in each case for the 3 years preceding the date of the demand under subsection (b) of this section.

     d. All communications in writing or by electronic transmission to stockholders generally within the past 3 years preceding the date of the demand under subsection (b) of this section.

     e. Minutes of any meeting of the board of directors or any committee of the board of directors and records of any action of the board of directors or any such committee.

84703357;2

Gillian Andrews
December 15, 2025
Page 5

_____

      f. Materials provided to the board of directors or any committee of the board of directors in connection with actions taken by the board of directors or any such committee.

      g. Annual financial statements of the corporation for the 3 years preceding the date of the demand under subsection (b) of this section.

      h. Any agreement entered into under § 122(18) of this title.

      i. Director and officer independence questionnaires.

*See* 8 *Del. C.* § 220(a)(1).

The Demand's requests go far beyond "books and records" cognizable under Section 220. For example, the Demand's definition of "Board Materials" would require the production of a broad category of documents that were never in fact provided to the Company's Board. Moreover, the requests seek documents exchanged by the Company with third party advisors and documents concerning the independence of the directors beyond independence questionnaires. Even more, the Demand requests materials that are not "specifically related" to the Stockholder's stated purposes as required by Section 220(b)(2)(c), such as documents concerning unrelated transactions for which the Stockholder has not alleged any harm to the Company. Ultimately, the Demand's requests are not limited to the Company's "books and records," as defined by Section 220, but instead seek broad categories of documents akin to discovery, which is improper. *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 165 (Del. Ch. 2006) ("Section 220 is . . . not a way to circumvent discovery proceedings, and is certainly not meant to be a forum for the kinds of wide-ranging document requests permissible under Rule 34."), *aff'd sub nom. Highland Equity Fund, L.P. v. Motient Corp.*, 922 A.2d 415 (Del. 2007). Even more, the Demand seeks books and records over a period from March 1, 2024 to present, but fails to explain how documents dating back to March 1, 2024, are "specifically related" to the purported purpose of investigating mismanagement or wrongdoing in connection with the Transaction, which arose in August 2025. 8 *Del. C.* § 220(b)(2)(c).

\*     \*     \*

In sum, the Board's decision to enter into the Transaction was made in its business judgment and in the best interests of the Company. The Demand offers no credible basis to infer wrongdoing or to support a proper purpose for inspection under Delaware law. Even if a proper purpose was stated, the Demand's scope is overbroad in light of the definition of "books and records" set forth in the amended Section 220(a). For these reasons, the Company believes the Demand is defective as currently stated. Again, if the Stockholder wishes to make a revised

Gillian Andrews
December 15, 2025
Page 6

_____

demand within the scope of 8 *Del. C.* §220, the Company will consider such revised demand in good faith.

Notwithstanding the foregoing, and as you are aware, Intel previously received a demand from Eric Gilbert, an Intel shareholder represented by Kurt Heyman, an attorney in your office, concerning the same subject matter as Mr. Paisner's Demand. Intel also found that Mr. Gilbert's demand was defective. However, Intel is working with Mr. Heyman to reach an agreement on the production of certain documents. As a courtesy, Intel will also provide any agreed upon production to Mr. Paisner, who like Mr. Gilbert provided his power of attorney to Mr. Heyman. This production will be made without waiving any of Intel's rights and does not constitute an admission of any of the allegations set forth in the Demand or that the Demand states a proper purpose or seeks materials within the scope of 8 *Del. C.* §220, all of which are addressed in detail above.

If you would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

/s/ *Andrew S. Dupre*

Andrew S. Dupre

cc:     Abbott Cooper, Esq. (via email)
        Seamus Kaskela, Esq. (via email)
        Adrienne Bell, Esq. (via email)
        Alan B. Morrison, Esq. (via email)

84703357;2

**EFiled:  Mar 05 2026 09:54AM EST**
**Transaction ID 78608572**
**Case No. 2026-0307-**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RICHARD D. PAISNER,                          :
                                             :
                    Plaintiff,               :
                                             :
          v.                                 :    C.A. No. _____
                                             :
LIP-BU TAN, FRANK D. YEARY,                  :
CRAIG H. BARRATT, JAMES GOETZ,               :
ANDREA J. GOLDSMITH, ALYSSA H.               :
HENRY, ERIC MEURICE, BARBARA                 :
NOVICK, STEVE SANGHI, GREGORY D.:            :
SMITH, STACY J. SMITH, DION J.               :
WEISLER, HOWARD LUTNICK, as                  :
Secretary of the United States Department    :
of Commerce, and the UNITED STATES           :
DEPARTMENT OF COMMERCE,                      :
                                             :
                    Defendants,              :
                                             :
          and                                :
                                             :
INTEL CORPORATION,                           :
a Delaware corporation,                      :
                                             :
                    Nominal Defendant.  :

## AFFIDAVIT AND VERIFICATION OF RICHARD D. PAISNER

STATE OF CALIFORNIA          )
                             ) SS
COUNTY OF ALAMEDA            )

RICHARD D. PAISNER, being duly sworn, deposes and says that:

1.  I am a Plaintiff in the above-captioned action, have read the foregoing

Verified Stockholder Derivative Complaint (the "Complaint") and know the

contents thereof, and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

2.      I currently own shares of Intel Corporation. common stock and I have owned such shares continuously during the relevant times alleged in the Complaint.

3.      I have not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to me, or (ii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

_____
Richard D. Paisner

SWORN TO AND SUBSCRIBED before me this _4th_ day of _March_, 2026.

_See CA Certificate Attached_
Notary Public

# California Jurat Loose Certificate

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____Alameda_____ } ss.

Subscribed and sworn to (or affirmed) before me this **4th** day of _____March_____, 20**26**

by _____Richard David Paisner_____,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared

before me.

_____
Notary Public Signature

Seal

EDWIN E. GRULLON
COMM. #2459185
Notary Public - California
San Francisco County
My Comm. Expires Aug. 15, 2027

──────── Optional Information ────────

To help prevent fraud, it is recommended that you provide information about the attached document below.
***This is not required under California State notary public law.***

Document Title:_____ # of Pages:_____

Notes

_____
_____
_____
_____
_____
_____
_____