EFiled:  Mar 05 2026 09:54AM EST
Transaction ID 78608572
Case No. 2026-0307-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RICHARD D. PAISNER,                          :
                                             :
                   Plaintiff,                :
                                             :
        v.                                   :   C.A. No. _____
                                             :
LIP-BU TAN, FRANK D. YEARY,                  :   **CONFIDENTIAL FILING**
CRAIG H. BARRATT, JAMES GOETZ,               :
ANDREA J. GOLDSMITH, ALYSSA H.               :
HENRY, ERIC MEURICE, BARBARA                 :
NOVICK, STEVE SANGHI, GREGORY D.:            :
SMITH, STACY J. SMITH, DION J.               :
WEISLER, HOWARD LUTNICK, as                  :
Secretary of the United States Department    :
of Commerce, and the UNITED STATES           :
DEPARTMENT OF COMMERCE,                      :
                                             :
                   Defendants,               :
                                             :
        and                                  :
                                             :
INTEL CORPORATION,                           :
a Delaware corporation,                      :
                                             :
                   Nominal Defendant.  :

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE
COURT OF CHANCERY OF THE STATE OF DELAWARE**

**If you are not authorized to view this document under Rule 5.1 or by Court
Order, read no further than this page and contact the following person:**

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS
PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

**Kurt M. Heyman (# 3054)**
**Gillian L. Andrews (#5719)**
**HEYMAN ENERIO GATTUSO & HIRZEL LLP**
**222 Delaware Avenue, Suite 900**
**Wilmington, DE 19801**
**(302) 472-7300**

**A public version of this document will be filed on or before March 9, 2026.**

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD D. PAISNER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. _____ |
| | : | |
| LIP-BU TAN, FRANK D. YEARY, | : | **CONFIDENTIAL FILING** |
| CRAIG H. BARRATT, JAMES GOETZ, | : | |
| ANDREA J. GOLDSMITH, ALYSSA H. | : | |
| HENRY, ERIC MEURICE, BARBARA | : | |
| NOVICK, STEVE SANGHI, GREGORY D.: | | |
| SMITH, STACY J. SMITH, DION J. | : | |
| WEISLER, HOWARD LUTNICK, as | : | |
| Secretary of the United States Department | : | |
| of Commerce, and the UNITED STATES | : | |
| DEPARTMENT OF COMMERCE, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| INTEL CORPORATION, | : | |
| a Delaware corporation, | : | |
| | : | |
| Nominal Defendant. | : | |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Richard D. Paisner ("Plaintiff"), by and through his undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Intel Corporation ("Intel," or the "Company"), and makes the following allegations in this Verified Stockholder Derivative Complaint against the current members of the

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

Company's Board of Directors (the "Board"),[1] Howard Lutnick, as Secretary of the United States Department of Commerce (the "Secretary"), and the United States Department of Commerce (the "DOC").  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief derived from the investigation of counsel, which included, without limitation, (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review of internal Intel documents obtained pursuant to 8 *Del. C.* § 220 (the "Demand"); and (iii) review and analysis of press releases, news reports, industry reports, and other information available in the public domain.

## NATURE OF THE ACTION

1.    This stockholder derivative action is brought on behalf of Nominal Defendant Intel to address the Board's breach of its fiduciary duties of loyalty, due care, and good faith regarding its uninformed approval of an unlawful contract that gives the U.S. government $11 billion worth of Intel stock for no meaningful consideration in response to extortionary threats by the government.  In that

---

[1]    The Board is composed of Lip-Bu Tan, Frank D. Yeary, Craig H. Barratt, James Goetz, Andrea J. Goldsmith, Alyssa H. Henry, Eric Meurice, Barbara Novick, Steve Sanghi, Gregory D. Smith, Stacy J. Smith and Dion J. Weisler (collectively, the "Director Defendants").

2

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

transaction, the Board included for itself a voting agreement that compels the government to vote its 9.9% Company stake as directed by the Board.

2. No law authorizes the U.S. government to acquire stock in Intel or any publicly held company. Accordingly, the Board had no authority to enter into such an unlawful contract or to issue 9.9% of Intel's equity to the DOC for no meaningful consideration. For that same reason, the government had no right to demand shares of Intel stock for any purpose, including through the pretextual advancement of disbursements Intel has already earned or had a right to receive under a November 2024 direct funding agreement with the DOC that emanated from the CHIPS Act. The resulting contract is therefore void for illegality and must be cancelled.

3. The Board was coerced and extorted into giving the DOC 9.9% of Intel stock, as well as a Warrant for an additional 4.9% of stock, for no meaningful consideration. The genesis of the unlawful contract began on August 7, 2025, when President Donald Trump publicly claimed that Intel's CEO, Lip-Bu Tan, was highly conflicted and must be fired immediately. That demand was followed by a private White House meeting on August 11, after which the President publicly stated that he and Tan had made a "little deal" for a 10% stake in Intel so that Tan could keep his job. That White House meeting was followed by stark demands to Intel from other members of the Administration between August 14 and 22, 2025, accompanied by warnings that Intel should not misconstrue the shakedown as a negotiation. The

3

THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

Administration's demands made clear that the Company and the Board would face unstated consequences for not acquiescing and giving the U.S. government a significant stake in Intel.

4.    In extraordinary and expedited fashion, the Board, operating under the shadow of the President's threats, and advised by legal counsel that itself was conflicted due to its *pro bono* promises to the President, caved to the government's extortion.  On August 22, 2025, the Board approved the unlawful contract with the DOC that is the subject of this derivative action, without (a) obtaining an opinion from unconflicted counsel as to the legality of this contract, (b) any analysis of the underlying direct funding agreement to be amended by the contract, or (c) any analysis of possible alternatives, including the possibility of refusing the government's unlawful and extortionate demands.  The Board's failures to be properly informed and explore potential options in response to the government's coercive demands are a further breach of their duties of care and good faith.

5.    Days after the Board approved the unlawful contract, President Trump put lie to the pretense that Intel received any consideration in return for the stock that it gave to the DOC:

4

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.



6.      Because of the threats made by the Administration to Intel's CEO, and, by implication, to the remainder of the Board, the entire Board was conflicted by well-founded fears over their personal and professional relationships, rendering them unable to exercise their independent and disinterested business judgment when the unlawful contract came before the Board for its approval.

7.      The Board's own failures, breaches of fiduciary duty and reluctance to stand up to the U.S. government prevents it from independently and disinterestedly considering any demand by Plaintiff to address these issues.

