# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| RICHARD D. PAISNER,<br><br>                  Plaintiff,<br><br>          v.<br><br>LIP-BU TAN, *et al.*,<br><br>                  Defendants,<br><br>          and<br><br>INTEL CORPORATION,<br><br>                  Nominal Defendant. | C.A. No. 1:26-cv-00414-RGA |

## [PUBLIC REDACTED VERSION] INTEL DEFENDANTS' OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS COMPLAINT

OF COUNSEL:

MUNGER, TOLLES & OLSON LLP
John M. Gildersleeve (*pro hac vice*)
Brian Rivas Boessenecker (*pro hac vice*)
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100

MUNGER, TOLLES & OLSON LLP
Bridget Fitzpatrick (*pro hac vice*)
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001
(202) 220-1131

AKERMAN LLP
Tammy L. Mercer (#4957)
222 Delaware Avenue, Suite 1710
Wilmington, DE 19801
(302) 596-9200

*Attorneys for Defendants Lip-Bu Tan, Frank D. Yeary, Craig H. Barratt, James Goetz, Andrea J. Goldsmith, Alyssa H. Henry, Eric Meurice, Barbara Novick, Steve Sanghi, Gregory D. Smith, Stacy J. Smith, Dion J. Weisler, and Nominal Defendant Intel Corporation*

May 21, 2026

**TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF PROCEEDINGS ..................................................................1

SUMMARY OF ARGUMENT ......................................................................................1

STATEMENT OF FACTS ............................................................................................2

    A.    Intel Is Awarded Future Funding Under the CHIPS Act and Secure Enclave, Subject to Achieving Milestones and Other Conditions ..........................3

    B.    Intel and DOC Negotiate and Agree to the Stock Agreement ................................4

    C.    The Stock Agreement Accelerates Funding, Removes Milestones and Conditions, and Aligns the U.S. Government with Intel .........................................7

ARGUMENT .................................................................................................................8

    A.    The Complaint Should Be Dismissed Under Rule 23.1 Because Plaintiff Fails to Plead Particularized Facts Showing That Demand Is Futile for a Majority of Intel's Directors ..................................................................................8

        1.    Legal Standard for Pleading Demand Futility .............................................8

        2.    Plaintiff Fails to Plead Any Material Personal Benefit to Any Director ...................................................................................................10

        3.    Plaintiff Fails to Plead Any Substantial Likelihood of Liability for Any Director ...................................................................................................13

        4.    Labeling Count IV a "Direct" Claim Does Not Prevent Dismissal ...........19

    B.    Alternatively, the Complaint Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim ..................................................................................20

CONCLUSION ............................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Benak v. All. Cap. Mgmt. L.P.*,
435 F.3d 396 (3d Cir. 2006)........................................................................................3

*In re Cognizant Tech. Sols. Corp. Deriv. Litig.*,
101 F.4th 250 (3d Cir. 2024) ...........................................................................8, 9, 10, 17

*Def. Distributed v. Att'y Gen. of N.J.*,
167 F.4th 65 (3d Cir. 2026) .......................................................................................17

*Foote v. Mehrotra*,
2023 WL 7214728 (D. Del. Nov. 2, 2023) ...............................................3, 9, 11, 13

*JNL Mgmt., LLC v. Hackensack Univ. Med. Ctr.*,
2019 WL 1951123 (D.N.J. May 2, 2019)...................................................................3

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991)......................................................................................................9

*Kiger v. Mollenkopf*,
2021 WL 5299581 (D. Del. Nov. 15, 2021) ......................................................11, 16

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002)......................................................................................3

*Smith v. Carrillo*,
2019 WL 6328033 (D. Del. Nov. 26, 2019) ................................................ 9, *passim*

*Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.*,
742 F.3d 37 (2d Cir. 2014).......................................................................................17

*Starr Int'l Co., Inc. v. United States*,
856 F.3d 953 (Fed. Cir. 2017)...................................................................................17

*In re Stem, Inc. Deriv. Litig.*,
2026 WL 880441 (D. Del. Mar. 31, 2026) ...............................................................20

*The Chemours Co. Sec. Litig.*,
2026 WL 1229228 (D. Del. May 5, 2026)..................................................................3

**STATE CASES**

*An v. Cosman*,
2025 WL 2180575 (Del. Ch. July 31, 2025)............................................................19

*Brookfield Asset Mgmt., Inc. v. Rosson*,
  261 A.3d 1251 (Del. 2021) ...............................................................................................19

*Chester Cnty. Emps.' Ret. Fund v. New Residential Inv. Corp.*,
  2017 WL 4461131 (Del. Ch. Oct. 6, 2017) ......................................................................10

*In re Citigroup Inc. S'holder Deriv. Litig.*,
  964 A.2d 106 (Del. Ch. 2009)...........................................................................................16

*Clifford Paper, Inc. v. WPP Invs., LLC*,
  2021 WL 2211694 (Del. Ch. June 1, 2021).......................................................................19

*In re Cornerstone Therapeutics Inc. S'holder Litig.*,
  115 A.3d 1173 (Del. 2015) .........................................................................................11, 20

*Gagliardi v. TriFoods Int'l, Inc.*,
  683 A.2d 1049 (Del. Ch. 1996)..........................................................................................16

*Gibraltar Priv. Bank & Tr. Co. v. Bos. Priv. Fin. Holdings, Inc.*,
  2011 WL 6000792 (Del. Ch. Nov. 30, 2011) ...................................................................18

*Glean Tech Fund II LP v. McIntosh*,
  2025 WL 2505049 (Del. Ch. Sept. 2, 2025) .....................................................................11

*Gottlieb v. Duskin*,
  2020 WL 6821613 (Del. Ch. Nov. 20, 2020) ...................................................................12

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003)...........................................................................................11

*Hanna v. Paradise*,
  2025 WL 1836642 (Del. Ch. July 3, 2025)........................................................................11

*Ligos v. Tsuff*,
  2022 WL 17347542 (Del. Ch. Dec. 1, 2022).....................................................................14

