**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RICHARD D. PAISNER,<br><br>Plaintiff,<br><br>v.<br><br>LIP-BU TAN, *et al.*,<br><br>Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 1:26-cv-00414-RGA |

## <u>COMMERCE DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS</u>

Filed:  May 21, 2026

BRETT A. SHUMATE
Assistant Attorney General

BENJAMIN L. WALLACE
United States Attorney

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director

DYLAN J. STEINBERG
Assistant United States Attorney

JAMES R. POWERS (TX Bar No. 24092989)
Trial Attorney
U.S. Department of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543

*Counsel for the Commerce Defendants*

# TABLE OF CONTENTS

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS .............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

STATEMENT OF FACTS ....................................................................................... 3

    I.     THE CHIPS ACT AND AMERICAN SEMICONDUCTOR COMPETITIVENESS ............................................................ 3

    II.    COMMERCE'S CHIPS ACT AGREEMENTS WITH INTEL ........................... 5

    III.   PLAINTIFF'S COMPLAINT ................................................................. 6

STANDARD OF REVIEW ...................................................................................... 7

ARGUMENT ...................................................................................................... 8

    I.     THE CHIPS ACT AUTHORIZES THE STOCK AGREEMENT. ........................ 8

    II.    SOVEREIGN IMMUNITY BARS PLAINTIFF'S CLAIM. .............................. 10

    III.   THE CHIPS ACT PREEMPTS PLAINTIFF'S STATE LAW CLAIMS FOR EQUITABLE RELIEF AGAINST THE STOCK AGREEMENT. ..................... 14

    IV.   PLAINTIFF'S CLAIMS FAIL TO SATISFY BASIC FEDERAL PLEADING STANDARDS ................................................................................... 18

CONCLUSION .................................................................................................. 20

## TABLE OF AUTHORITIES

**CASES**

*Abdulla v. Att'y Gen. of the United States*,
153 F.4th 342 (3d Cir. 2025) ................................................................................ 12, 14

*Adams v. FAA*,
1 F.3d 955 (9th Cir. 1993) ......................................................................................... 13

*Allen v. DeBello*,
861 F.3d 433 (3d Cir. 2017).......................................................................................... 19

*Arizona v. United States*,
567 U.S. 387 (2012)....................................................................................................... 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................... 7, 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................ 7

*Blish v. Thompson Automatic Arms Corp.*,
64 A.2d 581 (Del. 1948) ................................................................................................. 9

*Buckman Co. v. Plaintiffs' Legal Comm.*,
53 U.S. 341 (2001)........................................................................................................ 17

*Burdue v. FAA*,
774 F.3d 1076 (6th Cir. 2014) ...................................................................................... 13

*C & J Energy Servs., Inc. v. City of Miami Gen. Employees'*,
107 A.3d 1049 (Del. 2014) ........................................................................................... 19

*Campbell v. Pennsylvania Sch. Bds. Ass'n*,
336 F. Supp. 3d 482 (E.D. Pa. 2018) ........................................................................... 19

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)...................................................................................................... 15

*Custom Chrome, Inc. v. Comm'r*,
217 F.3d 1117 (9th Cir. 2000) ...................................................................................... 10

*Ellison v. Connor*,
153 F.3d 247 (5th Cir. 1998) ........................................................................................ 13

*FAA v. Cooper*,
   566 U.S. 284 (2012).................................................................................................. 10, 12

*F.A.M.E. LLC v. EmTurn LLC*,
   --A.3d--, No. 230, 2025, 2026 WL 1065704 (Del. Apr. 20, 2026)............................................ 9

*Farina v. Nokia Inc.*,
   625 F.3d 97 (3d Cir. 2010)...................................................................................... 15, 16, 17

*FDIC v. Meyer*,
   510 U.S. 471 (1994)...................................................................................................... 10

*Fellner v. Tri-Union Seafoods, LLC*,
   539 F.3d 237 (3d Cir. 2008)............................................................................................ 17

*Free v. Bland*,
   369 U.S. 663 (1962)...................................................................................................... 15

*Gentile v. Sec. & Exch. Comm'n*,
   974 F.3d 311 (3d Cir. 2020)................................................................................... 10, 11, 12

*Gould Elecs., Inc. v. United States*,
   220 F.3d 169 (3d Cir. 2000)............................................................................................ 11

*Green v. Fund Asset Mgmt., L.P.*,
   245 F.3d 214 (3d Cir. 2001)............................................................................................ 17

*Heckler v. Chaney*,
   470 U.S. 821 (1985)...................................................................................................... 12

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)........................................................................................................ 17

*In re Adler, Coleman Clearing Corp.*,
   263 B.R. 406 (S.D.N.Y. 2001)............................................................................................ 9

*In re Cognizant Tech. Sols. Corp. Derivative Litig.*,
   101 F.4th 250 (3d Cir. 2024) ........................................................................................... 18

*In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Def. Ass'n of
   Philadelphia*,
   790 F.3d 457 (3d Cir. 2015)....................................................................................... 15, 17

*In re Loestrin 24 Fe Antitrust Litig.*,
   814 F.3d 538 (1st Cir. 2016).............................................................................................. 9

iv

*In re Montgomery Ward, LLC*,
  292 B.R. 49 (Bankr. D. Del. 2003) ....................................................................... 9

*Ingram v. Cuomo*,
  51 F. Supp. 2d 667 (M.D.N.C. 1999) ................................................................ 11

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
  861 F.3d 944 (9th Cir. 2017) ............................................................................. 13

