IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICHARD D. PAISNER,<br><br>Plaintiff,<br><br>v.<br><br>LIP-BU TAN, *et al.*,<br>Defendants,<br><br>and<br><br>INTEL CORPORATION,<br><br>Nominal Defendant. | : | C.A. No. 26-cv-414-RGA |

**PLAINTIFF'S OMNIBUS ANSWERING BRIEF**
**<u>IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

HEYMAN ENERIO
GATTUSO & HIRZEL LLP
Kurt M. Heyman (# 3054)
Dominick T. Gattuso (# 3630)
Gillian L. Andrews (# 5719)
Denise S. Kraft (# 2778)
Brendan Patrick McDonnell (# 7086)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
(302) 472-7300
*Attorneys for Plaintiff*
*Richard D. Paisner*

OF COUNSEL:

GW LAW
Alan B. Morrison
2000 H Street NW
Washington D.C. 20052
(202) 994-7120

Dated: July 27, 2026

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING ........ 1

INTRODUCTION ........ 1

SUMMARY OF ARGUMENTS ........ 2

STATEMENT OF FACTS ........ 4

A. The CHIPS Act ........ 4

B. In 2024, Intel is Awarded $8.7 Billion in CHIPS Act and Secure Enclave Funding. ........ 6

1. The Direct Funding Agreement. ........ 6

2. The Secure Enclave ........ 7

C. A Change of Administration and The President Calls for Tan's Resignation. ........ 7

D. The Government Demands Equity and the Board Rushes to Approve the Stock Agreement. ........ 8

1. On August 14 the Board Met to Discuss Tan's White House Visit ........ 9

2. On August 18 the DOC Elevated Its Demands by Way of a Threat ........ 10

3. On August 20 the DOC Sent a Term Sheet and the Board Met a Second Time. ........ 10

4. On August 22 the Board Met a Final Time and Hastily Approved the Stock Agreement. ........ 11

5. The Voting Agreement Conveyed 9.9% or More of the Stockholder Voting Power to The Board. ........ 12

E. The Board Employed a Flawed Process to Approve the Stock Agreement. ........ 13

ARGUMENT ........ 15

I. THE COMPLAINT STATES A CLAIM THAT THE STOCK AGREEMENT IS UNLAWFUL ........ 15

A. Legal Standard ........ 15

B. The CHIPS Act Does Not Authorize the Government to Demand Stock and the Warrant from Intel, Rendering the Stock Agreement Unlawful ........ 16

C. Under the Commerce Defendants' Reading of the CHIPS Act, the Stock Agreement is a Coercive Financial Condition Rendering that Agreement Unconstitutional ..... 21

D. Under the Commerce Defendants' Reading, the CHIPS Act is an Unlawful Delegation of Legislative Authority Rendering the Stock Agreement Unconstitutional. ..... 23

II. PLAINTIFF'S FAILURE TO MAKE A DEMAND IS EXCUSED AS FUTILE..... 25

A. The Director Defendants Received a Material Personal Benefit from the Alleged Misconduct That Would be the Subject of the Litigation Demand. ..... 28

B. The Director Defendants Face a Substantial Likelihood of Liability on the Claims that Would be the Subject of the Litigation Demand. ..... 30

III. THE COMPLAINT STATES A CLAIM THAT THE BOARD BREACHED ITS FIDUCIARY DUTIES BY APPROVING THE STOCK AGREEMENT ..... 32

IV. PLAINTIFF'S CLAIMS ARE NOT BARRED BY SOVEREIGN IMMUNITY ..... 35

V. THE CHIPS ACT DOES NOT PREEMPT PLAINTIFF'S CLAIM AGAINST THE COMMERCE DEFENDANTS. ..... 36

VI. THE COMPLAINT STATES A VIABLE CLAIM AGAINST THE COMMERCE DEFENDANTS ..... 37

CONCLUSION ..... 39

# TABLE OF AUTHORITIES

## CASES


*ACP Master, Ltd. v. Sprint Corp.*,
2017 WL 3421142 (Del. Ch. July 21, 2017)....29

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003)....36

*Alaska Elec. Pension Fund v. Brown*,
988 A.2d 412 (Del. 2010)....34

*Am. Power & Light Co. v. Sec. Exch. Comm'n*,
329 U.S. 90 (1946)....24

*Berteau v. Glazek*,
2021 WL 2711678 (Del. Ch. June 30, 2021)....30

*Boyer v. Wilmington Materials, Inc.*,
754 A.2d 881 (Del. Ch. 1999)....34

*In re CBS Corp. S'holder Class Action & Deriv. Litig.*,
2021 WL 268779 (Del. Ch. Jan. 27, 2021)....33

*Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y. 2019)....4

*In re Cornerstone Therapeutics Inc. S'holder Litig.*,
115 A.3d 1173 (Del. 2015)....32-33

*County of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017)....4

*Dasso Int'l, Inc. v. Moso N. Am., Inc.*,
2021 WL 3476197 (D. Del. July 25, 2021)....35

*Della Corp. v. Diamond*,
210 A.2d 847 (Del. 1965)....37

*In re Edgio Inc. S'holders Litig.*,
2023 WL 3167648 (Del. Ch. May 1, 2023)....29, 31, 33

*Encite LLC v. Soni*,
2011 WL 5920896 (Del. Ch. Nov. 28, 2011)....33, 34

*Fed. Commc'ns Comm'n v. Consumers' Research*,
606 U.S. 656 (2025).... *passim*

*Goe v. Zucker*,
43 F.4th 19 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023) .......... 4

*Green v. Fund Asset Mgmt., L.P.*,
245 F.3d 214 (3d Cir. 2001) .......... 36

*Gupta v. Wilkinson*,
594 F. Supp. 3d 606 (D. Del. 2026) .......... 9

*Guttman v. Huang*,
823 A.2d 492 (Del. Ch. 2003) .......... 29

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 25

*Kelly v. Maxum Specialty Ins. Grp.*,
868 F.3d 274 (3d Cir. 2017) .......... 39

*Klein v. H.I.G. Capital, L.L.C.*,
2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018) .......... 30

*Lab. Skin Care, Inc., v. Ltd. Brands, Inc.*,
757 F.Supp.2d 431 (D. Del. 2010) .......... 35

*Landor v. Louisiana Dep't of Corr. and Pub. Safety*,
2026 WL 1791277 (2026) .......... 2, 21-23

*Learning Resources, LLP v. Trump*,
607 U.S. 229 (2026) .......... 2, 17-18, 20

*Lebanon Cty. Emps. Ret. Fund v. Collis*,
311 A.3d 773 (Del. 2023) .......... 31

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......... 36

*Martin Luther King, Jr. Cnty. v. Turner*,
785 F. Supp. 3d 863 (W.D. Wash. 2025) .......... 38

*In re Massey Energy Co.*,
2011 WL 2176479 (Del. Ch. May 31, 2021) .......... 31

*Medimmunite, Inc. v Genentech, Inc.*,
549 U.S. 118 (2007) .......... 38

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C.Cir.1982) .......... 39

*Moore Corp. v. Wallace Comput. Servs., Inc.*,
898 F. Supp. 1089 (D. Del. 1995)....38

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U. S. 519 (2012)....22

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016)....36

*Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*,
554 F.3d 1290 (10th Cir. 2009) .... 38-39

*Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*,
2004 WL 1949290 (Del. Ch. Aug. 24, 2004) .... 31-32

*Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div.*,
312 U.S. 126 (1941).... 24-25

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)....24

*In re RJR Nabisco, Inc. S'holders Litig.*,
1989 WL 7036 (Del. Ch. Jan. 31, 1989).... 28-29

*Scott v. Vantage Corp.*,
295 F. Supp. 3d 433 (D. Del. 2017)....5

*South Dakota v. Dole*,
483 U.S. 203 (1983)....2, 21, 23

*Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.*,
742 F.3d 37 (2d Cir. 2014)....32

*Starr Int'l Co., Inc. v. United States*,
856 F.3d 953 (Fed. Cir. 2017)....32

*In re Stem, Inc. Deriv. Litig.*,
2026 WL 880441 (D. Del. Mar. 31, 2026) ....5, 26

*In re Surrick*,
338 F.3d 224 (3d Cir. 2003)....35

*The Chemours Co. Sec. Litig.*,
2026 WL 1229226 (D. Del. May 5, 2026)....4

*Tornetta v. Musk*,
250 A.3d 793 (Del. Ch. 2019)....33

*United Food & Commercial Workers Union & Participating Food Indus. Emp'rs Tri-State Pension Fund v. Zuckerberg*,
262 A.3d 1034 (Del. 2021) .......... *passim*

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 18, 20

*Whitman v. American Trucking Assns., Inc.*,
531 U.S. 457 (2001) .......... 18, 23

*Wood v. Frank E. Best, Inc.*,
1999 WL 504779 (Del. Ch. July 9, 1999) .......... 30

*Young Women's Christian Ass'n of Rochester & Monroe Cnty. v. Hatteras Funds, LP*,
2026 WL 874818 (Del. Ch. Mar. 31, 2026) .......... 27, 30

*Young Women's Christian Assoc. of Rochester and Monroe Cnty. v. Hatteras Funds, LP*,
356 A.3d 459 (Del. Ch. Mar. 27, 2026) .......... 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 16