---

[2]      Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 25, 2025), https://truthsocial.com/@realDonaldTrump/115089582863713336.

5

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

8.     The unlawful contract with DOC also contained a voting agreement that required the DOC to vote its 9.9% of stock as directed by the Board.  This provision produced a non-ratable benefit for the Board members, not shared by any other Intel stockholders.   Instead of issuing nonvoting stock to the DOC or otherwise neutralizing the voting power of 9.9% of the Company's voting stock, the Board grabbed the voting power for itself.  The voting agreement undermines the Board's independence and disinterestedness in its approval of the unlawful contract and constitutes a further breach of the duty of loyalty.

9.     For all of these reasons, it would be futile to make a demand on the Board that approved the unlawful contract under such disabling conflicts.

10.     Plaintiff, through this derivative action, is the only means by which Intel may vindicate its right to be free from government extortion and extricate itself from this unlawful contract through cancellation of the shares issued to the DOC and obtain related declaratory and injunctive relief.

## JURISDICTION

11.     This Court has jurisdiction to hear and determine this action pursuant to 10 *Del. C.* § 341 and over Intel pursuant to 10 *Del. C.* § 3111, as a Delaware corporation.

12.     As directors and officers of a Delaware corporation, the Board members have consented to the jurisdiction of this Court pursuant to 10 *Del. C.* § 3114.

6

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

Because the DOC entered into the agreement that is challenged herein to acquire common stock of Intel, a Delaware corporation, it is subject to jurisdiction in this Court.

13.    Venue is proper in this forum because this action involves significant issues of Delaware corporate law, including the fiduciary duties of care, loyalty, and good faith, and is therefore suitable for adjudication before the Delaware Court of Chancery.

## PARTIES

14.    Plaintiff Richard D. Paisner is currently and has been a stockholder of Intel at all relevant times.

15.    Nominal Defendant Intel Corporation is a Delaware corporation, with its principal offices located in Santa Clara, California.  Intel is "a global designer and manufacturer of semiconductor products."

16.    Defendant Lip-Bu Tan is the Chief Executive Officer ("CEO") of Intel and a member of the Board.  He was appointed as CEO in March 2025.  He is also a founding managing partner of Walden Catalyst Ventures and chairman of Walden International Singapore, a venture capital firm (collectively "Walden").  Prior to being named CEO of Intel, Tan had served as CEO of Cadence Designs Systems, Inc. ("Cadence") from 2009 to 2021 and Executive Chairman of Cadence from 2021 until 2023.  Tan previously served on the Board of Intel from 2022 to 2024.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

17.    Defendant Frank D. Yeary is a current member of the Board which he joined in March 2009 and was named chairman of the Board in January 2023.

18.    Defendant Craig H. Barratt is a current member of the Board which he joined in November 2025.  Mr. Barratt was not a member of the Board at the time the unlawful contract being challenged in this action was approved by the Board.

19.    Defendant James J. Goetz is a current member of the Board which he joined in November 2019.

20.    Defendant Andrea J. Goldsmith is a current member of the Board which she joined in September 2021.

21.    Defendant Alyssa H. Henry is a current member of the Board which she joined in January 2020.

22.    Defendant Eric Meurice is current member of the Board which he joined in December 2024.

23.    Defendant Barbara G. Novick is a current member of the Board which she joined in December 2022.

24.    Defendant Steve Sanghi is a current member of the Board which he joined in December 2024.

25.    Defendant Gregory D. Smith is a current member of the Board which he joined in March 2017.

8

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

26.    Defendant Stacy J. Smith is a current member of the Board which he joined in March 2024.  Mr. Smith was employed by Intel for more than thirty years in various leadership positions before retiring from the Company in 2018.

27.    Defendant Dion J. Weisler is a current member of the Board which he joined in June 2020.

28.    Defendant Howard Lutnick is the Secretary of Commerce of the United States Department of Commerce.  Secretary Lutnick is charged with implementing the CHIPS Act, the law at issue in this case.

29.    Defendant the United States Department of Commerce is an agency of the executive branch of the United States of America.  The DOC is responsible for the administration for the CHIPS Act.  The DOC is a party to the contract being challenged in this action and is the owner of the shares of Intel common stock and the Warrant at issue in this action.

30.    Non-party Skadden, Arps Meagher & Flom LLP ("Skadden") is an international law firm that advised Intel on the unlawful contract being challenged in this action.  Upon information and belief, in March 2025, Skadden had entered into an agreement with the Administration, and the DOC specifically, to provide $100 million worth of *pro bono* legal services to the government and/or persons approved by the government.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

## BACKGROUND

### A.    Intel and The CHIPS Act.

31.    Once the dominant player in the semiconductor industry, by 2024 Intel had fallen from glory due to a plethora of missteps, including, among others, declining to provide chips that would power Apple's now ubiquitous iPhone and largely missing out on the AI boom (including by declining to invest in OpenAI in 2017).

32.    For more than two decades, Intel was the world's largest manufacturer of semiconductor chips but, by 2017, had ceded that role to Taiwan Semiconductor Manufacturing Company ("Taiwan Semiconductor").    Taiwan Semiconductor originated the "foundry" model — manufacturing chips for "fabless" companies (companies that design chips but do not manufacture them) such as NVIDIA.   As the semiconductor industry split between the foundry and fabless models, Intel remained dogged in its determination to manufacture only chips of its own design, eschewing both foundry and fabless models.  This changed in 2021 when Intel's then CEO Pat Gelsinger announced the "IDM 2.0" strategy that contemplated Intel both utilizing other foundries for chip manufacturing, as well as establishing its own foundry business.

33.    However, IDM 2.0 and the move into the foundry business required a massive investment to expand Intel's manufacturing capacity.  Fortuitously, as Intel

10

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

determined its move into the foundry business, the U.S. government was becoming increasingly concerned about the perils to national security posed by the sharp decline in domestic chip manufacturing relative to the rest of the world, notably Taiwan.

34.    This confluence of interests was apparent during President Biden's 2022 State of the Union speech, when the President singled out Gelsinger, his invited guest, for favorable comment, based on Intel's plans to build a semiconductor manufacturing facility near Columbus, Ohio, while urging Congress to pass the bill that became the CHIPs Act.[3]

35.    On August 9, 2022, the Creating Helpful Incentives to Produce Semiconductors Act of 2022, Public Law 116-167, 136 Stat. 1366, 15 U.S.C. § 4651, (the "CHIPS Act") became law.  Among other things, the CHIPS Act was intended to encourage semiconductor research, development, manufacturing, and workforce development by providing more than $52 billion in incentives and federal support for the domestic semiconductor industry in the form of grants and loan guarantees.