*Lyondell Chem. Co. v. Ryan*,
  970 A.2d 235 (Del. 2009) ...........................................................................................14, 20

*In re McDonald's Corp. S'holder Deriv. Litig.*,
  291 A.3d 652 (Del. Ch. 2023)...........................................................................................17

*McElrath v. Kalanick*,
  224 A.3d 982 (Del. 2020) .....................................................................................13, 14, 15

*Morrison v. Berry*,
  2019 WL 7369431 (Del. Ch. Dec. 31, 2019).....................................................................10

iii

*New Enter. Assocs. 14, L.P. v. Rich*,
  292 A.3d 112 (Del. Ch. 2023)........................................................................................19

*New Enter. Assocs. 14, L.P. v. Rich*,
  295 A.3d 520 (Del. Ch. 2023)........................................................................................13

*In re New Media Invs. II, LLC*,
  2026 WL 208698 (Del. Ch. Jan. 27, 2026)....................................................................19

*In re Pure Res., Inc., S'holders Litig.*,
  808 A.2d 421 (Del. Ch. 2002)........................................................................................18

*Ryan v. Armstrong*,
  2017 WL 2062902 (Del. Ch. May 15, 2017), *aff'd*, 176 A.3d 1274 (Del. 2017) ....................12

*Shafi v. Chien*,
  2025 WL 671854 (Del. Ch. Mar. 3, 2025)......................................................................10

*Siegel v. Cantor Fitzgerald, L.P.*,
  2025 WL 1074604 (Del. Ch. Apr. 10, 2025)...................................................................19

*Texas Pac. Land Corp. v. Horizon Kinetics LLC*,
  306 A.3d 530 (Del. Ch. 2023)........................................................................................13

*In re Trade Desk, Inc. Deriv. Litig.*,
  2025 WL 503015 (Del. Ch. Feb. 14, 2025), *aff'd*, 350 A.3d 1223 (Del. 2025) ....................11

*In re Tri-Star Pictures, Inc. Litig.*,
  1995 WL 106520 (Del. Ch. Mar. 9, 1995).....................................................................20

*United Food & Com. Workers Union v. Zuckerberg*,
  250 A.3d 862 (Del. Ch. 2020)........................................................................................14

*United Food & Com. Workers Union v. Zuckerberg*,
  262 A.3d 1034 (Del. 2021) ....................................................................................2, 9, 11

*In re Vaxart, Inc. S'holder Litig.*,
  2021 WL 5858696 (Del. Ch. Dec. 1, 2021)....................................................................13

*White v. Panic*,
  783 A.2d 543 (Del. 2001) ..............................................................................................17

*Zucker v. Andreessen*,
  2012 WL 2366448 (Del. Ch. June 21, 2012)..................................................................19

**FEDERAL STATUTES**

15 U.S.C. § 4659(a) ...........................................................................................................17

28 U.S.C. § 1367(c) ....................................................................................................................20

**STATE STATUTES**

8 *Del. C.* § 102(b)(7)..........................................................................................................13, 14

8 *Del. C.* § 122(18) ...................................................................................................................13

8 *Del. C.* § 141(e)......................................................................................................................15

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(6)...................................................................................................1, 2, 9, 20

Fed. R. Civ. P. 23.1 ................................................................................................... 1, *passim*

**NATURE AND STAGE OF PROCEEDINGS**

On March 5, 2026, Plaintiff filed the Verified Stockholder Derivative Complaint (D.I. 4, "Complaint") in the Delaware Court of Chancery against Intel Corporation's board of directors, the United States Department of Commerce ("DOC"), and DOC Secretary Howard Lutnick in his official capacity. On April 10, 2026, DOC and Secretary Lutnick removed the action to this Court. Intel and its directors now move to dismiss the Complaint under Federal Rules of Civil Procedure 23.1 and 12(b)(6).

**SUMMARY OF ARGUMENT**

Plaintiff is an Intel stockholder who purports to assert claims on Intel's behalf. The claims stem from Plaintiff's disagreement with actions that Intel's board took in its business judgment and in the best interest of Intel and its stockholders. Because Plaintiff has no standing to assert Intel's claims, this action should be dismissed under Rule 23.1.

On Intel's behalf, Plaintiff challenges the August 22, 2025 Warrant and Common Stock Agreement ("Stock Agreement") between Intel and DOC. In the Stock Agreement, DOC agreed to accelerate payment to Intel of billions of dollars that were contingent under the terms of Intel's CHIPS Act award and to release Intel from certain obligations tied to that funding. In exchange, DOC received Intel stock and warrants to buy additional stock. The Stock Agreement affirmed the U.S. Government's confidence in Intel's role in advancing the national priority of domestic semiconductor manufacturing. In the six months before the agreement, Intel's average share price was $21.65; in the next six months, it was $38.10, and on May 20, 2026, the day before this filing, Intel's stock closed at $118.96.

Purportedly to benefit Intel, Plaintiff alleges that Intel's board breached its fiduciary duties and committed waste by approving the Stock Agreement. Plaintiff seeks damages for Intel and asks the Court to invalidate the agreement.

1

1. The Court should dismiss the Complaint under Rule 23.1 because Plaintiff did not make the required pre-suit demand on Intel's board and the Complaint fails to plead particularized facts showing that demand is futile. To usurp the authority of Intel's board—12 directors elected by all of Intel's stockholders to manage its business and affairs—and assert claims on Intel's behalf, Plaintiff must show that at least six directors (1) "received a material personal benefit from the alleged misconduct"; (2) "face[] a substantial likelihood of liability"; or (3) "lack[] independence" from someone who received such a benefit or faces such liability. *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). No such particularized facts are pleaded for any Intel director, much less for six of them.

The Complaint fails to allege that any director materially and personally benefited from the Stock Agreement, and it fails to allege intentional, bad-faith misconduct by any director, as is required for a substantial likelihood of liability. Disagreeing with a board's business judgment, and claiming that it should have driven a harder bargain, does not show the directors' bad faith. Nor does it match the pleaded facts. Intel's board *rejected* DOC's initial proposal despite its many benefits—including making contingent future funding immediately available; releasing Intel from certain obligations; and strategically aligning the interests of Intel's stockholders and the U.S. Government—and the resulting negotiation improved the terms for Intel. Plaintiff also fails to allege that the Stock Agreement was unlawful, much less that Intel's board knew that and approved it anyway.