*KalshiEX, LLC v. Flaherty*,
  172 F.4th 220 (3d Cir. 2026) ............................................................................. 15

*Kaplan v. Peat, Marwick, Mitchell & Co.*,
  540 A.2d 726 (Del. 1988) .................................................................................. 18

*Lincoln v. Vigil*,
  508 U.S. 182 (1993).......................................................................................... 12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................ 7

*Makarova v. United States*,
  201 F.3d 110 (2d Cir. 2000)............................................................................... 11

*MITE Corp. v. Dixon*,
  633 F.2d 486 (7th Cir.1980) .............................................................................. 17

*Mocek v. City of Albuquerque*,
  813 F.3d 912 (10th Cir. 2015) ........................................................................... 11

*Morris v. Trump*,
  No. 21-CV-4445 (LTS), 2021 WL 2227797 (S.D.N.Y. June 1, 2021)................... 11

*Pennsylvania v. Nelson*,
  350 U.S. 497 (1956).......................................................................................... 17

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  563 U.S. 401 (2011)............................................................................................ 9

*South Dakota v. Wayfair*,
  585 U.S. 162 (2018)........................................................................................... 17

*Steenholdt v. FAA*,
  314 F.3d 633 (D.C. Cir. 2003) ........................................................................... 13

*Strassburger v. Earley*,
  752 A.2d 557 (Del. Ch. 2000)....................................................................................... 20

*United Food & Comm. Workers Union v. Zuckerberg*,
  262 A.3d 1034 (Del. 2021) ......................................................................................... 18

*Veloric* v. *J.G. Wentworth, Inc.*,
  No. CIV.A. 9051-CB, 2014 WL 4639217 (Del. Ch. Sept. 18, 2014)....................................... 19

*Wagner v. BRP Grp., Inc.*,
  316 A.3d 826 (Del. Ch. 2024).................................................................................... 19

*Webster v. Doe*,
  486 U.S. 592 (1988)................................................................................................. 13

**U.S. CONSTITUTIONS**

U.S. Const. art. I, § 8, cl. 3.................................................................................... 17

U.S. Const. art. VI, cl. 2....................................................................................... 15

**STATUTES**

5 U.S.C. § 702.................................................................................................... 12

15 U.S.C. §§ 4651–59................................................................................... *passim*

28 U.S.C. § 1442.................................................................................................... 1

49 U.S.C. § 44702................................................................................................ 13

Chips and Science Act Of 2022,
  Pub. L. No. 117-167, 136 Stat. 1366 (2022)........................................................ 4, 5

William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021,
  Pub. L. No. 116-283, 134 Stat. 3388 (2021)............................................................ 4

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

Fed. R. Civ. P. 12(b)(1), (6)................................................................................. 1, 7

Fed. R. Civ. P. 23.1(b)(2)(B) ................................................................................ 18

**OTHER AUTHORITIES**

Cong. Research Serv., R47523, *Frequently Asked Questions: CHIPS Act of 2022 Provisions and Implementation* (Apr. 25, 2023),
https://www.congress.gov/crs-product/R47523 .......................................................................... 4

Off. of the Dir. of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* (Mar. 2026),
https://www.dni.gov/files/ODNI/documents/assessments/ATA-2026-Unclassified-Report.pdf ............................................................................................................................... 4

Nat'l Institute of Standards & Tech., U.S. Dep't of Com., *Semiconductors*,
https://www.nist.gov/semiconductors (last visited May 21, 2026)............................................ 4

The U.S. Department of Commerce ("Commerce") and Secretary Howard Lutnick (the "Secretary"), in his official capacity (together, the "Commerce Defendants"), hereby move to dismiss the Complaint in full under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for the following reasons.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed this lawsuit in the Delaware Court of Chancery. The United States timely removed the suit to this Court under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). D.I. 1. The Commerce Defendants now timely move to dismiss per the Court's schedule. D.I. 20.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff's lawsuit seeks to undo an agreement that is authorized by federal law, advances the country's economic and national security, and provides enormous financial upside to the American taxpayer. The Court should reject this effort at the outset.

Congress and the Executive Branch agree that a paramount goal of national policy is fostering a secure domestic supply chain for the manufacture of advanced computer chips. This goal is rooted in core federal concerns of national and economic security. Advanced chips are integral to nearly every aspect of the twenty-first century economy and have numerous military and intelligence applications critical to America's defense industrial base. They are particularly essential to a pivotal matter shaping the future of the global economy: the United States' race with our foreign adversaries and competitors to dominate the field of artificial intelligence. The United States, however, relies heavily on an international supply chain rooted in Asia for advanced semiconductors and chips—a precarious position given the potential disruptions that may undermine the security and resilience of this supply chain. Congress sought to address this issue in passing the Creating Helpful Incentives to Produce Semiconductors Act ("CHIPS Act"). This law appropriated vast sums of money and created a series of programs intended to bolster U.S.-

based research and manufacture of semiconductors and microchips.  Its explicit purpose is to foster economic and national security by building out the domestic supply chain for advanced chips.  One of the CHIPS Act's key features is its directive to the Secretary to establish a $39 billion federal assistance program to incentivize the construction and development of U.S.-based semiconductor manufacturing.  Congress gave the Secretary broad discretion to conduct transactions and enter into agreements in furtherance of those stated goals.