**STATUTES**

8 *Del. C.* § 102(b)(7) .......... 31, 32

8 *Del. C.* § 141(e) .......... 33, 34

5 U.S.C. § 702 .......... 3, 35, 36, 38

12 U.S.C. § 5201, *et seq.* (the "EESA") .......... 5, 16, 32

15 U.S.C. § 4651, *et seq.* (the "CHIPS Act"). .......... *passim*

15 U.S.C. § 9001, *et seq.* (the "CARES Act") .......... 5, 16, 32

22 U.S.C. § 9601, *et seq.* (the "BUILDS Act") .......... 5, 16

28 U.S.C. § 1442 .......... 1, 37, 38

28 U.S.C. § 2201 (the "Declaratory Judgment Act") .......... 37

50 U.S.C. §§ 1701, *et seq.* (the "IEEPA") .......... 18

**RULES**

Fed. R. Civ. P. 12(b)(6) .......... 15, 33

Fed. R. Civ. P. 201 .......... 4

D. Del. L.R. 7.1.3(c)(2) .......... 35

Del. Ch. Ct. R. 23.1 .......... 33

**OTHER AUTHORITIES**

U.S. Constitution Article I, Section 8, Clause 1 .......... 21, 25

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedures Act, 5 U.S.C. §§ 551, *et seq.* |
| Board | The Board of Director of Intel as of August 22, 2025, composed of all Director Defendants except Craig H. Barratt |
| BUILD Act | Better Utilization of Investments Leading to Development Act of 2018, P.L. 115-254, Division F, 22 U.S.C. §§9612 *et seq.* (2025) |
| CARES Act | Coronavirus Aid, Relief, and Economic Security Act, P.L. No. 116-136, 15 U.S.C. §§ 9001 *et seq.* (2020) |
| CFO Zinsner | David Zinsner, Intel Chief Financial Officer |
| CHIPS Act | Creating Helpful Incentives to Produce Semiconductors for America of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Pub. L. 116-283, as amended by the CHIPS Act of 2022 (Division A of Pub. L. 117-167, 136 Stat. 1366), 15 U.S.C. §§ 4651, *et seq.* (2022) |
| Commerce Defendants | Collectively, the United States Department of Commerce and Howard Lutnick in his capacity as the Secretary of the United States Department of Commerce |
| Complaint, Compl. or ¶ | The Verified Stockholder Derivative Complaint, initially filed on March 5, 2026, in the Delaware Court of Chancery, as removed to the United States District Court, District of Delaware on April 10, 2026 (D.I. 21) |
| Cotton Letter | Letter from Senator Tom Cotton to Frank Yeary, Chairman of the Board, dated August 5, 2025 (Compl. Ex. C) |
| CPO Shapiro | Dave Shapiro, Chief Policy Officer, United States Department of Commerce |
| Defendants | The Director Defendants collectively with the Commerce Defendants |

| | |
|---|---|
| DFA | The Direct Funding Agreement entered into between Intel and the Department of Commerce on or about November 25, 2024, pursuant to the CHIPS Act |
| DFA Award | $7.8 billion in funds awarded to Intel under the DFA |
| Director Defendants | Lip-Bu Tan, Frank D. Yeary, Craig H. Barratt, James Goetz, Andrea J. Goldsmith, Alyssa H. Henry, Eric Meurice, Barbara Novick, Steve Sanghi, Gregory D. Smith, Stacy J. Smith and Dion J. Weisler[1] |
| DOC | United States Department of Commerce |
| DOC OB | Commerce Defendant's Memorandum in Support of Their Motion to Dismiss (D.I. 29) |
| DOD | United States Department of Defense |
| EESA | Emergency Economic Stabilization Act of 2008. P.L. No. 110-343, 15 U.S.C. §§ 5201, *et seq.* (2008) |
| Government | United Stated Government |
| Intel or the Company | Intel Corporation |
| Intel Defendants | Intel collectively with the Director Defendants |
| Intel OB | Intel Defendants Opening Brief in Support of Motion to Dismiss Complaint (D.I. 25) |
| IEEPA | International Emergency Economic Powers Act P.L. 95-223; 91 Stat. 1625, 50 U.S.C. §§ 1701, *et seq.* (1977) |
| NOFO | Notice of Funding Opportunity (NOFO), CHIPS Incentive Program – Commercial Fabrication Facilities, United States Department of Commerce |
| Plaintiff | Plaintiff Richard D. Paisner |
| Secretary | Howard Lutnick in his capacity as the Secretary of the United States Department of Commerce |

[1] Mr. Barratt was not a member of the Intel Board of Directors at the time the transaction at issue was approved.

| | |
|---|---|
| Secure Enclave | The Secure Enclave project, announced on September 16, 2024, between Intel and the Department of Commerce and the Department of Defense. |
| Secure Enclave Award | $3 billion of funds awarded to Intel under the Secure Enclave Agreement |
| Skadden | Skadden Arps Slate Meagher & Flom LLP |
| Stock Agreement | The Warrant and Common Stock Agreement, dated August 22, 2025, between Intel and the Department of Commerce |
| Tan | Lip-Bu Tan, Chief Executive Officer of Intel |
| TARP | Troubled Asset Relief Program established by the Emergency Economic Stabilization Act and administered under the auspices of the United States Department of Treasury |
| Term Sheet | The draft warrant and common stock agreement the Department of Commerce sent to Intel on August 20, 2025 (Compl. Ex. E at INTEL_000019) |
| Voting Agreement | Section 4.6 of the Stock Agreement |
| Warrant | Warrant to purchase up to 240,516,150 shares of Intel's common stock, or 4.9% of the outstanding shares on a pro forma basis as of June 28, 2025, issued to the Department of Commerce |

## NATURE AND STAGE OF THE PROCEEDING

On March 5, 2026, Plaintiff filed this stockholder derivative action in the Delaware Court of Chancery. Plaintiff is the owner of 500 shares of Intel stock. The Director Defendants and the Commerce Defendants were named as Defendants. Intel was named as the Nominal Defendant. The Commerce Defendants filed a timely petition to remove under 28 U.S.C. § 1442.

On May 21, 2026, all Defendants moved to dismiss the Complaint. (D.I. 25, 29). This is Plaintiff's omnibus brief in opposition to the Defendants' motions to dismiss.

## INTRODUCTION

Defendants cannot use the CHIPS Act to validate governmental extortion of Intel, a solvent, public company, no matter how many times they chant "national and economic security." By the President's and his team's own acknowledgement, the Government improperly coerced Intel into giving the DOC 9.9% of Intel's voting stock (plus the Warrant for 4.9% more), currently worth in excess of $46.1 billion, to release approximately $8.7 billion in CHIPS Act grants that had ***already*** been awarded to Intel under the 2024 DFA ($5.695 billion) and Secure Enclave ($3.175 billion), thereby making the DOC Intel's ***largest*** individual stockholder.

Cowed by the Government's threats, Intel's Board quickly capitulated, meeting just three times over eleven days before caving to the Government's coercive "offer." The Board approved the Stock Agreement on August 22, 2025, just ***two*** days after receiving the Government's term sheet, without receiving a formal legal opinion from Skadden, the Board's conflicted legal advisor, as to the legality of the proposal. Not only did the Board rush to approve the Stock Agreement, thereby diluting Intel's public stockholders, but the Board also increased its power by securing the DOC's agreement to vote its stock with the Board. Intel's Board acted in a conflicted, self-interested, uninformed manner and thereby harmed Intel and its public stockholders, including the Plaintiff.

## SUMMARY OF ARGUMENTS

1. Plaintiff's Complaint properly states a claim that the Stock Agreement is unlawful. Contrary to Defendants' assertions, the CHIPS Act does not expressly authorize the DOC to demand and receive Intel voting stock through the Stock Agreement. The absence of authority for the Stock Agreement is demonstrated by the text of the CHIPS Act, its legislative history, and the bespoke November 2024 DFA, which the DOC participated in drafting. It is also in stark contrast to other federal legislation where Congress employed clear, unequivocal language when authorizing the Government to take equity or warrants in public companies; and for those reasons, the Commerce Defendants' construction of the CHIPS Act also fails under the major questions doctrine, *see, e.g., Learning Resources, LLP v. Trump*, 607 U.S. 229 (2026). Moreover, their actions under the Act amount to a coercive financial condition imposed on Intel by the DOC and, as such, is unconstitutional, *see, e.g., Landor v. Louisiana Dep't of Corr. and Pub. Safety*, 2026 WL 1791277 (2026); *South Dakota v. Dole*, 483 U.S. 203 (1983). The Commerce Defendants' actions also run afoul of the unconstitutional delegation doctrine, *see, e.g., Fed. Commc'ns Comm'n v. Consumers' Research*, 606 U.S. 656 (2025).

2. Demand on Intel's Board is excused as futile under settled Delaware law, where, as here, a majority of the Board 'are under an influence which sterilizes their discretion' and 'cannot be considered proper persons to conduct litigation on behalf of the corporation.'" *United Food & Commercial Workers Union & Participating Food Indus. Emp'rs Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1048–49 (Del. 2021) ("*Zuckerberg*") (citations omitted). Specifically, the Board cannot impartially consider a demand to institute litigation challenging the Stock Agreement because a majority of its members approved that very Agreement mere months ago under threat of reprisals from the President and the DOC. Demand is also excused because the Director Defendants received material personal benefits from approving the Stock Agreement,

including through the Voting Agreement and the avoidance of personal attacks by the President and the DOC. Furthermore, the Director Defendants face a substantial likelihood of liability, having breached their fiduciary duties to Intel's stockholders by approving an Agreement (a) that is unlawful, (b) through an uninformed and deficient process, and which (c) resulted in a deal that was not entirely fair to Intel's stockholders. The Commerce Defendants' pleading standard argument fails for the same reasons.

3. Plaintiff's claims are not barred by the doctrine of sovereign immunity. The APA specifically permits actions against the Government and its agencies seeking "relief other than money damages[,]" which in this case is a request to cancel Intel shares illegally issued to the DOC. 5 U.S.C. § 702.

4. The Commerce Defendants' preemption argument fails because Plaintiff is relying on federal, not state, law for his claim that the Commerce Defendants lacked authority to acquire Intel stock under the CHIPS Act – a constitutional claim concerning the provisions of a federal statute. There is no conflict with Plaintiff's state law claims against the Defendants Directors.

5. The Commerce Defendants federal pleading standard argument fails because Count III alleges an actual controversy between the parties. Notwithstanding the DOC's lack of congressional authority to demand Intel equity as a condition to the Company receiving its CHIPS Act grant, the DOC and Intel's Board entered into the unlawful Stock Agreement, which should be rendered void; the Agreement also constituted a breach of fiduciary duty by a majority of the Director Defendants.

## STATEMENT OF FACTS[2]

### A. The CHIPS Act

On January 1, 2021, Congress passed the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, as amended by the CHIPS Act of 2022, which provided the $52 billion funding for the program at issue here. ¶35. The CHIPS Act "provides Federal financial assistance to covered entities to incentivize investment in" the design and fabrication of semiconductors in the U.S. 15 U.S.C. § 4652(a)(1). Section 4652 provides detailed eligibility requirements and specific statutory parameters the Secretary must abide by in deciding whether to approve a funding application. *Id.* at § 4652(a)(2). Section 4652 also details how the funds may be used and provides for clawback of the grant proceeds if the recipient fails to satisfy various deadlines and other conditions.