36.    Not surprisingly, given Intel's (and particularly Gelsinger's) role in supporting its passage, Intel became the largest single beneficiary of the CHIPS Act.

---

[3]    Joseph Biden, President of the United States, "State of the Union," Address to Congress, Mar. 1, 2022, https://rollcall.com/factbase/biden/transcript/joe-biden-speech-state-of-the-union-address-march-1-2022/).

11

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

37.    Nothing in the CHIPS Act contemplates the U.S. government acquiring an equity interest in any of its beneficiaries.

**B.    Intel's Direct Funding Agreement and Award.**

38.    On March 20, 2024, Intel announced that it had signed a non-binding preliminary memorandum of understanding with the DOC pursuant to which Intel would receive up to $8.5 billion in CHIPS Act grant funding to advance Intel's commercial semiconductor projects in Arizona, New Mexico, Ohio and Oregon.[4] Upon information and belief, nothing in the memorandum of understanding contemplated the U.S. government acquiring an equity interest in Intel.

39.    In DOC's own announcement, it stated that the direct funding would "help[] to incentivize over $100 billion in investments from Intel – marking one of the largest investments ever in U.S. semiconductor manufacturing, which will create over 30,000 good paying jobs and ignite the next generation of innovation."[5]

40.    On November 25, 2024, Intel and DOC finalized the previously announced direct funding agreement (the "DFA") pursuant to which the DOC agreed to award Intel up to $7.8 billion (the "DFA Award") in direct grant funds in

---

[4]    https://newsroom.intel.com/corporate/intel-celebrates-chips-act-funding-livestream-replay.

[5]    https://www.nist.gov/news-events/news/2024/03/biden-harris-administration-announces-preliminary-terms-intel-support.

12

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

consideration of work done to construct or modernize, as well as operate, microchip facilities in Arizona, Oregon, New Mexico and Ohio. **Exhibit A** (INTEL_000407-629).

41.    The DFA generally provides that the DOC will disburse funds to Intel when certain milestones towards completion of a project are met. Schedule B to the DFA (the "Disbursement Milestone Schedule") lists the milestones for each project. The Disbursement Milestone Schedule also lists for each project a "Project Completion Clawback Date," the date by which Intel must complete the relevant project. Ex. A at INTEL_000488.

42.    If Intel fails to complete a project by its Project Completion Clawback Date, such failure constitutes an event of default under the DFA and allows the DOC to, among other things, suspend or withhold a disbursement or suspend or terminate any portion of the DFA Award. Ex. A § 9.3(h) (INTEL_000450).

43.    Nothing in the DFA contemplated the U.S. government acquiring an equity interest in Intel.

**C.    The Secure Enclave.**

44.    On September 16, 2024, the U.S. Department of Defense (the "DOD") and the DOC jointly announced that Intel had been awarded "up to $3 billion in direct funding under the CHIPS and Science Act for a project known as the 'Secure

13

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

Enclave.'"[6]

45.    The Secure Enclave is a $3.5 billion fund derived from money originally intended to be part of the larger CHIPS Act program.  It purports to be a national security initiative that would make and package microchips in a special facility for defense and intelligence applications, including classified projects.[7]

46.    The award to Intel (the "Secure Enclave Award") was made to "support the manufacture of microelectronics and ensure access to a domestic supply chain of advanced semiconductors for national security."[8]

47.    Unlike the DFA Award, whose terms and conditions were memorialized in a publicly filed DFA, the specific terms and conditions of the Secure Enclave Award have not been publicly disclosed.  Upon information and belief, the Secure Enclave Award also contains bespoke terms and milestones that Intel must meet to receive distributions.  Also, upon information and belief, nothing in the Secure Enclave Award contemplated the U.S. government acquiring an equity interest in Intel.

---

[6]    https://www.war.gov/News/Releases/Release/Article/3906926/department-of-defense-department-of-commerce-joint-statement-announcement-in-su/.

[7]    *Id.*

[8]    *Id.*

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

48. Plaintiff requested that Intel provide any definitive documentation concerning the Secure Enclave Award (or, if none exist, a description of its material terms and conditions), but Intel has declined to produce any documents in response to that request, citing confidentiality restrictions.

49. To date, Intel is the only recipient of a Secure Enclave award.

**D.    Intel Reports a $16.6 Billion Quarterly Loss; Pat Gelsinger Departs**

50. On October 31, 2024, Intel reported a loss of $16.6 billion for the quarter ended September 30, 2024.

51. By December 2, 2024, the trading price of Intel Common Stock had declined approximately 52% since the start of the year.

52. On December 3, 2024, Intel announced that Mr. Gelsinger had retired as CEO and left the Board.

**E.    Intel Receives Disbursements Pursuant to the DFA**

53. Intel began receiving disbursements from the DFA Award during the fourth quarter of 2024.

54. In its Quarterly Report on Form 10-Q for the quarter ended June 30, 2025 (the "2Q25 10-Q"), Intel reported that, through June 28, 2025, it had received an aggregate of $2.2 billion in disbursements pursuant to the DFA, and had

15
**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

submitted requests for an aggregate of $850 million of additional disbursements that has been earned but not yet paid.[9]

### F.    President Trump and the CHIPS Act

55.    Following President Trump's election in November 2024, the future of many Biden Administration programs and policies, such as direct funding under the CHIPS Act and the Secure Enclave program, was in question, if not outright jeopardy.

56.    Nonetheless, during a December 4, 2024 presentation at UBS' Global Technology and AI Conference, when Intel's interim co-CEO, Executive Vice President and Chief Financial Officer ("CFO"), David A. Zinsner, was asked whether the DFA "is [ ] a piece that you see as maybe a risk potential[?]"[10]  Mr. Zinsner responded, "I don't think so.  *I mean we signed an agreement.  It's an ironclad agreement.*  It lays out all the milestones.  … [W]e're already actually 1/3 of the way probably through the milestones, quite honestly.  ...  There's always potential for some adjustment and thinking from the administration.  And if that's the case, we'll work with them."[11]

---

[9]    https://www.sec.gov/Archives/edgar/data/50863/000005086325000109/intc-20250628.htm.

[10]    https://seekingalpha.com/article/4742201-intel-corporation-intc-ubs-global-technology-and-ai-conference-transcript.

[11]    *Id*. (emphasis added).