2. Alternatively, the Court should dismiss the Complaint under Rule 12(b)(6). For largely the same reasons, Plaintiff fails to state any plausible claim against Intel's directors.

## STATEMENT OF FACTS

The statement of facts below is drawn from the Complaint's allegations and exhibits, and from materials subject to judicial notice and/or incorporated by reference in the Complaint.

2

## A. Intel Is Awarded Future Funding Under the CHIPS Act and Secure Enclave, Subject to Achieving Milestones and Other Conditions

In 2021, Intel adopted a new strategy that involves manufacturing not only Intel-designed chips, but also chips designed by outside customers. ¶ 32.[1] This strategy "required a massive investment to expand Intel's manufacturing capacity." ¶ 33. Meanwhile, "the U.S. Government was becoming increasingly concerned about the perils to national security posed by the sharp decline in domestic chip manufacturing." *Id.* In 2022, Congress enacted the CHIPS Act, "providing more than $52 billion in incentives and federal support for the domestic semiconductor industry." ¶ 35.

**CHIPS Act funding.** In November 2024, Intel and DOC, which administers the CHIPS Act, executed a Direct Funding Agreement ("DFA") under which Intel would receive "up to $7.8 billion" if conditions were met. ¶ 40. The DFA provided that "DOC will disburse funds … when certain milestones towards completion of a project are met" and guaranteed no funding apart from completion of milestones. ¶ 41. It also contained numerous "Clawback" conditions allowing DOC to "suspend or withhold a disbursement or suspend or terminate any portion of the DFA Award." ¶ 42.[2] As of June 28, 2025, Intel had received $2.2 billion under the DFA. ¶ 54.

---

[1] Paragraph citations refer to the Complaint; Exhibits A–I refer to its exhibits. Exhibits 1-6 are the exhibits to the Declaration of Brian Rivas Boessenecker, which are publicly available and subject to judicial notice: Intel's certificate of incorporation and bylaws (Exs. 1, 2), *see Foote v. Mehrotra*, 2023 WL 7214728, at *9 n.5 (D. Del. Nov. 2, 2023); *JNL Mgmt., LLC v. Hackensack Univ. Med. Ctr.*, 2019 WL 1951123, at *4 (D.N.J. May 2, 2019); SEC filings (Exs. 3, 4), *see The Chemours Co. Sec. Litig.*, 2026 WL 1229228, at *4 n.6 (D. Del. May 5, 2026); a news article (Ex. 5), *see Benak v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); and stock-price data (Ex. 6), *see In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002). In addition, Exhibits 3-5 are incorporated by reference in the Complaint. *See* ¶ 85 (Ex. 3); ¶ 97 (Ex. 4); ¶ 74 (Ex. 5).

[2] Specifically, the DFA conditioned disbursements on "satisfactory completion of the applicable Disbursement Milestone." Ex. A § 2.2.2. "Clawback Events" entitled DOC to "impose additional conditions," "suspend or terminate, all or any portion of," the award, "temporarily withhold or suspend a Disbursement," and "demand recovery … up to the full amount of the proceeds paid." *Id.* § 9.3. Annex D contained 23 pages of additional "Program Requirements."

***Secure Enclave funding.*** In September 2024, Intel announced "up to $3 billion in direct funding" for Secure Enclave, a "national security initiative." ¶¶ 44-45. This award likewise had "bespoke terms and milestones that Intel must meet to receive distributions." ¶ 47.

### B. Intel and DOC Negotiate and Agree to the Stock Agreement

Plaintiff alleges that, after President Trump's election, "the future of … direct funding under the CHIPS Act and the Secure Enclave program[] was in question, if not outright jeopardy." ¶ 55. In March 2025, the President told Congress to "'get rid of the CHIPS Act.'" ¶ 57; *see* ¶ 60 (alleging that Secretary Lutnick "'signaled that he could withhold promised CHIPS Act grants'"). Intel warned investors of the resulting "uncertainty regarding the timing of the US government fulfilling its obligations." ¶ 61.

***August 11 White House meeting.*** On August 7, 2025, after Senator Cotton questioned certain investments by Intel's CEO Lip-Bu Tan, the President posted that Tan was "highly CONFLICTED and must resign." ¶¶ 65-66. On August 11, Tan met with the President, Secretary Lutnick, and Treasury Secretary Bessent at the White House, after which the President posted that "my Cabinet members" and Tan would "spend time together" and "bring suggestions to me during the next week." ¶¶ 68-69.

***August 14 board meeting.*** On August 14, Tan reported to Intel's board of directors that



" ¶ 70; Ex. D at '001. Intel's board also reviewed ¶ 72; Ex. D at '006. The board's independent directors then met separately with outside counsel at Skadden. *See* Ex. D at '003.

***August 20 board meeting.*** Intel's board next met on August 20, when it discussed proposals by DOC to acquire stock in Intel. ¶ 79. Intel's CFO David Zinsner reported on multiple recent developments. First, on August 18, a DOC official had made a "        " which was

followed on August 19 by a draft agreement.  ¶ 81.  ███████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████"  *Id.*  Early on August 20, Zinsner spoke

again with the DOC official,  █████████████████████████████████████████████

██████████████████████████████████████████"  *Id.*  ████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████"  *Id.*  Secretary

Lutnick then called Tan with "████████████████████████"  *Id.*

     After Zinsner's report, the board weighed DOC's "███████████████████████

████████████████████████████████████████████"  Ex. E at '007; *see id.* at

'013-'019 (slides).  Under DOC's first offer, Intel would receive the "██████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████  *Id.* at '013.  In return, DOC would immediately receive ████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████  *Id.* at '013,