Under this statutory authority, Commerce and Intel have executed a set of agreements that collectively provide over $11 billion in federal assistance to Intel to support domestic manufacturing of leading edge semiconductors in exchange for Intel's payment of common stock to the United States, as well as warrants to purchase additional stock should Intel cease to own a majority stake in its semiconductor foundry business.  This deal has been a massive success for all parties.  Americans have received enormous value for their investment in a sector vital to U.S. economic and national security.  And Intel, in turn, has seen its stock price skyrocket.  On August 22, 2025—the date of the agreement challenged in the Complaint—the adjusted closing price for Intel stock was $24.80 per share.  As of yesterday, it had grown nearly five times over, to $118.96.

One Intel shareholder, Plaintiff Richard D. Paisner, now brings a derivative lawsuit to undo this success story.  Suing the Intel Board of Directors, Commerce, and the Secretary, Plaintiff alleges that the transactions violate the CHIPS Act and Delaware corporate law.  Plaintiff is wrong, and the Court should dismiss the Complaint in full.

1.     To begin, the only claim alleged against the Commerce Defendants, Count III, fails because the CHIPS Act expressly authorizes the Stock Agreement.  By its plain terms, the CHIPS Act empowers the Secretary to require payment from recipients of federal financial assistance and

2

to enter into agreements and conduct transactions on terms he deems appropriate. The Stock Agreement fits comfortably within this statutory authority.

2.      Plaintiff also fails to carry his burden of establishing jurisdiction to sue the Commerce Defendants. The United States possesses sovereign immunity from suit, and Plaintiff does not invoke any statutory waiver of that immunity. And the only potentially relevant waiver, in the Administrative Procedure Act ("APA"), does not apply to Plaintiff's claim because of the statutory discretion provided to the Secretary under the CHIPS Act.

3.      To the extent Plaintiff's other claims seek equitable relief to undo or impair the Commerce Defendants' rights under the Stock Agreement, those should be dismissed too as preempted by federal law. Such equitable state law relief would stand as an obstacle to the operation of the CHIPS Act and thereby countermand Congress's statutory purposes.

4.      Finally, threshold pleading defects likewise doom Plaintiff's claims. Plaintiff has failed to plead with particularity the prerequisites for a shareholder derivative suit, including an excuse for his failure to issue a demand to the Intel Board of Directors. Plaintiff also alleges no cause of action against the Commerce Defendants, as he must. Nor can Plaintiff override the Commerce Defendants' contractual rights by invoking the fiduciary duties of Intel's Directors.

Plaintiff's Complaint should be dismissed.

## STATEMENT OF FACTS

## I.      THE CHIPS ACT AND AMERICAN SEMICONDUCTOR COMPETITIVENESS

The CHIPS Act requires the Secretary of Commerce to establish several programs to support the domestic semiconductor manufacturing ecosystem, including, as relevant here, "a program that . . . provides Federal financial assistance to . . . incentivize investment in facilities and equipment in the United States" to support the domestic semiconductor industry. 15 U.S.C. §

3

4652(a)(1).[1]    A semiconductor is the "base for most electronics," powering "advanced technologies for healthcare, communications, computing, and transportation." Nat'l Institute of Standards & Tech. (NIST), U.S. Dep't of Comm., *Semiconductors*, https://www.nist.gov/semiconductors (last visited May 21, 2026) [hereinafter NIST, *Semiconductors*]. Historically, the United States has been a world leader in semiconductors. Contemporary semiconductor devices were invented here and their use across numerous applications, including in computer chips, has been a fixture of the American economy for decades. *See id.*

Today, however, the vast majority of semiconductors are manufactured overseas. *See id.*; *see also* Cong. Research Serv., R47523, *Frequently Asked Questions: CHIPS Act of 2022 Provisions and Implementation*, at 3 (Apr. 25, 2023)[2] [hereinafter CRS Report] (noting that the U.S. share of global chip manufacturing capacity fell from approximately 36% in 1990 to about 10% in 2020). Recent supply chain disruptions occurring during the COVID-19 pandemic made clear the vulnerabilities that can arise where the United States relies on other countries for such an essential technology. *See* NIST, *Semicondutors*. Concerns have also developed about the risks to economic and national security from the concentration of semiconductor production in East Asia, given the relationship between Taiwan and China. *See* CRS Report at 4; Off. of the Dir. of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* at 22 (Mar. 2026)[3] ("A

---

[1] This brief uses the term "CHIPS Act" to refer to the provisions of the United States Code codified at 15 U.S.C. §§ 4651–59. These provisions were enacted in two different recent statutes, each of which is sometimes interchangeably referred to as the CHIPS Act or the CHIPS and Science Act. *See* Pub. L. No. 116-283, §§ 9901 *et seq.*, 134 Stat. 3388, 4843 (2021); Pub. L. No. 117-167, §§ 101 *et seq.*, 136 Stat. 1366, 1372 (2022).
[2] *Available at* https://www.congress.gov/crs-product/R47523.
[3] *Available at* https://www.dni.gov/files/ODNI/documents/assessments/ATA-2026-Unclassified-Report.pdf.

4

conflict between China and Taiwan may disrupt U.S. access to trade and semiconductor technology critical to the global economy.").

Congress enacted the CHIPS Act in the context of this national and economic security backdrop.  In the statute, Congress explained that it expected the Secretary to award funding with an eye toward promoting "leadership of the United States in semiconductor technology," fostering "national security," bolstering the "security and resilience of the semiconductor supply chain," and "grow[ing] the economy of the United States."  15 U.S.C. § 4652(d)(1)–(4).  Congress accordingly appropriated $39 billion to power Commerce's efforts to incentivize semiconductor manufacturing in the United States.  *See id.* § 4652(a)(1); Pub. L. No. 117-167, § 102(a)(1), (2), 136 Stat. 1372.