Subsections (1) and (3) of Section 4659(a) provide that "[i]n carrying out the responsibilities of the [DOC] under this chapter, the Secretary may": (1) "enter into agreements, including contracts, grants and cooperative agreements, and other transactions as may be necessary and on such terms as the Secretary considers appropriate"; and (3) "require a person or other entity to make payments to the [DOC] upon application and as a condition for receiving support through an award of assistance or other transaction…." Relevant here, Sections 4659(a)(4) and (5) authorize the Secretary to retain scientific experts, consultants, legal counsel and other professionals in connection with implementing the application process and monitoring compliance

---

2 Paragraph citations refer to the Complaint. Exhibits A – I refer to the exhibits attached to the Complaint. Exhibits 1 – 9 cited herein are attached hereto. The exhibits attached are publicly available documents and, thus, subject to judicial notice. NOFO, Congressional Record excerpts (Exs. 1-4, 9), *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023); Fed. R. Civ. P. 201. President Biden's Executive Order 14080 (Ex. 5), *see* Fed. R. Civ. P. 201. Intel SEC filings (Ex. 6), *see The Chemours Co. Sec. Litig.*, 2026 WL 1229226, at *4 n.6 (D. Del. May 5, 2026). Senator Young's press comments (Exs. 7-8), *see* Fed. R. Civ. P. 201; *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263-64 (S.D.N.Y. 2019); *cf. County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 522 n.6 (N.D. Cal. 2017).

with the CHIPS Act; those fees and costs are paid by the applicants along with a yearly maintenance fee to the DOC. In April 2024, the DOC published the NOFO, which discusses the application process including the applicant's obligation to pay these fees and costs.[3] *See* NOFO §§ V.C.2; VI.B.1, 2.

Noticeably absent from the text of the CHIPS Act is any express language authorizing the DOC to demand equity or warrants from grant recipients as a condition to issuing funding under the CHIPS Act. ¶37. Congress knows how to draft legislation containing clear language expressly authorizing the Government to take equity or warrants in a public company as a condition of receiving federal financial assistance having done so in three recent federal laws.[4] Congress chose not to do so here. The Senate twice rejected efforts by Senators Bernie Sanders and Elizabeth Warren, who cited the CARES Act as precedent, to condition the receipt of CHIPS Act grants on the DOC obtaining warrants or equity in those public companies.[5] In response to Senator Sanders's "equity taking" proposal during floor debate on the CHIPS Act, Senator Brown distinguished the CHIPS Act from the CARES Act stating that the CHIPS Act is an "incentive program" designed to encourage domestic chip production not a CARES Act style "bailout" of the semiconductor

---

[3] The NOFO (Ex. 1) is available at https://www.nist.gov/system/files/documents/2024/04/19/Amended%20CHIPS-Commercial%20Fabrication%20Facilities%20NOFO%20Amendment.pdf.

[4] The relevant sections of the EESA, the BUILD Act and the CARES Act are discussed *infra* pp. 16-17.

[5] *See* 168 Cong. Rec. S 2318-19 (daily ed. May 4, 2022) (statement of Sen. Sanders) (Ex. 2); 168 Cong. Rec. 121, S3164-66 (daily ed. July 21, 2022) (statement of Sen. Sanders) (Ex. 3); *see also* CHIPS and Science Act, H.R. 4346, 117th Congress (2021-2022) (S.Amdt.5145 to S.Amdt.5135, submitted July 21, 2022) (Ex. 4), available at https://www.congress.gov/amendment/117th-congress/senate-amendment/5145/text.

industry.[6] Eighty-seven members of the Senate voted against the proposed Sanders-Warren amendment.[7]

### B. In 2024, Intel is Awarded $8.7 Billion in CHIPS Act and Secure Enclave Funding.

#### 1. The Direct Funding Agreement.

On November 25, 2024, Intel and DOC entered the DFA pursuant to which the DOC agreed to award Intel up to $8.7 billion in direct grant funds in consideration of work to be done to construct or modernize, as well as operate, microchip facilities in Arizona, Oregon, New Mexico and Ohio. ¶40; Compl. Ex. A. Article 2 of the DFA provides that funding was to be paid in installments in accordance with the milestones in Schedule B. *Id*. at INTEL_000413-15. Section 3.2 provides for "upside sharing."[8] *Id.* at INTEL_000416-17. In total, the DFA is 223 pages long, evidencing a heavily lawyered agreement with nothing left to chance, yet nowhere in the DFA is there any language mandating that Intel give the DOC equity or warrants in exchange for grant funding.[9] *See generally id*.

---

6 *See* 168 Cong. Rec. S2318-19 (daily ed. May 4, 2022) (statement of Sen. Brown); Senator Wicker agreed. *Id.* (statement of Sen. Wicker).

7 *See* 168 Cong. Rec. S 2318-19 (daily ed. May 4, 2022); 168 Cong. Rec. 121, S3164-66 (daily ed. July 21, 2022).

8 The NOFO further explains Upside Sharing, stating: "Recipients receiving more than $150 million in CHIPS Direct Funding will be required ***to share*** with the U.S. government ***a portion of any cash flows or returns*** that exceed the applicant's [cash flow] projections (above an agreed-upon threshold specified in the award). The [DOC] expects that upside sharing will only be material in instances where the project significantly exceeds its projected cash flows or returns, ***and will not exceed 75% of the recipient's direct funding award***." NOFO § I.C.6 (emphasis added).

9 No mention was made of the Government becoming joint owners of companies that received CHIPS Act funding in President Biden's Executive Order 14080, 87 Fed. Reg. 52847 (Aug. 22, 2022) (Ex. 5), which issued shortly after he signed the bill into law. ¶90. https://www.govinfo.gov/content/pkg/DCPD-202200729/pdf/DCPD-202200729.pdf.

In its Quarterly Report on Form 10-Q for the quarter ending June 28, 2025, Intel reported that it had received an aggregate of $2.2 billion in disbursements pursuant to the DFA and had submitted requests for an aggregate of $850 million of additional disbursements that had been earned but not yet paid.[10]

**2. The Secure Enclave.**

On September 16, 2024, the DOD and the DOC jointly announced that Intel had been awarded "up to $3 billion in direct funding under the CHIPS and Science Act for a project known as the 'Secure Enclave.'" ¶44. The Secure Enclave Award to Intel was made to "support the manufacture of microelectronics and ensure access to a domestic supply chain of advanced semiconductors for national security." ¶46. Unlike the DFA Award, whose terms and conditions were memorialized in a publicly filed DFA, the specific terms and conditions of the Secure Enclave Award have not been publicly disclosed.[11] ¶47.

**C. A Change of Administration and The President Calls for Tan's Resignation.**

Just prior to the Trump Administration coming into office, during a December 4, 2024 presentation at UBS' Global Technology and AI Conference, CFO Zinsner was asked whether the DFA "is [ ] a piece that you see as maybe a risk potential[?]" ¶56. CFO Zinsner responded, "I don't think so. ***I mean we signed an agreement*. *It's an ironclad agreement.*** It lays out all the milestones. … [W]e're already actually 1/3 of the way probably through the milestones, quite honestly." *Id.* (emphasis added).

---

[10] Intel 10-Q for quarter ending June 28, 2025, at p. 63 (Ex. 6), https://www.sec.gov/Archives/edgar/data/50863/000005086325000109/intc-20250628.htm. (Ex. 6).

[11] Plaintiff's books and records request asked Intel to provide documentation concerning the Secure Enclave Award, but Intel declined, citing confidentiality restrictions. Compl. Ex. H at 17, 19; ¶48.

On March 12, 2025, Tan was appointed as CEO and returned to the Board to guide Intel through a turnaround. ¶63. Shortly thereafter, Tan announced a three-pillar turnaround plan focused on investing in the U.S. foundry business in accordance with the DFA. ¶64.

On March 31, 2025, the Secretary "signaled that he could withhold promised CHIPS Act grants" –a fact acknowledged in Intel's Form 10-Q for the quarter ended March 29, 2025, where it reported that "recent U.S. government actions create uncertainty regarding the timing of the US government fulfilling its obligations under our CHIPS Act agreements." ¶¶60-61; Compl. Ex. B.

On August 5, 2025, Senator Cotton sent a letter to Intel Chair Frank Yeary expressing national security concerns about "the security and integrity of Intel's operations and its potential impact on U.S. National Security[,]" including Intel's ability to fulfill certain security regulations in connection with the DFA in light of Tan's alleged involvement in China-related business. Compl. Ex. C; ¶65.

The day after the public release of the Cotton Letter, President Trump called for Tan's resignation, posting on social media that Tan "is highly CONFLICTED and must resign immediately." ¶66. Just days later, on August 11, 2025, Tan made a hurried pilgrimage to Washington to meet with the President, the Secretary and the Secretary of the Treasury. ¶¶67-68. After the meeting, President Trump posted: "The meeting [with Tan] was a very interesting one. … Mr. Tan and my Cabinet members are going to spend time together, and bring suggestions to me during the next week." ¶69.

### D. The Government Demands Equity and the Board Rushes to Approve the Stock Agreement.

After Tan's August 11 White House meeting, the Board met just three times over the course of eight days before hastily approving the Stock Agreement without receiving a written legal opinion from Skadden as to its legality. On March 28, 2025, Skadden entered into an agreement

under governmental pressure to provide $100 million of *pro bono* legal services, including to the DOC—an agreement that later came under Congressional scrutiny. ¶58.

### 1. <u>On August 14 the Board Met to Discuss Tan's White House Visit.</u>

The Board first met on August 14, 2025, joined by Skadden, during which the redacted meeting minutes indicate that "Mr. Tan informed the Board, that, among other topics, [he and President Trump] discussed [the Cotton Letter] to the Board, his investments in China, the turnaround at Cadence, plans for the Company and Intel Foundry, and the CHIPS Act funds." ¶70; Compl. Ex. D at INTEL_000001. The minutes attached a letter from Tan, which described his meeting with the President and Secretary. *Id.* at INTEL_000006. That letter and the redacted August 14 minutes do not contain any reference to, or discussion of, Intel giving the Government any equity or even that the Board was aware of the Government's demands for equity as of August 14, 2025. ¶¶70-73.

President Trump's later remarks about the August 11 meeting paint a very different picture from that portrayed by the August 14 meeting minutes and Tan's letter. The President was reported as saying that "[Tan] walked in wanting to keep his job and he ended up giving us $10 billion for the United States. So we picked up $10 billion." ¶75. The President was later reported describing the August 11 White House meeting as follows: "I said, 'You know what? I think the United States should be given 10% of Intel.' And he said, 'I would consider that.'"[12] ¶74.

President Trump's comments indicate that the "deal" was effectively finalized between the President and Tan at the August 11 White House meeting, yet that deal was not disclosed in the Tan letter to the Board or discussed at the November 14 Board meeting, as evidenced by the August

---

[12] These comments, which the Defendants do not refute, were made by the President on August 22 and 24, 2025. Intel announced the Stock Agreement on August 22 - ten days after Tan's White House meeting. ¶¶68, 85. The President's statements are entitled to deference as true, and the Court may draw reasonable inferences that logically flow from those statements. *See Gupta v. Wilkinson*, 594 F. Supp. 3d 606, 610 (D. Del. 2026).