16

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

57.    In a joint address to Congress on March 4, 2025, after lauding Taiwan Semiconductor's commitment to invest $165 billion in a chip manufacturing facility in the United States, President Trump told Congress: "Your CHIPS Act is a horrible, horrible thing.  We give hundreds of billions of dollars, and it doesn't mean a thing;" and "You should get rid of the CHIPS Act."[12]

58.    On March 28, 2025, Skadden, Intel's legal adviser on the contract challenged in this action, entered into an agreement with the DOC to provide $100 million of *pro bono* legal services to the DOC—an agreement that later came under Congressional scrutiny.

59.    On March 31, 2025, President Trump issued an Executive Order establishing the United States Investment Accelerator (the "USIA") within the DOC to be responsible for the CHIPS Program Office (the "CPO") and to focus on "negotiating much better deals [regarding the CHIPS Act] than those of the previous administration."[13]

---

[12]    President Donald J. Trump, Address to Joint Session of Congress, Mar. 4, 2025, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-joint-session-congress-2025-march-4-2025/.

[13]    Exec. Order No. 14255, 90 Fed. Reg. 14701 (March 30, 2025).

17

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

60.    Following the establishment of the USIA, Bloomberg reported that Secretary Lutnick "has signaled that he could withhold promised CHIPS Act grants." **Exhibit B**.[14]

61.    In response to actions and statements by the Trump Administration, Intel disclosed in its Current Report on Form 10-Q for the quarter ended March 29, 2025 (the "1Q25 10-Q") that "recent U.S. government actions create uncertainty regarding the timing of the US government fulfilling its obligations under our CHIPS Act agreements."[15]

## G.    Lip-Bu Tan Is Named CEO

62.    Tan served on the Board from September 2022 until his abrupt resignation on August 19, 2024.  Contemporaneous news reports indicated that Tan had resigned in frustration over Intel's bloated workforce and layers of bureaucracy.[16]

---

[14]    Mackenzie Hawkins and Ian King, *US Chip Grants in Limbo as Lutnick Pushes Bigger Investments*, Bloomberg, Mar. 31, 2025.

[15]    https://www.sec.gov/ix?doc=/Archives/edgar/data/50863/000005086325000 074/intc-20250329.htm.

[16]    https://www.reuters.com/technology/intel-board-member-quit-after-differences-over-chipmakers-revival-plan-2024-08-27/.

18

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

63.    In March 2025, Tan was appointed as CEO and returned to the Board to guide Intel through a turnaround after it reported a $19 billion loss in 2024.

64.    On July 24, 2025, Tan announced a three-pillar turnaround plan that included Intel being "deeply committed to investing in the U.S." for its foundry business while also "slowing construction in Ohio to ensure our spending is aligned with demand[.]"[17]

**H.    President Trump Calls for Tan's Immediate Resignation, Then Changes His Tune**

65.    On August 5, 2025, Senator Tom Cotton sent a letter (the "Cotton Letter") (**Exhibit C**) to Frank Yeary, chairman of the Board, expressing concern about "the security and integrity of Intel's operations and its potential impact on U.S. National Security."  Specifically, Senator Cotton questioned Intel's ability to fulfill certain security regulations in connection with the $7.8 billion grant Intel had received pursuant to the CHIPS Act, in light of CEO Tan's (i) alleged "control" of "dozens of Chinese companies" and Tan's "stakes" in "hundreds of Chinese advanced-manufacturing and chip firms," eight of which "reportedly have ties to the Chinese People's Liberation Army" and (ii) Tan's prior tenure as CEO of Cadence, which had recently "pled guilty to illegally selling its products to a Chinese military

---

[17]    https://newsroom.intel.com/corporate/lip-bu-tan-steps-in-the-right-direction.

19

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

university and transferring its technology to an associated Chinese semiconductor company without obtaining licenses."

66.    On August 7, 2025, the day after the public release of the Cotton Letter, President Trump called for Tan's resignation, posting on social media:



Donald J. Trump ✓ ➕
@realDonaldTrump

The CEO of INTEL is highly CONFLICTED and must resign, immediately. There is no other solution to this problem. Thank you for your attention to this problem!

**6.95k** ReTruths  **29.6k** Likes                    Aug 07, 2025, 7:39 AM [18]

67.    Like other CEOs (as well as heads of state) before him, Tan made a hurried pilgrimage to Washington in hopes of soothing the President's very public ire.

68.    On August 11, 2025, Tan visited the White House and met with the President, Secretary Lutnick and the Secretary of the Treasury.

69.    After the meeting, President Trump posted:

---

[18].    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 7, 2025), https://truthsocial.com/@realDonaldTrump/posts/114987288040725570.

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**



> **Donald J. Trump** ✓ ⊞
> @realDonaldTrump
>
> I met with Mr. Lip-Bu Tan, of Intel, along with Secretary of Commerce, Howard Lutnick, and Secretary of the Treasury, Scott Bessent. The meeting was a very interesting one. His success and rise is an amazing story. Mr. Tan and my Cabinet members are going to spend time together, and bring suggestions to me during the next week. Thank you for your attention to this matter!
>
> **5.37k** ReTruths   **28.4k** Likes                    Aug 11, 2025, 4:57 PM   [19]

## I.    Questions Surround the August 11 Meeting and the August 14 Board Meeting

70.    The Board met on August 14, 2025, joined by Skadden, during which the redacted meeting minutes indicate that "Mr. Tan informed the Board, that, among other topics, [he and President Trump] discussed the Cotton Letter to the Board, his investments in China, the turnaround at Cadence, plans for the Company and Intel Foundry, and the CHIPS Act funds."  **Exhibit D** INTEL_000001-6 at INTEL_000001.

71.    The redacted August 14 minutes do not contain any reference to giving the DOC, specifically, or the U.S. government, generally, a stake in Intel, nor any similar demands made by the DOC, the President, or the U.S. government.  *Id.*

---

[19]    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 11, 2025), https://truthsocial.com/@realDonaldTrump/115012131343690532.

21

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

72.    During the August 14 meeting, the Board was provided with a letter (the "Tan Letter") prepared by Tan and his counsel (who remain unidentified) to Intel's independent directors.  Ex. D at INTEL_000006.  The Tan Letter appears to summarize the August 11 meeting and states that Tan had committed to the President to transfer Tan's equity holdings in Walden management companies in China to others and "to transfer any economic incentives connected thereto to a blind trust."  *Id*.  The Tan Letter notes that "President Trump expressed satisfaction with this commitment."  *Id*.  Absent from the Tan Letter is any reference to the DOC taking an equity stake in Intel.[20]

73.    President Trump's later characterizations of the August 11 meeting paint a very different picture from that portrayed by the August 14 meeting minutes or the Tan Letter, which indicate that the Board was unaware of the Administration's demands for Intel shares.