'019.  DOC's offer included a commitment to vote its shares for board nominees and proposals,

with some exceptions.  ¶ 82.  Under DOC's revised offer, Intel would get more: ████████████

█████████████████████████████████████████████████████████████████████"  Ex. E

at '015.  Intel would also give less: ███████████████████████████████████████████

████████████████████  *Id.*

     The board identified three major benefits to Intel from the transaction.  It would (1) "████████

█████████████████████████████████████████████████████████████████████████

██████████████████████"; (2) "████████████████████████████████████████████████████████████████████████████████████"; and (3) "a██████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. E at '008.  The board considered this "██████████████████████████" along with "██████████████████████████████████████████████████" *Id.*

The board determined that DOC's terms "████████████████████████████████████████████████████████████████████████████████████████████████"

¶ 83.  It "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. E at '008.  The board considered a "Draft Proposed Counter" in which Intel would receive, among other things, ██████████████████████ *Id.* at '016.  The independent directors (*i.e.*, all but Tan) then met separately with Skadden and "████████████████████████████████████████████████████████████████████████████████████████████████████████████" *Id.* at '008.

*August 22 board meeting.*  Intel's board met again on August 22.  ¶ 84.  Tan and Zinsner "██████████████████████████████████████" and Intel's "████████████████████" Ex. F at '020. Zinsner described ██████████████████████████████████████████████ Intel still would receive "██████████████████████████████████████████████████████████████████████████████████████████████████████"



giving Intel more flexibility to manage the future of that business. *Id.* at '021; *see* Ex. G at '370 (warrant); *compare* Ex. E at '019 (under prior offer, warrants triggered if Intel "███████████████████████████████████") (emphasis added).

After "██████████" the board concluded that "████████████████████████████████████████████████████████" Ex. F at '021. The board approved the Stock Agreement. *Id.* President Trump and Tan then announced it from the Oval Office, where the President said "he hoped he could help 'make Intel great' again." Ex. 5 at 12. In a press release, Intel described the Stock Agreement and quoted endorsements from Secretary Lutnick and the CEOs of Intel customers Microsoft, Dell, HP, and Amazon Web Services. ¶ 85; Ex. 3 at 9.

## C.    The Stock Agreement Accelerates Funding, Removes Milestones and Conditions, and Aligns the U.S. Government with Intel

The Stock Agreement provides that DOC will receive newly issued shares representing 9.9% of Intel stock, plus warrants for an additional 5% of Intel stock "exercisable only if, prior to August 25, 2030, Intel cease[s] to own at least a 51% direct or indirect interest in its foundry business." ¶ 86; Ex. G § 1.1(a). In exchange, the Stock Agreement provides that DOC will release $5.7 billion under the DFA "as promptly as practicable," and that, "to the maximum extent permissible under applicable Law, Intel's obligations pursuant to the DFA shall be considered discharged (other than with respect to Secure Enclave)." Ex. G § 1.1(b); *see id.* (DOC will "work with [Intel] to make appropriate amendments and modifications to the DFA"). As to Secure

7

Enclave, the agreement provides that "[t]he US Government shall also make the disbursements in respect of … Secure Enclave," *id.*, and that Intel will escrow the corresponding shares and release them as disbursements occur, *id.* § 4.4(b).  In addition, the Stock Agreement provides that DOC, with certain exceptions, will vote its shares for "each nomination and proposal recommended by the Board of Directors."  ¶ 98; *see* Ex. G § 4.6.

On August 27, 2025, Intel and DOC executed an Implementing Amendment to the DFA "as partial consideration for [DOC] receiving … Warrants and New Common Stock."  Ex. 4 at 6. It deleted or amended 18 sections or provisions of the DFA, including deleting Annex D (Program Requirements), Schedule B (Disbursement Milestone Schedule), Article 5 (Conditions Precedent to Each Disbursement), and Section 3.2 (Upside Sharing).  *Id.* § 2.

After falling 52% in 2024, ¶ 51, Intel's share price has risen 380% since entering into the Stock Agreement.  On August 7, 2025, when the President called on Tan to resign, Intel's share price was $19.77; by August 22, when the agreement was announced, it had risen to $24.80.  Ex. 6 at 3.  On August 25, the President posted "I love seeing their stock price go up," ¶ 88, and the *Wall Street Journal* noted the "share-price rebound in August following reports of the deal," Ex. 5 at 5. Over the next six months, Intel's share price averaged $38.10, compared to $21.65 over the prior six months, and on May 20, 2026, it was $118.96.  *See* Ex. 6.

## ARGUMENT

### A.  The Complaint Should Be Dismissed Under Rule 23.1 Because Plaintiff Fails to Plead Particularized Facts Showing That Demand Is Futile for a Majority of Intel's Directors

#### 1.  Legal Standard for Pleading Demand Futility

"In a shareholder derivative suit, the plaintiff seeks to bring a claim that belongs to the corporation on the corporation's behalf."  *In re Cognizant Tech. Sols. Corp. Deriv. Litig.*, 101 F.4th 250, 257 (3d Cir. 2024).  "'By its very nature,' this sort of suit 'encroaches on the managerial

freedom of directors by seeking to deprive the board of control over a corporation's litigation asset.'" *Id.* Accordingly, a derivative plaintiff "must either (1) make a demand on the company's board of directors to file the lawsuit itself, or (2) show that making such a demand would be 'futile.'" *Id.* The demand requirement implements a "'basic principle of corporate governance'" and "prevent[s] abuse of this [derivative suit] remedy." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95-96, 101 (1991).

Demand futility must be pleaded "with particularity." Fed. R. Civ. P. 23.1(b)(3). "To establish that demand is excused under Rule 23.1, the complaint must set forth 'particularized factual statements.'" *Smith v. Carrillo*, 2019 WL 6328033, at *4 (D. Del. Nov. 26, 2019) (Andrews, J.). "'The standard for pleading demand futility with particularity under [Rule] 23.1 is more stringent than the standard under Rule 12(b)(6).'" *Foote*, 2023 WL 7214728, at *2.