Congress expressly provided the Secretary with authority to determine how best to implement CHIPS Act funding and accomplish its statutory goals.  For example, 15 U.S.C. § 4659(a)(1) provides that, in carrying out his responsibilities under the statute, the Secretary "may" "enter into agreements, including contracts, grants and cooperative agreements, and other transactions as may be necessary and on such terms as the Secretary considers appropriate."  The statute further gives the Secretary authority to "require a person or other entity to make payments to the Department of Commerce upon application and as a condition for receiving support through an award of assistance or other transaction."  *Id.* § 4659(a)(3).  Congress also explained that the Secretary "shall determine the appropriate amount and funding type for each financial assistance award made to a covered entity" under section 4652(a).  *Id.* § 4652(a)(3)(A).

## II.    COMMERCE'S CHIPS ACT AGREEMENTS WITH INTEL

Under these statutory authorities, Commerce has entered into multiple agreements with Intel to issue federal CHIPS Act funding and facilitate various U.S.-based semiconductor investments by the company.  Commerce and Intel entered into a direct funding agreement (the

"Funding Agreement") on November 25, 2024, providing for an award of up to $7.8 billion in federal financial assistance to Intel. *See* Compl. ¶ 40 (citing Compl. Ex. A, D.I. 21-2). The Funding Agreement contemplates the disbursement of funds over time, based on the completion of certain project milestones, with the possibility that funds could be suspended, withheld, or terminated if Intel fails to satisfy various requirements. *See* Compl. ¶¶ 41, 42.

Separately, the U.S. Department of War, on behalf of Commerce, administers a different award of funds to Intel for the company's work on the "Secure Enclave" project, which is intended to facilitate the United States' "access to a domestic supply chain of advanced semiconductors for national security." Compl. ¶¶ 44–46. Through the first half of 2025, based on its progress towards the agreed-upon milestones, Intel qualified for some—but far from all—of the disbursements contemplated by the Funding Agreement and the Secure Enclave award. *See* Compl. ¶¶ 53, 54.

Later in 2025, Commerce and Intel returned to the negotiating table and reached another agreement: the Warrant and Common Stock Agreement (the "Stock Agreement"), dated August 22, 2025, which is the basis for Plaintiff's Complaint. As contemplated by the Stock Agreement, Commerce amended the Funding Agreement to accelerate disbursement of the remaining funds and discharged the company's remaining obligations under the Funding Agreement to the maximum extent permitted by law. Compl. Ex. G, Stock Agreement at INTEL_000326, D.I. 21-3. As a condition for accelerated funding, Commerce received a payment of 433,323,000 shares of Intel common stock, as well as warrants to purchase an additional 240,516,150 shares should Intel cease to own a majority interest in its semiconductor foundry business within a certain timeframe. *Id.* at '326, '370.

## III.   PLAINTIFF'S COMPLAINT

Plaintiff is an Intel shareholder who claims the Stock Agreement is unlawful under

Delaware and federal law.  Plaintiff has sued the Directors of Intel (the "Director Defendants"), as well as Commerce and the Secretary, for their respective roles in that agreement.  On a derivative basis, Plaintiff brings three claims for the asserted benefit of nominal defendant Intel.  Plaintiff also brings a direct claim against the Director Defendants.

Counts I and II are derivative claims pleaded only against the Director Defendants, claiming that they breached their fiduciary duty and wasted corporate assets in approving the Stock Agreement.  *See* Compl. ¶¶ 122–33.  Count III is a derivative claim against all defendants that seeks to void the Stock Agreement on the ground that the Commerce Defendants were "not authorize[d]" by federal law to execute the agreement.  *Id.* ¶¶ 134–40.  Lastly, Count IV is a direct claim against the Director Defendants on substantially similar grounds.  *See id.* ¶¶ 141–44.

Although Count III is the only claim pleaded directly against the Commerce Defendants, all of the claims bear on the Commerce Defendants' legal rights because Plaintiff seeks equitable relief impairing Commerce's rights under the Stock Agreement.  Plaintiff, for example, asks for equitable relief declaring the Stock Agreement void and canceling the shares and warrants issued to Commerce under it.  *Id.* at 42–43 ¶¶ B, E, F.

## STANDARD OF REVIEW

To survive a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a plaintiff bears the burden of establishing the Court's jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  A complaint must also "state a claim to relief that is plausible on its face" or be dismissed under Rule 12(b)(6).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  This requires that the complaint contain factual allegations that, taken as true, "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  It is not enough that the allegations are "consistent with" or show a

7

"sheer possibility" of liability. *Iqbal*, 556 U.S. at 678 (citation omitted). And courts need not accept as true those allegations that are mere legal conclusions or that are stated in conclusory fashion. *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## ARGUMENT

## I.    THE CHIPS ACT AUTHORIZES THE STOCK AGREEMENT.

The sole claim pleaded against the Commerce Defendants is Count III, which alleges that neither the CHIPS Act, nor any other source of federal law, authorizes Commerce to "acquire stock in a publicly traded company" here. Compl. ¶¶ 135, 136. But that premise is false as a matter of law: the CHIPS Act expressly authorizes the Stock Agreement. Plaintiff's only claim against the Commerce Defendants should be dismissed as a result.