14 meeting minutes. ¶¶70-72, 76; Compl. Ex. D. The Board's subsequent actions in approving the unlawful Stock Agreement were mere window dressing and did not involve any actual informed business judgment by the Board.

### 2. <u>On August 18 the DOC Elevated Its Demands by Way of a Threat.</u>

On August 18, 2025, confirming that a deal had been struck in principle between the President and Tan during the August 11 meeting, CPO Shapiro "sent a clear message" in a call to CFO Zinsner that Intel "should not make the 'mistake of thinking that this is a negotiation[]' and 'the President is expecting to announce a deal on these terms on Friday.'" Compl. Ex. E at INTEL_000012. "CPO [Shapiro] acknowledged that the Board could choose not to accept the offer, but noted that rejection will have consequences that [Shapiro] cannot predict and that [the B]oard needs to consider [the] benefits of having a friend in this administration and what the administration can do to help Intel (including with customers)." *Id.* The Government's clear message — there was no room for negotiation and a failure to accede to the Government's demands would lead to unpredictable and decidedly unfriendly consequences — was a direct threat to Intel and its Board.

### 3. <u>On August 20 the DOC Sent a Term Sheet and the Board Met a Second Time.</u>

On August 20, 2025, the DOC sent Intel a draft warrant and common stock agreement (the Term Sheet), which included, in part, the following terms: (i) release of $5.7 billion of previously awarded grant funds under the DFA; (ii) transfer of 9.9% Intel common stock to DOC, plus 10-year warrants for an additional 9.9% stock at $20 per share; and (iii) a requirement that the DOC "vote its shares/consent in favor of each nomination and proposal recommended by Intel's Board and against any nomination or proposal not recommended by Intel's Board[.]" *Id.* at INTEL_000012, 19.

The same day it received the Term Sheet, the Board met again, with Skadden in attendance,

which is the ***first time*** the Board was advised of the deal to give the Government a significant equity interest in Intel. *See* Compl. Ex. E. The August 20 minutes indicate that, in the span of a few days, (i) the DOC had made "a verbal offer related to an investment by the Administration (the United States)"; (ii) the DOC sent the Term Sheet; (iii) CFO Zinsner had a follow up call with CPO Shapiro; and (iv) the Secretary called Tan with updated terms on the deal. *Id.* at INTEL_000012. The Board's initial reaction to the Term Sheet included the opportunity "to receive a 'full throated endorsement' of the President and his administration" for the deal. *Id.* at INTEL_000014. The Board noted "the economic terms that had been proposed [by] the Administration [in the Term Sheet] were not, in their current form, attractive to the Company and would need to be negotiated to achieve a transaction that the Board could support." *Id.* at INTEL_000008. The Board and Skadden further acknowledged the questionable legality of the Government's demands and formed a "[s]mall executive team" to "review[] and discuss[] the proposal … given the economics and ***potential legal issues*** of the deal presented[.]" *Id.* at INTEL_000012 (emphasis added). Those meeting minutes also indicate that the Board "[n]eed[ed] more specific understanding of President's ability to excuse/waive all obligations given the CHIPS funds are appropriated by Congress and come with specific program restrictions/obligations in the statute." *Id.* at INTEL_000018. Despite these acknowledgments of the questions surrounding the Government's demands, there is no mention of the Board requesting a legal opinion from Skadden—which had only recently succumbed to the Trump Administration's bullying itself. The minutes also do not reflect any discussion of Skadden's conflict given its contemporaneous work for the DOC.

#### 4. On August 22 the Board Met a Final Time and Hastily Approved the Stock Agreement.

On August 22, 2025, the Board met, along with Skadden, for a third and final time. Compl. Ex. F. The Board knew about the Government's demands for a mere ***two days*** and had raised

questions about the President's authority for such a deal. Nevertheless, the Board failed to resolve those questions and voted unanimously to approve the Stock Agreement without receiving a legal opinion from Skadden. *Id.* at INTEL_000021; ¶87. Tan also voted in favor of the Stock Agreement despite his clear conflicts of interest, including the President's direct call for his resignation after the allegations of the Cotton Letter and Tan's personal visit to the White House, which the President characterized as an attempt by Tan to save his job. ¶¶65-69, 75. The Board hollowly committed to render a decision that "'should not be colored by any other considerations,' such as 'how it might impact Mr. Tan personally[,]'" but failed to ask Tan to recuse himself from the vote on the Stock Agreement. Compl. Ex. F at INTEL_000020-21; Intel OB at 6.

Immediately after the final Board meeting, Intel announced that it had entered into the Stock Agreement proposed by DOC. ¶85. President Trump replied shortly thereafter that "I PAID ZERO FOR INTEL[.]" ¶¶88, 95. The Stock Agreement provides for the issuance to the DOC of 433,323,000 shares of Intel common stock, representing 9.9% of the outstanding shares as of June 28, 2025, along with the Warrant to purchase up to 240,516,150 shares of Intel's common stock, or 4.9% of the outstanding shares on a pro forma basis as of June 28, 2025.

#### 5. The Voting Agreement Conveyed 9.9% or More of the Stockholder Voting Power to The Board.

Section 4.6 of the Stock Agreement contains the Voting Agreement, whereby the DOC agreed to vote all of its shares, as well as any shares of Intel common stock issued under the Warrant "(x) in favor of each nomination and proposal recommended by the Board of Directors and (y) against any other nomination or proposal not recommended by the Board of Directors," at any meeting of Intel's stockholders. ¶98; Compl. Ex. G at INTEL_000354. Both the August 20 and August 22 minutes make passing reference to "governance rights" without further discussion. *See* ¶99; Compl. Exs. E-F. The Board did not discuss any benefit to Intel's stockholders from giving the Board control over 9.9%, or more, of the vote belonging to the DOC. Nor did the Board

consider any alternative to the Voting Agreement, such as issuing non-voting stock to the DOC. *Id*.

Execution of the Stock Agreement made the DOC Intel's ***largest*** stockholder and materially enhanced the Board's control over Intel through the Voting Agreement. It concomitantly diluted the vote and value of the shares held by Intel's other public stockholders. ¶¶99, 116, 125, 142.

### E. **The Board Employed a Flawed Process to Approve the Stock Agreement.**

When Intel announced the Stock Agreement, it was unable to tell its stockholders that the arrangement was lawful. Instead, Intel dissembled, stating: "the legislative, judicial or executive branches of the U.S. government could determine in the future that all or a portion of the transactions were unauthorized, void or voidable. … Further, … no other agency or branch of the US Government has made commitments to support, refrain from challenging or otherwise impeding the transaction." ¶97; *see* Compl. Ex. E at INTEL_000012, 18.

Intel's flawed process was of its own making. Absent from the three sets of Board meeting minutes are, without limitation, (i) any analysis of the legality of the DOC's claim that it was entitled (under applicable law) to obtain ownership interests in a solvent, publicly traded company or to delay or withhold disbursements to Intel of the DFA Award or the Secure Enclave Award; (ii) any analysis of possible alternative funding sources the Company might utilize in the event that the DOC delayed or withheld disbursements of the DFA Award or the Secure Enclave Award; (iii) any consideration of giving the DOC non-voting stock instead of the Voting Agreement, which gave the Board voting rights over the DOC's shares; (iv) any discussion of Skadden's conflict with the DOC or the propriety of Skadden advising Intel on how to respond to the Trump Administration's extortion after recently kowtowing to similar coercion itself; and (v) any discussion of what "consequences" might ensue if the Board declined to accept the DOC's "offer."

¶109; *see generally* Compl. Exs. D-F. Having made their decision in just ***two days***, there can be no argument that the Board seriously and duly considered the DOC's demand, including whether to reject it. That leads to one conclusion: the Board's process was not merely flawed, it was entirely lacking in any informed business judgment and was further tainted by personal considerations of the Board. ¶111.

The Director Defendants were cowed by the Government's demand for shares in Intel. *See* ¶¶73-81, 85, 87-88, 98-99, 109-114, 116; Compl. Ex. E at INTEL_000012; *see also* Intel OB at 12. In fact, the Board ***considered*** the reputational consequences of acceding to the Government's demands, acknowledging that capitulation provided an opportunity "to receive a 'full throated endorsement' of the President and his administration." Compl. Ex. E at INTEL_000014. The Board must also have considered the converse: that a rejection of the Government's demands would lead to further attacks from the President and his administration.

Indeed, it is inconceivable that the Board did not realize they were in the President's crosshairs when CPO Shapiro "sent a clear message" that Intel "should not make the 'mistake of thinking that this is a negotiation'"; that "'the President is expecting to announce a deal on these terms on Friday'"; "that the Board could choose not to accept the offer, but …that rejection will have consequences that [Shapiro] cannot predict"; and that "[the B]oard needs to consider [the] benefits of having a friend in this administration …." Compl. Ex. E at INTEL_000012. Given CPO Shapiro's "clear message," the President's calls for Tan's resignation were as much of a threat to the other members of the Board as it was to Tan. It is reasonable to infer the Board feared that rejecting the DOC's demand would materially and adversely affect their personal interests, including, but not limited to, their interests in protecting their positions on the Board, protecting their personal reputations, being free from attacks by President Trump and his supporters on social media and elsewhere, preserving business and social ties, and not jeopardizing possible future

business, financial and other opportunities. ¶114. Those factors were shared by every member of the Board who approved the Stock Agreement and undermined the Board's independent decision-making process in approving the Stock Agreement.

## ARGUMENT[13]

## I. THE COMPLAINT STATES A CLAIM THAT THE STOCK AGREEMENT IS UNLAWFUL

The legal issue at the heart of this case is whether the Secretary had the legal authority to demand that Intel, a solvent, publicly traded company, issue 9.9% of its common stock and the Warrant to the DOC. Because the legality of the Stock Agreement is central to the claims and defenses in this action, including the question of whether demand on the Intel Board was excused, Plaintiff first addresses this core issue.

### A. Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Stem, Inc. Deriv. Litig.*, 2026 WL 880441, at *2 (D. Del. Mar. 31, 2026). "The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case. Evaluating a motion to dismiss under Rule 12(b)(6) requires the court to accept as true all material allegations of the complaint." *Scott v. Vantage Corp.*, 295 F. Supp. 3d 433, 437 (D. Del. 2017). "The issue is not whether a plaintiff will ultimately prevail, but whether the complaint is entitled to offer evidence to support the claims." *Id.*

[13] All emphases added and internal citations and quotations omitted from all case citations unless otherwise specified therein.