74.    The Wall Street Journal reported President Trump as later saying, with regard to the August 11 White House meeting:

---

[20]    Missing from the materials produced to Plaintiff is the "Draft Response Letter to Senator Cotton" that is noted as having been provided to the Board.  *See* Ex. D at INTEL_000004.  It is not clear whether the Company and/or Tan ever responded to the Cotton Letter and, if so, what was said.

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

He came in, he saw me, we talked for a while. I liked him a lot, I thought he was very good. Trump said of Tan from the Oval Office. "I said, 'You know what? I think the United States should be given 10% of Intel.' And he said, 'I would consider that.'"[21]

75. In a similar vein, Reuters reported President Trump as later saying: "He [Tan] walked in wanting to keep his job and he ended up giving us $10 billion for the United States. So we picked up $10 billion."[22]

76. The totality of President Trump's comments indicates that the "deal" was finalized between the President and Tan at the August 11 White House meeting, yet that was not disclosed in the Tan Letter to the Board or the Board's August 14 meeting minutes. Thus, by all appearances, the "deal" was done during Tan's meeting with the President, and the Board's subsequent actions in approving the

---

[21]    Robbie Whelan, Amrith Ramkumar, Lauren Thomas and Josh Dawsey, *Inside Intel's Tricky Dance with Trump*, THE WALL STREET JOURNAL, Aug. 24, 2025, https://www.wsj.com/tech/inside-intels-tricky-dance-with-trump-c03f729c?gaa_at=eafs&gaa_n=AWEtsqeqNRhsEaVUp4WhM2Zz1sDLoShaExwp0duxoMusVF-MrcsM4NDZufYMa5H4YkI%3D&gaa_ts=696d1fb1&gaa_sig=F0DMUletKtkorhepmuXCoYfJI3Yii8aI9dD-Vq-mpkEFV_ZQfYO1dFkHcsS0H1PkVYvr3KidtoOEaGPqDc0IvQ%3D%3D.

[22]    Aditya Soni, David Shepardson, Andrea Shalal and Max A. Cherney, *US to take 10% equity stake in Intel, in Trump's latest corporate move*, REUTERS, Aug. 22, 2025, https://www.reuters.com/business/us-take-10-equity-stake-intel-trumps-latest-corporate-move-2025-08-22/.

23

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

unlawful contract challenged in this action was mere window dressing and did not involve any actual informed business judgment by the Board.

77. Confirming that a deal had been struck in principle between the President and Tan during the August 11 meeting, on August 18, 2025, CPO general counsel, Dave Shapiro, "sent a clear message" in a call to Intel CFO Zinsner that Intel "should not make the 'mistake of thinking that this is a negotiation[]' and 'the President is expecting to announce a deal on these terms on Friday.'" **Exhibit E** INTEL_000007-19 at INTEL_000012. The "CPO acknowledged that the Board could choose not to accept the offer, but noted that rejection will have consequences that [Shapiro] cannot predict and that [the B]oard needs to consider benefits of having a friend in this administration and what the administration can do to help Intel (including with customers)." *Id.*

78. CPO general counsel Shapiro's statement that the Board had no ability to negotiate against the government and that, should the Company not agree to the Administration's demands, the consequences would be unpredictable and decidedly unfriendly, was a direct threat to Intel and to the members of its Board.

**J.      The August 20 Board Meeting**

79. On August 20, 2025, the Board met again, with Skadden in attendance, which is the first time the Board was advised of the deal to give the U.S. government significant shares of stock in the Company. *See* Ex. E.

24

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

80.    The August 20 meeting minutes indicate that, in the span of a few days, (i) the DOC, through its CPO, had made "a verbal offer related to an investment by Administration (the United States);" (ii) the CPO had sent a draft warrant and common stock agreement to Intel (the "Term Sheet") (Ex. E at INTEL_000012); (iii) CFO Zinsner, had a follow up call with Shapiro at CPO; and (iv) Secretary Lutnick called Tan with updated terms on the deal.  *See* Ex. E.

81.    This whirlwind series of events is summarized in a page from materials prepared for the August 20 Board meeting:

## Key Messages

- Following LBT White House visit last week,  the CPO called David Z with a verbal offer related to an investment by the Administration (the United States) into Intel
- We received a full draft Warrant and Common Stock Agreement the following day (Aug 19)
- Small executive team, PJT, Skadden and Frank reviewed and discussed the proposal and developed questions and potential counter proposals given the economics and potential legal issues  of the deal presented
- Dave had a very short follow up discussion with Dave Shapiro, GC in the CPO office this morning (Aug 20)
- In that call, CPO sent a clear message to Dave -- we should not make the "mistake of thinking that this is a negotiation." and "the President is expecting to announce a deal on these terms on Friday"
- CPO acknowledged that the Board could choose not to accept offer, but noted that rejection will have consequences that he cannot predict and that board needs to consider benefits of having a friend in this administration and what the administration can do to help Intel (including with customers).
- Trying to determine whether CPO is in fact fully aligned with President
- Howard Lutnick called LBT with a counter of updated economic terms

Ex. E at INTEL_000012.

82.    The Term Sheet from the DOC was sent on August 20, 2025, and included, in part, the following terms: (i) release of $5.7 billion of previously awarded grant funds under the DFA, (ii) transfer of 9.9% Intel Common Stock to DOC, plus 10-year warrants for an additional 9.9% stock at $20 per share, and (iii)

25

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

a requirement that the DOC "vote its shares/consent in favor of each nomination and proposal recommended by Intel's Board and against any nomination or proposal not recommended by Intel's Board[.]" Ex. E at INTEL_000019.[23]

83.    The August 20 minutes reflect that "the economic terms that had been proposed [by] the Administration were not, in their current form, attractive to the Company and would need to be negotiated to achieve a transaction that the Board could support." Ex. E at INTEL_000008. As will be seen, even though the economic terms were not attractive, the Board ultimately agreed to them anyway, with very limited changes.

**K.    The August 22 Board Meeting: A Rush to Announce the Stock Agreement**

84.    The Board met for a third and final time to discuss the Administration's demands on August 22, 2025. **Exhibit F** INTEL_000020-32. Skadden also attended the meeting.