Because Intel is a Delaware corporation, ¶ 15, Delaware law provides the substantive law of demand futility. *See Cognizant*, 101 F.4th at 257. "[M]eeting the demand futility standard is 'a difficult feat under Delaware Law.'" *Foote*, 2023 WL 7214728, at *4. For demand to be futile, Plaintiff must show that a majority of directors (1) "received a material personal benefit from the alleged misconduct"; (2) "face[] a substantial likelihood of liability on any of the claims"; or (3) "lack[] independence from someone who received [such] a material personal benefit" or "face[s] [such] a substantial likelihood of liability." *Zuckerberg*, 262 A.3d at 1059. Plaintiff must make this showing on a "director-by-director basis" "for at least half of the members of the demand board." *Id.*; *see Cognizant*, 101 F.4th at 257.

When this action was filed, Intel's board had 12 directors. ¶¶ 16-27. Because Plaintiff made no demand, ¶ 116, he must show that demand is futile for six directors to avoid dismissal. Plaintiff attempts to satisfy *Zuckerberg*'s first and second prongs for all directors, but fails to

9

satisfy any of the three prongs for any director. Because Plaintiff fails to "'state with particularity' facts showing that making a demand on the board would be futile," Rule 23.1 requires dismissal. *Cognizant*, 101 F.4th at 262.

### 2.    Plaintiff Fails to Plead Any Material Personal Benefit to Any Director

Plaintiff fails to satisfy *Zuckerberg*'s first prong for any director, much less six. Plaintiff does not plead that any director sold stock in the transaction or derived any economic value from it. Instead, he alleges only that (a) all directors avoided hypothetical future criticism, ¶¶ 113-114, and (b) DOC generally agreed to vote its shares with the board as a whole, ¶ 116(d). Neither allegation shows a material personal benefit.

*First*, no particularized facts show that avoiding hypothetical "reputational damage," ¶ 112, materially and personally benefited any director. "Delaware courts reject the idea that directors act improperly 'for the purpose of avoiding speculative reputational risk.' … [It is] unreasonable to infer that a person strove to protect her reputation by engaging in the sort of misconduct that could destroy it." *Shafi v. Chien*, 2025 WL 671854, at *11 (Del. Ch. Mar. 3, 2025) (quoting *Morrison v. Berry*, 2019 WL 7369431, at *13-14 (Del. Ch. Dec. 31, 2019) (rejecting theory that "activist shareholder pressure improperly motivated directors to act with self-interest")); *see also Chester Cnty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *7 (Del. Ch. Oct. 6, 2017) (specific facts must show "how [director] would suffer reputation harm").

Plaintiff does not attempt to show reputational motive on a director-by-director basis, and even as to all directors as a group, he offers only speculation. He alleges that "it would be understandable *if* [all directors] feared that rejecting the DOC's demands would materially and adversely affect their personal interest," *if* the President were to "publicly attack them." ¶¶ 113-114 (emphasis added). But Plaintiff does not allege that the President ever said anything about any of Intel's 11 outside directors. Nor does Plaintiff allege facts about any director's personal

10

circumstances to show his or her susceptibility to a future "attack." Instead, Plaintiff makes a sweeping generalization about "preserving business and social ties, and not jeopardizing possible future business, financial and other opportunities." ¶ 114. That does not suffice. *See Zuckerberg*, 262 A.3d at 1064 (no facts showed that waiver of mandatory retirement age "was financially or personally material" to director); *Hanna v. Paradise*, 2025 WL 1836642, at *6 (Del. Ch. July 3, 2025) ("[w]hether a benefit is material" depends on "amount, the recipient's wealth, and the circumstances surrounding [it]").

Broad-brush speculation is not particularized fact pleading. "[E]ach director has a right to be considered individually" and "independent directors are presumed to be motivated to do their duty with fidelity." *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015). A conclusory assertion about "President Trump's *modus operandi*," ¶ 114, cannot strip directors of that presumption. *See Glean Tech Fund II LP v. McIntosh*, 2025 WL 2505049, at *13 (Del. Ch. Sept. 2, 2025) (rejecting "material personal benefit" theory "tethered to a string of inferences"); *In re Trade Desk, Inc. Deriv. Litig.*, 2025 WL 503015, at *21 (Del. Ch. Feb. 14, 2025) ("Plaintiffs cannot satisfy [the demand futility] burden by engaging in group pleading."), *aff'd*, 350 A.3d 1223 (Del. 2025); *see also Foote*, 2023 WL 7214728, at *11 (no demand futility if "allegations regarding each Director are conclusory and unsupported by particularized facts"); *Guttman v. Huang*, 823 A.2d 492, 499, 502 (Del. Ch. 2003) (accepting "cursory contentions" of director self-interest would "create … hair-trigger demand excusal").[3]

---

[3] Allegations about Tan do not show demand futility because he is "only one director." *Kiger v. Mollenkopf*, 2021 WL 5299581, at *8 (D. Del. Nov. 15, 2021) (Andrews, J.). Moreover, Plaintiff fails to allege that Tan's position was material to him. *See Foote*, 2023 WL 7214728, at *11 ("hold[ing] positions such as CEO … does not indicate a lack of independence or interest"). And, Plaintiff's assertion that the President referred to "a 'little deal' … so that Tan could keep his job," ¶ 3, misquotes a "little deal" reference to Nvidia, not Intel. *See* https://apnews.com/article/nvidia-amd-15-revenue-share-deal-c06e20d9c3418f1d0b1292891c4610c6.