The plain terms of the CHIPS Act show why. In carrying out his responsibilities under the statute, the Secretary may enter "agreements" or any "other transaction as may be necessary" on any "terms" that the Secretary considers "appropriate." 15 U.S.C. § 4659(a)(1). Section 4659(a)(3) of the CHIPS Act specifically empowers the Secretary to require a recipient of funding to "make payments to the Department of Commerce . . . as a condition for receiving support through an award of assistance or other transaction." The Stock Agreement and subsequent amendment to the Funding Agreement resulted in Commerce's immediate payment of federal financial assistance and discharge of Intel's obligations under the Funding Agreement, in exchange for payments of Intel stock and warrants to purchase more stock under certain circumstances. Section 4659(a) explicitly provides for such an exchange.

Section 4659 also authorizes the Secretary to require funding recipients to provide Commerce with equity as a condition of receiving funding, as occurred here. The term "payment"

in section 4659(a)(3) is undefined and should therefore be given its "ordinary meaning." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011) (citation omitted). And that ordinary meaning encompasses not only money but any "valuable thing accepted in partial or full discharge of [an] obligation." *Payment*, Black's Law Dictionary (12th ed. 2024); *see also Oxford English Dictionary* (last modified Dec. 2025) (defining "payment" as a "sum of money (or equivalent) paid or payable . . . "). Courts have thus understood that a wide array of instruments that convey value may constitute "payment" in various contexts. *See, e.g.*, *In re Montgomery Ward, LLC*, 292 B.R. 49, 54 (Bankr. D. Del. 2003) (explaining that "a letter of credit is a mode of payment"); *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406 (S.D.N.Y. 2001) (applying statutory definition of "margin payment," which includes "a security" or "other property"); *cf. In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 550 (1st Cir. 2016) (explaining that the term "payment" as used in a Supreme Court opinion "connotes a much broader category of consideration than cash alone").

Given this broad understanding, shares of stock unquestionably qualify as "payment" under section 4659(a)(3). Indeed, courts have long recognized that the issuance of stock can be a form of payment. *See, e.g.*, *F.A.M.E. LLC v. EmTurn LLC*, --A.3d--, No. 230, 2025, 2026 WL 1065704, at *4 (Del. Apr. 20, 2026) (holding that under a contract, shares of stock were a "form of payment"); *Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 598 (Del. 1948) (holding that a corporation's issuance of stock in exchange for the release of a claim is "equivalent to the payment of cash by the creditor to the corporation for the stock, and the payment of cash by the corporation to the creditor in discharge of the indebtedness."). Because shares of stock are valuable things tendered in discharge of an obligation, they are manifestly "payments" within the scope of section 4659(a)(3).

The same goes for warrants.  Black's Law Dictionary defines "warrant" in this context as an "instrument granting the holder a long-term . . . option to buy shares at a fixed price" that is "commonly attached to preferred stocks or bonds."  *Warrant*, Black's Law Dictionary (12th ed. 2024).  Though a warrant is not itself a sum of money, it has value because it provides the warrant holder—here, the Commerce Defendants—the right to purchase stock under certain circumstances.  And it is likewise a financial instrument that the holder is entitled to enforce.  *See, e.g.*, *Custom Chrome, Inc. v. Comm'r*, 217 F.3d 1117, 1121–23 (9th Cir. 2000) (discussing the valuation of warrants for tax purposes).  Consequently, warrants fall within the broad definition of payments described above and thus constitute a form of "payment" that the Secretary may require under section 4659(a)(3) of the CHIPS Act as a condition of an applicant's receipt of an award.

In sum, shares of stock and warrants are things of value provided to Commerce in exchange for making modifications to the Funding Agreement.  They are precisely the kind of "payments" the CHIPS Act authorizes in section 4659(a)(3).  Had Congress wanted to limit the scope of payments to cash or particular financial instruments, it could have done so.  It did not.  The Stock Agreement thus fits comfortably within the CHIPS Act's parameters.

## II.    SOVEREIGN IMMUNITY BARS PLAINTIFF'S CLAIM.

Any claim against the Commerce Defendants also fails at a jurisdictional level because the Commerce Defendants are immune from suit here.  The United States and its agencies are "generally immune from suit under the doctrine of sovereign immunity."  *Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 315 (3d Cir. 2020) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)).  Only an "unequivocally expressed" waiver of immunity in federal "statutory text" may suffice to permit suit against the United States.  *FAA v. Cooper*, 566 U.S. 284, 290 (2012).  "A statutory

10

waiver of sovereign immunity thus defines the scope of a court's jurisdiction to entertain the suit." *Gentile*, 974 F.3d at 316 (citation omitted).

It is Plaintiff's burden to establish a basis for the Court's jurisdiction, but his Complaint cites no waiver of the United States' sovereign immunity from suit. *See Gould Elecs., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000) ("The plaintiff has the burden of persuasion to convince the court it has jurisdiction."); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (holding that "the plaintiff bears the burden of establishing that her claims fall within an applicable waiver" of sovereign immunity). Plaintiff's failure to identify a waiver of sovereign immunity in the Complaint warrants dismissal. *See, e.g.*, *Mocek v. City of Albuquerque*, 813 F.3d 912, 932 (10th Cir. 2015) (holding that, because "a complaint must state the jurisdictional basis for all of the claims alleged therein," a complaint against the federal government or its officials must "identif[y] a federal waiver of sovereign immunity"); *Morris v. Trump*, No. 21-CV-4445 (LTS), 2021 WL 2227797, at *3 (S.D.N.Y. June 1, 2021) ("Plaintiff has identified no basis for a finding of waiver of the federal government's sovereign immunity, which bars his official-capacity claims against the government and the federal officials who are named as defendants."); *Ingram v. Cuomo*, 51 F. Supp. 2d 667, 669 (M.D.N.C. 1999) ("A party suing the Federal Government, its agencies, or its officers must allege both the basis for the Court's jurisdiction and the *specific statute* containing the waiver of the Government's immunity from suit." (emphasis added)).