### B. **The CHIPS Act Does Not Authorize the Government to Demand Stock and the Warrant from Intel, Rendering the Stock Agreement Unlawful**

The Commerce Defendants correctly recognize that the DOC must have some statutory authority to acquire Intel's stock; otherwise, their unilateral actions would be set aside under *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). DOC OB at 8-10. The action declared unlawful in *Youngstown* was temporary, taken in a time of war, and did no more than prevent a management lockout, *id.* at 582-84; whereas here, the DOC has become the largest stockholder of Intel for so long as it chooses to keep the stock.

Contrary to the Commerce Defendants' assertions, not a single sentence in all of the CHIPS Act contains express language authorizing the DOC to take equity or warrants from a company that receives a CHIPS Act grant. Had Congress intended to grant such far-reaching authority to the Secretary, it certainly knew how to include express language to that effect in the statute, as it did in the EESA in 2008[14], the BUILDS Act in 2018[15], and again in the CARES Act in 2020[16].

In fact, Congress intentionally chose not to provide such statutory authority. The Senate twice-rejected the Sanders-Warren amendment to the CHIPS Act in 2022, purposefully leaving the CHIPS Act devoid of any language requiring or permitting the DOC to take equity or warrants in public companies receiving grant funds as evidenced by Senators Brown's and Wicker's

---

[14] 12 U.S.C. § 5201, *et seq.*; Section 5223(d)(1) of the EESA expressly authorizes the Secretary to take equity, warrants or a debt instrument in a troubled entity before purchasing any troubled assets, and further provides that, if the Secretary takes voting stock, the Secretary shall not vote the stock.

[15] 22 U.S.C. § 9601, *et seq.*; Section 9621(c) of the BUILDS Act provides that the U.S. International Development Finance Corporation ("DFC") may, as a minority investor, "acquire, equity or quasi-equity securities or shares or financial interests of any entity, …upon such terms and conditions as the [DFC] may determine."

[16] 15 U.S.C. § 9001, *et seq.*; Section 9042(d) of the CARES Act provides: "The Secretary may not issue a loan to, or a loan guarantee for, an eligible business … unless … the Secretary receives a warrant or equity interest in the eligible business…."

comments during floor debate.[17] And just days after the Stock Agreement was announced, Senator Young, one of the CHIPS Act drafters, reaffirmed that the CHIPS Act does not imbue the Government with authority to demand equity or warrants as a condition to receiving CHIPS Act grants, stating: "For those of us who voted for the legislation, I don't know of anyone who thought this was allowed under the law…. The intent was not for this to happen under the law."[18]

The Commerce Defendants nevertheless assert that the Secretary has broad authority to "enter 'agreements' or any 'other transactions as may be necessary' on any 'terms' that the Secretary considers 'appropriate'," and has "discretionary authority as to whether to issue funding and on what terms," including demanding that the grant recipient provide equity or warrants as a form of "payment" for the CHIPS Act grant. DOC OB at 8-10, 13-16 (*citing* 15 U.S.C. §§ 4659(a)(1), (3), (7), 4652(a)(2)(B), (C)). The Commerce Defendants' construction affords the Secretary carte blanche to do whatever he deems "necessary" and "appropriate" to effectuate the CHIPS Act. That purported authority is breathtaking in its excess, flatly contradicted by the legislative history, and exactly the type of government overreach the United States Supreme Court struck down in *Learning Resources*.

In *Learning Resources*, the Government imposed "tariffs of unlimited amount and duration, on any product from any country" claiming that the phrase "regulate . . . importation" in the IEEPA afforded the President the power to levy revenue-raising tariffs. 607 U.S. at 241-42.

---

[17] *See* 168 Cong. Rec. S2318-19 (daily ed. May 4, 2022); 168 Cong. Rec. S3615 (daily ed. July 21, 2022); *see also* 168 Cong. Rec. S2318 (daily ed. May 4, 2022) (statements of Senators Brown and Wicker).

[18] Alexander Bolton, *GOP author of CHIPS Act says law did not intend government stake in Intel*, THE HILL, Aug. 26, 2025, https://thehill.com/homenews/senate/5471480-young-pushes-back-intel-deal/ (Ex. 7); *see also* Ramsey Touchberry, *Todd Young says Trump's federal Intel stake violates the CHIPS Act he wrote*, WASHINGTON EXAMINER, Aug. 26, 2025, https://www.washingtonexaminer.com/news/senate/3783085/todd-young-trump-intel-deal-violates-chips-act/. (Ex. 8).

The IEEPA sets forth a laundry list of specific presidential powers, *id*., but does not use the words "tariffs" or "duties." The Supreme Court rejected the Government's expansive reading of "regulatory … importation" reasoning, among other things, that the Government failed to "identify any statute in which the power to regulate includes the power to tax" despite the U.S. Code being "replete with statutes granting the Executive the authority to 'regulate' someone or something…." *Id*. at 249. As the Court explained in relying on the major questions doctrine as another basis to strike down the President's tariffs, "Congress would not have delegated 'highly consequential power' through ambiguous language." *Id*. at 242 (quoting *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022)); *see also Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001) (reasoning that Congress "does not, one might say, hide elephants in mouseholes").

The same reasoning applies here. The CHIPS Act contains no language expressly authorizing the Government to demand stock or warrants from a grant recipient as "payment." Section 4659 limits the powers granted there to carry out "the responsibilities of the [DOC] under this chapter," *i.e.*, to advance the grant and loan guarantees under the CHIPS Act. Thus, the best reading of Section 4659(a)(1) is that it was included to ensure the Secretary would be able to enter into agreements and engage in other transactions necessary to provide the grants and loan guarantees that the CHIPS Act authorized. And the more sensible reading of subsections (3)-(5) and (7) is that they permit the Secretary to require applicants to pay the consultant, expert and maintenance fees incurred by the DOC in implementing the application process and monitoring a recipient's compliance with the CHIPS Act. That reading is squarely supported by a plain reading of Section 4659(a)(3), which provides that the Secretary may "require a[n] … entity to make payments" to the DOC "***upon application and as a condition for receiving support***"; the NOFO, which expressly sets forth the scope of those expert, consultant and maintenance fees and makes clear that the grant recipient shall bear those costs as a condition of receiving a grant, NOFO §§

V.C.2; VI.B.1, 2[19]; and Section 3.3 of the DFA, which states that Intel shall pay these fees and costs. Compl. Ex. A at INTEL_000417.

The Commerce Defendants' broad reading of Section 4652(a) is equally unsupportable. DOC OB at 13-14, 16. Subsections 4652(a)(2)(B) and (C) do no more than identify the criteria a grant applicant must satisfy to be considered for grant funds. And, while Section 4652(a)(3) authorizes the Secretary to "determine the appropriate amount and funding type for each financial assistance award," that subsection, on its face, does not afford the Secretary authority to demand equity from a grant recipient. Further, the NOFO, which discusses and cites Section 4652 at length, makes no mention of the Secretary taking equity from a grant recipient as payment for a grant. And while the NOFO recognizes the possibility of "Upside Sharing," it, like the DFA, are forward looking and speak in terms of dollars, not equity; and the NOFO caps upside sharing at a maximum of "75% of the recipient's direct funding award." *Compare* NOFO § I.C.6 *with* DFA § 3.2 (Compl. Ex. A at INTEL_000416) (setting forth a detailed calculation to determine whether an upside sharing payment is owed by Intel and, if so, the "***Dollar***" amount to be paid to the DOC).[20]

The fallacy in the Commerce Defendants' argument is further evidenced by the clawback provision in Section 4652(a)(5), which authorizes the Secretary to recover grant and loan proceeds if a recipient fails to satisfy the time limits and technology restrictions in the Act. The Commerce Defendants' arguments render that clawback provision superfluous. Indeed, what would the Secretary claw back where, as here, the DOC receives almost 10% of a company's voting stock

---

[19] The DOC amended the NOFO in or about October 2025. (Ex. 9). Section V.D.3 of the amended NOFO also provides that grant recipients may be required to pay the fees of the Secretary's experts and consultants as a part of the application process. *See* https://simpler.grants.gov/opportunity/00ce4809-b5ff-479a-ac47-bfbf09abdccb.

[20] Annex A to the DFA defines "Dollar" as "the lawful currency of the United States." Compl. Ex. A at INTEL_000474. Interestingly, the DOC removed the Upside Sharing provision in the original NOFO from the amended NOFO, which amendment was published ***after*** the Intel Board approved the Stock Agreement in August 2024.

and a warrant worth multiples of the funds it granted to the recipient, which equity the DOC can hold indefinitely?

The Commerce Defendants' argument also misses the mark because it ignores context, and context matters as indicated in *Learning Resources*. 607 U.S. at 242 ("We have long expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers") (quoting *West Virginia*, 597 U.S. at 723)). The CHIPS Act contains no clear language enabling the Secretary to demand equity or warrants in exchange for receipt of a grant, as the Commerce Defendants strained argument tacitly concedes. DOC OB at 8-10. That silence is not happenstance as the legislative history discussed herein reflects. In those few instances where Congress gave the Government authority to demand equity and warrants from private companies, it employed clear language. Moreover, no mention was made of the Government becoming joint owners of publicly traded companies that receive CHIPS Act funding in President Biden's Executive Order 14080, 87 Fed. Reg. 52847 (Aug. 22, 2022), which he issued shortly after signing the bill into law. ¶90. And the DFA contains no reference to the Government taking equity and warrants from Intel as "payment" for a CHIPS Act grant. Rather, as discussed, any "payment" would come in the form of dollars calculated pursuant to the upside sharing provision in Section 3.2 of the DFA, and that payment would "not exceed 75%" of Intel's DFA Award as set forth in Section I.C.6 of the NOFO.

The cases cited by the Commerce Defendants in support of their argument stand merely for the general, and thus unremarkable, proposition that a payment may include stock or warrants in some circumstances and, for that reason, are entirely distinguishable from the issue at bar. The context here is clear. The CHIPS Act does not authorize the Government to demand the "payment" of equity and warrants by Intel in exchange for receiving previously awarded grant funds, and nothing in the record indicates otherwise.

### C. Under the Commerce Defendants' Reading of the CHIPS Act, the Stock Agreement is a Coercive Financial Condition Rendering that Agreement Unconstitutional

The Complaint contains well-pled allegations that the Stock Agreement was a financial condition coercively imposed on Intel by the DOC under the auspices of the CHIPS Act, and is therefore unconstitutional. ¶¶73-81, 89-97, 109-114; *see* Compl. Ex. E at INTEL_0000012.