85.    The same day the Board met, Intel announced that it had entered into the unlawful contract with the DOC ("the Stock Agreement") (**Exhibit G**), which

---

[23]    The term sheet also provided that "Intel pay[] all out of pocket expenses incurred by [the DOC], including legal fees[]" and a requirement that a "legal opinion (building blocks, enforceability, no registration, 40 Act) and officer's certificate as to accuracy of representations/covenant compliance[]" be provided to the DOC prior to closing. Ex. E at INTEL_000019. Intel has confirmed that no legal opinion(s) were provided to the Board prior to it approving the transaction. Plaintiff was also not provided with any materials showing that Intel paid DOC's expenses and legal fees, as provided in the Term Sheet.

26

**THIS DOCUMENT IS A CONFIDENTIAL FILING. ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

Intel touted as a "historic agreement."[24]   Secretary Lutnick remarked that "Intel is excited to welcome the United States of America as a shareholder[.]"[25]

86.   Pursuant to the Stock Agreement, Intel agreed to issue the DOC 9.9% of the shares of Intel common stock, along with a Warrant, exercisable only if, prior to August 25, 2030, Intel ceased to own at least a 51% direct or indirect interest in its foundry business, to purchase an additional 4.9% of the Intel common stock at $20 a share.  Ex. G at 1.

87.   Notably, none of the Board minutes produced by the Company reflect that the Board received any opinion that the Stock Agreement was legal, and on information and belief, the Board never received such an opinion.  *See* Exs. D-F.

88.   President Trump announced the Stock Agreement in his own words, boasting that there was "ZERO" consideration given by the U.S. government for $11 billion in Intel Common Stock.

---

[24]   https://newsroom.intel.com/corporate/intel-and-trump-administration-reach-historic-agreement.

[25]   *Id.* (emphasis added).

27

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**



## L.    Flaws in The Stock Agreement.

### i.    *The Issuance of the Common Stock and the Warrant Are Without a Basis in the Law*

89.    Under the CHIPS Act, Congress created a multi-billion-dollar fund to be used by the DOC to provide financial assistance in the form of grants and loan guarantees to enable companies such as Intel to produce semiconductors. The funds are to be used "to incentivize investment in facilities and equipment in the United States for the fabrication, assembly, testing, advanced packaging, production, or

---

26    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 25, 2025), https://truthsocial.com/@realDonaldTrump/115089582863713336.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

research and development of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment."[27]

90.    The CHIPS Act does not authorize or direct the DOC to demand, let alone take, an equity stake in a private company such as Intel in connection with any financial assistance provided to that company by the DOC.  Nor is there any provision in any other law that authorizes the President, the DOC, or any other person or agency to acquire stock in a public traded company such as Intel in these circumstances.

91.    In a country based on private enterprise, only Congress may authorize the President or a federal agency to become a partial owner of a publicly traded company, and Congress has not done that in the CHIPS Act or any other law. Accordingly, the provisions of the Stock Agreement providing for Intel to grant the DOC 9.9% of its common stock, and for the issuance of a Warrant for an additional 4.9% of Intel's common stock, are without a legal basis and hence are void.

92.    The Stock Agreement describes and provides for the purported exchange of (i) the acceleration of the remaining $5.695 billion of the DFA Award and disbursements of $3.174 billion pursuant to the Secure Enclave Award—in other words, money that Intel either had already earned or had a right to receive—for

---

[27]    15 U.S.C. § 4653(a)(1).

29

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

(ii) 433,323,000 shares of Intel common stock, representing 9.9% of the outstanding shares as of June 28, 2025, along with a warrant to purchase up to 240,516,150 shares of Intel's common stock, or 4.9% of the outstanding shares on a pro forma basis as of June 28, 2025 (the "Warrant").  Ex. G at 1.

93.     Section 1.1(b) of the Stock Agreement provides that the DOC "agrees that to the maximum extent permissible under applicable Law, Intel's obligations pursuant to the DFA shall be considered discharged (other than with respect to Secure Enclave)."  Ex. G.  Because Intel had already satisfied the DFA with respect to a substantial portion of the funds subject to the DFA, this provision provided no meaningful consideration for the issuance to DOC of Intel's common stock and the Warrant.

94.     Section 1.1(b) of the Stock Agreement also provides that "[t]he US Government shall also make the disbursements in respect of, and on the terms and conditions of, Secure Enclave[.]"  Ex. G.  The U.S. government had already agreed to make "the disbursements in respect of, and on the terms and conditions of, Secure Enclave" when the Secure Enclave Award was announced in September 2024, and therefore this provision provided no meaningful consideration for the issuance to DOC of Intel's common stock and the Warrant.

95.      DOC's agreement to do what it had already agreed to do— to pay Intel money it was already owed or had a right to receive—was not meaningful

30

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

consideration for the transferring of 9.9% of Intel's common stock and the additional shares under the Warrant—a point recognized by President Trump himself" "I PAID ZERO FOR INTEL[.]"[28]

96.    Even if Intel had received consideration for its stock and the Warrant, the transaction would not be lawful because neither the CHIPS Act or any other law authorizes the U.S. government, including the DOC, to obtain stock or warrants in a publicly traded company.  Moreover, having apparently received no opinion on the matter, the Board had no basis to believe the Stock Agreement was lawful.

97.    When it announced the Stock Agreement, Intel acknowledged the questionable legality of the transaction by disclosing that the "the legislative, judicial or executive branches of the U.S. government could determine in the future that all or a portion of the transactions were unauthorized, void or voidable.  …  Further, while the DOC is contractually bound under the Purchase Agreement, no other agency or branch of the US Government has made commitments to support, refrain from challenging or otherwise impeding the transaction."[29]

---

[28]    Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 25, 2025), https://truthsocial.com/@realDonaldTrump/115089582863713336.

[29]    https://www.sec.gov/Archives/edgar/data/50863/000005086325000129/intc-20250822.htm.

31

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

### ii.    *The Voting Agreement Undermines the Board's Objectivity*

98.    Pursuant to Section 4.6 of the Stock Agreement, the DOC agreed to vote the DOC shares, as well as any shares of Intel common stock issued as a result of the exercise of the Warrant "(x) in favor of each nomination and proposal recommended by the Board of Directors and (y) against any other nomination or proposal not recommended by the Board of Directors," at any meeting of Intel's stockholders, subject to limited exceptions (the "Voting Agreement").  Ex. G.