11

Nor, in any event, does Plaintiff plead particularized facts showing that Intel's directors were "cowed." ¶ 116. They rejected DOC's initial offers as "████████████████ ██████████" Ex. E at '008, which led to additional benefits for Intel. *See* pages 6-7 above.[4]

*Second*, no particularized facts show that the Stock Agreement's voting provision gave any director a "material, non-ratable personal benefit." ¶ 116. That provision denied DOC any role in governance except in prescribed circumstances, allowing Intel to receive funds while retaining strategic flexibility. No facts show that the provision was material, or personal, or a benefit to any director. DOC agreed to vote with the board *as a whole*, not with any individual director, and regardless of which directors sit on the board at a given time. Nor does Plaintiff attempt to show, for example, that board proposals were at risk of being rejected by stockholders or that activists were seeking to defeat nominees. Delaware courts reject "conclusory and collective entrenchment theor[ies]." *Gottlieb v. Duskin*, 2020 WL 6821613, at *5-6 (Del. Ch. Nov. 20, 2020); *see Ryan v. Armstrong*, 2017 WL 2062902, at *16-17 (Del. Ch. May 15, 2017) (court cannot infer directors "acted solely or primarily to entrench themselves" because complaint is "silent" as to any "individual director's motivations, interests, and actions beyond its broad conclusory allegations"), *aff'd*, 176 A.3d 1274 (Del. 2017).

Moreover, the Complaint's exhibits show that ████████████████████████ ██████████ *See* Ex. E at '019 (term sheet for DOC's offer). "████████████████████████████████" was among the "USG Original Terms" and considered a "████████████████████████████" *Id.* at '018. No facts show that Intel's directors ever discussed it as benefiting them personally. Indeed, far from being facially suspect, such voting agreements are permissible under Delaware

---

[4] If Plaintiff intends his "reputational damage" assertion as showing lack of independence under *Zuckerberg*'s third prong, it fails for the same reasons and for lack of "specific facts showing that [any] director is beholden to another interested director." *Smith*, 2019 WL 6328033, at *5.

law.  *See Texas Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 539 (Del. Ch. 2023) (analyzing stockholder agreement to support board recommendations without suggesting impropriety); *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 571 (Del. Ch. 2023) ("stockholders can bind themselves to vote or not vote to any degree imaginable"); *see also* 8 *Del. C.* § 122(18) (authorizing such agreements).

Positing the alternative of "issuing nonvoting stock to the DOC," ¶ 8, or alleging that the board did not "███████████████████████████████" ¶ 99, gets Plaintiff nowhere.  Neither allegation shows a "material personal benefit" to individual directors.  Nor does Plaintiff allege any facts showing that DOC was amenable to non-voting stock, given that it ████████ retained the right to vote as it wished in some circumstances.  ¶ 98; *see* Ex. 3 at 4 (noting voting provision's "exceptions to protect the US Government's interests"); Ex. G § 4.6.

### 3.  Plaintiff Fails to Plead Any Substantial Likelihood of Liability for Any Director

Plaintiff also fails to satisfy *Zuckerberg*'s second prong as to any director, much less six. "If a corporation includes a [Section] 102(b)(7) provision in its charter, its board members will only [be] personally liable for breaches of the duty of loyalty, actions taken in bad faith, or intentional, knowing violations of law." *Foote*, 2023 WL 7214728, at *9.  Intel's Certificate of Incorporation has such an exculpatory provision. *See* Ex. 1 at 5 (Art. 8).  "Given this protection from due care violations, [Plaintiff] must plead with particularity that the directors 'acted with scienter, meaning "they had actual or constructive knowledge that their conduct was legally improper."'" *McElrath v. Kalanick*, 224 A.3d 982, 991-92 (Del. 2020).  "Pleading bad faith is a difficult task and requires 'that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting.'" *Id.*; *see In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *20 (Del. Ch. Dec. 1, 2021) (given "exculpatory provision pursuant to …

13

§ 102(b)(7), 'a substantial likelihood of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts'"); *see also Smith*, 2019 WL 6328033, at *3 (similar).  Plaintiff fails to plead the disloyal, bad-faith conduct required for any director to face a substantial likelihood of liability.

(a)      Plaintiff Fails to Plead Any Bad-Faith Breach of Fiduciary Duty

*First*, contending that Intel's directors should have driven a harder bargain with the U.S. Government does not show bad faith or disloyalty.  "In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."  *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009).  "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."  *McElrath*, 224 A.3d at 993 (citation omitted); *see id.* at 994 (alleging that "board should have done more" does not show "it acted in bad faith"); *Ligos v. Tsuff*, 2022 WL 17347542, at *9 (Del. Ch. Dec. 1, 2022) ("[A]n inference of bad faith does not arise merely from a director's allegedly deficient performance.").  Faulting the board for purportedly not "consider[ing] any alternatives," ¶ 124, does not show bad faith, either. *See Lyondell*, 970 A.2d at 243-44 (rejecting claim that directors did not "consider conducting a market check" because bad faith turns *not* on whether they "did everything that they (arguably) should have done," but on whether they "knowingly and completely failed to undertake their responsibilities"); *see also United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 900 (Del. Ch. 2020) ("criticiz[ing] the Committee's negotiations" does not show bad faith).

Nor, in any event, does Plaintiff support his assertion that Intel's board accepted a deal that "was finalized between the President and Tan at the August 11 White House meeting."  ¶ 76. Plaintiff cites two comments by the President.  In one, he recounted that "I said, 'You know what? I think the United States should be given 10% of Intel.'  And [Tan] said, '*I would consider that.*'";

14

in the other, he said Tan "*ended up* giving us $10 billion."  ¶¶ 74-75 (emphasis added).  Neither comment shows a deal was "finalized" on August 11.  As reported by the *Wall Street Journal* article cited by Plaintiff, only *after* the White House meeting and "a complicated negotiation" did "Tan and Lutnick … hammer out a deal."  Ex. 5 at 8.  Nor does the DOC official's comment that ███████████████████████████████████████████" show that "█████████████████████ █████" on August 11.  ¶ 77.  The Complaint is at odds with itself: Plaintiff erroneously claims ████████████████████████████████, *id.*, implying it ███████████████████████████ █████████████████████████████" ¶ 81, and so referred back to DOC's initial offer on August 18.  Nor does it show a "finalized" deal, but rather ████████████████████████████████████ █████" and, in fact, rejected.  *See* Ex. E at '008.