In any event, no applicable waiver of sovereign immunity exists here. Delaware state law certainly does not provide such a waiver; *Congress* must establish a waiver, not the Delaware legislature or courts. *See Gentile*, 974 F.3d at 315 (requiring "congressional authorization" to permit suit against the United States and its agencies). Nor does the CHIPS Act waive sovereign

11

immunity.   The CHIPS Act contains no provision regarding judicial review, let alone an "unequivocally expressed" waiver of sovereign immunity.  *Cooper*, 566 U.S. at 290.

The only colorable argument Plaintiff could make is that the United States has waived its sovereign immunity via section 702 of the APA.  5 U.S.C. § 702.  That provision permits suit against the United States by a "person suffering legal wrong because of agency action" where the claim seeks "relief other than money damages."  *Id.*[4]  But the APA's waiver of sovereign immunity does not apply here.  That is because Plaintiff has challenged "agency action [that] is committed to agency discretion by law."  *Gentile*, 974 F.3d at 317 (quoting 5 U.S.C. § 701(a)(2)).  This exception to judicial review under the APA applies where a law "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Abdulla v. Att'y Gen. of the United States*, 153 F.4th 342, 347 (3d Cir. 2025) (quoting *Heckler*), *cert. denied sub nom.* No. 25-641, 2026 WL 642813 (U.S. Mar. 9, 2026).  Such circumstances are "rare" given the APA's presumption in favor of judicial review.  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).

But section 701(a)(2) will preclude judicial review where, for example, a statute or regulation provides that an agency "may" take an action "in its discretion" and contains "no language limiting the [agency's] decision to" take that action.  *Abdulla*, 153 F.4th at 347 (reviewing agency action pursuant to a regulation having these characteristics).  Section 701(a)(2) thus bars review where there is "no standard by which [the court] may review [the agency's] exercise of this discretion."  *Id.*  For example, multiple courts of appeals have held that section 701(a)(2) bars review of claims challenging the use of an FAA authority where the statute permits it to be used

---

[4] Even this provision would not authorize money damages, if indeed Plaintiff's request for damages, Compl. at 43 ¶ G, is directed at the Commerce Defendants.  Sovereign immunity bars any damages claims against the Commerce Defendants.

"at any time for any reason" the agency "considers appropriate." *Burdue v. FAA*, 774 F.3d 1076, 1081–82 (6th Cir. 2014) (quoting 49 U.S.C. § 44702(d)(2)); *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (same); *see also Adams v. FAA*, 1 F.3d 955, 956 (9th Cir. 1993) (per curiam) (reviewing predecessor statute). Other similarly broad legal provisions have led to the same result. *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 954 (9th Cir. 2017) (action committed to agency discretion where the relevant statute provided no meaningful standard against which to judge the agency's interpretation of data generated from a statutorily required pilot program or agency's resulting action in issuing trucking permits); *Ellison v. Connor*, 153 F.3d 247, 253 (5th Cir. 1998) (holding Army Corps of Engineers' permitting decisions committed to unreviewable discretion because the statute provided no standards for issuance of the regulations at issue).

The CHIPS Act commits to the Secretary's discretion the decision to execute the Stock Agreement. It specifically provides that the Secretary "*may*" "enter into agreements . . . and other transactions as *may be necessary* and on such terms as the *Secretary considers appropriate*." 15 U.S.C. § 4659(a)(1) (emphases added). And it frees the Secretary to "establish such . . . procedures as the Secretary considers appropriate," *id.* § 4659(a)(7), and to "determine the appropriate . . . funding type for each financial assistance award" under the statute, *id.* § 4652(a)(3).

These provisions "exude[] deference" to the Secretary on the questions of whether to enter into agreements or conduct transactions under the CHIPS Act and, if so, what terms to negotiate. *Webster v. Doe*, 486 U.S. 592, 600 (1988) (finding relevant statute "fairly exudes deference" to the agency and accordingly "foreclose[s] the application of any meaningful judicial standard of review"). The CHIPS Act contains no language limiting that discretion in any respect applicable to Plaintiff's claim against the Commerce Defendants. Plaintiff does not argue, for example, that

13

Commerce failed to consider the relevant statutory factors in approving Intel's application for CHIPS Act financial assistance. *See* 15 U.S.C. § 4652(a)(1)(C).

Against all this, the only asserted defect that the Complaint identifies as to the Commerce Defendants is that the CHIPS Act purportedly "does not authorize or direct" Commerce to take "an equity stake in a publicly traded company such as Intel in connection with any financial assistance provided to that company" by Commerce. Compl. ¶ 135. But that is flatly incorrect. *See supra* pp. 8–10. As explained, the CHIPS Act expressly permits the Secretary to enter into "agreements" and "other transactions" and does not limit the "terms" of those transactions where the Secretary may deem them "necessary" or "appropriate." 15 U.S.C. § 4659(a)(1). Indeed, the statute even affirmatively contemplates that Commerce may receive "payments" in connection with the transactions. *Id.* § 4659(a)(3). The wisdom of that statutory deference is plain here: the agreement between the Commerce Defendants and Intel has been a resounding success for both parties. For the Commerce Defendants (and the American people), the investment helped reinvigorate an American company in a sector vitally important to national interests. And for Intel (and its shareholders), the investment increased the company's value enormously.