The Court's teachings in *Landor* and *Dole* are instructive. The CHIPS Act, like the statute addressed in *Landor*, has its genesis in the Spending Clause in Article I, Section 8, Clause 1 of the U.S. Constitution, which grants Congress the power to tax and spend money for the general welfare of the U.S. Though Congress may attach conditions to the receipt of federal funds under the Spending Clause, those conditions must be, among other criteria, (i) "unambiguously expressed," (ii) "related to the federal interest in particular national projects or programs legislation," and (iii) must "not 'pass the point at which pressure turns into compulsion.'" *Landor*, 2026 WL 1791277, at *6-7 (quoting *Dole*, 483 U.S. at 207-08, 211). To ascertain whether spending legislation is enforceable, the Supreme Court "traditionally turned to contract principles for guidance," key among them: "coerced consent to a contract is invalid" and "ambiguous contractual language is construed against its drafter." *Id.* at *6.

The Stock Agreement fails each of the foregoing criteria. *First*, the Commerce Defendants' construction of Sections 4652 and 4659 of the CHIPS Act is surely not an unambiguous reading. DOC OB at 8-10. On its face, the CHIPS Act contains no clear language expressly authorizing the Commerce Defendants to demand that Intel surrender millions of shares of Intel voting stock worth billions of dollars as a financial condition to release Intel's DFA Award, which had already been granted and earned, in part. The Commerce Defendants' interpretation of those sections is plainly contradicted by the legislative history underlying the CHIPS Act, the NOFO and the DFA the DOC negotiated and signed in November 2024. As the *Landor* court instructed, "ambiguous

contractual language is construed against its drafter." *Landor*, 2026 WL 1791277, at *6. Accordingly, the ambiguity here should be construed against the Government.

*Second*, the coerced transfer of millions of Intel shares and the Warrant is not a financial condition that is "related to the federal interest in particular national projects or programs legislation," *Id.* at *7, as Senators Brown and Wicker made clear before the Senate twice-rejected the Sanders-Warren amendment, and Senator Young later reaffirmed. The fact is that Congress determined that the grants and loans expressly authorized in the CHIPS Act was all that was necessary to incentivize chip production in the U.S. *Id.*

*Third*, the Stock Agreement amounts to "coerced assent to a spending condition—by way of an economic 'gun to the head'" and, thus "is invalid." *Landor*, 2026 WL 1791277, at *6 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U. S. 519, 581–582 (2012)). There was nothing voluntary or consensual about the Stock Agreement—it was extortion. The President pressured Intel's CEO to resign, at which point Tan placated the President by committing to transfer Tan's holdings in foreign companies to a blind trust and purportedly agreeing to consider giving the Government "10% of Intel." ¶¶66, 69, 72, 74. According to the President, "[Tan] walked in wanting to keep his job and he ended up giving us $10 billion for the United States." ¶75. On August 18, just seven days after Tan met with the President at the White House, CPO Shapiro told Intel's CFO Zinsner that Intel "should not make the 'mistake of thinking that this is a negotiation[]' and 'the President is expecting to announce a deal on'" August 22. ¶¶77, 81; Compl. Ex. E at INTEL_000012. While offering that Intel could choose not to accept the offer, CPO Shapiro warned that a "rejection will have [unpredictable] consequences," and advised that Intel's "[B]oard needs to consider [the] benefits of having a friend in this administration and what the administration can do to help Intel…." *Id.* On August 22, just four days after CPO Shapiro and CFO Zinsner spoke, and consistent with the President's earlier demand to close the "deal" quickly,

the Board caved to the Government's coercion and approved the Stock Agreement, which gave the DOC 9.9% of Intel's voting shares and the Warrant (for 4.9% more) worth billions of dollars, making the Government Intel's largest stockholder and diluting Intel's other public stockholders, ¶¶85-86, ¶98; Compl. Ex. G at INTEL_0003554. This was not a voluntary transaction but, rather, an economically coercive financial condition that far "[sur]pass[ed] the point at which 'pressure turns into compulsion'" and, therefore, the Stock Agreement is unconstitutional. *Landor*, 2026 WL 1791277, at *16 (quoting *Dole*, 483 U.S. at 211).

**D. Under the Commerce Defendants' Reading, the CHIPS Act is an Unlawful Delegation of Legislative Authority Rendering the Stock Agreement Unconstitutional.**

If the Commerce Defendants' construction of the CHIPS Act stands, the coerced transfer of millions of Intel shares and the Warrant to the DOC as a condition of Intel obtaining its previously awarded DFA Award is an unconstitutional delegation of legislative power to the Secretary under the decision in *Consumers' Research*, 606 U.S. 656. As the Supreme Court explained, "[t]o distinguish between the permissible and the impermissible in this sphere, we have long asked whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do." *Id.* at 673. While Congress may vest discretion in a federal agency to carry out the laws enacted, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Id.* (quoting *Whitman*, 531 U.S. at 475). Where, as here, an agency's "action will 'affect the entire national economy'," the "'guidance' needed [from Congress] is greater, … than when it addresses a narrow, technical issue…." *Id.* The magnitude of the instant transaction on Intel, the semiconductor industry and the national economy requires a significant level of statutory guidance, which cannot be satisfied (contrary to what the Commerce Defendants argue) by vague statutory language providing for "payment" on whatever "terms" the Secretary deems "appropriate." DOC OB at 8.

As *Consumers' Research* explains, to satisfy the "intelligible principle" test, Congress must make clear "both 'the general policy' the agency must pursue and 'the boundaries of [its] delegated authority.'" *Consumers' Research*, 606 U.S. at 673 (quoting *Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 105 (1946)). That test is not satisfied here. Congress has not expressed its policy that the Government should become a stockholder in CHIPS Act recipients. There are no statutory boundaries in Section 4659 other than the word "appropriate." According to the Commerce Defendants, the Secretary is free to decide what form of payment he desires, which could include money, stock, debt, cryptocurrency or something else entirely, and in whatever amount he chooses. DOC OB at 9-10. The Secretary may make a payment demand of some CHIPS Act recipients but not others, and he is free to choose how much he will demand of each recipient, without regard to what he has demanded of others. In short, the Secretary may demand a payment in any form and in any amount that he considers "appropriate," without any statutory limit or standard constraining that discretion. The Court has previously struck down statutes affording the Executive branch such unfettered discretion. *See Consumers' Research*, 606 U.S. at 683 (explaining that the statute struck down in *Panama Refining Co. v. Ryan*, 293 U.S. 388, 415 (1935), "empowered the President to bar the transport of petroleum products while 'establish[ing] no criterion' and 'declar[ing] no policy' for whether, when, or how he should do so") (quoting *Panama Refining*, 293 U.S. 388, 415 (1935)). So too here. The Commerce Defendants' reading of the CHIPS Act is directly contrary to the Court's instruction that a valid delegation of authority by Congress must include "boundaries of [the] delegated authority" sufficient to constrain executive discretion. *Id*. at 678.

Nor has Congress supplied standards sufficient to enable both "the courts and the public [to] ascertain whether the agency has followed the law," under the Commerce Defendants' construction of the CHIPS Act. *Consumers' Research*, 606 U.S. at 673 (quoting *Opp Cotton Mills,*

*Inc. v. Adm'r of Wage & Hour Div.*, 312 U.S. 126, 144 (1941)). Under that construction, there are no criteria, limits or guidelines in the CHIPS Act that delineate the boundaries of Congress's delegated authority that would enable a court to determine whether the Secretary had acted within those boundaries in demanding a payment of millions of shares of equity or warrants, as it did here. The word "appropriate" alone cannot provide the necessary boundaries. If it did, Congress could simply tell an agency to do whatever it thinks is "appropriate," and the nondelegation doctrine would be satisfied. That is not what *Consumers' Research* held.

While judicial review is not a constitutional requirement *per se*, it is a means of assuring that there are clearly defined statutory boundaries that are followed. "'Executive action under legislatively delegated authority … is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely.'" *Consumers' Research*, 606 U.S. at 701 n.3 (Kavanaugh, J., concurring) (quoting *INS v. Chadha*, 462 U.S. 919, 953-54, n.16 (1983)). By doing that, courts can satisfy themselves that Congress has adhered to the principle behind the nondelegation doctrine: Article I vests the legislative power in Congress and "that assignment of power to Congress is a bar on its further delegation: Legislative power, we have held, belongs to the legislative branch, and to no other." *Id.* at 672. As the foregoing attests, judicial review is critical in this instance.

For the foregoing reasons, the Stock Agreement is unlawful and must be set aside.

## II. PLAINTIFF'S FAILURE TO MAKE A DEMAND IS EXCUSED AS FUTILE.

In its most recent pronouncement about the demand requirement in derivative actions, the Delaware Supreme Court observed "that there are circumstances where making a demand would be futile because a majority of the directors 'are under an influence which sterilizes their discretion' and 'cannot be considered proper persons to conduct litigation on behalf of the

corporation.'" *Zuckerberg*, 262 A.3d at 1048–49. "Thus, the demand-futility analysis provides an important doctrinal check that ensures the board is not improperly deprived of its decision-making authority, while at the same time leaving a path for stockholders to file a derivative action where there is reason to doubt that the board could bring its impartial business judgment to bear on a litigation demand." *Id.* at 1049.

The *Zuckerberg* Court adopted a "refined test" for assessing demand futility that "refocuses the inquiry on the decision regarding the litigation demand, rather than the decision being challenged[;]" in other words, "are [the directors] under an influence which sterilizes their discretion[?]" *Id*. at 1058-59; *see also In re Stem*, 2026 WL 880441, at *3-4 (applying demand futility test set forth in *Zuckerberg*). This analysis necessarily tests "whether the board should be deprived of its decision-making authority because there is ***reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand***." *Zuckerberg*, 262 A.3d at 1059.

Under the refined test, the Court "should ask the following three questions on a director-by-director basis when evaluating allegations of demand futility:"

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.
>
> If the answer to any of the questions is "yes" for at least half of the members of the demand board, then demand is excused as futile.

*Id*.

"The claim-by-claim, director-by-director, and board-by-board analysis is not an analytical checklist. When claims are closely related, a court can evaluate them together. When directors are similarly situated, a court can evaluate them as a group." *Young Women's Christian Ass'n of Rochester & Monroe Cnty. v. Hatteras Funds, LP* ("*YWCA II*"), 2026 WL 874818, at *19 (Del. Ch. Mar. 31, 2026). In such circumstances, and where "other claims involve the same directors and arise out of the same nucleus of operative facts, then an analysis that results in demand being excused for one claim causes demand to be excused for those other claims as well." *Id.*

Before addressing the specific elements of the *Zuckerberg* test—which focuses on the Board's impartiality to consider a litigation demand—it is important to bear in mind that Plaintiff's principal claim is that the Commerce Defendants had no legal authority to requisition or receive Intel's common stock under the CHIPS Act. At the August 22, 2025 Board meeting, just ***two days*** after first being informed of the Government's demand and without a full discussion of that demand (including its legal basis, if any), the Director Defendants unanimously approved the Stock Agreement. Having made that choice under pressure from the President and the Secretary just six months before suit was filed, and after providing Plaintiff documents pursuant to his demand for inspection in which he explained why the transfer was not authorized by law, it would be unthinkable for these Director Defendants to tell the President and the Secretary that the Stock Agreement is unlawful and that Intel is rescinding it. Demanding that the Director Defendants take such action would have been futile and hence is excused as a matter of law.