99.    Both the August 20 minutes and August 22 minutes make passing reference to "governance rights," without further discussion.  *See* Exs. E-F.  The Board did not discuss any benefit to Intel's stockholders from giving the Board control over an additional 10%, or more, of the vote.  Nor did the Board consider any alternative to the Voting Agreement, such as issuing non-voting stock to the U.S. government.  This benefit to the Board members created a further conflict of interest in their decision on whether to approve the Stock Agreement and provided the Board with a non-ratable benefit in return.

### iii.    *Intel's Conflicted Legal Advisor.*

100.    The Company was advised on the Stock Agreement by Skadden, which suffered a conflict of interest which was also not discussed by the Board in its decision-making to approve the Stock Agreement.

32

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

101.   Skadden had previously agreed to contribute $100 million towards *pro bono* initiatives backed by the U.S. government, including for legal services to the DOC and other federal agencies.

102.   Skadden's agreement with the government—and the President, in particular—is the subject of multiple investigations by Congressional committees to determine the specific details of that agreement and whether it comports with existing law, as well as Skadden's ethical obligations.

103.   On April 6, 2025, Senators Richard Blumenthal and Representative Jamie Raskin, of the Senate Permanent Subcommittee on Investigations and the House Judiciary Committee, respectively, sent Skadden a letter seeking information and records about "an agreement whereby [Skadden] committed to providing $100 million in pro bono legal services to causes the President supports and acceded to the President's demands as to [Skadden's] selection of clients and the employees it chooses to hire, promote, and retain."[30]

104.   On September 24, 2025, Senator Blumenthal, joined by Senator Adam D. Schiff, and Representative Raskin sent another letter to Skadden stating that Skadden's response to the April 6, 2025 letter "failed to provide any of the requested

---

[30]    https://www.hsgac.senate.gov/wp-content/uploads/2025-4-6-Blumenthal-Raskin-Letter-to-Skadden.pdf.

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

records or information" preventing Congress from investigating "why [Skadden] promised $100 million in pro bono legal services to causes hand-picked by President Trump[.]"[31]

107. The Congressmen questioned whether adequate disclosures of these conflicts have been provided to Skadden's clients and requested further information from Skadden, including, *inter alia*, "a detailed description of the scope and duration of Skadden's work for the Commerce Department and an explanation of "whether Skadden notified clients adverse to the Administration of Skadden's work for the U.S. Government."[32]

106. The allegations set out in these Congressional inquiries further raised Plaintiff's concerns about Skadden's conflicts of interest and the overall fairness of the Stock Agreement.

107. In sum, Intel was being advised in a transaction with the DOC by a law firm that simultaneously represented the DOC as a result of a similar shakedown by the Administration. No evidence has been produced—in the Board meeting minutes or otherwise—that the Board was ever advised about or even considered Skadden's

---

[31]    https://www.hsgac.senate.gov/wp-content/uploads/2025-9-24-Letter-from-Sen.-Blumenthal-Congressman-Raskin-Sen.-Schiff-to-Skadden.pdf.

[32]    *Id.*

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

serious conflicts of interest.  *See generally* Exs. D-F.  Moreover, Skadden apparently never opined as to whether the Stock Agreement was lawful.  *Id.*

**M.   The Board's Flawed and Tainted Process.**

108.   The process by which the Board approved the execution of the Stock Agreement was flawed and tainted.

> ***i.    The Board Failed to Inform Themselves of All Material Information Regarding the Stock Agreement.***

109.   Absent from the three sets of Board meeting minutes are, without limitation, (i) any analysis of the legality of the DOC's claim that it was entitled (under the DFA or other applicable law) to obtain ownership interests in a private company or to delay or withhold disbursements of the DFA Award or the Secure Enclave Award; (ii) any analysis of possible alternative funding sources the Company might utilize in the event that the DOC delayed or withheld disbursements of the DFA Award or the Secure Enclave Award; and (iii) any discussion of what "consequences" might ensue if the Board declined to accept the DOC's "offer." *See generally* Exs. D-F.

110.   Also missing is any discussion of how an effort to mollify President Trump's apparent concerns about Tan and the issues raised in the Cotton Letter morphed into a demand for 9.9% of Intel's equity, and whether the DOC had the legal right to make that demand.

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

111.   The absence from the meeting minutes is any questioning of the legality of the DOC's demand for 9.9% of Intel's equity or the circumstances under which that demand was made, along with the absence of any evidence that the Board seriously considered refusing the DOC's demand, leads to one conclusion:  the Board's process was not merely flawed, it was entirely lacking in any business judgment and was tainted by the following personal considerations of the Board members.

### ii.    The Board's Decision Was Tainted by Personal Considerations.

112.   Measuring reputational damage is not an exact science, but precision is not needed to realize that President Trump's August 7, 2025 post declaring that Tan was "highly CONFLICTED" and "must resign immediately" caused grievous injury to Tan's reputation, as well as the anxiety and discomfort attendant to being in the President's crosshairs.  That demand followed on the heels of the Cotton Letter, which called out Tan's tenure as Intel CEO as a risk to national security.

113.   It would be impossible for any member of the Board to avoid questioning whether, if the Board rejected the DOC's demand, President Trump would publicly attack them as well, particularly in light of the CPO's assertion that the discussions were "not a negotiation" and his none-too-subtle reference to the

36

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

"consequences" that would follow such a rejection.  The President's post was, therefore, as much of a threat to the other members of the Board as it was to Tan.

114.    Given President Trump's *modus operandi*, it would be understandable if the members of the Board feared that rejecting the DOC's demand would materially and adversely affect their personal interests (including, but not limited to, their interests in protecting their personal reputations, being free from attacks by President Trump and his supporters on social media and elsewhere, preserving business and social ties, and not jeopardizing possible future business, financial and other opportunities).    Those understandable fears tainted and undermined the Board's decision-making process in approving the Stock Agreement.

## N.    Demand on the Board Would be Futile.

115.    Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

116.    Plaintiff has not made a demand on Intel's current Board to institute this action against the Defendants.  Any such demand would be a futile because a majority of the Board (a) approved the Stock Agreement at a series of meetings in August 2025 and there is no basis to conclude that they would change their minds, particularly since the Company's response to the Demand stated that the Stock Agreement was in the best interests of Intel; (b) were cowed by the Administration's threats and could not independently determine whether to approve the transaction;

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

(c) acted without adequate information or basis to approve the transfer of 9.9% of Intel's equity to the U.S. government for no meaningful consideration, in a transaction which they had no good faith basis to believe was lawful; (d) received a material, non-ratable personal benefit from the transaction in the form of the Voting Agreement; and (e) face a substantial likelihood of personal liability for their actions.