Contrary to Plaintiff's "window dressing" characterization, ¶ 76, the Complaint's exhibits show that Intel's board improved the deal.  The board directed that DOC's offer "███████████ ████████████████████████████████████████████████" Ex. D at '008, and approved the agreement only after finding that "█████████████████████████████████████" Ex. F at '021.  Specifically, Intel would issue the stock associated with Secure Enclave only after receiving corresponding funds, and would retain flexibility to sell up to 50% of its Foundry business without triggering warrants.  *See* pages 6-7 above.  While Plaintiff doubts "t████████████████████ ███████████████████████" ¶ 111, the board did just that.

*Second*, no particularized facts show that Intel's board received conflicted legal advice in bad faith.  Like any client, the board was entitled to rely on its lawyers' adherence to their professional responsibilities.  *See* 8 *Del. C.* § 141(e) (director "shall … be fully protected in relying in good faith" on professionals and experts); *McElrath*, 224 A.3d at 993 (even if CEO "might have a background that would lead a reasonable board member to dig deeper into [his] representations,"

"[i]t is not enough to allege that the directors should have been better informed—a due care violation exculpated by [Uber's] charter provision"). Moreover, even if Skadden "agreed to contribute $100 million towards *pro bono* initiatives backed by the U.S. government," ¶ 101, no pleaded facts show how that manifested into a disabling conflict, or that Skadden in fact gave conflicted advice to Intel's directors—much less how any conflict on Skadden's part would support a conclusion that a majority of directors acted in bad faith.

*Third*, no particularized facts show that Intel's board knowingly approved a supposedly unlawful agreement. *See Kiger*, 2021 WL 5299581, at *7 (complaint fails "to pass muster under Rule 23.1" if it cannot answer "when and how did each member of the Board become aware that laws … were being violated? And what information specifically were they given about the violations?"); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) ("bad faith" transaction includes one "that is … *known to constitute* a violation of applicable positive law"). Intel's board was advised throughout by inside and outside counsel. *See* Ex. D at '001; Ex. E at '007; Ex. F at '020. In claiming the board *must have known* the Stock Agreement was illegal because no board minutes "████████████████████████████ ████████" ¶ 87, Plaintiff improperly seeks to invert its burden. The "'stringent [pleading] requirements of factual particularity,'" *Smith*, 2019 WL 6328033, at *2, require showing "what the directors knew and when," *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 134 (Del. Ch. 2009). That Intel disclosed that "in the future" any branch of government could take the view that the transaction was "unauthorized, void or voidable," ¶ 97, does not show the board knew it was unlawful. Plaintiff's off-point reference to the inclusion in DOC's offer of ██████ ████████████████████████████████████████ ████████████████████████████████████████

16

██████████████████████████████, ¶ 82 n.23; Ex. E at '019, does not show the board's knowledge of supposed illegality, either.[5]

Nor does Plaintiff plead that the Stock Agreement was unlawful in the first place. He baldly asserts that no law "authorizes" it, ¶ 90, but the Court "must 'disregard … legal conclusions, and conclusory statements.'" *Def. Distributed v. Att'y Gen. of N.J.*, 167 F.4th 65, 85 (3d Cir. 2026). As explained in the Commerce Defendants' brief, the CHIPS Act provides broad authority to enter into such transactions. *See* 15 U.S.C. § 4659(a)(1), (3).

(b)    Plaintiff Fails to Plead Waste

Plaintiff also fails to plead particularized facts showing a substantial likelihood of liability for waste. He claims that Intel issued stock for "funding that it had already been awarded," ¶ 131, citing a snippet of social-media rhetoric, ¶ 88 ("I paid zero for Intel."); *see* ¶¶ 92-95 ("no meaningful consideration").[6] Plaintiff bypasses the transaction's substance.

"Corporate waste is limited to 'unconscionable cases where directors irrationally squander or give away corporate assets.'" *Cognizant*, 101 F.4th at 265. "A transaction constitutes waste when it is so one-sided that no rational person acting in good faith could approve it." *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 693 (Del. Ch. 2023); *see id.* at 694 (exchange "so extreme as to be inexplicable on any basis other than bad faith"); *see also White v. Panic*, 783 A.2d 543, 554 (Del. 2001) ("no corporate purpose"; "no consideration at all").

---

[5] Nor was the notion of government equity ownership facially unlawful. As just one example, the Federal Reserve in 2008 took a 79.9% equity stake in AIG, a transaction that withstood multiple shareholder challenges. *See Starr Int'l Co., Inc. v. United States*, 856 F.3d 953 (Fed. Cir. 2017); *Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37 (2d Cir. 2014); *see also* ¶ 136 (conceding that "Congress may authorize" government equity investments).

[6] Plaintiff omits many contrary characterizations, such as Senator Warren's letter to Secretary Lutnick asserting that "the President is handing billions of dollars … to Intel and asking for nothing in return" and calling "fantastical" the President's assertion that "he paid 'zero.'" *See* https://www.banking.senate.gov/imo/media/doc/letter_to_commerce_dept_re_intel-chips.pdf.

Intel received ample consideration. *First*, DOC accelerated $5.7 billion in funding, which Intel received entirely on August 27, 2025 rather than in piecemeal disbursements through 2030. *See* Ex. A at '590-'596; Ex. 4 at 2. Even if Intel would have received every cent, flexibility and the time value of money made immediate disbursement far more valuable. *Cf. Gibraltar Priv. Bank & Tr. Co. v. Bos. Priv. Fin. Holdings, Inc.*, 2011 WL 6000792, at *4 (Del. Ch. Nov. 30, 2011) ("cash management considerations and the concept of the time value of money are just two reasons why the timing of a payment may be important"); *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 442 (Del. Ch. 2002) ("same [merger] price" at later time is "less valuable").

*Second*, the Stock Agreement gave Intel certainty of receiving contingent funding that Plaintiff alleges was in "outright jeopardy" and could have been "withh[e]ld." ¶¶ 55, 60. Whereas DOC formerly could "suspend or withhold a disbursement or suspend or terminate" all or some of the DFA award in various circumstances, ¶¶ 41-42, the Stock Agreement provided for a broad discharge of Intel's DFA obligations and release of conditions, *see* Ex. G § 1.1(b); Ex. 4 at 5-9. It also removed "existing claw-back and profit-sharing provisions associated with the Government's previously dispersed $2.2 billion grant." Ex. 3 at 8. That Intel was "1/3 of the way probably through the milestones" in 2024, ¶ 56, fails to show that removing all *future* milestones and the clawback provisions did not benefit Intel.