In sum, sovereign immunity bars Plaintiff's claim against the Commerce Defendants because the Court has no meaningful federal standard against which to judge Plaintiff's claim against the Commerce Defendants. *See Abdulla*, 153 F.4th at 347. Given the absence of any other statutory waiver of sovereign immunity, the United States is immune from suit here.

III.    **THE CHIPS ACT PREEMPTS PLAINTIFF'S STATE LAW CLAIMS FOR EQUITABLE RELIEF AGAINST THE STOCK AGREEMENT.**

In addition to money damages against the Director Defendants, Plaintiff's Complaint seeks equitable relief to undo or impair the Stock Agreement. *See* Compl. at 42–43 ¶¶ B, C, E, F. But any such state law relief would conflict with the CHIPS Act's comprehensive scheme for

incentivizing semiconductor manufacturing, which gives the Secretary broad discretion in his execution of transactions under its terms. Plaintiff's request for equitable relief under Delaware law accordingly must yield to federal law.

Under the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2, any state law that "interferes with or is contrary to federal law" is preempted by such federal law. *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). Plaintiff's state law challenge to the Stock Agreement triggers "conflict preemption" because, "under the circumstances of [this] . . . case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 476 (3d Cir. 2015) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). And courts evaluate the relevant congressional purpose by reference to "the text and structure of the federal statute at issue." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 229–30 (3d Cir. 2026) (citation omitted).

The text and structure of the CHIPS Act squarely support preemption here. By its plain terms, the CHIPS Act's purpose is to incentivize semiconductor investment in the United States by permitting the expeditious distribution of federal funds on terms the Secretary deems "appropriate," 15 U.S.C. § 4659(a), to foster the national and economic security of the United States. Congress stated its expectation that these funds be distributed in a manner that "strengthens the security and resilience of the semiconductor supply chain," "provides a supply of secure semiconductors relevant for national security," "strengthens the leadership of the United States in semiconductor technology," and "grows the economy of the United States and supports job creation in the United States." *See id.* § 4652(d) (establishing the "sense of Congress" regarding

15

these points).  The statute further comprehensively establishes the eligibility criteria for entities to qualify for financial assistance and the criteria that the Secretary must and may consider in exercising his discretionary authority as to whether to issue funding and on what terms.  *See id.* § 4652(a)(2)(B), (C).  In receiving payment for financial assistance to Intel, the Secretary has applied these federal authorities in service of national security and economic interests.

Plaintiff seeks to employ Delaware corporate law to constrain the Secretary's discretionary actions under the statute and supplant Congress's determination about when and how CHIPS Act awards can be made.  That outcome "would interfere with the careful balance struck by Congress," *Arizona v. United States*, 567 U.S. 387, 406 (2012), in conferring broad discretion upon the Secretary to conduct CHIPS Act transactions—consistent with his policy priorities—using the statutory eligibility and decision-making criteria established in the statute.  Under preemption case law, "regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption." *Farina*, 625 F.3d at 123. This is precisely such a situation.  Here, the plain terms of the CHIPS Act show that Congress intended that the Secretary "use [his] reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives."  *See Farina*, 625 F.3d at 123.  State law cannot be used by Plaintiff to "re-balance the [federal] statutory objectives and inhibit the provision" of CHIPS Act funding or the Secretary's decision to require appropriate payment.  *See id.* at 122, 125 (finding state tort claims preempted where such claims would necessarily require finding that federal agency standards were "insufficiently protective of public health and safety"). Put differently, Plaintiff should not be permitted to wield Delaware corporate law as a sword to invalidate federal actions taken under a comprehensive federal funding scheme—particularly one of paramount national importance.

16

The CHIPS Act preempts Plaintiff's claims for equitable relief notwithstanding the traditional presumption against preemption of state law. *See, e.g.*, *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 230 (3d Cir. 2001) (finding presumption against preemption applied to breach of fiduciary duty claim). That presumption does not apply where, as here, "Congress legislates in an area of uniquely federal concern." *In re Commonwealth's Mot.*, 790 F.3d at 476 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 53 U.S. 341, 347 (2001)). The CHIPS Act centers on matters of national security and interstate and foreign commerce. These core federal constitutional authorities are not within the traditional ambit of state regulation. *See, e.g.*, *MITE Corp. v. Dixon*, 633 F.2d 486, 493 (7th Cir.1980) ("In the realms of national security and foreign affairs, state legislation has been held implicitly preempted because both areas are of unquestionably vital significance to the nation as a whole.") (citing *Pennsylvania v. Nelson*, 350 U.S. 497 (1956) and *Hines v. Davidowitz*, 312 U.S. 52 (1941)); *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018) (explaining that "state regulations may not discriminate against" or "impose undue burdens on interstate commerce"); U.S. Const. art. I, § 8, cl. 3.

Even where the presumption against preemption applies, the Third Circuit has not hesitated to find it "overcome where a Congressional purpose to preempt or the existence of a conflict is clear and manifest." *Farina*, 625 F.3d at 117 (quoting *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 249 (3d Cir. 2008)); *see also id.* at 133–34 (affirming dismissal of preempted claims notwithstanding the presumption). For the reasons discussed above, the existence of a conflict between the CHIPS Act and Plaintiff's Delaware state law claims for equitable relief undermining Commerce's rights under the Stock Agreement is "clear and manifest." Federal law must prevail in that circumstance.