Turning to the specifics of the *Zuckerberg* test, demand is excused because of the improper, material personal benefits received by all but one of the Director Defendants[21] and the substantial

---

[21] Mr. Barratt was not a member of the Board when the Stock Agreement was approved.

likelihood of liability that those Director Defendants face as a result of their approval of the Stock Agreement.

### A. The Director Defendants Received a Material Personal Benefit from the Alleged Misconduct That Would be the Subject of the Litigation Demand.

The Director Defendants received material personal benefits from the Stock Agreement, insofar as they (i) avoided becoming the targets of the Trump administration's ire, and (ii) obtained the ability to vote the DOC's shares in Intel through the Voting Agreement.

Tan became a target of the Trump administration; the Government's threats against him—including to his U.S. citizenship, his interests in Chinese businesses, and his position with Intel itself—led directly to his White House meeting with Trump and an agreement to issue Intel stock to the DOC. ¶¶65-69, 70-77, 112. The rest of the Board feared becoming the President's next targets. ¶¶113-14, 116. Such fear was not hypothetical. CPO Shapiro's threats on August 20 made clear that the entire Board was in the President's crosshairs. Compl. Ex. E at INTEL_000012.

The Director Defendants' personal fear of the Government's threats after witnessing Trump's actions towards Tan, and subsequently caving to the Government's extortionate threats, shows why they cannot impartially consider a demand to pursue litigation against the Commerce Defendants to cancel the illegal Stock Agreement. To the contrary, the Board considered the alleged benefits of a "'full throated endorsement' of the President and his administration[,]" and, therefore, must have considered the reputational consequences of refusing the transaction. *Id.* at INTEL_000014.

As former Chancellor Allen observed, the protections of the business judgment rule are not "available to a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests." *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989). "Greed is not the only human emotion that can pull one from the path of propriety; so might

hatred, lust, envy, revenge, or, as is here alleged, shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation." *Id.*; *accord Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003). Here, the Government's outright coercion—and the Director Defendants' resultant fear of reputational or other harm—is a factor which could lead the Court to find that the Stock Agreement was "unfair compared to what faithful fiduciaries could have achieved." *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *19 (Del. Ch. July 21, 2017). The Director Defendants' fear of reprisal caused them to act in a way that was not in the best interests of Intel or its stockholders by giving away more than 10% of the Company's equity out of fear for their own metaphorical hides, in breach of their fiduciary duties. Accordingly, they cannot impartially consider a demand to challenge the Stock Agreement.

Additionally, the Director Defendants received a direct, personal benefit from the transaction in the form of the Voting Agreement, under which they obtained the right to vote the DOC's current 9.9% holdings —a non-ratable benefit not shared with other Intel stockholders, which could be used to secure their own tenures on the Board. ¶¶98-99. This makes the Stock Agreement subject to the entire fairness standard of review, in which the Director Defendants have the burden of proving the fairness of the Voting Agreement (as to process and price), rather than the more deferential business judgment rule.[22] The overall transaction could have been structured differently, with the DOC receiving nonvoting shares that would not have diluted the other stockholders' votes, but instead the Director Defendants used the opportunity to create a benefit for themselves. ¶¶99, 116, 125, 142. The lack of independent advice of counsel provides a further

[22] At the very least, the Voting Agreement is subject to "enhanced scrutiny" as an entrenchment device, rather than the more lenient business judgment rule. *See In re Edgio Inc. S'holders Litig.*, 2023 WL 3167648, at *1-2, 15 (Del. Ch. May 1, 2023) (applying enhanced scrutiny review to voting agreement).

basis to apply the entire fairness standard of review instead of the business judgment rule. *See Wood v. Frank E. Best, Inc.*, 1999 WL 504779, at *3 (Del. Ch. July 9, 1999) (finding on a motion to dismiss that the "lack of an independent advisor … acting on the minority's behalf[,]" among other things, "means that there is nothing in the record at this stage of the proceedings to indicate that the merger was fair to the public shareholders"); *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018) (entire fairness analysis noting that "the same law firm and accounting advisor represented both [parties] in connection with the Transactions").

Because the Director Defendants received a material personal benefit as a result of their approval of the Voting Agreement, demand is excused under *Zuckerberg*. For these same reasons, the Commerce Defendants' pleading standard argument also fails. *See* DOC OB at 18.

### B. The Director Defendants Face a Substantial Likelihood of Liability on the Claims that Would be the Subject of the Litigation Demand.

At the pleadings stage, to show that a claim that a director faces a substantial likelihood of liability has "some merit," a plaintiff need only "make a threshold showing, through the allegations of particularized facts" that there is "reason to believe that the individual director was self-interested, beholden to an interested party, or acted in bad faith." *Zuckerberg*, 2020 WL 6266162, at *15-16. The Director Defendants face a substantial likelihood of liability here because the entire fairness standard applies and "because the Complaint pleads facts sufficient to state a non-exculpated claim against them." *Berteau v. Glazek*, 2021 WL 2711678, at *28 (Del. Ch. June 30, 2021). "If the … Directors had to confront a demand to assert [these claims], they would be forced to decide whether to authorize a suit that would generate discovery into and eventually factual findings about the same decision that gives rise to the substantial threat of liability against them." *YWCA II*, 2026 WL 874818, at *22.

Demand is excused under this prong of *Zuckerberg* because the Director Defendants face a substantial likelihood of liability for approving the Stock Agreement, for several reasons:

*First*, for the reasons set forth in Argument I above, the Stock Agreement transferred stock ownership to the DOC and that action was not authorized by law. "Where a fiduciary acts with the intent to violate positive law, she runs afoul of this proscription and violates the duty of loyalty." *Lebanon Cty. Emps. Ret. Fund v. Collis*, 311 A.3d 773, 795 (Del. 2023) (cleaned up); *In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2021) ("[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."). The Director Defendants' personal liability for violation of the duty of loyalty is not exculpated under 8 *Del. C.* § 102(b)(7), and therefore demand is excused.

*Second*, as discussed more fully above, the Director Defendants' receipt of a personal, non-ratable benefit in the form of the Voting Agreement is also a non-exculpated breach of the fiduciary duty of loyalty that excuses demand.[23]

*Third*, the Director Defendants approved the Stock Agreement without receiving any opinion of counsel that it was lawful, or any independent advice at all, and they were unable to represent to the stockholders that they had a good faith basis for believing it was lawful. ¶¶87, 96. This too is a non-exculpated breach of the duty of loyalty that excuses demand. *See Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*, 2004 WL 1949290, at *15 (Del. Ch. Aug. 24, 2004) ("[T]he Complaint alleges that the Board approved the program 'without any consideration, deliberation, or advice from any expert.' Such an allegation, if true, would imply

[23] This is the case even if "enhanced scrutiny" applies to the Voting Agreement instead of entire fairness. *See In re Edgio*, 2023 WL 3167648, at *15.

the type of knowing and intentional indifference that would imply a breach of fiduciary duty not insulated from liability by a § 102(b)(7) clause.").

The Director Defendants' reliance on *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953 (Fed. Cir. 2017) and *Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37 (2d Cir. 2014) as support for the proposition that "the notion of government equity ownership [here was not] facially unlawful" is misplaced. Intel OB 16-17 n.5. Plaintiff's claim does not depend on a claim that Government ownership is "facially unlawful" but that the DOC lacked statutory authority to acquire Intel stock, unlike the statutes at issue in *Starr*. As discussed herein, the EESA expressly required the Government to take equity or warrants in a troubled entity, such as AIG, before providing financial relief to AIG through TARP. Congress acted similarly through the CARES Act, which also expressly authorized the Government to obtain warrants in exchange for providing financial aid to severely distressed airlines during the COVID pandemic. And, in contrast to AIG in 2008 and various U.S. airlines in 2020-2021, Intel was a solvent company nowhere near economic collapse when the Intel Board capitulated to the Government's extortion and entered into the Stock Agreement.

## III. THE COMPLAINT STATES A CLAIM THAT THE BOARD BREACHED ITS FIDUCIARY DUTIES BY APPROVING THE STOCK AGREEMENT

The Director Defendants make a "throwaway" argument at the end of their brief that the Complaint fails to state a claim for breach of fiduciary duty. Intel OB at 20. As set forth above, however, the entire fairness standard governs this case because of the personal benefits a majority of the Director Defendants received from the Stock Agreement. "[T]he invocation of the entire fairness standard has a powerful pro-plaintiff effect against interested parties. When that standard is invoked at the pleading stage, the plaintiffs will be able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory charter provision because their conflicts of interest support a pleading-stage inference of disloyalty." *In re Cornerstone*

*Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180–81 (Del. 2015). Indeed, "it is rare the court will dismiss a fiduciary duty claim on a Rule 12(b)(6) motion when entire fairness is the governing standard of review." *Tornetta v. Musk*, 250 A.3d 793, 812 (Del. Ch. 2019). Moreover, as set forth more fully above, whether the entire fairness standard governs or not, the Complaint states non-exculpated claims for breach of fiduciary duty against a majority of the Director Defendants.

The Director Defendants further assert that the Voting Agreement claim is derivative rather than direct. Intel OB at 19. Not so. *See In re Edgio*, 2023 WL 3167648, at *5 (denying motion to dismiss and referring to claim regarding a voting agreement in favor of the board as a "direct claim"). The direct or derivative nature of the claim, however, is irrelevant to whether it states a claim under Rule 12(b)(6). "Plaintiff[] ha[s] adequately pled demand futility because a majority of the members of the … Board that would have considered a demand face a substantial likelihood of liability for the non-exculpated breach of their fiduciary duty of loyalty in" approving the Stock Agreement—including the Voting Agreement. *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *4 (Del. Ch. Jan. 27, 2021). "Because the pleading standard under …[Delaware] Rule 23.1 is more demanding than the standard imposed by … Rule 12(b)(6), it follows that the motion to dismiss the claims against these same … Board members for failure to state viable claims must also be denied." *Id*.