**O.  Plaintiff's Demand to Inspect Intel's Books and Records.**

117.   On November 20, 2025, Paisner made a demand under Section 220 to inspect Intel's books and records related to the Stock Agreement.  **Exhibit H**.

118.   On December 15, 2025, the Company issued a response to the Demand and refused to produce the requested books and records.  **Exhibit I**.

119.   Subsequent correspondence amongst counsel for the parties led to an agreement by the Company to produce certain Board materials relating to the Stock Agreement.

120.   On December 23, 2025, Plaintiff executed the Company's confidentiality agreements and received a limited number of Board meeting minutes and director questionnaires.

121.   To date, despite follow up from Plaintiff, Intel has refused to produce any additional books and records that are substantively responsive to the Demand.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

## COUNT I
### (Derivative Breach of Fiduciary Duty Claim Against the Director Defendants)

122.   Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

123.   The Director Defendants owed and owe Intel fiduciary duties.   By reason of their fiduciary relationships, the Director Defendants must exercise care, loyalty and good faith in the management and administration of Intel's business and affairs.

124.   The Director Defendants violated and breached their fiduciary duties of care, loyalty and good faith by failing to analyze and be fully informed about the legal basis for President Trump's demands for an equity interest in the Company in exchange for release of previously awarded grant funding, or to consider any alternatives to caving into the Administration's demands.

125.   The Director Defendants violated and breached their fiduciary duties of care, loyalty and good faith by putting their own interests ahead of the long-term interests of the Company by negotiating for the Voting Agreement which guaranteed that the DOC would vote in favor of all nominations and proposals presented and supported by the Board and would vote against any nominations or proposals not presented or supported by the Board, which was a non-ratable benefit personal to the

39

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

Director Defendants.    The Director Defendants also failed to consider any alternatives to the Voting Agreement.

126.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Intel has sustained and will continue to sustain significant risks and damages from the Stock Agreement.

127.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company for their breaches of fiduciary duties.

128.    Plaintiff, on behalf of Intel, has no adequate remedy at law.

## COUNT II
## (Derivative Waste Claim Against the Director Defendants)

129.    Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

130.    As detailed above, the Director Defendants improperly entered the Stock Agreement because any benefits received by Intel cannot reasonably be viewed as meaningful consideration for the transactions contemplated thereby.

131.    The Director Defendants wasted Intel's corporate assets by knowingly authorizing or permitting the Company to issue billions of dollars' worth of Intel stock to the DOC, to which the DOC had no legal right to demand or obtain, in exchange for federal funding that it had already been awarded to Intel, had already

40

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

been earned by Intel or for which Intel had a contractual right to receive under the DFA and Secure Enclave.

132.    The Director Defendants wasted Intel's corporate assets by failing to review and analyze any potential alternatives to the Stock Agreement, including but not limited to, refusing the Administration's demands, seeking alternative financing, and considering potential legal claims under the DFA and Secure Enclave.

133.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

## COUNT III
**(Derivative Claim to Invalidate Stock Agreement Against All Defendants)**

134.    Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

135.    The CHIPS Act does not authorize or direct the DOC to demand, let alone take, an equity stake in a publicly traded company such as Intel in connection with any financial assistance provided to that company by the DOC.  Nor is there any provision in any other law that authorizes the President, the DOC, or any other federal officer or agency to acquire stock in a publicly traded company such as Intel in these circumstances.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.

136.   Only Congress may authorize the President or a federal agency to become a partial owner of a publicly traded company, and Congress has not done that in the CHIPS Act or any other law.

137.   As such, the Secretary and the DOC knew or should have known that the Stock Agreement was an unlawful agreement.

138.   The unlawful Stock Agreement conferred an inequitable benefit on the DOC which it cannot retain.

139.   Director Defendants knew or should have known that the Stock Agreement was an unlawful contract as evidenced by the lack of legal opinion certifying the Stock Agreement.  Accordingly, the Board could not represent to stockholders that the Stock Agreement was lawful, but instead chose only to disclose risks that the Stock Agreement could ultimately be found to be void, voidable or unenforceable.

140.   The Stock Agreement is therefore without a legal basis and is void.

## COUNT IV
### (Direct Claim Against Director Defendants)

141.   Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

142.    The Director Defendants breached their fiduciary duties to Plaintiff by entering into the Voting Agreement which diluted the voting rights of all stockholders and conferred those voting rights upon the Director Defendants.

143.    Plaintiff has been harmed through the Voting Agreement's dilution of his voting rights.

144.    Plaintiff is entitled to damages for the Director Defendants' breaches of fiduciary duty.

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    An order finding that the Director Defendants have breached their fiduciary duties to Intel in approving the Stock Agreement;

B.    A declaration that the Stock Agreement is void due to its illegality, unenforceability and/or the Director Defendants' breaches of fiduciary duties;

C.    A declaration that the DOC had no legal right to demand or accept Intel stock and that Intel's Board had a legal obligation not to offer its stock or a warrant for its stock to the DOC or any other agency of the U.S. government;

D.    An order finding that the Director Defendants committed waste by approving the Stock Agreement;

E.    An order cancelling all of Company shares of common stock and the Warrant issued to the DOC pursuant to the Stock Agreement;

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**

F.      An order releasing to the Company the escrowed stock that is being

held for future distribution to the DOC in connection with the Warrant authorized in

the Stock Agreement;

G.      An order awarding damages in an amount to be proved at trial;

H.      An order awarding Plaintiff his costs and expenses, including

reasonable attorneys' fees, incurred in the prosecution of this action; and

I.      An order granting Plaintiff such other relief as this Court deems just

and appropriate.

                                        HEYMAN ENERIO
                                        GATTUSO & HIRZEL LLP

                                        */s/ Kurt M. Heyman*
                                        Kurt M. Heyman (# 3054)
                                        Gillian L. Andrews (# 5719)
                                        222 Delaware Avenue, Suite 900
                                        Wilmington, DE 19801
                                        (302) 472-7300
                                        anelson@hegh.law
                                        gandrews@hegh.law
                                        *Attorneys for Plaintiff Richard D. Paisner*

OF COUNSEL:

GW LAW
Alan B. Morrison
2000 H Street NW
Washington D.C. 20052
(202) 994-7120
abmorrison@law.gwu.edu

Dated:  March 5, 2026

44

**THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS IS
PROHIBITED EXCEPT AS AUTHORIZED BY RULE 5.1 OR COURT ORDER.**