*Third*, the Stock Agreement "██████████████████████████" with Intel, which received ratification of its role as a critical provider of domestic semiconductor manufacturing with the President's endorsement. Ex. E at '008; *see id.* at '012 ("████████████████████████ ████████"). This strategic alignment gave Intel stability important to its customer relationships and supply arrangements with the U.S. Government. *See* Ex. F at '028; Ex. 3 at 8 (endorsements by Intel customers). Plaintiff disregards these massive strategic benefits.

18

Not least, Plaintiff does not allege that Intel's share price fell when investors learned of the supposed irrational waste of Intel's assets. On the contrary, it rose dramatically and in a sustained way. *See* page 8 above. Plaintiff fails the "extreme" and "very rarely satisfied" test for waste. *Zucker v. Andreessen*, 2012 WL 2366448, at *8 (Del. Ch. June 21, 2012).

### 4. Labeling Count IV a "Direct" Claim Does Not Prevent Dismissal

Plaintiff's labeling of Count IV as a "direct" claim does not save it from dismissal for failure to plead demand futility. In cursory fashion, Plaintiff alleges that the voting provision "diluted the voting rights of all stockholders" *and* caused "dilution of his voting rights." ¶¶ 142-143. Plaintiff's label aside, the claim is derivative because it alleges *pro rata* dilution experienced equally by all stockholders. "Just because a plaintiff stamps the word 'direct' on its plead claim does not make it so." *Clifford Paper, Inc. v. WPP Invs., LLC*, 2021 WL 2211694, at *8 (Del. Ch. June 1, 2021); *see An v. Cosman*, 2025 WL 2180575, at *6 (Del. Ch. July 31, 2025) ("'[T]he court must … determine for itself whether a direct claim exists.'").

"[C]orporation overpayment/dilution [] claims ... are exclusively derivative." *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1277 (Del. 2021); *see Siegel v. Cantor Fitzgerald, L.P.*, 2025 WL 1074604, at *10 (Del. Ch. Apr. 10, 2025) ("[s]tockholders lack a 'fundamental' right to any fixed percentage of the voting power" and *Brookfield* "foreclosed" any direct claim for "dilution in voting power"). Were the law otherwise, any plaintiff could manufacture a direct claim based on the voting rights associated with any share issuance. Any "voting power dilution that allegedly harmed the stockholders flowed *indirectly to them in proportion to, and via, their shares in [Intel]*, and thus any remedy should flow to them the same way, *derivatively* via the corporation." *Brookfield*, 261 A.3d at 1266 (emphasis added); *see In re New Media Invs. II, LLC*, 2026 WL 208698, at *6 (Del. Ch. Jan. 27, 2026) ("loss—proportional to ownership—is the hallmark of a derivative claim" and generates no "separate, cognizable direct injury"); *New Enter.*

19

*Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 156a (Del. Ch. 2023) (similar).

> **B.**     **Alternatively, the Complaint Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim**

Alternatively, the Court should dismiss the Complaint as against Intel's directors under Rule 12(b)(6), which requires Plaintiff to plead facts demonstrating "'substantive plausibility.'" *Smith*, 2019 WL 6328033, at *2. Plaintiff fails to state claims for breach of fiduciary duty and waste for the same reasons that he fails to plead a substantial likelihood of liability. Because no allegations show that Intel's directors "knowingly and completely failed to undertake their responsibilities," *Lyondell*, 970 A.2d at 243-44, they are "entitled to be dismissed," *Cornerstone*, 115 A.3d at 1179. Plaintiff's "bald assertions or legal conclusions" also fail to state a claim to invalidate the Stock Agreement, *Smith*, 2019 WL 6328033, at *2, which is authorized as explained in the Commerce Defendants' brief, and the directors are not parties to it in any event.[7]

If the Court dismisses Count III against DOC and Secretary Lutnick, the Court also could decline to exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c); *In re Stem, Inc. Deriv. Litig.*, 2026 WL 880441, at *5 (D. Del. Mar. 31, 2026) (declining supplemental jurisdiction after dismissing federal claim for lack of demand futility). Under Intel's bylaws, the "sole and exclusive forum" for derivative and fiduciary-duty claims is the Delaware Court of Chancery. Ex. 2 at 24 (Art. XIII). This forum provision and the early stage of the case favor declining supplemental jurisdiction.

### CONCLUSION

The Complaint should be dismissed under Rule 23.1 or, alternatively, under Rule 12(b)(6).

---

[7] Craig Barratt, who joined the board after the Stock Agreement, ¶ 18, also should be dismissed as he "play[ed] no role in the process of deciding whether to approve [the] challenged transaction." *In re Tri-Star Pictures, Inc. Litig.*, 1995 WL 106520, at *2 (Del. Ch. Mar. 9, 1995).

OF COUNSEL:

MUNGER, TOLLES & OLSON LLP
John M. Gildersleeve (*pro hac vice*)
Brian Rivas Boessenecker (*pro hac vice*)
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100

MUNGER, TOLLES & OLSON LLP
Bridget Fitzpatrick (*pro hac vice*)
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C. 20001
(202) 220-1131

Dated:  May 21, 2026

AKERMAN LLP

/s/ Tammy L. Mercer
Tammy L. Mercer (#4957)
222 Delaware Avenue, Suite 1710
Wilmington, DE 19801
(302) 596-9200
tammy.mercer@akerman.com

*Attorneys for Lip-Bu Tan, Frank D. Yeary, Craig H. Barratt, James Goetz, Andrea J. Goldsmith, Alyssa H. Henry, Eric Meurice, Barbara Novick, Steve Sanghi, Gregory D. Smith, Stacy J. Smith, Dion J. Weisler, and Nominal Defendant Intel Corporation*

21