17

### IV.   PLAINTIFF'S CLAIMS FAIL TO SATISFY BASIC FEDERAL PLEADING STANDARDS.

A host of basic pleading defects also require dismissal at the threshold.

*First*, Plaintiff has failed to carry his burden under Federal Rule of Civil Procedure 23.1(b)(2)(B) to plead particularized facts showing that a demand on the Director Defendants would have been futile, a necessary predicate to his three shareholder derivative claims.  Intel is a Delaware corporation and Delaware law thus "governs the analysis of whether demand . . . must be excused as futile."  *In re Cognizant Tech. Sols. Corp. Derivative Litig.*, 101 F.4th 250, 257 (3d Cir. 2024); *United Food & Comm. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (establishing test for demand futility).  Plaintiff has failed to meet the standard for pleading demand futility as explained in greater detail in the Director Defendants' motion to dismiss.  The Complaint should thus be dismissed against all Defendants.  The Commerce Defendants fully join in and incorporate by reference the Director Defendants' argument here.[5]

*Second*, the Commerce Defendants should be dismissed from this case because Plaintiff pleads no viable cause of action against them.  The Complaint asserts three counts against the Director Defendants—Counts I, II, IV—for breaches of fiduciary duty and waste arising out of their approval of the Stock Agreement.  Compl. ¶¶ 122–33, 141–44.  The Commerce Defendants are not party to any of those claims.  Instead, the Complaint asserts one count—Count III—against "All Defendants," which it styles as a "claim" to "invalidate the Stock Agreement."  Compl. ¶¶ 134–40.  Count III, however, does not assert a cause of action; it seeks a remedy with no corresponding assertion of liability.  *See* Compl. at 43 (seeking a "declaration that the Stock

---

[5] Under Delaware law, third-party defendants in a derivative suit, like the Commerce Defendants, also "have standing to assert demand related defenses." *Kaplan* v. *Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 727 (Del. 1988).

Agreement is void" and an "order cancelling all of Company shares of common stock and the Warrant issued to the DOC pursuant to the Stock Agreement").

Plaintiff cannot strip Commerce of its contractual rights without pleading and proving a viable cause of action against Commerce. "Declaratory judgment is a remedy and not a cause of action." *Campbell v. Pennsylvania Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 504 (E.D. Pa. 2018), *aff'd on other grounds*, 972 F.3d 213 (3d Cir. 2020); *see also Allen v. DeBello*, 861 F.3d 433, 444 (3d Cir. 2017) ("The Declaratory Judgment Act does not, however, provide an independent basis for subject-matter jurisdiction; it merely defines a remedy."). That means Plaintiff cannot seek to declare Commerce's rights (or alleged absence thereof) under the Stock Agreement without pleading and proving some independent, substantive legal claim that Plaintiff (standing in Intel's shoes) may successfully mount against the Commerce Defendants. *See Veloric* v. *J.G. Wentworth, Inc.*, No. CIV.A. 9051-CB, 2014 WL 4639217, at *20 (Del. Ch. Sept. 18, 2014) (unpublished) (holding that plaintiffs' "declaratory judgment claim is not a distinct cause of action" but rather "a request for relief for Counts I–VI," and that because plaintiffs "failed to state a claim under any of [those] Counts . . . , it necessarily follows that" the declaratory judgment claim fails). Plaintiff has not alleged any such claim.

*Third*, Plaintiff cannot use a purported breach of fiduciary duties by the Intel Board to unwind the transaction and its resounding success. Delaware cases "demonstrate overwhelmingly that a court cannot invoke the fiduciary duties of directors to override a counterparty's contract rights" unless that counterparty was proven to have "aided and abetted [the] breach of fiduciary duty." *Wagner* v. *BRP Grp., Inc.*, 316 A.3d 826, 868 (Del. Ch. 2024) (collecting cases), *rev'd and remanded on other grounds*, 2026 WL 1256588, at *2 (Del. May 7, 2026); *see also C & J Energy Servs., Inc.* v. *City of Miami Gen. Employees'*, 107 A.3d 1049, 1072 (Del. 2014). Thus, even if

19

Plaintiff could prevail on its claims against the Director Defendants, the Court still could not "hold[] [the government] to its contractual obligations while stripping it of its bargained-for benefits" by cancelling the shares and warrant issuances, unless the court "find[s] that the [government] aided and abetted the . . . breach." *C & J Energy Servs., Inc.*, 107 A.3d at 1072; *see also Strassburger* v. *Earley*, 752 A.2d 557, 578 (Del. Ch. 2000) (rejecting request to rescind a transaction "because [the counterparty] is not a party to this lawsuit, nor is there any claim or evidence that [it] engaged in culpable conduct" such as aiding and abetting "that would make it equitable to subject it to the rescission remedy").  Plaintiff alleges no aiding and abetting claim at all, let alone any basis to plausibly state such a claim.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice.

20

Dated:  May 21, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

BENJAMIN L. WALLACE
United States Attorney

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director

DYLAN J. STEINBERG
Assistant United States Attorney

*/s/ James R. Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Trial Attorney
U.S. Department of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543
Fax: (202) 616-8460
Email: james.r.powers@usdoj.gov

*Counsel for the Commerce Defendants*