Contrary to the record before the Court, the Director Defendants further assert that the Board "was advised throughout by inside and outside counsel[.]" Intel OB at 15-16. To the extent that the Director Defendants rely on an "advice of counsel" defense under 8 *Del. C.* § 141(e), it is unavailing. "Nowhere in these assertions … do the Director Defendants specify even the general content of the advice they received[,]" nor do they point to any record showing that Skadden actually advised them that the Stock Agreement was authorized by law. *Encite LLC v. Soni*, 2011 WL 5920896, at *22 (Del. Ch. Nov. 28, 2011). As the *Encite* Court held, "[t]he Director

Defendants need not provide the substantive details of the advice they received from their attorneys, but some evidence of their counsel's legal *conclusions* is required if they wish to rely on counsel's advice …. Mere conclusory statements alleging that the board consistently consulted with, relied on and followed the advice provided by … counsel will not suffice." *Id*. (emphasis in original). Where that legal counsel faces conflicts of interest as to the party's contractual counterparty, the Delaware Court of Chancery has held that "the defense under Section 141(e) cannot be thought to be available." *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 910–11 (Del. Ch. 1999). "The concept of relying on experts reflects a fundamental principle of corporate law that entitles (impartial) fiduciaries to rely upon the advice of ***impartial*** experts as a defense." *Young Women's Christian Assoc. of Rochester and Monroe Cnty. v. Hatteras Funds, LP*, 356 A.3d 459, 495 (Del. Ch. Mar. 27, 2026) (cleaned up). Here, any advice that the Director Defendants received from Skadden—which simultaneously represented the DOC—was far from impartial.

Moreover, any reliance on an advice of counsel defense would result in an "at issue" waiver of the attorney-client privilege as to any advice received from Skadden or any other counsel regarding the Stock Agreement. *See Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010) (holding that "privilege, however, can be waived when a party places an otherwise privileged communication 'at issue' in the litigation. In determining whether this exception applies, the court must consider whether '(1) a party injects the privileged communications themselves into the litigation, or (2) a party injects an issue into the litigation, the truthful resolution of which requires an examination of confidential communications."). In response to Plaintiff's Section 220 Demand, which requested information related to any legal advice or opinion on the Stock Agreement from Skadden (Compl. Ex. H at 20), Intel advised that no such opinion was provided to the Board. ¶82 n.23. If the Director Defendants wish to rely on this defense, they were required to produce any advice they received to support the Stock Agreement to support their

motion. *See Dasso Int'l, Inc. v. Moso N. Am., Inc.*, 2021 WL 3476197, at *16 n.203 (D. Del. July 25, 2021) (citing D. Del. L.R. 7.1.3(c)(2) and declining to consider new argument raised in reply brief); *see also In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003); *Lab. Skin Care, Inc., v. Ltd. Brands, Inc.*, 757 F.Supp.2d 431, 439 (D. Del. 2010).

Lastly, Defendants' incredibly point to the rise in Intel's stock price as validation for the Government's extortive actions. Defendants' "no harm, no foul" argument is a red herring that is legally irrelevant. DOC OB at 2; Intel OB at 1, 8, 19. Whether Intel's stock price went up or down after entry into the Stock Agreement is irrelevant to Plaintiff's claims because (i) this is a challenge to the legality of the Stock Agreement, not a "stock drop case"; and (ii) the issuance of stock to the DOC was dilutive of the public stockholders' voting rights and value ***irrespective*** of the price of the stock at any given time. Put another way, whatever the increase in the stock price of Intel may be, its stockholders, including Plaintiff, would have been 10% better off without the DOC dilution.

## IV. PLAINTIFF'S CLAIMS ARE NOT BARRED BY SOVEREIGN IMMUNITY

The Commerce Defendants' sovereign immunity argument fails as a matter of law. Section 702 of the APA provides that an "[a]n action … seeking relief other than [for] money damages and stating a claim that an agency … thereof … failed to act … under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." *Id*. Plaintiff brought an equitable claim against all Defendants seeking an order cancelling all the DOC voting shares and the Warrant issued pursuant to the Stock Agreement. ¶¶134-40. Defendants do not argue otherwise.

The Commerce Defendants seek to invoke a "rare" exception to Section 702's sovereign immunity waiver and its "presumption in favor of judicial review," arguing that the waiver does not apply here because Plaintiff has challenged "agency action [that] is committed to agency

discretion by law." DOC OB at 12-13. As discussed herein, the CHIPS Act does not imbue the Secretary with the broad discretionary authority claimed, as the legislative history and the plain language of the CHIPS Act reflect; therefore, the Commerce Defendants' sovereign immunity defense fails. Where, as here, "the meaning of a statute [is] at issue, the judicial role [is] to 'interpret the act of Congress, in order to ascertain the rights of the parties.'" *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 387 (2024). "[W]hen the text [of a statute] is ambiguous or does not reveal congressional intent with sufficient precision to resolve our inquiry… a court traditionally refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 284 (3d Cir. 2016). Accordingly, Plaintiff's action seeking non-monetary relief for the Commerce Defendants' unlawful, extortive conduct is not barred by the sovereign immunity doctrine because the APA ***requires*** courts to exercise their independent judgment in deciding whether an agency has acted within the authority granted to it by Congress. *Loper*, 603 U.S. at 413; *see also Aid Ass'n for Lutherans v. U.S. Postal Serv*., 321 F.3d 1166, 1173 (D.C. Cir. 2003) (courts "cannot abdicate their responsibility to ensure compliance with congressional directives setting the limits on that discretion.").

## V. THE CHIPS ACT DOES NOT PREEMPT PLAINTIFF'S CLAIM AGAINST THE COMMERCE DEFENDANTS.

The Commerce Defendants' preemption argument fails under its own weight because Delaware's longstanding corporate law does not (and could not) "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the CHIPS Act. *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 222 (3d Cir. 2001). There is no conflict between Delaware corporate law and the CHIPS Act, and the Commerce Defendants' repeated refrain of "national and economic security" does not make it so. The only claim against the Commerce Defendants is Count III, a derivative claim to invalidate the Stock Agreement as

without a legal basis under federal law. ¶¶134-40. The resulting fact that the Stock Agreement would also be invalid under Delaware law does not create any preemption issue. *See Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965) ("[I]t is against the public policy of this State to permit its courts to enforce an illegal contract prohibited by law."). Thus, Plaintiff does not "seek[] to employ Delaware corporate law to constrain the Secretary's discretionary acts under the [CHIPS Act or] supplant Congress's determination about when and how CHIPS Act awards can be made." DOC OB at 16. In fact, a finding in favor of Plaintiff on Count III would have ***zero*** impact on the proper administration of the CHIPS Act. That legal determination would be based on a finding that the Secretary acted unlawfully under the CHIPS Act, and such a finding would not disturb the Secretary's ability to issue CHIPS Act grants and participate in a recipient's success through upside sharing, as the DOC had done previously in the DFA. Thus, the Commerce Defendants' preemption argument fails.

## VI. THE COMPLAINT STATES A VIABLE CLAIM AGAINST THE COMMERCE DEFENDANTS

This is a stockholder derivative action, which seeks the cancellation of the Intel common stock and the Warrant issued to the Commerce Defendants under the Stock Agreement because that transaction was not authorized by law. Having brought suit on behalf of Intel to challenge the unlawful Stock Agreement, Plaintiff sued the Commerce Defendants – the counterparties to the unlawful Stock Agreement. The Complaint does not rely on the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and subject matter jurisdiction is based, in part, on the Commerce Defendants' removal of this case under 28 U.S.C. § 1442.

However, even accepting the Commerce Defendants' assertion that the Declaratory Judgment Act applies, Count III properly pleads a justiciable claim for relief under the act. "Basically, the question ... is whether the facts alleged … show that there is a substantial

controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Medimmunite, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (discussing 28 U.S.C. § 2201); *see also Moore Corp. v. Wallace Comput. Servs., Inc.*, 898 F. Supp. 1089, 1095 (D. Del. 1995). *First*, there is a definite, substantial controversy: Count III alleges that the Commerce Defendants exceeded their statutory authority under the CHIPS Act and, therefore, the Stock Agreement is unlawful. ¶¶90-91, 96, 135-139. Because the Board is incapacitated Plaintiff may pursue this claim on behalf of Intel. *Second*, this controversy is of sufficient immediacy to warrant a declaratory judgment: The unlawful Stock Agreement diluted the vote and value of Intel's public stockholders, including Plaintiff. Those harms will continue until this Court adjudicates the lawfulness of the DOC's actions under the CHIPS Act. *Third*, one basis for this Court's subject matter jurisdiction of Count III is pursuant to 28 U.S.C. § 1442 because the Commerce Defendants properly removed this action. The Complaint also asserts a claim that the Commerce Defendants violated federal law, which Plaintiff may pursue under Section 702 of the APA. *See Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 883-84 (W.D. Wash. 2025) (finding that sovereign immunity had been waived under the APA and permitting Plaintiff to pursue declaratory judgment claim that government exceeded its statutory authority by imposing new funding conditions on previously awarded grants).

For the reasons discussed above, Plaintiff was not required to assert an aiding and abetting claim against the Commerce Defendants, and the Delaware cases cited in the Commerce Defendants' brief do not say otherwise. DOC OB at 19-20. Resolution of Count III, as asserted against the Commerce Defendants, requires an analysis of the lawlessness of the Commerce Defendants' actions under the CHIPS Act and its legislative history, not their performance of the Stock Agreement. *See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009) ("When the source of rights asserted is constitutional, statutory, or

regulatory in nature, the fact that resolution of the claim requires some reference to contract does not magically 'transform [the] action ... into one on the contract and deprive the court of jurisdiction it might otherwise have.'") (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

Accordingly, where, as here, Plaintiff has properly pled that the Commerce Defendants exceeded their statutory authority under the CHIPS Act; Defendants removed this case to federal court such that there is no parallel state court proceeding through which Plaintiff may obtain relief; a declaratory judgment by this Court would resolve the underlying legal issue; and the remaining factors enunciated in *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 283, 288-89 (3d Cir. 2017) weigh in Plaintiff's favor, the Court should exercise its discretion to permit the declaratory judgment claim to proceed.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.


HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Gillian L. Andrews*
Kurt M. Heyman (# 3054)
Dominick T. Gattuso (# 3630)
Gillian L. Andrews (# 5719)
Denise S. Kraft (# 2778)
Brendan Patrick McDonnell (# 7086)
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
(302) 472-7300
*Attorneys for Plaintiff Richard D. Paisner*

OF COUNSEL:

GW LAW
Alan B. Morrison
2000 H Street NW
Washington D.C. 20052
(202) 994-7120


Dated: July 27, 2026