# EXHIBIT 1

**NOTICE OF FUNDING OPPORTUNITY (NOFO)**

**CHIPS Incentives Program – Commercial Fabrication Facilities**

## EXECUTIVE SUMMARY

- **Federal Agency Name:** National Institute of Standards and Technology (NIST), United States Department of Commerce
- **Funding Opportunity Title:** CHIPS Incentives Program – Commercial Fabrication Facilities
- **Announcement Type:** Amendment
- **Funding Opportunity Number**: 2023-NIST-CHIPS-CFF-01
- **Assistance Listing (CFDA Number):** 11.037 – CHIPS Incentives Program
- **Dates:**
  - Full applications may be submitted until 5:00pm (EDT) on Tuesday, June 18, 2024.
  - Pre-applications may be submitted until 5:00pm (EDT) on Monday, May 20, 2024. Entities that submit a pre-application after this amendment is published and before the May 20, 2024 deadline will have 45 days after receiving a feedback letter to submit a full application, notwithstanding the general June 18, 2024 full application deadline.
  - Statements of Interest may be submitted until 5:00pm (EDT) on Tuesday, June 18, 2024. Entities are no longer required to wait at least 21 days after submitting a Statement of Interest before making their next submission and may submit a pre- or full application immediately after submitting a Statement of Interest.

  The Department of Commerce may amend this NOFO at any time. Any further changes to this NOFO will be communicated via https://www.grants.gov and https://www.chips.gov.

- **Application Submission Address:** https://applications.chips.gov/

**Funding Opportunity Description:** The CHIPS Incentives Program aims to catalyze long-term economically sustainable growth in the domestic semiconductor industry in support of U.S. economic and national security. This is the first Notice of Funding Opportunity under this program. It seeks applications for projects for the construction, expansion, or modernization of (a) commercial facilities for the front- and back-end fabrication of leading-edge, current-generation, and mature-node semiconductors; (b) commercial facilities for wafer manufacturing;

and (c) commercial facilities for materials used to manufacture semiconductors and semiconductor manufacturing equipment, provided that the capital investment equals or exceeds $300 million.

**Table of Contents**

**I. Program Description ... 3**
A. Program Objectives ... 3
B. Program Summary ... 4
C. Program Priorities ... 13
**II. Federal Award Information ... 26**
A. Funding Instrument ... 26
B. Funding Availability ... 26
C. Award Amount ... 27
D. Period of Performance ... 27
**III. Eligibility Information ... 28**
A. Eligible Applicants ... 28
**IV. Application and Submission Information ... 29**
A. How to Access an Application Package ... 29
B. Submission Dates and Times ... 29
C. Confidential Information ... 30
D. False Statements ... 32
E. Application Requirements ... 32
F. Requirements for Attachments Submitted through the CHIPS Incentives Program Application Portal ... 33
G. Statements of Interest ... 33
H. Content and Form of Pre-Application ... 34
I. Content and Form of Full Application Submission ... 39
J. Funding Restrictions ... 57
K. Prohibition on Profit and Fees ... 58
**V. Application Review Information ... 58**
A. Evaluation Criteria ... 58
B. Prioritization and Selection Factors ... 65
C. Review and Selection Process ... 65
D. Responsibility / Qualification Records on SAM.gov ... 68
E. Additional Information ... 68

**VI. Federal Award Administration Information ... 68**
A. Federal Award Notices ... 68
B. Third-Party Expenses and Fees ... 68
C. Administrative and National Policy Requirements ... 69
D. Funding Availability and Limitation of Liability ... 72
E. Reporting ... 72
F. Federal Awarding Agency Contacts ... 73
**VII. Appendix ... 74**
A. Definitions ... 74

## FULL ANNOUNCEMENT TEXT

## I. Program Description

This Notice of Funding Opportunity (NOFO) seeks applications for the CHIPS Incentives Program, authorized by Title XCIX—Creating Helpful Incentives to Produce Semiconductors for America of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Pub. L. 116-283, referred to as the CHIPS Act or Act), as amended by the CHIPS Act of 2022 (Division A of Pub. L. 117-167). The CHIPS Incentives Program is administered by the CHIPS Program Office (CPO) within the National Institute of Standards and Technology (NIST) of the United States Department of Commerce (Department).

The CHIPS Incentives Program can provide direct funding (via grants, cooperative agreements, or other transactions), loans, and loan guarantees (collectively, CHIPS Incentives) for eligible projects. This NOFO seeks applications for CHIPS Incentives that will support investments in the construction, expansion, and modernization of (a) commercial facilities in the United States for the front- and back-end fabrication of leading-edge, current-generation, and mature-node semiconductors; (b) commercial facilities in the United States for wafer manufacturing; and (c) commercial facilities in the United States for materials used to manufacture semiconductors and semiconductor manufacturing equipment, provided that the capital investment, as defined in Section IV.I.7 below, equals or exceeds $300 million.

This NOFO provides detailed information about the program objectives and requirements applicants will need to meet to receive funding. It also describes the procedures the Department will use to evaluate and select applications for funding. CPO will provide further guidance on these requirements and procedures in subsequent publications and through a series of public webinars, information about which will be available at https://www.chips.gov. Interested parties should routinely check https://www.chips.gov for updates.

### A. Program Objectives

The CHIPS Incentives Program aims to strengthen U.S. economic and national security, including economic resilience and competitiveness. The CHIPS Act sets forth multiple dimensions of this overriding objective:

- Strengthening the security and resilience of the semiconductor supply chain, including by mitigating gaps and vulnerabilities
- Providing a supply of secure semiconductors relevant for national security
- Strengthening the leadership of the United States in semiconductor technology
- Growing the economy of the United States and supporting job creation in the United States
- Bolstering the semiconductor and skilled technical workforces in the United States
- Promoting the inclusion of economically disadvantaged individuals and small businesses
- Improving the resilience of the semiconductor supply chains of critical manufacturing industries[1]

For the CHIPS Incentives Program to be successful on these many dimensions, it must lay the groundwork for long-term growth and economic sustainability in the domestic semiconductor industry and promote the secure and resilient supply chains on which the sector relies. The industry must produce, at scale, secure leading-edge logic and memory chips critical to the national security and future economy of the United States. It must support current-generation and mature-node technologies essential for economic and national security. The industry must have a robust and skilled workforce and a diverse base of suppliers for semiconductor production. It must support research and development (R&D) that will drive innovation in design, materials, and processes that will accelerate the industries of the future. Further, it must support the broader U.S. economy, creating good jobs accessible to all, and supporting and growing local economies and communities.

For the CHIPS Incentives Program to succeed, the Federal funds must serve as a catalyst to galvanize private, state, and local investment in the semiconductor industry. That is, the program funds are a supplement to, not a replacement for, other sources of capital.

The CHIPS Incentives Program seeks to fund applicants that demonstrate a commitment to investment in the United States for the long term and projects that maximize private sources of capital. Only private industry can marshal the resources necessary to make the sustaining investments needed in the decades that follow to maintain a resilient, economically viable, and growing U.S. semiconductor industry.

### B. Program Summary

The CHIPS Incentives Program must fund a variety of projects to achieve its economic and national security objectives. Projects will vary in technology, scale, cost, location, risk, workforce needs, and other factors. To fund any project, the Department must engage in an individualized review to determine whether the project is in the economic and national security interests of the United States and whether it satisfies the many eligibility requirements of the CHIPS Act, as well as to determine the types and amounts of funding appropriate for the project.[2] Because successful projects will vary in their attributes, the CHIPS Incentives Program funding awarded to projects will also vary. There is no one-size-fits-all award. A successful applicant should expect that the amount and type of funding it receives will be individualized

---

[1] *See* 15 U.S.C.§ 4652(d). See Appendix for the definition of "critical manufacturing industries."
[2] *See* 15 U.S.C. §§ 4652(a)(2)(C)(i)(I)-(II), 4652(a)(3)(A).

based on the Department's analysis of the Federal funds needed to meet program and project objectives, including considerations specific to its application.

This NOFO describes considerations and procedures the Department will use to make these case-by-case determinations. This section summarizes, in a question-and-answer format, certain eligibility and procedural requirements for applications under this NOFO. It addresses what projects are eligible for funding under this NOFO and the statutory requirements for eligibility. It describes the types and amounts of funding available. It also summarizes the application process, which begins with a statement of interest and proceeds through an optional pre-application phase (recommended for current-generation, mature-node, and back-end production facility applications; wafer manufacturing facility applications; and applications for eligible semiconductor materials and manufacturing equipment facilities) and then full application, due diligence, and award preparation and issuance phases. Other sections of the NOFO provide more detailed information on these subjects.

1. **What facilities are eligible for funding under this NOFO?**

This NOFO seeks applications for the construction, expansion, or modernization of commercial facilities in the United States in the following categories.

**Leading-Edge Facilities** for logic or memory that utilize the most advanced front-end fabrication processes which achieve the highest transistor and power performance. For logic, this currently includes facilities that produce semiconductors at high volumes using extreme ultraviolet (EUV) lithography tools. For memory, this currently includes facilities capable of producing 3D NAND flash chips with 200 layers and above, and/or dynamic random-access memory (DRAM) chips with a half-pitch of 13 nm and below.

**Current-Generation Facilities** that produce semiconductors that are not leading edge, up to 28 nm process technologies, and include logic, analog, radio frequency, and mixed-signal devices. New and expanded current-generation front-end fabrication facilities will deliver manufacturing capacity for current-generation semiconductor technologies, as well as new and specialty technologies such as devices based on compound semiconductor materials.

**Mature-Node Facilities** that fabricate generations of: (a) logic and analog chips that are not based on FinFET, post-FinFET transistor architectures, or any other sub-28 nm transistor architectures; (b) discrete semiconductor devices such as diodes and transistors; (c) optoelectronics and optical semiconductors; and (d) sensors.

**Back-end Production Facilities** for the assembly, testing, or packaging of semiconductors that have completed the front-end fabrication process. This category includes advanced packaging of semiconductors. The Department is particularly interested in projects that ensure competitive operating costs within the United States (e.g., through automation).

**Wafer Manufacturing Facilities** for the high-volume production of semiconductor wafers, including wafers made from silicon, silicon carbide, and gallium nitride. These facilities are the sites of ingot production and wafer slicing, lapping, polishing, cleaning and inspection.

**Semiconductor Materials Facilities** for the manufacture or production, including growth or extraction, of materials used to manufacture semiconductors, which are the chemicals, gases, raw and intermediate materials, and other consumables used in semiconductor manufacturing. Specific examples include but are not limited to polysilicon; photoresists and ancillaries (developers, strippers, litho solvents, and anti-reflective and hardmask layers); sputter targets (including tantalum, titanium, and aluminum); and materials specifically used in quantum information systems (such as hafnium and niobium). Applications for the construction, expansion, or modernization of commercial semiconductor materials facilities will be eligible for this NOFO only if the capital investment, as defined in Section IV.I.7, equals or exceeds $300 million.

**Semiconductor Manufacturing Equipment Facilities** for the physical production of specialized equipment integral to the manufacturing of semiconductors and subsystems that enable or are incorporated into the manufacturing equipment. Specific examples of semiconductor manufacturing equipment include but are not limited to deposition equipment, including chemical vapor deposition, physical vapor deposition, and atomic layer deposition; etching equipment (wet etch, dry etch); lithography equipment (steppers, scanners, extreme ultraviolet); wafer slicing equipment, wafer dicing equipment, and wire bonders; inspection and measuring equipment, including scanning electron microscopes, atomic force microscopes, optical inspection systems, and wafer probes; certain metrology and inspection systems; and ion implantation and diffusion/oxidation furnaces. Applications for the construction, expansion, or modernization of commercial semiconductor equipment facilities will be eligible for this NOFO only if the capital investment, as defined in Section IV.I.7, equals or exceeds $300 million.

Only facilities of the types listed above are eligible for funding under this NOFO. CPO will provide future guidance regarding potential additional funding opportunities.

### 2. What are the eligibility requirements for funding under this NOFO?

The CHIPS Act imposes several eligibility requirements for funding.

First, funding is available only to "covered entities."[3] This term includes private entities or consortia of private and public entities that can demonstrate the ability to substantially finance, construct, expand, or modernize an eligible facility.[4] Section III.A describes this requirement in more detail.

Second, funding is available to covered entities "to incentivize investment in facilities and equipment in the United States" for the fabrication, assembly, testing, advanced packaging, or production of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment.[5] An applicant must demonstrate how the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the CHIPS Incentives.

---

[3] *See* 15 U.S.C. § 4652(a)(1).
[4] *See* 15 U.S.C. § 4651(2).
[5] *See* 15 U.S.C. § 4652(a)(1).

Third, funding must be for the construction, expansion, or modernization of facilities of the kind described in Section I.B.1.[6] For the purposes of this NOFO, construction means the construction of a new facility. Expansion or modernization includes, for example, significantly enlarging an existing facility, increasing the capacity of an existing facility via a material capital investment, such as by adding a new production line, and upgrading an existing facility, such as to a new node or converting a facility from another use. Both expansions and modernizations will be evaluated on the materiality of the investment relative to existing production. Projects that involve relocating a material amount of equipment, facilities, or production from one facility in the United States to another facility, new or expanded, are disfavored. Such projects will be deemed nonresponsive to this NOFO absent a compelling economic or national security justification.

Fourth, the CHIPS Act specifies that the covered entity must have a documented interest in constructing, expanding, or modernizing an eligible facility.[7] And with respect to such construction, expansion, or modernization, the covered entity shall:

- Have been offered a covered incentive from a state or local jurisdiction (state or local incentive) where the project is located, for the purposes of attracting the construction, expansion, or modernization of the facility
- Make commitments to worker and community investment, including through training and education benefits paid by the covered entity and programs to expand employment opportunities for economically disadvantaged individuals
- Secure commitments from regional educational and training entities and institutions of higher education to provide workforce training, including programming for training and job placement of economically disadvantaged individuals
- Have an "executable plan," i.e., a plan reasonably capable of successful implementation, to sustain the facility without additional funding from the CHIPS Incentives Program
- Have documented its workforce needs and produced a strategy to meet such workforce needs as well as the aforementioned commitments to worker and community investment
- Have determined the types of semiconductor technology it will produce at the proposed facility, and the customers, or categories of customers, to whom the items will be sold
- Have developed an "executable plan" to identify and mitigate relevant semiconductor supply chain security risks, and
- Have policies and procedures to combat cloning, counterfeiting, and relabeling of semiconductors, as applicable.[8]

The Department has designed this NOFO, including the application requirements and review process, to ensure that these statutory requirements will be met for projects receiving CHIPS Incentives.

---

[6] *See* 15 U.S.C. § 4652(a)(4)(A).
[7] 15 U.S.C. § 4652(a)(2)(B)(i).
[8] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)-(iv).

### 3. What types of incentives can a project receive?

There are three types of CHIPS Incentives:

- Direct Funding, which provides funding to the applicant for eligible costs and can take the form of grants, cooperative agreements, or other transactions
- Loans, which are direct loans from the Federal government to the applicant for eligible costs
- Loan Guarantees, which are Federal guarantees of third-party loans to the applicant for eligible costs

A single application can result in an award (CHIPS Incentives Award) that contains more than one type of incentive. In the application, the applicant will specify which incentive type(s) it seeks; the amount of the incentive(s); and, for any CHIPS Loans and CHIPS Loan Guarantees, the essential terms being requested. However, projects may not receive CHIPS Loans or CHIPS Loan Guarantees if the majority of the goods they produce (by value or quantity) will be contracted to be sold to the Federal government.

Guidance on how applicants should develop their requests is set forth below. Applicant requests will be subject to review, due diligence, and negotiation, as described throughout this NOFO. Ultimately, the Department will determine the appropriate amounts, funding types, and terms for each CHIPS Incentives Award.[9] During the application process, the Department may request that an applicant modify its request for CHIPS Incentives based on an assessment of the request against the considerations set forth in this NOFO.

Applicants may be eligible to receive an additional incentive in the form of the Advanced Manufacturing Investment Credit (Investment Tax Credit).[10] This separate incentive is administered by the Internal Revenue Service and provides a tax credit for qualifying capital investments in a manufacturing facility for which the primary purpose is the manufacture of semiconductors or semiconductor manufacturing equipment, subject to certain credit recapture rules. The Department expects applicants to take advantage of the Investment Tax Credit, if eligible, to the fullest extent possible. Applicants must also detail in their application the support expected from the Investment Tax Credit.

### 4. What constitutes a project for purposes of an application?

For purposes of an application, a “project” is a set of capital expenditures for the construction, expansion, or modernization of a single facility. A project also includes any related workforce development or operating expense costs for the facility that the applicant proposes to cover with CHIPS Incentives funds.

### 5. Can an application include more than one project?

Yes. If an applicant wishes to apply for funding for more than one project, covering separate facilities within a single location and under common ownership and control, the applicant should

[9] *See* 15 U.S.C. § 4652(a)(3)(A).
[10] *See* 26 U.S.C. § 48D.

include all of those projects in a single application. For example, if the applicant intends to construct, expand, or modernize three facilities at a single location, the applicant should submit one application that includes three projects, corresponding to the construction, expansion, or modernization activities associated with each facility. An application may contain projects that occur simultaneously or sequentially (although each project must be eligible for funding under this NOFO to receive funding). If an applicant wishes to propose projects involving facilities at different locations, or under different ownership and control, these projects should be included in separate applications.

See Sections IV.H.2 and IV.I.3 for information about how each project should be described within the application. The Department may choose to fund all, some, or none of the projects proposed in a single application.

### 6. How can CHIPS Incentives funds be used?

Funds made available under the CHIPS Incentives Program, including the guaranteed portion of a third-party loan, may only be spent on eligible uses, which include the costs to:

- finance the construction, expansion, or modernization of a facility, or equipment for that facility
- support site development and modernization for a facility
- support workforce development for a facility
- pay reasonable operating expenses for a facility, as determined by the Department.[11]

Not all of the applicant's activities within a project may be eligible to receive program funds. However, as described in Sections IV.H.2 and IV.I.3, the applicant must clearly describe any activities within its proposed project that may be eligible uses for CHIPS Incentives. In addition, activities are eligible to receive program funds only to the extent that they are consistent with the requirements of this NOFO.

Certain purposes are ineligible uses for CHIPS Incentives. See Section IV.J for more details.

### 7. How much support can a project receive in CHIPS Direct Funding?

In determining the CHIPS Direct Funding amount for a project, the Department will consider the project's financial model and expected cash flows, the project's estimated internal rate of return (IRR), the strategic importance of the project to U.S. economic and national security, the extent of private investment, the risks associated with the project, the amount and type of government financial assistance (including state and local incentives, and the Investment Tax Credit), the availability of program funds, and other factors.

There is no fixed amount for how much a project can receive in CHIPS Direct Funding. The Department expects that the level of support from CHIPS Direct Funding will vary based on the specific characteristics of individual projects and the factors cited above. It is generally expected that most CHIPS Direct Funding awards will range between 5-15% of project capital

[11] *See* 15 U.S.C. § 4652(a)(4).

expenditures.[12] This range accounts for the expectation that most projects will be eligible for the Investment Tax Credit. The range may be higher if a project is not eligible for the Investment Tax Credit, such as for projects related to semiconductor materials facilities.

**8. How much support can a project receive in CHIPS Loans or CHIPS Loan Guarantees, and on what terms?**

There is no fixed limit on the loans or guarantees that a project may receive. Applicants should request CHIPS Loans or CHIPS Loan Guarantees to provide debt financing that is not available on comparable terms on the private market. CHIPS Loans and CHIPS Loan Guarantees are meant to supplement and not substitute for private funding. All loans and guarantees will be subject to rigorous underwriting and due diligence. The Department will not make a loan or issue a guarantee unless it determines that the applicant has a reasonable prospect of repaying the principal and interest on the loan or guaranteed loan, and that the amount of the loan or guaranteed loan, when combined with amounts available to the applicant from other sources, will be sufficient to carry out the project.[13]

The Department will consider multiple factors when determining the amount and features of any CHIPS Loan or CHIPS Loan Guarantee, including a project's financial model and expected cash flows, the project's estimated IRR, the strategic importance of the project for U.S. economic and national security, the risks associated with the project, the amount and type of government financial assistance, the availability of program funds, the ability for the project to support the proposed financing from a credit underwriting perspective, and other factors detailed in this NOFO.

The specific terms of a CHIPS Loan will be based on the project's financing requirements and risk characteristics, and will be subject to negotiation. Applicants should consider the following terms as a baseline when applying for a CHIPS Loan:

- Interest Rate: The interest rate on a CHIPS Loan will generally be based on the cost of funds to the Department of the Treasury for obligations of comparable maturity plus a portion of the spread to the market rate for commercial loans or debt of similar risk, tenor, and terms.
- Tenor: Loans will generally be extended for a term that covers the construction period plus up to 15 years. The maximum tenor is 25 years.
- Structure: Loans will be available on both a corporate and project finance basis, depending on the legal structure and nature of the project.
- Amortization: Corporate finance loans will generally be bullet loans repayable at maturity. Project finance loans will generally be non-amortizing during the construction period of a project and then amortizing until maturity.

---

[12] Project capital expenditures refers to expenses incurred in the construction or improvement of physical assets, such as the costs of land, building and construction, equipment and installation, physical improvements, and working capital during the construction phase.

[13]See 15 U.S.C. § 4652(g)(2).

- Prepayment: CHIPS Loans may be prepaid at the election of the borrower, subject to prepayment periods, waiting periods, and other terms to be agreed upon.

The specific terms of a CHIPS Loan Guarantee will be subject to negotiation with the applicant and the third-party lender(s). While the extent of the loan guarantee will vary based on the financing requirements and risk characteristics of a transaction, loan guarantees are not expected to cover more than 80% of any third-party debt obligation. CHIPS Loan Guarantees will be subject to underwriting and diligence standards comparable to CHIPS Loans.

### 9. How does the application process work?

A summary of the key stages of the process is provided below and detailed further in Section V. The application process includes the following phases: 1) Statement of interest, 2) Recommended pre-application, 3) Full application, 4) Due diligence, and 5) Award preparation and issuance. Pre-applications and full applications will be reviewed on a rolling basis. CPO will provide feedback to the applicant at various stages to inform the applicant's decision regarding whether to proceed to the next step in the process and to increase the likelihood of receiving applications that can realize the goals of the CHIPS Incentives Program.

The process includes the following steps:

Statement of Interest: A potential applicant must submit a statement of interest with a brief description of the planned application. The statement of interest enables the Department to gauge interest in the program and plan for pre-application or application review.

Pre-Application (recommended): A potential applicant may submit a pre-application, which contains a more detailed description of the proposed application than the statement of interest, including summary financial information and an Environmental Questionnaire. This optional pre-application phase creates an opportunity for dialogue between the Department and the potential applicant to ensure the proposed application would meet program requirements and address program priorities. The Department strongly encourages pre-applications for potential applicants for current-generation, mature-node, or back-end production facilities; potential applicants for wafer manufacturing facilities; and potential applicants for eligible semiconductor materials and manufacturing equipment facilities.

Topics of discussion during the pre-application phase may include, but are not limited to: relevance to economic and national security goals of the proposed project(s); the scope of the proposed project(s); capital structure; long-term economic viability; CHIPS Incentives request; plans to recruit, train, and retain the necessary workforce; environmental risk; environmental impacts and potential mitigation; cybersecurity and risk management plans; long-term investment plans for capital expenditures; and R&D. Pre-application review will conclude with a written assessment of the strengths and weaknesses of the pre-application and any further recommendations for improvement, as appropriate. The written assessment will be shared with the potential applicant and will include a recommendation for next steps, e.g., to submit a revised pre-application, submit a full application, or not submit a further pre-application or full application.

The Environmental Questionnaire submitted as part of the pre-application will allow the Department to assess the likely level of review under the National Environmental Policy Act (NEPA) earlier in the process, and to work with the potential applicant to ensure that all required environmental information is available as early as possible during the full application and due diligence stages. This can help expedite the process for potentially successful applications. For more information on the NEPA process, see Section VI.C.2.

The Department anticipates that, in certain instances, potential applicants may be in earlier stages of developing the project(s) to be included in their application. Pre-applications are particularly useful in this scenario. In exceptional cases with compelling national or economic security justification, pre-application feedback may include a preliminary indication that the potential applicant is likely to receive funding for project(s) proposed in the pre-application, contingent on the eventual submission of a complete full application, successful merit review, due diligence, and the future availability of funds.

Any feedback or recommendations provided during the pre-application process are not binding on the potential applicant or the Department.

Full Application: A potential applicant must submit a full application to be officially considered for a CHIPS Incentives Award. The full application will contain extensive, detailed information on the proposed project(s) to enable evaluation of its merits. Because the full application is resource-intensive, the applicant should strongly consider any pre-application feedback when deciding whether to prepare and submit a full application. The Department will engage with the applicant to seek further information or clarifications, provide feedback, including on the scope of the proposed project(s) and the amount of CHIPS Incentives requested, and ultimately, to negotiate the preliminary terms of a potential award.

Before moving into due diligence, the Department will prepare and offer the applicant a non-binding Preliminary Memorandum of Terms.

If a potential applicant has submitted a pre-application, it should not submit a full application until after it receives written feedback on the pre-application.

Due Diligence: If the Department determines that a full application is reasonably likely to receive an award and the Department and the applicant agree, or foresee agreement, on a non-binding Preliminary Memorandum of Terms, the application will enter the comprehensive due diligence phase. In this phase, the Department will require the applicant to provide additional information on national security, financial, environmental, and other issues. The Department intends to initiate its environmental review at this time and will request that the applicant, under the supervision of the Department, prepare required documentation (e.g., a draft environmental assessment or draft environmental impact statement), technical studies and consultations, and provide other information as requested. The Department will engage outside advisors, consultants, and/or attorneys at the due diligence stage, and the applicant will be responsible for their fees and costs. During this process, the Department will be available to discuss with the applicant how such costs may be monitored and controlled.

When the due diligence phase is substantially complete, the Department and the applicant may negotiate the applicable terms of a Long-form Term Sheet for the requested CHIPS Incentives. The provisions of the Long-form Term Sheet will be more detailed than the Preliminary Memorandum of Terms and may vary from the Preliminary Memorandum of Terms based on the Department's due diligence, further analysis of the full application, and further negotiations.

Award Preparation and Issuance: If the Department decides to issue a CHIPS Incentives Award or Awards to the applicant, the final award terms are expected to be substantially consistent with the Preliminary Memorandum of Terms or Long-form Term Sheet, as applicable, subject to the final results of the Department's due diligence, analysis of the full application and any further negotiations.

The Federal investment from the CHIPS Incentives Program in an individual project may not exceed $3 billion unless it is certified to Congress that the larger investment is necessary to: (1) significantly increase the proportion of reliable domestic supply of semiconductors relevant for national security and economic competitiveness that can be met through domestic production; and (2) meet the needs of national security.[14]

### 10. How will CHIPS Incentives be disbursed?

Disbursements of CHIPS Direct Funding will be tied to project milestones in connection with both the capital expenditure components of the project and the workforce development and/or operational cost components of the project. The period in which these milestones occur will vary by project, depending on the size and complexity of the project and the specific activities funded. The Department will work with the applicant during the application process to determine the appropriate milestones. The rate of disbursement is generally expected to be proportional to the rate at which non-Federal dollars are expended over the course of the project. CHIPS Loans may similarly be disbursed in tranches aligned with project milestones.

## C. Program Priorities

The CHIPS Incentives Program seeks to further priorities relating to economic and national security, workforce, and other matters. This section provides information about the program's priorities. Applicants should develop their applications with these priorities in mind, as they relate to various requirements and evaluative criteria that will form the basis for the Department's application review process. Applications that do not meet program priorities will not receive funding.

### 1. Economic and National Security Objectives

Advancing U.S. economic and national security is the principal objective of the CHIPS Incentives Program. The semiconductor industry and its supply chain are critical to the resilience of the U.S. economy. Semiconductors are an essential component in consumer electronics, automobiles, critical infrastructure, and data centers—to name just a few critical uses.

[14] 15 U.S.C. § 4652(a)(3)(B).

Semiconductors are also a critical input into modern defense systems, and their secure design and reliable availability is necessary for national security.

The Department seeks to invest in operationally secure projects employing appropriate cybersecurity practices, as well as implementing plans to promote supply chain security and risk management. Projects must be protected from internal and external risks ranging from insider threats to disaster recovery and ensure their supply chain is able to continue operations after an incident.

a. **Economic Security Objectives**

The semiconductor supply chain is global, and different elements of the supply chain are geographically concentrated in different regions of the world. This concentration means that a range of risks—from cybersecurity threats to natural disasters to pandemics—have the capacity to disrupt international semiconductor supply chains and damage the U.S. and global economy. The Department is therefore seeking to invest in projects that meaningfully increase U.S. semiconductor production and strengthen U.S. and allied supply chains, with a particular emphasis on projects that will mitigate risks from supply chain shocks associated with the geographic concentration of current semiconductor production. To best support supply chain resilience, projects should generally be capable of continued operations for a period of time without access to non-U.S. facilities and personnel.

For leading-edge facilities, the Department is seeking projects that utilize the most advanced commercial technology and produce products most critical to U.S. economic competitiveness. The Department is focused on the next wave of U.S.-based production, as well as on establishing a virtuous cycle of private-sector investment and innovation that bolsters U.S. competitiveness in the semiconductor industry. As such, the Department will evaluate the extent to which the applicant makes credible commitments of ongoing private investment in the United States. For current-generation and mature-node facilities, the Department is seeking projects that support production of semiconductors critical to U.S. economic security, including, for example, semiconductors used in automobiles, aerospace and defense, medical devices, or other U.S critical infrastructure sectors. To further advance U.S. economic security, the Department seeks to support applications with manufacturing processes that can be converted to produce different types of semiconductors in times of disruption.

The Department will generally favor applications that propose projects with sufficient scale to create long-term commercial sustainability and attract the related investments in suppliers and workforce necessary to engender a productive, efficient, and self-sustaining ecosystem. In order to increase U.S. resilience to potential supply shocks, the Department will also generally favor applications to build foundry capacity that can serve a range of logic customers. In addition, the Department will consider applications for production capacity in industry segments mostly served by integrated device manufacturers (IDMs), including but not limited to memory, analog, mixed-signal, discrete, radio frequency, and compound semiconductors.

The Department also seeks to mitigate risks associated with supply chain concentration through investments in back-end production facilities. In particular, the Department seeks to promote

U.S. competitiveness in advanced packaging, which will be critical to future deployments in leading-edge logic technology and manufacturing.

In addition, the Department aims to strengthen supply chain resilience by investing in materials and manufacturing equipment facilities that reduce vulnerabilities associated with geographic concentration, supply-chain bottlenecks, and/or production in foreign countries of concern. The Department also aims to invest in material and manufacturing equipment facilities that advance economic security by locating critical manufacturing know-how in the United States and contributing to the U.S. innovation ecosystem.

The Department recognizes the benefits of collaboration between facilities that are eligible under this NOFO and materials or manufacturing equipment facilities. The Department, accordingly, encourages applicants to take steps to attract associated supplier and other related investments, thus creating a more productive, efficient, and self-sustaining ecosystem and catalyzing future upgrades and expansions. The Department encourages applicants for facilities eligible under this NOFO to consider how their proposed project can spur broader development. Applicants can do this in various ways, such as by identifying plans for key material or manufacturing equipment suppliers to locate in the same area, identifying infrastructure that can benefit the applicant as well as material or manufacturing equipment suppliers, or by incorporating these suppliers in the applicant's workforce development or R&D commitments.

Relatedly, the Department seeks to support applications for semiconductor materials and manufacturing equipment facilities that help build productive and self-sustaining ecosystems, including by clustering with semiconductor fabrication facilities or otherwise improving the competitiveness and innovativeness of the U.S. semiconductor ecosystem.

#### b. **National Security Objectives**

By serving as foundational components to U.S. defense and critical infrastructure systems, semiconductors are also vital to U.S. national security. The government organizations and contractors that fulfill national security missions require stable, long-term onshore access to semiconductors. The Department is therefore committed to supporting projects that meet government agencies' need for access to safe, secure, and domestically produced chips. The Department seeks projects with the ability to adapt commercial production, testing, and packaging models for low-volume and high-mix national security components or to otherwise apply commercial technologies to support national security missions. Finally, the Department seeks applicants that are willing to supply the U.S. government with access to facilities for experimentation, transition, production, and potential integration into national security programs.[15]

The Department also acknowledges that the risk of malicious disruptions to semiconductors and their supply chains has risen in concert with increased chip complexity, process separation, and

[15] Note, however, that applications for CHIPS Loans and Loan Guarantees should not include assumptions about the Federal government serving as an off-taker or otherwise providing future funding that will support the financial viability of a project.

outsourcing.[16] The evolving threat landscape, coupled with today's digitized world, provides a large attack surface for adversaries to steal, compromise, alter, or destroy sensitive information that is critical to economic and national security.[17] The Department seeks applicants that have made themselves resilient to these attacks, such as by establishing a plan to protect intellectual property and by assuring the security of their supply chain to prevent tampering, counterfeiting, and other security issues. The Department will also prioritize projects capable of mitigating additional operational and cyber security risks, including those posed by insider threats, external influence from foreign entities of concern, dependence on foreign-owned or sourced inputs or equipment, and espionage.

Supply chain security is critical to ensure safe and continued production of semiconductors. The Department seeks projects with demonstrated resilience measures through the protection of physical infrastructure and the supplier ecosystem, and risk management strategies to avoid supply chain exploitation or the loss of intellectual property. Such measures include supply chain stress-test analyses, regular supply chain mapping into second-tier and further suppliers, third-party continuous monitoring, and mandatory supplier redundancy and agility policies.

The Department will also consider the national security risks of the location of any upstream or downstream steps in the manufacturing process, such as packaging.

#### c. Additional Assistance for Mature Nodes

Consistent with the CHIPS Act, the Department will dedicate at least $2 billion from the CHIPS Incentives Program to support production of mature nodes. Recent shortages in available chips at mature nodes led to widespread economic challenges. Shortages were concentrated in a few specific kinds of semiconductor inputs and applications, including legacy logic chips (used in medical devices, automobiles, and other products), analog and mixed-signal chips (used in power management, image sensors, radio frequency, and other applications), and optoelectronics chips (used in sensors and switches). The specific kinds of products with significant semiconductor supply and demand mismatches impacted a wide variety of industries and end users. The Department seeks to promote economic resilience through increased production at mature technology nodes.

The Department will give priority to applications for mature-node facilities that support the resilience of semiconductor supply chains for critical manufacturing industries (as defined in the Appendix) in the United States. Applications for mature-node facilities will otherwise be evaluated across the same priorities and criteria applicable to other projects.

### 2. Commercial Viability

Long-term commercial viability is an essential component of any successful application. Commercially viable projects will be grounded on a sound business case providing reliable cash

---

[16] *See* The White House, Building Resilient Supply Chains, Revitalizing American Manufacturing, and Fostering Broad-Based Growth (2021).

[17] *See* Department of Commerce and Department of Homeland Security, Assessment of the Critical Supply Chains Supporting the U.S. Information and Communications Technology Industry (2022).

flows that are sufficient to maintain continuity of operations and continued investment as necessary in the facility.

Each applicant must describe the type of semiconductor technology, material, or equipment the proposed project(s) will produce.[18] Applications should also demonstrate an awareness of a project's risks, including any risks from oversupply of the product, and the applicant's strategies for mitigating them. A strong application will present a sophisticated understanding, backed by evidence, of the demand for a project's output and other sources of existing and potential future supply. Each applicant must also identify the customers, or categories of customers, for a project's output.[19] The Department encourages proposals that have offtake commitments, attract more private capital, and induce larger-scale, private domestic investments. The Department also encourages purchase commitments and collaborations across the supply chain to clarify future demand, improve transparency and trust, and mitigate the risk of future chip shortages or oversupply.

The applicant's strategy for commercial viability should apply to the entire estimated useful life of the project facilities.[20] That means that the strategy should demonstrate a commitment to making the investments and upgrades necessary to ensure that each facility in the application remains competitive, secure, and commercially viable for its useful life. This strategy should specifically address investments necessary to address technology obsolescence risk, if relevant.

### 3. Financial Strength

The CHIPS Incentives Program is a crucial and significant investment in the semiconductor industry, but it does not provide enough funding on its own to create the capacity needed to meet the program's economic and national security objectives. Applicants should structure the finances of their project(s) in a way that maximizes private-sector contributions and minimizes the need for government incentives. The Department may decline to award CHIPS Incentives at the requested amount if the applicant has not demonstrated sufficient efforts to maximize the use of private-sector funds. The Department will evaluate the degree to which the applicant, through its funding request, leverages private investment, incentives provided by state and local governments, and the Investment Tax Credit to increase scale and lower the need for CHIPS Incentives. The Department will pay particular attention to the following factors in assessing the strength of the application's financial structure:

- Applicant Equity Capital: Applicants should have appropriate levels of equity capital in the proposed project(s) that are consistent with market benchmarks and market conditions. Applicants should not rely on CHIPS Incentives to displace private capital or enable outsized returns relative to commercially reasonable expectations for similar projects.
- Debt: Applicants are also expected to include prudent levels of external debt financing, either at the corporate level or the project level, to the extent necessary to reduce the need

[18] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(V)(aa).
[19] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(V)(bb).
[20] Absent unusual circumstances, the Department expects the useful life of a new fab will generally be at least 20 years.

for CHIPS Incentives. Proposed total debt levels (i.e., including loans, loan guarantees, existing debt, and any new external debt financing) should be sustainable based on the profile of a project or corporate entity, consistent with strong underwriting principles and an appropriate credit rating for the risk and financial structure of the project.

- Third-Party Equity: The Department encourages applications that bring other sources of equity capital into the overall capital structure, including innovative structures that bring in financing partners that do not typically participate in the semiconductor industry.
- Investment Tax Credit (if applicable): Projects that are eligible should maximize the impact of the Investment Tax Credit to reduce the need for CHIPS Incentives.
- Customer Financing**:** The Department encourages the use of customer financing, offtake agreements, prepayments, or other customer contributions to capital or operating expenses that can strengthen a project's finances.
- State or Local Government Incentives: Applicants must be offered a state or local government incentive to be eligible for CHIPS Incentives.[21] The Department encourages projects that include state and local incentive packages capable of creating spillover benefits that improve regional economic resilience and support a robust semiconductor ecosystem, beyond assisting a single company. Such incentives might include investments in workforce, education, site preparation, or infrastructure (including transit or utilities) that are not limited to the applicant, but designed to benefit both the applicant and the broader community. Likewise, the Department will place less weight on incentives (such as direct tax abatements) with less potential for spillover benefits.

Each applicant will be required to submit a detailed financial model for each proposed project according to the instructions set forth in Section IV.I.7. The model should reflect projected cash flows over the estimated useful life of a project facility, including capital expenditures, operating expenditures, revenues, taxes, and terminal values; the capital structure for the facility; internal rates of return and profitability metrics; scenarios under different macroeconomic, market, and operating environments to allow for sensitivity analysis and stress testing; and other information. CPO will protect confidential business information from disclosure consistent with applicable laws. See Section IV.C for more information on the use of and protections afforded confidential business information.

Each applicant should justify the assumptions in its model and the requested CHIPS Incentives based on cash flow modeling, projected rates of return for a project, historical performance of other similar projects by the applicant or others within the United States and globally, risks associated with a project, competitive returns for similar projects, sensitivity analyses of a project's performance, and other applicable analysis or evidence.

The model submitted with the full application will inform a comprehensive assessment of a project's finances, which will include analysis of the model against market data, conditions and benchmarks, the historical performance and returns of comparable projects, relevant expert analysis, and other information, as well as thorough diligence on the model for applications that

[21] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(I).

reach the due diligence phase. Throughout the review process, the Department may request additional information and/or revisions to the model in response to the analyses and diligence.

### 4. Project Technical Feasibility and Readiness

Timely construction and effective operation of facilities is crucial to the overall success of the CHIPS Incentives Program. Project technical feasibility includes the ability of the applicant to construct, equip, and operate the proposed project(s) in a secure manner. To demonstrate technical feasibility, applicants should provide a clear project execution plan, including major construction and operational milestones, construction rights and permits, and key contractual arrangements.

Activities funded under this NOFO will be subject to various Federal, state, and local environmental and permitting requirements. The Department intends to prioritize applications that demonstrate a clear path to meeting these requirements in a timely manner. This path could include identifying steps to reduce costs and barriers to construction, using existing infrastructure or making mitigation commitments, and securing agreements from state and local permitting authorities to ensure projects stay on schedule.

The applicant should identify the necessary environmental compliance and permitting steps for each project proposed in the application, and, as relevant, for each individual activity within each individual project.

### 5. Workforce Development

A highly skilled, diverse workforce is critical to meeting the goals of the CHIPS Incentives Program. This includes both the construction workforce who construct or expand facilities, and the semiconductor workforce who operate them. The applicant will need a strategy for both workforce components.

#### a. Facility Workers

The Department believes that a strong, long-term workforce strategy is critical to the economic and national security goals of the CHIPS Act. As such, each applicant should commit to appropriate investments to recruit, train, hire, retain, and upskill a diverse workforce in good jobs at their facility. The Good Jobs Principles[22] published by the Departments of Commerce and Labor outline the elements of a good job, including recruitment and hiring practices, pay and benefits, job security and working conditions, worker empowerment, skills and career advancement, and organizational culture.

[22] *See* U.S. Department of Commerce and U.S. Department of Labor, Good Jobs Principles (2022).

Sectoral partnerships[23] will play an integral role in the development and implementation of high-quality, equitable workforce development strategies. As such, the Department will require all applicants' workforce development strategies to reflect the following steps:

- Applicants must secure commitments from strategic partners, including partnerships with regional educational and training entities and institutions of higher-education to provide workforce training.[24] The strongest applicants will, wherever possible, engage in sectoral partnerships with a wide array of additional strategic partners so they have the broadest view of potential workforce solutions and will take a systems-level approach to these partnerships. For example, rather than partnering with only a single community college, an applicant might instead partner with a community college system to engage the full range of potential community college partners in the region. Strategic partners can include:
  - Other businesses
  - Government organizations (e.g., Federal, state, local, tribal)
  - Educational institutions (e.g., K-12, community colleges, technical colleges and universities, historically Black colleges and universities, tribal colleges and universities, and minority serving institutions, including Hispanic-serving institutions)
  - Training organizations
  - Economic development organizations
  - Workforce development organizations (e.g., state and local workforce boards)
  - Labor unions and other labor organizations
  - Industry associations
  - Community-based organizations (e.g., non-profits, faith-based organizations)
  - Career and technical education programs and career and technical student organizations for students in public secondary schools and community and technical colleges
- Applicants must describe the constitution and layout of partnerships they have formed, as well as plans to utilize these partnerships on an ongoing basis, such as through regular convening. Applicants should also describe the roles and responsibilities each partner will take on as part of their plan.
- Applicants must develop an equity strategy, in concert with their partners, to create equitable workforce pathways for economically disadvantaged individuals in their region. Recruiting, training, and retaining a diverse and skilled set of workers will necessitate building new pipelines for workers, including specific efforts to attract economically disadvantaged individuals[25] and promote diversity, equity, inclusion, and accessibility.

---

[23]A sectoral partnership is a systems-level approach to equitable workforce development that aligns employer demand for a skilled workforce with available workers by bringing together a range of key partners to train and place workers into high-quality jobs. See Section IV.I.10 for additional detail.

[24] *See* 15 U.S.C. § 4652(a)(2)(B)(III). Applicants are not eligible for incentives unless they have secured commitments from regional educational and training entities and institutions of higher-education to provide workforce training.

[25] *See* 15 U.S.C. § 4652(a)(2)(B)(ii); Definition of "economically disadvantaged individuals" in the Appendix.

In collaboration with its partners, each applicant must create a workforce development plan to articulate the applicant's approach to meeting their facility workforce needs. The plan should contain a detailed workforce needs assessment, and the recruitment, training, and retention strategies that address the specific workforce challenges identified in the assessment. The applicant's plan should document how the applicant will expand access for economically disadvantaged individuals, including how the applicant's recruitment, training, and retention strategies will be tailored to address the needs of these workers. The plan should also detail the applicant's engagement with strategic partners, including but not limited to labor unions, workforce development organizations, state and local workforce boards, educational institutions, and others. Strong applications will reflect an integrated, comprehensive approach to building inclusive workforce pipelines through a sectoral partnership and strategies to retain workers in good jobs. Strong applications will also demonstrate a vision for long-term sustainability. Engaging with educational institutions at all levels will be key to training the next generation of workers, including commitments to work with K-12 institutions and develop and strengthen career and technical education.

An effective workforce plan will be informed by, and demonstrate support and commitments from, a diverse set of community and public-sector entities and include evidence-informed approaches to outreach, recruiting, training, wraparound services, job placement, and advancement. See Sections IV.H.5, IV.I.10, and V.A.5 for additional detail.

In addition, the Department expects applicants to commit to working to support long-term, cross-cutting initiatives—such as competency development, curriculum design, and credentialing—that will strengthen the U.S. national semiconductor workforce. Because meeting workforce needs will require ongoing collaboration and coordination across the sector, the Department expects to engage with recipients to support workforce efforts after awards are made.

b. **Construction Workers**

With respect to the construction and expansion of facilities, each applicant will be required to submit a construction workforce plan that includes a detailed description of the steps that will be taken by the applicant and their construction partners to recruit, hire, train, and retain a diverse and skilled construction workforce. As part of this plan, applicants should describe their approach to worker recruitment and retention, including efforts to include women and other economically disadvantaged individuals in the construction industry; a strategy for creating good jobs; and engagement with community partners such as labor unions, workforce development organizations, and others.

The Department strongly encourages the use of project labor agreements (PLAs) in connection with construction projects. Applicants that commit to using best-practice project labor agreements will generally be likely to produce a construction workforce plan that meets the criteria in this NOFO. By contrast, applicants that do not commit to using a PLA will be required to submit workforce continuity plans and show that they have taken other measures to reduce the risk of delays in project delivery.

### c. Child care

Child care is critical to expanding employment opportunity for economically disadvantaged individuals, including economically disadvantaged women. The Department requires that any applicant requesting CHIPS Direct Funding over $150 million provide a plan for access to child care for facility and construction workers, e.g., through on- or near-site child care, pre-arranged agreements with existing child care providers, child care subsidies, or other similar measures.

To meet families' needs and thus expand employment opportunity, child care should be:

- Affordable: costs are within reach for low- and medium-income households
- Accessible: at a convenient location with hours that meet workers' needs
- Reliable: granting workers confidence that they will not need to miss work for unexpected child care issues
- High-Quality: providing a safe and healthy environment that families can trust and that nurtures the healthy growth and development of children.

Projects that do not request CHIPS Direct Funding meeting the $150 million threshold are still strongly encouraged to provide access to child care for facility and construction workers to the greatest extent feasible.

## 6. Broader Impacts

The Department is committed to building strong communities that participate in the prosperity of the semiconductor industry, as well as ensuring that taxpayer investments maximize benefits for the U.S. economy. The Department also strongly supports inclusion, diversity, equity, and access, and firmly believes that the semiconductor industry cannot succeed unless all Americans have an opportunity to participate, including communities and individuals that have historically been underrepresented in the industry. In particular, the Department is interested in how projects will create broader impacts across the following dimensions:

**Commitments to Future Investment in the U.S. Semiconductor Industry.** Ensuring the security and resilience of the semiconductor supply chain and strengthening the leadership of the United States in semiconductor technology will require more than facilities built with the initial round of CHIPS Incentives. It will require sustained capital, research and development, and workforce investments in the U.S. semiconductor ecosystem. The Department seeks to prioritize incentives for applicants that are committed to their CHIPS Incentives-supported project as well as to future investments that grow the U.S. semiconductor industry and upstream and downstream industries necessary to promote a leading-edge ecosystem that promotes American semiconductor resilience and leadership. To demonstrate this commitment, each applicant will submit its strategy for continued reinvestment in the domestic semiconductor industry. In particular, the Department will prioritize applicants that credibly commit to investing in R&D in the United States, such as by building domestic R&D fabs or other domestic R&D facilities.

Applicants can complement their commitment to reinvestment with a commitment to refrain from stock buybacks for five years from the date of award. The Department will evaluate

applicants on the basis of their pledges to reinvest capital into the domestic semiconductor industry.

**Upside Sharing.** As part of their financial model, applicants must provide the Department with projected cash flows over the lifetime of the project. The Department will perform diligence on those projections, which will be used to help determine the CHIPS Direct Funding award amount, if applicable. Over time, a project may generate cash flows or returns that significantly exceed the projections that were used to determine the CHIPS Direct Funding amount. The Department welcomes such successful performance, as it contributes to the long-term viability of the domestic semiconductor industry.

Recipients receiving more than $150 million in CHIPS Direct Funding will be required to share with the U.S. government a portion of any cash flows or returns that exceed the applicant's projections (above an agreed-upon threshold specified in the award). The Department expects that upside sharing will only be material in instances where the project significantly exceeds its projected cash flows or returns, and will not exceed 75% of the recipient's direct funding award. Because successful projects will differ considerably in their key attributes, upside sharing arrangements may vary by project, and, in exceptional circumstances, may be waived.

The Department will use any upside sharing proceeds to support the purposes of the CHIPS Act and strengthen the U.S. semiconductor ecosystem.

**Support for CHIPS Research and Development Programs.** Strengthening the role of the United States in semiconductor technology requires a robust innovation ecosystem for research and development. Applicants for CHIPS Incentives should help ensure that this innovation ecosystem—which is critical to the semiconductor industry's long-term success—can flourish.

R&D initiatives established by the CHIPS Act include the National Semiconductor Technology Center (NSTC), which will conduct research and prototyping of advanced semiconductor technology; the National Advanced Packaging Manufacturing Program (NAPMP), which will strengthen semiconductor advanced test, assembly, and packaging capability in the domestic ecosystem; the National Network for Microelectronics Research and Development, also known as the Department of Defense Microelectronics Commons (Microelectronic Commons), to enable domestic lab-to-fab transition of microelectronics innovations; at least one new Manufacturing USA Institute focused on semiconductor manufacturing; and microelectronics research at NIST. Robust industry participation in these new initiatives, particularly the NSTC and NAPMP, will be essential for their success.

Each applicant should commit to participating in the NSTC and, if applicable, engage, support, and collaborate with NAPMP-funded projects in an appropriate manner, taking into account the nature of the applicant and the activities of these organizations. Further details will be provided as these organizations develop their operational plans and membership programs. Applicants for CHIPS Incentives should also propose commitments to support these or other CHIPS R&D efforts. The Department expects that the substance of applicant commitments to R&D will vary. For example:

- Applicants for semiconductor production facilities should reserve capacity to support shuttle runs at market rates or below in support of small businesses, academia, and potential R&D projects coordinated by the NSTC.
- Applicants for packaging facilities could reserve capacity for use by the NSTC or NAPMP.
- Applicants could rotate project technical staff to the NSTC or NAPMP, or train NSTC and NAPMP technical staff through exchanges.
- Applicants could provide process data to the NSTC to support aggregated large-scale datasets for training and manufacturing process optimization.
- Applicants could provide access to existing R&D facilities either as affiliated partners of the NSTC, the Microelectronic Commons, ongoing National Science Foundation programs, or independently.
- Applicants could provide the NSTC, NAPMP, or Microelectronic Commons with donations of or access to equipment and/or design tools.
- Applicants could increase public and industry access to mature-node process design kits, such as through open-source licenses, to foster intellectual property (IP) development and improve foundry interoperability.

**Creating Inclusive Opportunities for Businesses**. The CHIPS Incentives Program strives for the inclusion of minority-owned businesses, veteran-owned businesses, women-owned businesses, and small businesses as part of any funded project.[26] Applicants should explain how they will address this priority, and strong applications will outline proactive efforts to include such businesses in a project's construction and production supply chain, as well as robust outreach plans for engaging with minority-owned, veteran-owned, women-owned, and small businesses. Such steps may include, but are not limited to:

- Ensuring that small, minority-owned, veteran-owned, and women-owned businesses are solicited for construction and production supply chain opportunities, and placing them on solicitation lists.
- Dividing total requirements, when economically feasible, into smaller tasks or quantities to expand access to participation by minority-owned, veteran-owned, women-owned, and small businesses.
- Establishing delivery schedules for subcontractors that encourage participation by small, minority-owned, veteran-owned, and women-owned businesses.
- Investing in supplier diversity programs and working with supplier diversity organizations to grow a pool of diverse suppliers.
- Implementing net-15 payment periods (i.e., full payment is due in 15 days after the invoice date) or having quick payment resolution mechanisms in the event that payments to subcontractors are not rendered timely.
- Assigning dedicated staff to manage outreach and data analysis on engagements with small, minority-owned, veteran-owned, and women-owned businesses.

[26] *See* Exec. Order No. 14080, 87 Fed. Reg. 52,847 (Aug. 25, 2022).

- Using the services and assistance, as appropriate, of such organizations as the Minority Business Development Agency, Small Business Administration, NIST Hollings Manufacturing Extension Partnership Centers, and others.

Strong applications will include concrete goals for measuring performance of outreach plans. To the extent that the applicant relies on contractors, the Department expects the applicant to work with those contractors to implement supplier diversity efforts and to collect data on program performance.

**Climate and Environmental Responsibility.** The Department understands that semiconductor companies can both reduce their environmental impact and further their competitive advantage by helping their customers meet ambitious net-zero goals. Applicants are expected to design their projects to minimize the potential for adverse impacts on the environment and the local community, including communities with environmental justice concerns. Specifically, each applicant must submit a climate and environmental responsibility plan (see Section IV.G.11). All applicants are encouraged to make use of renewable energy to the maximum extent possible for operation of their projects. Applicants constructing a new facility for fabricating semiconductors are strongly encouraged to use 100% renewable energy for facility operations. Applicants are encouraged to achieve this goal through on-site generation, power purchase agreements, or utility green tariffs or equivalent approaches.

Applicants should demonstrate that they have sufficiently accounted for current and future weather- and climate-related risks, such as wildfires, droughts, extreme heat and cold, inland and coastal flooding, and the extreme winds produced by tornadoes, hurricanes, and other weather events. The climate and environmental responsibility plan should include how new facilities will be designed, built, and operated to account for the weather- and climate-related risks that may occur over the lifetime of the facility.

**Community Investments.** The CHIPS Act requires that applicants make commitments to community investment.[27] The Department aims to ensure that such investments build strong communities that participate in the prosperity of the semiconductor industry, growing the economy of the United States and supporting job creation in the United States.[28] Applicants should strive to ensure that their investments contribute to a region's long-term strategy for economic vitality.

Accordingly, ideal investments would demonstrate a clear link between CHIPS Incentives Program goals and the underlying economic characteristics of a region. For example, if transit costs are a significant barrier to attracting workers, investments that reduce those costs can help unlock a region's potential for long-term growth, while simultaneously promoting equity. Similarly, community investments could include:

- Financing or building affordable housing or providing housing vouchers, especially where housing access is a barrier to workforce participation and retention.

[27] 15 U.S.C. § 4652(a)(2)(B)(ii)(II).
[28] *See* 15 U.S.C. § 4652(d)(4).

- Financial support for a research institute or innovation campus to complement a new manufacturing facility and promote cluster-based economic growth.
- Investments in local K-12 schools and community colleges with a focus on pathways to career technical opportunities and/or college.

Applicants may wish to particularly highlight any benefits to economically disadvantaged individuals.

Because communities are best positioned to understand their own needs, the Department expects applicants to work closely with stakeholders in local communities to develop a set of investments that is responsive to local needs. Strong applications will reflect hand-in-hand collaboration with different stakeholders to ensure that community investments eliminate pressing barriers to economic participation and inclusive growth. Applicants can demonstrate community support in a variety of ways, including through community benefits agreements and letters of support from community-based organizations and local officials. Co-investments from third parties and philanthropies are strongly encouraged to achieve economies of scale. Similarly, applicants should seek to align their community investments with ongoing state and local economic development programs, such as regional or cluster-based growth efforts, or with comparable Department and/or other Federal programs, such as the Build Back Better Regional Challenge, to amplify their impact.

**Domestic Manufacturing and Content.** Applicants should describe whether and how they plan to utilize iron, steel, and construction materials produced in the United States as part of their projects.

## II. <u>Federal Award Information</u>

### A. Funding Instrument

CHIPS Incentives will be provided, as appropriate, through grants, cooperative agreements,[29] other transaction agreements, loans, and loan guarantees.

The final composition and structure of any financial assistance awards made under this program will be determined during the review and selection process. An application could result in one or more awards.

### B. Funding Availability

The amounts available under the CHIPS Act are as follows:

- for CHIPS Direct Funding, up to $38.22 billion; and
- for CHIPS Loans and CHIPS Loan Guarantees, up to $75 billion in direct loan or guaranteed principal

[29] For cooperative agreements, the nature of the Department's "substantial involvement" will generally include collaboration with the recipient in developing and implementing the approved scope of work.

The Department does not expect to award the full amount available under this NOFO. Some funding will be awarded under future funding opportunities. The actual amounts awarded under this NOFO will depend on the quality of applications received; the allocation of CHIPS Incentives into direct funding, loans, and loan guarantees; program priorities; the issuance of other NOFOs; and the availability of funds.

Consistent with the CHIPS Act, at least $2 billion will be reserved for covered entities that agree to fabricate, assemble using packaging, or test semiconductors at mature technology nodes, or provide equipment or materials for the fabrication, assembly, testing, or packaging of semiconductors at mature technology nodes.[30] With respect to this dedicated funding, this NOFO offers funding only for covered entities that agree to fabricate, assemble using packaging, or test semiconductors at mature technology nodes. See Section I.B.1.

### C. Award Amount

The total amount of a CHIPS Incentives Award, and the specific amounts of CHIPS Direct Funding, CHIPS Loans, and CHIPS Loan Guarantees will vary by project. Sections I.B, IV.I, and V.A.3 provide more information on how applicants should structure their applications for CHIPS Incentives Awards, including with respect to the size of their requests and identifying the specific activities that may be eligible uses of funds. These sections also describe how the Department will determine the size, type, and terms of CHIPS Incentives Awards. As explained in those sections, CHIPS Incentives Awards will be individually negotiated and awarded based on considerations specific to each application, as well as the availability of program funds.

For activities eligible under this NOFO, the Department generally expects that the total amount of a CHIPS Incentives Award, inclusive of CHIPS Direct Funding and the principal amount of a CHIPS Loan or CHIPS Loan Guarantee, will not exceed 35% of project capital expenditures. That percentage may be higher if a project is not eligible for the Investment Tax Credit, such as for certain projects related to semiconductor materials facilities. As noted in Section I.B.7, the Department generally expects most CHIPS Direct Funding awards will range between 5% to 15% of project capital expenditures. These percentages reflect certain assumptions about a project, including debt-to-equity ratios and the contribution of the Investment Tax Credit, which may not apply in all cases.

### D. Period of Performance

The specific period of performance will depend on the size and complexity of the project(s) and the specific activities funded and will be negotiated with the applicant and reflected in the award documents. In general, the period of performance could be as short as two years or, for more complex applications, including multi-project proposals, ten years or more.

The period of performance is distinct from the tenor on CHIPS Loans or CHIPS Loan Guarantees, which may be longer than the period of performance. Further, the conclusion of an award's period of performance does not signify the end of a recipient's obligations related to a CHIPS Incentives Award.

---

[30] *See* CHIPS Act of 2022, § 102(a)(3).

## III. Eligibility Information

### A. Eligible Applicants

#### 1. Covered Entity Requirement

An applicant must be a "covered entity" to receive CHIPS Incentives. For purposes of this NOFO, a "covered entity" means a nonprofit entity; a private-sector entity; a consortium of private-sector entities; or a consortium of nonprofit, public, and private-sector entities with a demonstrated ability to substantially finance, construct, expand, or modernize a facility relating to fabrication, assembly, testing, advanced packaging, or production of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment.[31]

As this definition makes clear, multiple entities may be involved in a single CHIPS Incentives Program application. In general, the recipient should be the single, private-sector, domestic legal entity that will receive the CHIPS Incentives directly from the Department.[32] A recipient will assume legal and financial responsibility for the CHIPS Incentives received, including any funds provided to subrecipients and contractors.

The recipient entity should be identified as early in the application process as possible to facilitate an expeditious review. However, submission of a statement of interest or pre-application while a recipient entity is still being determined is permissible so long as the eventual recipient is a member of the affiliated group of the entity submitting the statement of interest or pre-application.

The Department may require that the parent or affiliated entities of the recipient provide commitments or guarantees for the benefit of the Federal government or to advance program priorities. For example, a parent corporation's guarantee of payment may be required for a CHIPS Loan or for financial clawbacks that could be triggered by a violation of program requirements.

Consortium applications involve an umbrella entity and multiple participating entities. If the Department determines that the umbrella entity is not adequately capitalized to perform the award or protect taxpayer dollars, one or more members of the consortium may be required to assume financial responsibility for the consortium.

---

[31] *See* 15 U.S.C. § 4651(2). Because projects solely for research and development are outside the scope of this NOFO, the definition above is modified from the statutory definition.

[32] Multiple recipients or a nondomestic recipient may be permitted, at the sole discretion of the Department, in exceptional cases, such as in cases of applications involving more than one member of an affiliated group, i.e. a corporate parent and one or more of its subsidiaries. Such exceptions will only be granted if consistent with applicable law and where providing for multiple recipients would further program or project objectives and would not undermine the ability of the Department to evaluate an application and monitor and enforce compliance with the terms of any resulting CHIPS Incentives Award. Multiple recipients will not be permitted where the recipients are not part of the same affiliated group. After the submission of a statement of interest, a submitter may seek guidance on whether a multiple recipient or nondomestic recipient option may be available for its potential application.

### 2. Foreign Entities of Concern and Foreign Capital

Foreign entities of concern[33] are not eligible to receive CHIPS Incentives. In addition, the Department will review applications for involvement of foreign entities of concern and will not approve any applications where a foreign entity of concern—through control,[34] access to information, or other mechanisms—poses an undue risk to a project or U.S. national security interests. Applicants are required to provide information via the SF-328 form at the time of full application to enable an initial assessment of these issues. Additional information, beyond the scope of the SF-328 form, may be required in due diligence, to further identify and, if necessary, mitigate potential risks to national security.

CHIPS Incentives Awards will also involve requirements to enable identification and mitigation of national security risks posed by involvement of foreign entities of concern that may arise after an application is approved.

### 3. Cost Sharing or Matching

Cost sharing or matching funds, as governed by 2 CFR § 200.306, are not legally required for this NOFO. However, the Department expects that selected projects will be majority funded from non-Federal sources. Each applicant must be able to demonstrate that they have sufficient resources available to complete the proposed project, when combined with the requested CHIPS Incentives.

## IV. Application and Submission Information

### A. How to Access an Application Package

Application forms and instructions are available on the CHIPS Incentives Program application portal. FAQs, guides and templates are available at https://www.chips.gov.

### B. Submission Dates and Times

The Department is amending this Notice of Funding Opportunity to add closure dates, as follows:

**Full applications** may be submitted until 5:00pm (EDT) on Tuesday, June 18, 2024.

**Pre-applications** may be submitted until 5:00pm (EDT) on Monday, May 20, 2024. Entities that submit a pre-application after this amendment is published and before the May 20, 2024 deadline

---

[33] *See* 15 U.S.C. § 4651(8).

[34] The term "control" for this purpose is defined as any direct or indirect investment in a corporate entity that provides the investor with the means to influence important matters affecting the project. The term "means to influence important matters" includes membership or observer rights on, or the right to nominate an individual to a position on, the board of directors or equivalent governing body of the corporate entity; any involvement, other than through voting of shares, in substantive decision-making by the corporate entity; and consultation rights with respect to technology licensing to third parties.

will have 45 days after receiving a feedback letter to submit a full application, notwithstanding the general June 18, 2024, full application deadline.

**Statements of Interest** may be submitted until 5:00pm (EDT) on Tuesday, June 18, 2024. Entities are no longer required to wait at least 21 days after submitting a Statement of Interest before making their next submission and may submit a pre- or full application immediately after submitting a Statement of Interest.

The Department may amend this NOFO at any time. Any further changes to this NOFO will be communicated via https://www.grants.gov and https://www.chips.gov.

### C. Confidential Information

CPO recognizes the importance of protecting confidential business information from public disclosure. CPO and the Department will follow applicable laws, including, for example, the CHIPS Act, the Trade Secrets Act, and the Freedom of Information Act (FOIA), to protect such information.

#### 1. Statutes Applicable to Confidential Business Information

Subject to certain exceptions, Section 4652 of the CHIPS Act provides that "any information derived from records or necessary information disclosed by a covered entity to the Secretary under this section" is exempt from disclosure under FOIA and "shall not be made public."[35]

All Federal employees are also bound by the Trade Secrets Act, which makes Federal employees criminally liable for the unauthorized disclosure of "information [that] concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association."[36] Violations of the Trade Secrets Act may result in the loss of employment, fines, or imprisonment.

Finally, FOIA requires Federal agencies, including CPO and the Department, to disclose agency records requested by a member of the public, including information received from outside parties, unless FOIA specifically exempts the information from disclosure. Information that "shall not be made public" under Section 4652 of the CHIPS Act "shall be exempt from disclosure under section 552(b)(3) of title 5,"[37] making it exempt from disclosure under FOIA.[38] In addition, FOIA exempts from disclosure information submitted by an applicant that constitutes trade secrets or is privileged or confidential commercial or financial information.[39]

---

[35] 15 U.S.C. § 4652(a)(6)(G)(i). The exceptions are for information 1) relevant to any administrative or judicial action or proceeding, 2) that a covered entity has consented to be disclosed to third parties, or 3) necessary to fulfill the congressional notification requirement specified under Section 4652(a)(6)(H). "Covered entity" is defined at 15 U.S.C. § 4651(2). The Department interprets "information disclosed by a covered entity to the Secretary under this section" to include information disclosed by a covered entity as part of the application process under this NOFO.
[36] 18 U.S.C. § 1905.
[37] 15 U.S.C. § 4652(a)(6)(G)(i).
[38] *See* 5 U.S.C. § 552(b)(3).
[39] 5 U.S.C. § 552(b)(4).

The Department will apply these exemptions, in accordance with the law and the Department's FOIA regulations,[40] to FOIA requests.

### 2. Instructions for Marking Confidential Business Information

To assist the Department in protecting trade secrets or privileged or confidential commercial or financial information, applicants should follow these guidelines in submitting information via a statement of interest, pre-application, or full application.

First, the following legend should appear on the first page of any document containing trade secrets or privileged or confidential commercial or financial information:

> This document contains trade secrets or commercial or financial information that is privileged or confidential and is exempt from public disclosure. Such information shall be used or disclosed only in accordance with the CHIPS Incentives Program NOFO or as otherwise authorized or required by law. The information subject to these restrictions is contained on all pages of the document except for pages [insert page number or other identification of pages that contain no restricted information.]
>
> (End of Legend)

Second, the following legend should appear on each page of the document that contains information the applicant seeks to designate as trade secrets or privileged or confidential commercial or financial information:

> Use or disclosure of information contained on this sheet is subject to the restriction on the title page of this document.
>
> (End of Legend)

The use of any other legend may constitute grounds for removing the application from further consideration without assuming any liability for inadvertent disclosure. Each applicant must also use good faith when designating information as trade secrets or commercial or financial information that is privileged or confidential.

### 3. Use of Information

Any person or entity submitting information under this NOFO acknowledges and understands that information and data contained in or submitted in connection with statements of interest, pre-applications, full applications, or due diligence under this NOFO (together, "applicant information and data") may be accessed and used by Federal employees for the purposes of this NOFO and carrying out the government's responsibilities in connection with the CHIPS Incentives Program, or as otherwise required by law. By submitting applicant information and data, the applicant, potential applicant, or an entity submitting a statement of interest consents to

[40] *See* 15 C.F.R. Part 4.

the disclosure of such applicant information and data to consultants and contractors for these purposes, consistent with Federal law.

The Department may publish information concerning the award of incentives throughout the review, selection, and award process. By submitting a full application, the applicant consents to the disclosure of information regarding the identity of the applicant and its ultimate corporate parent, the location of the proposed project(s), the estimated total capital expenditure for the proposed project(s), the status of its application (*e.g.*, complete and pending review, approved for entry into due diligence, in due diligence, denied, or withdrawn); whether a non-binding Preliminary Memorandum of Terms has been offered to the applicant, as well as basic terms thereof; disclosures of project information and environmental impacts required under Federal environmental review requirements, such as the National Environmental Policy Act (as determined by the Department), any notifications to Congress required by law, or any other disclosures required by law.

Any accepted non-binding Preliminary Memorandum of Terms or CHIPS Incentives Award will specify additional information that the Department may make public, including, for example, the identity of the recipient, the type(s) and amount(s) of the CHIPS Incentives, and appropriate summaries of the project(s). As will be set forth in the terms and conditions of a CHIPS Incentives Award, successful applicants will be expected to support program and project reviews, audits, and evaluations, including by submitting required financial and performance information and data in an accurate and timely manner, making available documents and other records related to the award project(s) upon request, and by cooperating with Department and external program evaluators, including the Office of the Inspector General. Certain post-award progress reporting may also be made public.

The Department may also publish aggregated information from statements of interest, pre-applications, and applications.

### D. False Statements

It is a crime to knowingly make false statements to a Federal agency. Misrepresentation of material facts may be the basis for denial of an application. Penalties upon conviction may include fine and imprisonment. For details, please refer to 18 U.S.C. § 1001.

### E. Application Requirements

Application forms and instructions are available on the CHIPS Incentives Program application portal. FAQs, guides and templates are available at https://www.chips.gov. Applicants will provide information to the CHIPS Incentives Program application portal via web forms, the population of required templates, and the upload of narrative documents and other required or supporting attachments. The following sections describe the information that will be required as part of the submissions for statements of interest, pre-applications, and full applications.

All application materials must be submitted electronically via the CHIPS Incentives Program application portal. In addition to the requirements set forth below, during the application review process the Department may request additional records and information necessary for fulfilling the purposes of this NOFO.

## F. Requirements for Attachments Submitted through the CHIPS Incentives Program Application Portal

### 1. Figures, graphs, images, and pictures

Should be of a size that is easily readable or viewable and may be presented in landscape orientation

### 2. Font

Easy-to-read font (11 point minimum). Smaller type may be used in figures and tables but must be clearly legible.

### 3. Line spacing

Single spacing or double spacing is permitted.

### 4. Margins

One inch top, bottom, left, and right

### 5. Page layout

Portrait orientation except for figures, graphs, images, and pictures. Paragraphs are to be clearly separated from each other by double spacing, paragraph formatting, or equivalent.

### 6. Page numbering

Number pages sequentially.

### 7. Page size

Pages must be 8½ inches by 11 inches, excluding maps or diagrams.

### 8. Language

English

### 9. Typed document

All materials, including forms, must be typed.

## G. Statements of Interest

A statement of interest form available on the CHIPS Incentives Program application portal is required for each full application or pre-application submitted. Parties are encouraged to submit the statement of interest as soon as they have decided they are likely to pursue a CHIPS Incentives Program application. The statement of interest is designed to help the Department gauge interest in the program and the types of projects and applicants, and prepare to review pre-applications or full applications.

## H. Content and Form of Pre-Application

The optional (and, with the exception of leading-edge facilities, recommended) pre-application serves as an opportunity for the Department to provide a preliminary assessment of the likelihood of a potential application receiving CHIPS Incentives, and to provide meaningful feedback to applicants before they prepare a full application package.

Together, the project plan and workforce development information requested below should not exceed 20 pages for narrative responses, excluding relevant attachments. Pre-applications must be submitted through https://applications.chips.gov.

Pre-applications will be reviewed upon receipt to screen for eligibility, completeness, and responsiveness to this NOFO, including the program priorities (Section I.C). Pre-applications determined to be ineligible, incomplete, or nonresponsive may be returned to the potential applicant to cure any deficiencies. However, the Department, in its sole discretion, may review a substantially complete pre-application if any gaps in information can easily be rectified during the review and feedback process.

The pre-application includes information sought via the web forms on the CHIPS Incentives Program application portal and the following information:

### 1. Cover Page

The cover page will be input directly via a web form on the CHIPS Incentives Program application portal.

### 2. Project Plan

Each potential applicant must submit a project plan that describes each project expected to be included in the future full application. The project plan should explain how each project satisfies the program description (see Section I of this NOFO) and the evaluation criteria (see Section V.A. of this NOFO). If the applicant does not have sufficient information to describe the activities associated with one or more projects in its pre-application, the applicant should provide any available information, including a conceptual project plan or qualitative description of the associated activities.

The project plan should contain the following information:

- Description of Projects: A description of the construction, expansion, or modernization activities proposed for each facility expected to be included in the application, including a description of the facility location and existing or required infrastructure. This description should include the products that each facility produces or will produce and their end market application, along with information on the scale, size, and capacity of production. Identify the top 10 customers for each major product and associated volumes (to the extent known). Identify key suppliers, e.g. names of equipment and raw material providers. If the applicant expects to include multiple projects (for work proposed at multiple facilities) in the application, the description should explain both the ways in which the individual projects are interrelated and the value provided by each project on

its own, independent of the other projects. For example, if the application will include two fabs located at a single site, the description may explain that the two projects share common workforce development strategies and will jointly improve an applicant's market share and cost efficiency, but that the proposed construction, expansion, or modernization of each fab can take place independently from the work proposed at the other fab. Similarly, if the applicant expects the application to include individual activities that may be independently useful and eligible for the CHIPS Incentives Program, separate from other activities at the same facility, the project description should explain both the ways in which the individual activities are interrelated and the value provided by each component or activity on its own.

- Consortium Description (if applicable): Potential consortium applications must identify the individual entities that are members of the consortium, the roles of each entity, the governance, management, and oversight structures for the consortium, and the method of distributing CHIPS Incentives to individual entities.
- Cluster Profile: For commercial fabrication and wafer manufacturing facilities, a description of how the project(s) will attract associated supplier, workforce, and other related investments, thus creating a more productive, efficient, and self-sustaining ecosystem and catalyzing future upgrades and expansions.
- Estimated Project Timeline: An estimated schedule for the capital expenditures and expected operations for each project in the application, including estimated timeframes for key construction milestones and production of products. This section should also indicate an estimated timeframe for when the applicant may be ready to submit a full application, assuming the Department encourages the submission of a full application based on the proposal contained in the pre-application.
- Summary Narrative Addressing the Evaluation Criteria: A summary narrative explaining how the proposed project(s) align with the evaluation criteria set forth in Section V.A. The summary should include information indicating how each of the six evaluation criteria are or are expected to be addressed. Potential applicants are encouraged to focus, in particular, on how the proposed project(s) will further the economic and national security objectives of the United States, as described in Section I.C.1.
- CHIPS Incentives Justification: A summary narrative explaining how the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the incentives. More information should be provided in the Financial Information section of the pre-application.
- Applicant Profile: A brief description of the applicant, including identification of its headquarters, primary officers, ownership (publicly traded or privately held), main business lines, and main countries of operation. For applicants that are a subsidiary of another entity, this information should be provided for the ultimate corporate parent as well. The corporate relationship between the applicant and the ultimate parent should also be described.

### 3. Financial Information

Each potential applicant should submit a summary of financial information for the potential applicant and the proposed project(s), as well as detailed sources and uses of funds for each

proposed project in the pre-application. Applicant and project-level financials should be prepared in accordance with Generally Accepted Accounting Principles or comparable standards (e.g., International Financial Reporting Standards). The financial information should include the following items:

- Facility Ownership Structure: Provide formal legal entity and organizational structure for the proposed project(s) showing all relevant entities, including relationship with the ultimate corporate parent (if applicable).
- Sources and Uses of Funds: Provide the information listed below about project costs and capital sources via a descriptive narrative and via the Project Sources and Uses of Funds spreadsheet template available on the CHIPS Incentives Program application portal. If the pre-application proposes multiple projects, project costs and capital sources should be provided cumulatively for the entire set of proposed projects in the pre-application and for each project individually.
    - Project Costs: Project costs should include, but are not limited to, those noted below:
        - Capital Investment: The costs required to complete the construction, expansion, or modernization of the project and initiate operation, broken down by category such as land, construction (e.g. labor and material), equipment, infrastructure improvements (e.g. utility plants, access to infrastructure, or wastewater treatment plants), and administrative expenses directly attributable to the construction, expansion, or modernization (e.g., legal, engineering, and permitting fees).
        - Operating Losses and Other Cash Outflows until Cash Flow Breakeven: Estimated operating losses/cash outflow, including upgrade investments, maintenance, interest expenses, and working capital once project is operationalized until cash flow breakeven.
        - Workforce Development Costs**:** Spending by the applicant on workforce development activities to support the proposed project.
    - Project Capital Sources: Total project capital sources should equal the project costs described above, and should include, for example:
        - Sponsor Equity: Expected amount of equity financing from the applicant and/or its corporate parent.
        - Debt Funding: Expected amount of debt financing from the applicant, its corporate parent, or otherwise (including intercompany loans). If debt is raised on the corporate parent's balance sheet, provide details on debt allocated to this project.
        - Third-Party Equity: Amount of expected equity financing from other third parties, including an indication of amount of debt that may be raised outside of the project structure.
        - State and Local Government Incentives**:** Estimated value of benefit that the project is expected to receive from state and local government incentives.

        - Investment Tax Credit: Estimated value of the benefit that the project is expected to be eligible to receive from the Investment Tax Credit (if applicable).
        - CHIPS Incentives: Proposed dollar value of CHIPS Incentives for the project, specifying the values of CHIPS Direct Funding, Loans, and/or Loan Guarantees, as well as the third-party lender for Loan Guarantees.
        - Any Other Sources of Funds**:** Other sources of funds not captured above, such as from customers, suppliers, foreign governments, or other Federal sources (e.g., Export-Import Bank).
- Company Financials: For the applicant and, as applicable, its ultimate corporate parent and any key intermediate entities, provide audited consolidated financial statements at fiscal year-end for each of the last three years, and interim financial statements for the current fiscal year. Also provide any key performance metrics (e.g., margins, return on equity), as well as details on leverage and related debt coverage metrics and ratings, as applicable, for each financial period.
- Summary Financials for Each Project**:** Provide a high-level summary of the expected revenues (broken down by number of units sold and price per unit), costs, and cash flows for each project, including key income statement, cash flow statement, and balance sheet information. Also provide a summary narrative and supporting evidence for key assumptions underlying these projections. The financial information should be in the format of a dynamic, integrated spreadsheet in Microsoft Excel. The program should permit variable inputs to the key assumptions. The income statement, balance sheet, and statement of cash flows should be linked within the model.
- CHIPS Incentives Request
    - Provide a summary of requested dollar amounts for CHIPS Direct Funding, via a web form on the CHIPS Incentives Program application portal.
    - Provide a narrative description for how the financial information submitted for the project supports a conclusion that the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the incentives.
    - Provide a description of how the CHIPS Incentives requested were sized based on cash flow modeling, IRR analysis, sensitivity analysis, and other applicable analyses. Explain why the request is appropriate based on expected risks and returns of the project, historical projects of similar nature, or other relevant market benchmarks. Provide a justification for why the projected IRR in the cash flow model is appropriate for a project of this type, scale, and risk profile.

### 4. Environmental Questionnaire

Each potential applicant must provide the requested information on the Environmental Questionnaire using the template available on the CHIPS Incentives Program application portal. See Section VI.C.2 for more information. If the potential applicant expects to propose more than one project in its application, the potential applicant must address the questions separately for each project in the Environmental Questionnaire.

The purpose of the Environmental Questionnaire is to ensure that the Department is aware, in broad terms, of relevant environmental considerations, and can work with the potential applicant to ensure that the applicant can provide all required environmental information during the full application and due diligence stages. While the potential applicant is not expected to have complete information regarding potential environmental impacts at the pre-application stage, a more complete Environmental Questionnaire will reduce the likelihood of unexpected delays at later phases, which may result if the Department determines that the project poses environmental concerns that have not been adequately disclosed, or that the information submitted is insufficient to assess the potential environmental impacts. The Department will only fund activities for which it is able to complete any necessary environmental review. The Department encourages potential applicants to consult with internal or external subject matter experts while preparing the pre-application Environmental Questionnaire.

### 5. Workforce Development Information

Each potential applicant must discuss its approach to recruit, train, and retain a diverse and skilled set of workers to fill the good jobs that will be created to operate its semiconductor facilities. Potential applicants should provide a description of their:

- Anticipated facility workforce needs
- Proposed strategies to meet facility workforce needs, including proposed equity strategy to promote the hiring and retention of economically disadvantaged individuals[41]
- Approach to meeting the Good Jobs Principles
- Proposed high-quality education and training programs or strategies, such as Registered Apprenticeships, pre-apprenticeship programs, career and college pathways, and wraparound supportive services
- Actions taken to engage with a broad range of potential strategic partners
- Actions taken with respect to creating or participating in a sectoral partnership, such as convening or conducting outreach to potential partner organizations, establishing the constitution and layout of the partnership, defining respective roles and responsibilities, or identifying a backbone organization to facilitate the sectoral partnership

To the extent that the potential applicant is in discussions with workforce, educational, community-based, public-sector, local housing, or other organizations on proposed collaborations that have not yet been finalized, it should describe the state and goals of those discussions.

The potential applicant may also note any planning it has done, in concert with partners, for meeting its construction workforce needs. However, a construction workforce plan is not required at the pre-application stage.

[41] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(II)(bb).

## I. Content and Form of Full Application Submission

This section provides instructions and details for submission of full applications to the CHIPS Incentives Program.

The full application includes a series of sections, each described below. It includes a detailed description of all projects in the application, supplemented by narrative sections that demonstrate how the application addresses each dimension of the merit review framework. Page limits are provided where applicable. Sections should be accompanied by relevant attachments that substantiate information in the narrative section, which do not count toward the page limit. All application materials must be submitted through the CHIPS Incentives Program application portal.

Applicants should make efforts to complete the process of registering for the System for Award Management (SAM.gov), including obtaining a Unique Entity Identifier (UEI), prior to submitting a full application. Applicants are strongly encouraged to begin the process of registering for SAM.gov as early as possible. While this process ordinarily takes between three days and two weeks, in some circumstances it can take six or more months to complete due to information verification requirements. The Department is unable to issue a CHIPS Incentives Award to an entity that lacks an active SAM.gov registration.

A summary table of the application structure is provided below:

1. Cover Page
2. Covered Incentive
3. Description of Project(s)
4. Applicant Profile
5. Alignment with Economic and National Security Objectives
6. Commercial Strategy
7. Financial Information
8. Project Technical Feasibility
9. Organization Information
10. Workforce Development Plan
11. Broader Impacts
12. Standard Forms

### 1. Cover Page

Follow the directions in the CHIPS Incentives Program application portal to complete the cover page.

### 2. Covered Incentive

Each applicant must provide a letter from a state or local government entity to demonstrate that they have been offered a qualifying covered incentive, indicating the estimated size and nature of the incentive. The offer of a covered incentive may be contingent; if so, any contingencies need to clearly be specified in the letter. Further, prior to receiving a CHIPS Incentives Award, the

applicant may be required to provide additional information demonstrating to the Department's satisfaction that the covered incentive has been or will be received.

### 3. Description of Project(s)

The applicant must submit a detailed description of proposed project(s) in the application, which is responsive to the program description (see Section I) and the evaluation criteria (see Section V.A). There should be an overarching description of the vision for all projects (no more than 15 pages), as well as a description (no more than 15 pages long) of each project. The description should contain the following information:

- <u>Description of Projects</u>: A description of the construction, expansion, or modernization activities proposed for each facility included in the application, including a description of the facility location and existing or required infrastructure. This description should include the products that each facility produces or will produce and the end market application and top 10 customers for those products, along with information on the scale, size, and capacity of production. If the application includes multiple projects (for work proposed at multiple facilities), the description should explain both the ways in which the individual projects are interrelated and the value provided by each project on its own, independent of the other projects. For example, if the application includes two fabs located at a single site, the description might explain that the two projects share common workforce development strategies and will jointly improve an applicant's market share and cost efficiency, but that the proposed construction, expansion, or modernization of each fab can take place independently from the work proposed at the other fab. Similarly, if the application includes individual activities that may be independently useful and eligible for the CHIPS Incentives Program, separate from other activities at the same facility, the project description should explain both the ways in which the individual activities are interrelated and the value provided by each activity on its own. Applicants relocating a material amount of existing facility infrastructure must provide a plan detailing those efforts and rationale for doing so, including a description of the specific infrastructure being relocated, the value of that infrastructure, any changes to US capacity due to relocation, and the reason for that relocation.
- <u>Consortium Description (if applicable)</u>: Consortium applicants should also identify the individual entities that are members of the consortium, the roles of each entity, the governance, management, and oversight structures for the consortium, and the method of distributing CHIPS Incentives to individual entities.
- <u>Cluster Profile</u>: For commercial fabrication and wafer manufacturing facilities, a description of how the project(s) will attract associated supplier, workforce, and other related investments, thus creating a more productive, efficient, and self-sustaining ecosystem and catalyzing future upgrades and expansions. Where relevant, applicants should elaborate on the benefits of the cluster in other components of the application and describe the existence and nature of any agreements with co-locating suppliers.
- <u>Project Timeline</u>: A detailed description of the overall timeline and key milestones inclusive for each project, for both the capital expenditure components of the project and the workforce development and/or operational cost components of the project. A timeline, preferably in the form of a Gantt chart, should be used to logically illustrate

timing and interrelationships of major milestones. In addition, as relevant, provide a master project timeline that illustrates how all projects will be sequenced over time.

- Summary Narrative Addressing Evaluation Criteria: A summary of how each project—as well as the application as a whole—meets each of the evaluation criteria (see Section V.A). The summary should include information indicating how each of the six evaluation criteria are addressed. An explanation of how each project—and the application as a whole—will further the economic and national security objectives of the United States should be included, as described in Section I.C.1.
- CHIPS Incentives Justification: A brief narrative explaining how the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the incentives. More detailed analysis is required in the Financial Information section of the application.

### 4. Applicant Profile

Provide the following information for the applicant. If the applicant is a subsidiary, this information should be provided for the applicant, its ultimate corporate parent, and any key intermediate entities:

- Descriptive Information About the Applicant: Information related to the applicant's businesses, including but not limited to company name, corporate form, jurisdiction of formation, description of key business activities, year established, headquarters country/state/city, countries/U.S. states of operation, and number of employees. In addition, the application should include a brief description of the company's business profile, key products manufactured, end markets, and competitors, as well as any existing or planned business operations in foreign countries of concern.
- Company Financials: If available, audited consolidated financial statements at fiscal year-end for each of the last five years, and interim financial statements for the current fiscal year. If available, this should include key financial metrics including margin, free cash flow and return information, leverage, debt service coverage, and related ratios, such as interest coverage ratios; fixed-charge coverage ratios; debt-to-capital ratios; debt/earnings before interest, taxes, depreciation, and amortization (EBITDA) ratios; asset coverage ratios; and working capital ratios. If available, applicants should also include nationally recognized statistical ratings organization (NRSRO) ratings, as well as their latest rating reports.
- Equity Capital Structure: Information on major shareholders, number of shares outstanding, share price history, and market valuation (or estimated private valuation) at year-end for the last five years, if available. In addition, provide a description of any planned equity issuances, including as related to the application, for the applicant, its ultimate corporate parent, and any key intermediate entities (as applicable).
- Outstanding Debt: Schedule listing outstanding debt, lines of credit, other material indebtedness, guarantees, or (material) off-balance sheet liabilities, along with the expected cost for those liabilities. In addition, provide a description of any planned debt issuances, including as related to the application, for the applicant, its ultimate corporate parent, and any key intermediate entities (as applicable). Also provide any cash information and net debt calculations.

### 5. Alignment with Economic and National Security Objectives

Describe how the project(s) meets economic and national security objectives in no more than 30 pages. The description should address the program priorities set forth in Section I.C.1, as applicable, and the merit review criteria in Section V.A.1. These include how the project(s) will, both individually and collectively:

- Enhance U.S. economic competitiveness through credible commitments to ongoing private investments in the U.S. and the creation of a long-term, sustainable ecosystem.
- Increase global supply chain resilience by mitigating the risk of potential shocks, reducing the impact of potential disruptions, serving a variety of customers, and moving production outside of countries of concern.
- Address the U.S. government's need for access to safe, secure, and domestically produced chips.

For applications for semiconductor material and equipment facilities, in particular, applicants should address how their proposed project(s) will reduce vulnerabilities associated with geographic concentration and bottlenecks; help build productive and self-sustaining semiconductor ecosystems; and/or strengthen economic security by locating critical manufacturing know-how in the United States.

In addition, all applicants should specifically discuss the following aspects of their project:

- **Cybersecurity.** Applicants should review the NIST Framework for Improving Critical Infrastructure Cybersecurity[42] and provide an initial evaluation of their current organizational and project cybersecurity practices. In this evaluation, applicants should also describe what additional resources, such as applicable laws, regulations, standards, NIST guidance or Cybersecurity & Infrastructure Security Agency (CISA) recommendations (e.g., the CISA Cross-Sector Cyber Performance Goals and CISA Cross-Sector Checklist[43]) they use as reference materials. The evaluation should assess risks, including those associated with access, availability, confidentiality, integrity, and a lack of geographic diversification. For major risks identified, the applicant should provide a brief assessment of the risk, as well as describe what risk mitigation strategies it currently implements or plans to implement (e.g., access control, network segmentation, contingency planning, disaster recovery plans, redundant capacity, cyber insurance, employee training, and continuous monitoring).

  Applicants should also detail operational security measures, and efforts to continuously assess and protect data (including, but not limited to, guarding against insider threats, supply chain threats, and threats to physical security).

[42] NIST, U.S. Dep't of Commerce, Version 1.1, Framework for Improving Critical Infrastructure Cybersecurity (2018).
[43] Cybersecurity & Infrastructure Security Agency, Cross-Sector Cybersecurity Performance Goals.

- **Supply Chain Resilience and Risk Management.** The applicant should demonstrate a feasible plan to support the supply chain security and resilience of the proposed project(s). In particular, the applicant should demonstrate its ability to continue operating when faced with supply/materials shocks, as well as the following aspects of resilience and supply chain risk management:
    - Physical Infrastructure: Access to power, water, air strips, and material transportation channels
    - Supplier Ecosystem: Raw material, equipment, and component supply chain acquisition strategies
    - Continuity of Operations: Ability to operate in the United States but without access to non-U.S. facilities and personnel
    - Risk Management: Strategy to minimize and mitigate any adversarial attempts to degrade, exploit, or otherwise compromise the end-to-end supply chain, to include the introduction of counterfeit and/or malicious items into the supply chain or the loss of intellectual property

As part of this section, the applicant should supply a mapping and analysis of its supply chain and associated risk mitigations, including a list and mapping of all key suppliers. In addition, applicants should address other techniques used to manage supply chain risk, such as supply chain stress test analyses, regular supply chain mapping into second-tier and further suppliers, third-party continuous monitoring, and supplier redundancy and agility policies.[44]

The supply chain resilience plan should include, but not be limited to, information about the following topics:

- Senior executive leadership accountability for managing supply chain risk and the associated reporting structure, including frequency of reporting to the board of directors
- Corporate approach to managing supply chain risk, resilience, and security
- Metrics, data, and methodology (e.g., stress tests) used to assess supply chain risk both upstream and downstream; for example, metrics might include the number of single points of failure, lead time for key items, and time to recover and time to survive in different scenarios
- Traceability and audit capabilities employed for managing the supply chain
- Nature of relationships with suppliers to prevent and promote agile response to unexpected situations (such as long-term contracts, mechanisms for information-sharing, and joint problem-solving exercises).

**Foreign Control.** Each applicant should identify any foreign entity[45] that exercises control over the applicant or a proposed project or has access to confidential information about the proposed project. The applicant should also identify any potential transactions occurring during the

[44] For information on agility, *See* Council of Economic Advisors, The White House, *2022 Economic Report of the President* (2022), 210-4.
[45] *See* 15 U.S.C. § 4651(6).

application process that could result in such control by a foreign entity or sharing of confidential information with a foreign entity.

### 6. Commercial Strategy

Describe the commercial strategy, including information on customer and end-market demand, volume growth, pricing dynamics, competitive positioning, and supply dynamics, for each proposed project. In no more than 15 pages, this section should discuss the following topics:

- End-Market Demand: Information on end market industries and projected growth, level of obsolescence risk, evidence of any pre-purchase commitments to demonstrate customer demand or other evidence of specific customer demand. Include explicit reference to the top 10 customers for each major product and associated volumes (to the extent known).
- Market Position and Competitor Landscape: Include an assessment of key competitors, market dynamics, supply and demand dynamics over time, pricing trends and exposure to pricing pressure during downturns and periods when there is an oversupply of semiconductors.
- Stability of Supplies and Materials: For projects for commercial fabrication and wafer manufacturing facilities, include strategies to ensure stable and predictable sources of supplies and materials required as feedstock over the long run, including potential long-term contracts with suppliers and stress testing of the supplier network.
- Improvement Plans: Describe existing plans as well as resourcing for continued investment in facility upgrades and improvements.

### 7. Financial Information

For each project in the application, provide a detailed description of the financial plan in no more than 20 pages overall (excluding attachments and appendices). The plan should include sources and uses of funds, cash flow projections, key equity return and debt service metrics, CHIPS Incentives request, and sensitivity analyses. The applicant should also provide supporting evidence for any key assumptions.

- Applicants should provide Microsoft Excel and PDF attachments to the greatest extent feasible to support the information below. In particular, the financial statements, project cash flows, and sensitivity analyses should be in the format of a dynamic, integrated spreadsheet in Microsoft Excel. The program should permit variable inputs to the key assumptions. Applicant and project-level financials should be prepared in accordance with Generally Accepted Accounting Principles or comparable standards (e.g., International Financial Reporting Standards). The income statement, balance sheet, and statement of cash flows should be linked, and the sensitivity analyses should be included as scenarios within the model.
- Project Sources and Uses of Funds: Provide the information listed below about project costs and capital sources via a descriptive narrative and via the Project Sources and Uses of Funds spreadsheet template available on the CHIPS Incentives Program application portal. If the application proposes multiple projects, project costs and capital sources

should be provided cumulatively for the entire set of proposed projects and for each project individually.

- Project Costs: Project costs should include, but are not limited to, those noted below:
  - Capital Investment: Costs required to complete construction of the project and initiate operation, broken down by category such as land, construction (e.g., labor and material), equipment, infrastructure improvements (e.g. utility plants, access to infrastructure, and wastewater treatment plants), and administrative expenses directly attributable to the project construction (e.g., legal, engineering, and permitting fees).
  - Operating Losses and Other Cash Outflows until Cash Flow Breakeven: Estimated operating losses/cash outflows, including upgrade investments, maintenance, interest expenses, and working capital once the project is operationalized until cash flow breakeven.
  - Workforce Development Costs: Spending by the applicant on workforce development activities to support the proposed project.
- Project Capital Sources: Total project capital sources should equal the project costs described above, and should include, for example:
  - Sponsor Equity: Amount of equity financing from the applicant or its corporate parent.
  - Debt Funding: Amount of debt financing from or raised by the applicant, its corporate parent, or otherwise (including intercompany loans) at either the project or corporate level. In case debt is raised or expected to be raised on the applicant or corporate parent's balance sheet, provide details on allocated debt to the project(s) in the application. In the descriptive narrative, provide information on the key features and terms and conditions related to these debt instruments.
  - Third-Party Equity: Amount of equity financing from third parties, including an indication of the amount of debt that may be raised outside of the project structure.
  - State and Local Government Incentives: Include the estimated value of benefits that the project is expected to receive from state and local government incentives, as well as an explanation of the potential for spillover benefits.
  - Investment Tax Credit: Include the estimated value of benefit that the project is expected to be eligible to receive from the Investment Tax Credit (if applicable).
  - CHIPS Incentives: Include the proposed dollar value of CHIPS Incentives for the project, specifying the values of direct funding, loans, and/or loan guarantees, as well as the identified third-party lender for loan guarantees.
  - Any Other Sources of Funds: Other sources of funds not captured under the above, such as from customers or suppliers.

- Project Cash Flow, Income Statement, and Balance Sheet Projections and Relevant Metrics for Each Project (to be provided in a Microsoft Excel model with formulas):

- Detailed Cash Flow Projections for the Project: Provide the cash flow projections on a levered and unlevered basis (as applicable). Provide quarterly cash flows through the first year of cash flow breakeven and then annually thereafter through the end of the facility's useful life, including:
  - Initial Project CapEx (see Capital Investment category above)
  - Additional Project CapEx (e.g., for upgrades and refurbishments and other investments to sustain operations for the useful life of the facility)
  - Working Capital
  - Project Revenue: Detailed revenue projections including breakdown by project capacity, utilization rates, assumed yield, and price. Include a justification of underlying assumptions.
  - Operating Costs: Detailed breakdown of operating expenses, including, for example, the cost of materials, labor, maintenance, administration, R&D, marketing, corporate overhead, and other expenses. Any allocated corporate overhead or any intercompany expenses to the project should also be detailed and explained.
  - Debt and Interest: Cash flows related to debt or debt-like instruments including disbursements, interest payments, and principal repayments.
  - Cash Flows To and From Third-Party Partners (if applicable)
  - Other Financial Assistance: Cash inflows from grants (e.g., state and local incentives).
  - Taxes: Breakdown of corporate taxes for income generated by the project, including the tax benefit the project is expected to be eligible to receive from the Investment Tax Credit.
  - Terminal Value: Estimated terminal value of any assets at the end of the facility's useful life.
- Project Income Statement Projections: Quarterly income statement projections through the first year of cash flow breakeven and then annually thereafter through the lifetime of the project, including relevant cash flow items noted above as well as other items such as depreciation and amortization.
- Project Balance Sheet Projections: Quarterly balance sheet projections through the first year of cash flow breakeven and then annually thereafter through the lifetime of the project.
- IRR: Project IRR on a levered and unlevered basis.
- Key Project Financial Performance Metrics: Include summary metrics such as gross margin, EBITDA margin, earnings before interest and taxes margin, return on equity, and return on assets, among other relevant metrics over time.
- Key Project Risk and Debt Service Metrics: Include summary debt servicing related metrics such as debt/equity, debt-service coverage ratio, debt/EBITDA, interest coverage, and asset coverage ratios over time.

- Scenario Analysis: Evaluate the financial resilience of each project by illustrating project cash flows, income statements and balance sheets, key profitability metrics, IRR, and risk and debt service metrics under a plausible range of scenarios over the estimated useful life of the facility. Sensitivities should be shown in both the upside and downside cases.

Sensitivity analyses should be included as scenarios within the model(s). Examples of sensitivities include:

- Revenue Dynamics: Throughput/utilization, output prices, and loss of major customers.
- Cost: Cost overruns during project construction and equipment installation, higher costs of materials due to supply chain disruptions, and higher or lower operating expenses.
- Timing: Impact of construction delays, equipment delays, and timing differences on yield generation.
- Technology Vulnerability: Impacts of future competing technologies.

- CHIPS Incentives Request:
  - Provide a summary of requested dollar amounts for CHIPS Direct Funding, by following the instructions in the CHIPS Incentives Program application portal.
    - Dollar amount of CHIPS Direct Funding requested.
    - Dollar amount of CHIPS Loan and/or Loan Guarantees requested, including proposed terms.
  - In a narrative description:
    - Provide a rationale for the CHIPS Incentives request.
    - Provide a narrative description for how the financial information submitted for the project supports a conclusion that the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the incentives.
    - Provide a description of how the CHIPS Incentives requested were sized based on cash flow modeling, IRR analysis, sensitivity analysis, and other applicable analyses. Explain why the request is appropriate based on expected risks and returns of the project, historical projects of similar nature, or other relevant market benchmarks. Provide a justification for why the projected IRR in the cash flow model is appropriate for a project of this type, scale, and risk profile.
    - Provide a description of specific efforts to date to bring other capital (debt, state and local incentives, other private capital) into the project and how the CHIPS Incentives request would enable and not displace those other funding sources.
- CHIPS Loan or Loan Guarantee Request: Applicants seeking CHIPS Loans or Loan Guarantees should provide the following information:
  - A full description of the proposed terms for any CHIPS Loans requested, including amount, interest rate, tenor, amortization schedule, structure (corporate finance vs. project finance), corporate support or third-party guarantees, prepayment option, or other loan features. To the extent that requested terms differ from the baseline terms in Section I.B.8, the summary should include a justification.
  - A full description of the proposed terms for any CHIPS Loan Guarantees requested, including underlying loan terms (see above), identity of third-party lenders, and amount and extent of guarantee. To the extent requested terms differ

from the baseline terms in Section I.B.8, the summary should include a justification.

- For both CHIPS Loans and Loan Guarantees, an explanation of efforts the applicant has made to attract debt financing from other sources and the rationale for seeking CHIPS Loans or Loan Guarantees beyond financing available from external providers.
- To the extent not provided in the project cash flow section above (e.g., for loans at the corporate level), cash flow analysis of the ability of the borrower to service and repay CHIPS Loans or loans subject to CHIPS Loan Guarantees, including debt service metrics (e.g., debt service coverage ratio, debt/equity, debt/EBITDA, etc.) under baseline and stress conditions. If the loan/loan guarantee is at the corporate level or any level above the project, provide cash flow, income statement, and balance sheet projections and related metrics for the borrower through the term of the loan/loan guarantee
- Financial and related credit information for any third-party lenders or entities providing credit support.

### 8. Project Technical Feasibility

The applicant must demonstrate the technical feasibility of each proposed project, which includes the viability and security of the underlying technology and manufacturing processes; the ability to execute required construction; and effective management of the environmental review process. The applicant should provide a detailed description of these topics in no more than 20 pages for each proposed project and include attachments to support details where relevant (which will be excluded from the page limit). At a minimum, the document should discuss the following topics:

#### a. Technology and Manufacturing Processes

This section must include a detailed description of the core underlying technology and manufacturing processes to be utilized in the facility or facilities for which CHIPS Incentives are sought. The applicant should include detailed information on the respective level of maturity of the technology and manufacturing processes, as well as the applicant's relevant experience and expertise to support successful execution at the scale envisioned in the application, the risks that they have identified with delivering against the goals of their projects, and the mitigating actions they are taking.

#### b. Construction Plan

The applicant must include a detailed construction plan that demonstrates appropriate mechanisms and contingencies to reduce construction risks. The overview should contain, but not be limited to, the following information:

- <u>Location</u>: Description of project facilities, site, and surrounding location (as applicable), including infrastructure (e.g., roads, utilities, and water) and any planned improvements.
- <u>Construction Project Work Plan</u>: Detailed description of the major engineering, construction, and site preparation activities linked to specified cost and other milestones

and performance guarantees, including a detailed accompanying budget (if not provided with financial information described in Section IV.I.7).

- Schedule**:** Integrated detailed schedule that encompasses time periods for design, procurement, construction, commissioning, and production ramp up.
- Key Partners, Contractors, and Suppliers: Profile of key partners, contractors, and suppliers.
- Construction Rights and Permits: Inventory of all Federal, state, and local permits, licenses, and approvals required to site, construct, implement, and operate the facility, including environmental authorizations or reviews necessary to commence construction. Include filing and approval dates, as available or as anticipated.

#### c. Environmental Questionnaire and Information

To allow the Department to determine the appropriate level of environmental review and ensure that an applicant is ready to begin the environmental review process, applicants that have not previously submitted a completed Environmental Questionnaire as part of a pre-application must submit one as part of their full application. The Environmental Questionnaire can be found on the CHIPS Incentives Program application portal. Applicants that previously completed a pre-application Environmental Questionnaire should update the document and submit the updated version as part of their full application.

### 9. Organization Information

#### a. Ownership, Legal Entity, and Organizational Structure

The applicant should provide a formal legal entity and organizational structure detailing all parent companies, subsidiaries, and affiliates and other relevant entities, including associated ownership of those entities, up to the top shareholder(s) and the ultimate corporate parent (if applicable). In addition, the applicant should outline recent and upcoming organizational changes, including mergers and acquisitions and any recent or proposed changes to corporate structure. Applicants should provide this information in the form of detailed charts and accompanying narrative explaining the legal entity and organizational structure.

#### b. Managerial Capability

The applicant should describe the approach to managerial oversight and governance of the project(s) from construction through the life of the facility. Include an organizational chart of management and other key personnel, including contractors and any other entities that will play substantial roles. List the experience and qualifications of key management personnel, including experience with projects of similar size and scope. The applicant should include one-page resumes for (a) all key management personnel and (b) all key personnel of contractors and any other entities that will play substantial roles in the project.

#### c. Consortium Applications

An applicant applying on behalf of a consortium should detail the key participants, including a description of the role each participant will play, a description of the structure of the consortium, and the benefits of applying as a consortium. The applicant should also provide documentation and evidence of the planned operating model, such as the working model, governance structure,

decision-making authority/rights, contractual obligations, financial obligations, roles and responsibilities, and any memoranda of understanding.

d. **Past Project History**

The applicant should provide summary for each of any comparable facilities commissioned by the applicant or its parent companies in the last ten years, including details on type of production and output, years in operation, location, project cost, and summary financials. Summary financials should include project IRR and other relevant risk and return metrics.

e. **Intellectual Property Security**

The applicant must identify policies and procedures to combat cloning, counterfeiting, and relabeling of semiconductors, as applicable, as well as protecting semiconductor designs and other intellectual property associated with the manufacture of semiconductors.

f. **Litigation and/or Conflicts**

The applicant should disclose any current, threatened (in writing), or pending litigation, or criminal or civil government investigations involving the applicant, its corporate parents, or, to the applicant's knowledge, any other relevant party, related to permitting, public involvement, environmental issues, construction defects, fraud, securities fraud, conflict of interest, failure to perform under a local, state, or Federal contract, or other charges which may reflect on the applicant's trustworthiness, financial position, or ability to complete the project(s).

g. **Advisors and Key Partners**

For the purpose of assisting the Department in complying with government ethics rules, the applicant should provide a list of the following:

1) advisors who will represent the applicant before the Department in connection with its application, identifying the advisory services provided.
2) any partner named elsewhere in the application (e.g. contractor, investor in the project, workforce training partner, etc.), and identify the section(s) of the application in which the entity is named.

### 10. Workforce Development Plan

Each applicant must document the expected workforce needs for each facility and provide a strategy to meet such needs[46] in a single workforce development plan. Applicants must also produce a workforce plan for their construction workforce. Applicants are required to identify the overall financial resources that will be committed to these efforts by the applicant and other parties across the workforce system. Applicants should also explain what those resources will be used for, although the Department understands that the level of detail may vary depending on the stage of the development of a sector partnership or other workforce development planning. The plans for construction workers and facility workers should not exceed 30 pages in total, excluding any attachments.

[46] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(VI).

### a. Facility Workforce Plan

The facility workforce development plan should demonstrate appropriate investments and commitments to create good jobs and recruit, train, screen, hire, retain, and upskill a diverse workforce sufficient to meet the operating needs of the entire facility. Applicants are also required to consult, engage, and coordinate with workforce partners—including educational institutions, training providers, community-based organizations, labor unions, career and technical education organizations, and public-sector organizations—in formulating their workforce plan. The Department expects that applicants will engage with each of these groups, at a minimum, in formulating their plan, as projects are most likely to succeed in creating a high-skilled and inclusive workforce by committing to close and ongoing coordination with on-the-ground stakeholders. Applicants should also demonstrate a vision for long-term sustainability by engaging with educational institutions that will be key to training the next generation of workers, including working with K-12 institutions to develop and strengthen career and technical education programs.

The Department considers essential and strongly encourages the development of sectoral partnerships to ensure that immediate and long-term pathways are created for local workforces to operate facilities. These partnerships may include other employers with shared skills needs, education and training providers, the public workforce system, higher education institutions, labor unions, and community-based and other worker-serving organizations. A best practice for a sectoral partnership is to identify a trusted partner to serve as a backbone entity to coordinate these entities and manage the partnership. In strong applications, a sectoral partnership will drive the workforce development plan. An applicant that has not organized or participated in a sectoral partnership should explain, in its plan, why doing so was infeasible and how its workforce efforts will ensure that it has engaged partners to serve worker needs.

Workforce development plans should have five components:

#### (1) Workforce Needs Assessment

Assessment of the workforce needs of the project (job types, skills, and workers required over time in each job type), including the necessary workforce for facility operations, on-site supplier operations, engineering, administration, and others. The applicant and their partners should map identified workforce needs to existing resources and the existing labor market to determine gaps. The analysis should also identify other workforce risks that could adversely impact the project.

#### (2) Worker Recruitment and Retention

Describe the overall workforce development system approach and key stakeholders, as well as the applicant's commitments to worker and community investments through training and education benefits and identifying programs to expand employment opportunities for economically disadvantaged individuals.[47] This should include commitments of the applicant's financial resources as well as other non-CHIPS Incentives resources to fund this effort in a manner that is sustainable over the long-term. Applicants should identify spending by priority (outreach, training, wraparound services, etc.).

---

[47] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(II).

The Department encourages the applicant to address several well-known workplace barriers. The workforce plan should reflect commitments to ensuring that all workers have access to a safe environment that is free of harassment, discrimination, and retaliation; setting clear expectations about workplace conduct and anti-harassment policies, including consequences for violating policies; and setting clear procedures for reporting misconduct in the workplace. The Department also strongly encourages applicants to identify creative recruitment and retention strategies to increase the participation of economically disadvantaged individuals. Such strategies could include skills-based hiring and removing degree requirements, setting diverse hiring slate policies, eliminating personal and demographic information from the hiring process, and conducting structured and skills-based interviews.

(3) **Good Jobs Principles Approach**

The Departments of Labor and Commerce's Good Jobs Principles[48] provide a framework to ensure semiconductor facility jobs are high quality. The workforce development plan should describe the applicant's approach to meeting these principles for newly created jobs and to increase job quality for existing jobs at expanded facilities. Additional details on the dimensions of job-quality are available on Department of Commerce's website.[49]

**(4) Workforce Training and Wraparound Services**

The workforce development plan should include commitments to provide workforce training to address the applicant's needs. These commitments should include programming for training and job placement, including for economically disadvantaged individuals and underrepresented groups in the semiconductor industry. The Department expects applicants to develop such strategies in concert with their partners. The Department also expects that applicants may need to make additional training commitments as their efforts progress based on changing workforce needs.

Where possible, the applicant should identify existing, successful training programs that can be scaled and adapted to meet the applicant's needs, as well as their use of work-and-learn training models. To demonstrate satisfaction of the statutory requirement that the applicant secure "commitments from regional educational and training entities and institutions of higher education to provide workforce training, including programming for training and job placement of economically disadvantaged individuals," [50] the applicant must also attach letters of commitment from education and training entities and institutions that detail the specific tasks they will perform in support of the workforce plan and the resources that will be provided, including, but not limited to, programming for training and job placement of economically disadvantaged individuals.

Applicants should make commitments to hiring individuals who complete training programs, and should also strongly consider partnering with programs that train workers with the needed skills, then provide career pathways that lead to good jobs (such as Registered Apprenticeships, pre-

---

[48] U.S. Department of Labor, *Good Jobs Principles*, https://www.dol.gov/general/good-jobs/principles (2022).
[49] U.S. Department of Commerce, *Job Quality Toolkit*, https://www.commerce.gov/work-us/job-quality-toolkit (2022).
[50] 15 U.S.C. § 4652(a)(2)(B)(ii)(III).

apprenticeships with a strong relationship with one or more Registered Apprenticeship programs, other programs at community and technical colleges with successful track records of putting students on the path to good jobs, career pathways programs in high schools, and other paid work-based learning). Applicants may also consider how they can partner with such programs and provide real-world, hands-on work-based learning opportunities to secondary and postsecondary students interested in the semiconductor industry and to workers interested in career advancement.

Finally, as part of their description of training commitments, applicants must describe any wraparound services and other barrier reductions they or their partners will provide to support facility workers' access to and completion of training, as well as transition into and progression in a job (such as adult care, child care, transportation assistance, housing assistance, emergency cash assistance, language support, tools, uniforms, equipment, application fees, and services like mentorships that aim to help retain workers, etc.).

#### (5) **Metrics and Milestones**

In addition, the workforce development plan must include the core milestones the program aspires to achieve (with timing), as well as metrics and processes to measure, track, and report publicly on the goals and commitments. CHIPS Incentives awardees will be expected to collect real-time, granular data that will inform the evaluation of their workforce efforts and help track the success of their workforce commitments. Applicants will also be expected to make data publicly available in a form that protects individual worker information, including personally identifiable information. The Department will provide additional guidance on metrics at the time of award. At a minimum, applicants should be prepared to describe and subsequently report:

- Metrics and a plan to collect demographically disaggregated data on outreach, recruitment, hiring, education, and outcomes (including job placement and wages) of skills training programs and upskilling efforts
- Disaggregated data on the demographics of the workforce, including breakdowns of work hours, wages, benefits, and other measures of job quality
- How data will be collected so that it can be evaluated in real time and the means of accountability, such as any reporting to key stakeholders

### b. **Construction Workforce Plan**

Applicants must also provide a detailed description of the steps that will be taken by the applicant and their construction partners to recruit, hire, train, and retain a diverse and skilled construction workforce, including any steps to expand employment opportunity for economically disadvantaged individuals. The plan should include the elements of a workforce plan discussed above: 1) Workforce needs assessment; 2) Worker recruitment and retention; 3) Good Jobs Principles approach; 4) Workforce training and wraparound services; and 5) Metrics.

Accordingly, the plan should include the identification of the number of jobs needed by craft/position type and where expected gaps may exist. The plan should also include identification of existing programs that successfully train diverse populations and that can be scaled appropriately before construction begins and as construction is ongoing, including high-quality apprenticeship readiness programs and Registered Apprenticeships. Applicants are

strongly encouraged to provide wraparound services for construction workers to complete training and be retained on the construction site (such as adult care, transportation assistance, language support, tools, uniforms, appropriately sized safety gear and equipment, and services like mentorships that aim to help retain workers, etc.). The plan should also include specific details about the percentage of labor hours expected to be performed by registered apprentices.

As part of their construction workforce plan, applicants must also provide a description of the steps that will be taken to ensure that all contractors and subcontractors on the construction project have and will continue to have a strong track record of compliance with all Federal labor laws, including but not limited to all relevant provisions, rules, and regulations of the Davis-Bacon Act, Executive Order 11246, and the Occupational Safety and Health Act, and the steps that will be taken to prevent the misclassification of workers. This description should also include the steps that will be taken to ensure that all workers have access to a safe working environment that is free of harassment, discrimination, and retaliation.

The construction workforce plan should address whether the applicant commits to having a PLA. An applicant that chooses not to use a PLA must take additional steps to ensure that a project will have the necessary construction workforce to timely deliver on its goals.

If an applicant proceeds without a PLA, the applicant must instead provide a project workforce continuity plan, detailing:

- Steps taken and to be taken to ensure the project has ready access to a sufficient supply of appropriately skilled and unskilled labor to ensure construction is completed in a competent manner throughout the life of the project, including a description of any required professional certifications and/or in-house training, Registered Apprenticeships or labor-management partnership training programs, and partnerships with entities like unions, community colleges, or community-based groups
- Steps taken and to be taken to minimize risks of labor disputes and disruptions that would jeopardize timeliness and cost-effectiveness of the project
- Steps taken and to be taken to avoid workplace illnesses, injuries, and fatalities, including descriptions of safety training, certification, and/or licensure requirements for all relevant workers (e.g., OSHA 10, OSHA 30, confined space, traffic control, or other training required of workers employed by contractors), the use of workplace safety committees, and whether the applicant commits to allowing employees to specify a worker or union representative to accompany any OSHA inspectors during inspections of the construction project
- Steps taken and to be taken to ensure that workers on the project receive wages and benefits sufficient to secure an appropriately skilled workforce in the context of the local or regional labor market.

After the project begins construction, the applicant must also report the name of any subcontracted entity performing work on the project, and disaggregated data on the total number of workers employed by each such entity.

c. **Child Care Requirement**

Applicants requesting CHIPS Direct Funding over $150 million are required to include information on how they will provide access to affordable, accessible, reliable, and high-quality child care for facility and construction workers. While applicants may consider on- or near-site child care, applicants may also secure other arrangements, such as subsidizing the cost of child care (i.e., providing financial assistance) or partnering with off-site providers to ensure availability for workers. Applicants that do not request CHIPS Direct Funding meeting the $150 million threshold are still very strongly encouraged to provide access to child care for facility and construction workers to the greatest extent feasible and will be evaluated on whether they provide for such benefits in their workforce plan.

The Department recognizes that there will not be a one-size-fits-all solution, as child care needs will vary across communities and employers. The Department expects applicants to devise solutions that are responsive to their workers' needs, such as access at extended hours, and regional market dynamics. In addition, the Department encourages applicants to work with community stakeholders, including state and local governments and local groups with expertise administering child care, to create effective solutions.

Applicants may also consider whether there are opportunities to leverage facilities or arrangements that would aid both facility and construction workers. However, applicants may choose to address facility and construction workers separately. Applicants that are subject to this requirement should therefore work with their contractors to determine what strategies they will use to ensure access to child care, including access at extended hours when necessary, and then describe those strategies as a separate element of their facility and construction workforce plans.

**11. Broader Impacts**

Each applicant must provide an overview of the broader impacts of the proposed project(s), covering each of the following topics. This section should be no longer than 30 pages, excluding any attachments. See Section I.C.6. for additional details.

- Commitments to Future Investment in the U.S. Semiconductor Industry (maximum of 15 pages): The applicant should submit a strategy for reinvesting in the domestic semiconductor industry and describe how it addresses the priorities outlined in Section I.C.6 for future capital and R&D investments. In particular, the strategy should address the applicant's commitments to investing in R&D in the United States, including a description of the nature and scale of the research and development activities that will be based in the United States and any capital investments in R&D facilities.
- Buyback Commitment: In light of the Department's commitment to prioritizing applicants that invest in the United States, the applicant should detail their intentions with respect to stock buybacks over five years, including whether they intend to refrain from or limit them, as well as details around the existence of any current or future intentions for share buybacks, dividend payments, dividend payment increases, or special dividends.
- Support for Semiconductor Research and Development: Applicants should note commitments made to support the CHIPS R&D programs including the NSTC, NAPMP, and Manufacturing USA. Efforts can include potential access to research facilities for

CHIPS R&D supported projects, support for multiproject wafer runs, workforce exchange and training, donations of equipment and tools, and other potential support mechanisms.

- Creating Inclusive Opportunities for Businesses through a Supplier Diversity Plan: The applicant should describe its supplier diversity plan, including their goals and components of their strategy to achieve them (such as outreach and data tracking). The applicant should describe how it will coordinate with small, minority-owned, veteran-owned, and women-owned businesses, as well as describe their supplier diversity programs and/or office and any internal staff dedicated to overseeing outreach to such businesses. The applicant should also describe how it will track and disclose data on supplier diversity that is demographically disaggregated (e.g., race, ethnicity, gender, veteran status), including statistics on what share of suppliers are majority-owned by different groups.[51] As part of this component, the applicant should describe other proactive commitments to supplier diversity as described in Section I.C.6 and how it will work with contractors to collect the necessary data. The applicant may also describe broader commitments to diversity and inclusion, including diversity of its existing suppliers, as well as supplier diversity commitments made as part of state and local government incentives.
- Climate and Environmental Responsibility: The applicant should submit a climate and environmental responsibility plan that addresses how the proposed project(s) will meet climate and environmental goals and describe company climate and environmental policies. Among other environmental issues, the plan should include details on the topics below (as described in Section I.C.6):
    - Energy: A description of how the applicant will use renewable energy to the maximum extent possible.. Transitioning to a clean energy supply will bring down the long-term cost of operations as the cost of using renewable energy decreases.
    - Climate Resilience: A description of design features, construction methods, and operation strategies that the applicant will employ to increase resilience from weather- and climate-related risks (e.g., increased flooding, wildfires) that may occur over the lifetime of the facility.
    - Water: For applications for commercial fabrication facilities, a description of the applicant's water conservation efforts, such as plans to fund water restoration projects, increase water reuse and recycle rates year over year, and other progressive strategies to achieve more ambitious water conservation goals over time.
    - Sustainability Transparency: A description of the metrics and processes the applicant will use to measure, track, and report publicly on its climate and environmental responsibility goals and commitments.
    - Community and Environmental Justice Impacts: A description of the applicant's strategies for minimizing the potential for adverse impacts to the local community, including communities with environmental justice concerns.

[51] For an example of disaggregated data reporting, *See* U.S. Small Business Administration, *SBA Releases FY 2020 Disaggregated Contracting Data*, SBA Blog (December 1, 2021), https://www.sba.gov/blog/sba-releases-fy-2020-disaggregated-contracting-data.

- Community Investments: The applicant should identify its set of community investments to drive regional economic resilience and broad-based growth, including a description of how it has worked with local communities and other stakeholders to design such investments and how they will unlock barriers to economic participation and benefit disadvantaged communities. See Section I.C.6.
- Domestic Content: Applicants should include a description of whether and how they intend to utilize domestically produced iron, steel, and construction materials. Applicants should also identify whether they will include domestic content specifications in their contracting terms.

### 12. Standard Forms

All applicants should submit standard forms as follows:

- SF-328, Certificate Pertaining to Foreign Interests
- **CD-511, Certification Regarding Lobbying. Enter "2023-NIST-CHIPS-CFF-01" in the Award** Number field. Enter the title of the application, or an abbreviation of that title, in the Project Name field
- SF-LLL, Disclosure of Lobbying Activities (if applicable)

In addition, applicants may be required to submit the following forms:

- SF-424, Application for Federal Assistance, signed by an authorized representative of the applicant organization
- For the construction component of projects, the SF-424C and SF-424D
- For the workforce development component of projects, as well as any operational activities, the SF-424A

Applicants will be informed during the application review process if these forms are required.

## J. Funding Restrictions

Funds made available under the CHIPS Incentives Program, including the guaranteed portion of a third-party loan, may only be put to eligible uses. See Section I.B.6. In addition, funds made available under the CHIPS Incentives Program may not be used to:

- construct, modify, or improve a facility outside of the United States[52]
- physically relocate existing facility infrastructure to another jurisdiction in the United States, unless the project is in the interest of the United States, as determined by the Department[53]
- purchase an equity security that is listed on a national securities exchange of an award recipient or any parent company of such recipient or to pay dividends or make other capital distributions with respect to the common stock (or equivalent interest) of the recipient or any parent company of such recipient[54]

[52] 15 U.S.C. § 4562(i).
[53] 15 U.S.C. § 4652(a)(2)(C).
[54] *See* CHIPS Act of 2022, Pub. L. No. 117-167, § 102(g)(1), 136 Stat. 1366, 1378-1379 (2022).

- pay off any Federal direct or guaranteed loan or any other form of Federal debt

Project budgets may not include indirect costs. Applicants with a negotiated indirect cost rate agreement must ensure all uses of Federal funds are charged as direct costs in the categories listed in Section I.B.6.

The failure to mention a particular use of funds above does not imply that such use is either allowable or unallowable. Final determinations on the allowability of particular uses of funds is at the sole discretion of the Department.

### K. Prohibition on Profit and Fees.

Recipients and subrecipients of CHIPS Incentives may not charge, as part of the project budget, profits, fees, or other incremental charges above the actual costs incurred in executing the award's approved scope of work.

This restriction does not impact an award recipient's ability to earn profits by selling products fabricated, assembled, or packaged at facilities supported by Federal financial assistance in the ordinary course of business.

## V. Application Review Information

### A. Evaluation Criteria

The merit review process will assess whether projects are eligible for the CHIPS Incentives Program and the strengths and weaknesses of projects against the six criteria listed below. The evaluation will be qualitative, not numerical. The first criterion below—the extent to which the application addresses the program's economic and national security objectives—is of primary importance and receives the greatest weight.[55] The remaining five criteria will receive approximately equal weight. Applications will only be recommended for award if each criterion is adequately addressed in the application materials. If an application is deficient in one or more areas, the applicant may be requested to make certain revisions in order to continue in the review and selection process.

#### 1. Economic and National Security Objectives

This criterion addresses an application's potential impact on economic and national security objectives.

##### a. Economic Security Objectives

This component of the criterion assesses how an application advances economic security by building sustainable domestic capacity that reduces U.S. reliance on vulnerable or overly concentrated production. The assessment of this component of the criterion will consider:

[55] Before approving an award, the Secretary, or the Secretary's designee, must determine that a "project to which the application relates is in the economic and national security interests of the United States." 15 U.S.C. § 4652(a)(2)(C)(i)(II). This economic and national security determination is distinct from the merit review.

- The type of facility proposed to be constructed, expanded, or modernized, relative to U.S. strategic needs
- The extent to which a project increases or supports an increase to U.S. semiconductor production and the amount of current and projected domestic demand for the product or service produced at the proposed facility
- The extent to which a project creates a more resilient semiconductor supply chain, such as by addressing the risks associated with geographic concentration of current semiconductor production
- Whether the applicant plans to build foundry or other capacity that can serve many different customers
- The extent to which the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the incentives
- The extent to which the applicant has taken steps to attract associated supplier, workforce, and other related investments, thus creating a more productive, efficient, and self-sustaining ecosystem and catalyzing future upgrades and expansions

In addition, the assessment will consider the following factors depending on facility type:

- **Leading-Edge Facilities**
    - The extent to which the proposed project will utilize the most-advanced technology and produce those products most critical to future U.S. economic security
    - The extent to which the applicant makes credible commitments of ongoing investment in the United States, supporting a virtuous cycle of private investment and innovation that reestablishes U.S. leadership
    - For memory facilities, the extent to which the application includes plans for regular upgrades in the United States
- **Current-Generation Facilities**
    - The extent to which a project supports production of semiconductors critical to U.S. economic security
    - The extent to which the proposed manufacturing processes can easily be converted to produce different types of semiconductors in times of disruption
- **Mature-Node Facilities**
    - The extent to which the project increases the number of semiconductors produced in the United States at mature nodes necessary to support economic security, including, for example, semiconductors used in automobiles, aerospace and defense, medical devices, or other U.S critical infrastructure sectors
    - The extent to which the proposed manufacturing processes can easily be converted to produce different types of semiconductors in times of disruption
- **Back-End Production Facilities**
    - The extent to which the proposed project would support U.S. leadership in advanced technologies, such as advanced packaging
    - The extent to which the proposed project would promote U.S. competitiveness by lowering the cost of conventional packaging in the United States

- **Wafer Manufacturing Facilities**
  - The extent to which the proposed project mitigates vulnerabilities associated with geographic concentration
  - The extent to which the proposed project contributes to the competitiveness and innovativeness of the U.S. semiconductor ecosystem
- **Semiconductor Materials and Manufacturing Equipment Facilities**
  - The extent to which the proposed project strengthens supply chain resilience by reducing vulnerabilities associated with geographic concentration, supply-chain bottlenecks, and/or production in foreign countries of concern
  - The extent to which the proposed project helps build productive and self-sustaining semiconductor ecosystems, including by clustering with semiconductor fabrication facilities or otherwise improving the competitiveness and innovativeness of the U.S. semiconductor ecosystem
  - The extent to which a proposed project advances economic security by locating critical manufacturing in the United States and contributing to the U.S. innovation ecosystem

b. **National Security Objectives**

This component of the criterion will assess whether applicants address national security considerations, including by securing supply chains for technologies used by government organizations and their contractors. In addition, it will assess a project's operational vulnerabilities and resilience to threats from foreign entities of concern. The assessment of this component of the criterion will consider:

- The extent to which the proposed project will produce semiconductors that are relied on or will be relied on by the U.S. Department of Defense, other government systems, or critical infrastructure
- The extent of the availability of other mechanisms to support future government national security needs, such as the ability to protect export-controlled and other information, prevent espionage, provide U.S. government access to facility output, or adapt commercial production for low-volume and high-mix national security components
- The quality of the applicant's strategy for mitigating key risks to operational security, supply chain security, and cybersecurity, including:
  - The likelihood that the applicant will protect semiconductor production and use for national security purposes from insider threats and external interference, if applicable
  - The likelihood that the applicant can effectively establish security of intellectual property (i.e., core IP and manufacturing process know-how) and government assets, particularly if serving national security, export-controlled, or critical infrastructure needs
  - The comprehensiveness and maturity of the applicant's cybersecurity and cyber-supply chain risk management plans and activities
  - The extent to which the applicant has identified and mitigated any risks or vulnerabilities associated with dependence on foreign-owned or sourced inputs, equipment, facilities, personnel, or subsequent manufacturing steps

- The quality of the applicant's supply chain resilience plan and risk management strategy, to include:
    - The quality of the applicant's supply chain resilience plan and analysis of key chokepoints, including the likelihood of obtaining supply of materials, equipment, and components as needed for successful operations under adverse scenarios
    - The sufficiency of the supply chain resilience and risk management efforts to document supply chain risks and how the applicant intends to address or mitigate those risks
- The likelihood that a foreign entity of concern will pose an undue risk to the project or U.S. national security interests, such as through control, access to information, or other means

#### c. Additional Considerations for Projects Related to Mature Nodes

For applications for additional assistance for mature nodes, the assessment will consider a project's likelihood of directly increasing the number of semiconductors produced in the United States at mature nodes and supplying those semiconductors to critical manufacturing industries.

### 2. Commercial Viability

This criterion addresses the project's long-term commercial viability to ensure there is a reasonable market environment and demand for the project's output. The assessment of this criterion will consider the extent to which the application adequately demonstrates:

- Robust demand for proposed project output, including differentiated use cases in end market industries
- Size and diversity of the customer base, including evidence of any large offtake (or similar) agreements with customers or other evidence of specific customer demand
- Projected existing and planned future supply and how this project impacts the overall supply/demand dynamic for the project output
- Expected volume and pricing dynamics for the output, including sensitivity to cyclical fluctuations and economic downturns
- Technology obsolescence risk during the useful life of the facility, and associated plans for maintenance and upgrades to keep the facility competitive and commercially viable for its useful life
- Stability and predictability in sourcing of key supplies, including actual and potential long-term contracts with suppliers

### 3. Financial Strength

This criterion addresses the project's financial strength and its ability to withstand stress in market downturn conditions. The assessment of this criterion will consider:

- Financial strength of the applicant and/or the applicant's parent company relative to the proposed project, as demonstrated by its current financial position, historical performance, and other factors, as applicable

- Comprehensiveness and reasonableness of the projected capital expenditures and other costs incurred to reach cash flow breakeven
- Likelihood that the project will generate sustainable earnings and operating cash flows, specifically considering:
    - Economic viability and profitability of the project considering key metrics like underlying volume and pricing assumptions, gross margins, cash margins, and ongoing capital expenditures
    - The impact of different stress scenarios (e.g., lower than anticipated sales volumes and prices, reduced project performance, loss of major customers, loss of key component or material suppliers, high input material prices, the impact of future competing technologies), and the extent to which contingency plans are likely to be effective
    - Ability of the project to generate sufficient cash flows to service the project's debt obligations, if any, over the life of the project, even under stress conditions, and extent to which contingency plans are likely to be effective
- Degree to which the applicant has committed private investment and/or attracted third-party private investment to increase scale and reduce the need for CHIPS Incentives, specifically considering:
    - The specificity of the overall sources of funds, including the amount of investment from the applicant and the degree to which the project leverages outside sources of capital, including prudent levels of debt and economically viable financing structures from other potential funding sources
    - The degree to which the project has already secured capital and the reasonableness of the terms of that capital
    - The extent and nature of support from state and local governments, including whether state and local incentives and investments are designed to create spillover benefits that benefit a wide set of stakeholders and improve the region's economic resilience
- Degree to which the request for CHIPS Incentives is reasonable and necessary to make the project viable in the United States, including whether the request is sized appropriately based on cash flow modeling, IRR analysis, sensitivity analysis, and other applicable analyses, and whether the projected IRR in the cash flow model is reasonable based on the expected risks and returns of the project, historical projects of similar nature, or other relevant market benchmarks
- For applicants seeking CHIPS Loans/Loan Guarantees: Creditworthiness of the applicant and its parent company or others providing credit support (as applicable); the strength of cash flows relative to debt service requirements under base case and stress conditions; and the rationale for seeking CHIPS Loans and/or CHIPS Loan Guarantees beyond financing available in private markets. In addition, for CHIPS Loan Guarantees, the creditworthiness of third-party lenders and co-lenders, and the extent of risk sharing.

### 4. Technical Feasibility and Readiness

This criterion addresses the feasibility of execution of the project from construction to ongoing operational execution and maintenance. The assessment of this criterion will consider:

- Organizational Readiness: The extent to which the applicant and key partners (e.g., general contractor, engineering firms, equipment installers, etc.) have the necessary experience and governance structure to complete and operate a project of this scale, including:
  - The extent to which the applicant has successfully executed similar projects and can demonstrate the economic, technical, and project management success of those similar projects
  - If the applicant is collaborating with partners, including as part of a project consortium, the extent to which the operating model is effectively structured (e.g., working model, governance, decision-making authority)
- Technology and Manufacturing Processes: Likelihood that the applicant will successfully execute the technology and manufacturing processes proposed in the project, including, for example:
  - Assessment of the competencies, strengths, and experiences of the applicant and key partners as it relates to the technology and manufacturing processes proposed
  - Feasibility of the technology and manufacturing processes outlined in the project proposal
  - Whether the project has obtained access to the intellectual property required
- Construction Plan: The extent to which the applicant has a viable construction plan and appropriate mechanisms in place to reduce construction risks and develop the necessary construction workforce. Examples include:
  - The depth and quality of the applicant's experience, including the key personnel responsible for executing the construction of the proposed project
  - Timing for completion of construction and production ramp up schedule, including ability to achieve full-scale production in a reasonable timeframe and mitigation plan for project delays and cost overruns
  - Degree to which key contractual arrangements necessary to the success of the construction have been secured or are likely to be secured
  - Competencies, strengths, and experiences of key partners (e.g., equipment suppliers and engineering, architectural, and design companies)
  - Compliance record of construction contractors and subcontractors with Federal labor laws and the extent to which steps are in place to prevent the misclassification of workers on the construction site
- Environmental Risk: Likelihood and extent to which the project could face regulatory delays, such as in a permitting or environmental review process, including the level of NEPA review that would be required for the project

### 5. Workforce Development

The criterion addresses the degree to which the workforce development plans set out a coherent, achievable, and equitable strategy to address talent needs and generate the workforce needed to execute on the applicant's project goals. The assessment of this criterion will consider the:

- Completeness, cohesiveness, and feasibility of the strategies and financial plan to recruit, secure, and train the skilled and diverse workforce necessary to complete the proposed projects and operate the facilities, including:

    - Workforce needs assessment
    - Worker recruitment and retention plan
    - Commitment to good jobs as defined by the Departments of Labor and Commerce's Good Jobs Principles
    - Worker training plan and wraparound services that reduce barriers to access to and completion of the training
    - Metrics for success
- Capacity, resourcing, and cohesiveness of the applicant's partnerships, including the extent of the applicant's engagement with a broad range of strategic partners; whether the applicant has formed a sectoral partnership; whether there is a clear delineation of roles and responsibilities among partners; and quality of participation commitments of community colleges and other higher education institutions, high school career and technical education programs, labor unions, and other entities
- The depth and quality of the applicant's equity strategy to recruit, hire, train, and retain a skilled and diverse facility and construction workforce, including the specific steps that will be taken to recruit, hire, train, and retain economically disadvantaged individuals and disclose data on workforce and training participant diversity, as well as the extent to which the plan draws on evidence-backed approaches
- Whether the applicant plans to use apprenticeship readiness and other programs that successfully train diverse populations
- Quality of the construction workforce plan, including the completeness, cohesiveness, and feasibility of the strategy to recruit, secure, and train the workforce necessary to complete the proposed project, including whether the applicant plans to use a project labor agreement
- For applicants requesting CHIPS Direct Funding over $150 million, the sufficiency, quality, and feasibility of the plans to provide facility and construction workers with access to affordable, accessible, reliable, and high-quality child care; for applicants requesting less than $150 million, quality of plans to provide access to child care for facility and construction workers to the greatest extent feasible

### 6. Broader Impacts

This criterion addresses the degree to which the proposed project will provide broader public impacts. The assessment of this criterion will consider:

- Strength of commitment to invest in ongoing capital programs in the United States and complementary commitments; e.g., the extent of the applicant's commitments to refrain from stock buybacks
- Explicit evidence of real and credible commitments to building domestic R&D facilities (and in participating in other major R&D efforts in the United States) to ensure process technology innovation is occurring in the United States and a sustainable ecosystem is being built
- Strength of the applicant's commitment to support CHIPS R&D programs such as the NSTC and NAPMP and other programs that strengthen and advance U.S. leadership in R&D, including participation in networks of universities, colleges, and employers that foster innovation in the U.S. semiconductor ecosystem

- Quality and comprehensiveness of the applicant's strategy for engaging with small, minority-owned, veteran-owned, and women-owned businesses as strategic partners, suppliers, or contractors or subcontractors, and commitment to tracking and disclosing disaggregated data on supplier diversity and contractor/subcontractor diversity
- Quality of the applicant's climate and environmental responsibility plan, including renewable energy use, climate resilience, water conservation, sustainability transparency, and addressing environmental justice concerns
- Quality and comprehensiveness of the applicant's plans to develop local community investments that will drive regional equity and inclusion and broad-based growth, especially through regional economic clusters, as well as the degree of demonstrated community support and alignment of investments with local needs
- Strength of intent to use domestically produced iron, steel, and construction materials

### B. Prioritization and Selection Factors

The prioritization and selection factors for selecting applications for funding are below. The Department will give significant primary weight to the first factor in prioritizing applications in the review and selection process.

- Contribution to economic and national security, consistent with strategic goals described in Section I.C.1 and the evaluation criteria described in Section V.A.1
- Efficient use of taxpayer dollars, as described in Section I.C.3 and the evaluation criteria in Section V.A.3
- Creation of broader impacts, consistent with the description in Section I.C.6 and the evaluation criteria in Section V.A.6
- Extent to which the applicant is prepared to proceed to execution
- Whether the project will produce chips for critical infrastructure
- Whether the applicant, or a corporate affiliate of the applicant, has previously received financial assistance in this program
- Whether the project duplicates other projects funded by the Department or other Federal agencies
- Diversity of awards in the program, including based on geographic location of facilities receiving support and the size of awards

### C. Review and Selection Process

For eligible, complete, and responsive applications, the Department will convene an Investment Committee to conduct a merit review and consider whether to advance applications through the process or deny applications. If the Investment Committee determines that an application is sufficiently meritorious to be eligible to receive a CHIPS Incentives Award, it may make a recommendation to a Transaction Review Committee composed of senior Department of Commerce leadership. The Transaction Review Committee must approve an application prior to issuance of a CHIPS Incentives Award. The following sections describe this process in greater detail.

### 1. Full Application Review

Full applications will be reviewed upon receipt to determine eligibility, completeness, and responsiveness to this NOFO, including the program priorities (see Section I.C). Full applications determined to be ineligible, incomplete, or nonresponsive will be returned to the applicant. The Department may, at its discretion, review a substantially complete application if any gaps in information can be rectified easily during the review process.

An Investment Committee will conduct an individual, qualitative merit assessment of each eligible, complete, and responsive full application against the evaluation criteria in Section V.A. The Department may contact applicants at any point during the process to obtain additional or clarifying information. The review process may include interviews with applicants and consultation with outside contractors or experts if deemed necessary to assist in the merit assessment.

The Investment Committee will make a written determination, based on the qualitative assessment, the program requirements, the evaluation criteria (Section V.A) and one or more of the prioritization and selection factors (Section V.B), that:

- The application, or one or more projects in it,[56] is eligible for an award and should advance to the due diligence phase
- The application should be held for later consideration pending review of other applications, or
- The application should be denied, which shall be a final and non-appealable decision[57]

For projects advancing from the full application phase to the due diligence phase, the Department will prepare a non-binding Preliminary Memorandum of Terms, subject to Investment Committee approval, that will include recommendations for the amount and form of any CHIPS Incentives and key terms that should be considered for inclusion in an award. These recommendations may deviate from what the applicant requested. The Department will provide the Preliminary Memorandum of Terms to the applicant for review and negotiation prior to or upon entering the due diligence phase.

After approving an application for entry into the due diligence phase, the Investment Committee may recommend an application to a Transaction Review Committee, which is the selecting official and must approve any applications for funding under this NOFO. The Transaction Review Committee may accept, modify, or reject a recommendation of the Investment Committee, or return the recommendation for further evaluation, negotiation, or due diligence. In considering a recommendation, the Transaction Review Committee may consider any information available to it. The Transaction Review Committee may compare multiple full

[56] As noted above, see Section I.B.5, an application may contain more than one project. The Department may choose to advance through the review process and select for funding less than all of the projects proposed in an application.
[57] Further submissions by the same applicant for the project(s) proposed in a denied application will not be reviewed or considered.

applications and use one or more of the prioritization and selection factors to choose which full applications(s) to select.

The Department may work with applicants throughout the process to maximize the chance of achieving the program's economic and national security objectives, including, for example, through discussing changes to application scope or CHIPS Incentives requests. Such discussions are not themselves part of the merit review, and the merit review will be completed on the application as submitted or revised.

### 2. Due Diligence

Before selecting a full application for funding, the Department will conduct due diligence of the full application for—including, but not limited to—national security risks, financial and commercial information, environmental impacts, and other issues, to inform a final determination on whether to make a CHIPS Incentives Award and on what terms.

An invitation to the due diligence phase is not an assurance of funding. Negotiation of the key terms of the CHIPS Incentives Award will continue at this stage, and even if funding is ultimately awarded, the terms may end up differing from the non-binding Preliminary Memorandum of Terms depending on the negotiation, information uncovered during due diligence, program priorities, and the availability of funds. During the diligence phase, the Department will work directly with applicants to obtain all information required at this stage. Due diligence may also include obtaining information from sources other than the applicant. The Investment Committee and the Transaction Review Committee may receive updates throughout this process. The Department may use the services of financial, commercial, technical, environmental, or other consultants or contractors and outside legal counsel in the due diligence phase. Applicants will be required to pay for these services. Information about the services and their costs will be provided to applicants upon or before entering the due diligence phase. Applicants may withdraw their application if they do not agree to pay for these services.

When the due diligence phase is substantially complete, the Department and the applicant may negotiate the applicable terms of a Long-form Term Sheet for the requested CHIPS Incentives. The provisions of the Long-form Term Sheet will be more detailed than the Preliminary Memorandum of Terms and may vary from the Preliminary Memorandum of Terms based on the Department's due diligence, further analysis of the full application, and further negotiations.

### 3. Award Preparation and Issuance

If the Transaction Review Committee approves a full application, the Department will prepare and negotiate final award documents in accordance with the terms of the Transaction Review Committee's approval. If the Department decides to issue a CHIPS Incentives Award or Awards to the applicant, the final award terms are expected to be substantially consistent with the Preliminary Memorandum of Terms or Long-form Term Sheet, as applicable, subject to the final results of the Department's due diligence, analysis of the full application, and any further negotiations. An application may be returned to the Transaction Review Committee if a deviation from the terms of its approval is required in the final award documents. Prior to the

execution of the final award documents, the Department will provide any notice to Congress required under the CHIPS Act.[58]

The awarding of the CHIPS Incentives Award occurs upon the issuance of Form CD-450 or comparable award form by a NIST authorizing officer. The award decisions of the NIST authorizing officer are final and may not be appealed.

### D. Responsibility / Qualification Records on SAM.gov

In considering applications, the Department will consider the record of the applicant, as well as of its corporate parent, in executing programs or activities under Federal grants, cooperative agreements, procurement awards, other transactions, as well as its integrity and business ethics. As part of this consideration, prior to making a CHIPS Incentives Award, the Department will review and consider the non-publicly available information about that applicant in the designated integrity and performance system accessible through Responsibility / Qualification Records on SAM.gov (formally the Federal Awardee Performance and Integrity Information System (FAPIIS)). This review may also include the applicant's corporate parent or affiliates that are under common ownership and control. Each applicant, at its option, may review information in the designated integrity and performance system accessible through SAM and comment on any information about itself that a Federal awarding agency previously entered and is currently in the designated integrity and performance system accessible through SAM. The Department will consider any comments by the applicant, in addition to the other information in the designated integrity and performance system, in making a judgment about the applicant's integrity, business ethics, and record of performance under Federal awards.

### E. Additional Information

Any decision by the Department to deny an application shall be final and non-appealable. Unsuccessful applicants will be notified of a denial by e-mail and will have the opportunity to receive a debriefing. Unsuccessful applications will be retained in accordance with Department of Commerce recordkeeping requirements.

## VI. Federal Award Administration Information

### A. Federal Award Notices

Successful applicants will receive an award package from an authorized NIST official.

### B. Third-Party Expenses and Fees

#### 1. Third-Party Expenses

The Department may utilize independent technical, financial, environmental, or other consultants or contractors and outside legal counsel during the due diligence process. Each applicant, as applicable, shall be responsible for the payment of all expenses charged by the independent consultants or contractors and outside legal counsel in connection with an application.

[58] *E.g.*, 15 U.S.C. § 4652(a)(2)(C)(i)(III).

Notwithstanding payment by the applicant, all services rendered by an independent consultant, or contractor or outside legal counsel to the Department in connection with an application shall be solely for the benefit of the Department. The Department may require the payment of an advance retainer to such independent consultants or contractors or outside legal counsel as security for the collection of the fees and expenses charged by the independent consultants or contractors and outside legal counsel. In the event an applicant fails to comply with the provisions of such payment agreement, the Department, in its discretion, may stop work on or terminate an application, or may take such other remedial measures as it deems appropriate.

#### 2. Maintenance Fee

An applicant receiving a CHIPS Loan or CHIPS Loan Guarantee must pay a non-refundable annual maintenance fee to cover the Department's administrative expenses, other than extraordinary expenses, incurred in servicing and monitoring the loan or loan guarantee. The maintenance fee shall accrue from the date of execution of the award through the date of payment-in-full of the related obligations. The maintenance fee shall be paid each year in advance, in the amount specified in the award, commencing with payment of a pro-rated annual payment prior to the financial closing date of the award, on or prior to the date and in the amount specified in the award.

### C. Administrative and National Policy Requirements

#### 1. Administrative Requirements

CHIPS Direct Funding, CHIPS Loans, and CHIPS Loan Guarantees will be subject to administrative requirements set forth in the terms of the CHIPS Incentives Award. These may include, but not be limited to, terms to ensure the appropriate use of Federal funds, compliance with programmatic requirements and commitments made by the applicant in the application, and conditions to mitigate project or applicant specific risks identified in the review process; remedies for noncompliance, including, but not limited to, temporarily withholding or suspending payments, disallowing costs, suspension or termination of the award, the return of funds made available under the award, the initiation of suspension or debarment proceedings in accordance with law; and other terms to ensure the efficient and effective execution of the project.

#### 2. National Environmental Policy Act and other Federal Environmental Authorizations

Applicants must assist the Department with compliance with NEPA (42 U.S.C. § 4321 et seq.), and other applicable Federal environmental laws and authorities such as the National Historic Preservation Act, Endangered Species Act, Clean Water Act, and related Executive Orders. The Department may request that an applicant prepare draft environmental analyses, which it will analyze to determine the potential environmental impacts and consultation needs of projects receiving CHIPS Incentives Program funding. The Department expects applicants to design their projects so that they avoid, minimize, and mitigate the potential for significant effects on the human environment, as detailed in Section IV.I.11. The applicant will be responsible for obtaining and complying with applicable Federal, state, and local permits such as those required under the Clean Water Act, Clean Air Act, and Resource Conservation and Recovery Act. The

Department expects that each applicant invited to enter due diligence (see Section V.C.2) will be ready to begin the environmental review process and may request the applicant demonstrate such readiness before the Department invites the applicant to proceed to this phase. The Department encourages applicants to begin preparing for the environmental review process as early as possible so that the applicant can demonstrate its readiness to commence the project(s). Applicants should therefore prepare for the environmental review, including gathering data and analysis, engaging experts or outside contractors, etc., as early as possible. While actions taken by the applicant to demonstrate readiness do not guarantee selection for the due diligence phase, such actions will facilitate an expeditious environmental review process if selected for due diligence.

### 3. Davis-Bacon Requirements

All laborers and mechanics employed by the applicant, subrecipients, or contractors or subcontractors in the performance of construction, alteration, or repair work funded in whole or in part under this NOFO shall be paid wages at rates not less than those prevailing on similar projects in the locality, as determined by the Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, United States Code, commonly referred to as the "Davis-Bacon Act." Recipients of funding under this NOFO may also be required to undergo Davis-Bacon Act compliance training and to maintain competency in Davis-Bacon Act compliance.[59]

### 4. Compliance with Federal Employment and Labor Law

All applicants must comply with all applicable Federal labor and employment laws, including but not limited to Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act, the Occupational Safety and Health Act, and the National Labor Relations Act, which protects employees' right to bargain collectively and engage in concerted activities for the purpose of workers' mutual aid or protection.

### 5. Mega Construction Project Program

The Department will require a small number of recipients with costs above $35 million that receive awards under this funding opportunity to partner with the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) in the Mega Construction Project Program, if selected by OFCCP, as a condition of their award. Under this program, the Department will require recipients to make clear to prime contractors in the pre-bid phase that the recipient's award terms will require their participation in the Mega Construction Project Program.

### 6. Construction Clawback

The CHIPS Act requires the Department to determine target dates by which each project shall commence and complete.[60] If a project does not commence and complete by the target dates

[59] The U.S. Department of Labor offers free prevailing wage seminars several times a year that meet this requirement at https://www.dol.gov/agencies/whd/government-contracts/construction/seminars. For additional guidance on how to comply with the Davis-Bacon provisions and clauses, see https://www.dol.gov/agencies/whd/government-contracts/construction and https://www.dol.gov/agencies/whd/government-contracts/protections-for-workers-in-construction.

[60] 15 U.S.C. § 4652(a)(5)(A)

specified in an award, the Department shall progressively recover up to the full amount of an award provided to a covered entity.[61]

As part of the application process, applicants will be required to provide detailed information about project timelines (see Section IV.I.7). The Department will determine the specific target dates for each award based on information provided in the application and negotiations that occur during the review and selection process.

The Department may waive elements of the clawback requirements if circumstances beyond the ability of the covered entity to foresee or control are responsible for the delay.

### 7. Technology Clawback

Under the CHIPS Act, the Department shall recover the full amount of an award provided to a successful applicant if, during the applicable term with respect to the award, the applicant knowingly engages in any joint research or technology licensing effort (i) with a foreign entity of concern; and (ii) that relates to a technology or product that raises national security concerns, as determined by the Department and communicated to the applicant before engaging in such joint research or technology licensing.[62] Additional information on the implementation of this provision will be provided to applicants prior to award.

### 8. Foreign Country of Concern Expansion Clawback

Under the CHIPS Act, a successful applicant must enter into an agreement specifying that during the 10-year period beginning on the date of the award, it may not engage in any significant transaction involving the material expansion of semiconductor manufacturing capacity any foreign country of concern, except under certain limited conditions.[63] Additional information on the implementation of this provision will be provided to applicants prior to award.

### 9. Prohibition on Certain Telecommunication and Video Surveillance Services or Equipment

Recipients, as well as contractors and subrecipients, may not use funds received in a CHIPS Incentives Award for certain telecommunication and video surveillance services or equipment, as set forth in section 889 of the National Defense Authorization Act of 2019 (Pub. L. No. 115-232).

### 10. Fraud, Waste, and Abuse

The U.S. Department of Commerce Office of Inspector General (OIG) seeks to improve the efficiency and effectiveness of the Department's programs, including deterring and detecting fraud, waste, abuse, and mismanagement. The OIG accomplishes this mission primarily through investigations, audits, and inspections of Department activities, including grants, cooperative agreements, loans, and contracts.

---

[61] 15 U.S.C. § 4652(a)(5)(B).
[62] 15 U.S.C. § 4652(a)(5)(C)
[63] *See* 15 U.S.C. § 4652(a)(6)(C)

Disclosures. Recipients of financial assistance from the Department shall timely disclose, in writing, to the OIG and Department, whenever, in connection with the award, performance, or closeout of an award under this NOFO, the recipient suspects that a principal, employee, agent, or subrecipient has committed: (a) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) A violation of the Civil False Claims Act (31 U.S.C. §§ 3729-3733).

Reporting. The OIG maintains a hotline to receive allegations of fraud, waste, or abuse. To report such allegations, please visit https://www.oig.doc.gov/Pages/Hotline.aspx. Upon request, the OIG will take appropriate measures to protect the identity of any individual who reports misconduct, as authorized by the Inspector General Act of 1978, as amended. Reports to the OIG may also be made anonymously.

### D. Funding Availability and Limitation of Liability

Funding for the program listed in this NOFO is contingent upon the availability of appropriations. In no event will the Department be responsible for application preparation costs. Publication of this NOFO does not oblige the Department to award any specific project or to obligate any available funds. The NOFO also is not intended to and does not create any rights enforceable by any alleged third-party beneficiaries.

If an applicant receives a CHIPS Incentives Award, the Department is not under any obligation to provide any additional future funding in connection with that award or to make any future award(s). Amendment or renewal of an award to increase funding or to extend the period of performance is at the sole discretion of the Department.

### E. Reporting

The Department understands the importance of undertaking systematic data collection and other rigorous evaluative activities to assess the outcomes related to funds given under this NOFO. The Department is committed to this goal, and all applicants should expect this will be a requirement of all awards. The Department intends to collect a range of data from recipients, which include, but are not limited to information on: domestic production capacity; workforce pipeline expansion, particularly among underserved communities; environmental impacts, and implementation and effectiveness of environmental mitigation; and increased economic opportunity in communities. These data will be instrumental in understanding the effects of individual funded projects and will enable the Department to assess the extent to which the strategic objectives have been achieved.

All award recipients will be expected to comply with any reporting requirements, as well as any program evaluation activities undertaken by the Department. More detail regarding reporting requirements will be included in the non-binding Preliminary Memorandum of Terms. Applicants that progress to this phase will then be required to plan accordingly such that they can fulfill these requirements with fidelity.

#### 1. CHIPS Incentives Financial and Programmatic Reports

The Department will track the performance of each CHIPS Incentives Award via financial and programmatic reports, in accordance with the award terms and conditions. Reports will generally

be required no less than semi-annually and must be submitted in an electronic format to be specified at the time of award.

### 2. Integrity and Performance Matters

If the total value of a covered entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10 million for any period of time during the period of performance of a CHIPS Incentives Award made under this NOFO, then the covered entity shall be subject to the requirements specified in Appendix XII to 2 C.F.R. Part 200 for maintaining the currency of information reported to SAM that is made available in FAPIIS about certain civil, criminal, or administrative proceedings involving the recipient.

## F. Federal Awarding Agency Contacts

**Please direct programmatic inquiries to:**

**Michael Schmidt**

Director, CHIPS Program Office
CHIPS Program Office
National Institute of Standards and Technology
Herbert C. Hoover Building
1401 Constitution Ave, NW
Washington, D.C. 20230
Phone: (301) 975-2000
Email: AskChips@chips.gov

**Please direct grant management inquiries to:**

**Gilberto Castillo**
Group Leader/Grants Management Officer
Grants Management Division
National Institute of Standards and Technology
100 Bureau Drive
Gaithersburg, MD 20899
Phone: (202) 281-8505
Email: gilberto.castillo@nist.gov

**Please direct media inquiries to:**

**Maddy Broas**
Press Secretary
CHIPS Program Office
Herbert C. Hoover Building
1401 Constitution Ave, NW
Washington, D.C. 20230

Phone: (301) 520-7407
Email: madeline.broas@chips.gov

## VII. Appendix

### A. Definitions

- advanced packaging – a subset of packaging technologies that uses novel techniques and materials to increase the performance, power, modularity, and/or durability of an integrated circuit. Advanced packaging technologies include flip-chip, 2D, 2.5D, and 3D integration, fan-out and fan-in, and embedded die/system-in-package (SiP).
- back-end semiconductor manufacturing – the fabrication processes after all the features/circuits have been created on the wafer, including assembly, testing, and packaging.
- covered entity – a nonprofit entity; a private entity; a consortium of private entities; or a consortium of nonprofit, public, and private entities with a demonstrated ability to substantially finance, construct, expand, or modernize a facility relating to fabrication, assembly, testing, advanced packaging, or production of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment.
- covered incentive – an incentive offered by a governmental entity to (A) a covered entity, for the purposes of constructing within the jurisdiction of the governmental entity, or expanding an existing facility within that jurisdiction, a facility described under "covered entity;" and (B) a workforce-related incentive (including a grant agreement relating to workforce training or vocational education), any concession with respect to real property, funding for research and development with respect to semiconductors, and any other incentive determined appropriate by the Secretary, in consultation with the Secretary of State.
- critical infrastructure – the 16 infrastructure sectors,[64] as defined by Presidential Policy Directive 21,[65] whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof.
- critical manufacturing industry – one of the industries in the table below, or any other manufacturing industry designated by the Secretary based on the relevance of the manufacturing industry to the national and economic security of the United States, including the impacts of job losses.

| **Industry** | **Associated NAICS Codes** |
|---|---|
| Machinery manufacturing | 333 (all) |
| Motor vehicle manufacturing | 3361-3363 |

[64] *See* Cybersecurity and Infrastructure Security Agency, U.S. Dep't of Homeland Security, *Critical Infrastructure Sectors* (Oct. 21, 2020), https://www.cisa.gov/critical-infrastructure-sectors.
[65] *See* The White House, Presidential Policy Directive /PPD-21, Critical Infrastructure Security and Resilience (2013).

| | |
|---|---|
| Computer and electronics manufacturing | 334 (all) |
| Transportation equipment manufacturing (e.g., aerospace products and parts) | 336 (all) |
| Chemical products manufacturing | 325 (all) |
| Food manufacturing | 311-312 |
| Fabricated metals manufacturing | 332 (all) |
| Medical equipment and supplies manufacturing | 3391 |
| Navigational, measuring, electromedical, and control instruments manufacturing | 3345 |
| Electrical equipment, appliance, and component manufacturing | 335 (all) |
| Primary metals manufacturing | 331 (all) |

- economically disadvantaged individuals – individuals whose ability or opportunity to compete in the economy has been impaired due to an individual's (1) membership in a group that has been subjected to racial or ethnic prejudice or cultural bias within American society; (2) gender; (3) veteran status; (4) limited English proficiency; (5) disability status; (6) long-term residence in an environment isolated from the mainstream of American society; (7) membership in a Federally or state-recognized Indian Tribe; (8) long-term residence in a rural community; (9) residence in a U.S. territory; (10) residence in a community undergoing economic transitions (including communities impacted by the shift toward a net-zero economy or deindustrialization); (11) individuals without a college degree; or (12) membership in another "underserved community," as defined in Executive Order 13985.
- front-end semiconductor fabrication – the process of forming devices like transistors, poly capacitors, non-metal resistors, and diodes on a wafer of semiconductor material.
- materials used to manufacture semiconductors – the chemicals, gases, raw and intermediate materials, and other consumables used in semiconductor manufacturing. Specific examples include but are not limited to polysilicon; photoresists and ancillaries (developers, strippers, litho solvents, and anti-reflective and hardmask layers); sputter targets (including tantalum, titanium, and aluminum); and materials specifically used in quantum information systems (such as hafnium and niobium).
- mature technology node – generations of logic and analog chips that are not based on fin field-effect transistor (finFET) or post-finFET transistor architectures, or any sub-28 nanometer (nm) transistor architectures.
- minority-owned business – a business where not less than 51 percent of the ownership or control of which is held, directly or indirectly, by one or more minority individuals; and not less than 51 percent of the net profit or loss of which accrues to one or more minority individuals.
- Secretary – the Secretary of Commerce.

- semiconductor – an integrated electronic device or system, most commonly manufactured using materials such as, but not limited to, silicon, silicon carbide, or III-V compounds, and processes such as, but not limited to, lithography, deposition, and etching. Such devices and systems include but are not limited to analog and digital electronics, power electronics, and photonics, for memory, processing, sensing, actuation, and communications applications.
- semiconductor manufacturing equipment – specialized equipment integral to the manufacturing of semiconductors and subsystems that enable or are incorporated into the manufacturing equipment. Specific examples of semiconductor manufacturing equipment include but are not limited to: (1) deposition equipment, including Chemical Vapor Deposition, Physical Vapor Deposition, and Atomic Layer Deposition; (2) etching equipment (wet etch, dry etch); (3) lithography equipment (steppers, scanners, extreme ultraviolet); (4) wafer slicing equipment, wafer dicing equipment, and wire bonders; (5) inspection and measuring equipment, including scanning electron microscopes, atomic force microscopes, optical inspection systems, and wafer probes; (6) certain metrology and inspection systems; and (7) ion implantation and diffusion/oxidation furnaces.
- supply chain – a system of organizations, people, activities, information, and resources, possibly international in scope, that provides products or services to consumers in the private and public sectors. For the purposes of this NOFO, the scope of this definition encompasses any organization that directly contributes to the lifecycle of a semiconductor, especially focusing on the design, manufacturing, and packaging processes.
- veteran-owned business – a business where not less than 51 percent of which is owned by one or more veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans and the management and daily business operations of which are controlled by one or more veterans.
- wafer manufacturing – the high-volume production of semiconductor wafers, including wafers made from silicon, silicon carbide, and gallium nitride. Wafer manufacturing includes ingot production and wafer slicing, lapping, polishing, cleaning, and inspection.
- women-owned business – a business where not less than 51 percent of the ownership or control of which is held, directly or indirectly, by one or more women; and not less than 51 percent of the net profit or loss of which accrues to one or more women.

# EXHIBIT 2

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

United States of America

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 117th CONGRESS, SECOND SESSION

Vol. 168 WASHINGTON, WEDNESDAY, MAY 4, 2022 No. 74

# House of Representatives

The House was not in session today. Its next meeting will be held on Friday, May 6, 2022, at 10 a.m.

# Senate

WEDNESDAY, MAY 4, 2022

The Senate met at 10 a.m. and was called to order by the Honorable BEN RAY LUJÁN, a Senator from the State of New Mexico.

## PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray. O God, the strength of all who put their trust in You, remind our lawmakers that we can accomplish little without Your mercy and grace. Give them the wisdom to trust Your power and might in their every endeavor, as You inspire them to live worthy of Your faithfulness.

Lord, we all borrow our daily heartbeats from You, so give us the serenity to accept the things we cannot change, the courage to change the things we can, and the wisdom to know the difference. And Lord, continue to strengthen the Ukrainian people.

We pray in Your powerful Name. Amen.

## PLEDGE OF ALLEGIANCE

The Presiding Officer led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mr. LEAHY).

The senior assistant legislative clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, May 4, 2022.*

*To the Senate:*

Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable BEN RAY LUJÁN, a Senator from the State of New Mexico, to perform the duties of the Chair.

PATRICK J. LEAHY,
*President pro tempore.*

Mr. LUJÁN thereupon assumed the Chair as Acting President pro tempore.

## RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

## CONCLUSION OF MORNING BUSINESS

The ACTING PRESIDENT pro tempore. Morning business is closed.

## EXECUTIVE SESSION

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will proceed to executive session.

### RECOGNITION OF THE MINORITY LEADER

The ACTING PRESIDENT pro tempore. The Republican leader is recognized.

### LAW ENFORCEMENT

Mr. McCONNELL. Mr. President, the week before last, it was my honor to sit down with a number of law enforcement officials in my hometown of Louisville, but I wish we could have met under happier circumstances.

Our city is contending with a tragic and record-setting jump in crime. Last year, Louisville saw 188 homicides—the most in any year on record. In the last 2 years, carjackings have tripled, and deadly drugs are becoming so prevalent on our streets that Jefferson County saw 500 overdose deaths in 2021.

Unfortunately, the historic wave of crime that has swept my hometown is challenging communities all across America. The murder rates of at least a dozen other major cities set alltime records last year. Chicago saw its most carjackings in 20 years, and in the first quarter of 2022, New York's crime rate was already up—listen to this—44 percent.

Needless to say, this is a time for strong law enforcement. Studies show that fewer police and less active policing make crime worse and leave the most vulnerable communities particularly worse off.

But our Nation's police officers aren't just facing higher volumes of crime; they are facing more direct, personal risks to confront it. Last year, as overall homicide counts continued to climb past 2020's record total, killings of police officers saw a staggering 59-percent spike of their own: 73—73—men and women sworn to protect and serve their communities were killed in 2021 while trying to do exactly that, and, already, 2022 has seen more than 100 more officers shot in the line of duty.

The surge in anti-police violence that boiled over in the summer of 2020 has taken its toll on the men and women of law enforcement. An exhaustive report

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

compiled by the city of Louisville last year found that morale—morale—among our officers is alarmingly low. A full 75 percent would leave for another police department. Not surprisingly, this has led to a severe staffing shortage on the force. Our police chief even took out billboard ads in Atlanta—in Atlanta—to try to recruit officers from other cities.

Now more than ever, we need to fund law enforcement, support police officers, and back the blue, but too many Democrats are apparently bent on doing just the opposite. The far left's call to defund the police has taken root at every level of government. Elected officials—sworn to preserve, protect, and defend the Constitution—have chosen instead to amplify distrust of the men and women who work every day to enforce our laws.

So let's just consider whom the Biden administration has prioritized for confirmation to top jobs in the Justice Department.

There is the new U.S. attorney with a reputation for pushing to cancel entire categories of the Criminal Code and the assistant attorneys general who have advocated for efforts to ''decrease police budgets'' and ''invest less in police.''

There is the newly minted Supreme Court Justice who advocated in her last job that the COVID pandemic was an appropriate reason to let inmates out of jail right here in Washington.

Just last week, our colleagues on the Judiciary Committee considered a nominee to the circuit court with an unapologetic record of hostility toward law enforcement. Without any basis in fact, Nusrat Choudhury suggested that police murdering unarmed Black men ''happens every day.'' Happens every day?

When our colleague the junior Senator from Louisiana called her out on it, the nominee tried to claim that she had only made the statement as an act of ''rhetorical advocacy''—''rhetorical advocacy''—on behalf of a client.

Unsurprisingly, that answer hasn't done much to ease the concerns of America's law enforcement community. Major organizations representing officers—from the Sergeants Benevolent Association to the National Sheriffs' Association, to the Fraternal Order of Police—have voiced strong, strong opposition and called on President Biden to ''take a stand against this dangerous and absurdly''—absurdly—''divisive rhetoric.''

Well, needless to say, the President and his administration need to do a lot more than that to prove to the men and women of law enforcement that they have their backs.

S.J. RES. 39

Now, Mr. President, on another matter, last week, President Biden offered a particularly candid look at his view of education in America. In speaking at an awards ceremony for public school teachers, he remarked:

> They're not somebody else's children. They're like yours when they're in the classroom.

Unfortunately, this wasn't a mistake. It was actually a rather accurate summary of the increasingly radical way he and his party think of children in America.

When it comes to the respective roles of parents and teachers, Democrats have used the past 2 years of the pandemic disruptions to show their true colors. They have shoveled money into woke training, like the North Carolina program to help preschool teachers ''deconstruct whiteness''—''deconstruct whiteness.'' They have torn up time-tested procedures as in one California district's move to institute an equity lottery for admissions. Last fall, the former chair of the Democratic National Committee ran a gubernatorial campaign, saying:

> I don't think parents should be telling schools what they should teach. Suffice it to say, parents in Virginia saw things differently.

Across America, parents have rejected the radical liberal campaign to make education a ''one size fits all government knows best'' proposition. From coast to coast—even in deep-blue bastions like San Francisco—they have sent rogue local administrators packing and asserted their rights and responsibilities as the first and most important teachers of their children.

Yesterday, Senate Republicans made clear once again that we stand with the parents of America. A bipartisan majority adopted Senator THUNE's resolution of disapproval on one of the Biden administration's most egregious violations of parents' rights and kids' well-being.

Masking children as young as 2 in Head Start Programs across the country, including outside on the playground—including outside on the playground—flies in the face of what even the World Health Organization considers settled science. And it has seriously damaged parents' confidence in the systems to which they entrust their children for hours every day.

So I was proud to join a majority of my colleagues last night to express the Senate's opposition to this unconscionable policy. Ah, but make no mistake: This is not the last we will hear about the far left's efforts to grab more control over how America raises its kids.

As we speak, Senate Democrats are trying to resurrect portions of the failed reckless taxing-and-spending spree they spent most of last year trying to ram through on party lines. That proposal includes the Toddler Takeover that would stick American families with dramatically higher costs and dramatically less choice in the market for childcare.

More redtape for independent providers, special subsidies for bureaucracies' preferred one-size-fits-all systems, outright hostility toward the faith-based options that are preferred by a majority of families who use outside-the-home childcare, and nothing—nothing at all—for families who choose to have a full-time parent or another family member look after their kids; just the latest example of a massive overreach the American people never asked for.

The Biden administration is having a hard enough time with basic governing responsibilities like national security, energy independence, and controlling inflation. American families, and especially children, will be a whole lot better off the sooner the Democrats stop looking for even more ways to fail them.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. CARDIN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

U.S. SUPREME COURT

Mr. CARDIN. Mr. President, I have taken this time to talk about National Small Business Week, but because of the events of the last 48 hours, I need to comment on the Justice Alito draft opinion that, if it were adopted by the Supreme Court, would overturn Roe v. Wade.

I find this draft opinion to be outrageous. It puts the health, well-being, and constitutional rights of women across the Nation in great jeopardy, particularly those low-income women.

Thirty-six million women of reproductive age would be at risk if the Alito opinion became the ruling of the Supreme Court.

We look to our courts to protect and expand our constitutional protections, not to contract and weaken the constitutional protections, reversing nearly 50 years of legal precedent of Roe v. Wade.

What we need to do is to make sure that this body does everything we can to protect women's rights and to protect their healthcare right to make their own decision.

I am pleased that 16 States, including the District of Columbia, have taken action to protect women's rights, including my own State of Maryland, but we need to do more. We need to pass the Women's Health Protection Act. I am a cosponsor of that—proud to be a cosponsor of it—which would codify Roe v. Wade to protect reproductive rights for women. I hope we will have the opportunity to do that. I think we all recognize that we have a responsibility to act before the Supreme Court makes its ruling that could jeopardize the constitutional rights.

NATIONAL SMALL BUSINESS WEEK

Now, Mr. President, I do want to speak about National Small Business Week, which is this week, May 1 through 7.

I have the honor of chairing the Small Business and Entrepreneurship

Committee here in the U.S. Senate, and I have the opportunity as chair to talk about small businesses 52 weeks a year and to brag about what small businesses are doing.

This week gives us the opportunity to highlight for every American the incredible contributions small businesses make to our economy.

National Small Business Week is an annual reminder of how important small businesses are to the success of America. Small businesses are the lifeblood of our national economy and our local communities. There are more than 32 million small businesses across the Nation, and they support more than 61 million jobs.

As Congress works to address the myriad of challenges facing our country from climate change to foreign conflicts, the issues facing small business owners can be drowned out. That is why I asked to be a member of the Small Business Committee when I first entered the U.S. Senate in 2007.

The committee is one of the smaller committees in terms of resources and staff, but I know that it was going to be a place where I could support entrepreneurs, those in my home State of Maryland and nationwide, who are focused on creating the companies, products, services, and technologies of the future.

That is where job growth will take place in this country. More jobs are created through small business than through larger companies. That is where innovation takes place in this country, where we find ways to deal with challenges, as we saw during COVID–19. But it is also where small businesses do not have the same resiliency to deal with downturns in our economy. That is why it was so important for us to act in regard to the COVID–19 pandemic.

Two years ago, as our Nation faced a threat of a once-in-a-century global pandemic, supporting our small business owners was one of my top priorities. I will always be proud of the swift, bipartisan action this body took to ensure that our vibrant small business sector would not be a casualty of the COVID–19 pandemic.

Since the beginning of the pandemic, Congress has created several new programs to support small businesses, including the Paycheck Protection Program that was there to protect the workforce in small business; the EIDL Advance Grant Program, which provided some capital for small businesses during the pandemic and provided, through its loan program, the longer term capital that was needed during this period of time; the Shuttered Venue Operators Grant Program that dealt with businesses that were basically ordered to close during the pandemic because of the public health risk; the Restaurant Revitalization Fund that was aimed at an industry that was so badly devastated as a result of COVID–19 when people would not go out to restaurants; and several other initiatives that we passed during that period of time.

We have appropriated more than $1 trillion to the Small Business Administration to fund these initiatives and others, and it has been critical to the survival of small businesses and now to our own economic recovery.

Several independent studies have confirmed that the SBA's implementation of these programs was largely successful and improved over time, especially in terms of equity reaching the underserved communities. The improvement is the result of thoughtful policies Congress has implemented, as well as the Biden administration's efforts to invest in underserved entrepreneurs.

Americans registered a record-setting 5.4 million new small businesses this last year, which was a 1-million increase over the prior record of 4.4 million. So we are responding. The small business community is vibrant. Even better, this increase is occurring in some of our most underserved communities with minorities—specifically minority women—driving the entrepreneurial surge.

So this year's theme for National Small Business Week, ''Building a Better America Through Entrepreneurship,'' could not be more fitting, and it should serve as a clarion call for every Member of Congress.

We simply cannot let this opportunity pass us by. Instead, we in Congress must tap into and bolster the entrepreneurial spirit that is sweeping our Nation to build a fairer and more just economy for all.

The good news: We already know how we can do this because that is what we did during the pandemic. Several independent studies have confirmed that small business relief programs we created over the past 2 years improved over time. The improvement was the result of policies, many of which were bipartisan, that directly addressed the structural barriers that make it more difficult for women, minorities, and other underserved entrepreneurs to start and grow successful businesses.

In the years ahead, Congress must leverage the inroads that the SBA has made into these previously underserved communities so that critical services and business loan products can better reach entrepreneurs who need them the most.

The most immediate action we can take is to replenish the Restaurant Revitalization Fund. This is a matter of basic fairness. There are still more than 177,000 outstanding applications for the Restaurant Revitalization Fund. These are restaurants that qualified for the relief but, because there were not enough funds in the program appropriated by Congress and because of the original confusion on application priorities, they were not able to get the funds even though they were eligible and they needed the funds. In some States, as many as 6 in 10 requests for grants remain unmet.

So Congress cannot mistake the hopeful indicators of recovery for a sign that restaurants and bars are back to where they were prior to the pandemic. They are not. Many bars and restaurants are still months behind on rent and other bills, and they also must deal with increased supply costs as a result of supply chain issues and labor costs. They still need our support. The need is still there, and fairness requires us to act.

I want to thank Senator WICKER for working with me to introduce bipartisan legislation that will replenish this critical program and provide support to other hard-hit industries.

In the longer term, there are three policies that Congress should enact to better support the surge of interest in entrepreneurship and make our economy more diverse and resilient in the future.

First, Congress should create a direct lending program at the SBA that will allow for another avenue for access to capital, filling the current gaps in our financial ecosystem. A reimagined direct lending program would allow entrepreneurs to apply directly to the SBA or through community lenders for small Federal loans.

We know that many underserved entrepreneurs are discouraged even from applying for a business loan because of the high rates of rejection. Commercial banks tend to deal with their existing customers. They also tend to want larger loans or the larger of the small businesses, not the smaller, the startups of the small businesses. A direct lending program from the SBA could help.

Second, Congress should codify the Community Advantage loan program. The loan program is particularly successful in getting capital to underserved entrepreneurs. We have a track record under the Community Advantage Program. It works. It reaches those communities that have been left out in the past.

I am grateful for the Biden administration's recent announcement that it will extend the program for 2 years and implement changes to make the program more helpful to underserved small businesses. For example, the administration will increase the maximum loan size and expand the number of lenders in the program to provide loans to more underserved entrepreneurs.

Third, Congress should give SBA the tools and resources to nurture the next generation of entrepreneurs by creating a network of incubators and accelerators on the campuses of our Nation's historically Black colleges and universities, minority-serving institutions, and community colleges.

In Maryland, our State HBCUs and community colleges play a key role in the entrepreneurial ecosystem. They are resource partners for the SBA. They host business incubators and accelerators, and they leverage their relationship with the underserved communities to lift up the entrepreneurs in

those communities. We need to do the same on a national scale and support our resource partners.

These are commonsense policies that will unlock the growth potential of our Nation's entrepreneurs and help us to recover from the COVID–19 pandemic in a stronger, fairer way.

As we celebrate National Small Business Week, let us also double down on the investments we have made in our entrepreneurs over the past 2 years. Let us once again put partisanship aside and pass thoughtful legislation that addresses the root causes of the issues that our Nation's entrepreneurs face on a daily basis.

We can do this. During this week, let us rededicate ourselves to help America's small businesses, help fairness and opportunity in this country, and help our economy grow even stronger.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. THUNE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

U.S. SUPREME COURT

Mr. THUNE. Mr. President, Monday's leak of a draft opinion in the Dobbs Supreme Court case was an unprecedented and deeply disturbing breach of confidentiality that almost always surrounds Supreme Court deliberations. It is difficult to think this was anything but an escalation in the radical left's campaign to bully the Supreme Court into delivering decisions in line with the priorities of the Democratic Party. From Court-packing threats to threats from the Democratic leader himself that were directed to specific Justices, attempting to intimidate the Supreme Court has become par for the course for liberals, but Monday's leak represents a new low.

Almost as disturbing as the leak has been the reaction from my Democratic colleagues. Their hysterical comments have been focused almost entirely on the prospect of their getting an outcome they don't want in the Dobbs case. I have seen almost no concern about how the leak will affect the integrity of the Supreme Court as an institution, and their activist base has gone out of its way to praise the leaker.

More than one Democrat has actually called for undermining the integrity of the Supreme Court by packing the Court with additional Justices. Yes, that is the result of what happened yesterday among Democrats. More than one Democratic Senator believes that the proper response to a Supreme Court decision you don't like is to add additional Justices to the Court until you can be confident that you will get the outcomes you want.

Other Democratic Senators have proposed undermining the integrity of the U.S. Senate by abolishing the Senate filibuster rule—again, in order to be sure that they can get the legislative outcome they want in response to this possible decision in the Dobbs case.

Mr. President, regardless of what side you are on in this debate, you should be willing to stand up for the rule of law and the integrity of our institutions. That shouldn't be a partisan issue. Our system of government depends upon the rule of law, which is based upon an independent judiciary, free of political pressure or partisan influence.

Do Democrats really want a future in which Supreme Court decisions are made based on political pressure or bullying rather than on the Justices' impartial application of the law and the Constitution to the case before them? Maybe they do. But if they continue to push in that direction, they will end up sacrificing our system of government in the process.

Mr. President, I have strong beliefs in any number of issues, including abortion, but above all, I believe in our system of government and in the rule of law. While I will fight passionately in support of the causes I believe in, I will not sacrifice the integrity of our institutions for what would ultimately be nothing but temporary political gain. It is starting to seem like most of my Democratic colleagues disagree with that position. That may possibly be a recipe for political success, but it is also a recipe for destroying free government.

I am glad that Chief Justice Roberts has taken steps to investigate this unprecedented breach of trust at the Court, and I hope that he will receive the full support of the Department of Justice should this turn out to be a criminal matter. It is difficult to overstate how much this breach could erode trust among Justices and Supreme Court staff, and I hope the damage is minimized by a quick identification of the party responsible. I hope every one of the Justices will continue to feel free to do their jobs and follow the facts, the law, and the Constitution.

At least one Democrat has suggested Republicans are spending more time commenting on the leak than on the content of Justice Alito's draft because we are somehow scared to talk about our pro-life decision. Let me be perfectly clear: We are not. I am proud to defend the right to life, and I know my colleagues are as well.

I think most of us have refrained from commenting because we don't yet truly know the outcome. But I will say this. I hope Justice Alito's opinion ends up being the majority opinion. As I have long believed, Roe v. Wade was a terrible decision by an activist Court that reached far beyond the Constitution and the Court's interpretive role to impose a new abortion regime on the entire country. I hope the Supreme Court overturns Roe and returns the question of abortion to the American people and their elected representatives, where it belongs.

The fight to defend life is in keeping with our highest ideals, our passion for justice, our dedication to human rights, and our compassion for the innocent and the vulnerable. I am grateful for all the Americans who have fought to make sure the right to life of vulnerable human beings is protected and have spent their time and their resources helping moms in need. I look forward to a day, which I hope is soon approaching, when innocent, unborn Americans will enjoy the full protection of the law.

I yield the floor.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. BARRASSO. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

ENERGY

Mr. BARRASSO. Mr. President, I come to the floor today to talk about the need that we have here in this country for more energy—and specifically, more American energy.

On Thursday, Leader SCHUMER and NANCY PELOSI held a press conference, and they announced they had finally come up with an energy plan. After nearly a year—a year of Joe Biden's energy crisis where he killed the Keystone XL Pipeline, struck down leasing—it is good to see they finally have a plan.

It turns out this official Democrat energy plan is not going to create one more drop of American energy. So what will the plan do? Well, if you look at it, you will see it sends bureaucrats—unelected, unaccountable, heavy-handed bureaucrats—to shake down energy companies. Instead of producing more American energy, they want more Federal investigations into American energy.

It won't lower the price of energy—no, not by a single penny. If anything, it might actually increase energy costs across our country. People in Wyoming this past weekend were paying $4 a gallon for gasoline. It doesn't take a Federal investigation to figure out what is wrong here with energy in America. We know why prices are up: supply and demand. Very simple. Demand for energy is up, and supply is not. Supply is actually down.

Yet, after a year of high prices, Democrats still refuse to admit it, ignoring inflation, not facing the facts that we have the American energy in the ground here and they won't let us get it out.

But now the Democrats are coming up with election-year conspiracy theories. They say high prices aren't happening because of the law of economics. They are saying it is happening because of secret backroom deals. Democrats claim it is an international conspiracy rigged by a global oil market.

Instead of producing American energy, Democrats want to produce excuses, one after another.

At the Democrat press conference, the majority leader said: ''The American people didn't send us here to point fingers and blame each other.'' They ought to point fingers at themselves. That is exactly what the Democrat leader and the President have done for the last 15 months since the day Joe Biden took office. They blamed inflation on coronavirus, then they blamed it on economic growth, then they blamed it on corporations, they blamed it on ports and shipping companies, they blamed it on Vladimir Putin, everyone except themselves who are the cause of the problem.

They will blame anyone, as long as they don't have to change their radical and reckless policies. But they won't deal with the problem. Right now, Democrats basically point to the fact that they are determined to give the American people more of the same, and it is the same things that have brought Joe Biden's approval numbers to an alltime low—on the inflation, on economy, on the cost of energy—alltime historic lows, for a President who should know better but is following the lead of the liberal radical left.

So people are going to be facing more inflation, more high energy costs. And it now costs so much to fill up a tank of gasoline; it is over a hundred dollars to fill up, and I saw that repeatedly across Wyoming last weekend.

This is the same level of anxiety for hard-working families at the end of every month when the paychecks don't keep up. On Sunday, just this past Sunday, the cost of diesel hit an alltime high. Not just a 40-year high like we have for inflation, an alltime high for diesel fuel.

Diesel prices have doubled since Joe Biden took office. Higher diesel prices means it will cost more to transport goods to market. Food prices are up; everything that one buys at the market is up. No matter how bad it gets, Democrats refuse to change course.

Joe Biden continues to attack American energy and American energy workers. Right now, Joe Biden's administration are blocking oil and gas leases at 80 percent of the available Federal lands. There are thousands of drilling requests that are in limbo, which is where Joe Biden has put them.

He has done everything possible, you would think, to undermine investment in American energy. Told the banks, don't lend. Told businesses, don't invest. An attack on direct—on jobs and affordable energy.

If Democrats were really serious about lowering energy prices, they would stop their war on American energy. We need to unleash American energy, not keep it in the ground. Look, Democrats remain the party of higher costs, the party of expensive regulations, the party of high taxes, and the party of greater reliance on foreign countries.

Working families cannot afford the Democratic agenda. People feel stuck or stressed. They are squeezed by inflation. They are squeezed by high energy prices. They have to make decisions about how they drive and how they eat and what they eat and how they live.

The Democratic policies have brought us all of this. We need to replace the Democratic policies; and come November, we are going to replace the Democrats in the House and in the Senate.

I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Pennsylvania.

Mr. CASEY. I ask unanimous consent to speak as if in morning business.

The ACTING PRESIDING OFFICER. Without objection, it is so ordered.

UKRAINE

Mr. CASEY. Mr. President, I rise this morning to express concern for the people of Ukraine and the hundreds of millions who are going to bed hungry across the globe.

Every day since that terrible day, February 24, we have watched in horror as Vladimir Putin and his army, his forces, killed innocent Ukrainians, over and over and over again like nothing—nothing—we have seen since World War II.

Russian forces continue to besiege and shell Ukrainian cities like Mariupol, where over the last two months, civilians have lived in bunkers under perpetual fire. These are civilians in those bunkers.

Only yesterday, 130 civilians managed to escape the battered Azovstal steel plant. Describing the last several months, one evacuee said:

> You can't imagine how scary it is when you sit in the shelter, in a wet and damp basement which is bouncing, shaking. We were praying to God that missiles fly over our shelter, because if it hit the shelter, all of us would be done.

Sadly, 200 more Ukrainian civilians have been unable to evacuate, even as Russian forces began storming the steel mill just yesterday. So our prayers are with them and the remaining brave Ukrainian fighters continuing to hold on to this plant.

But atrocities continue across all of Ukraine. In Donetsk yesterday, three civilians were killed on their way to collecting water—collecting water—for their families.

The United States, of course, must continue to help Ukraine fight against Mr. Putin and his forces. Mr. Putin is the incarnation of evil. It is as clear as any debate could be.

The good news is, countries all over the world are unified against him. But we have a long way to go. Now, I and so many others across the House and the Senate strongly supported the appropriation that Congress made back in March—$13.6 billion in emergency appropriations to support Ukraine, and I stand by President Biden's recent $33 billion request to help Ukraine defend itself over the long term.

Unfortunately, in that first number, the $13.6 billion, the good news is we had support for that in both parties. But I have to say for the record: Not enough support on the Republican side. Here in the Senate, 31 Republicans voted against the $13.6 billion. And when you add up the Senate Republicans voting against the $13.6 billion in the spending bill and add them to the House Republicans, which is, obviously, a much bigger number, it is more than 200 Members of the Republican Party in the U.S. Congress voted against every single penny of the $13.6 billion for Ukraine.

So I hope—I hope—when it comes to the $33 billion that I hope we will be able to pass—but I am sure it will be a number at least comparable to that. But whatever the number is for the people of Ukraine, I hope that we will get unanimous support in the U.S. Congress.

I hope we won't see more than 200 Members of Republicans in the Congress voting against the people of Ukraine. This is not a difficult choice. You are either on one side or the other.

I said Mr. Putin is the incarnation of evil—he is. The good news is, we have another choice. The other choice is Mr. Zelenskyy, the people of Ukraine, and those brave fighters in Ukraine. They are the personification of all that we claim to stand for when we talk about democracy.

This isn't a moment to theorize or to talk about democracy in glowing terms without taking actions. They are doing the fighting on the battlefield. The least that we can do is vote the right way. That is the power you have as a Member of Congress. House, Senate, Democrat, Republican or Independent, you have the power to vote. And I hope that we will have unanimous support for the $33 billion that the President has asked for.

Now, what will that funding entail? I won't go through all of it, but this funding will include $20.4 billion in additional security and military assistance for Ukraine. It is important to put that into context, so it is basically 20 of the 33 will be for security and military assistance. That is on top of what has already been appropriated just since the battle—the war in Ukraine started when Russia invaded.

With President Biden's leadership and with a lot of support in the Congress, we have been able to provide billions of dollars just on the military and security assistance, not to mention the humanitarian support, the sanctions, and the unified approach that so many countries around the world have taken.

But we have a lot more to do, and in my judgment, the $33 billion won't be enough. We are going to be back at it probably in a few months providing more. But at a minimum, we have got to get this done for the people of Ukraine. Part of that appropriation will be the replenishing of donated NATO weapons and equipment.

This help, in total—all of this security assistance and other humanitarian support—will be critical to Ukraine's

ability to prevail—to prevail—over Russian forces through the summer and the fall. We must continue to provide all of the artillery, the anti-tank, the anti-air weapons, and air defense systems and other capabilities that Ukraine can use to block Russian authoritarianism and support the Ukrainian people. However, regardless of how much support the United States, NATO, and other allies and partners provide, we must remember that nothing we do—nothing we do—is comparable to the awesome sacrifice for freedom and democracy that Ukrainians are now making every day when they give their lives—they give their lives in this war—and have their own families shattered in the process.

They are upholding—the people of Ukraine, those brave fighters on the battlefield every day, every week, every month now, those Ukrainians are upholding democracy, not just for themselves, not just for our country, but for the entire free world.

There are, of course, other consequences to this war. The war has already driven over 13 million Ukrainians from their homes. These Ukrainians, who are either refugees going to another country or internally displaced within Ukraine but are outside of their homes, that number is equal to the entire population—roughly equivalent, 13 million, to the entire population of my home State of Pennsylvania. Just imagine that, 13 million people being displaced. And, unfortunately, it doesn't seem like that will be the end.

So I want to commend the European Union and Ukrainian neighbors in the region for their warm welcome to such an unprecedented refugee flow from Ukraine. Now, recently, just two weeks ago, traveling through Italy, Georgia, and France, I saw everyday Italians, Georgians, Frenchmen and Frenchwomen opening their hearts and their homes to Ukrainian refugees, not to mention the people of Poland, who have done so much, and so many others.

Just one example, in Italy, faith-based nonprofits like Sant'Egidio that we had time to meet with on our trip have led the way in providing support to those in need.

I also commend the administration's work to support these refugees across Europe and those remaining in Ukraine, much of that work funded by part of the $13.6 billion that Congress appropriated in March.

FOOD SECURITY

Mr. President, let me move to another topic, but it is directly related to what we just talked about: food security. Our work on the overall strategy, as it relates to the people of Ukraine and protecting democracy, is far from complete.

The world has not yet felt the full effect—the full brunt—of the global effects of Mr. Putin's unprovoked, unlawful, and certainly unjustified war. While millions of Ukrainians have already become refugees, or internally displaced people, there are food shortages in more than one-third of the country. By the end of the year, tens of millions across the globe also will face immediate danger from hunger.

So this is a crisis for the people of Ukraine on a whole host of fronts, obviously, but it is also a food security crisis for the world at the same time.

The reason for that immediate danger that people face right now being unable to find the food that they need to survive is because of this invasion, as well as, obviously, the terrible impact the pandemic has had.

As a breadbasket of the world, before the war, Ukraine fed over 400 million people across the globe, and the greater Black Sea area exported more than 12 percent of the food calories that are traded worldwide. The war has cut off, cut off, these supplies while also raising fuel and transportation costs.

There is less food to go around, and it costs more to get food to those who need it the most.

This comes on top of the COVID–19 pandemic, as I mentioned, which increased hunger and complicated supply chains and climate change effects like severe droughts and floods.

It also costs more to grow food, as Russia previously dominated the world's fertilizer markets. Today, both food and fertilizer prices have skyrocketed to higher than ever before, and the World Food Programme estimates that 878 million people across 92 countries of the world do not have adequate food on their table—878 million people.

Over 276 million people now face acute food insecurity, meaning that they are in immediate danger of not being able to find their next meal. So they are the ones in the most trouble right now all across the world—276 million. It is not all the folks who are hungry and have a food security crisis but those who are in immediate danger.

Due to Putin's horrific war, by the end of 2022, another 47 million people will likely face those same dangers—47 million people. That will mean that around the world, almost as many people as live in the entire United States will face immediate danger from hunger. Most of these people live outside of Ukraine in the Middle East, Africa, Latin America, where any further price shock may put entire communities at risk.

I see the distinguished majority leader. Does he want me to suspend?

I yield the floor.

RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The majority leader is recognized.

U.S. SUPREME COURT

Mr. SCHUMER. Mr. President, I thank the always gracious, always thoughtful, always perspicacious, always persistent—and many other good adjectives—Senator from Pennsylvania for yielding.

Now, Mr. President, there is only one way—only one way—to describe the Supreme Court's reported decision to overturn Roe v. Wade: an abomination.

Such a decision, if it comes to pass, would be an utter abomination. Women across America would suffer irreparable harm to their rights, their health, and their dignity. It would go down as one of the worst and most damaging opinions that the Court has handed down in modern history, and the Court would suffer a mortal blow to its reputation that I fear will last forever.

Yesterday, I pledged that Senate Democrats will act on legislation to codify Roe into law. It is vital that we act quickly because this is no longer an abstract exercise. This is as real as it gets, America—as real as it gets.

Every single American is going to see where every single Senator stands on protecting a woman's right to choose. And rest assured, Americans will be watching.

Now, we must be clear. This week's draft decision didn't come out of nowhere. It didn't materialize in a vacuum. Indeed, the blame for the end of Roe lies primarily right across the aisle here with Senate Republicans.

The Supreme Court's decision to overturn Roe would never have been possible without Leader MCCONNELL and Senate Republicans spending years packing our courts with hard-right judges, judges who came from a list under the Trump years that the Federalist Society approved. And the Federalist Society's purpose, when it was put into action, from what I have read, is to repeal Roe. And the Republicans on this side of the aisle, right there, were willing—willing—accomplices in that deed.

Let me say it again. The Supreme Court's decision to overturn Roe would have never been possible without Leader MCCONNELL and Senate Republicans spending years packing our courts with hard-right judges.

Now, Republicans are twisting themselves into pretzels, trying to distract from this truth. Yesterday, Leader MCCONNELL said that the real story was somehow the leaks and not the end of Roe.

Can you believe that? The leaks are more important than the rights of 100 million American women? Give me a break.

And when Leader MCCONNELL evidently was asked at his press conference yesterday: Are you glad Roe would be repealed, he wouldn't even answer that, even though he had worked years to do it, because they know where history is going. They know where the American people are. They know they are on the wrong side of both so they are trying to ''low key'' it.

Republicans have spent decades trying to achieve the end of Roe, and now that they are about to succeed, they are flailing around, talking about a leak instead of owning up to their own actions. We won't let them. We know, all of us, why Republicans are spending

all their focus on the leak. It is because they don't want to focus on Roe, where, again, they are on the wrong side of history and the wrong side of the American people.

Their hypocrisy and refusal to own this decision is utterly shameful. The end of a constitutional right to choose is not some small or inconsequential subject; it is huge. It touches on one of the most personal, most private, most important decisions a woman can make regarding her body.

So it is worth saying again: Without Senate Republicans working years to pack our courts, without them changing the rules of the Senate to confirm three ideological Justices, Roe would not—would not—be on the brink of being overturned.

And don't take my word for it. Leader MCCONNELL himself expected and hoped for this outcome. When asked in 2019 what confirming President Trump's Justices meant for the antiabortion movement, he said:

> There are a number of [States] who have enacted new legislation [that] would be winding its way up through the courts and [it] gives us an opportunity to begin to pick away at Roe v. Wade.

''Pick away at Roe v. Wade.''

So what the Court did was not an aberration; it was a plan, a plan by Senate Republicans, a plan by Leader MCCONNELL.

Senate Republicans spent years rubberstamping one radical Trump judge after another onto the Federal bench in order to ''pick away at Roe.''

Many of these judges were wildly unqualified. Many of them were out of step—far out of step—from the American mainstream.

What is more, every single Republican also changed Senate rules to confirm not one, not two, but three Trump Justices to the U.S. Supreme Court, assuring a 6-to-3 conservative majority. Some of these Justices lied to the Senate by misrepresenting their views on respecting precedent when it came to decisions like Roe.

And, of course, after the death of Justice Scalia, Leader MCCONNELL took the unprecedented and truly destructive step of preventing the Senate from considering the nomination of Merrick Garland.

So nobody here should be fooled. Nobody in America should be fooled. The Republican leader might not say it, but the end of Roe is a culmination of actions taken by the Republican leader and the Republican Party writ large to skew our courts with hard-right, ideological, vehemently anti-choice judges.

And now that they are close to succeeding, they can't even bring themselves to own up to their own actions because they know—they know—just how strongly the American people oppose restricting the right to choose.

But this is not the end of the story. Republicans cannot hide from the American people and cannot hide their role in bringing Roe to an end. They will have to answer to the people this month, this year, and especially this November, when American voters go to the polls. And we are going to vote here in the Senate to make clear where every single Member stands on the right to choose.

Few issues—few issues—are as personal, as private, and as important to Americans as whether or not to have an abortion. The Nation will be watching to see who in this Chamber will defend this precious right to choose and who will stand with the Roberts Court to destroy this right in one fell swoop.

BUSINESS BEFORE THE SENATE

Mr. President, now, on another subject—on a very different subject—tonight, the Senate—or, this afternoon, the Senate will begin holding votes on as many as 28 motions to instruct before the conference committee begins the work of finalizing our jobs and competition bill.

Twenty of those motions to instruct come from Republicans, a sign of the immense good faith Democrats have shown Republicans in getting this bill over the finish line.

For the information of all Members, we are going to be voting late into the night to get through as many of the motions to instruct as we can. I ask Members to vote quickly, to stay near the floor, so we can keep the process moving smoothly and as quickly as we can on the floor of the Senate.

Once again, I thank my dear colleague from Pennsylvania for yielding.

I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Pennsylvania.

FOOD SECURITY

Mr. CASEY. Mr. President, I thank the majority leader.

I will resume my comments about food security.

As I mentioned earlier, across the world now, we not only have 276 million people who now face acute food insecurity—as I said, meaning that they are in immediate danger of not being able to find their next meal—but what is ahead is an exacerbation of that problem. Another 47 million people will likely face these same dangers by the end of this year.

So a food security problem, which was a substantial problem before the pandemic, made ever worse by the pandemic, has gotten much worse because of the war in Ukraine—all caused by an attack on a sovereign country by a brutal dictator, Mr. Putin.

So this is one of the many reasons why this war in Ukraine—or why all of us, I should say, across the free world have a stake in what happens in Ukraine.

I wanted to also highlight what the United States is doing in the midst of this terrible food insecurity crisis.

We can't afford to forget and should not forget about the tens of millions who are struggling to survive as a result of this invasion. To feed all of those in need, the World Food Programme, which does such good work all across the globe—goes into conflict zones to provide food to people—that program estimates it will take more than $18 billion.

The United States must not share this burden alone, but if we don't lead the way, no one will. That is true in so many instances. It is true with regard to the President's leadership against Mr. Putin by helping the people of Ukraine; it is also true in terms of American leadership on food security.

President Biden's request for $33 billion for all aspects of the challenge in Ukraine doesn't include enough, in my judgment. It includes $1.6 billion for food security and humanitarian assistance. Now, that sounds like a lot of money, but it is not enough to meet the moment.

And despite my consistent urging, Congress has appropriated flat funding for the U.S. food security program, Feed the Future, over the last 10 years. Adjusting for inflation, the program has been cut by almost a third of its total programming, from almost $1.5 billion in today's dollars to just over $1 billion.

So, today, we face the same global food crisis which the Feed the Future Program was originally created to address after the 2008 recession. So after a recession, we had a global food security challenge, and now after a pandemic, and exacerbated by the war in Ukraine, we have potentially an even greater challenge.

So we must again rise to the challenge. When I say ''we,'' I mean the U.S. Government, the Congress, the branch of our government that appropriates money, has to rise to the challenge by providing the resources that are necessary to feed those who face famine—not just missing a meal here and there, famine itself.

We have got to support these smallholder farmers, who are the backbone of the world's food supply, and sustainably strengthen food systems to protect against the next war, the next pandemic, the next drought, or the next flood.

So that is why I am leading a letter to appropriators urging robust funding of all—all—global food security accounts in the fiscal year 2023 budget, specifically calling for an almost $200 million increase just for the Feed the Future Program, not to mention those other global food security programs and accounts.

This funding will only put a dent in the growing food security crisis, but it will inspire our allies and our partners to follow us. America leads the world in so many ways, and, fortunately, most of the time on food security we have led the world as well.

We need to do that again. We need to lay the groundwork for a more secure food future and save tens and tens of thousands of lives—potentially a lot more than that—in the immediate future.

NATIONAL CRITICAL CAPABILITIES DEFENSE ACT

Mr. President, I will move to one final topic before I conclude. This is a

topic we are hearing more about because of the pandemic and because of legislation we are working on right now.

Today and tomorrow, as the majority leader made reference to, we are going to be voting here in the Senate on measures ahead of a conference—kind of a coming together of the House and Senate—to work out differences on landmark legislation aimed at addressing U.S. economic competition with the Chinese Communist Party and investing in American workers.

As the House and Senate proceed to this conference on the Senate-passed U.S. Innovation and Competition Act and the House version, which is called the COMPETES Act, I urge bipartisan leadership in both the House and the Senate to negotiate in good faith and ensure substantive provisions that support the interests of American workers, supply chains, and security.

Key among these provisions in the trade title is the House COMPETES Act and within it, the bipartisan, bicameral National Critical Capabilities Defense Act, which both Senator CORNYN and I wrote and have led the effort on to pass this legislation. In the House, Representatives PASCRELL and DELAURO have worked on this as well.

The pandemic exacerbated a problem that has been decades in the making. Here it is: The United States has ceded its manufacturing power to other countries—especially countries like China—that don't play by the rules. From the PPE shortages that we all know so much about at the beginning of the pandemic—I mean, we couldn't even provide enough masks, gloves, and gowns for our own people. That was an American failure that was long in the making. We cannot—cannot—allow that to happen. But, of course, PPE doesn't end the story; we have ceded our manufacturing power to other parts of the world in so many other ways.

For too long, corporations have prioritized their profits over anything else. They have prioritized those profits by offshoring their manufacturing to countries with low labor standards that undercut American workers, thereby lowering the cost of design and production all across the board. So offshoring our manufacturing capabilities—the best in the world, I would argue—why would we offshore it like we have over a generation? Offshoring our supply chain has gotten so bad that it is now putting our economic security at risk, but it is also putting our national security at risk.

The issue is that we don't even know how bad the problem is. At its core, this bill, the National Critical Capabilities Defense Act, is a transparency effort. We need to know how much we are relying on foreign adversaries for both the design and manufacturing of goods that are critical to our economic and national security interests. Once we know that, we can start investing in domestic manufacturing strategically, which will lower costs for families, provide good-paying jobs to American workers, and ensure that we are no longer relying on adversaries for the basic functions of our economy.

This is a commonsense policy, and that is why this bill has bipartisan support in the House and the Senate. Members of the Senate are coming together on this who often don't agree on much but agree that we have to protect our manufacturing base. We cannot be at the mercy of other countries in a pandemic or more generally when it comes to our economic interests but also our security interests.

That is why Biden administration officials, from the National Security Advisor to the Secretary of Commerce, have acknowledged a need to review outbound investment. Even former National Security Advisor H.R. McMaster proposed some form of a government outbound investment review mechanism.

I recognize that this is not an easy problem to solve. It is not an easy mechanism to create within the bureaucracy of the Federal Government. But this critical moment calls for having to do the hard work to ensure that we are meeting the economic and national security challenges of the day.

This is a moment to do the work to set our government and the American people up for success in a world where the Chinese Communist Party will continue to incentivize American investment into that country and away from the United States, thereby eroding the foundation of American power, which is leveraging our economic might to uphold liberal Democratic norms—the same norms that are being challenged every day in places like Ukraine.

So this is why I urge my colleagues in leadership to work with me and to work with others in a bipartisan, bicameral effort to negotiate and hammer out the details of this legislation and to ensure the inclusion of this critical legislation in a final competitiveness package.

If a company is outsourcing technology, outsourcing a product that compromises or has the potential to compromise our national security, we not only should know about that, but we should have the opportunity as a government whose first duty is to protect our national security. That same Government, the U.S. Government, should be able to review those transactions and make a determination about whether or not that outsourcing will put us at a disadvantage. That is a reasonable request for people in both parties, both Houses, and the administration, and it is about time we did this. It is long overdue.

So this isn't simply that we couldn't make enough masks and had to rely upon other countries in a pandemic. That was bad enough. That was embarrassing enough. This is a lot more than PPE; this is about our economic security and our national security.

There is no reason why those kinds of investments that companies make every day—sometimes without any thought about what it will do to our security—there is no reason why that shouldn't be the subject of an appropriate review to protect our national security.

With that, I would yield the floor.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The bill clerk proceeded to call the roll.

The ACTING PRESIDENT pro tempore. The Senator from Oklahoma.

Mr. INHOFE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

REMEMBERING ORRIN G. HATCH

Mr. INHOFE. Mr. President, much has already been said on this floor as we express our love and admiration for our friend and former colleague, Senator Orrin Hatch of Utah. He was not like any other Senator. Orrin was the best of all of us, and our household is very sad to hear of his passing.

I will never forget the time he took to answer calls from an obscure State senator from Oklahoma. If you haven't figured it out, that was me. He had a way about him with everyone he met, an unwavering kindness and gentle nature that Kay and I will miss deeply. You don't see a lot of that in the U.S. Senate. We were close long before I was even in the House. Orrin was the one whom I would go to for wisdom. We had the same love for Jesus and everything that we hold dear.

I will always remember his humor, but he also gave his best advice. He was not just a friend but a confidante. Whether he was talking about Scripture or history, he had a way of saying things that brought people together. You don't see that today. You see people fighting each other, and that is what people always say. When I go back home to Oklahoma, people talk about, why don't you guys get along? Well, we do. It just doesn't come across that way. But it did with him.

I think back fondly on everything that we did while Orrin was in office. Despite strong opposition at the time, myself and Senators Hatch, Chambliss, and THUNE were able to pass an amendment permitting the Air Force to enter into a multiyear procurement for a total of 60 F–22s during the 2007 NDAA. The NDAA is something we pass every year. It is the National Defense Authorization Act. And that happened that year. Now, that turned out to be one-third of our total force in one effort, one NDAA effort.

The argument against the amendment at the time was that we didn't need such an air-dominant fighter, but we knew we were making an investment in the future of our defense. Orrin had that foresight. He was always looking to the future. In advancing years,

people would joke around about it because he was looking at the next generation. He showed that foresight always when others didn't.

Not only that, but together we worked very closely to ensure the future of our Air Force depots. I remember the codel. A codel is a group of Members who go someplace to examine things. I led a group codel, along with Senator Hatch and Senator Chambliss, which toured each one of our depots as part of the initiative to restore their funding. This is something that we had to do at that time because our previous administration had not done an adequate job.

Now, Orrin—you know, you think of him as always a serious person. He wasn't. Most of the time, he was poking fun at himself. I remember laughing often when he was around. Together, we supported funding for these Air Force depots that continue to be vital to our home States of Oklahoma, Utah, and Georgia, but we had fun while doing it. That was Orrin's way of doing it. He always had fun.

For those of you who are not familiar with our Nation's depots, they are state-of-the-art maintenance and repair facilities for the Air Force's aircraft. We do this ourselves because we can't trust anyone else to get them done. Simply put, our Nation would not be able to rule the skies without the critical maintenance and repair work that is performed on our incredibly complex aircraft.

To ensure our Nation will always have our Nation's depots, there are laws commonly called core and 50/50 laws which preserve the depots' maintenance. I know that a lot of people are not familiar with the term ''depot,'' but it is critically important for our survival.

Throughout my tenure on the Senate Armed Services Committee, I greatly appreciated the legal analysis that Senator Hatch provided my staff and me when the executive branch would send over suggested changes to these critical laws.

Now, there were many times when, after reading those proposals, Senator Hatch would raise the alarm, and my colleagues on the Senate Armed Services Committee and I would then turn to do battle, and sometimes we had to do what was necessary, but we did it together.

After the Obama administration canceled the NASA project Constellation, which was supposed to replace the space shuttle, there was a real question whether the civilian solid rocket motor industry, which employs thousands of people in Utah, was going to survive. Obviously it did survive, and that was due to Orrin Hatch. Using his considerable legislative skills, Senator Hatch was able to insert language in the fiscal year 2010 National Defense Authorization Act that directed the new heavy-lift Space Launch System be built to lift, from inception, 130 tons—an objective which at the time could only be accomplished by using solid rocket motors.

And he did it. He did it. He looked out into the future. This is back when he was actually in advanced years himself. As a result, a few weeks ago, NASA rolled the SLS out to the launch pad for testing before it carries the astronauts to the Moon in what is projected to be 2025.

I was also very impressed by how Senator Hatch used his prominence to promote the use of Hill Air Force Base. Whenever there was an Air Force official within hearing distance, Senator Hatch would espouse the strength and capabilities of the Hill, Ogden Air Logistics Complex, and he did so very persuasively. The results were there, and he was the guy who did it. In fact, I honestly believe that one of the reasons Hill was chosen to receive the first three squadrons of F–35s is that Orrin Hatch was always advocating for Hill with the Air Force senior leadership.

Now, one of the things that I loved about Orrin Hatch was his placement of obscure words into many of his speeches. He would say things that were so obscure that no one would know what he was talking about. No one in the Senate wanted to believe that they didn't understand what he was talking about, but they didn't. He would use words that no one really had any idea what they meant. I actually wrote these down some time ago.

''Bovarism.'' That was defined, by him, as having an exaggerated, especially glamorized, estimate of oneself. I think we know what we are talking about there.

''Cockalorum'' is a small man with a big opinion of himself. We know that.

''Furphy'' is a false report or a rumor.

When asked why he insisted on using that kind of vocabulary, Senator Hatch would beam his boyish grin and chuckle and respond:

I like confusing the Democrats.

He had a very peculiar way of trying to get to know volunteers. He would get people who had no status in life. He would have people who were driving cars. Many of them were young people who were escorting him to different places just to make speeches or something. He had a peculiar way of trying to get to know volunteers—people who no one else paid any attention to. If they were driving him to events, without fail, he would always compliment the volunteer about his car. It could be an old junker car, but, nonetheless, he would talk about it because he knew young people were proud of their cars. I am talking about the young volunteer could have been driving a 50-year-old Yugo, with the floor rusted through, but I can assure you that Senator Hatch would find something nice to say about the volunteer's car.

My personal opinion is that one of the best ways to know someone is to listen to him pray. When we address our Creator, we reveal who we really are. Many of us waited around and listened and waited for Orrin to give one of his prayers. He had that kind of a love that everyone enjoyed. For those who have listened to this or who have read this record, I want to present the genuine Orrin Hatch to you—a person whom we all came to know and love.

In 2010, Senator Hatch was chosen to say the main prayer at the 57th National Prayer Breakfast here in Washington. It has been going on for 60 years, and we have had our 60th now. This is something that will last forever.

I ask unanimous consent to have printed in the RECORD, at the conclusion of my remarks, the full text of Senator Hatch's prayer for peace and tranquility in front of that crowd of 4,000 people on that February morning 12 years ago.

Today, I believe Orrin Hatch fully enjoys the peace and tranquility that he prayed for. All of that is to say, Orrin Hatch will be missed dearly by me and by the many friends of Orrin Hatch's. We have lost a true hero and one of my closest personal friends. Kay and I are praying for Elaine and their family and loved ones as they go through this difficult time.

So today is goodbye to my friend.

God bless you, Orrin Hatch.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

''Let us pray. As we bow our heads this morning before Thee, we are so grateful for this great nation, and for the nations of the world and especially for the opportunities we have as a nation to bring peace and contentment and tranquility throughout this world. We are grateful for our great leaders and pray Thou will bless them. We pray that Thou will bless our President and our Vice President and their cabinet. And all the leaders throughout the federal government, that they might be inspired to lead us to do the things that are righteous in Thy sight. That we might be able to be good followers and that we might be able to bind together to do what is right. As Moses' father-in-law told him, let's share the responsibility and let's work together in the best interests of our country. Let's have bipartisanship reborn again in this great nation. We are so grateful for those who serve in the military, who are represented here today and throughout this country. We are grateful for all the sacrifices that they undertake on our behalf. We are grateful for those who are in harm's way and we pray Thou will pour out Thy special blessing upon them, that they may be blessed and protected. And we pray that we might be a nation that will help bring peace and tranquility throughout the world. We are grateful for all the food, clothing and shelter that Thou hast provided for us. We are grateful for those who serve in governments throughout the states and the respective state legislatures. And last but not least, we are grateful for the Congress of the United States and pray that the Congress might be able to work together, as Democrats and Republicans and Independents, to serve Thee and serve our country and to serve our fellow men and women. And bring peace and content to this great nation and throughout the world. We pray at this time for those who are suffering in Haiti and elsewhere throughout the world and ask you to bless them and help them and help us to do

our share in helping throughout this world. We are grateful for leaders from other countries who are here and pray Thy blessing upon them. Once again, we ask you to bless our President and Vice President and the leaders of this country. In the name of Jesus Christ. Amen.''

Mr. INHOFE. I yield the floor.

The PRESIDING OFFICER (Mr. HICKENLOOPER). The Senator from Nebraska.

RUSSIA AND CHINA

Mr. SASSE. Mr. President, Ukraine's struggle against Russia's invasion has reminded Americans that, sometimes, the world divides into good and evil and into heroes and villains. Not always. There are many fights that are not like that, and we just stupidly talk like it. Debates about marginal tax policy are not good versus evil or heroes versus villains; but, sometimes, fights are heroes versus villains.

Heroes are men and women who love their country and who love their freedom and who want to pass along freedom to the next generation, but they are also people who believe in freedom more broadly. Heroes are people who believe that we were created in the image of God and that everyone has unalienable rights: the rights to life, liberty, speech, religion, assembly, protest. These are pre-governmental rights. Governments don't give us these rights; we are endowed with these rights by nature and nature's Creator. Heroes recognize this not only about themselves and their own countrymen and -women but about everybody. Zelenskyy is such a hero.

The villains are tyrants. They are people who want to oppress others, who want to hold them down. They want to take freedom from their countrymen but also from their neighbors. They are people who seek power at the expense of the weak. Putin is such a villain.

But there is another villain in this drama, a villain who isn't getting nearly enough attention, and he is Chairman Xi, the dictator in China. His Chinese Communist Party has enabled him to do all sorts of oppressive things against men and women in his country. We know what is happening in Xinjiang—there is actually a genocide happening against the Uighurs in our time—but Xi is doing more than just oppressing people at home.

A hundred years from now, when the history of the Russian invasion of Ukraine is written, assuming that it isn't written as Chinese propaganda, I am confident that the public will have a much clearer understanding of the way that Xi and Putin have worked together and have worked together closely. We can't talk here about everything we know in the Intelligence Committee, but I am confident that, when the history is written, the American people and the people of the world will see Xi and Putin as having worked hand in hand, side by side.

Americans should understand this today: Chairman Xi is not indifferent about Ukraine. He is on Putin's side, and he has supported Putin's unprovoked war.

The situation in Ukraine reminds us of a pretty good rule for 21st century foreign policy, and it is this: The Chinese Communist Party is almost always on the wrong side of freedom and human dignity.

The CCP and the United States are in the middle of a global conflict of visions. It is important for us in this Chamber not to say ''the United States and China'' as if we mean 330 million Americans and 1.4 billion Chinese are locked in a battle; but the U.S. vision, the American idea, is in conflict with the vision of the Chinese Communist Party and the ways that they want to oppress not just their neighbors but their own citizens. The CCP and the U.S. are locked in a global conflict of visions, and that is true whether DC politicians want to admit it every day or not, and sometimes it seems convenient for folks not to admit it.

It is the free peoples of the world—NATO allies, Ukrainians, and other freedom lovers—who are fighting against a handful of totalitarian regimes—chiefly, Putin's Russia and Xi's Chinese Communist Party. These are the folks who are terrorizing not just their own people but their neighbors. This contest is a contest between liberty and tyranny. Not every fight is, but this one is; and you had damned well better believe that the tyrants are working together strategically and intentionally to undermine freedom.

So let's back up to February 4.

The Winter Olympics had just begun, and Vladimir Putin was in China to visit Chairman Xi. Together, they released what they called a ''joint statement'' announcing a new partnership with ''no limits.'' The Xi-Putin statement said there would be no limits in their partnership against the United States. They promised that they would work together to promote each other's economic and national security interests even as Putin was amassing forces on the border of Ukraine and preparing for his invasion. Xi was not unaware of what Putin was planning when he released and signed the ''no limits'' statement.

Here is why this is strange: Historically, Russia and China have not been friends. For centuries, these two countries have clashed with one another. During the Cold War, not even shared communist ideology could unite China and Russia for very long. The CCP studied the collapse of the Soviet Union to learn how to keep a communist regime afloat, and they have been very adept at using new technologies not to advance human freedom but to squash human freedom. Now, though, the historic rivals have found something they have in common. Both Putin and Xi hate the United States and hate, most fundamentally, our ideas of the dignity of every individual having been created in the image of God.

Let's do a little geography.

Russia and China share nearly 3,000 miles of common border. Russia is a giant. It has 11 time zones. Think about that. If you look at your globe of the world and spin it all the way around, you will get 24 time zones. Russia spans 11 of them. Russia is about 11 percent of the area of land on Earth. There are 5 countries that have about 6 percent: China is one; the U.S. is one; Canada is one—and India. So Russia has 11 percent, and 5 countries have about 6 percent. No other country has more than about 2 percent of the land mass of Earth.

The Russian-Chinese border has historically been complicated because they haven't gotten along, but as he planned to launch his wicked invasion of Ukraine, Putin needed to move troops and materiel all the way from the border with China in the East back into Europe in the West. And he couldn't do that—he couldn't leave this giant border unguarded—unless Chairman Xi said: We don't have any problems right now. And that is exactly what happened. Xi agreed that he would be on the same page with Putin as Putin took all of his troops and all of his materiel back from this historically contested border to use against the free people of Ukraine.

From the beginning of this crisis, Chairman Xi has been in lockstep with Putin. The New York Times writes in some impressive reporting that Xi even asked Putin to delay the invasion until after the Olympics ended, which Putin ultimately did.

One of the biggest ways China has supported Russia through all of this is by amplifying Russian lies and propaganda about the war. Chinese Communist Party propagandists, such as Wang Yi, have done everything from blaming the United States and NATO for the war to playing up Russia's unrealistic security demands, to echoing lies about Ukrainian biolabs.

Xi's henchmen and CCP-controlled state media have always been there to amplify Putin's falsehoods. Some of the stuff Putin is saying at home is laughably absurd even to the hosts of state TV, who are paid to read these scripts. Yet Xi has been willing to take all of it, translate it into Mandarin, and pump it into China to make sure the people in China don't have an accurate understanding of what is happening between Russia and Ukraine. The CCP's state media have been trying to tell the world repeated untrue stories about Russia, and they now cover up the atrocities and horrors that have been committed by Russian troops against Ukrainian civilians.

The propagandizing is obviously despicable, but the diplomatic support the CCP is providing Russia is even more dangerous. Through the COVID pandemic, we saw how China tried to manipulate international organizations like the WHO to promote their own narrative and to bully other countries. During the invasion of Ukraine, they have done the same thing on behalf of Putin.

The Chinese foreign ministry has participated in the consistent spreading of lies about the war through and to other international organizations.

At the U.N., Chinese diplomats have worked tirelessly to provide cover for Russian crimes and to enable Putin's invasion. They have spurned the pleas of Ukraine and other European countries to try to help restore the peace.

And just a couple of weeks ago, China's vice minister met with the Russian Ambassador to announce the regimes will ''continue to strengthen strategic coordination with Russia.'' Statements like these have become characteristic of the twisted friendship that has developed between these two aggressor nations and what they call their ''no-limits friendship.''

China has also attempted to bail out Russia and to save their economy from the crippling sanctions that we and our allies have imposed since the beginning of this invasion. As soon as the sanctions were imposed, Chinese banks were looking for work-arounds so they could keep doing business with Russia, partly for their own interests but largely to help stabilize and subsidize Russia.

Russian banks issued Chinese UnionPay cards, after Visa and Mastercard pulled out of the country, and ordered Chinese currency savings accounts. China was already in the currency manipulation business, but since February, they have been using their talents not just to prop up their own currency but also to keep the ruble from flaming out. And while other free countries have begun shunning Russia's energy sector, China's state-owned energy companies have continued to conduct what they call ''normal trading cooperation'' with Russia, looking for ways to expand and eat up more of the Russian supply.

But China hasn't only been supporting Putin indirectly. Chairman Xi has also aided Putin's invasion of Ukraine directly. The Times of London reported at the beginning of April that China launched a massive cyber attack on Kyiv mere days before Putin invaded. Think about that. The Chinese Government was involved in a cyber attack against free Ukraine to help Russia.

As the Russian army has struggled, Putin has asked Xi for direct military assistance, and Xi is reportedly deliberating about how he can do more, hoping the international community won't notice. We should notice. We should amplify what Xi is doing. He is aiding and abetting Russia's war crimes against civilians.

Here is the fact: Putin and Xi are tied at the hip. China regularly claims that it stands for the principles of state sovereignty, territorial integrity, and noninterference in domestic affairs. Yet China has supported and provided diplomatic cover for Russia's illegal, immoral, and unprovoked war against Ukraine every step of the way. Now there is the chance that Team Zelenskyy could win, and so what has Xi done in response? He has decided to convene meetings to figure out how he can amp up support for Putin.

We should be asking ourselves: Why is Chairman Xi so supportive of this invasion? Part of the reason is because Vladimir Putin is running a scout team offense for Chairman Xi's eventual planned invasion of Taiwan. Xi wants to learn everything he can about how democracies and free peoples will respond and how democracies defend themselves so that he can try to develop strategies to beat us and to beat our allies.

Xi also wants Putin to win because he thinks this will demoralize Taiwan and the rest of the free world. He wants to be able to tell a story where the age of America, where the age of freedom is over. Xi wants to plunge the globe into a new dark age—an age of surveillance state totalitarianism. And step one at this moment is destroying the friends of Ukraine.

We shouldn't deceive ourselves. What we are seeing in Ukraine is a contest between freedom and tyranny. It is not in our national interest to see the tyrants triumph. We need to show the world that the forces arrayed by Putin and Xi cannot defeat the bravery of men and women who want to live free and who believe in freedom.

Zelenskyy and Ukraine's heroes have a chance to smash the new Russia-China axis, but they need our support. Standing up to Putin and helping Ukraine is important for its own sake, but it is also important because this is the opening skirmish in a larger confrontation between tyranny and liberty, between Chinese communists and the American idea.

Will the United States continue to lead the world toward peace and freedom, or will tyrant Xi and his CCP have the chance to impose their totalitarianism on weaker countries around the Pacific?

Today in Ukraine, it is easy to see the line between good and evil, and that is why it is time for us to step up, to help Ukraine, but also to tell the world who Chairman Xi is, what he believes, what he has done on Putin's behalf, and why he is on Putin's side.

The PRESIDING OFFICER. The Senator from Utah.

U.S. SUPREME COURT

Mr. LEE. Mr. President, Justice Alito's draft opinion in Dobbs v. Jackson Women's Health is a masterpiece of jurisprudence, and it is a long overdue victory for the preborn. It is also a vindication of nearly 50 years of tireless efforts by the pro-life movement, the conservative legal movement, by textualists and originalists, and by President Trump's recent judicial appointments.

I am proud to say that this decision vindicates the efforts of people like my late father, who wrote an amicus brief in City of Akron v. Akron Center for Reproductive Health.

Incidentally, it was in that context when I first had an encounter with individuals on the opposite side of this issue. I was 11 years old when my father submitted that amicus brief while serving as President Reagan's Solicitor General.

One morning, a busload of pro-abortion rights protesters showed up outside of our home. My parents and my siblings were out running errands, going about various activities. I found myself alone that morning. I went outside to talk to the people who had shown up in our quiet suburban neighborhood in a Greyhound-size bus carrying signs and shouting slogans of one sort or another.

I introduced myself to the woman who appeared to be in charge. Her first words startled me. She said: Well, hello, little boy. We are not here to hurt you.

I thought that was strange. It ought to go without saying. It is a little alarming when that is the first thing someone says to you. I asked her what she was doing. She told me that they were there because they disagreed with some things that my father had submitted to the Supreme Court of the United States in that amicus brief to which I referred.

I then asked the question: Why do you have to do it on my lawn? She responded in a way that I found curious. She said: Well, we are trying very hard not to step on your lawn. We are actually staying on the sidewalk.

I didn't yet understand the difference between an easement and a walkway and whether they had entered onto the curtilage of our home. All I knew was that it seemed like a strange place to be doing this, in front of a private residence, a home where a public official lived and slept and raised his children.

I think about the tireless efforts of people like my late father to stand up for the rights of unborn human beings and for the injustice brought about by Roe v. Wade—a 1973 decision by the Supreme Court that stripped power away from the American people, stripped their opportunity to make decisions regarding abortion at the appropriate level of government, to have those decisions made by their own elected lawmakers rather than by unelected, unaccountable Judges who had arrogated to themselves the almost exclusive prerogative to decide how, when, whether, to what extent abortions may be regulated.

What lies before the Supreme Court is the test of weathering the storm of political opinion. The line has been drawn, and Roe v. Wade appears to be on the verge of being overturned. Should this draft opinion become the official holding of the Court, Americans will, once again, have the opportunity to debate and discuss these issues with the American people each deciding, within their respective State, what terms and conditions ought to apply, what restrictions ought to be imposed to protect human life.

This should give us all hope that America is not doomed to decline. All

it takes is persistence, even in the face of daunting odds and decades of setbacks by those who love God and love our country. For once, good men and women did not do nothing, and this evil will triumph no more.

I was thinking recently about a monument that was placed on the Mall upon the hill where the Washington Monument stands. A few months ago, people placed white flags, each memorializing those who had died with COVID–19. I believe at the time there were 6 or 700,000 people in America who had died with this illness, and so there were 6 or 700,000 little white flags, each standing only a few inches tall on that hill where the Washington Monument stands. From a distance, it looked like a snowstorm had hit Washington, DC. It hadn't. It was actually quite beautiful.

I started thinking, I started wondering: What if a similar memorial were placed—if only temporarily, like that one was—honoring, memorializing those 63 million babies who had been aborted since Roe v. Wade was decided in 1973, taking away from the American people the ability to make their own laws in their own States pursuant to authority that belongs to the American people and our constitutional system of government—63 million babies. A portion of this came out of my generation. There are an estimated one-fourth of generation X who were never born because they were aborted—63 million. What if we had small red flags, each representing one of those babies? It has occurred to me that there wouldn't be room enough on that hill to accommodate all of those. I seriously wonder whether there would be room enough in the entire Mall, between the Capitol Building to the east and the Lincoln Memorial to the west, to accommodate all of those red flags. And what would that look like? The COVID memorial looked like a snowstorm. This sea of red flags would look like something else.

Now, this moment is not without some sense of loss. When I saw a draft Supreme Court opinion that had been leaked to the news media, I experienced a wave of emotions. As pleased as I was and as encouraged as I am by what appears to be something that will soon become the opinion of the Court, I was also deeply upset that an employee of the Supreme Court of the United States could betray the trust of the Justices.

I recalled from my own time that I spent at the Supreme Court, the time I spent as a law clerk working for Justice Alito, the great lengths to which the Court went to protect the internal deliberations of the Justices. We drafted opinions on separate computers—''separate computers'' meaning we had a computer system that allowed us to handle internal correspondence between the chambers, to transfer draft opinions between the various chambers.

That computer system was completely walled off from the outside world. It was connected only by a local area network, one that was impenetrable from the outside world. If we wanted to do any research, any outside correspondence, anything that would require internet access, we had to go to a separate computer; we couldn't use that one. It was walled off completely, with good reason.

You see, the Court operates in such a way that its ultimate work product in any case will consist of a ruling; and, in fairness to the Justices, you have got to make sure that everything is in order; that the Justices each have decided exactly how they are going to vote, which opinion they are going to join, and what that opinion is going to say before they release their opinions. If those go out too early, then they are not ready. That does a grave injustice to the litigants and to the American people, generally.

That is why the Court goes to great lengths. It is not that they are being secretive about it. The Court is actually quite open and transparent. It is a matter of public record what documents they review in each case. The oral arguments presented to the Court are, likewise, matters of public record. And the documents that they produce that have legal operation are also public documents. It is actually a very open and transparent process.

But during the time period between when argument is heard and an opinion is rendered, the Court needs to be able to deliberate and consider its options confidentially. So that is what this security system does. It is there to make sure that opinions, as they are being drafted and sent back and forth, don't leak out.

In many circumstances, the editing of opinions took place on that same computer system, with drafts going back and forth; redlined, proposed edits between them. In those moments when you did need to print them out, you needed a hard copy, you could do so; but there were conditions attached to them. There was an understanding that they shouldn't leave the building, you can't take them home with you, they shouldn't go outside the Court, they probably shouldn't even go outside of your particular office. And when you are finished with them, you don't just throw it in the wastebasket; you put them in a burn bag.

Each law clerk has next to his or her desk a tall brown paper bag with stripes on it, and at the end of the day someone comes around and collects the contents of those burn bags. And they shred them. My understanding is that they shred them a couple times so that the documents are reduced not just to long, thin ribbons of paper that have been cut apart but they have been cut multiple times so that it is a fine mist of confetti.

It is also my understanding and was at the time that before any of that even left the building, they would take it to an incinerator—that confetti—and they would burn it and they would grind it up into an ashy pulp, perhaps put some water in there, creating a slurry, so that no one could look at what was previously a draft opinion and discern what is going to happen.

You see, lives are at stake. Power is at stake. Sometimes an enormous amount of money is at stake. All these things matter, and the Court wants to make sure that the opinions go out only when they are ready.

Every day was filled with a sense of seriousness and of duty, a seriousness felt by everyone, even and especially when there was disagreement. The ability to deliberate and discuss these complicated legal principles through the process of writing, editing, and sharing opinions with their colleagues is how the Justices are able to distill legal principles and arrive at proper legal conclusions and to do so, moreover, in a way that is respectful of the litigants and of each member of the Court. That is why their work is guarded from public scrutiny at this stage and why a breach of confidentiality such as what we have witnessed this week is so damaging.

And, to be clear, this is unprecedented. I can't think of another instance of this happening over the Court's entire history—certainly in modern history. I can't think of another instance in all of history in which something like this has happened, as the Court and its personnel have had a long history and a proud tradition of taking great care in these matters.

Yet while I am convinced that this leak may have been an attempt to intimidate the Justices and the majority, perhaps an effort to get them to change their position, I am also confident that this attempt will not succeed. And it must not succeed. Chief Justice Roberts said this very thing in his official statement, and he announced that an investigation into the leak will take place. I trust him and the other Justices and the Office of the Marshal at the Supreme Court to steer the Court through this storm and to oversee this investigation.

The overwhelming feelings that I have today really are of joy—joy in the probable outcome of this case—and pride in being a former law clerk to Justice Alito, for whom I clerked twice: once when he was serving on the U.S. Court of Appeals for the Third Circuit and again while he was on the Supreme Court.

The draft opinion overturns Roe v. Wade and Planned Parenthood v. Casey, stating that they ''must be overruled and the authority to regulate abortion must be returned to the people and their elected representatives,'' noting correctly that the Constitution neither explicitly nor implicitly protects a right to abortion.

Every human life, born and unborn, has immeasurable dignity and worth, each unrepeatable and infinitely valuable. The lives of an unborn baby and her mother and her father matter, and

the Court overturning prior precedents such as Roe and Casey is not unprecedented—not at all. In fact, some of the Court's most consequential and lauded decisions overturned prior rulings.

Justice Alito compared the damage wrought by Roe to that of the ''separate but equal'' doctrine created in Plessy v. Ferguson. Now, thankfully, the Supreme Court of the United States in Brown v. Board of Education overturned Plessy, putting an end to racially segregated schools, just as it appears now poised to overturn the erroneous decisions in Roe and in Casey.

The opinion is exceptionally well reasoned, thorough, and grounded in the Constitution. It also means that in States across our country, including in my home State of Utah, hundreds of thousands of unborn children—children who could not be protected by State law due to restrictions placed on them by an invented, nonexistent constitutional doctrine created out of whole cloth in Roe and in Casey—now have some chance at being protected, depending, of course, on which decision makers in which States make which decisions regarding the protection of human life.

As Americans, we must not—we can never forget what is at stake. If this majority decision stands, those who recognize the sanctity of human life—like myself and like a majority of Utahns—will have much to celebrate, but we must also recognize that this is not the end of this chapter in American history. The efforts of the last half century have not been done just simply to overturn Roe.

You see, getting to this point, the point that the Court has apparently reached, means that this discussion can finally begin. It is a discussion that has been closed out. Debatable matters have been rendered beyond debate. This, of course, is the vision of a post-Roe America. This is why overturning Roe matters. What happens next with regard to abortion will be determined by the people of the 50 States through their elected leaders, as our constitutional command of federalism demands.

Now, some States, like Utah, already have laws in place to protect the most vulnerable among us the moment that Roe and Casey are overturned. I hope and pray that many innocent lives will be saved, not just in my State but all throughout our country. And I pray for all nine Justices' safety and for our country.

We all know and we have to remember that the laws adopted in one State will be different than the laws adopted in another. Part of living in a pluralistic society, part of living in our constitutional Republic requires us to accept the idea that people have different opinions; they have different views. Regional differences appear from one State to another. I predict that the laws of Utah with regard to the protection of preborn human life may differ considerably from those of Vermont; that the laws of Massachusetts may differ in meaningful ways from those in Mississippi.

Overturning Roe v. Wade and Casey v. Planned Parenthood does not do almost any of the things that are recited in the parade of horribles that those who are condemning this decision already have recited. Among the more frequent and perplexing arguments is that the overturning of Roe v. Wade and Casey v. Planned Parenthood somehow signals or will result in the demise of democracy.

Nothing could be further from the truth. In fact, it is difficult to understand how anyone could even make this argument with a straight face. I don't mean here—not referring to their underlying position; I am referring to the specific argument that this somehow represents a threat to democracy. Quite the opposite is true.

By overturning Roe v. Wade and Casey v. Planned Parenthood, what the Supreme Court will be doing, the very thing it will be allowing is for the democratic process to unfold, for people to make laws as they deem fit in their respective States.

You see, all powers not granted by the Constitution to the Federal Government and not prohibited by the Constitution to the States remain to be made with the States or with the people themselves. That is what this does. So if we want to talk about democratic principles, this will further democratic principles. It will advance republican democracy, not undermine it.

Another argument that has been made that I find equally perplexing is the suggestion that this somehow amounts to zealots on the Supreme Court of the United States dictating to women across America decisions regarding abortion. That is also not true. There is nothing about overturning Roe v. Wade and Casey v. Planned Parenthood that requires that anyone do anything beyond the fact that it is lifting previously recognized but nonexistent impediments to State governments to protect unborn human life.

To those who have raised these concerns, to those who disagree with my views on the sanctity of unborn human life—and I recognize that there are those who do; many of them, in fact—I would direct them to their respective State-elected officials, specifically their State legislatures. That is where this decision is to be made. It is not to be made by the Supreme Court of the United States. They can't criminalize anything. It is not within their power. They are just deciding who gets to decide what. Different States are going to decide this differently, but that is part of the entire constitutional design.

What Justice Alito wrote in this draft opinion is something that I hope will stand. It is absolutely right. It is unassailable from a constitutional standpoint, and it is absolutely essential to restore the American people to that which is rightfully theirs.

I remain deeply troubled by those who appear, whether by leaking this opinion, characterizing it in ways that are unfair, threatening to pack the Supreme Court of the United States, talking about passing legislation that would increase the number of seats on the Supreme Court—these are all efforts designed to degrade, to denigrate and delegitimize the Supreme Court of the United States.

To those who have any inclination to do such a thing, I would say this: Roe v. Wade has stood in place nearly my entire life. Since I was old enough to understand it throughout my entire life, I have regarded it as a really bad decision, a very wrong decision.

Notwithstanding that, I have always regarded and still regard the Supreme Court of the United States, despite its flaws—flaws stemming from the fact that it is run by fallible, mortal human beings who sometimes make mistakes—despite its flaws, it is the greatest tribunal of its kind anywhere in the world. We would not want to substitute it because there is no better court of last resort anywhere in the world, even with its flaws. We must not risk what would come if we continue to delegitimize the Court.

In the meantime, I am grateful that the Court appears finally to be on the verge of correcting this grave injustice, and I look forward to the debates and the discussions that will occur once and for all by the people's elected representatives. These decisions will now be able to be made by the people's elected lawmakers and not by unelected, unaccountable jurists who lack authority to make that decision on behalf of all Americans.

I continue to pray for the Court and for our country. Heaven knows our Republic needs it.

The PRESIDING OFFICER. The Senator from Illinois.

UKRAINE

Mr. DURBIN. Mr. President, last week, my staff found a photo from a congressional trip I made to Eastern Europe in 1991. In one of the photos, I was standing in front of a wall. There is a message on the wall painted in big letters. It reads: ''Freedom for Baltic Countries.''

I remember that trip. The trip had special resonance for me and my family. Eight decades earlier, my mother—only 2 years old—she and her family fled one of those Baltic nations—Lithuania—to escape the tyranny of czarist Russia, and they found freedom in America.

Here I was—her son—returning to the Baltics in a remarkable moment in history. You see, 2 years earlier, in August 1989, 2 million people—I will show you the photo of this because it is historic—2 million people in the Baltic States of Lithuania, Latvia, and Estonia joined hands to form a 373-mile-long Baltic chain of freedom. This human chain spanned the three nations and sent a clear message that the Baltic nations wanted to reclaim their

freedom and their independence from the brutal occupation first by czarist Russia, then by Nazi Germany, and finally by the Soviet Union.

Months before the fall of the Berlin Wall, the Baltic chain of freedom forecast the end of the Soviet Union. But who were these countries to defy the Soviet Union? Countries with barely 3 million population in Lithuania, 2 million in Latvia, and 1½ million in Estonia were setting out to defy the superpower of the Soviet Union.

In February 1990, the people of Lithuania had chosen a new Parliament in their first free election. The new Parliament voted to restore their independence and made Lithuania the first Soviet Republic to declare independence. They were followed quickly by their neighbors, Latvia and Estonia.

You could feel at that moment when I visited the Seimas, which is the Parliament of Lithuania, the hope and history in the air, but there was also a feeling of trepidation and uncertainty. Would these small new democracies be able to preserve their freedom?

In January 1991, the blowback that many had feared occurred. Soviet tanks rolled into Lithuania's capital city of Vilnius. They attacked a crowd of protesters who were armed mainly with prayers and a few old hunting rifles, killing 13 innocent protesters and injuring hundreds more. Soviet troops and tanks attacked protesters in Latvia. I remember visiting Riga and seeing flowers and the candles on one of the walkways near downtown where a Latvian lost his life standing up for freedom in their country.

The Soviet troops could not break the determination of the Baltic people.

In February and March of 1991, the people of these three countries voted overwhelmingly in support of restoring independence. The United States recognized the sovereign new democracies later that same year.

Today, these three countries are prosperous, vibrant democracies, proud members of the European Union and NATO, and supporters of their Ukrainian neighbors who are facing Putin's monstrous military wrath.

When I visited Vilnius in January of 1991—a month before Gorbachev attacked with his tanks—I stood with the brave soldiers and ordinary citizens who filled the square outside the Parliament. They showed me their little arsenal of weapons. They took me back very quietly and secretly. It consisted of about 20 old hunting rifles. They were going to take on the Soviets. The situation seemed desperate and even doomed. Yet Baltic freedom prevailed.

I think of those days often now.

When Russia launched its unprovoked, unconscionable war, we were told Kyiv and the Ukrainian Government would fall within weeks or even days. Our military experts gave us their opinion, and that is what they said. Two months later, thank God, Kyiv is still free. Volodymyr Zelenskyy is still Ukraine's President. May God protect him.

Russia has suffered devastating losses on the battlefield and has been forced to retreat. Its forces are demoralized and in disarray. Russia's economy is faltering under the weight of the most punishing sanctions imposed against any nation in modern history.

Just as in the Baltics three decades ago, Russian strongmen have failed to understand the desire of people—even when they are outnumbered, if they are determined to be free and choose their own leaders, they will not be stopped. The Russians have failed to understand the determination of a community of democracy to stand together behind them and defeat the brutality and aggression of Vladimir Putin.

Putin may be able to deceive the people living in Russia for now, but he cannot lie to the world. We know that the Russian military has caused horrible devastation. We see it on the news. And they have committed horrific war crimes against innocent Ukrainian people. One need only look to the barbaric executions and brutality Russia has inflicted on the Kyiv suburb of Bucha. After the Russians fled, Bucha's mayor, Anatolii Fedoruk, described the immediate scenes:

> Corpses of executed people still line the Yabluska street in Bucha. Their hands are tied behind their backs with white ''civilian'' rags, they were shot in the back of their heads.

Putin had the sickening audacity to honor the military unit responsible for these crimes, saying this unit had distinguished itself in the protection of the fatherland.

Russian war crimes have not been limited to this situation. Throughout Ukraine, investigators are reporting that Russian soldiers are using rape as a weapon of war and deliberately shelling schools, hospitals, apartment buildings, emergency food centers, and other civilian targets. There are reports of summary executions of individuals and murders of children.

I agree with President Zelenskyy. In his words, he said it is ''time to do everything possible to make the war crimes of the Russian military the last manifestation of such evil on earth.''

The world can't tolerate this barbarity, and the United States must never ever provide a safe haven for anyone who commits war crimes of this nature or crimes against humanity in Ukraine or anywhere in the world. For that reason, I am introducing legislation that gives our government the authority to prosecute non-U.S. citizens who commit such atrocities in other nations and then seek haven, refuge, or seclusion in our country.

My bill is called the War Crimes Accountability Act. It closes a loophole in our current law that prevents our government from prosecuting war crimes unless they are actually committed in the United States or by or against U.S. citizens or members of our Armed Forces.

My bill would also make crimes against humanity a crime under U.S. law so that such perpetrators cannot find—ever—safe haven in this country. What would this mean in practice? If a Russian soldier committed war crimes such as those we see here or crimes against humanity in Ukraine or a person commits such atrocities anywhere in the world—say in Myanmar or in China—they can be tried under U.S. law and face criminal, civil, and immigration consequences. It builds on previous laws I sponsored to make people who commit acts of genocide or who use child soldiers in war accountable under U.S. law. Those bills passed the Senate unanimously and were both signed into law by President George W. Bush.

Despite the heroic efforts of the Ukrainian people, Russian forces continue to lay siege to the eastern part of that country, bombing civilians and forcing an even greater humanitarian nightmare.

Last week, U.N. Secretary General Antonio Guterres traveled to Kyiv. He witnessed the destruction wrought by Russia, and he said:

> When I see those destroyed buildings, I must say what I feel. I imagined my family in one of those houses that is now destroyed. . . . I see my granddaughters running away in panic, part of the family eventually killed.

He went on to say:

> The war is an absurdity of the 21st century. The war is evil.

So when President Biden announced a substantial new aid package for Ukraine, I said immediately: Count me in. The other day at the Senate Appropriations Committee on Defense, I asked Defense Secretary Austin and General Milley, the Chairman of the Joint Chiefs, about Ukraine's defense capabilities and the President's new request for aid. Both of these military leaders emphasized that continued, substantial support from the United States and its allies will be critical not only for Ukraine's future but also to reassure our allies in the region, in the Baltics, Moldova, Poland.

The $33 billion that Biden has asked for aid in Ukraine will help them withstand the next brutal phase of war and prevent Putin from spreading this malevolent war into other nations.

Let me conclude with a story about another brave soldier in the ranks of civilians, standing up to Putin's menace. Her name is Sviatlana Tsikhanouskaya. She is a leader of the democratic opposition in Belarus, another former Soviet Republic bordering the Baltics and Poland.

Last week, Ms. Tsikhanouskaya was in Washington to meet with the leaders of our government. Senator SHAHEEN hosted a meeting with her. Had Putin's puppets in Belarus not rigged the last election, she might have been elected President—almost certainly would have been. This photo shows Belarusians protesting that rigged election, risking their lives to do it, I might add. For months, thousands of Belarusians protested. Many were arrested and sentenced to long prison

sentences. I had been there before. The last dictator in continental Europe is a man named Lukashenka. He has phony elections from time to time. Anyone with the audacity to run against him is sure to lose by Lukashenka's count and almost certainly to be imprisoned immediately.

He did that to this lady's—Ms. Tsikhanouskaya's—husband who is now in jail in Minsk. This photo shows Belarusians with the courage to protest that rigged election. For months, thousands have protested; many have been arrested and sentenced. Today, Vladimir Putin is using Belarus as a staging ground for Russia's assault on Ukraine, but the Belarusian people have not given up their determination for freedom either. Hundreds of Belarusians, maybe more, are fighting in Ukraine today, and we thank them for that courage. Others have helped to blunt Putin's assault by sabotaging Belarusian train lines and crippling Russian supply lines. The supplemental aid package that President Biden has requested for Ukraine, for the weapons to repel Russia's war of conquest and to give the people of Belarus, the Baltics, Moldova, Poland, the security they need to realize their dreams of freedom, dignity, and independence is a statement of the values of America.

I urge my colleagues to come together, waste no time, pass it quickly, send the Ukrainians what they need to win this war.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

UNANIMOUS CONSENT AGREEMENT—H.R. 4521

Mr. SCHUMER. I ask unanimous consent that at 2:30 today, the Senate resume legislative session and resume the House message to accompany H.R. 4521; further, that the previous order be modified to allow Senator MURKOWSKI to offer the motion to instruct that is at the desk in lieu of the motion in the previous order; that Senator BENNET or his designee be permitted to make the Bennet motion; and that the Senate vote on the motions in the order listed without further intervening action or debate, with all other provisions in the previous order remaining in effect, and that all votes after the first be 10-minute votes.

The PRESIDING OFFICER. Is there an objection?

Without objection, it is so ordered.

The PRESIDING OFFICER. The Senator from Texas.

U.S. SUPREME COURT

Mr. CORNYN. Mr. President, just a couple of days ago, we witnessed an unprecedented attack on the independence and integrity of the U.S. Supreme Court, a third coequal branch of government, when some reporters got their hands on a nearly 3-month-old draft of an opinion, setting off a political firestorm, creating a lot of confusion, more than a little hysteria. And all of which is, frankly, beside the point because the Court actually hasn't decided anything.

But this was a stunning breach of confidentiality for an institution that relies on a private, confidential deliberative process.

The Supreme Court was designed to operate, as is our judiciary, free of political and other outside influence and interference. That is why Justices are not elected; they are nominated and confirmed to serve life terms. That is why they don't have term limits. That is why you can't reduce their salary while they are in office, to make sure that politics and outside opinions have nothing to do with the way they do their job because, of course, their job is a limited but important job of saying what the law is, not making it up, not being a policy maker, but saying what the law is.

It is absolutely critical to our form of government and to our separated powers and our three branches of government that the Supreme Court be protected from pressure campaigns from anyone—politicians, political activists. Anyone. But that is exactly what is happening right now, and many of our colleagues on the other side of the aisle are fanning the flames. And they know that this is not a final opinion, but they see a political opportunity to fan the flames of hysteria and mislead the American people about exactly what this all means and what the consequences are.

For example, in the wake of this news, the Democratic leader of the Senate and the Speaker of the House released a statement—an unconscionable statement, in my view. They called it an abomination, one of the worst and most damaging decisions in modern history and one that defiled the Supreme Court's reputation.

That is what they say about a non-decision, a nonjudgment, about a leaked, 3-month-old draft.

We have no idea how the Court will ultimately decide the case, but this was a political opportunity that the Speaker and the majority leader could not resist.

Frankly, I think it is because they would like to change the subject.

The American people's concerns, if you ask them—as public opinion pollsters have—what they are concerned about, they said they are concerned about inflation, they are concerned about crime, they are concerned about the border, they are concerned about the war, the Russian invasion of Ukraine. But this is a grand opportunity to change the subject and to mislead the American people.

For some reason, the Senate majority leader, Senator SCHUMER, and Speaker PELOSI did not criticize the person who actually leaked the opinion, the person who committed a frontal assault on the independence of our judiciary, the Supreme Court.

One of the most powerful institutions in our country experiences an unprecedented breach of confidentiality, and what do our Democratic colleagues, the Speaker and the majority leader, do? They attack the Justices. They attack the Court. They don't attack the leaker, the person who committed this egregious breach of confidentiality.

Nowhere in their joint statement did they even mention the leak or leaker, or reaffirm the importance of an independent judiciary.

No, they took the opportunity to slam the Justices, who have not yet decided the case.

Unfortunately, this is nothing new. In 2019, the Democratic leader went to the Supreme Court steps and threatened two Supreme Court Justices by name if they did not rule in a certain way.

He said:

> You have released the whirlwind, and you will pay the price. You won't know what hit you if you go forward with these awful decisions.

That is our colleague, the senior Senator from New York, the majority leader of the Senate. He threatened two sitting Justices with retribution should they rule in a way he disagreed with.

The top Senate Democrat lobbing threats at Supreme Court Justices is a dangerous, dangerous model for the American people. This is the branch of government that is supposed to be kept free from those pressures and those sorts of threats, that kind of intimidation, or at least attempts at intimidation.

But, here again, the Senator from New York and the Speaker of the House, they know that, but they did it anyway.

It doesn't matter what case is before the Supreme Court or what ruling is ultimately handed down, leaders of Congress, some of the highest elected officials in the U.S. Government, should be a better example and defend the important principle of judicial independence.

Justice Scalia, in one of his speeches that I read a few years back, talked about what is unique about our system of government, and he said it is the independence of the judiciary, which are the crown jewels. He said, you read the Constitution of the old Soviet Union or any one of a number of other countries, they may have a fine written document that pledges allegiance to certain high-minded values, many of which are contained in our Constitution, but they are just words on a paper.

He said what is different in the United States of America is the independence of the judiciary, who will call balls and strikes and who will ultimately decide some of the most contentious and disputed issues in our country based on the Constitution and laws of the United States, not because

they took a public opinion poll to see what was more popular or they were threatened with retribution by some politician.

Unfortunately, our Democratic colleagues and, in particular, their leaders have taken a dangerous approach, and they are not just taking aim at individual Justices; they want to undermine the entire institution of the independent judiciary, particularly the Supreme Court.

A few years ago, five of our colleagues on the Democratic side, including the current chairman of the Senate Judiciary Committee, filed an amicus brief—a friend of the court brief—in a case involving gun rights. These Senators made a not-so-subtle threat that unless the Court ruled in a particular way, the entire institution would be, in their words, ''restructured.'' That is nothing more, nothing less than a simple effort to coerce the Justices into deciding a case in a particular way; to threaten them that unless you go our way, the Court will be restructured.

Well, we know that those weren't just idle words, given some of the threats to pack the Court by adding additional Justices to the Court. We heard that threat of Court packing many times. That was one of the agenda items should our Democratic colleagues eliminate the filibuster, the requirement of 60 votes before you close off debate in the Senate. They said they were going to pack the Court. Many of the presidential hopefuls embraced that idea in 2020, and the latest news has it that a number of Democrats are bringing this idea back to center stage. Disagree with what you think the Court might ultimately decide, and we are going to restructure it. We are going to pack it until we get the result that we want. Kiss an independent judiciary goodbye—the crown jewels of our system of government.

Earlier this week, the junior Senator from Massachusetts called the Supreme Court's current majority ''stolen, illegitimate, and far-right.'' These are Justices who were confirmed by the U.S. Senate. It is dangerous and dishonest to suggest that any of their positions are anything less than consistent with the law and the Constitution.

Our colleague went on to say that the Supreme Court should be ''expanded.'' That is another way of saying they should pack the Court with like-minded policymakers. Well, whether you talk about expanding the Court or packing the Court, the result is the same. It is just another effort to try to politicize this independent branch of government—this independent judiciary—which, as I said and will say again, are the crown jewels of our system of government, an independent judiciary.

Well, even Joe Biden knows that is a boneheaded idea. The reason I know that and we know that is because that is what he said in 1983. He called Court packing a ''boneheaded idea.''

Justice Ginsburg was asked about it. She said ''nine seems to be a good number.'' That was her gentle way of saying that if you start adding Justices to the Court or restructuring or packing the Court, basically, you are in pursuit of a political outcome and you undermine the independence of the judiciary and they are transformed into something far different than what our Founding Fathers believed it would be, which is an institution that would decide legal disputes, whether they be constitutional or otherwise, and would be depended on by the American people to present fair opportunities for all sides to be heard and then an outcome that was not tainted by bias or politics or policymaking.

As Justice Breyer has said, the very authority that the Court has depends on ''a trust that the court is guided by legal principle, not politics'' and that these types of changes—packing, restructuring, whatever you want to call it—he said would erode that trust, undermine the public's confidence and trust in the Supreme Court.

But as we have seen the last few days since this draft opinion was leaked in an egregious breach of confidentiality, our friends across the aisle don't want impartial judges. They don't want an independent judiciary. They want judges who will deliver a particular outcome in a case. They want the Court to be an extension of their politics here in the Senate.

Well, politics has its place, but its place is right here and in the White House, where the voters get to vote for us or vote against us every 2 years or 6 years, as the case may be—or 4 years, in the case of the President.

I understand that our colleagues want a specific ruling on abortion rights. Tomorrow, it could be Second Amendment rights. The next day, it might involve the means by which we run our elections. This entire episode highlights just how far the radicals in the other party are willing to go to try to get their way. They don't care about the long-term best interests of the country. They don't care about an independent judiciary. They are looking for an opportunity to score political points and distract the American people from what they are really concerned about, which is their ability to put food on the table and support their families.

The reason why our Founders designed a Federal Government with three separate but equal branches is because they thought the checks and balances that the three branches would impose would be protective of their liberty. And when one branch goes too far, another branch can be a check and a balance on that and, ultimately, the Supreme Court could be the final arbiter on the constitutionality or the legality of what the other branches are trying to do.

But our colleagues across the aisle—by their irresponsible rhetoric undermining public confidence in the Court, jeopardizing the independence of the judiciary—are blurring the lines between the political process and the judicial branch's responsibility. And why? For partisan political gain.

An independent judiciary is essential to our democracy. The parties whose cases are being decided by the Court should never have to worry about outside influencers or whether politics plays into the decision-making process.

How would you feel if you had a case before the U.S. Supreme Court and you knew that your opposing party tried to pressure or coerce or persuade the judge to arrive at a certain outcome regardless of the law or facts? Well, that would be the opposite of an impartial tribunal and independent judiciary; but that is exactly what our Democratic colleagues are trying to do with the U.S. Supreme Court in this instance.

Americans have a constitutional right to due process of law and that precludes any attempt to influence or obstruct an independent judiciary for making a decision in an individual case. I would like to see more of our colleagues on the other side of the aisle fight to protect the integrity and independence of the judiciary. But if they won't, then we will.

One thing is for certain. As Chief Justice Roberts said, the Court needs to get to the bottom of how this draft opinion got into the hands of the press in an unprecedented and egregious breach of confidence. The Supreme Court Chief Justice Roberts has directed the Marshal of the Court to investigate the source of this leak and once that happens, the person responsible will be held accountable. It is a very tight-knit group of people who have access to these draft opinions.

I have every confidence the Marshal of the Court will find the person who leaked this opinion to the press, and they will be held accountable in what will undoubtedly be a life-changing consequence, particularly if it is a law clerk or someone who is working for the Court. It will be a career-ending mistake.

But this is, first and foremost, a matter of protecting the integrity and independence of the judiciary from any force, external or internal, that seeks to chip away at the Court's independence.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Ms. ERNST. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

BIDEN ADMINISTRATION

Ms. ERNST. Mr. President, I am really beginning to believe everyone in the White House is clueless. After promising to lead us away from crisis and chaos, President Biden has instead made achieving the American dream

more challenging and, folks, a heck of a lot more expensive while at the same time making the world a much more dangerous place. Then, to cover up the connection between his actions and their disastrous outcomes, the President plays the blame game.

Since Joe Biden was sworn in as President just a little over a year ago, we have experienced record-setting inflation, making everyday essentials unaffordable; an unprecedented number of migrants rushing our southern border; our national debt topping $30 trillion for the first time; the Taliban's retaking control of Afghanistan; and the world being brought to the brink of nuclear war.

Are these events purely the result of chance or are they direct consequences of the choices being made in the White House? You don't need to be a detective to solve this whodunit. Let's go ahead and examine the case.

All right. Over the past year, the cost of nearly everything has increased at the fastest pace in over four decades. A gallon of milk is up nearly 50 cents, and 2 pounds of ground beef costs over $1.50 more than it did a year ago. Add in rising rents and home prices, and these numbers really add up quickly.

While Iowans and the rest of Americans are struggling to adjust their family budgets to the ever increasing cost of living, the Biden administration has repeatedly dismissed concerns about the price problem.

Last summer, the President said:

> It's highly unlikely that it's going to be long-term inflation that's going to get out of hand.

Now that the problem can no longer be ignored, he is actually blaming corporate greed.

Get a clue.

The Federal Reserve says the reason prices in the United States have been outpacing inflation in other countries since 2021—when Biden became President—is as a direct result of Washington's unprecedented spending spree. It turns out you can't just print trillions of dollars and hand it out for free.

Republicans in Congress and even some Democrats warned that this would happen when the President began pushing one trillion-dollar spending bill after another. Now hardworking Americans are stuck paying for the Biden binge-spending twice—first with higher taxes and then again with higher bills. When you add it all up, Bidenomics is costing every family almost $500 more a month today than a year ago to buy the same exact items.

So, despite the President's fingerpointing, this problem isn't being caused by corporate greed for profits, and it isn't caused on Wall Street.

The White House is using a similar setup to hide the true cause of higher prices at the pump. President Biden wants us to believe that the skyrocketing costs to fill up your tank are all Vladimir Putin's fault, but gas was on the rise for more than a year before the Russian invasion of Ukraine. In fact, gas prices have steadily increased since the President's first day in office when he signed an Executive order to shut down the Keystone XL Pipeline. On that day, January 20, 2021, a gallon of gas cost less than $2.50. The President then signed an Executive order turning off all new oil and gas leases on public lands.

While the President was shutting down U.S. energy, he was helping to make the world more dependent on Putin for power. In May of last year, the Biden administration waived the sanctions on Russia's Nord Stream 2 gas pipeline. By then, gas here in the United States had reached $3 a gallon. When Putin invaded Ukraine in February, the price was already more than $3.50 per gallon.

So don't be fooled, folks. It is really Biden's war on American energy that has been fueling the soaring costs. While the Russian dictator is guilty of many horrible things, the higher gas prices we have been paying for over the past year and a half did not begin as a result of Putin in Ukraine because of the war.

It is impossible to miss the irony of President Biden's pointing the finger at Putin since the Russian dictator's aggression against Ukraine may have been emboldened by Biden's abrupt abandonment in Afghanistan. The poorly planned evacuation also turned over billions of dollars of weapons and equipment to the Taliban and other terrorists and left countless Americans and our allies behind while costing the lives of 13 of our brave servicemembers.

The President blamed our own military—he blamed our own military—for not warning him of the catastrophe that would occur if he withdrew all U.S. forces, but those claims were contradicted under oath before the Senate Armed Services Committee by his own advisers, who said the President was told Afghanistan would collapse. Try as he might to lay the blame elsewhere, the President singlehandedly made the call to completely withdraw from Afghanistan, which will go down as one of the worst foreign policy decisions in U.S. history.

Now Biden's blunders are threatening to turn the crisis at our southern border into total chaos. The number of illegal crossings last year exceeded 1.7 million—the most ever recorded. To make matters worse, the administration has announced that those attempting to enter our country illegally will soon no longer be turned away under the authority provided by title 42. As a consequence, Homeland Security officials are expecting a record surge of border crossings, which could reach as many as 18,000 people a day.

Just like his other abrupt, poorly thought-out decisions, the President has no plan to deal with the inevitable repercussions. When the predictable disaster occurs, the President will be surprised and confused and look for someone else to blame.

I could go on, but I am all ready to rest my case since the same set of fingerprints is on all of the evidence of these problems.

But, President Biden, if you still haven't figured it out, I will give you a clue. Spoiler alert: The culprit is you.

Whether signing Executive orders to turn off American-made energy or signing budget-busting bills that are fanning the flames of inflation, the source of these problems can all be traced back to President Biden, with the pen, in the Oval Office.

It is right there, folks. Case closed.

That is how all of these crises were created over the past year.

Now, imagine how some of the other policies being proposed by Democrats, like defunding the police, abolishing ICE, or enacting the Green New Deal, could turn out if President Biden is given the chance to sign them into law.

Taxpayers can rest assured that Republicans in Congress will keep doing our part to make sure those bills never make it to the President's desk. And if the President tries to bypass Congress and enact its radical agenda by signing Executive orders behind the closed doors of the White House, Americans can count on Republicans to clue you in.

I yield the floor.

The PRESIDING OFFICER (Ms. ROSEN). The Senator from Tennessee.

BIDEN ADMINISTRATION

Mrs. BLACKBURN. Madam President, it has been over a year since Joe Biden and KAMALA HARRIS and the Democrats took control of all the government here in DC. They like the fact that they have got their hands on the drivers, and they are enacting their policies. But what is so interesting, as my colleague from Iowa was pointing out, is they continue to try to blame Donald Trump and Republicans for the issues that are in front of us.

Just a few years ago, if you would have asked me how I would evaluate a government that spent their way into inflation—recordbreaking inflation—surrendered our border to the drug cartels, and abandoned two Embassies, I would tell you that that sounds like an administration that is in disarray. I think most people would believe that to be a fact.

But here is the problem: We have moved beyond disarray. Tennesseans feel like it is more like a catastrophe.

This is not mere incompetence at work. Joe Biden is earning his disapproval rating that he was joking about at the Correspondents' Dinner last week. He knows that it is, indeed, low—some of the lowest ever.

The fact is that President Biden and Vice President HARRIS have had a terrible, horrible, no good, very bad year, and they did this to themselves. And now their allies in Congress are ready to make things even worse. They are doubling down.

This is what happens when you try to force an agenda filled with pet projects that the American people are telling you they do not want and, as taxpayers are saying, ''You can't afford this.''

This is what happens when you really have no vision for the future of the country. It is all about power, all about control.

Last month, the Harvard Kennedy School Institute of Politics released a poll showing that this distinction between agenda and vision actually matters to people. They found that 56 percent of young Americans, ages 18 to 29, disapprove of Joe Biden's job performance. That is correct; 56 percent disapprove. And just last spring, 59—that is right, 59—percent of young persons were still in his corner.

Look at what is happening. Look at that flip that is taking place.

The measure of success or failure for this administration shouldn't come down to how many boxes they can check off their wish list but how many young Americans look at what they are doing, and they say: I can't support this. This does not give me hope. This does not look good for my future.

Indeed, 56 percent of young Americans, ages 18 to 29, disapprove of the Biden agenda.

Right now, this age group, they are losing hope. That same Harvard poll shows that their top concern isn't the environment; it isn't abortion or Roe v. Wade; it is the economy. And why wouldn't it be? The current inflation rate is 8.5 percent. Last year, it was 2.6 percent.

How can anyone be expected to plan for their future if they are struggling to plan for next week's grocery run? They are paying a premium just to live.

Meanwhile, the President is asking them to sacrifice even more so he can check some more boxes on his to-do list that is all about this leftist agenda. It is not about the people; it is about power; it is about control.

Young Americans—and I would say all Americans, Tennesseans—deserve better than this. They deserve leaders who have a vision for the future of this country, who have the God-given common sense to see it through.

Joe Biden and the Democrats have been in power for more than a year. The window for blame-shifting and excuses is closed. It is shut. It is time for the President to abandon this self-destructive agenda and give the American people a fighting chance at reclaiming their own vision for the future.

I yield the floor.

The PRESIDING OFFICER. The Senator from Virginia.

UNANIMOUS CONSENT REQUEST—EXECUTIVE CALENDAR

Mr. KAINE. Madam President, in a moment, I am going to make a motion by unanimous consent to call up, and hopefully confirm, significant appointments in the Department of Defense.

We are in the midst of a war in Europe right now. It is hard to imagine that, and yet it is the case. Every day we see atrocities committed by Vladimir Putin's illegal invasion of Ukraine, but every day we also see the concerted effort of the United States and NATO allies and other nations to provide dramatic support for the Ukrainian defense force and the Ukrainian people.

We honor the Ukrainians' resolve and heroism, and we feel proud of the role that the United States and other nations are playing in providing defense. And I hope we will take additional defense support up on the floor in the days to come. However, this is not easy work to do.

One of the positions that I am going to be seeking a UC on is the DOD Assistant Secretary for Sustainment, Christopher Lowman, who is a Virginian. He and his family live in Fredericksburg.

Mr. Lowman is, according to the committee, completely noncontroversial and very much desired in this position.

He was born in Germany, in a military family, grew up in Virginia, went to college in New Jersey. He was a U.S. marine beginning in 1984, and then after his Active Marine service, entered the Army civil service as an Army maintenance management intern in 1989. And he has been with the Army ever since.

His specialty is logistics. So this Assistant Secretary of Sustainment is kind of the peak logistics officer in the Pentagon.

He previously was the Acting Principal Deputy Assistant Secretary of the Army for Acquisition, Logistics, and Technology. OK. That is a title that is—you know, what does that actually mean? I will tell you what it means. When the United States is trying to get historic amounts of military aid across a contested border from allied countries into a war zone, we need people who know logistics. It may not be the sexiest part of the military mission, but it is part of the mission that is absolutely critical, and it is part of the mission where the U.S. military is second to none in the world.

If you wonder why the Russian military's grand plans to topple Ukraine in just a couple of days came to naught, you first say it is Ukrainian heroism, and you second say it is the support of our allies, but, third, you have to point out the Russian military has demonstrated that they haven't mastered logistics. The inability to maintain supply chains, the inability to do proper maintenance of tanks and other vehicles is one of the reasons that the Russians have not been able to accomplish their aims. So what this war in Europe is demonstrating is militaries that have the capacity to do logistics and provide supplies to people on the front end of the fight are critical to success.

Given the fact that the United States is the key to pulling together the international effort to provide support to the Ukrainian defense force, and given the fact that that mission depends upon having the best logistics in the world, why would we leave the chief logistics official at the Pentagon position vacant in the middle of a war when the United States is playing this heroic role?

For that reason, Madam President, I ask unanimous consent that the Senate proceed to executive session to consider the following nominations en bloc: Calendar Nos. 477, 599, 777, 779, 780, 781, 861, and 886; that the Senate vote on the nominations en bloc without intervening action or debate; that the motions to reconsider be considered made and laid upon the table; that any statements related to the nominations be printed in the RECORD; that the President be immediately notified of the Senate's action and the Senate resume legislative session.

The PRESIDING OFFICER. Is there objection?

Mr. HAWLEY. Madam President.

The PRESIDING OFFICER. The Senator from Missouri.

Mr. HAWLEY. Madam President, reserving the right to object, I find myself here on the floor again as my friend the Senator from Virginia, whose sincerity and urgency on this issue I don't doubt for a second, tries to move a whole slate of nominees to which multiple Republican Senators have objections. And let me give you a sense of why.

One of the nominees that my friend is attempting to move here, let's be clear, to do this without a vote—we could be voting on these nominees. The majority leader could schedule votes on them any time, but he hasn't done that. He hasn't done it in some of the cases for months.

This is an act—this is a request to suspend the regular order of the Senate and to confirm these nominees without a vote. Well, I, for one, am not going to consent to confirming without a vote people like Ravi Chaudhary. He is being nominated for Assistant Secretary of the Air Force.

Mr. Chaudhary, who appeared before the Armed Services Committee, on which I sit, as does my friend from Virginia—Mr. Chaudhary has proposed using AI technology—artificial intelligence—to track members of the military, identify them as extremists, and then have them expelled.

He said:

> The key to disrupting them—

Meaning ''extremists,'' his word, people whose views he doesn't agree with.

> The key to disrupting them is uncovering and understanding their initial behaviors, elements that are contained in their electronic footprints.

What Mr. Chaudhary has proposed to do is to use surveillance on members of the U.S. military to determine whether they might, in the future, commit acts that he might disapprove of and then to take action against these members of the military.

In 2015, he wrote this: that the military exhibits a ''culture of xenophobic cronyism.'' And he went on to say that there was a ''xenophobic command climate'' in the U.S. military today.

I said to Mr. Chaudhary, at the time when we had our hearing, that I cannot

believe that he would propose to use surveillance on members of the U.S. military to track their speech, to track their activity online, to track their movements online, all in an effort to decide if they might, in the future, commit acts that he disagrees with.

I submit to you, Madam President, not only is that wrong; it is blatantly unconstitutional—blatantly unconstitutional—and it is frightening. What is further frightening is that he would be nominated for a leadership position in the Department of Defense.

I call on the President of the United States to withdraw this nomination today, just as he should withdraw his unconstitutional disinformation board that he is attempting to force on the American people as we speak. This is the most radically anti-free-speech administration in American history. Their actions are an affront to the basic constitutional values of this Nation, including and especially the First Amendment.

I am appalled—appalled—at what this administration is doing—censoring American citizens, surveilling them—and now advocating it in the U.S. military, to the men and women who put their lives on the line?

So, no, I will not consent to have this individual, who never should have been nominated for this position, fast-tracked to be confirmed without a vote, without a single, solitary vote on the floor of the U.S. Senate.

Mr. KAINE. Madam President, will the Senator yield for a question?

Mr. HAWLEY. I think you have the floor, Senator; so, yes, I think——

Mr. KAINE. Will the Senator yield for a question?

It strikes me that the Senator's objection is you do not want to have this candidate—the bloc of them advanced without a vote. If I can guarantee that you get a vote on these nominations, will you drop your objection?

Mr. HAWLEY. Can I respond to that?

Mr. KAINE. Yeah. I mean, I know you will vote no. You have made it plain. But if I can guarantee you would get a vote, will you drop your objection?

Mr. HAWLEY. On all eight of them, Senator?

Mr. KAINE. Yeah.

Mr. HAWLEY. To have a vote on the floor?

Mr. KAINE. Yes.

Mr. HAWLEY. I would be happy to take a vote on the floor on all eight nominations.

Mr. KAINE. And that is what my point is. We are not fast-tracking these without a vote. This is a motion to allow a vote en bloc on the floor. So you will have an opportunity to vote against Mr. Chaudhary or all of these. This is not a motion to immediately approve them without a vote. It is just a motion to bring them up so that you and others can vote on these nominees. That is all I am seeking.

And so my request, basically, would guarantee you a vote on all of these nominations if you drop your objection.

Mr. HAWLEY. Is this a recorded vote on the floor, Senator?

Mr. KAINE. It would be a—yes. It would be en bloc, but it is a recorded vote, is my understanding.

And, again, Madam President, just to clarify, my motion is only that the Senate be allowed to vote on these nominees: Alex Wagner for Assistant Secretary of the Air Force; Ashish Vazirani for Deputy Under Secretary of Defense; Christopher Lowman, Assistant Secretary of Defense; Lester Martinez-Lopez, Assistant Secretary of Defense; Agnes Schaefer, Assistant Secretary of the Army; Franklin Parker, Assistant Secretary of the Navy; Musetta Tia Johnson, Judge of the U.S. Court of Appeals for the Armed Forces; and Ravi Chaudhary, Assistant Secretary of the Air Force.

I understand my colleague will vote no, but all I am moving is for the Senate to be able to have a vote on these nominees.

Mr. HAWLEY. Senator, you want to vote on all eight at one time; you don't want to vote on each one?

Mr. KAINE. My motion is to consider them, yes, en bloc; but it would be a recorded vote, is my understanding.

Mr. HAWLEY. What I propose to do here is—there are multiple Senators on this side of the aisle besides myself who have objections to different multiple of these. What I propose to do is object to this now, but I think we can work something out on this going forward.

So I think—do I have the floor now?

The PRESIDING OFFICER. The Senator from Virginia has the floor, and there is a pending unanimous consent request.

Mr. HAWLEY. OK. So I object.

The PRESIDING OFFICER. Objection is heard.

Mr. KAINE. I appreciate the objection being heard, and I would just say to my colleague, I hope we could work out a deal that would enable us to have a floor vote where my colleague could vote as he chooses on these nominees. This was not an attempt to bypass a vote; it was just an effort to have a vote where everybody can be recorded on the nominees. I hope we can work that out.

The PRESIDING OFFICER. The Senator from Missouri.

## ISSUES FACING THE NATION

Mr. BLUNT. Madam President, I want to continue to talk about some of the challenges the administration is facing and the country is facing. Let me talk for just a little bit about the border, about the economy, and about our ongoing concerns on COVID.

First of all, the border—we have had a number of people come to the floor and talk about the border, the problems at the border. Many of these problems were really self-inflicted on day 1. The President, on the first day of his Presidency—and I chaired the inauguration on January 20. Hours after that, the President decided to stop building the wall.

I was never an advocate of needing a wall everywhere along the southern border, but we had a wall in lots of places already. It was doing some good, but it wasn't doing as much good as it needed to do. And just the idea that we—with the material on the ground and the old wall torn down—would decide to stop building the wall, I think, started these problems.

And if that wasn't enough, then-President Trump had made arrangements, the State Department had made arrangements—everybody involved—with Mexico to have people who were applying for asylum wait for their court date in Mexico. It was my view at the time that we should do anything we could to help the Mexican Government make that work because the alternative was people would come into the United States and not show up for an asylum date later.

In Mexico, they have learned that they weren't going to qualify for asylum because fewer than—9 out of 10 people, roughly, will not qualify. You found that out before you got into the United States and successfully had entered our country, even though you weren't eligible to. If you were waiting in Mexico and you found a lawyer to talk to and maybe even a way to hear your case in some way there, you would find out that you weren't going to qualify for asylum 8½ times or 9 times out of 10, and that is where you should have found that out.

To come in the country and wait for months to have a court date that you may or may not show up for just simply has not worked, and everybody that understands this system understands it doesn't work. And everybody that understands the obligation of a government understands that a government has some obligation to control its own borders, and you don't control your own borders by having people come into the country that aren't legally eligible to come into the country and then just stay here. So that policy produced real chaos.

And then title 42, under the public health law, was another thing that we put in place, as we put all kinds of other COVID-related protections in place. And now we want to eliminate title 42. The only place, apparently—if you follow the CDC closely right now—that we don't need to up our game on COVID protection is the border of the United States.

None of these things makes sense. We have too many people who have been encouraged wrongly and told: You come to the United States, you ask for asylum, they let you into the United States, and then you don't show up for your asylum hearing.

I am for legal immigration. I am for solving the Dreamer problem. I am for doing a lot of things that we need to do to make our immigration laws work properly.

We need to understand the workforce needs of the country. We need to understand what to do about people who came or stayed illegally. But we also need to understand how to secure the border. And that is where, for any of these other things to work, you have to do that.

The COVID problem, as I said, appears to only be a problem at the CDC—well, actually, it appears to be a problem everywhere but the border. The CDC, just yesterday, had a new rule that even for domestic travel, people should now—their advice is have a test for domestic travel—before you get on an airplane to go domestically, to have that test.

The efforts that we were working on and working hard on to replenish the categories that have been spent for research, particularly for the therapeutics that we need to have a stock of that haven't been fully certified yet—so they have to be the Government is the purchaser of those—we were working on a $10 billion bill. And even this morning again, the Secretary of Commerce, at our appropriations hearing, said: Well, that would just be a start. We need 10 or 20 or 30 billion more before the end of this fiscal year than we currently have, and it is an emergency—10, 20, 30 billion more than we have now.

But at the border, no problem at all. At the border, this is no problem. We need billions of dollars to deal with it internally. We need to not only have fewer tests, which everybody agrees, fewer standards for domestic travel; we now need a new standard, they say, for domestic travel. Surely they will think about that. And while we are negotiating, again, spending, this issue comes out simultaneously that the border is a problem.

And then, of course, everybody knows the economy is a problem. All you have got to do to find out the economy is a problem is go to the gas station or go to the grocery store, and most Americans do that and do it a lot. And when gas prices go up, when food prices go up, every family knows it.

What we are seeing now is inflation that I think it is 8.5 percent. It may be settling in at 8.5 percent. But wherever it settles in, it is a whole lot higher than it was at any time during the Obama administration. The highest month in the entire Obama administration of inflation—that is not a year average—the highest single month was 3.4 percent. Under President Trump, the highest single month was 2.9 percent. We are now at 8.5 percent, and the Producer Price Index has been in double digits since December. That is usually a sign that the other index is going to follow that double-digit, scary number that is out there.

So energy policies that produced exactly the result you would think they would: higher energy prices; spending policies: the American Rescue Plan. I thought, at the time, it was a final COVID bill, but when you looked at the bill before we had a chance to vote on it and saw it, it really didn't have very much to do with COVID. Maybe 6 percent of the $1.9 trillion went to COVID. The rest of it went to things that put money in people's pockets to help them recover in an economy that was already recovering.

You can't spend $1.9 trillion in a short period of time, even in the biggest and most vibrant economy in the world, and not drive up prices. So whether it is inflation, whether it is the economic stress—I talked to a group of Missouri realtors today, and, of course, they are beginning to see people wonder if they can afford a house at the interest rates that are out in front of us. It makes a big difference if the interest payment is based on 3.5 percent interest or 5.5 or 6.5 or 7.5 or, as it was in the mid 1980s, 11 to 15 percent interest.

These are issues we need to get under control. Most of these issues have an explanation that is rooted in confused policy decisions in the administration.

I look forward to those confused policy decisions heading in a different direction. Let's look at the information. Let's be realistic. Let's not continue to see all of these things headed in a direction that makes no common sense in America today.

I yield the floor.

## LEGISLATIVE SESSION

---

### AMERICA CREATING OPPORTUNITIES FOR MANUFACTURING, PRE-EMINENCE IN TECHNOLOGY, AND ECONOMIC STRENGTH ACT OF 2022

The PRESIDING OFFICER. Under the previous order, the Senate will resume legislative session and resume consideration of the House message to accompany H.R. 4521, which the clerk will report.

The senior assistant legislative clerk read as follows:

House message to accompany H.R. 4521, a bill to provide for a coordinated Federal research initiative to ensure continued United States leadership in engineering biology.

The PRESIDING OFFICER. The Senator from Kentucky.

#### MOTION TO INSTRUCT

Mr. PAUL. Madam President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Kentucky [Mr. PAUL] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include the provisions contained in section 6107 of the Senate amendment (relating to prohibiting funds made available to any Federal agency from being used for gain-of-function research conducted in China).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Paul motion to instruct.

Mr. PAUL. Last year, the Senate unanimously adopted my amendment to prevent taxpayer dollars from being used to finance gain-of-function research conducted in China. My motion to instruct asks that this language be incorporated into the final bill.

Gain-of-function research enhances the severity or transmissibility of existing viruses that may infect humans. The dangers are so acute that from 2014 to 2017, the NIH suspended funding for all gain-of-function research projects.

While we may never know whether the pandemic arose from a lab in Wuhan or occurred naturally, the emergence of COVID serves as a reminder that dangerous research conducted in a secret and totalitarian country is simply too risky to fund. Congress must ensure that taxpayer dollars will not be used to fund gain-of-function research in China.

I urge a ''yes'' vote.

Mr. KAINE. I yield back all time on the Democrats' side.

#### VOTE ON MOTION

The PRESIDING OFFICER. All time is yielded back.

The question is on agreeing to the motion.

The motion was agreed to.

Mr. PAUL. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. BARRASSO. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

#### MOTION TO INSTRUCT

Mr. BARRASSO. Madam President, please call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Wyoming [Mr. BARRASSO] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that require immediate development of a 2022–2027 Federal oil and gas leasing program on the outer Continental Shelf, which shall be finalized not later than June 30, 2022, and which shall provide for a minimum of 10 regionwide oil and gas lease sales in the Gulf of Mexico and Alaska Regions of the outer Continental Shelf, with a minimum of 2 oil and gas lease sales per calendar year, not fewer than 1 of which shall be in the Gulf of Mexico Region each calendar year.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Barrasso motion to instruct.

Mr. BARRASSO. Madam President, I rise in support of the motion to instruct conferees to require the Department of Interior to finalize a 5-year offshore oil and gas leasing plan no later than June 30, 2022. It would require at least 10 sales in the Gulf of Mexico and Alaska. In consultation with both Senators RUBIO and SCOTT, it does not impact any moratoriums, including Florida's.

The Biden administration has failed to develop a 5-year plan. Gina McCarthy has told us why. Last week, she said President Biden is absolutely committed, she said, to blocking additional drilling. Jen Psaki confirmed it at the White House.

Instead of begging for oil from our enemies, like Iran and Venezuela, we should produce more American energy.

I urge my colleagues to join me in supporting this amendment.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. MARKEY. Madam President, I rise to urge my colleagues to vote no on this motion to instruct from Senator BARRASSO.

If we want to talk solutions to the energy price crisis, if we want to talk solutions to the climate crisis, we have bills to do that.

Our Federal oil and gas leasing programs include critical State and public involvement that this amendment is attempting to undercut and sabotage and to try to weaponize this bill in order to have the hope of prompting yet another giveaway for oil and gas companies, which is not going to do a thing to help the American people or the American economy.

Oil and gas companies already have more than 1,500 offshore leases that they are not currently using, encompassing a swath of ocean larger than the entire State of Maryland. The top 25 oil and gas companies posted $237 billion in record profits last year, which they should be using, if they want, to drill there, but they are not doing it.

So we need to focus on delivering clean energy, efficient solutions to communities, not undercutting Federal processes and giving more handouts to Big Oil.

I urge my colleagues to reject this amendment.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion to instruct conferees.

Mr. BARRASSO. Madam President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

The clerk will call the roll.

The senior assistant executive clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) and the Senator from Minnesota (Ms. KLOBUCHAR) are necessarily absent.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Alabama (Mr. SHELBY).

The PRESIDING OFFICER (Ms. BALDWIN). Are there any other Senators in the Chamber desiring to vote or change their vote?

The result was announced—yeas 53, nays 44, as follows:

[Rollcall Vote No. 148 Leg.]

YEAS—53

| | | |
|---|---|---|
| Barrasso | Grassley | Paul |
| Blackburn | Hagerty | Portman |
| Blunt | Hawley | Risch |
| Boozman | Hickenlooper | Romney |
| Braun | Hoeven | Rounds |
| Burr | Hyde-Smith | Rubio |
| Capito | Inhofe | Sasse |
| Cassidy | Johnson | Scott (FL) |
| Collins | Kelly | Scott (SC) |
| Cornyn | Kennedy | Sinema |
| Cotton | Lankford | Sullivan |
| Cramer | Lee | Thune |
| Crapo | Lummis | Tillis |
| Cruz | Manchin | Toomey |
| Daines | Marshall | Tuberville |
| Ernst | McConnell | Wicker |
| Fischer | Moran | Young |
| Graham | Murkowski | |

NAYS—44

| | | |
|---|---|---|
| Baldwin | Heinrich | Rosen |
| Blumenthal | Hirono | Sanders |
| Booker | Kaine | Schatz |
| Brown | King | Schumer |
| Cantwell | Leahy | Shaheen |
| Cardin | Luján | Smith |
| Carper | Markey | Stabenow |
| Casey | Menendez | Tester |
| Coons | Merkley | Van Hollen |
| Cortez Masto | Murphy | Warner |
| Duckworth | Murray | Warnock |
| Durbin | Ossoff | Warren |
| Feinstein | Padilla | Whitehouse |
| Gillibrand | Peters | Wyden |
| Hassan | Reed | |

NOT VOTING—3

| | | |
|---|---|---|
| Bennet | Klobuchar | Shelby |

The motion was agreed to.

The PRESIDING OFFICER. The junior Senator from Texas.

MOTION TO INSTRUCT

Mr. CRUZ. Madam President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Texas [Mr. CRUZ] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include section 3258 of the Senate amendment, which requires a report identifying ''major areas of diplomatic, energy, infrastructure, banking, financial, economic, military, and space cooperation . . . between the People's Republic of China and the Islamic Republic of Iran'', regarding the policy of the United States to limit such cooperation through terrorism-related sanctions imposed on the Central Bank of Iran and the Islamic Revolutionary Guard Corps, as such sanctions are necessary to limit such cooperation.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Cruz motion to instruct.

Mr. CRUZ. Madam President, China and Iran are two of the most dangerous enemies of the United States. China is our most significant geopolitical foe for the next 100 years. Iran is the world's leading state sponsor of terrorism.

The Biden administration, unfortunately, has been dealing with both from a position of weakness. Specifically, the Biden administration has refused to enforce oil sanctions against Iran, allowing Iran to sell more than a million barrels a day of oil primarily to China.

At the same time, the Biden administration is negotiating to lift terrorism sanctions on the Islamic Revolutionary Guard Corps and the Central Bank of Iran. The IRGC is responsible for murdering over 600 service men and women. The IRGC, right now, is actively trying to murder the former Secretary of State of the United States and the former National Security Advisor.

If you support terrorism sanctions on the IRGC, you should vote yes, and if you want to lift those sanctions, you should vote no.

The PRESIDING OFFICER. The junior Senator from Connecticut.

Mr. MURPHY. Madam President, the provision in the underlying bill that Senator CRUZ's motion argues for is a good one in that we should care about cooperation between China and Iran, but I would encourage my colleagues to oppose this MTI because of another extraneous provision in the motion.

The motion argues that the United States should tie our Iran terrorism sanctions to our China policy, and that, frankly, is a bad idea. Terrorism-related sanctions are about punishing and deterring support for terrorism. If we want to use sanctions to deter cooperation between Iran and China, then we should craft those tailored sanctions; but to tie our Iran terrorism sanctions to our China policy would have the effect, really, of muddying the waters about the purpose of terrorism sanctions. Terrorism sanctions should be about stopping terrorism—period, stop. If we start applying terrorism sanctions for other purposes, it weakens our entire anti-terror strategy.

For that reason, I would urge opposition to the motion.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Mr. CRUZ. Madam President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) is necessarily absent.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Alabama (Mr. SHELBY).

The result was announced—yeas 86, nays 12, as follows:

[Rollcall Vote No. 149 Leg.]

YEAS—86

| | | |
|---|---|---|
| Baldwin | Blackburn | Blunt |
| Barrasso | Blumenthal | Booker |

| | | |
|---|---|---|
| Boozman | Hawley | Risch |
| Braun | Heinrich | Romney |
| Burr | Hickenlooper | Rosen |
| Cantwell | Hoeven | Rounds |
| Capito | Hyde-Smith | Rubio |
| Cardin | Inhofe | Sasse |
| Casey | Johnson | Schumer |
| Cassidy | Kaine | Scott (FL) |
| Collins | Kelly | Scott (SC) |
| Coons | Kennedy | Shaheen |
| Cornyn | King | Sinema |
| Cortez Masto | Klobuchar | Smith |
| Cotton | Lankford | Stabenow |
| Cramer | Leahy | Sullivan |
| Crapo | Lee | Tester |
| Cruz | Luján | Thune |
| Daines | Lummis | Tillis |
| Duckworth | Manchin | Toomey |
| Durbin | Marshall | Tuberville |
| Ernst | McConnell | Van Hollen |
| Feinstein | Menendez | Warner |
| Fischer | Moran | Warnock |
| Gillibrand | Murkowski | Whitehouse |
| Graham | Murray | Wicker |
| Grassley | Ossoff | Wyden |
| Hagerty | Peters | Young |
| Hassan | Portman | |

NAYS—12

| | | |
|---|---|---|
| Brown | Merkley | Reed |
| Carper | Murphy | Sanders |
| Hirono | Padilla | Schatz |
| Markey | Paul | Warren |

NOT VOTING—2

| | |
|---|---|
| Bennet | Shelby |

The motion was agreed to.

The PRESIDING OFFICER (Mr. HICKENLOOPER). The Senator from New Jersey.

MOTION TO INSTRUCT

Mr. MENENDEZ. Mr. President, I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from New Jersey [Mr. MENENDEZ] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist upon the provisions contained in section 73003 of the Senate amendment (relating to establishment of an Inspector General of the Office of the United States Trade Representative).

The PRESIDING OFFICER. Under the previous order, there will be 2 minutes of debate equally divided prior to the vote on the Menendez motion to instruct.

The Senator from New Jersey.

Mr. MENENDEZ. Mr. President, this motion would establish an inspector general at the Office of the U.S. Trade Representative.

As we have seen over the past several years, inspectors general are a key way that Congress conducts oversight over our Federal Government. Through these independent watchdogs, we prevent waste, fraud, and abuse, increasing transparency while ensuring Federal Agencies remain accountable to the American people. It is a model that most of the Federal bureaucracy has adopted because it works.

When it comes to the Office of the U.S. Trade Representative, it remains an outlier—one of the only Cabinet-level Agencies without this key oversight tool. An Agency led by a Senate-confirmed appointee, tasked with carrying out decisions affecting every worker, business, and consumer in this country, is currently operating without one of the most effective guardrails we have against overreach. Just a few years ago, Congress saw how two negotiators for USMCA were using their positions to solicit consulting work on the regulations they had written. We saw how the Agency's opaque tariff exclusion process was beset by inconsistent decision making and political favoritism.

This is an amendment that has been sponsored by over 53 Senators, Republicans and Democrats alike. It passed in USICA originally with a 91-to-4 vote. I urge my colleagues to support it. I am happy to take a voice vote.

VOTE ON MOTION

The PRESIDING OFFICER. If there is no further debate, the question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Idaho.

MOTION TO INSTRUCT

Mr. RISCH. Mr. President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Idaho [Mr. RISCH] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that take actionable steps to address the risks of and counter malign or undue influence and activities in the United States and abroad by the Chinese Communist Party, the Government of the People's Republic of China, or individuals or entities acting on their behalf.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Risch motion to instruct.

The Senator from Idaho.

Mr. RISCH. Mr. President, I didn't stop the reading because it is pretty self-explanatory what this is.

There was language in S. 1260 when it left here and went over to the House, under division C, that would have strengthened the ability of the United States to counter Chinese influence abroad. Specifically, the influence we are talking about here in one particular case especially is what is going on in colleges and universities around the country.

What this does is put some very clear windows into what the Chinese Communist Party is doing on college campuses, particularly as it relates to grants and money that they are putting into the colleges and universities. We are asking and directing the negotiators to see that there is such language in the final bill that comes out.

The PRESIDING OFFICER. Is there further debate on the motion?

Mr. RISCH. Mr. President, I will accept a voice vote.

VOTE ON MOTION

The PRESIDING OFFICER. Hearing no further debate, the question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Arizona.

MOTION TO INSTRUCT

Mr. KELLY. Mr. President, I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Arizona [Mr. KELLY] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include incentives to support investments in semiconductor manufacturing and innovation in the United States, including investments in the fabrication, assembly, testing, advanced packaging, and research and development of semiconductors.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to the vote on the Kelly motion to instruct.

Mr. KELLY. Mr. President, microchips are in everything from household vacuums to the most advanced fighter jets. A resilient domestic microchip supply chain is important to our national security and to our economy, but we have two problems. We are facing a shortage of microchips, and we do not have the capacity to produce enough of them here in the United States. That is why we have worked together, Republicans and Democrats, to pass a plan in the Senate competitiveness bill that will boost American microchip manufacturing capacity, create thousands of jobs, and help lower costs for families.

I ask my colleagues to support this motion to show the continued bipartisan momentum behind our plan so we can get this across the finish line.

I am OK with a voice vote.

VOTE ON MOTION

The PRESIDING OFFICER. Hearing no further debate on the motion, the question is on agreeing to the motion to instruct.

The motion was agreed to.

Mr. MENENDEZ. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. LEE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

MOTION TO INSTRUCT

Mr. LEE. Mr. President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Utah [Mr. LEE] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to

the bill H.R. 4521 be instructed to insist that the final conference report not include the provisions contained in the following sections of the bill (as passed by the House of Representatives):

(1) Section 30609 (relating to building United States economic growth and technological innovation through the Green Climate Fund).

(2) Section 30607 (relating to addressing international climate change mitigation, adaptation, and security).

(3) Section 30601(b)(7)(E) (relating to the sense of Congress on implementing the Paris Agreement).

(4) Section 30610 (relating to ensuring a whole-of-government response to climate action).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Lee motion to instruct.

Mr. LEE. Mr. President, Americans are facing an affordability crisis. In my home State of Utah, the average household is having to pay an additional $702 every month just for basic living expenses relative to what they paid every month at the beginning of last year.

Inflation is unsustainable. Energy is one primary driver of inflation, and this administration's senseless energy policies are largely to blame. The House's version of this bill contains more of these damaging policies that will hurt Americans, and hurt Utahns in particular, while they can least afford it.

My motion instructs conferees not to include the House provisions, including one sending $2 billion per year indefinitely to developing countries to support their supply of zero emissions vehicles; another provision that would send $8 billion to the U.N.'s green climate fund, which has historically given money to China; as well as another provision expressing the sense of Congress that the United States should implement the Paris Agreement, which is estimated to lead to a 20 percent increase in the costs for the average American family's electric bill and shrink our national GDP by $2.5 trillion.

Americans can't afford these energy policies. My motion will make sure that they don't have to pay for them.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. WHITEHOUSE. Mr. President, if we want friends overseas and if we want a robust world economy, it is important that America plays fair with the rest of the world on climate. Participating in the international climate fund, participating in the Paris accord and the COP agreements, and having a robust national strategy on climate change are all distinctly in our national security and economic interests.

I urge voting no on the Lee motion to instruct, and I further urge that if we want to protect the American consumer, get the heck off of fossil fuel before it drives us into ruin with high prices set by international cartels and massive pollution.

VOTE ON MOTION

Mr. LEE. I call for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) is necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. HAWLEY) and the Senator from Alabama (Mr. SHELBY).

Further, if present and voting, the Senator from Missouri (Mr. HAWLEY) would have voted ''yea.''

The result was announced—yeas 48, nays 49, as follows:

[Rollcall Vote No. 150 Leg.]

YEAS—48

| | | |
|---|---|---|
| Barrasso | Graham | Paul |
| Blackburn | Grassley | Portman |
| Blunt | Hagerty | Risch |
| Boozman | Hoeven | Romney |
| Braun | Hyde-Smith | Rounds |
| Burr | Inhofe | Rubio |
| Capito | Johnson | Sasse |
| Cassidy | Kennedy | Scott (FL) |
| Cornyn | Lankford | Scott (SC) |
| Cotton | Lee | Sullivan |
| Cramer | Lummis | Thune |
| Crapo | Manchin | Tillis |
| Cruz | Marshall | Toomey |
| Daines | McConnell | Tuberville |
| Ernst | Moran | Wicker |
| Fischer | Murkowski | Young |

NAYS—49

| | | |
|---|---|---|
| Baldwin | Hickenlooper | Rosen |
| Blumenthal | Hirono | Sanders |
| Booker | Kaine | Schatz |
| Brown | Kelly | Schumer |
| Cantwell | King | Shaheen |
| Cardin | Klobuchar | Sinema |
| Carper | Leahy | Smith |
| Casey | Luján | Stabenow |
| Collins | Markey | Tester |
| Coons | Menendez | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Feinstein | Ossoff | Whitehouse |
| Gillibrand | Padilla | Wyden |
| Hassan | Peters | |
| Heinrich | Reed | |

NOT VOTING—3

| | | |
|---|---|---|
| Bennet | Hawley | Shelby |

The motion was rejected.

The PRESIDING OFFICER (Ms. SMITH). The Senator from Tennessee.

MOTION TO INSTRUCT

Mrs. BLACKBURN. Madam President, I call up my motion to instruct conferees which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Tennessee [Mrs. BLACKBURN] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include a provision that requires the Director of the Office of Management and Budget, in consultation with the Administrator of General Services, the Director of the National Institute of Standards and Technology, the Director of the Cybersecurity and Infrastructure Security Agency, the Director of National Intelligence, the Secretary of Defense, the Secretary of State, the Secretary of the Treasury, and the Chairman of the Board of Governors of the Federal Reserve System, and consistent with information security requirements designed to address any national security risks, to develop guidance for executive agencies requiring adequate security measures for any transfer, storage, or use of digital yuan on information technology.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to the vote on the Blackburn motion to instruct.

Mrs. BLACKBURN. Madam President, if we continue to ignore the threat posed by the digital yuan, Beijing will use this technology to increase its surveillance capacity, avoid U.S. sanctions, and threaten the dominance of the U.S. dollar in the global trade.

This is the reason for this motion. This motion would require the managers to include a simple provision that will require OMB to work with our executive Agencies to put some much needed security measures in place.

We cannot afford to look the other way while the CCP increases its own global power at the expense of the free world and is looking for opportunities to use the digital yuan to increase surveillance.

I urge a ''yes'' vote on the motion.

VOTE ON MOTION

The PRESIDING OFFICER. Is there further debate on the motion?

If not, the question is on agreeing to the motion.

The motion was agreed to.

MOTION TO INSTRUCT

The PRESIDING OFFICER. The Senator from Arkansas.

Mr. COTTON. Madam President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from Arkansas [Mr. COTTON] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist upon rejecting the authorization of appropriations for contributions to the Green Climate Fund under section 30609(b) of the text of the bill as engrossed by the House of Representatives and insisting upon including an authorization of appropriations of $8,000,000,000 within section 2118 of division A of the Senate amendment (relating to funding for the Defense Advanced Research Projects Agency) for Department of Defense research, development, production, and procurement of weapon systems needed to compete with China.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to the vote on the Cotton motion to instruct.

The Senator from Arkansas.

Mr. COTTON. Madam President, the United States is in a new cold war with China, but Joe Biden doesn't seem to be up to the fight. China's military is growing while ours is shrinking. The President's Defense budget can't even

keep up with the Democrats' own rate of inflation. The President even denies that China is waging a cold war against us.

And while we are shortchanging our own military against a dangerous communist adversary, the Government wants to send $8 billion of your money to a U.N. boondoggle called the Green Climate Fund.

If anyone should be paying for a Green Climate Fund, it should be the Chinese communists, the world's worst polluters—not American taxpayers.

My proposal is simple. Instead of giving that $8 billion to the United Nations to waste on climate schemes and corruption, we should send it to our troops and help rebuild our military.

The U.N. or the U.S. military? It is an easy choice. I urge my colleagues to support the motion.

The PRESIDING OFFICER. The Senator from Rhode Island.

Mr. WHITEHOUSE. Madam President, this is the second shot that has been taken this afternoon at the international climate fund by our friends on the other side.

America is a great and powerful nation, and it is usually good for great and powerful nations not to be a jerk, and therefore sticking up for the countries that are suffering because of climate pollution is something that a great and powerful nation ought to do.

Don't be a jerk and clean up your own messes are two things that I learned as a child. And I think that our national security and our economic advantage are both served by actually supporting the international climate fund and helping the world work its way through the predicament that the fossil fuel industry has foisted on us. I urge a ''no'' vote on this.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Mr. WHITEHOUSE. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET), the Senator from Nevada (Ms. CORTEZ MASTO), the Senator from New Mexico (Mr. LUJÁN), the Senator from New Jersey (Mr. MENENDEZ), and the Senator from California (Mr. PADILLA) are necessarily absent.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Alabama (Mr. SHELBY).

The result was announced—yeas 50, nays 44, as follows:

[Rollcall Vote No. 151 Leg.]

YEAS—50

| | | |
|---|---|---|
| Barrasso | Capito | Crapo |
| Blackburn | Cassidy | Cruz |
| Blunt | Collins | Daines |
| Boozman | Cornyn | Ernst |
| Braun | Cotton | Fischer |
| Burr | Cramer | Graham |
| Grassley | Manchin | Sasse |
| Hagerty | Marshall | Scott (FL) |
| Hawley | McConnell | Scott (SC) |
| Hoeven | Moran | Sullivan |
| Hyde-Smith | Murkowski | Thune |
| Inhofe | Paul | Tillis |
| Johnson | Portman | Toomey |
| Kennedy | Risch | Tuberville |
| Lankford | Romney | Wicker |
| Lee | Rounds | Young |
| Lummis | Rubio | |

NAYS—44

| | | |
|---|---|---|
| Baldwin | Hickenlooper | Sanders |
| Blumenthal | Hirono | Schatz |
| Booker | Kaine | Schumer |
| Brown | Kelly | Shaheen |
| Cantwell | King | Sinema |
| Cardin | Klobuchar | Smith |
| Carper | Leahy | Stabenow |
| Casey | Markey | Tester |
| Coons | Merkley | Van Hollen |
| Duckworth | Murphy | Warner |
| Durbin | Murray | Warnock |
| Feinstein | Ossoff | Warren |
| Gillibrand | Peters | Whitehouse |
| Hassan | Reed | Wyden |
| Heinrich | Rosen | |

NOT VOTING—6

| | | |
|---|---|---|
| Bennet | Luján | Padilla |
| Cortez Masto | Menendez | Shelby |

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Alaska.

MOTION TO INSTRUCT

Ms. MURKOWSKI. Madam President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Alaska [Ms. MURKOWSKI] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include the text of S. 140, 117th Congress, as reported to the Senate on December 17, 2021.

The PRESIDING OFFICER. Under the previous order, there will be now 2 minutes of debate equally divided prior to a vote on the Murkowski motion to instruct.

Ms. MURKOWSKI. Madam President, the Senator from Rhode Island and I have offered a motion related to our bipartisan BLUE GLOBE Act. This is legislation that focuses on our oceans. They are a key source of food for us. They produce most of the oxygen we need to breathe. They help us maintain our global climate. But we largely ignore them, unfortunately.

We haven't done nearly enough to address overfishing, pollution, and acidification. According to NOAA, we have actually mapped more of the moon than we have our oceans. So BLUE GLOBE will help change that by improving data collection, accelerating ocean-focused innovation, and taking other important steps. It will help strengthen our economy, protect against China's illegal fishing, and bolster our national security along the coasts.

It received unanimous consent support from the Commerce Committee. It is a perfect fit for a bill on competitiveness, so I would urge the Senate to support this motion to instruct conferees to include BLUE GLOBE in the final bill.

VOTE ON MOTION

The PRESIDING OFFICER. Is there further debate?

Hearing none, the question is on agreeing to the motion to instruct.

The motion was agreed to.

Ms. MURKOWSKI. Thank you, Madam President.

The PRESIDING OFFICER. The Senator from North Carolina.

Mr. TILLIS. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. SULLIVAN. I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

MOTION TO INSTRUCT

Mr. SULLIVAN. Madam President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Alaska [Mr. SULLIVAN] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that prohibit a renewable energy project receiving Federal financial assistance, a subsidy, or any other financing mechanism authorized under the final conference report, such as a grant or tax credit, from purchasing materials, technology, or critical minerals mined, produced, processed, or refined in the People's Republic of China or the Russian Federation.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Sullivan motion to instruct.

Mr. SULLIVAN. Madam President, as recently as the early 1980s, our Nation produced the vast majority of the critical minerals and renewable energy technology we use in America but not anymore. Unfortunately, Russia and particularly China have a stranglehold on most of these critical minerals and clean energy technology that our Nation needs.

To make matters worse, Madam President, some of these critical minerals and materials we are importing, like solar panels and EV batteries, are processed and manufactured in China using forced labor in some of the worst environmental standards in the world.

Madam President, may I have 30 seconds to complete my statement?

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SULLIVAN. We can change this, Madam President. We must change this.

My motion to instruct is simple. Any renewable energy project receiving Federal funds cannot use materials, technologies, or critical minerals from

China or Russia—simple, commonsense, humane, and in the interest of America's workers and our national defense.

I urge my colleagues to vote yes.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. WYDEN. Madam President, this Congress and the Clean Energy for America legislation, which passed the Senate Finance Committee, is the best opportunity in the past decade for bold action that deals not just with the threat of climate change but gives us a chance to get those big investments here in the United States with domestic manufacturing and good jobs—an economic win-win.

Our country should be doing everything possible to invest in a technology-neutral, private-sector-driven approach to promote a clean energy future, including investing in renewable energy projects, including the manufacturing of solar, wind, and other technologies here at home.

Further, I would note that our country has a clear prohibition on products made with forced labor that is restricting and will continue to restrict renewable energy products produced with forced labor in China from entering the United States.

My friend, whom I always like working with, introduces a new, vague restriction that would unfortunately tie our hands, limit our businesses' ability to source necessary materials for their products with vague and overly broad restrictions.

I urge my colleagues to oppose the motion.

VOTE ON MOTION

The PRESIDING OFFICER. Is there further debate?

If not, the question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Florida.

MOTION TO INSTRUCT

Mr. RUBIO. Madam President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Florida [Mr. RUBIO] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include a Federal Government-based counterintelligence review to certify recipients of grants, funding, awards, or other resources provided, and intellectual property developed, as a result of the conference report, have national security protections in place to prohibit misappropriation and theft of Federal resources.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Rubio motion to instruct.

The Senator from Florida.

Mr. RUBIO. Madam President, this will not take long.

I don't think anybody at this point is unaware that China steals the things that we in America innovate: our research, our ingenuity, our products, our secrets. They steal it. So we are about to spend tens of billions of dollars on research, and if we are going to do that, I think we should take steps to make sure that the tens of billions aren't also stolen.

It doesn't make a lot of sense—and most people would agree—to spend all of this public money on research without enough protections to keep the Chinese from stealing it. So what this motion to instruct would do is it would ensure that the government undertakes a counterintelligence review to certify that the entities that are getting this public money—either through direct funding or through intellectual property developed as a result—have national security protections against the theft of American research and resources.

What this would ensure is that there are protections in place to strengthen the bill's research funding accounting requirements in section 2307 and to ensure review of the funding for university technology centers.

If this bill is to truly be the America COMPETES Act, we need to make sure that America's funding and grants and other taxpayer resources are not going to be stolen by our adversaries to beat us using our own money.

I ask my colleagues to vote yes on the motion to instruct.

VOTE ON MOTION

The PRESIDING OFFICER. Is there further debate?

If not, the question is on agreeing to the motion.

The motion was agreed to.

The Senator from Michigan.

Ms. STABENOW. Madam President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. JOHNSON. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

MOTION TO INSTRUCT

Mr. JOHNSON. Madam President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Wisconsin [Mr. JOHNSON] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to reject any proposals to prohibit the possession, acquirement, receipt, transportation, sale, or purchase of mink raised in captivity in the United States for fur production.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Johnson motion to instruct.

The Senator from Wisconsin.

Mr. JOHNSON. Madam President, this is truly one of the more inappropriate additions that the House made to this bill: to ban the production of farming of mink for the production of fur. I have no idea why they have included it here. It makes no sense to be included. Actually, in Wisconsin, it supports hundreds of jobs and produces exports to China.

So my motion simply instructs the conferees to reject any proposal that would ban mink farming.

I want to thank Senators ROMNEY, DAINES, and BOOZMAN for their support of this amendment, and I urge my colleagues to support American farmers by voting in favor of this motion to instruct.

The PRESIDING OFFICER. The Senator from New Jersey.

Mr. BOOKER. Madam President, the instruction by my colleague from Wisconsin directs conferees to reject bipartisan House language that addresses a serious public health concern related to mink farming.

Mink farms in Europe and the United States have spawned five COVID–19 variants that have collectively infected thousands of people. The next mink variant could infect millions of people. Vaccinations do not prevent infection or transmission in mink, and the risk of virus mutation on mink farms remains significant.

Today, there are only 60 mink farms left in the United States, and they sell their furs to buyers in China, not here. Americans have stopped buying fur because keeping these semiaquatic wild animals in cages and breaking their necks to kill them for fur is inhumane.

More than a dozen European countries have already phased out mink farming because of the serious pandemic risks they present. The United States should immediately follow suit.

I urge my colleagues, for the health of our country, to join me in voting no on this motion to instruct.

VOTE ON MOTION

I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the motion.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET), the Senator from Nevada (Ms. CORTEZ MASTO), the Senator from New Mexico (Mr. HEINRICH), the Senator from New Mexico (Mr. LUJÁN), the Senator from New Jersey (Mr. MENENDEZ), and the Senator from California (Mr. PADILLA) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT) and the Senator from Alabama (Mr. SHELBY).

The result was announced—yeas 59, nays 33, as follows:

[Rollcall Vote No. 152 Leg.]

YEAS—59

| | | |
|---|---|---|
| Baldwin | Hagerty | Portman |
| Barrasso | Hawley | Risch |
| Blackburn | Hoeven | Romney |
| Boozman | Hyde-Smith | Rounds |
| Braun | Inhofe | Rubio |
| Burr | Johnson | Sasse |
| Capito | Kelly | Scott (FL) |
| Casey | Kennedy | Scott (SC) |
| Cassidy | King | Sinema |
| Collins | Klobuchar | Smith |
| Cornyn | Lankford | Stabenow |
| Cotton | Lee | Sullivan |
| Cramer | Lummis | Tester |
| Crapo | Manchin | Thune |
| Cruz | Marshall | Tillis |
| Daines | McConnell | Toomey |
| Ernst | Moran | Tuberville |
| Fischer | Murkowski | Wicker |
| Graham | Ossoff | Young |
| Grassley | Paul | |

NAYS—33

| | | |
|---|---|---|
| Blumenthal | Hassan | Rosen |
| Booker | Hickenlooper | Sanders |
| Brown | Hirono | Schatz |
| Cantwell | Kaine | Schumer |
| Cardin | Leahy | Shaheen |
| Carper | Markey | Van Hollen |
| Coons | Merkley | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Feinstein | Peters | Whitehouse |
| Gillibrand | Reed | Wyden |

NOT VOTING—8

| | | |
|---|---|---|
| Bennet | Heinrich | Padilla |
| Blunt | Luján | Shelby |
| Cortez Masto | Menendez | |

The motion was agreed to.

The PRESIDING OFFICER (Mr. OSSOFF). The Senator from Vermont.

MOTION TO INSTRUCT

Mr. SANDERS. I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Vermont [Mr. SANDERS] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that require each beneficiary of Federal financial assistance for semiconductor manufacturing to be banned from purchasing the stock of the beneficiary, from outsourcing employment opportunities of the beneficiary to any country outside of the United States, and from repealing any collective bargaining requirements of the beneficiary, and that require each such beneficiary to issue warrants and equity stakes in the enterprise of the beneficiary to the Federal Government and to remain neutral in any union organizing effort of the employees of the beneficiary.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Sanders motion to instruct.

Mr. SANDERS. Mr. President, no one disagrees that we need to manufacture more microchips here in the United States, but we should not be providing a $53 billion blank check to the highly profitable microchip industry with no protections for the American taxpayer.

The five companies that will likely receive the lion's share of this funding: Intel, Texas Instruments, Samsung, Micron Technology, and Global Foundries made over $75 billion in profits last year and spent over $18 billion on stock buybacks.

We have strange priorities here in the Senate. We can't extend the child tax credit to combat child poverty. We can't deal with the crisis in childcare. We can't provide dental care to seniors on Medicare. We can't deal with climate change. But somehow we can provide a massive amount of corporate welfare to a handful of corporations.

The motion I am offering today would instruct the conferees to impose the following conditions on companies receiving this assistance: They must agree to issue warrants or equity stakes to the Federal Government.

If private corporations are going to benefit from $53 billion in taxpayer welfare, the financial gains must be shared with the American people—not just wealthy stockholders. Further, these companies must agree to not buy back their own stock, not outsource American jobs, not repeal existing collective bargaining agreements, and remain neutral in union organizing efforts.

What we are talking about here is not a radical idea. These exact conditions, word for word, were included in the bipartisan CARES Act, which passed the Senate 96 to 0.

The PRESIDING OFFICER. The Senator's time is expired.

The Senator from Ohio.

Mr. BROWN. Mr. President, I rise in opposition to Senator SANDERS' motion to instruct.

When America invented the semiconductor 40 years ago, we produced nearly half of the world's semiconductors. Today, we produce less than 10 percent.

Look what happened: Plants shut down across Ohio. Whirlpool, Ford, GM—forced to idle plants because of the ''spread out all over the world'' supply chain.

We passed the CHIPS Act 2 years ago. I thank Senator CANTWELL who—what she has done to stop this, encourage more production of these chips at home.

This bill will fund—this legislation will fund the bill Congress already passed. It is not a bailout. It is critical to my State—10,000 good jobs, 5,000 building trades—union building trades jobs paying prevailing wage for the next 10 years. It is an incentive program.

The EU, China, Taiwan, South Korea all provide incentives to make these chips domestically. None of them require stock warrants.

Everybody in this body knows my position in opposition to the financial services industry to stock buybacks. You can count on that.

I yield my final 30 seconds to Senator WICKER.

The PRESIDING OFFICER. The Senator from Mississippi.

Mr. WICKER. Mr. President, there are already significant taxpayer mandates in the bill, as it is limiting award size, prohibiting funds from going to so-called foreign entities, such as China, and clawback provisions.

Why do we need chips?

We need chips for Javelin missiles. We need them for—major weapons systems contain thousands of chips. The Arleigh Burke-class destroyer includes 250,000 chips.

It would make it much harder for Americans to produce these chips if the Sanders amendment were to pass.

I urge a no vote, and I join my friend from Ohio in urging a no vote.

The PRESIDING OFFICER. All time is expired on the motion.

Mr. SANDERS. Mr. President, may I have 30 seconds in response?

The PRESIDING OFFICER. The Senator from Vermont.

Mr. SANDERS. No one debates the need for chips. But to my friend from Ohio, I would say: You are right. We lost tens of thousands of jobs over the last 20 years. You know why? Because the same microchip companies shut down plants in America to go for cheap labor in Asia, and now we are rewarding them with $53 billion in corporate welfare.

For all of my friends who talk about the deficit and how we can't fund the needs of our children or the elderly, $53 billion going to some of the most profitable corporations in America without any taxpayer protection is an absolute outrage.

Let's vote for this proposal.

VOTE ON MOTION

Mr. WICKER. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET), the Senator from Delaware (Mr. COONS), the Senator from New Mexico (Mr. HEINRICH), the Senator from New Mexico (Mr. LUJÁN), and the Senator from New Jersey (Mr. MENENDEZ) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT) and the Senator from Alabama (Mr. SHELBY).

The result was announced—yeas 6, nays 87, as follows:

[Rollcall Vote No. 153 Leg.]

YEAS—6

| | | |
|---|---|---|
| Baldwin | Markey | Sanders |
| Booker | Merkley | Warren |

NAYS—87

| | | |
|---|---|---|
| Barrasso | Collins | Gillibrand |
| Blackburn | Cornyn | Graham |
| Blumenthal | Cortez Masto | Grassley |
| Boozman | Cotton | Hagerty |
| Braun | Cramer | Hassan |
| Brown | Crapo | Hawley |
| Burr | Cruz | Hickenlooper |
| Cantwell | Daines | Hirono |
| Capito | Duckworth | Hoeven |
| Cardin | Durbin | Hyde-Smith |
| Carper | Ernst | Inhofe |
| Casey | Feinstein | Johnson |
| Cassidy | Fischer | Kaine |

| | | |
|---|---|---|
| Kelly | Padilla | Sinema |
| Kennedy | Paul | Smith |
| King | Peters | Stabenow |
| Klobuchar | Portman | Sullivan |
| Lankford | Reed | Tester |
| Leahy | Risch | Thune |
| Lee | Romney | Tillis |
| Lummis | Rosen | Toomey |
| Manchin | Rounds | Tuberville |
| Marshall | Rubio | Van Hollen |
| McConnell | Sasse | Warner |
| Moran | Schatz | Warnock |
| Murkowski | Schumer | Whitehouse |
| Murphy | Scott (FL) | Wicker |
| Murray | Scott (SC) | Wyden |
| Ossoff | Shaheen | Young |

NOT VOTING—7

| | | |
|---|---|---|
| Bennet | Heinrich | Shelby |
| Blunt | Luján | |
| Coons | Menendez | |

The motion was rejected.

The PRESIDING OFFICER. The Senator from Montana.

MOTION TO INSTRUCT

Mr. DAINES. Mr. President, I ask unanimous consent that, notwithstanding the previous order, it be in order to offer my motion to instruct at this time.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. DAINES. Mr. President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Montana [Mr. DAINES] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to reject provisions that weaken the energy security of the United States, prohibit the development of an all-of-the-above energy portfolio, or direct funds to foreign entities for international climate objectives.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Daines motion to instruct.

Mr. DAINES. Mr. President, if we have learned anything over the past few months, it is the importance of supporting ''Made in America'' energy.

Since Europe has divested in traditional energy, Vladimir Putin has weaponized it and has Europe over a barrel. This is the path America is headed down if the administration continues to stonewall traditional American energy development.

For the sake of our national security, we must unleash American energy production, which includes an ''all of the above'' energy portfolio with renewables, hydropower, oil, gas, nuclear, and coal. Energy security is national security, and a global, energy-dominant America is a safer world.

We should also not be sending money to China like the House bill does in a package that is meant to help us win the race against China. It just doesn't make sense.

I urge my colleagues to support this motion to instruct and reject the provisions from the House that weaken the energy security of the United States.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. MERKLEY. Mr. President, I rise in opposition to this motion to instruct for one simple reason: It is up to America to lead the world in reducing the use of fossil fuels and in pivoting to renewable energy. Yet this motion to instruct says we cannot do anything to help foreign entities address any aspect of the climate objective: not to fight forest fires that come from climate change, not to address the salinization or the acidification of the sea, not to address reforestation or deforestation.

It is up to America to help make sure that we provide nonfossil fuel energy for the future that will help us all address this huge list of issues. It is important that we lead the world, not neglect the world.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER (Mr. KELLY). The Senator from New Hampshire.

MOTION TO INSTRUCT

Ms. HASSAN. Mr. President, I ask unanimous consent that, notwithstanding the previous order, it be in order to offer my motion to instruct at this time.

The PRESIDING OFFICER. Without objection, it is so ordered.

Ms. HASSAN. Mr. President, I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from New Hampshire [Ms. HASSAN] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that expand the research and development tax credit for small businesses and preserve full and immediate expensing for research and development investments.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Hassan motion to instruct.

Ms. HASSAN. Mr. President, I rise today to offer a bipartisan motion with Senator YOUNG that will help fuel American innovation.

The research and development tax credit gives critical support to small businesses and startups that power our economy. By strengthening the R&D tax credit for startups and preserving other tax incentives for research here in America, we can outcompete countries like China.

I would also like to thank the additional 16 Senators supporting the motion: Senators BALDWIN, MARSHALL, FEINSTEIN, SASSE, WARNOCK, BLUNT, KELLY, PORTMAN, PADILLA, FISCHER, COONS, BOOZMAN, CORTEZ MASTO, CAPITO, ROSEN, and WICKER.

I yield to the Senator from Indiana.

Mr. YOUNG. Mr. President, I ask unanimous consent to speak for 1 minute.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. YOUNG. Mr. President, I thank my colleague from New Hampshire.

This bill is about maintaining our competitiveness with China.

We cannot compete with China without robust domestic R&D. A company investing $100 in R&D in China this year will get a $200 deduction. In America, that company investing $100 would only get to deduct $10 this year.

We must not lose out on innovation and production to China. I ask my colleagues to support this motion and support domestic R&D. Every day we wait is another day we fall behind.

The PRESIDING OFFICER. The Senator from Vermont.

Mr. SANDERS. Mr. President, recent polls suggest that Congress has a 19-percent favorability rating, and I find that shocking. Clearly, if that 19 percent had any inkling as to what goes on here in the Senate, that number would be much lower.

Over and over again, I hear Members of the Senate express their deep concerns about the deficit. ''Oh, my God, our deficit.'' We can't maintain a child tax credit to cut child poverty, and we can't make sure that senior citizens on Medicare have teeth in their mouths—we just can't afford it—but, apparently, we can afford to provide $125 billion in tax breaks over the next 4 years to some of the most profitable corporations in America, including Amazon, Intel, AT&T, Boeing, you name it.

This amendment would repeal—now, this is amazing, and I say this to my Democratic colleagues. This amendment would repeal a modest tax increase on profitable corporations that President Donald Trump pushed to partially offset the cost of his massive tax giveaway to the rich a few years ago. This was Trump's initiative to kind of cover the tax breaks he gave to billionaires and large corporations. If this amendment were enacted, Lockheed Martin and Raytheon would receive a $2 billion tax break each year, and Northrop Grumman would receive a $1 billion tax break.

Is that what we are in the business of doing, telling working families we can't help them but that we are giving huge tax breaks to some of the wealthiest and most profitable corporations in America?

I urge my colleagues to vote against this motion.

The PRESIDING OFFICER. The Senator from New Hampshire.

Ms. HASSAN. Mr. President, I ask unanimous consent to speak for 10 more seconds.

The PRESIDING OFFICER. Without objection, it is so ordered.

Ms. HASSAN. Our R&D proposal is critical to helping small businesses and to investing in R&D here at home to help us outcompete countries like China.

There is strong bipartisan support for this measure.

VOTE ON MOTION

I ask for the yeas and nays.

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET), the Senator from West Virginia (Mr. MANCHIN), and the Senator from New Jersey (Mr. MENENDEZ) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT) and the Senator from Alabama (Mr. SHELBY).

The result was announced—yeas 90, nays 5, as follows:

[Rollcall Vote No. 154 Leg.]

YEAS—90

| | | |
|---|---|---|
| Baldwin | Grassley | Peters |
| Barrasso | Hagerty | Portman |
| Blackburn | Hassan | Reed |
| Blumenthal | Hawley | Risch |
| Boozman | Heinrich | Romney |
| Braun | Hickenlooper | Rosen |
| Brown | Hirono | Rounds |
| Burr | Hoeven | Rubio |
| Cantwell | Hyde-Smith | Sasse |
| Capito | Inhofe | Schatz |
| Cardin | Johnson | Schumer |
| Carper | Kaine | Scott (FL) |
| Casey | Kelly | Scott (SC) |
| Cassidy | Kennedy | Shaheen |
| Collins | King | Sinema |
| Coons | Klobuchar | Smith |
| Cornyn | Lankford | Stabenow |
| Cortez Masto | Leahy | Sullivan |
| Cotton | Luján | Tester |
| Cramer | Lummis | Thune |
| Crapo | Marshall | Tillis |
| Cruz | McConnell | Toomey |
| Daines | Merkley | Tuberville |
| Duckworth | Moran | Van Hollen |
| Durbin | Murkowski | Warner |
| Ernst | Murphy | Warnock |
| Feinstein | Murray | Whitehouse |
| Fischer | Ossoff | Wicker |
| Gillibrand | Padilla | Wyden |
| Graham | Paul | Young |

NAYS—5

| | | |
|---|---|---|
| Booker | Markey | Warren |
| Lee | Sanders | |

NOT VOTING—5

| | | |
|---|---|---|
| Bennet | Manchin | Shelby |
| Blunt | Menendez | |

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Florida.

MOTION TO INSTRUCT

Mr. SCOTT of Florida. I call up my motion, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Florida [Mr. SCOTT] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that ensure that any taxpayer funds spent in the bill, including those provided to universities and private sector corporations, are subject to comprehensive return on investment analyses and claw back provisions, and corresponding timely reports on the use of such funds to Congress and the American public.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to the vote on the Scott motion to instruct.

The Senator from Florida.

Mr. SCOTT of Florida. Mr. President, this government is $30 trillion in debt, and Congress is working every day to spend money like it is burning a hole in our pocket. This bill has billions of spending, billions of taxpayer dollars, and zero mandates for return on investment. That is crazy. It is crazy and illogical. No American would make a deal like this for their business or their family. Congress shouldn't do it with your tax dollars either.

The conferees must ensure this bill makes all taxpayer funds subject to a comprehensive return-on-investment analysis with clawback provisions and mandate a report on how every dollar is spent.

We used taxpayer dollars to incentivize private sector growth when I was Governor of Florida. It helped bring businesses to my State and create jobs. But we always had return-on-investment metrics and clawbacks for when those metrics weren't met. We should be demanding the same here, and I urge my colleagues to join me and support accountability to the taxpayer.

The PRESIDING OFFICER. The Senator from Washington.

Ms. CANTWELL. Mr. President, speaking against my colleague, I am sure he is well-meaning, but the language in this underlying amendment would condition the funds of this bill. Say the taxpayer money provided to universities on research—think about what we do today with universities on a lot of subjects. Just ask yourself, would you ever have an ROI on the COVID vaccine? basic research around lifesaving medicine? It took 60 years to prove the return on that investment. There are underlying DARPA funds in this bill. Do you think that all of those DARPA funds showed return on investment? Say goodbye to those moneys.

This also says that it can be conditioned for a clawback. Who? So nuclear research done by one institution and one administration but not liked by the next administration is clawed back? I think we have trusted our universities to do this research for us, and that is what a research economy is about.

We need to dust off our R&D skills and make these investments and make the commitments. The underlying bill has safeguards on spending in the bill.

I ask my colleagues to vote no on this motion to instruct.

VOTE ON MOTION

The PRESIDING OFFICER. Hearing no further debate, the question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Iowa.

MOTION TO INSTRUCT

Ms. ERNST. Mr. President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Iowa [Ms. ERNST] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to reject the provision as agreed to by the House of Representatives that would reauthorize the Small Business Innovation Research and Small Business Technology Transfer programs under section 9 of the Small Business Act (15 U.S.C. 638) without authorization to prevent the Russian Federation and the People's Republic of China from acquiring technology critical to national security developed through programs of the Small Business Administration and participating Federal agencies.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to the vote on the Ernst motion to instruct.

Ms. ERNST. Mr. President, the Small Business Innovation Research and Small Business Technology Transfer Programs provide critical innovation support to America's small businesses. While this program is celebrating 40 years in business, SBIR continues to be exploited by foreign adversaries due to lack of controls within the programs to prevent the transfer of new American technology to our adversaries.

China has become one of the largest beneficiaries of the SBIR Programs because of the lack of adequate oversight. China and other foreign adversaries, like Putin's Russia, know this and have been establishing shell companies, acquiring beneficial ownership in American enterprises, selecting key awardee personnel for talent recruitment, and other state-directed technology acquisition. China has also infiltrated businesses known as SBIR mills that have won numerous grants.

This is a clear national security threat and is wholly unacceptable. Serious and comprehensive due diligence reforms are needed to combat adversarial foreign influence in these programs and to protect our national security.

I ask my colleagues on both sides of the aisle to support this effort.

The PRESIDING OFFICER. The Senator from Maryland.

Mr. CARDIN. Mr. President, I agree with my colleague that the SBIR Program and the STTR Program are critical to our American small businesses. It offers them incredible opportunities to develop technology important for our Nation. I also agree with my colleague that it is important we prevent critical national security technology developed by the programs from being acquired by China and Russia.

I do point out that if you look at the COMPETES Act, there are safeguards to prevent our foreign adversaries from acquiring sensitive technology—and not just China and Russia but all foreign countries of concern, including Iran and North Korea. This effort

builds on section 223 of the fiscal year 2021 National Defense Authorization Act that provides protection and requires disclosure to guard against foreign influence on federally funded research and development.

I am going to support the motion to instruct and work with my colleague so we can develop clear language and make it clear that the technology developed by the SBIR Program and STTR Program are protected against being taken into China and Russia. I look forward to working with my colleague.

I support the motion.

VOTE ON MOTION

The PRESIDING OFFICER. Hearing no further debate, the question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Oklahoma.

MOTION TO INSTRUCT

Mr. LANKFORD. Mr. President, I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Oklahoma [Mr. LANKFORD] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions requiring that any agreement negotiated by the United States with the Islamic Republic of Iran addressing Iran's development of nuclear weapons—

(1) also includes provisions addressing the full range of Iran's destabilizing activities, including development of the means of delivery for such weapons (such as ballistic missiles), support for terrorism, and evasion of sanctions by individuals, entities, and vessels in the trade of petroleum products with the People's Republic of China;

(2) does not lift sanctions on the Islamic Revolutionary Guard Corps; and

(3) does not revoke the designation of the Islamic Revolutionary Guard Corps as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to the vote on the Lankford motion to instruct.

The Senator from Oklahoma.

Mr. LANKFORD. Mr. President, we are about to go into conference on what we are basically calling the China bill, but this bill does not address China's practice of purchasing and stockpiling sanctioned Iranian oil on the black market.

This procurement spike by China is directly correlated with the spike in terrorist activities by Iran and its proxies in the Middle East. Iran is laundering these petroleum products and illicitly transferring the oil at sea to Iranian tankers and foreign-flagged vessels. Three-quarters of this oil is ultimately exported to China, which purchased 310 million barrels of oil from Iran last year. All of this is happening while China is actually negotiating directly with Iran on our behalf in Vienna.

This particular motion to instruct goes straight at this illicit activity from Iran that is facilitating the terror activities and also addresses the designation that Iran is asking if they are going to negotiate with the Biden administration on the Iran nuclear deal. Iran is specifically asking that they get a lift of the ''foreign terrorist organization'' on the Islamic Revolutionary Guard Corps. That is the group that was attacking our troops in Iraq and facilitating their death.

We need to address this and take it off the table so that Iran does not get by with this and the Islamic Revolutionary Guard Corps does not.

I urge a ''yes'' vote on my motion to instruct.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. MURPHY. Mr. President, I would urge opposition to this motion.

This motion asks the Senate to endorse President Trump's Iran policy—a policy that, if you didn't notice, was a complete, total failure.

The motion calls for a provision in the underlying bill to prohibit a return to the JCPOA and to keep Trump's ''maximum pressure'' campaign intact until a mythical comprehensive agreement is achieved with Iran, inclusive of all their malevolent behavior. This policy just hasn't worked. To apply it prospectively would be ruinous.

Friends, Iran is weeks away from having enough nuclear material for a weapon. To deny this administration the ability to enter into a nuclear agreement isn't just folly; it is downright dangerous.

I wish a comprehensive agreement with Iran was possible, but 4 years of failure by President Trump was proof that, for the time being, it is not. We should not endorse 4 more years of this failed Iran policy.

I urge opposition.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Mr. LANKFORD. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) and the Senator from New Jersey (Mr. MENENDEZ) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT), the Senator from Idaho (Mr. RISCH), and the Senator from Alabama (Mr. SHELBY).

Further, if present and voting, the Senator from Idaho (Mr. RISCH) would have voted ''yea.''

The result was announced—yeas 62, nays 33, as follows:

[Rollcall Vote No. 155 Leg.]

YEAS—62

| | | |
|---|---|---|
| Barrasso | Gillibrand | Peters |
| Blackburn | Graham | Portman |
| Blumenthal | Grassley | Romney |
| Booker | Hagerty | Rosen |
| Boozman | Hassan | Rounds |
| Braun | Hawley | Rubio |
| Burr | Hoeven | Sasse |
| Capito | Hyde-Smith | Schumer |
| Cardin | Inhofe | Scott (FL) |
| Cassidy | Johnson | Scott (SC) |
| Collins | Kelly | Sinema |
| Coons | Kennedy | Sullivan |
| Cornyn | King | Tester |
| Cortez Masto | Lankford | Thune |
| Cotton | Lee | Tillis |
| Cramer | Lummis | Toomey |
| Crapo | Manchin | Tuberville |
| Cruz | Marshall | Wicker |
| Daines | McConnell | Wyden |
| Ernst | Moran | Young |
| Fischer | Murkowski | |

NAYS—33

| | | |
|---|---|---|
| Baldwin | Kaine | Reed |
| Brown | Klobuchar | Sanders |
| Cantwell | Leahy | Schatz |
| Carper | Luján | Shaheen |
| Casey | Markey | Smith |
| Duckworth | Merkley | Stabenow |
| Durbin | Murphy | Van Hollen |
| Feinstein | Murray | Warner |
| Heinrich | Ossoff | Warnock |
| Hickenlooper | Padilla | Warren |
| Hirono | Paul | Whitehouse |

NOT VOTING—5

| | | |
|---|---|---|
| Bennet | Menendez | Shelby |
| Blunt | Risch | |

The PRESIDING OFFICER. On this vote, the yeas are 62, the nays are 33.

Under the previous order requiring 60 votes for the adoption of this motion, the motion is agreed to.

The majority leader.

Mr. SCHUMER. OK. My colleagues, we have seven votes left; three look like they will be voice, so there are four votes. If we stay in our seats and try to stick as close as we can to the 10-minute vote, we can finish very soon. So please do that.

I yield the floor.

The PRESIDING OFFICER. The Senator from Vermont.

MOTION TO INSTRUCT

Mr. SANDERS. Mr. President, I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from Vermont [Mr. SANDERS] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to recede from the provision contained in section 2614(c) of the Senate amendment (relating to contract redundancy and funding for the human landing system program of the National Aeronautics and Space Administration, which would likely go to Blue Origin).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate equally divided prior to a vote on the Sanders motion to instruct.

The Senator from Vermont.

Mr. SANDERS. Mr. President, this motion is cosponsored by Senator JOHNSON of Wisconsin, and I have to say that we are on a roll tonight.

We have already voted to give $53 billion in corporate welfare to the microchip industry. We voted to give $125 billion in tax breaks to some of the wealthiest corporations in the country.

But now we have the opportunity to do even better. We can give $10 billion to Jeff Bezos, the second wealthiest person in this country, who is the owner of the space company Blue Origin.

Clearly, Mr. Bezos desperately needs this Federal assistance. He is only worth $150 billion, and with all of his lawyers and accountants, in a given year, he pays nothing in Federal income taxes.

He is the owner of Amazon, which in a given year also pays nothing in Federal income taxes.

Mr. Bezos has enough money to buy a $500 million yacht, $175 million estate in Beverly Hills, and a $23 million mansion here in Washington.

I am sure that your constituents will be very excited to hear that you are going to give him this $10 billion, which he clearly desperately needs.

Further, for those people here who believe in trade unions, Mr. Bezos has spent millions of dollars at Amazon preventing workers at Amazon from exercising their constitutional right to form a union.

He is part of Amazon, a company that has been fined over and over again for violating the law.

Mr. President, at a time when 70 million are uninsured, when 600,000 people are homeless in this country, when we are seeing a growing gap between the very rich and everybody else, it does not make a lot of sense to give $10 billion to the second wealthiest person in this country.

I urge my colleagues to vote yes on this motion.

The PRESIDING OFFICER. The Senator from Alabama.

Mr. TUBERVILLE. Mr. President, NASA recognizes that competition makes us better. That is why they asked Congress to fund a second provider for the lunar lander.

Developing additional designs was NASA's original intent—a type of built-in insurance. It helps foster greater astronaut safety, which you can appreciate, and minimize the impact of delays; in the end, protecting the American taxpayers' investment in the Artemis program.

To continue advancements in American ingenuity and innovation, Congress must embrace competition, safety, and public-private partnerships.

My colleague from Vermont's motion would take a sledgehammer to American ingenuity and the Artemis program.

I urge my colleagues to vote against this motion.

The PRESIDING OFFICER. The Senator from Washington.

Ms. CANTWELL. Mr. President, I ask unanimous consent for an additional 30 seconds.

The PRESIDING OFFICER. Without objection, it is so ordered.

Ms. CANTWELL. I, too, oppose this amendment.

Striking the authorization does strike competition. NASA has asked for continued competition, and there are many defense contractors who have expressed interest—Lockheed Martin, Northrop Grumman, Dynetics.

So I understand my colleague's frustration and what he wants to complain about, but this is about safety, and it is about redundancy, and it is about us authorizing the Artemis program; not just having appropriators make a decision, but having the authorization of safety and redundancy that we expect if we as a Nation are going to take the next woman astronaut all the way to the surface of the Moon.

When I think about what happened with the space shuttle Columbia and the disaster, NASA suffered great consequences. They have said redundancy matters, and that is what we are authorizing, and the competition my colleague just mentioned.

The PRESIDING OFFICER. The Senator from Vermont, 30 seconds.

Mr. SANDERS. Mr. President, you know, I hear this word ''competition,'' but I want everybody to know what the competition is in the space program.

The competition is between Mr. Musk and SpaceX. Musk is the wealthiest guy in the country, and Jeff Bezos and Blue Origin, the second wealthiest guy in this country.

Is that really the kind of space program that the American people want? I think not.

Mrs. FEINSTEIN. Madam President, I rise today to explain my position on Senator SANDERS' motion to instruct conferees to remove language from any final conference report of the U.S. Innovation and Competition Act and the America COMPETES Act that would provide $10 billion for NASA to develop a second Human Landing System.

California has long been the epicenter of the global aerospace and commercial space industries, and I am proud of the many technical and scientific advancements made by California scientists and engineers. The bills that the conference committee will consider are intended to ensure that the innovation in aerospace in California and beyond has the support needed to maintain the United States' global competitive edge and lead scientific advancement.

When the Senate passed the U.S. Innovation and Competition Act last summer, I was concerned that section 2614 of the bill would circumvent the competitive process at the heart of Federal procurement and undermined NASA's existing contract for the Artemis Human Landing System.

By that time, NASA had already completed a contract review and award for the Artemis program for the development of a landing system, selecting the proposal by SpaceX. The SpaceX bid not only received the highest rating for its technical aspects and management approach, it also had the lowest price.

Nevertheless, the unsuccessful contractors who did not receive the final contract, Blue Origin and Dynetics, filed a complaint with the Government Accountability Office, alleging violations and unreasonable evaluation practices.

The GAO investigated for 3 months and ultimately denied the claims by the contractors, saying: ''The evaluation of all three proposals was reasonable and consistent with applicable procurement law, regulation, and the announcement's terms.''

Like Senator SANDERS, I had initial concerns that section 2614 of the U.S. Innovation and Competition Act would create an additional Human Landing System contract, thereby providing substantial public funding to contractors who lost a fair competitive contract award. Moreover, the terms of section 2614 threatened to force NASA into a rushed acquisition and could have diverted funds from other important projects to cover the expenses of this second Artemis award.

However, my staff and I have worked with Senator CANTWELL and her staff at the Senate Commerce Committee to address those concerns. I understand that the Commerce Committee will work through the conference process to extend the timeline for the new contract in the bill—previously just 90 days—to ensure that NASA can undertake another fair procurement process.

They have further committed to working with NASA to ensure that the language does not represent an unfunded mandate, forcing NASA to pull funds from other programs.

Lastly, NASA's budget request this year for the landing system was $1.5 billion, a significantly more reasonable amount than the enormous figure included in the original Senate bill. As a member of the Appropriations Subcommittee for Commerce, Justice, and Science, I will continue to observe this program closely to ensure that these Federal funds are spent responsibly and without favoritism.

I want to reiterate that I have long supported NASA's scientific endeavors, including the upcoming Artemis moon mission, and I look forward to seeing the improved language in the final version of the bill. I thank Senator CANTWELL and her staff for working with me to address my concerns, and I respectfully note that I will vote no on the motion by Senator SANDERS.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Mr. SANDERS. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) and the Senator from New Jersey (Mr. MENENDEZ) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT), the Senator from Idaho (Mr. RISCH), and the Senator from Alabama (Mr. SHELBY).

The result was announced—yeas 17, nays 78, as follows:

[Rollcall Vote No. 156 Leg.]

YEAS—17

| | | |
|---|---|---|
| Boozman | Johnson | Rubio |
| Braun | Klobuchar | Sanders |
| Cotton | Lee | Scott (FL) |
| Gillibrand | Markey | Smith |
| Hawley | Murkowski | Warren |
| Hirono | Paul | |

NAYS—78

| | | |
|---|---|---|
| Baldwin | Graham | Peters |
| Barrasso | Grassley | Portman |
| Blackburn | Hagerty | Reed |
| Blumenthal | Hassan | Romney |
| Booker | Heinrich | Rosen |
| Brown | Hickenlooper | Rounds |
| Burr | Hoeven | Sasse |
| Cantwell | Hyde-Smith | Schatz |
| Capito | Inhofe | Schumer |
| Cardin | Kaine | Scott (SC) |
| Carper | Kelly | Shaheen |
| Casey | Kennedy | Sinema |
| Cassidy | King | Stabenow |
| Collins | Lankford | Sullivan |
| Coons | Leahy | Tester |
| Cornyn | Luján | Thune |
| Cortez Masto | Lummis | Tillis |
| Cramer | Manchin | Toomey |
| Crapo | Marshall | Tuberville |
| Cruz | McConnell | Van Hollen |
| Daines | Merkley | Warner |
| Duckworth | Moran | Warnock |
| Durbin | Murphy | Whitehouse |
| Ernst | Murray | Wicker |
| Feinstein | Ossoff | Wyden |
| Fischer | Padilla | Young |

NOT VOTING—5

| | | |
|---|---|---|
| Bennet | Menendez | Shelby |
| Blunt | Risch | |

The motion was rejected.

MOTION TO INSTRUCT

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. CASSIDY. Mr. President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

A Senator from Louisiana [Mr. CASSIDY] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that require the President to directly address troubling developments in Mexico's energy sector that intentionally cause harm to United States jobs and economic interests, business and investor interests, and climate goals through the use of consultations under the USMCA (as defined in section 3 of the United States-Mexico-Canada Agreement Implementation Act (19 U.S.C. 4502)).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to the vote on the Cassidy motion to instruct.

Mr. CASSIDY. Mr. President, the importance of trade agreements is that everyone follows the rules they agreed to. Mexico is not following the USMCA.

They have forced the closures or partial closures of dozens of fuel facilities and have canceled permits for the import and export of fuels. They are favoring their national industry, PEMEX, and disadvantaging American companies, including companies building renewable projects. These actions chill foreign direct investment with Mexico, hurt American businesses, and undermine climate goals; but Mexico continues to benefit from the rest of the USMCA.

We wish to be a strong and dependable trade partner with Mexico, but the USMCA should be honored. The role of the USTR is to represent the interests of the United States and hold trade partners to their word. Mexico should respect property rights for U.S. businesses. This should be a priority for the USTR.

I yield back all time.

VOTE ON MOTION

The PRESIDING OFFICER. Without objection, all time is yielded back.

The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Georgia.

MOTION TO INSTRUCT

Mr. WARNOCK. Mr. President, I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

A Senator from Georgia [Mr. WARNOCK] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that fully fund programs to build institutional research capacity at historically Black colleges or universities that are developing research institutions.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Warnock motion to instruct.

Mr. WARNOCK. Mr. President, this legislation will help to lower costs for hard-working families, create jobs, and equip the Nation to compete in a changing economy.

Historically Black colleges and universities have been putting in the work. For years, they have always had to punch above their weight, but they play a critical role in creating those jobs and in ensuring that we have a diverse, trained workforce for new technology, for research, and advanced manufacturing opportunities in Georgia and, indeed, across the country.

That is why we have to invest in their ability to meet tomorrow's challenges. When we invest in all of our young people, we position our economy to be strong for 10 years, 20 years, 30 years into the future.

The purpose of this motion is very simple. It will ensure that our entire higher education sector can contribute to our growing tech and innovation economy. We make good use of all of our talent in creating businesses and good-paying jobs in Georgia and all across the Nation. I hope that we can adopt this motion by voice vote.

VOTE ON MOTION

The PRESIDING OFFICER. Is there further debate on the motion?

If not, the question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from West Virginia.

MOTION TO INSTRUCT

Mrs. CAPITO. Mr. President, I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from West Virginia [Mrs. CAPITO] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include provisions that—

(1) emphasize that, under current law, the President may not—

(A) declare, on the basis of climate change—

(i) a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.);

(ii) an emergency or major disaster under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.); or

(iii) a public health emergency under section 319 of the Public Health Service Act (42 U.S.C. 247d); or

(B) invoke, on the basis of climate change, the authorities of the Defense Production Act of 1950 (50 U.S.C. 4501 et seq.); and

(2) provide that nothing in H.R. 4521 grants the President the authority to make a declaration or invocation described in paragraph (1).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Capito motion to instruct.

Mrs. CAPITO. Mr. President, this motion to instruct emphasizes that climate change cannot be used as a basis for the President to declare an emergency or a major disaster or any other means to expand executive powers.

In the last 2 weeks, Progressives in Congress have renewed their push for the President to claim powers he doesn't have and make it harder to produce energy domestically and export it abroad. This is bad policy, and it sets a bad precedent to encourage expansive executive authority.

Now, of course, I think we should address climate change, but ceding broad authority over to the Executive is not the way to go. I have worked together with my colleagues on numerous pieces of meaningful climate legislation and continue to do so as the ranking member of the Environment and Public Works Committee.

When Congress wants to address climate, as we have in the past, it rolls up its sleeves and does so in a thoughtful, bipartisan manner, with clear, detailed direction to the Executive, not by giving the Executive broad authority to do whatever it sees fit.

I encourage a positive vote on my motion to instruct.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. MERKLEY. Mr. President, when vigorous storms attack the heartland and destroy crops, I hope that the President has emergency powers to assist those farmers. When fires—fiercer fires in a longer fire season—proceed to burn not just one town but six towns to the ground in the State of Oregon in an almost unbelievable, horrendous reduction to ashes, I hope the President has emergency powers to declare a major disaster and assist the good people of my State or your State when these disasters happen. If changing temperatures and changing rain patterns bring the sandfly to Texas and leishmaniasis or some other deadly disease, then, indeed, the President needs to have the power to declare a public health service emergency.

Taking away the ability for the President to declare major disasters or health emergencies or national emergencies when there are disasters striking our people is a terrible idea, and I encourage you to vote no on this motion to instruct.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Mr. MERKLEY. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) is necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT), the Senator from Idaho (Mr. RISCH), and the Senator from Alabama (Mr. SHELBY).

The PRESIDING OFFICER (Ms. BALDWIN). Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 49, nays 47, as follows:

[Rollcall Vote No. 157 Leg.]

YEAS—49

| | | |
|---|---|---|
| Barrasso | Grassley | Paul |
| Blackburn | Hagerty | Portman |
| Boozman | Hawley | Romney |
| Braun | Hoeven | Rounds |
| Burr | Hyde-Smith | Rubio |
| Capito | Inhofe | Sasse |
| Cassidy | Johnson | Scott (FL) |
| Collins | Kelly | Scott (SC) |
| Cornyn | Kennedy | Sullivan |
| Cotton | Lankford | Thune |
| Cramer | Lee | Tillis |
| Crapo | Lummis | Toomey |
| Cruz | Manchin | Tuberville |
| Daines | Marshall | Wicker |
| Ernst | McConnell | Young |
| Fischer | Moran | |
| Graham | Murkowski | |

NAYS—47

| | | |
|---|---|---|
| Baldwin | Carper | Feinstein |
| Blumenthal | Casey | Gillibrand |
| Booker | Coons | Hassan |
| Brown | Cortez Masto | Heinrich |
| Cantwell | Duckworth | Hickenlooper |
| Cardin | Durbin | Hirono |

| | | |
|---|---|---|
| Kaine | Ossoff | Smith |
| King | Padilla | Stabenow |
| Klobuchar | Peters | Tester |
| Leahy | Reed | Van Hollen |
| Luján | Rosen | Warner |
| Markey | Sanders | Warnock |
| Menendez | Schatz | Warren |
| Merkley | Schumer | Whitehouse |
| Murphy | Shaheen | Wyden |
| Murray | Sinema | |

NOT VOTING—4

| | |
|---|---|
| Bennet | Risch |
| Blunt | Shelby |

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Pennsylvania.

MOTION TO INSTRUCT

Mr. TOOMEY. Madam President, I call up my motion to instruct, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The legislative clerk read as follows:

The Senator from Pennsylvania [Mr. TOOMEY] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist upon the provisions contained in section 73001 of the Senate amendment (relating to establishing a process for exclusion of articles from duties under section 301 of the Trade Act of 1974).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Toomey motion to instruct.

Mr. TOOMEY. Madam President, my motion would simply instruct the Senate conferees to USICA to keep a provision of the Wyden-Crapo trade amendment that passed the Senate 91 to 4. Specifically, it is the provision that requires the administration reestablish an exclusion process for current and future section 301 actions.

This does not repeal 301 tariffs. It doesn't preclude new 301 tariffs. But, remember, when the Trump administration imposed 301 tariffs, they created an exclusion process for the simple reason that it was important to exclude from tariffs those circumstances in which it would do more harm to an American manufacturer and worker than those targeted by the tariffs. But the exclusion process has expired. It has not been fully restarted. So many U.S. manufacturers are not able to get the relief they need.

The USICA language that passed the Senate would reestablish this exclusion process. The language grants considerable flexibility to the U.S. Trade Rep, even to the point where the exclusion process could be waived altogether if the Trade Rep concludes that, otherwise, it would diminish American leverage.

The bipartisan language simply helps ensure that American manufacturers remain competitive. Nearly every one of us submitted letters of request from constituent companies asking for exclusions.

The PRESIDING OFFICER. The Senator's time has expired.

Mr. TOOMEY. There is no exclusion if there is no exclusion process.

The PRESIDING OFFICER. The Senator from Ohio.

Mr. BROWN. Madam President, I rise to oppose Senator TOOMEY's motion to instruct against motions that undermine investments in American manufacturing and production.

I urge my colleagues to oppose this motion to instruct. It supports a broad exclusion process for 301 tariffs for goods from China. These tariffs are in place because of Chinese unfair trade practices that target our industrial base and jobs in Pennsylvania and Ohio and New Jersey.

The AFL–CIO opposes this motion. The USTR opposes it. The bipartisan, pro-industry Alliance for American Manufacturing opposes it. They know any exclusions need to be part of a broader strategic approach that we all support to trade policy with China. Creating an overly broad exclusion process that ties our hands would take away leverage we need to pressure China to change its behavior—behavior the steel industry in my State and other industries all over the country know too well.

China cheats. We know this. It subsidizes its steel industry. It props up state-owned enterprises. It steals intellectual property. It pollutes the Earth and exploits our workers. It is costing my State and all over the country jobs year after year. We can't let China's cheating undermine the investments we are making in this bill.

I ask for opposition to the Toomey motion.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Mr. SCHUMER. Madam President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) is necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT), the Senator from Idaho (Mr. RISCH), and the Senator from Alabama (Mr. SHELBY).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote or change their vote?

The result was announced—yeas 53, nays 43, as follows:

[Rollcall Vote No. 158 Leg.]

YEAS—53

| | | |
|---|---|---|
| Barrasso | Cruz | Lee |
| Blackburn | Daines | Lummis |
| Booker | Ernst | Manchin |
| Burr | Feinstein | Marshall |
| Cantwell | Fischer | McConnell |
| Capito | Hassan | Menendez |
| Carper | Hickenlooper | Murkowski |
| Cassidy | Inhofe | Murray |
| Collins | Kaine | Ossoff |
| Coons | Kelly | Paul |
| Cornyn | King | Romney |
| Cortez Masto | Klobuchar | Rosen |
| Cramer | Leahy | Rounds |

| | | |
|---|---|---|
| Sasse | Thune | Warnock |
| Shaheen | Tillis | Wicker |
| Sinema | Toomey | Wyden |
| Smith | Tuberville | Young |
| Sullivan | Warner | |

NAYS—43

| | | |
|---|---|---|
| Baldwin | Hawley | Portman |
| Blumenthal | Heinrich | Reed |
| Boozman | Hirono | Rubio |
| Braun | Hoeven | Sanders |
| Brown | Hyde-Smith | Schatz |
| Cardin | Johnson | Schumer |
| Casey | Kennedy | Scott (FL) |
| Cotton | Lankford | Scott (SC) |
| Crapo | Luján | Stabenow |
| Duckworth | Markey | Tester |
| Durbin | Merkley | Van Hollen |
| Gillibrand | Moran | Warren |
| Graham | Murphy | Whitehouse |
| Grassley | Padilla | |
| Hagerty | Peters | |

NOT VOTING—4

| | |
|---|---|
| Bennet | Risch |
| Blunt | Shelby |

The motion was agreed to.

The PRESIDING OFFICER. The junior Senator from New Mexico.

Mr. LUJÁN. Madam President, I ask unanimous consent that notwithstanding the previous order, it be in order to offer my motion to instruct at this time.

The PRESIDING OFFICER. Without objection, it is so ordered.

MOTION TO INSTRUCT

Mr. LUJÁN. Madam President, I have a motion at the desk to instruct conferees.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from New Mexico [Mr. LUJÁN] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist on provisions supporting the work of the Department of Energy, user facilities of the Department of Energy, and National Laboratories, including work in microelectronics and across the key technology focus areas (as defined in section 2002 of the amendment).

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Luján motion to instruct.

The junior Senator from New Mexico.

Mr. LUJÁN. Thanks to a bipartisan effort in the Commerce Committee, the Senate-passed U.S. Innovation and Competition Act includes nearly $17 billion to support research, development, and supply chain support at the Department of Energy National Laboratories, including key technology areas, such as high-performance computing, advanced energy technologies, artificial intelligence, quantum information science, and advanced manufacturing. The House bill also includes robust support for our National Labs.

This strong investment is critical to maintaining and strengthening U.S. competitiveness and security, especially as global R&D expenditures rise in these transformative industries.

Our National Labs are a research crown jewel, and other countries are taking notice of our progress. In fact, China is working to build out their own national lab network modeled after our own DOE Labs. Inaction would leave the United States at risk of being rapidly outpaced.

New Mexico's own Sandia and Los Alamos National Laboratories are leading the way in developing cutting-edge technologies in key focus areas and driving innovation in critical national priorities, such as next-generation microelectronics.

The Department of Energy's experience working with universities, collaborating with the private sector, and protecting American intellectual property from theft makes it a pillar of the U.S. innovation ecosystem.

VOTE ON MOTION

The PRESIDING OFFICER. The Senator's time has expired.

Hearing no further debate, the question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The majority leader.

Mr. SCHUMER. Madam President, this is our last vote, and I want to thank Members on both sides of the aisle for their cooperation. If you would have told me at noon today we would finish this by 10:20, I would have said we never could do it.

Thank you. Last vote.

The PRESIDING OFFICER. The Senator from South Carolina.

MOTION TO INSTRUCT

Mr. SCOTT of South Carolina. I call up my motion to instruct conferees, which is at the desk.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from South Carolina [Mr. SCOTT] moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist that the final conference report include a requirement that any new legislation providing for new mandates on greenhouse gas emissions should not be enacted unless similar mandates are enacted in the People's Republic of China.

The PRESIDING OFFICER. Under the previous order, there will now be 2 minutes of debate, equally divided, prior to a vote on the Scott motion to instruct.

The Senator from South Carolina.

Mr. SCOTT of South Carolina. Madam President, this should be simple. The last 20 years, China's emissions have gone from 13 percent globally to 28 percent. At the same time, our emissions have gone from 25 percent down to 14 percent.

I will start over.

The last 20 years, China's emissions have doubled—13 percent to 28 percent. At the exact same time, ours has gone from 25 percent to 14 percent.

Why would we cripple our economy to make it easier for China to prosper? This should be a simple one. Gas in DC is $5 a gallon. We are destroying America's economy, and we are crippling our Nation's energy security. This should be simple.

I yield back the rest of my time.

The PRESIDING OFFICER. The Senator from Delaware.

Mr. CARPER. I rise reluctantly in opposition to the motion to instruct offered by our friend from South Carolina. I genuinely enjoy his friendship. And working with him, I agree with him on many issues. This is one where we just disagree.

I have serious concerns with the motion he is offering tonight to prevent U.S. greenhouse gas emission mandates from being enacted unless China enacts similar mandates. Greenhouse gases that drive climate change threaten our planet, threaten our lives. They threaten our livelihood.

They also present an opportunity for the United States to lead on the global stage. We have an opportunity—a now-or-never opportunity—for our country to lead in deploying clean, American-made technologies, to lower greenhouse emissions, create American jobs, and position our economy to compete with and beat competitors, including China, like a drum.

Our ability to provide clean energy leadership or to collect climate change data should not be contingent on the action of our foes, as this motion to instruct recommends. The leadership is keeping out of step when everyone else is marching to the wrong tune, including China.

In conclusion, our country should be leading by example—not from behind—in tackling the climate crisis so that our businesses, our workers, and our planet reap the benefits of a clean economy.

And that is why I will be voting reluctantly on this motion to instruct our colleagues, and I hope you will join with me.

I ask for the yeas and nays.

The PRESIDING OFFICER. The Senator from South Carolina.

Mr. SCOTT of South Carolina. I have great respect for Senator CARPER. I think he is a man of integrity. I will simply say that China can't hear the music he is talking about. Our emissions have been going down while theirs is going up.

Clean energy in this footprint is produced cleaner in America than it is in China. So if you care about the environment, produce it here at home. If you care about national security, produce it here at home.

(Applause.)

That is all I am suggesting.

I will reclaim the last 10 seconds of my time.

VOTE ON MOTION

The PRESIDING OFFICER. The question is on agreeing to the motion.

Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Colorado (Mr. BENNET) is necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT), the Senator from Idaho (Mr. RISCH), and the Senator from Alabama (Mr. SHELBY).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote or change their vote?

The result was announced—yeas 47, nays 49, as follows:

[Rollcall Vote No. 159 Leg.]

YEAS—47

| | | |
|---|---|---|
| Barrasso | Graham | Paul |
| Blackburn | Grassley | Portman |
| Boozman | Hagerty | Romney |
| Braun | Hawley | Rounds |
| Burr | Hoeven | Rubio |
| Capito | Hyde-Smith | Sasse |
| Cassidy | Inhofe | Scott (FL) |
| Collins | Johnson | Scott (SC) |
| Cornyn | Kennedy | Sullivan |
| Cotton | Lankford | Thune |
| Cramer | Lee | Tillis |
| Crapo | Lummis | Toomey |
| Cruz | Marshall | Tuberville |
| Daines | McConnell | Wicker |
| Ernst | Moran | Young |
| Fischer | Murkowski | |

NAYS—49

| | | |
|---|---|---|
| Baldwin | Hirono | Rosen |
| Blumenthal | Kaine | Sanders |
| Booker | Kelly | Schatz |
| Brown | King | Schumer |
| Cantwell | Klobuchar | Shaheen |
| Cardin | Leahy | Sinema |
| Carper | Luján | Smith |
| Casey | Manchin | Stabenow |
| Coons | Markey | Tester |
| Cortez Masto | Menendez | Van Hollen |
| Duckworth | Merkley | Warner |
| Durbin | Murphy | Warnock |
| Feinstein | Murray | Warren |
| Gillibrand | Ossoff | Whitehouse |
| Hassan | Padilla | Wyden |
| Heinrich | Peters | |
| Hickenlooper | Reed | |

NOT VOTING—4

| | |
|---|---|
| Bennet | Risch |
| Blunt | Shelby |

The motion was rejected.

APPOINTMENT OF CONFEREES

The PRESIDING OFFICER. The Chair appoints the following conferees, which the clerk will report.

The senior assistant legislative clerk read the names of: Senators CANTWELL, MENENDEZ, WYDEN, PETERS, MURRAY, BROWN, WARNER, KELLY, WARNOCK, HICKENLOOPER, TESTER, HEINRICH, BALDWIN, WICKER, CRAPO, RISCH, BURR, PORTMAN, GRASSLEY, SHELBY, TOOMEY, BARRASSO, CAPITO, CORNYN, YOUNG, and MORAN.

The PRESIDING OFFICER. The junior Senator from Delaware.

## EXECUTIVE SESSION

## EXECUTIVE CALENDAR

Mr. COONS. Madam President, I ask unanimous consent that the Senate proceed to executive session to consider the following nomination: Executive Calendar No. 589, James D. Rodriguez, to be Assistant Secretary of Labor for Veterans' Employment and Training; that the Senate vote on the nomination without intervening action or debate; that the motion to reconsider be considered made and laid upon the table; that any statements related to the nomination be printed in the RECORD; that the President be immediately notified of the Senate's action, and the Senate resume legislative session.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of James D. Rodriguez, of Texas, to be Assistant Secretary of Labor for Veterans' Employment and Training.

The PRESIDING OFFICER. The question is, Will the Senate advise and consent to the Rodriguez nomination?

The nomination was confirmed.

## LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will now resume legislative session.

## MEASURE PLACED ON THE CALENDAR—S. 4132

Mr. COONS. Madam President, I understand there is a bill at the desk that is due for a second reading.

The PRESIDING OFFICER. The clerk will read the bill by title for the second time.

The senior assistant legislative clerk read as follows:

A bill (S. 4132) to protect a person's ability to determine whether to continue or end a pregnancy, and to protect a health care provider's ability to provide abortion services.

Mr. COONS. In order to place the bill on the calendar under the provisions of rule XIV, I would object to further proceedings.

The PRESIDING OFFICER. Objection having been heard, the bill will be placed on the calendar.

## MORNING BUSINESS

## REMEMBERING THOMAS OAKLEY

Mr. DURBIN. Madam President, Tom Oakley was a man with a mission. His mission was to put Quincy and Western Illinois on the map. The only sure way to do that was to personally redraw the maps. So he did.

In the late 1950s, there was not a four-lane highway anywhere within 100 miles of Quincy, IL. Critics called the region: ''Forgottonia.'' Thomas Oakley had more than a good memory. He had a vision, and Western Illinois was not about to be forgotten.

Any political candidate who paid a visit to Tom's Herald-Whig editorial board knew what to expect. No complimentary coffee or cool glass of water until Tom asked the question. With a dead serious look and his deep bass voice, he skipped the pleasantries.

''What's your position on completing the four-lane Central Illinois Expressway all the way to Quincy?''

''I am for it,'' I quickly answered as a congressional candidate in 1982.

Tom smiled and asked how I liked my coffee. It was the beginning of a beautiful friendship.

For decades, Quincy and the Tri-States had no greater advocate than Tom. His indefatigable voice for the region rightfully earned him the honor of having a 60-mile stretch of the Chicago to Kansas Expressway highway named after him. From Quincy to Macomb, it is the Thomas A. Oakley Highway now. He also helped grow his family's media company Quincy Media, Inc., into the 13th largest media company in the country. Last month, Tom passed away, and today, we honor the memory and legacy of my friend.

Tom was a member of the fourth generation of his family to work for Quincy Media, which operates the Quincy Herald-Whig, the Hannibal Courier-Post, and WGEM television and radio. Quincy Media has properties in several other markets as well. He was born to Thomas C. and Mary Oakley on June 24, 1932. As a young person, he began his career as a carrier boy for the Quincy Herald-Whig. In summers, he worked for Quincy Broadcasting and the Quincy Herald-Whig.

After graduating from Quincy High School in 1950, Tom earned a bachelor's degree in economics from Duke University and joined the U.S. Air Force in 1954. He served for 3 years, 2 of them flying a B–47 bomber with the Strategic Air Command. Tom was honorably discharged with the rank of first lieutenant in 1957 and was a captain in the Inactive Reserves. In 1958, he returned to Quincy and the family business.

Tom became the president and CEO of Quincy Media in 1969, following the death of his father. Under his leadership, he led the company through decades of growth, adding television stations in several markets and one additional newspaper. Tom also championed efforts to improve the Quincy infrastructure. He used his personal leadership and expanding media outlets to promote improving the quality of life in the region.

For more than 60 years, Tom worked toward developing a highway for the Tri-States, which had been bypassed by the Eisenhower era infrastructure boom. He was on an untold amount of committees throughout his life. Tom helped found the Joint Industrial Development Commission, the first unified effort to build the economy of the Tri-State region. This was a predecessor of the Great River Economic Development Foundation, which remains a driving force to improve Quincy and Adams County.

Tom made things happen. Every Governor since Otto Kerner, who was elected in 1960, heard about the Western Illinois highway needs from Tom. He was instrumental in securing funds to complete the Central Illinois Expressway from Springfield to the Mississippi River at Hannibal, the Chicago to Kansas Expressway, and the Avenue of the Saints from St. Louis to Minneapolis. There is now a four-lane bridge over the Mississippi River at Hannibal, too. He threw his weight behind projects to

improve Amtrak, Baldwin Field, locks and dams, and a port district. Tom worked with elected officials at every level of government, regardless of party, so Illinois and the surrounding States' residents could have a better life.

For his work in media and improving the region, Tom received numerous awards. From the Quincy Chamber of Commerce Hall of Fame to being the first recipient of the annual Boy Scout community service award, he was a deeply honored person. In 2020, he was inducted into the Gold Circle by the Mid-America Chapter of the National Academy of Television Arts and Sciences, one of television's highest honors.

Tom also was generous financially. The Oakley family made the single largest philanthropic investment in the history of Quincy University, focusing on scholarships, academic facility improvements, and support programs. Earlier this year, Tom announced a $1 million gift to Culver-Stockton College to establish the Tri-State Development Summit at the school.

Tom inspired a legacy that will continue and channel regional cooperation. He was fiercely loyal to both his family and his community, and I am fortunate to call him a friend. We will miss his leadership. His life was a life well-lived. Tom is survived by his son Ralph, his daughter Mary, his many grandchildren, and great-grandchildren. Tom, like his beloved Western Illinois, will not be forgotten.

(At the request of Mr. DURBIN, the following statement was ordered to be printed in the RECORD.)

## VOTE EXPLANATION

● Mr. BENNET. Madam President, I was necessarily absent for rollcall vote No. 148. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 149. Had I been present for the vote, I would have voted yea.

I was necessarily absent for rollcall vote No. 150. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 151. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 152. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 153. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 154. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 155. Had I been present for the vote, I would have voted yea.

I was necessarily absent for rollcall vote No. 156. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 157. Had I been present for the vote, I would have voted nay.

I was necessarily absent for rollcall vote No. 158. Had I been present for the vote, I would have voted yea.

I was necessarily absent for rollcall vote No. 159. Had I been present for the vote, I would have voted nay.●

## VOTE EXPLANATION

Mr. HAWLEY. Mr. President, had there been a recorded vote, I would have voted no on the Motion to Instruct Conferees from Mr. MENENDEZ that moves that the managers on the part of the Senate at the conference on the disagreeing votes of the two Houses on the Senate amendment to the bill H.R. 4521 be instructed to insist upon the provisions contained in section 73003 of the Senate amendment (relating to establishment of an Inspector General of the Office of the United States Trade Representative).

## VOTE EXPLANATION

Mr. SCOTT of Florida. Madam President, if there had been a recorded roll call vote on the Menendez motion to instruct conferees in relation to H.R. 4521, USICA, I would have voted no.

If there had been a recorded roll call vote on the Kelly motion to instruct conferees in relation to H.R. 4521, USICA, I would have voted no.

## REMEMBERING GERRY FRANK

Mr. WYDEN. Madam President, I speak today to honor the memory of an esteemed and beloved Oregonian who spent his life bettering our State. On March 13, Oregon lost its most devoted citizen and advocate: Gerry Frank.

Gerry's life and service to Oregon has inspired so many to learn, laugh about, and love what makes Oregon so special: our State's jaw-dropping beauty, our unique independence, and our incredible capacity to land on our feet. And Gerry has always done it in his own special way. No one I know has managed to do as much good as Gerry Frank with a simple piece of chocolate cake.

Gerry was a true renaissance man. A graduate of both Lincoln High in Portland and Cambridge in the U.K., he made his mark as a successful haberdasher, restauranteur, politician, and World War II veteran. But we all knew his true loves: Oregon and a great piece of cake. Gerry used the best chocolate cake in the world to bring us together at the State fair, a contest he selflessly judged annually for 60 years. He kept a terrific restaurant and retailer called Gerry Frank's Konditorei which paired delicious Oregon food with that cake. And he went to bat for Oregon community organizations of every size and shape, saying, ''How much cake do you need to give a good cause a boost?''

After the family business of Meier & Frank was sold in 1965, Gerry turned to politics, joining Senator Mark Hatfield's office. Gerry's politics were always pretty simple. He would ask, ''Is that idea fair? Does it make sense? And is it a part of Oregon's long tradition of welcoming fresh approaches to tackling big challenges?'' For almost 20 years Gerry worked as Mark Hatfield's chief of staff, gaining the nickname ''Oregon's Third Senator,'' for his dogged work ethic and devotion to Oregonians. Gerry is an incredible testament to what we call back home the Oregon Way: where we put aside partisan leanings to get things done for our State.

After leaving politics, Gerry followed his passion for meeting new people and seeing new places. A talented writer, he was the travel columnist at the Oregonian newspaper for many years and published multiple books, including one of my personal favorites: ''Gerry Frank's Oregon.''

Gerry, a man of many talents and passions, never forgot about his home in Salem. Despite travelling to over 150 countries, he always returned home in time for some of Oregon's beloved traditions, including the State fair and the Rose Festival. In 2019 the Gerry Frank Salem Rotary Amphitheater was built in his name, just another testament to the impact Gerry had on his community as a lifelong Rotarian and lover of live music. And soon, Providence Health in Portland will complete the Gerry Frank Center for Children's Care in his memory.

The State of Oregon will not forget Gerry Frank, and neither will I. While his passing brings us sadness, it also bring us gratitude for his tireless work to make Oregon a better place to call home. I honor the illustrious life of Gerry Frank and unforgettable legacy he left in our State for generations to come.

## RECOGNIZING THE COUNTRY MUSIC HALL OF FAME 2021 INDUCTEES

Mrs. BLACKBURN. Madam President, it is my honor to officially congratulate the Country Music Hall of Fame 2021 inductees. This past weekend I was fortunate enough to attend their Medallion Ceremony and help welcome The Judds, Ray Charles, Eddie Bayers, and Pete Drake into country music's closest circle of friends.

Naomi and Wynonna Judd, 2021's Modern Era Artist inductees, were one of country music's most cherished duos. The story of how they became The Judds reads like something out of a movie script: a mama and her daughter change their names, move to Nashville, and land a record deal after a chance encounter with a hit producer. I, like thousands of their fans, was absolutely heartbroken when Naomi's life came to an end just 1 day before she was to receive her medallion, but her story lives on in the generations of female artists she inspired and through Wynonna's ongoing, stunning contributions to country music.

Few artists in living memory have taken more risks and earned more respect than Ray Charles, 2021's Veterans Era Artist inductee. Ray's timeless

contributions to the past, present, and future of country music have inspired generations of rising stars to stake their own unique claims in the rich and diverse traditions of the genre. Ray's career should serve as a gentle reminder to us all that while conformity may make for an easier journey, the creative heart rarely finds solace or joy in following in another's footsteps.

This year, the Country Music Hall of Fame honored not one but two musicians who fundamentally transformed the sound and feel of modern music and set country musicmaking above the rest. Eddie Bayers, one of 2021's Recording and Touring Musician inductees, is an undisputed master of his craft. He is a first call drummer, a revered instructor, and one of the industry's most coveted human metronomes. For more than 50 years, he has laid the groove for the world's most beloved artists, and I am so pleased to see him finally take his place in the spotlight. Pete Drake, Bayers' fellow 2021 Recording and Touring Musician inductee, used his unparalleled skill on the pedal steel guitar to turn already great musicians into chart-topping legends. He forever changed the way artists in all genres thought about pedal steel, and his version of Alvino Rey's ''talking'' steel guitar, dubbed the ''talk box,'' made its way into some of rock 'n roll's most iconic and instantly recognizable records.

On behalf of the entire Tennessee delegation, I would like to express my gratitude to Naomi, Wynonna, Ray, Eddie, and Pete for their passion and artistry. The world is a far more vibrant and beautiful place for having experienced the gift of their music.

## ADDITIONAL STATEMENTS

### TRIBUTE TO DR. JOSE ROMERO

• Mr. BOOZMAN. Madam President, I rise today to recognize Dr. Jose Romero for his service as Secretary of the Arkansas Department of Health. He has led the ADH with a strong resolve and determination throughout the COVID–19 pandemic and his medical expertise has helped Arkansans navigate and establish commonsense health solutions during this unprecedented time.

Dr. Romero launched his career at the Arkansas Department of Health when he served as chief medical officer, and he was later appointed interim Secretary of Health in May of 2020 by Governor Asa Hutchinson. Dr. Romero proved he was more than up to the task; he excelled in this position and was quickly elevated to Secretary in August of the same year. The governor has said of his time working with Dr. Romero, ''He's supported me. He's supported our state. He's understood the political dynamics as well as the epidemiology of dealing with this pandemic, and while it's a great loss to Arkansas, he's developed a very, very strong team at the Department of Health that I know will be able to continue with great vigor and continued leadership.''

Dr. Romero has years of experience and an impressive educational background that prepared him to serve the people of Arkansas in the critical role he has filled over the last several years. He served as the chairman of the Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices, which provided national guidance on the prioritization and distribution of the COVID–19 vaccine. He has also recently been appointed to the American Academy of Pediatrics' Committee on Infectious Diseases and has consistently showed his ability to expertly inform and protect public health for the entire country.

Dr. Romero has a passion for not only serving others but teaching as well. He is a professor of pediatrics at the University of Arkansas for Medical Sciences and has board certification in pediatrics and pediatric infectious diseases. He was also the section chief of pediatric infectious diseases at the Arkansas Children's Hospital from 2008 through 2020, where he was involved with numerous studies across his field that have contributed immensely to medical sciences. I am so grateful Arkansans have had such a dedicated civil servant looking out for us for so long.

Dr. Romero has continuously shown his incredible commitment to the betterment of our Nation through his work improving the health of Americans and educating the next generation of healthcare professionals. Throughout his time as Secretary of Health, Dr. Romero has bravely navigated the COVID–19 pandemic and helped the Natural State stay safe and healthy while continuing to thrive.

He has become a familiar face across Arkansas standing beside Governor Hutchinson during daily press conferences regarding the virus, making him a trusted source for many Arkansans with questions and concerns about the pandemic and medicine generally. As a member of the Governor's cabinet, Dr. Romero worked diligently alongside the Governor's team to provide senior scientific and executive leadership for the agency, and his commitment to the health and well-being of Arkansans has been clear throughout his career. Dr. Romero has shown his dedication for providing quality information to all Arkansans during his tenure, and we have benefited from his expertise.

It is evident Dr. Romero's passion for service and selfless dedication to public health has made an incredibly positive impact in every project he has been a part of and helped our State and all its citizens throughout the pandemic. Dr. Romero has devoted his life to protecting the public and educating others. I appreciate the opportunity to work with Dr. Romero and thank him for his commitment to improving the health and wellness of Arkansans. As he transitions to the Centers for Disease Control and Prevention, Arkansas is full of gratitude for Dr. Romero and his dedication to our State.•

### TRIBUTE TO WALLACE ''BUTCH'' THUNDER HAWK

• Mr. CRAMER. Madam President, I want to honor today the distinguished career of a remarkable North Dakota educator and artist who is retiring from teaching this month.

Wallace ''Butch'' Thunder Hawk is an internationally renowned artist who has been a Tribal art teacher at United Tribes Technical College in Bismarck for 49 years. He has helped hundreds of students grow their artistic talent and appreciate traditional Native American art and traditions.

Beyond his classroom in Bismarck, the impact of Butch's passion for creating and teaching Native American art has been felt around the world. A Hunkpapa Lakota Teton Sioux, he was raised in the community of Cannonball on the Standing Rock Reservation. Butch was influenced by the work of his grandparents and mother, who created traditional art including beadwork, warbonnets, and tools. Ledger art has become one of Butch's great interests, and he has created hand-carved horse effigies, horse memorial sticks, war shields, and traditional weaponry.

His artwork can be seen in homes and museums around the region and world. He was instrumental in establishing the Indian Hall exhibit at Thomas Jefferson's Monticello, helping to recreate art similar to what Lewis and Clark would have collected during their famous expedition in the early 1800s. Working with Harvard University's Peabody Museum of Archaeology and Ethnology, he and his students created several pieces for Monticello's Indian Hall, including clubs, lances, arrows, shields, pipes, and a quiver and bowcase. Later, following several years as a visiting scholar at Harvard, he was a curator of an exhibit at the Peabody Museum on Lakota images of the West. One of his horse memorial effigy replicas is in the permanent collection at the Nelson Atkins Museum in Kansas City, and two major art pieces are on display at the James Monroe House in Charlottesville, VA. One of his ornaments featuring a bison was displayed on the White House Christmas Tree in 2008.

He has said creating art and teaching honors his ancestors, his family, his students, and other artist friends. He considers it a privilege to share Lakota traditions with students and help them grow their appreciation of this art.

When I heard the news that Butch Thunder Hawk was retiring from teaching, I smiled. In previous positions I held that included promoting all that is good about North Dakota, Butch was at the very top of the list of our State's most treasured cultural ambassadors. A humble, personable,

and honorable man, he was generous in sharing his talents and work. Butch embodies all that is good about North Dakota and the rich traditions of the Tribal nations located in our State. His work and influence will resonate in his students for generations to come. On behalf of the people of North Dakota, I thank him for his years of teaching. And I wish him the best in his retirement, which I am certain will include creating more art and influencing many more people.●

## 200TH ANNIVERSARY OF CLAY TOWNSHIP, MICHIGAN

● Mr. PETERS. Madam President, I rise today to recognize the 200th Anniversary of Clay Township, MI. Forming the southernmost portion of St. Clair County, Clay Township is endowed with natural beauty, fertile farmland, and a rich tradition of entrepreneurship dating back to the fur trade between French explorers and the indigenous people, also known as the Anishinaabe.

Long before Michigan was incorporated as a U.S. Territory and western expansion encouraged migration to the area we know now as St. Clair County, the region was home to the Anishinaabe peoples. Members of the Odawa, Pattawami, and Ojibwe Tribes and more made their homes alongside the Otisi-Keta, and Otisi-Keta-Sippi waters, now known respectively as Lake St. Clair, and the St. Clair River. The nutrient-dense farmland, abundant natural resources, and easy access to trade routes provided by the many waterways endowed the Anishinaabe with a rich culture and community that would eventually attract the notice of French explorers arriving in the area. In fact, it was these early French explorers who would christen the Otisi-Keta as ''Lac-Sainte-Claire'' after discovering the crystal-clear waters on the day of the Festival of Sainte Claire. In time, the lake, tributary, and surrounding land became known as St. Clair, the modern appellation we see today. Although French explorers began to depart from the territory following the Seven Years War, the legacy of trade and industry established with the Anishinaabe laid the foundation for the development of Clay Township as a hub of local commerce.

Among the first settlers of Clay Township were Angus MacDonald and John Martin, who founded the city of Pointe du Chene—now known as Algonac—in 1805. MacDonald and Martin chose to settle the city at the head of the St. Clair flats, which had been the previous site of trade between the Anishinaabe and the French. Algonac quickly developed into the principal settlement in the area and is now recognized as one of the oldest cities in Michigan. Clay Township would be officially organized 17 years later in 1822. With this recognition, Clay Township became one of the four original townships that comprised the entirety of St. Clair County.

Today, Clay Township is comprised of 82.3 square miles of land and water. Bounded on three sides by water and divided into several islands by branches of the St. Clair River, it is known as a center for local water recreation and is home to over 9,000 residents. The freshwater delta formed by the St. Clair River and waters of Harsens Island is the only major river delta in the Great Lakes Basin and the largest freshwater delta in North America. Michigan's Department of Natural Resources manages two sites on Harsens Island, supporting pedestrians, cyclists, and other outdoor enthusiasts wanting to admire the wildlife and waters of the region. The Algonac State Park is comprised of 1,550 acres and provides sanctuary to rare habitats and 22 threatened, endangered, or special-concern species of plants, birds, and butterflies. With its rich history and lush natural resources, Clay Township is recognized as one of the best places to live in the State of Michigan.

Clay Township has been an integral part of the State of Michigan and our great Nation for over 200 years. As a Michigander and passionate advocate for all of Michigan's waters, I am honored to ask my colleagues to join me in celebrating this significant milestone for the township, as well as its residents, elected officials, and businesses. I wish Clay Township continued growth and prosperity in the years ahead.●

## MEASURES PLACED ON THE CALENDAR

The following bill was read the second time, and placed on the calendar:

S. 4132. A bill to protect a person's ability to determine whether to continue or end a pregnancy, and to protect a health care provider's ability to provide abortion services.

## EXECUTIVE AND OTHER COMMUNICATIONS

The following communications were laid before the Senate, together with accompanying papers, reports, and documents, and were referred as indicated:

EC–3846. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; The Boeing Company Airplanes; Amendment 39–21913'' ((RIN2120–AA64) (FAA–2022–0004)) received in the Office of the President of the Senate on March 30, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3847. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace; Corsciana, TX'' ((RIN2120–AA66) (Docket No. FAA–2021–1102)) received in the Office of the President of the Senate on March 30, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3848. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Establishment and Amendment of Area Navigation (RNAV) Routes; Eastern United States'' ((RIN2120–AA66) (Docket No. FAA–2021–0912)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3849. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Establishment of Area Navigation (RNAV) Routes; South and Central United States'' ((RIN2120–AA66) (Docket No. FAA–2022–0920)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3850. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Area Navigation (RNAV) Routes Q–140 and Q–812; NY'' ((RIN2120–AA66) (Docket No. FAA–2022–0029)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3851. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of United States Area Navigation (RNAV) Routes T–212, T–216, T–218, and T–221; Eastern United States'' ((RIN2120–AA66) (Docket No. FAA–2021–0974)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3852. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Area Navigation (RNAV) Routes; Southeastern United States'' ((RIN2120–AA66) (Docket No. FAA–2021–0913)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3853. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment and Removal of Area Navigation (RNAV) Routes; South Central FL Metroplex Project'' ((RIN2120–AA66) (Docket No. FAA–2021–0940)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3854. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of V–6, V–10, V–30, V–100, and V–233 in the Vicinity of Litchfield, MI'' ((RIN2120–AA66) (Docket No. FAA–2021–0596)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3855. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''IFR Altitudes; Miscellaneous Amendments; Amendment No. 564'' ((RIN2120–AA63) (Docket No. 31417)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3856. A communication from the Management and Program Analyst, Federal

Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Standard Instrument Approach Procedures, and Takeoff Minimums and Obstacle Departure Procedures; Miscellaneous Amendments; Amendment No. 3999'' ((RIN2120–AA65) (Docket No. 31418)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3857. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Standard Instrument Approach Procedures, and Takeoff Minimums and Obstacle Departure Procedures; Miscellaneous Amendments; Amendment No. 4000'' ((RIN2120–AA65) (Docket No. 31419)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3858. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Standard Instrument Approach Procedures, and Takeoff Minimums and Obstacle Departure Procedures; Miscellaneous Amendments; Amendment No. 3997'' ((RIN2120–AA65) (Docket No. 31415)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3859. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Standard Instrument Approach Procedures, and Takeoff Minimums and Obstacle Departure Procedures; Miscellaneous Amendments; Amendment No. 3998'' ((RIN2120–AA65) (Docket No. 31416)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3860. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Modification of Class D and Class E Airspace, and Establishment of Class E Airspace; Southwest Oregon Regional Airport, OR'' ((RIN2120–AA66) (Docket No. FAA–2021–0816)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3861. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Establishment of Class E Airspace; Falmouth, MA'' ((RIN2120–AA66) (Docket No. FAA–2021–0988)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3862. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Establishment of Class E Airspace; Luka, MS'' ((RIN2120–AA66) (Docket No. FAA–2021–1191)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3863. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Establishment of Class E Airspace; Dewitt, AR'' ((RIN2120–AA66) (Docket No. FAA–2021–0938)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3864. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class D and Class E Airspace; South Florida'' ((RIN2120–AA66) (Docket No. FAA–2021–0169)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3865. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace D and Class E Airspace; Lawrenceville, GA'' ((RIN2120–AA66) (Docket No. FAA–2021–1108)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3866. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace; Elkton, MD'' ((RIN2120–AA66) (Docket No. FAA–2021–1190)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3867. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace; Hampton, GA'' ((RIN2120–AA66) (Docket No. FAA–2021–1049)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3868. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace; Peachtree City, GA'' ((RIN2120–AA66) (Docket No. FAA–2021–1057)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3869. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace; Griffin, GA'' ((RIN2120–AA66) (Docket No. FAA–2021–1053)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3870. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace; Uvalde, TX'' ((RIN2120–AA66) (Docket No. FAA–2021–0636)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3871. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace; Elkton, MD'' ((RIN2120–AA66) (Docket No. FAA–2021–1190)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3872. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class D, Class E, and Establishment of Class E Airspace; Atlanta, GA Area'' ((RIN2120–AA66) (Docket No. FAA–2021–0941)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3873. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Amendment of Class E Airspace and Revocation of Class E Airspace; Grove, OK'' ((RIN2120–AA66) (Docket No. FAA–2021–1149)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3874. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Criteria; Special Class Airworthiness Criteria for the 3DRobotics Government Services 3DR–GS H520-G Unmanned Aircraft'' ((RIN2120–AA64) (Docket No. FAA–2022–1083)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3875. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Criteria; Special Class Airworthiness Criteria for the Percepto Robotics, Ltd. Percepto System 2.4 Unmanned Aircraft'' ((RIN2120–AA64) (Docket No. FAA–2020–1089)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3876. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Criteria; Special Class Airworthiness Criteria for the Flytrex, Inc. FTX–M600P Unmanned Aircraft'' ((RIN2120–AA64) (Docket No. FAA–2020–1090)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3877. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Criteria; Special Class Airworthiness Criteria for the Airobotics Inc, OPTIMUS 1-EX Unmanned Aircraft'' ((RIN2120–AA64) (Docket No. FAA–2020–1092)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3878. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Criteria; Special Class Airworthiness Criteria for the Flirtey Inc. Flirtey F4.5 Unmanned Aircraft'' ((RIN2120–AA64) (Docket No. FAA–2020–1091)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3879. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Criteria; Special Class Airworthiness Criteria for the TELEGRID Technologies,

Inc. TELEGRID DE2020 Unmanned Aircraft'' ((RIN2120–AA64) (Docket No. FAA–2020–1088)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3880. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Criteria; Special Class Airworthiness Criteria for the Wingcopter GmbH 198 US Unmanned Aircraft'' ((RIN2120–AA64) (Docket No. FAA–2020–1087)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3881. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Leonardo S.p.a. Helicopters; Amendment 39–21999'' ((RIN2120–AA64) (Docket No. FAA–2022–0024)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3882. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Airbus SAS Airplanes; Amendment 39–21958'' ((RIN2120–AA64) (Docket No. FAA–2021–1059)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3883. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Airbus SAS Airplanes; Amendment 39–21950'' ((RIN2120–AA64) (Docket No. FAA–2021–0883)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3884. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Airbus SAS Airplanes; Amendment 39–21968'' ((RIN2120–AA64) (Docket No. FAA–2021–0506)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3885. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Airbus SAS Airplanes; Amendment 39–21879'' ((RIN2120–AA64) (Docket No. FAA–2021–0617)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3886. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Airbus Helicopters; Amendment 39–32994'' ((RIN2120–AA64) (Docket No. FAA–2022–0021)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3887. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Bell Textron Inc., Helicopters; Amendment 39–21990'' ((RIN2120–AA64) (Docket No. FAA–2021–0713)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3888. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Bell Textron Inc. (Type Certificate Previously Held by Bell Helicopter Textron Inc.) Helicopters; Amendment 39–21969'' ((RIN2120–AA64) (Docket No. FAA–2021–0157)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3889. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; The Boeing Company Airplanes; Amendment 39–21938'' ((RIN2120–AA64) (FAA–2021–0664)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3890. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; The Boeing Company Airplanes; Amendment 39–21976'' ((RIN2120–AA64) (FAA–2021–0962)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3891. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; The Boeing Company Airplanes; Amendment 39–21977'' ((RIN2120–AA64) (FAA–2021–0963)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3892. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; The Boeing Company Airplanes; Amendment 39–21982'' ((RIN2120–AA64) (FAA–2022–0279)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3893. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Bell Textron Inc. (Type Certificate Previously Held by Bell Helicopter Textron Inc.) Helicopters; Amendment 39–21986'' ((RIN2120–AA64) (Docket No. FAA–2021–1178)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3894. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Airbus Helicopters Deutschland GmbH (AHD) Helicopters; Amendment 39–21979'' ((RIN2120–AA64) (FAA–2022–0278)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3895. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Airbus Helicopters Deutschland GmbH Helicopters; Amendment 39–21967'' ((RIN2120–AA64) (FAA–2021–1180)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3896. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; MARS A.S. Parachutes; Amendment 39–21992'' ((RIN2120–AA64) (Docket No. FAA–2022–0289)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3897. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; CFM International, S.A. Turbofan Engines; Amendment 39–21900'' ((RIN2120–AA64) (Docket No. FAA–2021–0259)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3898. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Schempp-Hirth Flugzeugbau GmbH Gliders; Amendment 39–21956'' ((RIN2120–AA64) (Docket No. FAA–2021–1019)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3899. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; General Electric Turbofan Engines; Amendment 39–21959'' ((RIN2120–AA64) (Docket No. FAA–2021–0699)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3900. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Viking Air Limited (Type Certificate Previously Held by Bombardier, Inc.) Airplanes; Amendment 39–21963'' ((RIN2120–AA64) (Docket No. FAA–2020–1005)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3901. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Embraer S.A. (Type Certificate Previously Held by Empresa Brasileira de Aeronautica S.A.) Airplanes; Amendment 39–21964'' ((RIN2120–AA64) (Docket No. FAA–2020–1073)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3902. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; GROB Aircraft SE (Type Certificate Previously Held by GROB Aircraft AG) Airplanes; Amendment 39–21966'' ((RIN2120–AA64) (Docket No. FAA–2022–0152)) received in the Office of the President of the

Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3903. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Pratt & Whitney Turbofan Engines; Amendment 39–21975'' ((RIN2120–AA64) (Docket No. FAA–2021–0959)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3904. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Various Restricted Category Helicopters; Amendment 39–21971'' ((RIN2120–AA64) (Docket No. FAA–2022–0158)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3905. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Honda Aircraft Company LLC Airplanes; Amendment 39–21965'' ((RIN2120–AA64) (Docket No. FAA–2021–0838)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3906. A communication from the Management and Program Analyst, Federal Aviation Administration, Department of Transportation, transmitting, pursuant to law, the report of a rule entitled ''Airworthiness Directives; Goodrich Externally-Mounted Hoist Assemblies; Amendment 39–21962'' ((RIN2120–AA64) (Docket No. FAA–2020–1120)) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3907. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Highly Migratory Species; Adjustments to 2021 Northern Albacore Tuna, North and South Atlantic Swordfish, and Atlantic Bluefin Tuna Reserve Category Quotes'' (RIN0648–XT041) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3908. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries'' (RIN0648–XB796) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3909. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries'' (RIN0648–XB751) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3910. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries'' (RIN0648–XB145) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3911. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Commercial Aggregated Large Coastal Sharks, Hammerhead Sharks, and Blacktip Sharks in the Gulf of Mexico Region; Retention Limit Adjustment'' (RIN0648–XB306) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3912. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries'' (RIN0648–XB214) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3913. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries'' (RIN0648–XB400) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3914. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries'' (RIN0648–XB791) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3915. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Pacific Island Fisheries; 2022 U.S. Territorial Longline Bigeye Tuna Catch Limits'' (RIN0648–XP016) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3916. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Western and Central Pacific Fisheries for Highly Migratory Species; Extension of Emergency Decisions of the Western and Central Pacific Fisheries Commission'' (RIN0648–XB334) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3917. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; 2021 Closure for Spiny Lobster in the U.S. Caribbean off Puerto Rico'' (RIN0648–XB228) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3918. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Reef Fish Fishery of the Gulf of Mexico; Reopening of the Red Snapper Recreational For-Hire Fishing Season in the Gulf of Mexico'' (RIN0648–XB465) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3919. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Reef Fish Fishery of the Gulf of Mexico; 2021 Commercial and Recreational Accountability Measure and Closures for Gulf of Mexico Lane Snapper'' (RIN0648–XB450) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3920. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Atlantic Sea Scallop Fishery; Closure of the Closed Area I Scallop Access Area to General Category Individual Fishing Quota Scallop Vessels'' (RIN0648–XB421) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3921. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Northeastern United States; Atlantic Sea Scallop Fishery; Amendment 21t Plan'' (RIN0648–BK68) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3922. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Pacific Island Fisheries; Modifications to the American Samoa Longline Limited Entry Program'' (RIN0648–BH65) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3923. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Western and Central Pacific Fisheries for Highly Migratory Species; Extension of Emergency Decisions of the Western and Central Pacific Fisheries Commission'' (RIN0648–XB661) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3924. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Pacific Island Fisheries; Exemption for Large U.S. Longline Vessels to Fish in Portions of the American Samoa Large Vessel Prohibited Area; Court Order'' (RIN0648–BK28) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3925. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Modification of the West Coast Commercial Salmon Fisheries; Inseason Action #18'' (RIN0648–XB196) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3926. A communication from the Branch Chief of the Office of Sustainable

Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Modification of the West Coast Commercial Salmon Fisheries; Inseason Action #17'' (RIN0648–XB156) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3927. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Modification of the West Coast Commercial Salmon Fisheries; Inseason Action #22, #23, and #24'' (RIN0648–XB274) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3928. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Modification of the West Coast Commercial Salmon Fisheries; Inseason Action #26 through #30'' (RIN0648–XB377) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3929. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Modification of the West Coast Commercial Salmon Fisheries; Inseason Action #25'' (RIN0648–XB310) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3930. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Pacific Coast Groundfish Fishery; Pink Shrimp and Midwater Trawl Exemptions to Vessel Monitoring System Requirements for the West Coast Groundfish Fishery'' (RIN0648–BK73) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3931. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Coastal Pelagic Species Fisheries; Biennial Specifications; 2021–2022 and 2022–2023 Specifications for Pacific Mackerel'' (RIN0648–BK56) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3932. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Pacific Coast Groundfish Fishery; 2021–2022 Biennial Specifications and Management Measures; Inseason Adjustments; Correction'' (RIN0648–BL10) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3933. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Effective Dates of West Coast Groundfish Electronic Monitoring Program'' (RIN0648–BK80) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3934. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries Off West Coast States; Emergency Action to Temporarily Extend the Sablefish Primary Fishery Season'' (RIN0648–BK94) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3935. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Pacific Halibut Fisheries; Catch Sharing Plan; Inseason Action'' (RIN0648–XB316) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3936. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Snapper-Grouper Fishery of the South Atlantic; 2021 Recreational Accountability Measure and Closure for the South Atlantic Other Jacks Complex'' (RIN0648–XB588) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3937. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''2021–2022 Commercial Quota Reduction for King Mackerel in the Run-Around Gillnet Fishery of the Gulf of Mexico'' (RIN0648–XB395) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3938. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Reef Fish Fishery of the Gulf of Mexico; 2021 Recreational Accountability Measure and Closure for Gulf of Mexico Gray Triggerfish'' (RIN0648–XB415) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3939. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Reef Fish Fishery of the Gulf of Mexico; 2021 Recreational Accountability Measure and Closure for Gulf of Mexico Red Grouper'' (RIN0648–XB410) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3940. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Atlantic; Atlantic Migratory Group Cobia; Amendment 1 and Addendum 1 to Amendment 1'' (RIN0648–BK63) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3941. A communication from the Branch Chief, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; Gray Triggerfish Management Measures'' (RIN0648–BK34) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3942. A communication from the Branch Chief, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; 2021 Commercial Closure for South Atlantic Red Snapper'' (RIN0648–BK34) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3943. A communication from the Branch Chief, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Red Snapper Private Angling Component Accountability Measure in Federal Waters off Texas'' (RIN0648–XB702) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3944. A communication from the Branch Chief, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; Lane Snapper Management Measures'' (RIN0648–BK36) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3945. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Northeastern United States; Atlantic Bluefish Fishery; Quota Transfers from VA to NY and NJ to NC'' (RIN0648–XB433) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3946. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Northeastern United States; Atlantic Herring Fishery; Adjustment to the 2021 Specifications'' (RIN0648–XB447) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3947. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Northeastern United States; Atlantic Bluefish Fishery; Quota Transfer from VA to NY'' (RIN0648–XB229) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3948. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Northeastern United States; Summer Flounder Fishery; Quota Transfer from VA to RI'' (RIN0648–XB654) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3949. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Atlantic Herring Fishery; 2021 Closure of the Atlantic Herring Fishery’’ (RIN0648–XB612) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3950. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; 2022 and 2023 Summer Flounder, Scup, and Black Sea Bass Specifications’’ (RIN0648–XX072) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3951. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Atlantic Deep-Sea Red Crab Fishery; Final 2022 Atlantic Deep-Sea Red Crab Specifications’’ (RIN0648–XX076) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3952. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Atlantic Mackerel; 2022 Interim Action’’ (RIN0648–BL05) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3953. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Atlantic Bluefish Fishery; Quota Transfers from NJ to RI and MD to NC’’ (RIN0648–XB525) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3954. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Northeast Multispecies Fishery; Framework Adjustment 61’’ (RIN0648–BK24) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3955. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Atlantic Herring Fishery; Adjustments to 2022 Specifications’’ (RIN0648–XX077) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3956. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Atlantic Bluefish Fishery; 2022 and Projected 2023 Specifications’’ (RIN0648–XX073) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3957. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Atlantic Mackerel, Squid, and Butterfish Fisheries; Specifications’’ (RIN0648–BK59) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3958. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Summer Flounder Fishery; Quota Transfers from VA to CT and NC to RI’’ (RIN0648–XB615) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3959. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Northeastern United States; Summer Flounder Fishery; Quota Transfers from NC to CT and ME to RI’’ (RIN0648–XB686) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3960. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Reallocation of Pacific Cod in the Central Regulatory Area of the Gulf of Alaska’’ (RIN0648–XB656) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3961. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Ocean Perch in the Western Regulatory Area of the Gulf of Alaska’’ (RIN0648–XB183) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3962. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Ocean Perch in the Bering Sea Subarea of the Bering Sea and Aleutian Islands Management Area’’ (RIN0648–XB292) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3963. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Sablefish in the Bering Sea Subarea of the Bering Sea and Aleutian Islands Management Area’’ (RIN0648–XB231) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3964. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Cod by Trawl Catcher Vessels in the Western Regulatory Area of the Gulf of Alaska’’ (RIN0648–XB233) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3965. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; ‘Other Rockfish’ in the Central and Western Regulatory Areas of the Gulf of Alaska’’ (RIN0648–XB388) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3966. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Cod in the Bering Sea and Aleutian Islands Management Area’’ (RIN0648–XB372) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3967. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Reallocation of Pacific Cod in the Bering Sea and Aleutian Islands Management Area’’ (RIN0648–XB349) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3968. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Groundfish Fishery by Non-Rockfish Program Catcher Vessels Using Trawl Gear in the Western and Central Regulatory Area of the Gulf of Alaska’’ (RIN0648–XB337) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3969. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; Chinook Salmon Prohibited Species Catch Limits in the Gulf of Alaska’’ (RIN0648–XB312) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3970. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ‘‘Fisheries of the Exclusive Economic Zone Off Alaska; ‘Other Rockfish’ in the Aleutian Islands Subarea of the Bering Sea and Aleutian Islands Management Area’’ (RIN0648–XB452) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3971. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Cod by Vessels Using Pot Gear in the Western Regulatory Area of the Gulf of Alaska'' (RIN0648–XB755) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3972. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Reallocation of Pacific Cod in the Bering Sea and Aleutian Islands Management Area'' (RIN0648–XB505) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3973. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Gulf of Alaska; Final 2022 and 2023 Harvest Specifications for Groundfish'' (RIN0648–XY118) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3974. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Ocean Perch in the Bering Sea and Aleutian Islands Management Area'' (RIN0648–XB142) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3975. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Cod by Catcher/Processors using Hook-and-Line Gear in the Central Regulatory Area of the Gulf of Alaska'' (RIN0648–XA789) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3976. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Kamchatka Flounder in the Bering Sea and Aleutian Islands Management Area'' (RIN0648–XB064) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3977. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Regulatory Amendment to Remove GOA Sablefish IFQ Pot Gear Tags and Notary Certification Requirements'' (RIN0648–BK76) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3978. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Ocean Perch in the Bering Sea and Aleutian Islands Management Area'' (RIN0648–XB143) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3979. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Fisheries of the Exclusive Economic Zone Off Alaska; Chinook Salmon Prohibited Species Catch Limits in the Gulf of Alaska'' (RIN0648–XB658) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3980. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Reapportionment of the 2021 Gulf of Alaska Pacific Halibut Prohibited Species Catch Limits for the Trawl Deep-water Fishery Categories'' (RIN0648–XB141) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3981. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Pacific Cod by Non-American Fisheries Act Crab Vessels Operating as Catcher Vessels Using Pot Gear in the Western Regulatory Area of the Gulf of Alaska'' (RIN0648–XB777) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

EC–3982. A communication from the Branch Chief of the Office of Sustainable Fisheries, National Marine Fisheries Service, Department of Commerce, transmitting, pursuant to law, the report of a rule entitled ''Pacific Cod by Catcher Vessels Greater than or Equal to 50 feet Length Overall using Hook-and-Line Gear in the Central Regulatory Area of the Gulf of Alaska'' (RIN0648–XB321) received in the Office of the President of the Senate on April 25, 2022; to the Committee on Commerce, Science, and Transportation.

## PETITIONS AND MEMORIALS

The following petitions and memorials were laid before the Senate and were referred or ordered to lie on the table as indicated:

POM–133. A joint resolution adopted by the General Assembly of the Commonwealth of Virginia expressing its support for the Jones Act; to the Committee on Commerce, Science, and Transportation.

SENATE JOINT RESOLUTION NO. 47

Whereas, Virginia's rich history of shipbuilding and maritime trade makes the Commonwealth a critical hub in the nation's transportation system and essential in the growth of offshore renewable energy development; and

Whereas, the COVID–19 pandemic has demonstrated the critical importance of maintaining resilient domestic industries and transportation services for Virginia's citizens and workforce; and

Whereas, the Merchant Marine Act of 1920, known as the Jones Act and codified in Title 46 of the United States Code, requires that vessels carrying cargo between locations in the United States be owned by American companies, crewed by American mariners, and built in American shipyards; and

Whereas, America's ability to project and deploy forces globally and to supply and maintain military installations domestically depends on the civilian fleet of Jones Act vessels and mariners; and

Whereas, mariners aboard Jones Act vessels strengthen America's homeland security as additional eyes and ears to monitor the nation's 95,000 miles of shoreline and 25,000 miles of navigable inland waterways; and

Whereas, Virginia is home to over 19,280 maritime jobs supported by the Jones Act that generate $1.3 billion in labor income; and

Whereas, maritime industry jobs create ladders of opportunity through high-paying, family-wage careers that offer significant career advancement without generally necessitating advanced formal education and extensive student loans; and

Whereas, the Jones Act fleet, more than 40,000 vessels strong, supports nearly 650,000 family-wage jobs and over $154 billion in economic output nationally, including more than $4 billion in the Virginia economy; Now, therefore, be it

*Resolved by the Senate, the House of Delegates concurring*, That the General Assembly hereby express its support for the Jones Act. In affirming its resolute support for the Jones Act, the General Assembly also celebrates the centennial of the Jones Act as it continues to foster a strong domestic maritime industry that is critical to Virginia's and the nation's economic prosperity and national security; and, be it

*Resolved*, further, That the Clerk of the Senate transmit copies of this resolution to the Speaker of the United States House of Representatives, the President of the United States Senate, and the members of the Virginia Congressional Delegation so that they may be apprised of the sense of the General Assembly of Virginia in this matter.

---

POM–134. A resolution adopted by the House of Representatives of the State of Missouri recommending to the President of the United States and the United States Congress to reaffirm our country's unwavering support for Ukraine's freedom, sovereignty, and territorial integrity within its internationally recognized borders, extending to its territorial waters; to the Committee on Foreign Relations.

HOUSE RESOLUTION NO. 3658

Whereas, Ukraine is a sovereign and independent nation located in Eastern Europe and an ally, under a bilateral investment treaty, of the United States; and

Whereas, Russia, a transcontinental country spanning Eastern Europe and Northern Asia, has launched an all-out invasion of Ukraine by land, air, and sea; and

Whereas, Russian forces have dramatically escalated their offenses by deploying a forty-mile long convoy of tanks and other military equipment advancing south to attack the people of Ukraine, including the City of Kyiv; and

Whereas, Russia's invasion of Ukraine is the largest invasion of a sovereign nation in Europe since World War II; and

Whereas, the combat is directly responsible for massive civilian casualties, including a Russian mortar attack on a children's hospital that inflicted devastating loss of life; and

Whereas, Russia's attack on Ukraine was unprovoked and unjustified; and

Whereas, as the attack intensifies, the humanitarian crises could reach unprecedented levels, with the United Nations estimating

that between one million and five million people will be in need of urgent health care, safety, and security; and

Whereas, Ukraine's President, Volodymyr Zelenskyy, declared that Russia had ''embarked on a path of evil, but [Ukraine] is defending itself and won't give up its freedom . . .'':

Resolved that we, the members of the House of Representatives of the One Hundred First General Assembly, Second Regular Session hereby:

(1) Proudly stand alongside Ukraine, its people, and its leaders during this horrific and unnecessary war and vow to support Ukraine and hold Russia fully accountable for its catastrophic decision to invade;

(2) Condemn, in the strongest possible terms, Vladimir Putin's violent attack on the people of Ukraine and strongly endorse the swift and severe economic sanctions and stringent export controls that President Biden's administration has imposed on Russia;

(3) Urge Russia to immediately cease its violent, illegal, and immoral assault upon Ukraine, end the needless bloodshed, and return to diplomacy and the rules-based international order that has ensured peace and prosperity for so many; and

(4) Recommend to the President of the United States and the United States Congress to reaffirm our country's unwavering support for Ukraine's freedom, sovereignty, and territorial integrity within its internationally recognized borders, extending to its territorial waters; and

Resolved that the United States should take prudent and responsible measures to ensure that the required force posture is present in Europe to deter and, if necessary, defeat Russian aggression against any NATO member; and

Resolved that the United States should immediately strengthen additional sanctions on Russia by restricting the Russian banking and financial sectors, cybersecurity, and other key industrial sectors; and

Resolved that the United States should immediately bolster energy connectivity in Eastern Europe; and

Resolved that the United States should expand the target list of Russian officials under the Magnitsky Act, which would implement a greater range of targeted sanctions aimed directly at Russian officials responsible for violating Ukrainian freedom and sovereignty, including the freezing of financial assets and the imposition of visa bans; and

Resolved that the Chief Clerk of the Missouri House of Representatives be instructed to prepare a properly inscribed copy of this resolution for the President and Secretary of the United States Senate, the Speaker and Clerk of the United States House of Representatives, and each member of the Missouri Congressional delegation.

---

POM–135. A resolution adopted by the Senate of the State of Ohio urging the United States government to secure its borders; to the Committee on Homeland Security and Governmental Affairs.

SENATE RESOLUTION NO. 243

Whereas, A strong, secure border benefits the United States: and

Whereas, The well-being and safety of the citizens of the United States is being jeopardized by threats from transnational criminal organizations; and

Whereas, It is integral to the security, well-being, and harmony of the people of the United States to sustain secure borders; and

Whereas, The dedicated individuals of the United States Customs and Border Protection work diligently and honorably to secure borders in the most efficient and humane manner; and

Whereas, The Governor of Ohio has allocated our state's resources to secure our borders through the assignment of over one hundred members of the Ohio National Guard to support United States Customs and Border Protection and the assignment of troopers from the Ohio State Highway Patrol to travel to Texas to support local law enforcement with border surveillance; and

Whereas, Ill-motivated individuals continuously seek to cause harm, danger, injury, hazard, and peril to those who protect the United States' borders; and

Whereas, Those individuals who cross the United States' borders without regard for the legal immigration process circumvent the individuals who show respect for the rule of law; and

Whereas, Those same individuals defy the right of the United States to control its own sovereign territory and regulate the happenings within its rightful borders; and

Whereas, The smuggling of contraband, such as drugs and weapons, have plagued the United States' borders; and

Whereas, In fiscal year 2021, United States Customs and Border Protection seized more than 319,000 pounds of marijuana, 109,000 pounds of methamphetamine, 97,000 pounds of cocaine, 11,000 pounds of fentanyl, and 5,400 pounds of heroin; and

Whereas, These illegal drugs are sold, spread, and used throughout the American citizenry as drug overdoses and abuse rates reach the highest levels on record in the United States, including Ohio hitting a record death rate from opioid overdose during the second quarter of 2020; and

Whereas, In 2020, 81% of overdose deaths in Ohio involved illicit fentanyl or fentanyl analogs, while drug deaths related to fentanyl increased 32% from 2019; and

Whereas, Most fentanyl and fentanyl-related substances abused in the United States are trafficked into the country via international mail, express consignment, or across the southwestern border; and

Whereas, The act of human smuggling, which deliberately evades immigration laws, is a daily occurrence at the southwestern border according to U.S. Immigration and Customs Enforcement; and

Whereas, Individuals who are smuggled into the United States may be involved in transnational criminal organization operations or may be forced into human trafficking situations; and

Whereas, Human trafficking is a serious issue in Ohio, as state sources identified over 1,300 cases between 2014 and 2020, ranking the state among the ten worst in the nation for human trafficking; and

Whereas, The United States Department of State has urged state and local governments, as well as nonprofit organizations, to address cross-border trafficking issues and support strong collaboration at the borders to identify and prevent human trafficking; Now therefore be it further

*Resolved*, That we, the members of the Senate of the 134th General Assembly of the State of Ohio, support the investment of necessary resources by the United States government to ensure secure, strong, and sustainable borders; and be it further

*Resolved*, That the Clerk of the Senate transmit duly authenticated copies of this resolution to the President Pro Tempore and Secretary of the United States Senate, the Speaker and Clerk of the United States House of Representatives, the President and Vice President of the United States, the members of the Ohio Congressional delegation, and the news media of Ohio.

---

POM–136. A concurrent resolution adopted by the Legislature of the State of West Virginia applying to the United States Congress, under the provisions of Article V of the Constitution of the United States, for the calling of a convention of the states limited to proposing amendments to the Constitution of the United States that impose fiscal restraints on the federal government, limit the power and jurisdiction of the federal government, and limit the terms of office for its officials and for members of Congress; to the Committee on the Judiciary.

HOUSE CONCURRENT RESOLUTION NO. 31

Whereas, Executive orders by the President of the United States have become a vehicle through which the President may overstep the limits of his or her constitutional authority; and

Whereas, The concentration of power at the federal level has had the effect of making federal officials less responsive to the will of the people and more readily influenced by lobbyists, wealthy corporations and special interests in Washington, D.C.; and

Whereas, Much of federal law is now enacted by federal bureaucrats who were never chosen by the people and have no accountability to the people whatsoever; and

Whereas, Policy decisions made at the state level tend to be more responsive to the needs and desires of the people; and

Whereas, The federal government has created a crushing national debt through improper and imprudent spending; and

Whereas, The federal government has invaded the legitimate roles of the states through the manipulative process of federal mandates, many of which are unfunded to a great extent; and

Whereas, The states have the ability to restore the responsiveness of government to the people and to restrain abuses of federal power by proposing amendments to the Constitution of the United States through a limited convention of the states under Article V; therefore, be it

*Resolved by Legislature of West Virginia:*

That the Legislature hereby applies to Congress, under the provisions of Article V of the Constitution of the United States, for the calling of a convention of the states limited to proposing amendments to the Constitution of the United States that impose fiscal restraints on the federal government, limit the power and jurisdiction of the federal government, and limit the terms of office for its officials and for members of Congress; and, be it

*Further Resolved*, That the Clerk of the House of Delegates forward a copy of this resolution, legislative call and application to the President and Secretary of the United States Senate and to the Speaker and Clerk of the United States House of Representatives, and copies to the members of the said Senate and House of Delegates from this state; also to transmit copies hereof to the presiding officers of each of the legislative houses in the several states, requesting their cooperation; and, be it

*Further Resolved*, That this application constitutes a continuing application in accordance with Article V of the Constitution of the United States until the legislatures of at least two thirds of the several states have made applications on the same subject; and, be it

*Further Resolved*, The West Virginia Legislature adopts this application expressly subject to the following reservations, understandings, and declarations:

(1) An application to the Congress of the United States to call an amendment convention of the states pursuant to Article V of the United States Constitution confers no power to Congress other than the power to call such a convention. The power of Congress to exercise this ministerial duty consists solely of the authority to name a reasonable time and place for the initial meeting of a convention;

(2) Congress shall perform its ministerial duty of calling an amendment convention of the states only upon the receipt of applications for an amendment convention for the substantially same purpose as this application from two thirds of the legislatures of the several states;

(3) Congress does not have the power or authority to determine any rules for the governing of an amendment convention of the states called pursuant to Article V of the United States Constitution. Congress does not have the power to set the number of delegates to be sent by any state to such a convention, nor does it have the power to name delegates to such a convention. The power to name delegates remains exclusively within the authority of the legislatures of the several states;

(4) By definition, an amendment convention of the states means that states shall vote on the basis of one state, one vote;

(5) A convention of the states convened pursuant to this application shall be limited to consideration of the topics specified herein and no other. This application is made with the express understanding that an amendment that in any way seeks to amend, modify, or repeal any provision of the Bill of Rights shall not be authorized for consideration at any stage. This application shall be void ab initio if ever used at any stage to consider any change to any provision of the Bill of Rights;

(6) Pursuant to Article V of the United States Constitution, Congress may determine whether proposed amendments shall be ratified by the legislatures of the several states or by special state ratification conventions. The West Virginia legislature recommends that Congress select ratification by the legislatures of the several states; and

(7) The West Virginia Legislature may provide further instructions to its delegates and may recall its delegates at any time for a breach of a duty or a violation of the instructions provided; and, be it

*Further Resolved,* That the Clerk of the House forward a copy of this resolution to the representatives and senators elected by the citizens of West Virginia serving the citizens of West Virginia in the Congress of the United States in Washington, D.C.

---

POM–137. A petition from a citizen of the State of Texas relative to enactment of federal legislation; to the Committee on Homeland Security and Governmental Affairs.

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. CARPER, from the Committee on Environment and Public Works, without amendment: S. 4136. An original bill to provide for improvements to the rivers and harbors of the United States, to provide for the conservation and development of water and related resources, and for other purposes.

## EXECUTIVE REPORTS OF COMMITTEE

The following executive reports of nominations were submitted:

By Mr. MENENDEZ for the Committee on Foreign Relations.

Marc B. Nathanson, of California, to be Ambassador Extraordinary and Plenipotentiary of the United States of America to the Kingdom of Norway.

Nominee: Marc B. Nathanson.

Post: Ambassador to the Kingdom of Norway.

Nominated: 11/04/2021.

(The following is a list of members of my immediate family. I have asked each of these persons to inform me of the pertinent contributions made by them. To the best of my knowledge, the information contained in this report is complete and accurate.)

Please see attachment detailing contributions by individuals.

1. Marc Nathanson (Federal), Date, Amount, Notes:

Feinstein For Senate 2018, 3/17/2017, $2,700.00, FEC database lists current committee name Feinstein For Senate 2024.

Josh Gottheimer for Congress Committee, 3/31/2017, $2,700.00.

Angus King for Senate, 4/24/2017, $1,000.00.

Schiff Leads PAC, 8/21/2017, $5,000.00, JFC contribution: allocated by JFC to Schiff for Congress.

Heidi for Senate, 10/3/2017, $1,000.00.

With Honor Fund, Inc., 12/11/2017, $5,000.00.

Democratic Midterm Victory Fund, 12/11/2017, $5,000.00.

Rufus Gifford for Congress 2018, 2/28/2018, $2,700.00.

Sean Patrick Maloney for Congress, 3/30/2018, $2,700.00.

Senate IMPACT: TN & NV, 4/26/2018, $5,400.00, JFC contribution: allocated by JFC to Rosen for Nevada and Bredesen for Senate.

Greg Stanton for Congress, 7/18/2018, $2,500.00.

Katie Hill for Congress, 7/18/2018, $2,500.00.

Gil Cisneros for Congress, 7/18/2018, $2,500.00.

Katie Porter for Congres, 7/18/2018, $2,500.00.

Harley Rouda for Congress, 7/18/2018, $2,500.00.

Mike Levin for Congress, 7/18/2018, $2,500.00.

Cindy Axne for Congress, 7/18/2018, $2,500.00.

Abby Finkenauer for Congress, 7/18/2018, $2,500.00.

Dean Phillips for Congress, 9/11/2018, $500.00.

Rufus Gifford for Congress, 12/10/2018, −$2,700.00, Refund of prior contribution.

Kamala Harris for the People, 2/5/2019, $2,700.00.

Josh Gottheimer for Congress, 4/11/2019, $2,800.00.

Karen Bass for Congress 2020, 4/24/2019, $1,000.00.

The Markey Committee, 5/29/2019, $2,800.00.

Dan for Colorado, 5/29/2019, $2,800.00.

With Honor PAC, 5/29/2019, $5,000.00.

Dan for Colorado, 6/1/2019, −$1,610.00, Partial refund of prior contribution.

Chris Coons for Delaware, 6/1/2019, $5,600.00.

Biden for President, 7/18/2019, $2,800.00.

Biden for President, 8/9/2019, $26.25, Campaign merchandise.

Biden for President, 8/27/2019, −$26.25, Refund of prior contribution.

Cory 2020, 9/16/2019, $2,800.00.

Ted Lieu for Congress, 9/18/2019, $2,800.00.

DCCC, 9/25/2019, $35,500.00.

Pete for America, 12/12/2019, $2,800.00, Check never cashed by recipient committee.

Hickenlooper for Colorado, 12/21/2019, $1,000.00, Check sent with contribution card listing both Marc and Jane Nathanson; recipient committee attributed the full contribution to ‘‘Janet [sic] Nathanson’’ on its FEC reports.

DNC, 1/22/2020, $10,000.00.

Matt Lieberman Senate 2020, 5/7/2020, $500.00.

Max Rose for Congress, 6/8/2020, $500.00.

Booker Victory Fund, 6/8/2020, $1,500.00, JFC contribution: allocated by JFC to Cory Booker For Senate.

Biden Victory Fund, 6/12/2020, $100,000.00, JFC contribution: allocated by JFC to Biden for President, DNC, and multiple state party committees; portion allocated to DNC above $25,500 was in error by the JFC; JFC indicated that excessive allocation is being reallocated to other permissible recipients in the JFC.

Engel for Congress, 6/18/2020, $1,500.00, Check never cashed by recipient committee.

Michelle for Kansas, 7/8/2020, $2,800.00.

Biden PT Fund, 7/30/2020, $5,000.00, Presidential Transition Fund.

Friends of Mark Warner, 8/18/2020, $2,500.00.

Biden Victory Fund, 8/20/2020, $10,000.00, JFC contribution: allocated by JFC to multiple state party committees.

Biden Victory Fund, 8/21/2020, $2,800.00, JFC contribution: allocated by JFC to multiple state party committees.

Sara Gideon for Maine, 9/3/2020, $500.00.

House Majority PAC, 9/10/2020, $35,500.00.

Biden Victory Fund, 9/13/2020, $2,800.00, JFC contribution; allocated by JFC to multiple state party committees.

DCCC, 9/14/2020, $35,500.00.

Elissa Slotkin for Congress, 9/15/2020, $500.00.

Biden Victory Fund, 9/22/2020, $100,000.00, JFC contribution: allocated by JFC to multiple state party committees.

Republican Voters Against Trump PAC, 9/22/2020, $25,000 00.

Biden Victory Fund, 10/1/2020, $35,000.00, JFC contribution: allocated by JFC to Biden for President and DNC: both allocations were in error by the JFC; JFC indicated that excessive allocation is being reallocated to other permissible recipients in the JFC.

Hickenlooper Victory Fund, 10/5/2020, $4,600.00, JFC contribution: allocated by JFC to Hickenlooper for Colorado and Colorado Democratic Party.

Jake Auchincloss for Congress, 10/15/2020, $2,800.00.

Republican Voters Against Trump PAC, 10/21/2020, $10,000.00.

Biden Victory Fund, 11/15/2020, $305.28, JFC contribution; allocated by JFC to multiple state party committees.

Democrats for Israel, 12/18/2020, $1,000.00.

PIC 2021, Inc., 1/11/2021, $25,000.00, Inaugural Committee.

Alex Padilla for Senate, 1/12/2021, $2,800.00.

PIC 2021, Inc., 1/17/2021, $76,000.00, In-kind (travel): Inaugural Committee.

Democratic National Committee, 2/22/2021, $25.00.

California Democratic Party, 2/23/2021, $5,000.00.

Friends of Schumer, 4/20/2021, $5,800.00.

Schiff Leads PAC, 6/30/2021, $5,800.00.

Josh Gottheimer for Congress, 7/12/2021, $5,800.00.

2. Jane Nathanson (Federal), Date, Amount, Notes:

Feinstein for Senate 2018, 3/17/2017, $2,700.00, FEC database lists current committee name: Feinstein For Senate 2024.

Biden for President, 7/18/2019, $2,800.00.

DNC, 1/22/2020, $10,000.00.

Hickenlooper for Colorado, 2/24/2020, $1,000.00. See explanation above under 12/21/2019 contribution from Marc Nathanson to this committee.

Debbie Dingell for Congress, 6/11/2020, $1,000.00.

Biden Victory Fund, 8/13/2020, $100,000.00, JFC Contribution: allocated by JFC to Biden for President, DNC, and multiple state party committees.

---

John N. Nkengasong, of Georgia, to be Ambassador at Large, Coordinator of United States Government Activities to Combat HIV/AIDS Globally.

Nominee: John Nkengasong.

Post: Ambassador at Large and Coordinator of the United States Government Activities to Combat HIV/AIDS Globally at the Department of State.

Nominated: January 4, 2022.

(The following is a list of members of my immediate family. I have asked each of these persons to inform me of the pertinent contributions made by them. To the best of my knowledge, the information contained in this report is complete and accurate.)

Contributions, amount, date, donee:

2020 GA Senate, $200, Dec 2020, Democrat Candidate (Do not recall which of the democrat party candidates); WA08 Congressional, $500, Jan 2018, Dr Shannon Hac***

2. Susan Nkengasong (Spouse)—No contributions.

---

Caroline Kennedy, of New York, to be Ambassador Extraordinary and Plenipotentiary

of the United States of America to the Commonwealth of Australia.

Nominee: Caroline Kennedy.

Post: Ambassador Extraordinary and Plenipotentiary to the Commonwealth of Australia.

Nominated: 1/7/22.

The following is a list of members of my immediate family. I have asked each of these persons to inform me of the pertinent contributions made by them. To the best of my knowledge, the information contained in this report is complete and accurate.

Contributions, Amount, Date, and Donee: Caroline Kennedy $2,000.00, 3/23/18, Crowley Leadership Fund; $2,000.00, 3/26/18, Joe Crowley; $100.00, 9/30/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; Caroline Kennedy $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; 10.87, 11/1/18 Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.86 11/1/18 Act Blue; $50.00, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.86, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.86, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.87, 11/1/18, Act Blue; $10.86, 11/1/18, Act Blue; $250.00, 11/1/18, Susan Wild; $10.87, 11/1/18, Susan Wild; $500.00, 11/1/18, Leslie Cockburn; $10.87, 11/1/18, Leslie Cockburn; $500.00, 11/1/18, Serve America PAC; $10.87, 11/1/18, Tom Malinowski; $250.00, 3/26/19, Pete Buttigieg; $100.00, 3/26/19, Kamala Harris; $100.00, 3/26/19, Elizabeth Warren; $10.00, 3/26/19, Act Blue; $250.00, 3/31/19, Pete Buttigieg; $500.00, 3/31/19, Amy Klobuchar; $250.00, 3/31/19, Pete Buttigieg; $25.00, 3/31/19, Act Blue; $100.00, 3/31/19, Elizabeth Warren; $100.00, 3/31/19, Kamala Harris; $10.00, 3/31/19, Act Blue; $1,000.00, 4/14/19, Pete Buttigieg; $50.00, 4/14/19, Act Blue; $100.00, 4/17/19, Kamala Harris; $10.00, 4/17/19, Act Blue; ,$50.00, 4/25/19, Elizabeth Warren; $1,000.00, 5/5/19, Joe Biden; $25.00, 5/5/19, Act Blue; $25.00, 5/10/19, Amy Klobuchar; $2.50, 5/10/19, Act Blue; $250.00, 5/15/19, Joe Biden; $25.00, 5/15/19, Act Blue; $100.00, 5/22/19, Kamala Harris; $100.00, 5/22/19, Elizabeth Warren; $15.00, 5/28/19, Amy Klobuchar; $15.00, 5/28/19, Amy Klobuchar; $125.00, 7/9/19, Act Blue; $125.00, 7/9/19, Act Blue; $125.00, 9/28/19, Elizabeth Warren; $25.00, 9/28/19, Act Blue; $250.00, 11/3/19, Elizabeth Warren; $50.00, 11/8/19, Elizabeth Warren; $1,000.00, 11/18/19, Deval Patrick; $100.00, 11/20/19, Amy Klobuchar; $100.00, 11/20/19, Amy Klobuchar; $100.00, 11/21/19, Amy Klobuchar; $150.00, 11/23/19, Amy Klobuchar; $150.00, 11/23/19, Amy Klobuchar; $150.00, 11/24/19, Amy Klobuchar; $1,000.00, 12/2/19, Joe Biden; $100.00, 12/5/19, Joe Biden; $10.00, 12/5/19, Act Blue; $1,050.00, 12/6/19, Joe Biden; $100.00, 12/14/19, Amy Klobuchar; $150.00, 12/28/19, Amy Klobuchar; $15.00, 12/28/19, Act Blue; $100.00, 12/28/19, Biden For President; $25.00, 1/18/20, Deval Patrick; $150.00, 2/10/20, Amy Klobuchar; $1,000.00, 2/11/20, Amy Klobuchar; $100.00, 2/19/20, Amy Klobuchar; $2,800.00, 3/29/20, Biden For President; $1,500.00, 4/23/20, Joe Kennedy III; $1,000.00, 5/12/20, Amy Kennedy; $100.00, 6/14/20, Act Blue; $50.00, 6/18/20, Act Blue; $10.00, 6/18/20, Act Blue; $100.00, 8/2/20, John Hickenlooper; $10.00, 8/2/20, Act Blue; $100.00, 8/2/20, John Hickenlooper; $250.00, 8/3/20, Senate Majority PAC; $25.00, 8/3/20, Act Blue; $10.00, 8/12/20, Act Blue; $100.00, 8/12/20, Biden For President; $50.00, 9/2/20, Act Blue; $250.00, 9/2/20, John Hickenlooper; $100.00, 9/4/20, Act Blue; $10.00, 9/4/20, Act Blue; $100.00, 9/4/20, Act Blue; $10.00, 9/4/20, Act Blue; $1,000.00, 9/4/20, Mark Kelly; $250.00, 9/4/20, Sara Gideon; $2,500.00, 9/7/20, Biden Victory Fund; $2,500.00, 9/7/20, Democratic National Committee; $50.00, 9/22/20, Act Blue; $5.00, 9/22/20, Act Blue; $100.00, 9/25/20, Act Blue; $100.00, 10/30/20, Act Blue; $10.00, 10/30/20, Act Blue; $250.00, 11/2/20, Theresa Greenfield; $100.00, 11/2/20, Theresa Greenfield; $500.00, 11/3/20, Amy Kennedy; $250.00, 11/10/20, Raphael Warnock; $500.00, 11/14/20, Raphael Warnock; $50.00, 11/14/20, Act Blue; $250.00, 11/18/20, Raphael Warnock; $250.00, 11/21/20, Raphael Warnock; $25.00, 11/21/20, Act Blue; $250.00, 11/23/20, Raphael Warnock; $25.00, 11/23/20, Act Blue; $250.00, 11/25/20, Raphael Warnock; $100.00, 12/4/20, Act Blue.

Edwin Schlossberg, $1,000.00, 1/7/18, DCCC; $500.00, 1/29/18, DCCC; $1,000.00, 2/7/18, DCCC; $500.00, 2/28/18, DCCC; $1,000.00, 3/7/18, DCCC; $100.00, 3/14/18, Brian Flynn; $500.00, 3/29/18, DCCC; $1,000.00, 4/8/18, DCCC; $500.00, 4/29/18, DCCC; $1,000.00, 5/7/18, DCCC; $500.00, 5/29/18, DCCC; $100.00, 6/6/18, Act Blue; $500.00, 6/11/18, Ami Bera; $1,000.00, 6/11/18, DCCC; $1,000.00, 6/12/18, DCCC; $100.00, 6/28/18, Act Blue; $500.00, 6/30/18, DCCC; $100.00, 7/6/18, Mikie Sherrill; $1,000.00, 7/8/18, DCCC; $500.00, 7/29/18, DCCC; $100.00, 8/6/18, Mikie Sherrill; $1,000.00, 8/7/18, DCCC; $500.00, 8/29/18, DCCC; $250.00, 9/5/18, Josh Welle; $100.00, 9/6/18, Mikie Sherrill; $1,000.00, 9/9/18, DCCC; $500.00, 9/14/18, Schiff House Victory Fund; $500.00, 9/19/18, Schiff House Victory Fund; $500.00, 9/30/18, DCCC; $100.00, 10/6/18, Mikie Sherrill; $1,000.00, 10/7/18, DCCC; $500.00, 10/29/18, DCCC; $100.00, 11/3/18, Mikie Sherrill; $100.00, 11/6/18, Mikie Sherrill; $1,000.00, 11/7/18, DCCC; $500.00, 11/29/18, DCCC; $100.00, 12/3/18, Act Blue; $100.00, 12/6/18, Act Blue; $1,000.00, 12/9/18, DCCC; $500.00, 12/30/18, DCCC; $100.00, 1/3/19, Mikie Sherrill; $100.00, 1/6/19, Mikie Sherrill; $1,000.00, 1/7/19, DCCC; $500.00, 1/29/19, DCCC; $100.00, 2/3/19, Mikie Sherrill; $100.00, 2/6/19, Mikie Sherrill; $1,000.00, 2/7/19, DCCC; $500.00, 2/28/19, DCCC; $100.00, 3/3/19, Mikie Sherrill; $100.00, 3/6/19, Mikie Sherrill; $1,000.00, 3/7/19, DCCC; $500.00, 3/31/19, DCCC; $100.00, 4/3/19, Mikie Sherrill; $100.00, 4/6/19, Mikie Sherrill; $100.00, 5/3/19, Mikie Sherrill; $100.00, 5/6/19, Mikie Sherrill; $100.00, 6/3/19, Mikie Sherrill; $100.00, 6/6/19, Mikie Sherrill; $250.00, 6/17/19, Jackie Gordon; $100.00, 7/3/19, Mikie Sherrill; $100.00, 7/6/19, Mikie Sherrill; $100.00, 8/3/19, Mikie Sherrill; $100.00, 9/18/19, Act Blue; $25.00, 12/5/19, Act Blue; $250.00, 12/5/19, Biden For President; $250.00, 12/8/19, Democratic National Committee; $2,500.00, 1 /3/20, Biden For President; $1,050.00, 1/10/20, Biden For President; $50.00, 2/10/20, Act Blue; $1,000.00, 2/16/20, Democratic National Committee; $25.00, 2/18/20, Act Blue; $1,000.00, 2/23/20, Democratic National Committee; $500.00, 4/16/20, Biden For President; $500.00, 4/19/20, Democratic National Committee; $10.00, 4/23/20, Act Blue; $1,000.00, 4/26/20, Democratic National Committee; $20.00, 5/17/20, Act Blue; $20.00, 5/17/20, Act Blue; $50.00, 5/20/20, Act Blue; $100.00, 5/26/20, Act Blue; $100.00, 6/3/20, Kara Eastman; $10.00, 6/3/20, Act Blue; $500.00, 6/6/20, Biden For President; $500.00, 6/7/20, Democratic National Committee; $100.00, 6/16/20, Kara Eastman; $100.00, 6/16/20, Act Blue; $500.00, 6/25/20, Kara Eastman; $1,000.00, 6/28/20, Democratic National Committee; $1,900.00, 7/6/20, Biden For President; $100.00, 7/13/20, Act Blue; $1,000.00, 7/17/20, Biden For President; $100.00, 7/17/20, Act Blue; $1,000.00, 7/22/20, Biden For President; $50.00, 7/23/20, Act Blue; $50.00, 7/23/20, Act Blue; $50.00, 7/23/20, Blue Senate Candidate Fund; $100.00, 7/24/20, Act Blue; $1,000.00, 7/26/20, Democratic National Committee; $1,000.00, 7/26/20, Democratic National Committee; $5.00, 7/26/20, Blue Senate Pac; $4.09 7/26/20, Amy McGrath; $4.09 7/26/20, John Hickenlooper; $150.00, 7/27/20, Act Blue; $100.00, 7/27/20, Act Blue; $250.00, 7/27/20, John Hickenlooper; $100.00, 7/29/20, John Hickenlooper; $1,000.00, 8/2/20, DCCC; $100.00, 8/3/20, Act Blue; $150.00, 8/3/20, Act Blue; $150.00, 8/3/20, DCCC; $100.00, 8/10/20, Act Blue; $150.00, 8/10/20, Act Blue; $150.00, 8/10/20, DCCC; $1,000.00, 8/16/20, DCCC; $100.00, 8/17/20, Act Blue; $150.00, 8/17/20, Act Blue; $150.00, 8/17/20, DCCC; $100.00, 8/24/20, Act Blue; $25.00, 8/25/20, Act Blue; $1,000.00, 8/25/20, DCCC; $1,000.00, 8/27/20, Democratic National Committee; $5,000.00, 8/27/20, DCCC; $250.00, 8/31/20, Blue Senate PAC; $25.00, 8/31/20, Blue Senate PAC; $250.00, 8/31/20, Blue Senate Candidate Fund; $18.75 8/31/20, John Hickenlooper; $10.00, 8/31/20, Act Blue; $2,800.00, 9/4/20, SMP; $15.00, 9/4/20, Act Blue; $20.00, 9/4/20, Act Blue; $1,000.00, 9/6/20, DCCC; $3,000.00, 9/8/20, DCCC; $30.00, 9/8/20, Act Blue; $4.00, 9/13/20, Act Blue; $500.00, 9/13/20, SMP; $300.00, 9/24/20, Kara Eastman; $20.00, 9/24/20, Act Blue; $125.00, 9/24/20, Act Blue; $125.00, 9/24/20, Act Blue; $1,000.00, 9/24/20, Biden For President; $20.00, 9/24/20, Act Blue; $3.00, 9/24/20, Act Blue; $100.00, 9/24/20, Act Blue; $1,000.00, 9/24/20, Democratic National Committee; $1,000.00, 9/24/20, Democratic National Committee; $1,000.00, 9/28/20, DCCC; $1,000.00, 9/28/20, LCV Victory Fund; $10.00, 9/28/20, Act Blue; $750.00, 10/5/20, DCCC; $10.00, 10/5/20, Act Blue; $10.00, 10/5/20, Act Blue; $250.00, 10/5/20, Tedra Cobb; $1,000.00, 10/11/20, DCCC; $10.00, 10/13/20, Act Blue; $250.00, 10/13/20, Tedra Cobb; $30.00, 10/17/20, Act Blue; $1,000.00, 10/18/20, DCCC; $113.64 10/20/20, Kara Eastman; $113.63 10/20/20, Jackie Gordon; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.64 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $113.63 10/20/20, Act Blue; $25.00, 10/20/20, Act Blue; $250.00, 10/22/20, Democratic Victory PAC, Inc.; $25.00, 10/22/20, Act Blue; $100.00, 10/24/20, Act Blue; $1,000.00, 10/25/20, Democratic National Committee; $250.00, 10/28/20, Gina Ortiz Jones $1,000.00, 10/28/20, Democratic Victory PAC, Inc.; $500.00, 10/29/20, Democratic National Committee; $500.00, 10/29/20, Jaime Harrison; $1,000.00, 10/29/20, DCCC; $2,800.00, 10/31/20, Biden For President; $22,200.00, 11/1/20, Democratic National Committee; $1,000.00, 11/15/20, DCCC; $100.00, 11/24/20, Act Blue; $1,000.00, 11/26/20, Democratic National Committee; $100.00, 12/

9/20, People For Ben; $800.00, 12/24/20, Democratic National Committee; $100.00, 12/24/20, Act Blue; $250.00, 12/31/20, Our Future United; $1,000.00, 1/10/21, DCCC; $1,000.00, 1/14/21, Nancy Pelosi; $1,000.00, 1/24/21, Democratic National Committee; $100.00, 1/24/21, Act Blue; $1,000.00, 2/4/21, DCCC; $1,000.00, 2/24/21, Democratic National Committee; $100.00, 2/24/21, Act Blue; $500.00, 2/28/21, DCCC; $250.00, 3/11/21, Progressive Turnout Project; $1,000.00, 3/24/21, Democratic National Committee; $100.00, 3/24/21, Act Blue; $1,000.00, 4/24/21, Democratic National Committee; $100.00, 4/24/21, Act Blue; $1,000.00, 5/24/21, Democratic National Committee; $100.00, 5/24/21, Act Blue; $1,000.00, 6/24/21, Democratic National Committee; $100.00, 6/24/21, Act Blue; $1,000.00, 7/22/21, DCCC; $1,000.00, 7/24/21, Democratic National Committee; $500.00, 8/11/21, Backroads PAC; $500.00, 8/23/21, National Democratic Training Committee PAC; $1,000.00, 10/31/21, DCCC.

---

MaryKay Loss Carlson, of Arkansas, a Career Member of the Senior Foreign Service, Class of Minister-Counselor, to be Ambassador Extraordinary and Plenipotentiary of the United States of America to the Republic of the Philippines.

Nominee: MaryKay Loss Carlson.

Post: The Republic of the Philippines.

Nominated: February 10, 2022.

(The following is a list of members of my immediate family. I have asked each of these persons to inform me of the pertinent contributions made by them. To the best of my knowledge, the information contained in this report is complete and accurate.)

Contributions, amount, date, donee:

MaryKay L. Carlson, $100, 10/3/2020, ACTBLUE.

Aubrey A. Carlson, NONE.

---

Philip S. Goldberg, of the District of Columbia, a Career Member of the Senior Foreign Service, Class of Career Ambassador, to be Ambassador Extraordinary and Plenipotentiary of the United States of America to the Republic of Korea.

Nominee: Philip S. Goldberg.

Post: Republic of Korea.

Nominated: February 14, 2022.

(The following is a list of members of my immediate family. I have asked each of these persons to inform me of the pertinent contributions made by them. To the best of my knowledge, the information contained in this report is complete and accurate.)

Contributions, amount, date, and donee:

1. Self: None.

---

By Mr. BROWN for the Committee on Banking, Housing, and Urban Affairs.

*Ventris C. Gibson, of Virginia, to be Director of the Mint for a term of five years.

*Paul M. Rosen, of California, to be Assistant Secretary of the Treasury for Investment Security.

By Mr. CARPER for the Committee on Environment and Public Works.

*Benny R. Wagner, of Tennessee, to be Inspector General of the Tennessee Valley Authority.

By Mr. TESTER for the Committee on Veterans' Affairs.

*Shereef M. Elnahal, of New Jersey, to be Under Secretary for Health of the Department of Veterans Affairs.

*Nomination was reported with recommendation that it be confirmed subject to the nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.

(Nominations without an asterisk were reported with the recommendation that they be confirmed.)

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. BARRASSO (for himself, Mr. BROWN, Ms. COLLINS, Mr. COONS, Ms. HASSAN, Mr. LEAHY, Ms. LUMMIS, Mr. MERKLEY, Ms. MURKOWSKI, and Mr. REED):

S. 4133. A bill to provide for phased-in payment of Social Security Disability Insurance payments during the waiting period for individuals with a terminal illness; to the Committee on Finance.

By Mr. CORNYN (for himself, Mrs. GILLIBRAND, Mr. BLUMENTHAL, Mr. KING, Mrs. FEINSTEIN, Mr. KAINE, Mr. PETERS, Mr. TILLIS, Mr. SCOTT of Florida, Mrs. BLACKBURN, Ms. COLLINS, Mr. BOOZMAN, and Mrs. SHAHEEN):

S. 4134. A bill to direct the President to submit to Congress a report on United States Government efforts to collect, analyze, and preserve evidence and information related to war crimes and other atrocities committed during the full-scale Russian invasion of Ukraine since February 24, 2022, and for other purposes; to the Committee on Foreign Relations.

By Mr. HAWLEY:

S. 4135. A bill to dissolve the Department of Homeland Security Disinformation Governance Board, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. CARPER:

S. 4136. An original bill to provide for improvements to the rivers and harbors of the United States, to provide for the conservation and development of water and related resources, and for other purposes; from the Committee on Environment and Public Works; placed on the calendar.

By Mr. CARPER (for himself, Mrs. CAPITO, Mr. CARDIN, and Mr. CRAMER):

S. 4137. A bill to provide for improvements to the rivers and harbors of the United States, to provide for the conservation and development of water and related resources, and for other purposes; to the Committee on Environment and Public Works.

By Ms. DUCKWORTH (for herself and Mr. TILLIS):

S. 4138. A bill to develop and implement strategies for research and development for bioindustrial manufacturing and the implementation of additive manufacturing for defense purposes, and for other purposes; to the Committee on Armed Services.

By Ms. KLOBUCHAR (for herself, Ms. SMITH, Mr. HICKENLOOPER, Mr. WHITEHOUSE, Mr. LEAHY, Mr. MERKLEY, and Mr. BOOKER):

S. 4139. A bill to amend the Internal Revenue Code of 1986 to establish a tax credit for manufacturers of high-efficiency heat pumps and heat pump water heaters; to the Committee on Finance.

By Mr. MURPHY:

S. 4140. A bill to amend chapter 22 of title 44, United States Code, to ensure Presidential records are preserved, duly created when non-official electronic messaging accounts are used, and made available to the public and the next administration in a timely fashion to advance national security and accountability, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Ms. HIRONO:

S. 4141. A bill to amend title 38, United States Code, to establish in the Department of Veterans Affairs an Advisory Committee on United States Outlying Areas and Freely Associated States, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. RUBIO (for himself, Mr. SCOTT of Florida, Mrs. BLACKBURN, Mr. BRAUN, Mr. SASSE, and Mr. COTTON):

S. 4142. A bill to counter the military-civil fusion strategy of the Chinese Communist Party and prevent United States contributions to the development of dual-use technology in China; to the Committee on Foreign Relations.

By Mr. RUBIO:

S. 4143. A bill to prohibit the importation of agricultural products, raw materials, and food from the Russian Federation if the Russian Federation prohibits the importation of such products, materials, and food from the United States, and for other purposes; to the Committee on Finance.

By Mr. MARKEY (for himself, Ms. WARREN, Mr. SANDERS, Mr. BOOKER, and Ms. SMITH):

S. 4144. A bill to amend the Energy Policy Act of 2005 to establish an energy efficient appliance rebate program to provide rebates for the manufacturing, distribution, and shipment of certain building electrification products, and for other purposes; to the Committee on Finance.

By Ms. CANTWELL (for herself, Ms. KLOBUCHAR, Mr. WARNOCK, and Mr. LUJÁN):

S. 4145. A bill to amend section 13 of the Federal Trade Commission Act to provide equitable relief, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. CORNYN:

S. 4146. A bill to amend title 40, United States Code, to grant the Supreme Court of the United States security-related authorities equivalent to the legislative and executive branches; to the Committee on the Judiciary.

## ADDITIONAL COSPONSORS

S. 769

At the request of Ms. CORTEZ MASTO, the name of the Senator from California (Mr. PADILLA) was added as a cosponsor of S. 769, a bill to authorize funds to prevent housing discrimination through the use of nationwide testing, to increase funds for the Fair Housing Initiatives Program, and for other purposes.

S. 936

At the request of Mr. DURBIN, the name of the Senator from Minnesota (Ms. KLOBUCHAR) was added as a cosponsor of S. 936, a bill to require online marketplaces to collect, verify, and disclose certain information regarding high-volume third party sellers of consumer products to inform consumers.

S. 1489

At the request of Mr. MENENDEZ, the names of the Senator from Minnesota (Ms. SMITH) and the Senator from Louisiana (Mr. KENNEDY) were added as cosponsors of S. 1489, a bill to amend the Inspector General Act of 1978 to establish an Inspector General of the Office of the United States Trade Representative, and for other purposes.

S. 1548

At the request of Mr. LUJÁN, the names of the Senator from Massachusetts (Mr. MARKEY) and the Senator

from Michigan (Mr. PETERS) were added as cosponsors of S. 1548, a bill to amend the Public Health Service Act to improve the diversity of participants in research on Alzheimer's disease, and for other purposes.

S. 2372

At the request of Mr. HEINRICH, the names of the Senator from New Hampshire (Mrs. SHAHEEN) and the Senator from Nevada (Ms. CORTEZ MASTO) were added as cosponsors of S. 2372, a bill to amend the Pittman-Robertson Wildlife Restoration Act to make supplemental funds available for management of fish and wildlife species of greatest conservation need as determined by State fish and wildlife agencies, and for other purposes.

S. 2854

At the request of Mr. KENNEDY, the name of the Senator from New Jersey (Mr. MENENDEZ) was added as a cosponsor of S. 2854, a bill to allow for the transfer and redemption of abandoned savings bonds.

S. 2952

At the request of Mr. PAUL, the name of the Senator from Rhode Island (Mr. WHITEHOUSE) was added as a cosponsor of S. 2952, a bill to amend the Federal Food, Drug, and Cosmetic Act to allow manufacturers and sponsors of a drug to use alternative testing methods to animal testing to investigate the safety and effectiveness of a drug, and for other purposes.

S. 3236

At the request of Ms. KLOBUCHAR, the name of the Senator from Idaho (Mr. RISCH) was added as a cosponsor of S. 3236, a bill to require the Federal Communications Commission to reform the contribution system of the Universal Service Fund, and for other purposes.

S. 3871

At the request of Mr. MARSHALL, the name of the Senator from Tennessee (Mr. HAGERTY) was added as a cosponsor of S. 3871, a bill to provide a means for Congress to prevent an organization's designation as a foreign terrorist organization from being revoked by the Secretary of State.

S. 4082

At the request of Mr. BOOZMAN, the name of the Senator from Oklahoma (Mr. LANKFORD) was added as a cosponsor of S. 4082, a bill to prohibit the use by the Department of Veterans Affairs of funds to provide emergency assistance at the southern border of the United States resulting from the repeal of certain public health orders, and for other purposes.

S. 4109

At the request of Mr. WICKER, the name of the Senator from Tennessee (Mrs. BLACKBURN) was added as a cosponsor of S. 4109, a bill to authorize the development of a national strategy for the research and development of distributed ledger technologies and their applications, to authorize awards to support research on distributed ledger technologies and their applications, and to authorize an applied research project on distributed ledger technologies in commerce.

S.J. RES. 43

At the request of Mrs. HYDE-SMITH, the name of the Senator from South Carolina (Mr. GRAHAM) was added as a cosponsor of S.J. Res. 43, a joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Department of the Treasury and the Centers for Medicare & Medicaid Services relating to ''Patient Protection and Affordable Care Act; Updating Payment Parameters, Section 1332 Waiver Implementing Regulations, and Improving Health Insurance Markets for 2022 and Beyond''.

S. RES. 596

At the request of Mr. SCHATZ, the name of the Senator from Washington (Ms. CANTWELL) was added as a cosponsor of S. Res. 596, a resolution designating April 2022 as ''Preserving and Protecting Local News Month'' and recognizing the importance and significance of local news.

## STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. CORNYN (for himself, Mrs. GILLIBRAND, Mr. BLUMENTHAL, Mr. KING, Mrs. FEINSTEIN, Mr. KAINE, Mr. PETERS, Mr. TILLIS, Mr. SCOTT of Florida, Mrs. BLACKBURN, Ms. COLLINS, Mr. BOOZMAN, and Mrs. SHAHEEN):

S. 4134. A bill to direct the President to submit to Congress a report on United States Government efforts to collect, analyze, and preserve evidence and information related to war crimes and other atrocities committed during the full-scale Russian invasion of Ukraine since February 24, 2022, and for other purposes; to the Committee on Foreign Relations.

Mr. CORNYN. Mr. President, I ask unanimous consent to print my bill for introduction in the CONGRESSIONAL RECORD. The bill directs the President to submit to Congress a report on U.S. Government efforts to collect, analyze, and preserve evidence and information related to war crimes and other atrocities committed during the Russian invasion of Ukraine since February 24, 2022.

There being no objection, the text of the bill was ordered to be printed in the RECORD, as follows:

S. 4134

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the ''Ukraine Invasion War Crimes Deterrence and Accountability Act''.

**SEC. 2. SENSE OF CONGRESS.**

It is the sense of Congress that—

(1) in its premeditated, unprovoked, unjustified, and unlawful full-scale invasion of Ukraine that commenced on February 24, 2022, the military of the Government of the Russian Federation under the direction of President Vladimir Putin has committed war crimes that include—

(A) the deliberate targeting of civilians and injuring or killing of noncombatants;

(B) the deliberate targeting and attacking of hospitals, schools, and other non-military buildings dedicated to religion, art, science, or charitable purposes, such as the bombing of a theater in Mariupol that served as a shelter for noncombatants and had the word ''children'' written clearly in the Russian language outside;

(C) the indiscriminate bombardment of undefended dwellings and buildings;

(D) the wanton destruction of property not justified by military necessity;

(E) unlawful civilian deportations;

(F) the taking of hostages; and

(G) rape, or sexual assault or abuse;

(2) the use of chemical weapons by the Government of the Russian Federation in Ukraine would constitute a war crime, and engaging in any military preparations to use chemical weapons or to develop, produce, stockpile, or retain chemical weapons is prohibited by the Chemical Weapons Convention, to which the Russian Federation is a signatory;

(3) Vladimir Putin has a long record of committing acts of aggression, systematic abuses of human rights, and acts that constitute war crimes or other atrocities both at home and abroad, and the brutality and scale of these actions, including in the Russian Federation republic of Chechnya, Georgia, Syria, and Ukraine, demonstrate the extent to which his regime is willing to flout international norms and values in the pursuit of its objectives;

(4) Vladimir Putin has previously sanctioned the use of chemical weapons at home and abroad, including in the poisonings of Russian spy turned double agent Sergei Skripal and his daughter Yulia and leading Russian opposition figure Aleksey Navalny, and aided and abetted the use of chemical weapons by President Bashar al-Assad in Syria; and

(5) in 2014, the Government of the Russian Federation initiated its unprovoked war of aggression against Ukraine which resulted in its illegal occupation of Crimea, the unrecognized declaration of independence by the so-called ''Donetsk People's Republic'' and ''Luhansk People's Republic'' by Russia-backed proxies, and numerous human rights violations and deaths of civilians in Ukraine.

**SEC. 3. STATEMENT OF POLICY.**

It is the policy of the United States—

(1) to collect, analyze, and preserve evidence and information related to war crimes and other atrocities committed during the full-scale Russian invasion of Ukraine that began on February 24, 2022, for use in appropriate domestic, foreign, and international courts and tribunals prosecuting those responsible for such crimes;

(2) to help deter the commission of war crimes and other atrocities in Ukraine by publicizing to the maximum possible extent, including among Russian and other foreign military commanders and troops in Ukraine, efforts to identify and prosecute those responsible for the commission of war crimes during the full-scale Russian invasion of Ukraine that began on February 24, 2022; and

(3) to continue efforts to identify, deter, and pursue accountability for war crimes and other atrocities committed around the world and by other perpetrators, and to leverage international cooperation and best practices in this regard with respect to the current situation in Ukraine.

**SEC. 4. REPORT ON UNITED STATES EFFORTS.**

Not later than 90 days after the date of the enactment of this Act, and consistent with

the protection of intelligence sources and methods, the President shall submit to the appropriate congressional committees a report, which may include a classified annex, describing in detail the following:

(1) United States Government efforts to collect, analyze, and preserve evidence and information related to war crimes and other atrocities committed during the full-scale Russian invasion of Ukraine since February 24, 2022, including a description of—

(A) the respective roles of various agencies, departments, and offices, and the interagency mechanism established for the coordination of such efforts;

(B) the types of information and evidence that are being collected, analyzed, and preserved to help identify those responsible for the commission of war crimes or other atrocities during the full-scale Russian invasion of Ukraine in 2022; and

(C) steps taken to coordinate with, and support the work of, allies, partners, international institutions and organizations, and nongovernmental organizations in such efforts.

(2) Media, public diplomacy, and information operations to make Russian military commanders, troops, political leaders and the Russian people aware of efforts to identify and prosecute those responsible for the commission of war crimes or other atrocities during the full-scale Russian invasion of Ukraine in 2022, and of the types of acts that may be prosecutable.

(3) The process for a domestic, foreign, or international court or tribunal to request and obtain from the United States Government information related to war crimes or other atrocities committed during the full-scale Russian invasion of Ukraine in 2022.

**SEC. 5. DEFINITIONS.**

In this Act:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term ''appropriate congressional committees'' means—

(A) the Committee on Foreign Relations, the Committee on the Judiciary, and the Select Committee on Intelligence of the Senate; and

(B) the Committee on Foreign Affairs, the Committee on the Judiciary, and the Permanent Select Committee on Intelligence of the House of Representatives.

(2) ATROCITIES.—The term ''atrocities'' has the meaning given that term in section 6(2) of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (Public Law 115–441; 22 U.S.C. 2656 note).

(3) WAR CRIME.—The term ''war crime'' has the meaning given that term in section 2441(c) of title 18, United States Code.

## AUTHORITY FOR COMMITTEES TO MEET

Mr. DURBIN. Mr. President, I have 12 requests for committees to meet during today's session of the Senate. They have the approval of the Majority and Minority Leaders.

Pursuant to rule XXVI, paragraph 5(a), of the Standing Rules of the Senate, the following committees are authorized to meet during today's session of the Senate:

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS

The Committee on Environment and Public Works is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 9:45 a.m., to conduct a business meeting.

COMMITTEE ON FOREIGN RELATIONS

The Committee on Foreign Relations is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 10 a.m., to conduct a business meeting.

COMMITTEE ON FOREIGN RELATIONS

The Committee on Foreign Relations is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 2:15 p.m., to conduct a hearing on nominations.

COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

The Committee on Homeland Security and Governmental Affairs is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 2:30 p.m., to conduct a hearing.

COMMITTEE ON INDIAN AFFAIRS

The Committee on Indian Affairs is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 2:30 p.m., to conduct a hearing.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 10 a.m., to conduct a hearing.

COMMITTEE ON VETERANS' AFFAIRS

The Committee on Veterans' Affairs is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, to conduct a business meeting.

SELECT COMMITTEE ON INTELLIGENCE

The Select Committee on Intelligence is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 2:30 p.m., to conduct a closed hearing.

SUBCOMMITTEE ON FINANCIAL INSTITUTIONS AND CONSUMER PROTECTION

The Subcommittee on Financial Institutions and Consumer Protection of the Committee on Banking, Housing, and Urban Affairs is authorized to meet during the session of the Senate on Wednesday, May 4 2022, at 2:30 p.m., to conduct a hearing.

SUBCOMMITTEE ON PRIVACY, TECHNOLOGY, AND THE LAW

The Subcommittee on Privacy, Technology, and the Law of the Committee on the Judiciary is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 2 p.m., to conduct a hearing.

SUBCOMMITTEE ON STRATEGIC FORCES

The Subcommittee on Strategic Forces of the Committee on Armed Services is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 4:30 p.m., to conduct a hearing.

SUBCOMMITTEE ON TAXATION AND IRS OVERSIGHT

The Subcommittee on Taxation and IRS Oversight of the Committee on Finance is authorized to meet during the session of the Senate on Wednesday, May 4, 2022, at 2 p.m., to conduct a hearing.

## ORDERS FOR THURSDAY, MAY 5, 2022

Mr. COONS. Madam President, I ask unanimous consent that when the Senate completes its business today, it adjourn until 11 a.m., Thursday, May 5; that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, and morning business be closed; that upon the conclusion of morning business, the Senate proceed to executive session to consider Calendar No. 887, Kathryn Huff, of Illinois, to be an Assistant Secretary of Energy; further, that the Senate vote on confirmation of the Huff nomination at 1:45 p.m.; finally, if the nomination is confirmed during Thursday's session, that the motion to reconsider be considered made and laid upon the table and the President be immediately notified of the Senate's action.

The PRESIDING OFFICER. Without objection, it is so ordered.

## ADJOURNMENT UNTIL 11 A.M. TOMORROW

Mr. COONS. Madam President, if there is no further business to come before the Senate, I ask unanimous consent that it stand adjourned under the previous order.

There being no objection, the Senate, at 10:13 p.m., adjourned until Thursday, May 5, 2022, at 11 a.m.

## CONFIRMATION

Executive nomination confirmed by the Senate May 4, 2022:

DEPARTMENT OF LABOR

JAMES D. RODRIGUEZ, OF TEXAS, TO BE ASSISTANT SECRETARY OF LABOR FOR VETERANS' EMPLOYMENT AND TRAINING.

# EXTENSIONS OF REMARKS

SENATE COMMITTEE MEETINGS

Title IV of Senate Resolution 4, agreed to by the Senate of February 4, 1977, calls for establishment of a system for a computerized schedule of all meetings and hearings of Senate committees, subcommittees, joint committees, and committees of conference. This title requires all such committees to notify the Office of the Senate Daily Digest—designated by the Rules Committee—of the time, place and purpose of the meetings, when scheduled and any cancellations or changes in the meetings as they occur.

As an additional procedure along with the computerization of this information, the Office of the Senate Daily Digest will prepare this information for printing in the Extensions of Remarks section of the CONGRESSIONAL RECORD on Monday and Wednesday of each week.

Meetings scheduled for Thursday, May 5, 2022 may be found in the Daily Digest of today's RECORD.

MEETINGS SCHEDULED

MAY 10

9:30 a.m.

Committee on Armed Services

To hold hearings to examine worldwide threats; to be immediately followed by a closed session in SVC–217.

SD–G50

10 a.m.

Committee on Appropriations

Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies

To hold hearings to examine proposed budget estimates and justification for fiscal year 2023 for the Department of Agriculture.

SD–124

Committee on Appropriations

Subcommittee on Defense

To hold hearings to examine proposed budget estimates and justification for fiscal year 2023 for the Department of the Army.

SD–192

Committee on Banking, Housing, and Urban Affairs

To hold hearings to examine the Financial Stability Oversight Council Annual Report to Congress.

SD–538/VTC

Committee on Health, Education, Labor, and Pensions

To hold hearings to examine the nomination of Kalpana Kotagal, of Ohio, to be a Member of the Equal Employment Opportunity Commission.

SH–216

2:30 p.m.

Committee on Armed Services

Subcommittee on Airland

To hold hearings to examine Army modernization in review of the Defense Authorization Request for fiscal year 2023 and the Future Years Defense Program.

SR–222

Committee on Armed Services

Subcommittee on Readiness and Management Support

To hold a joint hearing to examine the Shipyard Infrastructure Optimization Program.

SD–G50

Committee on Foreign Relations

To hold hearings to examine the nomination of Bridget A. Brink, of Michigan, to be Ambassador to Ukraine, Elizabeth H. Richard, of Virginia, to be Coordinator for Counterterrorism, with the rank and status of Ambassador at Large, and Alexander Mark Laskaris, of the District of Columbia, to be an Ambassador to the Republic of Chad, all of the Department of State, and other pending nominations.

SD–106/VTC

MAY 11

10 a.m.

Committee on Appropriations

Subcommittee on Interior, Environment, and Related Agencies

To hold hearings to examine proposed budget estimates and justification for fiscal year 2023 for the Indian Health Service.

SD–124

Committee on Appropriations

Subcommittee on Legislative Branch

To hold hearings to examine proposed budget estimates and justification for fiscal year 2023 for the Architect of the Capitol, the Senate Sergeant at Arms, and the Congressional Budget Office.

SD–192

Committee on Commerce, Science, and Transportation

Business meeting to consider S. 2427, to require the Federal Communications Commission to conduct a study and submit to Congress a report examining the feasibility of funding the Universal Service Fund through contributions supplied by edge providers, S. 3053, to amend the Weather Research and Forecasting Innovation Act of 2017 to require the Administrator of the National Oceanic and Atmospheric Administration to develop a plan and national guidance document to improve precipitation estimates, S. 3232, to require the Consumer Product Safety Commission to promulgate a consumer product safety rule for freestanding clothing storage units to protect children from tip-over related death or injury, S. 3278, to protect children and other consumers against hazards associated with the accidental ingestion of button cell or coin batteries by requiring the Consumer Product Safety Commission to promulgate a consumer product safety standard to require child-resistant closures on consumer products that use such batteries, S. 3290, to establish a National Manufacturing Extension Partnership Supply Chain Database, S. 3429, to establish an Alaska Salmon Research Task Force, S. 3533, to amend the John D. Dingell, Jr. Conservation, Management, and Recreation Act to improve the National Volcano Early Warning and Monitoring System, S. 3692, to direct the Federal Communications Commission to evaluate and consider the impact of the telecommunications network equipment supply chain on the deployment of universal service, S. 4145, to amend section 13 of the Federal Trade Commission Act to provide equitable relief, the nomination of Linda L. Fagan, to be Commandant, and promotion lists, both of the Coast Guard.

SR–253

Committee on Energy and Natural Resources

Subcommittee on National Parks

To hold hearings to examine S. 557, to establish a pilot program for native plant species, S. 1344, to redesignate the Pullman National Monument in the State of Illinois as the Pullman National Historical Park, S. 1718, to amend the Rosie the Riveter/World War II Home Front National Historical Park Establishment Act of 200 to provide for additional areas to be added to the park, S. 1814 and H.R. 3531, bills to authorize the Women Who Worked on the Home Front Foundation to establish a commemorative work in the District of Columbia and its environs, S. 2367, to authorize the Secretary of the Interior to acquire land in Frederick County, Maryland, for the Historic Preservation Training Center of the National Park Service, S. 2964, to clarify the status of the North Country, Ice Age, and New England National Scenic Trails as units of the National Park System, S. 3141, to establish the New Philadelphia National Historical Park in the State of Illinois as a unit of the National Park System, S. 3185, to amend the Delaware Water Gap National Recreation Area Improvement Act to extend the exception to the closure of certain roads within the Recreation Area for local businesses, S. 3240, to waive the application fee for applications for special use permits for veterans' special events at war memorials on land administered by the National Park Service in the District of Columbia and its environs, S. 3307, to modify the boundary of the Wilson's Creek National Battlefield in the State of Missouri, S. 3334, to extend the authority for the establishment of a commemorative work to honor enslaved and free black persons who served in the American Revolution, S. 3338, to revise the boundary of the Ste. Genevieve National Historical Park in the State of Missouri, S. 3519, to amend the National Trails System Act to designate the Butterfield Overland National Historic Trail, S. 3551, to require the Secretary of Agriculture and the Secretary of the Interior to carry out certain activities to enhance recreational opportunities for gateway communities, S. 3667, to amend title 54, United States Code, to establish within the National Park Service the United States African-American Burial Grounds Preservation Program, S. 3685, to direct the Secretary of the Interior to conduct a special resource study to determine the suitability and feasibility of establishing the John P. Parker House in Ripley, Ohio, as a unit of the National Park System, S. 4112, to address issues

involving the economic statecraft of the United States, S. 4121, to designate the Kol Israel Foundation Holocaust Memorial in Bedford Heights, Ohio, as a national memorial, H.R. 268, to provide for the boundary of the Palo Alto Battlefield National Historic Park to be adjusted, to authorize the donation of land to the United States for addition to that historic park, and H.R. 1931, to provide competitive grants for the promotion of Japanese American confinement education as a means to understand the importance of democratic principles, use and abuse of power, and to raise awareness about the importance of cultural tolerance toward Japanese Americans.

SD–366

Committee on Environment and Public Works

To hold an oversight hearing to examine the Council on Environmental Quality.

SD–406

Committee on the Judiciary

To hold hearings to examine pending nominations.

SD–226

2 p.m.

Committee on Appropriations

Subcommittee on Commerce, Justice, Science, and Related Agencies

To hold hearings to examine proposed budget estimates and justification for fiscal year 2023 for the Department of Commerce.

SD–192

Committee on Appropriations

Subcommittee on State, Foreign Operations, and Related Programs

To hold hearings to examine the global food security and COVID–19 crises, focusing on the U.S. response and policy options.

SD–124

2:30 p.m.

Committee on Foreign Relations

To hold hearings to examine the President's proposed budget request for fiscal year 2023 for the United States Agency for International Development.

SD–G50/VTC

3 p.m.

Committee on Veterans' Affairs

To hold hearings to examine the quality of care in the VA and the private sector.

SR–418

4:30 p.m.

Committee on Armed Services

Subcommittee on Strategic Forces

To hold hearings to examine Space Force programs in review of the Defense Authorization Request for fiscal year 2023 and the Future Years Defense Program.

SR–232A

MAY 12

9:30 a.m.

Committee on Appropriations

Subcommittee on Transportation, Housing and Urban Development, and Related Agencies

To hold hearings to examine proposed budget estimates and justification for fiscal year 2023 for the Department of Housing and Urban Development.

SD–192

10:15 a.m.

Committee on Homeland Security and Governmental Affairs

To hold hearings to examine pathways to procurement innovation.

SD–342

# *Daily Digest*

# Senate

## *Chamber Action*

*Routine Proceedings, pages S2293–S2341*

**Measures Introduced:** Fourteen bills were introduced, as follows: S. 4133–4146. **Page S2339**

**House Messages:**

**America Competes Act—Motions To Instruct Conferees:** Senate resumed consideration of the House message to accompany H.R. 4521, to provide for a coordinated Federal research initiative to ensure continued United States leadership in engineering biology, taking action on the following motions to instruct conferees on the part of the Senate on the disagreeing votes of the two Houses on the bill to be instructed to insist on the inclusion in the final conference report the following motions proposed thereto: **Pages S2312–26**

Adopted:

Paul Motion to Instruct Conferees to insist that the final conference report include the provisions contained in section 6107 of the Senate amendment (relating to prohibiting funds made available to any Federal agency from being used for gain-of-function research conducted in China). **Page S2312**

By 53 yeas to 44 nays (Vote No. 148), Barrasso Motion to Instruct Conferees to insist that the final conference report include provisions that require immediate development of a 2022–2027 Federal oil and gas leasing program on the outer Continental Shelf, which shall be finalized not later than June 30, 2022, and which shall provide for a minimum of 10 region-wide oil and gas lease sales in the Gulf of Mexico and Alaska Regions of the outer Continental Shelf, with a minimum of 2 oil and gas lease sales per calendar year, not fewer than 1 of which shall be in the Gulf of Mexico Region each calendar year. **Pages S2312–13**

By 86 yeas to 12 nays (Vote No. 149), Cruz Motion to Instruct Conferees to insist that the final conference report include section 3258 of the Senate amendment, which requires a report identifying "major areas of diplomatic, energy, infrastructure, banking, financial, economic, military, and space cooperation . . . between the People's Republic of China and the Islamic Republic of Iran", regarding the policy of the United States to limit such cooperation through terrorism-related sanctions imposed on the Central Bank of Iran and the Islamic Revolutionary Guard Corps, as such sanctions are necessary to limit such cooperation. **Pages S2313–14**

Menendez Motion to Instruct Conferees to insist upon the provisions contained in section 73003 of the Senate amendment (relating to establishment of an Inspector General of the Office of the United States Trade Representative). **Page S2314**

Risch Motion to Instruct Conferees to insist that the final conference report include provisions that take actionable steps to address the risks of and counter malign or undue influence and activities in the United States and abroad by the Chinese Communist Party, the Government of the People's Republic of China, or individuals or entities acting on their behalf. **Page S2314**

Kelly Motion to Instruct Conferees to insist that the final conference report include incentives to support investments in semiconductor manufacturing and innovation in the United States, including investments in the fabrication, assembly, testing, advanced packaging, and research and development of semiconductors. **Page S2314**

Blackburn Motion to Instruct Conferees to insist that the final conference report include a provision that requires the Director of the Office of Management and Budget, in consultation with the Administrator of General Services, the Director of the National Institute of Standards and Technology, the Director of the Cybersecurity and Infrastructure Security Agency, the Director of National Intelligence, the Secretary of Defense, the Secretary of State, the Secretary of the Treasury, and the Chairman of the Board of Governors of the Federal Reserve System, and consistent with information security requirements designed to address any national security risks, to develop guidance for executive agencies requiring adequate security measures for any transfer, storage, or use of digital yuan on information technology. **Page S2315**

By 50 yeas to 44 nays (Vote No. 151), Cotton Motion to Instruct Conferees to insist upon rejecting the authorization of appropriations for contributions to the Green Climate Fund under section 30609(b)

of the text of the bill as engrossed by the House of Representatives and insisting upon including an authorization of appropriations of $8,000,000,000 within section 2118 of division A of the Senate amendment (relating to funding for the Defense Advanced Research Projects Agency) for Department of Defense research, development, production, and procurement of weapon systems needed to compete with China. **Pages S2315–16**

Murkowski Motion to Instruct Conferees to insist that the final conference report include the text of S. 140, 117th Congress, as reported to the Senate on December 17, 2021. **Page S2316**

Sullivan Motion to Instruct Conferees to insist that the final conference report include provisions that prohibit a renewable energy project receiving Federal financial assistance, a subsidy, or any other financing mechanism authorized under the final conference report, such as a grant or tax credit, from purchasing materials, technology, or critical minerals mined, produced, processed, or refined in the People's Republic of China or the Russian Federation. **Pages S2316–17**

Rubio Motion to Instruct Conferees to insist that the final conference report include a Federal Government-based counterintelligence review to certify recipients of grants, funding, awards, or other resources provided, and intellectual property developed, as a result of the conference report, have national security protections in place to prohibit misappropriation and theft of Federal resources. **Page S2317**

By 59 yeas to 33 nays (Vote No. 152), Johnson Motion to Instruct Conferees to reject any proposals to prohibit the possession, acquirement, receipt, transportation, sale, or purchase of mink raised in captivity in the United States for fur production. **Pages S2317–18**

Daines Motion to Instruct Conferees to reject provisions that weaken the energy security of the United States, prohibit the development of an all-of-the-above energy portfolio, or direct funds to foreign entities for international climate objectives. **Page S2319**

By 90 yeas to 5 nays (Vote No. 154), Hassan Motion to Instruct Conferees to insist that the final conference report include provisions that expand the research and development tax credit for small businesses and preserve full and immediate expensing for research and development investments. **Pages S2319–20**

Scott (FL) Motion to Instruct Conferees to insist that the final conference report include provisions that ensure that any taxpayer funds spent in the bill, including those provided to universities and private sector corporations, are subject to comprehensive return on investment analyses and claw back provisions, and corresponding timely reports on the use of such funds to Congress and the American public. **Page S2320**

Ernst Motion to Instruct Conferees to reject the provision as agreed to by the House of Representatives that would reauthorize the Small Business Innovation Research and Small Business Technology Transfer programs under section 9 of the Small Business Act (15 U.S.C. 638) without authorization to prevent the Russian Federation and the People's Republic of China from acquiring technology critical to national security developed through programs of the Small Business Administration and participating Federal agencies. **Pages S2320–21**

By 62 yeas to 33 nays (Vote No. 155), Lankford Motion to Instruct Conferees to insist that the final conference report include provisions requiring that any agreement negotiated by the United States with the Islamic Republic of Iran addressing Iran's development of nuclear weapons—(1) also includes provisions addressing the full range of Iran's destabilizing activities, including development of the means of delivery for such weapons (such as ballistic missiles), support for terrorism, and evasion of sanctions by individuals, entities, and vessels in the trade of petroleum products with the People's Republic of China; (2) does not lift sanctions on the Islamic Revolutionary Guard Corps; and (3) does not revoke the designation of the Islamic Revolutionary Guard Corps as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189). (Pursuant to the order of Wednesday, April 27, 2022, the amendment having achieved 60 affirmative votes, was agreed to.) **Page S2321**

Cassidy Motion to Instruct Conferees to insist that the final conference report include provisions that require the President to directly address troubling developments in Mexico's energy sector that intentionally cause harm to United States jobs and economic interests, business and investor interests, and climate goals through the use of consultations under the USMCA (as defined in section 3 of the United States-Mexico-Canada Agreement Implementation Act (19 U.S.C. 4502)). **Page S2323**

Warnock Motion to Instruct Conferees to insist that the final conference report include provisions that fully fund programs to build institutional research capacity at historically Black colleges or universities that are developing research institutions. **Page S2323**

By 49 yeas to 47 nays (Vote No. 157), Capito Motion to Instruct Conferees to insist that the final conference report include provisions that—(1) emphasize that, under current law, the President may not—(A) declare, on the basis of climate change—

(i) a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.); (ii) an emergency or major disaster under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.); or (iii) a public health emergency under section 319 of the Public Health Service Act (42 U.S.C. 247d); or (B) invoke, on the basis of climate change, the authorities of the Defense Production Act of 1950 (50 U.S.C. 4501 et seq.); and (2) provide that nothing in H.R. 4521 grants the President the authority to make a declaration or invocation described in paragraph (1). **Pages S2323–24**

By 53 yeas to 43 nays (Vote No. 158), Toomey Motion to Instruct Conferees to insist upon the provisions contained in section 73001 of the Senate amendment (relating to establishing a process for exclusion of articles from duties under section 301 of the Trade Act of 1974). **Pages S2324–25**

Luján Motion to Instruct Conferees to insist on provisions supporting the work of the Department of Energy, user facilities of the Department of Energy, and National Laboratories, including work in microelectronics and across the key technology focus areas (as defined in section 2002 of the amendment). **Page S2325**

Rejected:

By 48 yeas to 49 nays (Vote No. 150), Lee Motion to Instruct Conferees to insist that the final conference report not include the provisions contained in the following sections of the bill (as passed by the House of Representatives): (1) Section 30609 (relating to building United States economic growth and technological innovation through the Green Climate Fund). (2) Section 30607 (relating to addressing international climate change mitigation, adaptation, and security). (3) Section 30601(b)(7)(E) (relating to the sense of Congress on implementing the Paris Agreement). (4) Section 30610 (relating to ensuring a whole-of-government response to climate action). **Pages S2314–15**

By 6 yeas to 87 nays (Vote No. 153), Sanders Motion to Instruct Conferees to insist that the final conference report include provisions that require each beneficiary of Federal financial assistance for semiconductor manufacturing to be banned from purchasing the stock of the beneficiary, from outsourcing employment opportunities of the beneficiary to any country outside of the United States, and from repealing any collective bargaining requirements of the beneficiary, and that require each such beneficiary to issue warrants and equity stakes in the enterprise of the beneficiary to the Federal Government and to remain neutral in any union organizing effort of the employees of the beneficiary. **Pages S2318–19**

By 17 yeas to 78 nays (Vote No. 156), Sanders Motion to Instruct Conferees to recede from the provision contained in section 2614(c) of the Senate amendment (relating to contract redundancy and funding for the human landing system program of the National Aeronautics and Space Administration, which would likely go to Blue Origin). **Pages S2321–23**

By 47 yeas to 49 nays (Vote No. 159), Scott (SC) Motion to Instruct Conferees to insist that the final conference report include a requirement that any new legislation providing for new mandates on greenhouse gas emissions should not be enacted unless similar mandates are enacted in the People's Republic of China. **Pages S2325–26**

The Chair was authorized to appoint the following conferees on the part of the Senate: Senators Cantwell, Menendez, Wyden, Peters, Murray, Brown, Warner, Kelly, Warnock, Hickenlooper, Tester, Heinrich, Baldwin, Wicker, Crapo, Risch, Burr, Portman, Grassley, Shelby, Toomey, Barrasso, Capito, Cornyn, Young, and Moran, with instructions. **Page S2326**

**Huff Nomination—Agreement:** A unanimous-consent agreement was reached providing that at approximately 11 a.m., on Thursday, May 5, 2022, Senate begin consideration of the nomination of Kathryn Huff, of Illinois, to be an Assistant Secretary of Energy (Nuclear Energy), and vote on confirmation thereon at 1:45 p.m. **Page S2341**

**Nomination Confirmed:** Senate confirmed the following nomination:

James D. Rodriguez, of Texas, to be Assistant Secretary of Labor for Veterans' Employment and Training. **Page S2326**

**Measures Placed on the Calendar:** **Page S2326**

**Executive Communications:** **Pages S2329–35**

**Petitions and Memorials:** **Pages S2335–37**

**Executive Reports of Committees:** **Pages S2337–39**

**Additional Cosponsors:** **Pages S2339–40**

**Statements on Introduced Bills/Resolutions:** **Pages S2340–41**

**Additional Statements:** **Pages S2328–29**

**Authorities for Committees to Meet:** **Page S2341**

**Record Votes:** Twelve record votes were taken today. (Total—159) **Pages S2313–16, S2318–21, S2323–26**

**Adjournment:** Senate convened at 10 a.m. and adjourned at 10:13 p.m., until 11 a.m. on Thursday, May 5, 2022. (For Senate's program, see the remarks of the Acting Majority Leader in today's Record on page S2341.)

# *Committee Meetings*

*(Committees not listed did not meet)*

## APPROPRIATIONS: HHS

*Committee on Appropriations:* Subcommittee on Labor, Health and Human Services, and Education, and Related Agencies concluded a hearing to examine proposed budget estimates and justification for fiscal year 2023 for the Department of Health and Human Services, after receiving testimony from Xavier Becerra, Secretary of Health And Human Services.

## APPROPRIATIONS: DOE

*Committee on Appropriations:* Subcommittee on Energy and Water Development concluded a hearing to examine proposed budget estimates and justification for fiscal year 2023 for the Department of Energy, after receiving testimony from Jennifer M. Granholm, Secretary of Energy.

## APPROPRIATIONS: DHS

*Committee on Appropriations:* Subcommittee on Homeland Security concluded a hearing to examine proposed budget estimates and justification for fiscal year 2023 for the Department of Homeland Security, after receiving testimony from Alejandro N. Mayorkas, Secretary of Homeland Security.

## APPROPRIATIONS: USFS

*Committee on Appropriations:* Subcommittee on Interior, Environment, and Related Agencies concluded a hearing to examine proposed budget estimates and justification for fiscal year 2023 for the Forest Service, after receiving testimony from Randy Moore, Chief, Forest Service, Department of Agriculture.

## APPROPRIATIONS: VA

*Committee on Appropriations:* Subcommittee on Military Construction, Veterans Affairs, and Related Agencies concluded a hearing to examine proposed budget estimates and justification for fiscal year 2023 for the Department of Veterans Affairs, after receiving testimony from Denis McDonough, Secretary of Veterans Affairs.

## NUCLEAR WEAPONS COUNCIL

*Committee on Armed Services:* Subcommittee on Strategic Forces concluded a hearing to examine the Nuclear Weapons Council, after receiving testimony from Jill Hruby, Administrator, National Nuclear Security Administration, Department of Energy, Heidi Shyu, Under Secretary of Defense for Research and Engineering, William LaPlante, Chairman, John Plumb, Assistant Secretary of Defense for Space Policy, Admiral Christopher Grady, Vice Chairman, Joint Chiefs of Staff, and Admiral Charles Richard, Commander, United States Strategic Command, all of the Nuclear Weapons Council.

## OVERDRAFT FEES

*Committee on Banking, Housing, and Urban Affairs:* Subcommittee on Financial Institutions and Consumer Protection concluded a hearing to examine overdraft fees and their effects on working families, including S. 2677, to amend the Truth in Lending Act to limit overdraft fees and establish fair and transparent practices related to the marketing and provision of overdraft coverage programs at depository institutions, after receiving testimony from Aaron Klein, Brookings Institution, and David Pommerehn, Consumer Bankers Association, both of Washington, D.C.; and Jason Wilk, Dave, Los Angeles, California.

## BUSINESS MEETING

*Committee on Banking, Housing, and Urban Affairs:* Committee ordered favorably reported the nominations of Ventris C. Gibson, of Virginia, to be Director of the Mint, and Paul M. Rosen, of California, to be Assistant Secretary for Investment Security, both of the Department of the Treasury.

## BUSINESS MEETING

*Committee on Environment and Public Works:* Committee ordered favorably reported the following business items:

An original bill entitled, ''Water Resources Development Act'';

6 General Services Administration resolutions; and

The nomination of Benny R. Wagner, of Tennessee, to be Inspector General of the Tennessee Valley Authority.

## POLITICAL ACTIVITIES OF TAX EXEMPT ENTITIES

*Committee on Finance:* Subcommittee on Taxation and IRS Oversight concluded a hearing to examine laws and enforcement governing the political activities of tax exempt entities, after receiving testimony from Philip Hackney, University of Pittsburgh School of Law, Pittsburgh, Pennsylvania; Bradley A. Smith, Institute for Free Speech, and Scott Walter, Capital Research Center, both of Washington, D.C.; and Ann Ravel, former Chair of the Federal Election Commission, Los Gatos, California.

## BUSINESS MEETING

*Committee on Foreign Relations:* Committee ordered favorably reported the following business items:

Amendments to the Treaty on Fisheries between the Governments of Certain Pacific Island States and the Government of the United States of America (Treaty Doc.115–3);

Agreement between the Government of the United States of America and the Government of the Republic of Croatia comprising the instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union, signed June 25, 2003, as to the Application of the Treaty on Extradition signed on October 25, 1901 (the ''U.S.-Croatia Extradition Agreement''), and the Agreement between the Government of the United States and the Government of the Republic of Croatia comprising the Instrument as contemplated by Article 3(3) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed at Washington on June 25, 2003 (the ''U.S.-Croatia Mutual Legal Assistance Agreement''), both signed at Washington on December 10, 2019 (Treaty Doc.116–2);

Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer (the ''Montreal Protocol''), adopted at Kigali on October 15, 2016, by the Twenty-Eighth Meeting of the Parties to the Montreal Protocol (the ''Kigali Amendment'') (Treaty Doc.117–1); and

The nominations of John N. Nkengasong, of Georgia, to be Ambassador at Large, Coordinator of United States Government Activities to Combat HIV/AIDS Globally, Marc B. Nathanson, of California, to be Ambassador to the Kingdom of Norway, MaryKay Loss Carlson, of Arkansas, to be Ambassador to the Republic of the Philippines, Philip S. Goldberg, of the District of Columbia, to be Ambassador to the Republic of Korea, and Caroline Kennedy, of New York, to be Ambassador to the Commonwealth of Australia, all of the Department of State.

## NOMINATIONS

*Committee on Foreign Relations:* Committee concluded a hearing to examine the nominations of Jane Hartley, of New York, to be Ambassador to the United Kingdom of Great Britain and Northern Ireland, and Constance J. Milstein, of New York, to be Ambassador to the Republic of Malta, who were both introduced by Senator Schumer, Alan M. Leventhal, of Massachusetts, to be Ambassador to the Kingdom of Denmark, who was introduced by Senator Markey, and Bruce I. Turner, of Colorado, for the rank of Ambassador during his tenure of service as U.S. Representative to the Conference on Disarmament, all of the Department of State, after the nominees testified and answered questions in their own behalf.

## DEPARTMENT OF HOMELAND SECURITY BUDGET

*Committee on Homeland Security and Governmental Affairs:* Committee concluded a hearing to examine the President's proposed budget request for fiscal year 2023 for the Department of Homeland Security, after receiving testimony from Alejandro N. Mayorkas, Secretary of Homeland Security.

## INFRASTRUCTURE INVESTMENT AND JOBS ACT

*Committee on Indian Affairs:* Committee concluded an oversight hearing to examine implementing the Infrastructure Investment and Jobs Act for Native communities, focusing on setting new foundations, after receiving testimony from Wizipan Garriott, Principal Deputy Assistant Secretary of the Interior for Indian Affairs; Elizabeth A. Fowler, Acting Director, and Rear Admiral Mark Calkins, Public Health Service, Assistant Surgeon General, Director, Division of Sanitation Facilities Construction, both of the Indian Health Service, Department of Health and Human Services; Timothy Hess, Associate Administrator, Office of Federal Lands Highway, Federal Highway Administration, Department of Transportation; Adam Geisler, Division Chief, Tribal Connectivity and Nation To Nation Coordination Division, Office of Internet Connectivity and Growth, National Telecommunications and Information Administration, Department of Commerce; Mark Mitchell, All Pueblo Council of Governors, Albuquerque, New Mexico; Harold C. Frazier, Great Plains Tribal Chairmen's Association, and Dakota Longbrake, Tribal Transportation Program Coordinating Committee, both of the Cheyenne River Sioux Tribe, Eagle Butte, South Dakota; Garret T. Yoshimi, University of Hawai'i System, Honolulu; and Nicole Borromeo, Alaska Federation of Natives, Anchorage.

## SWIPE FEES

*Committee on the Judiciary:* Committee concluded a hearing to examine excessive swipe fees and barriers to competition in the credit and debit card systems, after receiving testimony from Doug Kantor, National Association of Convenience Stores, Alexandria, Virginia; Laura Karet, Giant Eagle, Inc., Pittsburgh, Pennsylvania; Charles G. Kim, Commerce Bancshares, Kansas City, Missouri; Linda Kirkpatrick, Mastercard International Incorporated, Purchase, New York, New York; Ed Mierzwinski, U.S. PIRG, Washington, D.C.; and Bill Sheedy, Visa Inc., San Francisco, California.

## SOCIAL MEDIA

*Committee on the Judiciary:* Subcommittee on Privacy, Technology, and the Law concluded a hearing to examine platform transparency, focusing on understanding the impact of social media, after receiving testimony from Brandon Silverman, CrowdTangle, Oakland, California; Nathaniel Persily, and Daphne

Keller, both of Stanford University Cyber Policy Center, Stanford, California; Jim Harper, American Enterprise Institute, Washington, D.C.; and Jonathan Haidt, New York University Stern School of Business, New York, New York.

### BUSINESS MEETING

*Committee on Veterans' Affairs:* Committee ordered favorably reported the nomination of Shereef M. Elnahal, of New Jersey, to be Under Secretary for Health of the Department of Veterans Affairs.

### INTELLIGENCE

*Select Committee on Intelligence:* Committee held closed hearings on intelligence matters, receiving testimony from officials of the intelligence community.

Committee recessed subject to the call.

# House of Representatives

## *Chamber Action*

The House was not in session today. The House is scheduled to meet at 10 a.m. on Friday, May 6, 2022.

## *Committee Meetings*

No hearings were held.

## *Joint Meetings*

### WAR CRIMES IN UKRAINE

*Commission on Security and Cooperation in Europe:* Commission concluded a hearing to examine Russian war crimes in Ukraine, after receiving testimony from Beth Van Schaack, Ambassador at Large for Global Criminal Justice, Department of State; Iryna Venediktova, Ukraine Prosecutor General; Wolfgang Benedek, University of Graz; Marco Sassoli, University of Geneva; Veronika Bílkova, Charles University; and Timothy Snyder, Yale University.

### COMMITTEE MEETINGS FOR THURSDAY, MAY 5, 2022

*(Committee meetings are open unless otherwise indicated)*

#### Senate

*Committee on Armed Services:* to hold hearings to examine the posture of the Department of the Army in review of the Defense Authorization Request for fiscal year 2023 and the Future Years Defense Program; to be immediately followed by a closed session in SVC–217, 9:30 a.m., SD–G50.

*Committee on Banking, Housing, and Urban Affairs:* to hold hearings to examine student loan servicers and their impact on workers, 10 a.m., SD–538.

*Committee on the Budget:* to hold hearings to examine whether taxpayer dollars should go to companies that violate labor laws, 11 a.m., SD–608.

*Committee on Commerce, Science, and Transportation:* Subcommittee on Consumer Protection, Product Safety, and Data Security, to hold hearings to examine ensuring fairness and transparency in the market for prescription drugs, 10 a.m., SR–253.

*Committee on Energy and Natural Resources:* to hold hearings to examine the President's proposed budget request for fiscal year 2023 for the Department of Energy, 10 a.m., SD–366.

*Committee on Homeland Security and Governmental Affairs:* to hold hearings to examine securing and ensuring order on the southwest border, 10:15 a.m., SD–106.

*Committee on the Judiciary:* business meeting to consider S. 977, to amend the Sherman Act to make oil-producing and exporting cartels illegal, S. 3846, to reauthorize the Justice and Mental Health Collaboration Program, and the nomination of S. Lane Tucker, to be United States Attorney for the District of Alaska, Department of Justice, 9 a.m., SH–216.

#### House

No hearings are scheduled.

*Next Meeting of the* SENATE

**11 a.m., Thursday, May 5**

**Senate Chamber**

**Program for Thursday:** Senate will begin consideration of the nomination of Kathryn Huff, of Illinois, to be an Assistant Secretary of Energy (Nuclear Energy), and vote on confirmation thereon at 1:45 p.m.

*Next Meeting of the* HOUSE OF REPRESENTATIVES

**10 a.m., Friday, May 6**

**House Chamber**

**Program for Friday:** House will meet in Pro Forma session at 10 a.m.

Congressional Record

The *Congressional Record* (USPS 087–390). The Periodicals postage is paid at Washington, D.C. The public proceedings of each House of Congress, as reported by the Official Reporters thereof, are printed pursuant to directions of the Joint Committee on Printing as authorized by appropriate provisions of Title 44, United States Code, and published for each day that one or both Houses are in session, excepting very infrequent instances when two or more unusually small consecutive issues are printed one time. ¶Public access to the *Congressional Record* is available online through the U.S. Government Publishing Office, at *www.govinfo.gov*, free of charge to the user. The information is updated online each day the *Congressional Record* is published. For more information, contact the GPO Customer Contact Center, U.S. Government Publishing Office. Phone 202–512–1800, or 866–512–1800 (toll-free). E-Mail, *contactcenter@gpo.gov*. ¶To place an order for any of these products, visit the U.S. Government Online Bookstore at: bookstore.gpo.gov. Mail orders to: Superintendent of Documents, P.O. Box 979050, St. Louis, MO 63197–9000, or phone orders to 866–512–1800 (toll-free), 202–512–1800 (D.C. area), or fax to 202–512–2104. Remit check or money order, made payable to the Superintendent of Documents, or use VISA, MasterCard, Discover, American Express, or GPO Deposit Account. ¶Following each session of Congress, the daily *Congressional Record* is revised, printed, permanently bound and sold by the Superintendent of Documents in individual parts or by sets. ¶With the exception of copyrighted articles, there are no restrictions on the republication of material from the *Congressional Record*.

**POSTMASTER:** Send address changes to the Superintendent of Documents, *Congressional Record*, U.S. Government Publishing Office, Washington, D.C. 20402, along with the entire mailing label from the last issue received.

# EXHIBIT 3

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

United States of America

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 117th CONGRESS, SECOND SESSION

Vol. 168 WASHINGTON, THURSDAY, JULY 21, 2022 No. 121

# Senate

The Senate met at 10 a.m. and was called to order by the Honorable JACKY ROSEN, a Senator from the State of Nevada.

## PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Almighty God, we would rest in You, for You alone can bring order to our world.

Reveal Yourself to our Senators, guiding them on the path of peace. May they place behind them disappointed hopes as they lean on You for comfort and strength. Lord, replace their doubts with faith. Strengthen the good in them so that nothing may hinder the outflow of Your power in their lives. Give might to the weak, and renew the strength of the strong.

Lord, we thank You for Your great power as we praise You in Your mighty Name. Amen.

## PLEDGE OF ALLEGIANCE

The Presiding Officer led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mr. LEAHY).

The senior assistant legislative clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, July 21, 2022.*

*To the Senate:*

Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable JACKY ROSEN, a Senator from the State of Nevada, to perform the duties of the Chair.

PATRICK J. LEAHY,
*President pro tempore.*

Ms. ROSEN thereupon assumed the Chair as Acting President pro tempore.

## RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

## CONCLUSION OF MORNING BUSINESS

The ACTING PRESIDENT pro tempore. Morning business is closed.

## LEGISLATIVE SESSION

## CHIPS ACT OF 2022—Resumed

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of the House message to accompany H.R. 4346, which the clerk will report.

The senior assistant legislative clerk read as follows:

House message to accompany H.R. 4346, a bill making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes.

Pending:

Schumer motion to concur in the amendment of the House to the amendment of the Senate to the bill, with Schumer Amendment No. 5135 (to the House amendment to the Senate amendment), relating to the CHIPS Act of 2022.

Schumer Amendment No. 5136 (to Amendment No. 5135), to add an effective date.

Schumer motion to refer the bill to the Committee on Commerce, Science, and Transportation, with instructions, Schumer Amendment No. 5137, to add an effective date.

Schumer Amendment No. 5138 (to (the instructions) Amendment No. 5137), to modify the effective date.

### RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The Democratic leader is recognized.

### CANNABIS ADMINISTRATION AND OPPORTUNITY ACT

Mr. SCHUMER. Madam President, over the last few decades, Americans' views on cannabis legalization have dramatically, dramatically changed. Twenty years ago, less than a third of Americans believed that cannabis should be made legal. Today, that share is nearly 70 percent of the population, the highest level of support ever.

We can see this shift playing out in the States. Nearly 90 percent of Americans live in a State that has legalized cannabis for either medical or adult recreational use. New York legalized cannabis in 2021. And even voters in deep-red South Dakota voted to legalize it for adult recreational use.

Cannabis legalization has proven immensely successful at the State level so it is time that Congress catches up with the rest of the country.

Last year, Senators WYDEN, BOOKER, and I released a discussion draft of the Cannabis Administration and Opportunity Act. After receiving more than 1,800 public comments and working with numerous Senate committees to improve the bill, today we are introducing this historic legislation.

I am proud to be the first majority leader ever to say that it is time to end the Federal prohibition on cannabis, and this bill provides the best framework for updating our cannabis laws and reversing decades of harm inflicted by the War on Drugs.

I have had many productive conversations with my Republican and Democratic colleagues about cannabis reform, and I look forward to working with Members from both sides of the aisle to secure support for this bill.

Our bill will legalize cannabis by removing it from the Controlled Substances Act, empowering States to create their own cannabis laws instead. It

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

will establish a robust regulatory system to protect public health and ensure that cannabis is as safe as possible. It includes rules to prevent impaired driving, prevent youth access, and prevent illegal diversion. We also robustly fund a variety of research programs to make up for lost time when it comes to cannabis research.

So important, our bill will also expunge the Federal criminal records of people with convictions for nonviolent cannabis offenses and allow those in Federal prison for nonviolent cannabis offenses to appeal their sentences.

It is a tragedy—tragedy—that far too many Americans, particularly Black and Hispanic Americans, have permanent blocks on their record, making it nearly impossible to move forward with their lives just because they were arrested with a little marijuana in their pocket. How unfair and what a waste of human resources.

Our bill will also establish an Opportunity Trust Fund to reinvest in communities that have been devastated by the War on Drugs. And it will create opportunities for entrepreneurs and small businesses to legitimately pursue new opportunities in the growing cannabis industry.

And, of course, underlying it all, this bill is about individual freedom and basic fairness. The fact that cannabis remains a schedule I controlled substance—in the same bad company of other drugs like heroin—is not just senseless; it is deeply harmful for countless Americans—again, almost always people of color—and it impinges on the freedom of all of us. If this is working in all the States, why not let people use it?

We need to change that. We need to change the lack of freedom and fairness. We need to create opportunities for entrepreneurs to legitimately pursue new opportunities, and comprehensive Federal cannabis legislation is critical to reaching that goal.

I want to extend my deep appreciation to Senators BOOKER and WYDEN as well as all of my colleagues who have worked with us on this important and long-overdue change. I want to thank Senators MURRAY and Senator PETERS and all the chairs of the more than 10 Senate committees who worked with us over the past several years to significantly improve the bill from the discussion draft we released last year. This bill would not be possible without the hard work of them and their staffs.

I want to stress that this is the beginning of the legislative process, not the end. We are going to work hard to create support for our bill, and I hope we can make more progress toward cannabis reform in the future. I look forward to working with Democrats and Republicans to get something done this year.

H.R. 4346

Madam President, now on the chips bill, last night, I filed cloture on a major piece of legislation that will help lower costs, boost scientific innovation, and take direct aim at the national chips shortage, which is hurting almost every single American.

Members of both sides know that America's chips crisis is sending shock waves across the economy. It is endangering our national security. According to an article by Bloomberg, China's top chipsmaker has now likely advanced its tech by two generations, threatening U.S. competitiveness.

To ignore the chips crisis means higher costs, squandered job opportunities, and greater dependence on foreign chip producers. Thankfully, the Senate is close to finally taking action.

In the long run, our bipartisan chips bill will ease semiconductor supply chain woes, increase domestic inventory of chips, and thus help lower costs on all sorts of products that rely on chips to work.

But because the vote earlier this week was so bipartisan, I amended the bill to include one of the largest science packages the Senate has considered in a long time.

As you know, I was the original author of many of the provisions in the science section when I worked with Senator YOUNG on the Endless Frontier Act more than 2 years ago.

We will devote tens of billions of dollars to cultivate the next generation of tech hubs all across the country, especially in regions that have been overlooked. We will invest in new science jobs, and that will keep America No. 1. It has always been America's cutting-edge lead on innovation, in science and research, that has then created millions and millions of good-paying jobs and kept our economy prosperous. In the last decade, America seems to have forgotten that, and this bill revitalizes that goal and that dream.

These scientific investments are crucial not just for innovation and science jobs but for critical jobs that support these industries too.

I will keep working with my colleagues to get this bill done quickly. With 64 votes in favor of moving forward earlier this week, there is no reason to wait around.

The 21st century will be won or lost on the battleground of technological innovation. Let me say it again because that is a crucial sentence. The 21st century will be won or lost on the battleground of technological innovation.

Our country now faces a moment of truth: Will American workers, American tech, and American ingenuity shape the world over the next hundred years in the same way we have shaped it in the last hundred? Of course, I believe America will lead the way if this Chamber is willing to do what is necessary for our economic and national security.

PRESCRIPTION DRUG COSTS

Madam President, now on prescription drugs, later today, Senate Democrats and Republicans will meet with the Parliamentarian to start the so-called Byrd bath on legislation to bring down the cost of prescription drugs, cap out-of-pocket expenses, and make sure millions of Americans do not see their premiums go up in the coming months. This is an important step in the larger process of bringing a reconciliation bill to the floor that can win the support of all 50 Democratic Senators.

Ask any American on the street, and it is a guarantee that they will agree the price of prescription medications is one of the most frustrating and debilitating problems in our country.

It is a vicious pincer grip: On the one hand, Americans desperately need their medicines to stay healthy, live a normal life, and stay alive, in some cases, but on the other hand, that means many Americans have to pay an arm and a leg at the pharmacy just to stay healthy.

Meanwhile, as Americans pay exorbitant prices for basic medications, the Nation's largest pharmaceutical companies are feasting off record profits because they face little accountability for jacking up prices to consumers. This cannot continue.

Democrats are going to work in the weeks ahead on legislation that will empower Medicare to negotiate the price of prescription drugs for the first time ever. We will also cap out-of-pocket expenses at $2,000 a year. These changes will save Americans an incredible amount of money, and it is one of the best things we can do to lower costs for the American people.

Let me say again, lowering the cost of prescription drugs and capping out-of-pocket expenses is one of the very best things we can do to fight inflation and lower costs for the American people. So those who talk about inflation, support this bill.

So in the coming weeks, the question before the Senate will be simple: Who will take action in this Chamber to bring down the cost of prescription drugs and make sure premiums don't go up in the future, and who will defend the interests of Big Pharma that spikes the prices of scores of crucial drugs?

TUCKER CARLSON

Madam President, finally, on FOX News, earlier this week, FOX News anchor Tucker Carlson once again used his enormous platform on prime-time television to spread the malicious, dangerous, and racist conspiracy of ''replacement theory.'' It is far from the first time he has done so. But in light of the recent violence in Buffalo inspired by ''replacement theory,'' it is shocking and dangerous for Mr. Carlson to keep propagating this message.

I am deeply disappointed—frankly, outraged—that FOX News has taken no action to address the conduct of Mr. Carlson. It makes me sick to my stomach to think that Mr. Carlson has been given a free pass to amplify racist conspiracy theories to millions of Americans—theories that are eerily similar to those cited by Buffalo's horrible shooter.

There is only one way to describe what Mr. Carlson is doing: He is stoking racial resentment among his viewers with these vile and racist conspiracy theories. I urge FOX News to compel him to stop at once.

## MEASURES PLACED ON THE CALENDAR—H.R. 8404

Mr. SCHUMER. Madam President, I understand that there is a bill at the desk that is due for a second reading.

The ACTING PRESIDENT pro tempore. The Senator is correct.

The clerk will read the bill by title for the second time.

The senior assistant legislative clerk read as follows:

A bill (H.R. 8404) to repeal the Defense of Marriage Act and ensure respect for State regulation of marriage, and for other purposes.

Mr. SCHUMER. In order to place the bill on the calendar under the provisions of rule XIV, I would object to further proceeding.

The ACTING PRESIDENT pro tempore. Objection having been heard, the bill will be placed on the calendar.

Mr. SCHUMER. I yield the floor.

## CHIPS ACT OF 2022—Continued

Mr. SCHUMER. Madam President, I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. McCONNELL. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

### RECOGNITION OF THE MINORITY LEADER

The Republican leader is recognized.

### THE ECONOMY

Mr. McCONNELL. Madam President, Washington Democrats' one-party government has actually performed an amazing feat. In 18 months, they have taken an economy that was ready to soar and completely derailed it with $2 trillion in unnecessary borrowing, printing, and spending. Now, 9.1 percent inflation is pinching hard-working Americans every time they visit the gas pump or the grocery store.

The Biden administration has tried their hardest to find a silver lining amid the economic storm clouds they helped create. They have touted the strength of consumer spending to conclude our economy is strong. That is what they said. Well, of course, consumer spending has only gone up because the price of nearly everything has increased. A recent economic analysis shows the American people do spend more on gas, groceries, furniture, and clothes than we used to, but—listen to this—adjusted for inflation, they are actually consuming less—paying more, getting less.

Parents of school-age kids are some of the hardest hit. Four in ten say they won't go back-to-school shopping before the upcoming school year. One young mother in Nevada says she will ''pick out one or two shirts'' for her daughter ''and that's it.'' Inflation has made everything else too expensive.

Over in Arizona, inflation forces the average household to spend over $9,600 more a year compared to when President Biden took office. Many families simply don't have that much wiggle room in their budgets and are resorting to desperate measures simply to stay afloat.

One Phoenix area food bank has seen a 78-percent increase in visitors compared with just last year—78 percent more families who simply can't afford to live in this Democrat-run economy. A woman in line at the food bank said she had never needed to visit one before but ''the prices are way too high'' right now to support four children on her husband's salary.

Colorado families are facing the highest inflation costs in the Nation, in the whole country: nearly $10,900 in extra spending per year compared to the beginning of the Biden administration. Not surprisingly, Coloradans are falling behind on paying for daily necessities. One pawn shop owner in the State has noticed a marked increase in loan seekers at his business. For most of them, they just need ''30 bucks, 40 bucks'' to ''pay small bills, get gas, put groceries on the table.''

This is all happening in my home State of Kentucky as well. People are taking out loans, cutting back spending, and relying on charity just to cope with ever-increasing prices. But that hasn't stopped Washington Democrats from proposing new ways to wreck our economy. As we speak, they are batting around a new suite of tax hikes aimed squarely at the middle class. If Democrat-driven inflation hasn't pushed struggling families off the edge quite yet, the Democrat-driven recession certainly will finish the job.

So what is on the menu? New taxes on small businesses already struggling with inflation, new fees and regulations on American energy producers that will send prices even higher at the pump, new socialist price control schemes to stifle healthcare innovation.

Apparently, record inflation isn't enough to make Democrats realize their reckless economic agenda is a failure, an abject failure. Maybe tax-hike-induced stagflation will set them straight.

### UKRAINE

Madam President, now on another matter, I had the honor, along with others, of greeting the First Lady of Ukraine, Olena Zelenska, who greeted us here in the Capitol. Like my colleagues in the room, I was moved by her blunt, plaintive remarks to Congress. As her country endures the fifth month of a brutal Russian siege, Ms. Zelenska was candid about the pain and suffering Russia's unprovoked war of aggression was causing her homeland. She said: ''Russia is destroying our people.''

The First Lady conveyed the incredible determination of the Ukrainian people and echoed their simple request for the tools to fight their own fight—''Weapons,'' she said, ''to protect one's home and the right to wake up alive in that home.''

I hope the First Lady's visit helped steel our colleagues' resolve as friends of Ukraine. Russia's invasion has already reminded the West that revisionist aggressors cannot be appeased. And Ukraine's brave resistance, equipped with the arsenal of the free world, is a further reminder that this is a fight they intend to win.

The Senate should be proud of our work over the past several months to get more lethal capabilities into Ukrainian hands. But at every step of the way, the Biden administration has been a bit slow to green light the game-changing weapons Ukraine's frontline defenders actually need.

I urged the President for more than a year to take specific actions to deter Russian aggression against Ukraine—actually, before it escalated. Last June, I urged him to deliver lethal capabilities to Ukraine and other states in Vladimir Putin's crosshairs. Instead, the administration slow-walked security assistance for months.

In December, I called for U.S. military reinforcements along NATO's eastern flank, but the President waited until February to deploy forces—too late to deter Putin's aggression. And even after Russia had launched its unlawful invasion, the President has repeatedly deterred himself from providing Ukraine the capabilities it needs.

With nearly every weapons system requested by Ukraine, the cycle in Washington plays out like this: first, hesitation and concern; then, excuses that Ukraine couldn't effectively use the proposed weapons or objections that providing them would escalate the conflict; then—then—grudging willingness to transfer the weapons; and finally, with weapons in Ukrainian hands, self-congratulations from the Biden administration that they are having a positive impact on the battlefield. It is exhausting to watch this decision-making cycle repeat itself from Kentucky. It must be exacerbating to watch it from Kyiv.

The need for advanced, longer-range weapons to turn back Russia's aggression is painfully obvious. Air defense capabilities to combat Russia's continuing long-range strikes against civilian populations across Ukraine, anti-ship weapons to combat the Russia Black Sea blockade and the humanitarian food crisis it is causing worldwide, and more capable, longer-range artillery to pound Russian positions in occupied Ukraine from relative safety—this will help offset any numerical advantage Russia has achieved by pumping so much more combat power into its invasion force.

So here it is. Putin cannot be allowed to believe he can just wait for the West to become complacent. It would do a moral disservice to the brave Ukrainians fighting every single day for their country. But this is not just about Ukraine's security. If Russia achieves its objective in Ukraine, it will imperil our own security. And if we waiver—if we waiver—on Ukraine, it would certainly send an unmistakable signal of weakness to Beijing, which is watching the conflict in Ukraine very closely.

For their part, so are our friends and allies in China's backyard. As Japan's Prime Minister put it back in May: ''Ukraine might be East Asia tomorrow.''

Russia's brutal war has cost the people of Ukraine their homes, their safety, and their lives. But it has also reawakened the West to the reality of long-term deterrence and competition.

It has led modern partners like Sweden and Finland to cast their lot with the greatest military alliance in the history of the world. And it has prompted current treaty allies to shake off years of neglect for their own defense capabilities. All of this will result in greater burden-sharing, interoperability, military capability, and collective security for the NATO alliance.

The United States cannot afford to neglect this lesson ourselves. As the leader of the free world and the No. 1 target of revisionist adversaries like China and Russia, we have to take seriously our obligation to maintain America's military superiority.

We need to act quickly and pass a defense authorization bill that restores our readiness, grows our stockpiles of critical munitions, reinforces our position along NATO's eastern flank, and lays the foundations for a new era of credible deterrence in Asia by modernizing and equipping our military for real competition with China.

I hope the Democratic leader will let the Senate take action on this critical legislation without further delay.

The ACTING PRESIDENT pro tempore. The majority whip.

HIGHLAND PARK SHOOTING

Mr. DURBIN. Madam President, we have a great number of holidays each year in America. But is there a more perfect holiday than the Fourth of July? We celebrate the birth of our Nation. We gather with our families for picnics, a trip to the beach, backyard barbecues, take in a baseball game, and go to a parade. It is just the ultimate American celebration. We relax, pull out our American flags, gather our kids, and thank God that we are born in this great Nation and can call it home.

But this last Fourth of July became a different scene in one part of my home State of Illinois. It was the first time in years that the people of Highland Park were able to gather together publicly. So there was a special celebration as they gathered at 10 in the morning for the Fourth of July parade.

Oh, in addition to the usual suspects at these parades, political candidates, there were a lot of groups just there in pure celebration: high school bands, gatherings of veterans, all sorts of groups in a wonderful, wonderful suburban town in the Chicagoland area of Highland Park.

Yesterday, we held a hearing in the Senate Judiciary Committee about the day of the July Fourth parade in Highland Park. I wish we didn't have to hold that hearing. I would rather it would have been some other subject, some other place. But it was the 10th hearing during this Congress—the 10th time—that we had held a hearing in the Judiciary Committee on gun violence—gun violence, the No. 1 cause of death of children in America. Let me repeat that: gun violence, the No. 1 cause of death among children in America.

Yesterday, we focused on Highland Park and the Fourth of July parade, and we focused on the obvious mass shooting incident that took place. And we focused on military-style assault weapons.

The Fourth of July shooting in Highland Park, IL, was the 309th mass shooting in America this year. What is a mass shooting? When four people are either injured or killed—309 times it had happened before July the Fourth.

By the time of yesterday's hearing, 16 days after the Fourth of July, that number of 309 had grown by 47 mass shootings since the Fourth of July in America—16 days, 47 more mass shootings.

Where else on Earth is this taking place? Nowhere. Right here in the United States of America is the only place on Earth where mass shootings are happening on such a frequent basis.

In many of the deadliest shootings, the attacker used an assault weapon, a combat weapon—a gun specifically designed to kill the maximum number of people in just a few seconds; the same weapon we saw in Uvalde, TX, where the kids in their classrooms were killed; the same weapon we saw in the supermarket in Buffalo, NY, when early morning shoppers on a Saturday were killed; and, sadly, the same weapon that was used in Highland Park.

During the Fourth of July parade in Highland Park, a deranged gunman perched himself on a rooftop, using a Smith & Wesson assault rifle, killing seven people and wounding dozens more. He shot 83 rounds in less than a minute. Let me say that again: 83 rounds in less than a minute.

This is Aiden McCarthy. Aiden is 2 years old. His mom and dad, Kevin and Irina McCarthy, took him to the Fourth of July parade in Highland Park. I first heard about him just an hour or 2 after this terrible incident. I called my friend Nancy Rotering, who is the mayor of Highland Park, and asked her: Tell me, what can I do?

She said: I don't know. Things are happening so fast. We actually found a 2-year-old toddler who was wandering on the street by himself. We don't know who he belongs to. His picture is being circulated in the community.

The conclusion was fairly obvious. Whoever brought him to that parade was not able to look for him and care for him. And the story eventually unfolded. Kevin and Irina McCarthy brought Aiden to the parade—his first parade. And then when the shooting started, they shielded him with their bodies. In a matter of minutes, Aiden lost both of his parents. Fortunately, a grandparent was located, and Aiden is in safe hands today.

But because of this assault weapon being fired on the crowd, he lost his mom and dad. That is the reality when a parent has to shield a child like this from a mass shooting.

Nancy Rotering, as I mentioned earlier, is mayor of Highland Park. She testified yesterday about the parade. She told us that when the shooting started, she thought the sound of bullets was actually a drum cadence from the local marching band. That is how fast the bullets were being fired.

When she realized there was an active shooter, she began evacuating the crowd. She said the adults she confronted stared back at her. They didn't understand what she was saying. But the children, the teenagers, they understood. This was a shooter; this wasn't a drill.

Did you hear that? The children and the teens at the Highland Park parade instinctively knew what was happening because they had been trained in their schools to deal with mass shootings. That is how common these mass shootings have become.

I grew up in a different era, Cold War era, where it was duck and cover under your desk for fear of a nuclear attack—an attack by the Soviet Union. These kids—our kids, our grandkids—are being schooled not just in the ABCs, but they are being schooled in survival, so that if a shooter shows up in a classroom, they know what to do to try to survive.

Mayor Rotering told the Judiciary Committee:

> Our children are expected to return to school in [about] a month. . . . They are frightened to go back. . . . They are frightened to play outside. Many never want to go to . . . parade[s] again. For the rest of their lives, they will look over their shoulders, ready for another active shooter, thanks to the drills our society has normalized [in our classrooms].

She continued:

> Playing outside is normal. Back to school is normal. Fear of a shooter is not normal; but now in Highland Park [Illinois] and so many other American communities, it is [the new normal].

It can't be said enough that mass shootings with assault weapons are a unique American phenomenon. They are devastating—so devastating.

I want to show you another picture with Aiden McCarthy. This is Cooper Roberts, 8 years old. Cooper and his twin brother Luke went to the parade with their mom and dad. And in the

course of the shooting, he was shot, taken to the hospital immediately. He has gone through at least seven or eight surgeries now, touch and go for many days as to whether he would live. And, sadly, in addition to the damage that was done to his body, his spinal cord was severed by this same bullet.

You see, when you fire an assault weapon at a human body, it hits that body at three times the ordinary velocity of any other firearm. It is so powerful that it was originally designed by the U.S. Army to achieve a single goal described to us in the committee yesterday. That goal was to be able to shoot one of these AR–15s and pierce a metal helmet worn by a soldier 500 yards away—five football fields—the AR–15. It is not another firearm. It is a killing weapon. And, unfortunately, Cooper Roberts was in the line of fire. We pray that he recovers.

His mom and dad have kept us posted, all of us posted, as to his progress. But if you think about the devastation that an AR–15 combat weapon assault rifle can do to a human body, imagine what it did to this poor little boy's body. That is the reality of the issue we are discussing.

Many gun manufacturers, like Smith & Wesson, Mossberg, Bushmaster, and Daniel Defense have launched ad campaigns marketing their assault weapons like they are fashion accessories.

Let me show you a few of them. This is from Mossberg:

> Engineered to the specs of freedom and independence, stand and salute the tactical rifle. We are America's oldest family-owned firearms manufacturer, building dependable, hard-working rifles and shotguns since 1919. American built, American strong. Arm yourself with a Mossberg.

That is the type of weapon that shot Cooper Roberts, that killed the parents of Aiden McCarthy. How is it being marketed? A symbol of independence and freedom.

Some of these other ads—want proof of your manhood? ''Consider your Man Card reissued,'' says Bushmaster with their AR–15.

I want to make sure, as we said at the hearing yesterday, that these weapons are properly characterized. I will tell you how I characterize them. The manufacturers of these weapons should be ashamed of what is happening across America. To suggest that this typifies the values of this country is just plain wrong and offensive. It is time for us to name and shame these companies. It is time to hold them accountable for the devastation they made possible. How many AR–15s are there in America? We don't really know. The best estimate is 20 million—20 million.

I want to dispel a common talking point we hear from the other side of the aisle. We heard it yesterday. They claim our communities don't need new gun safety laws; all they need are good guys with guns. I wish it were that simple. It is not.

In one survey of 433 active shooter attacks, how many were stopped by a good guy with a gun? Twenty-two out of four hundred and thirty-three—about 5 percent. Half of those 22 were security guards and trained law enforcement who were there present on the scene and off duty.

The sad reality is, when the police come on the scene and someone is holding a gun, they don't know if it is a perpetrator, a danger, or somebody on their side. In many instances, they shoot the wrong person, making a split-second decision in seeing a person holding a gun.

So this notion that we are going to come to the rescue of one another and stop mass shootings is not a reality. Five percent of active shooter attacks were stopped by a good guy with a gun—5 percent. Imagine buying a car and being told there is only a 5-percent chance that the airbag will go off if you need it in a crash? You wouldn't take that car out of the dealership, and for good reason.

We heard testimony yesterday from RAND Corporation firearms expert Dr. Kyleanne Hunter. She told us that assault weapons make mass shootings significantly more lethal.

The evidence is clear. It is time for us to have a national conversation about America and mass shooting.

Let me say that the manufacturers shouldn't get off the hook. They aren't just selling you a product.

Let me show you one other thing that is particularly outrageous. Sadly, this is in my home State of Illinois. It is a JR–15. It is designed to look like the AR–15, the combat weapon assault rifle. It is lighter, so it can be carried by a kid. Here are the symbols of this JR–15. They are skulls, skulls of children. Each one of them has a pacifier in his mouth. It isn't just on this poster, on this ad; it is emblazoned on the gun itself. This is a kid's assault weapon. Think about that for a second. In America, we have reached a point where that is even thought of in light of the killing that has taken place.

The hearing yesterday showed an outpouring of people from Highland Park in numbers I never expected. I believe there were 100 people there who, on their own dime, came out to Washington to make sure all of us in Congress knew what happened in Highland Park, how that village and their lives were changed on the Fourth of July. What are we going to do about it—shrug our shoulders and wait for tomorrow's mass shooting? Sadly, we can expect one to come.

I listen to the defenses, but, frankly, I can't understand people trying to defend the right to own an assault rifle in America.

One Senator argued: Well, it is just an inanimate object, you know. Don't blame the object for the results.

I wonder if he feels the same way about a grenade launcher. Should people have the right to own grenade launchers? I hope we can all agree that is an incredible thought. Why doesn't this weapon fall into a similar category, a combat, Army assault weapon that is being used by individuals to kill so many innocent people in this country—kill them at a concert in Las Vegas, at schools in Connecticut, at schools in Texas, at Fourth of July parades in my home State.

Last month, we did come together—and I want to salute Senator MURPHY, who is on the floor—to pass a bill that was the most important gun safety law we considered in three decades. I voted for it. It didn't address this issue at all except in the background checks for those under 21. And I am glad it did, but it didn't address the issue of whether these guns should even be in America at this point, legal in America. That, I think, is the critical threshold issue.

Incidentally, this shooter, who seemed to have a pretty ill-fated life from the start, managed to buy high-capacity magazines so that he could clip in quickly 30 rounds here, 30 rounds there, and fire off 83 times. Why in the world does anyone need a high-capacity clip magazine? I don't understand it. It doesn't have any practical value for sport or hunting.

We need to address the widespread, serious problem of civilian access to military assault weapons, even for shooters as young as 18.

I thank the people from Highland Park for coming yesterday and all the brave law enforcement and first responders whom I saw gather that evening when I arrived at Highland Park. We owe them a lot. They are doing an amazing job, and we should pay tribute to them and what they did. But even they, being present and armed, could not stop this from happening. They were up against a mighty weapon—a weapon we trust for the military, we trust for the police; a weapon which has no place in the hands of people like the shooter in Highland Park on the Fourth of July.

Are we going to continue this American tradition of mass shootings? Sadly, we will unless this body, this Senate, decides that it is worth the fight, worth the political debate. After Highland Park, count me in. I want to be on the record saying it is time to put an end to these assault rifles, these weapons of war which have sadly taken so many innocent lives like poor Aiden McCarthy's parents and five others who died in Highland Park.

I hope for our children's sake that we don't run away from this problem. The people in Highland Park had to run away from the Fourth of July parade, and now they are counting on us to stand up and face it squarely.

I yield the floor.

The PRESIDING OFFICER (Mr. BOOKER). The Senator from Tennessee.

### BIDEN ADMINISTRATION

Mrs. BLACKBURN. Mr. President, America is facing a perfect storm of inflation, unsustainable energy costs, and supply chain chaos. Russia and Iran are circling the wagons.

Joe Biden is still finding new ways to put the American people last. In fact,

when it comes to getting gas prices under control, he has chosen to unleash a China-first policy rather than unleashing the power of American energy.

I have spent the past 18 months laying out in great detail how Joe Biden and the Democrats have damaged our credibility and enriched our adversaries. They undermined our economic recovery. They abandoned the border. They destroyed American energy independence. The list goes on and on, unfortunately. It appears that everything they have done makes life worse for ''we the people.''

Unfortunately, it is emboldening the axis of evil—Russia, China, Iran, North Korea. Under normal circumstances, Vladimir Putin's trip to Iran this week would be a cause for concern, but with the Biden administration in charge, it appears it could be just the tip of the iceberg because although Russia and Iran are competitors, especially in the energy sector, they are absolutely united in their hatred of the United States and in their desire to undermine Western interests.

When they look at the United States, they see a country whose President got a head start undermining those interests on day 1 of his administration, and you better believe they are ready to take advantage of this. They are ready for it. This week, look at what they have done. You had Gazprom, which is the Russian energy giant, and the National Iranian Oil Company come together and announce a $40 billion agreement to work together on oil and gas development and pipeline construction. They are reading the writing on the wall, and what they see is hesitation from the U.S. President to move us back to energy independence, where we were on day 1 of his administration, so they are making plans as to how they will work together and dominate the energy sector.

Meanwhile, Joe Biden has also sold about a million barrels of oil from our Strategic Petroleum Reserve to the Chinese Communist Party. When I have spoken with Tennesseans about this, they are furious. They cannot understand why he would make a choice to do this. The left has done their best to provide cover for the President, claiming that a million barrels is really nothing to worry about, but you know it is something to worry about. Our SPR has about 750 million barrels in it. We are drawing it down at about a million barrels a day. Plus, the President is now selling to our adversaries—selling it.

We did a little bit of research into what China can get out of a barrel of oil, and here is what we found: That gives you 20 gallons of gasoline; 12½ gallons of distillate, which is what we use for diesel fuel; and about 3½ gallons of jet fuel. To Tennesseans, this makes a big difference.

I really agree with my fellow Tennesseans about this. When they look at this picture and they think about the President's big sale to Hunter Biden's friends in Beijing, they don't see a gallon of gas here and there. What they see is 20 million full tanks of gas. They see diesel fuel that our farmers need. Right now, with the price of diesel doubling, we have farmers in Tennessee who cannot get crops planted. They chose not to plant crops because of the cost of diesel, fertilizer, chemicals, pesticides. They see sabotage of their hopes and their dreams and their plans—their plans—for their family, for their business, for their farm.

As I have been out and about around the State and talked to Tennesseans, they have a message for this President, this administration, my Democratic colleagues. This is more than just a political disagreement. In their minds, and I agree, this is a national security risk—a national security risk.

We are making ourselves vulnerable. Giving any aid or advantage to our adversaries is wrong, and this has got to end. Joe Biden and the Democrats must abandon this China-first energy policy and return to an America-first policy.

Restart the Keystone Pipeline. Approve more energy infrastructure. Hold more lease sales. Approve drilling permits that are waiting for approval.

Let's get the regulators out of the way. Stall some of these 42 regulations that the President has put on the oil and energy sector this year. Let's do this. Let's advantage ourselves with American energy before it is too late.

I yield the floor.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. MURPHY. Mr. President, I ask unanimous consent that the following Senators be permitted to speak prior to the scheduled vote. Senator MURPHY for up to 15 minutes; Senator CORNYN for up to 15 minutes; and Senator COONS for up to 3 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

ELECTORAL REFORM

Mr. MURPHY. Mr. President, I come to the floor today to talk about a piece of legislation that was introduced yesterday by 16 bipartisan Senators: the Electoral Count Reform and Presidential Transition Improvement Act.

I am proud of the effort between Republicans and Democrats to put aside our differences on other issues and to be able to put before this body a proposal that will assure that the votes that are cast all across this country for President in 2024 result in the winner of that election sitting in the Oval Office.

And I come to the floor today to underscore for my colleagues why this piece of legislation is so vitally necessary.

All across the country, we are seeing an epidemic of candidates being nominated for Governor, for secretary of state, for Congress, who don't believe Joe Biden won the 2020 election.

They instead believe these wild conspiracy theories about voting machines that magically switched votes from one candidate to another, Sharpies that voted for Joe Biden illegally. All of it has been debunked, but the conspiracy theories and the support for this notion that Donald Trump actually won the election, according to the rules of the electoral college in 2020, continue to spread.

The Republican nominee for Governor in Pennsylvania, who appoints the State's chief election official, was right here at the Capitol, yards away from this Chamber on January 6, as individuals were storming the building trying to do harm to us. He took part in high-level meetings after the 2020 election, intended to overturn Biden's win in Pennsylvania.

He is perhaps mere months away from being the next Governor and chief elections officer of that State. Across the country, former President Trump is organizing what he calls an America First Secretary of State Coalition, and he is pretty unapologetic about what the design is. It is to install election officers all across the country whose chief loyalty is to Donald Trump, not the vote.

His endorsed candidate in Arizona, for instance, called for Biden's win in Arizona to be thrown out and for the Republican State legislature to appoint its own electors instead.

In Nevada, the endorsed Republican candidate for secretary of state, another Trump loyalist, says if he was in office in 2020, he would not have certified Joe Biden's win, leading to an immediate constitutional crisis.

What is happening all across the country right now is a complete, total rejection of democracy by Trump supporters and his endorsed candidates.

Now, they aren't representative of the entire Republican Party, but, unfortunately, they are winning primaries all across the country, and they are winning elections all across the country.

And these Trump loyalists, they are not interested in the winner of an election becoming President if that winner isn't Donald Trump. They effectively want Donald Trump installed as a monarch, and they are willing to just throw out democracy if that is what is necessary to keep their leader in power.

And as I mentioned, this isn't some fringe phenomenon any longer. I think we have a lot of Republicans in the Senate and the House who see this danger coming and want to take steps to prevent it. That is why we are introducing this legislation, but there are over 100 winners of Republican primaries for Congress and statewide office this year who believe—who have stated this belief publicly that the 2020 election was stolen and that Donald Trump should still be President.

There is just a very well-developed and well-organized movement, where Trump supporters are learning from his inability to overturn the election in 2020, and they are galvanizing themselves to leave nothing to chance in 2024.

The operation to install Trump in the White House in 2025, if he runs, will be more sophisticated and better organized than 2020. The threat that 2024 will be the last year of American democracy is real.

I know that sounds like hyperbole, but we came really close to losing our democracy in 2020. And if a President is installed in the White House who did not actually win the election, then I don't know how you claim that this experiment for 250 years is still ongoing.

So we need to act, as a body, across the aisle. Those of us who believe that our loyalty to country is more important than our loyalty to party need to act to make it as hard as possible for a group of traitors to install as President the loser of the 2024 Presidential election.

And so toward that end, we have introduced a piece of legislation that will seek to reform the way in which electors are sent to Congress and the way in which we count those electors to put up as many barriers as we can to these efforts to install the loser of the 2024 election as President of the United States.

So I am grateful to Senator COLLINS and Senator MANCHIN for leading this process. I am grateful to be a part of it, along with Senators PORTMAN, SINEMA, ROMNEY, SHAHEEN, MURKOWSKI, WARNER, TILLIS, CAPITO, CARDIN, YOUNG, COONS, SASSE, and GRAHAM.

And so let me tell you, in just a few minutes, what the most important elements—let me just tell you about some of the key elements of the Electoral Count Reform Act. It engages to make the selection and counting of fraudulent electors harder by both addressing efforts by Congress to overturn valid State results but also to make it harder for States to submit to Congress invalid State results.

Now, on January 6 of last year, we saw a handful of our colleagues attempt to throw out the valid elector slates from States like Pennsylvania and Arizona. And, luckily, in the end, those efforts only got a handful of votes here in the Senate, but the majority of Republicans voted to throw out those slates in the House of Representatives, which just tells you how mainstream these views have become.

And so, in two important ways, we make that attempt by Congress to throw out valid results from a State a little bit, but substantially, harder. Under our current law, it only takes one single Senator in order to throw this entire Senate into a debate over whether or not we should count or throw out certain electors.

In the end, there were, I think, 12 Republican Senators who suggested we should throw out ballots, but really all that was needed was 1. So what we do is we increase that threshold from 1 Senator to 20 percent of Senators, from 1 House Member to 20 percent of House Members to begin that debate. Ultimately, you still need a majority of the House and the Senate to throw out an elector slate, but you can't even begin that debate now without having 20 percent of each body. That is a substantial and important change.

Second, we clarify the role of the Vice President. Now, some would argue that this isn't necessary; that the Vice President's role in this process is ceremonial, but that is not what Donald Trump thought. Donald Trump and his cadre of fringe lawyers believed, by reading a statute in a particular way, that Mike Pence had the ability by himself to refuse to count certain slates of electors.

Now, that is not how the 1887 Act reads, but just to be absolutely clear, our reform act clarifies the law to make 100 percent clear that the Vice President's role is just ceremonial.

And then, as I said, we also take steps to make it harder for States to send fraudulent results to Congress because that is the primary threat in 2024. I still think that there are the votes in the Senate, no matter what the elections look like in 2024, for the Senate to make sure that we don't throw out valid results that are sent to the Congress.

The bigger threat is that one candidate wins in a State like Arizona or—depending on what happens in the gubernatorial election in Pennsylvania—Pennsylvania and instead that State decides to send electors for the losing candidate to Congress, making some vague, broad claims of fraud that they can't substantiate.

So we make that exercise in fraud less likely through a number of means. First, there is a really ambiguous provision in the 1887 law which President Trump argued in the courts allowed for State legislatures to appoint their own electors if they judged that the election was incomplete. Now, what that was initially intended to mean was if an election didn't happen because of a natural disaster, but Trump's lawyers thought that that meant that these claims of fraud could satisfy that incomplete criteria.

Well, we removed that ambiguity in this underlying piece of legislation. No longer will anybody be able to claim that State legislatures can just step in after the fact and appoint different electors.

Second, we have a clear prohibition that State legislatures can't change the rules of how electors are chosen after the election itself. Now, it is up to State legislatures as to how they appoint electors.

Every State right now appoints them based upon who won the popular vote in their State, but the Constitution does give that power to the State legislature. It does not give them the power to change that process after the voters have cast their vote. We make that clear in this piece of legislation.

And then, most importantly, we clarify the process by which campaigns and candidates can contest a fraudulent certification or a fraudulent appointment of electors.

As we saw in the 2000 election, there is overlapping contesting jurisdictions between States and the Federal court system. It often takes very—a very long time for those processes to play out and unwind. We set up in this bill a new expedited process of review by a three-judge panel. We limit the cases that can be brought to that panel by the campaigns themselves, just to make sure we aren't incentivizing spurious litigation.

But that new process allows the candidates and the campaigns, if they believe that the laws of the State have not been upheld in allowing the majority winner of that State to dictate what electors get sent to Washington, to make that claim before a three-judge panel in an expedited fashion, to have that case go up to the Supreme Court in an expedited manner as well.

Clarifying the way in which we solve for these contests, if they arise over a valid slate of electors and an invalid slate of electors is an important reform in this bill.

Listen, what we have built over the last 250 years in the United States of America, it really is a miracle, and we should never forget how much of an anomaly American democracy is when you look at the broad scope of the governments under which people have lived.

This idea that citizens, not dictators or Kings or plutocrats, get to decide who leads a nation—250 years later, it is still a revolutionary idea.

And I remind my constituents all the time that democracy is really unnatural, right? There are not a lot of other things that are important to us in our lives that we run through democratic vote. Our workplaces are really important places, but we don't run our workplace through democratic vote. The boss—the CEO—makes the decisions there.

We love our sports teams, right? We follow them. We live and die for them. But the decisions on those teams—they are not made by democratic vote. There is a coach, a general manager who makes the decisions. I love my kids, but they don't get an equal vote in the decisions of my household with my wife and me. Lots of things that are important to us in our lives don't run by democratic vote. We are very comfortable, in fact, with hierarchal systems, with one person or a handful of people making decisions for us, but we have reserved this idea of democracy for the decisions that are made that govern our community, our town, our State, or our Nation.

We need to remember that over the course of world history, almost no one has lived in a democratic civilization. Why? Because it is natural for human beings to want their chosen leader to be in charge, their preferred leader to be in charge, no matter what everybody else in the community believes. It is also natural for leaders, once they have tasted power, to want to cling to that power and refuse to give it up, no matter the wishes of their citizenry.

So we need to be constantly vigilant to protect this experiment. In the grand sweep of world history, that is what it is—a revolutionary experiment. We need to recognize the moments when the threats to that experiment are new and novel and more grave than normal and be nimble enough to respond.

So I would argue that this is one of those moments, and I am so grateful to the group of bipartisan Senators who have worked so hard to introduce this legislation.

I yield the floor.

The PRESIDING OFFICER. The Senator from Texas.

H.R. 4346

Mr. CORNYN. Mr. President, the business before the Senate is a critical undertaking to shore up our vulnerability to imported microcircuits, otherwise known as semiconductors. You might wonder why this is so important if you haven't been following the debate over the last couple of years.

While this legislation has taken many names, it began as the CHIPS for America Act in June of 2020, which established a new program to incentivize manufacturers of these tiny microcircuits, known as semiconductors, to set up shop here in the United States.

We have tried to fund the program at different times through the Endless Frontier Act; the U.S. Innovation and Competition Act, sometimes called USICA; the America COMPETES Act; the Make It in America Act. But no matter what the title is or whatever you call it, the purpose is to eliminate this unacceptable risk that somehow—due to pandemic, due to military conflict, due to natural disaster—our access to the most advanced semiconductors on the planet would be cut off, with devastating consequences to the U.S. economy and our national security.

I know some people wonder, Why should the Federal taxpayer provide financial incentives to semiconductor manufacturing? And that is a perfectly good question. The reason is, we are in a competition with countries all around the world that are providing incentives to build these necessary and essential facilities in their country, and if we don't participate in this competition, we will end up maintaining our dependency entirely on semiconductors imported into the United States. We saw big investments being made in other countries—China, the EU, Germany, France. A number of different countries want this manufacturing capability in their country because they understand its importance to their economy and security.

Now, you might wonder, Why is it necessary? Well, there is a reason—an economic reason—why these semiconductor manufacturers are almost all based in Asia. The overwhelming majority are made in Taiwan, and that is because it costs 30 percent less to build these facilities in Asia than it does here in the United States.

But COVID–19 exposed a lot of vulnerabilities of supply chains, whether it is PPE—personal protective equipment—or semiconductors, and this idea that just because somebody could build something cheaper somewhere else, that checked all the boxes. It does not check all the boxes. And there are some things we must have access to, and one is a secure source of these microcircuits that run everything from your cell phone to the F–35 Joint Strike Fighter. We know that semiconductors will get more and more important as the world competes to come up with smaller and more powerful semiconductor chips to operate everything from computers to our weapons systems.

When the pandemic hit, the supply chain vulnerability was demonstrated by empty car lots, backordered electronics, higher prices, contributing to inflation. Consumers who never needed to know what a semiconductor was found themselves impacted by this disruption.

My State is home to companies across a full range of industries that have been impacted, from consumer electronics to defense companies.

Last spring, an executive from Toyota told me that when he first started with the company, he could count the number of chips in a given vehicle on two hands. That certainly is not the case now, with almost autonomous vehicles and certainly with all the sensors that have made driving a lot safer and a lot more convenient added to new cars. Think about the high-tech features in our cars—navigation systems, Bluetooth, automatic braking, backup cameras, and parking sensors. That is on top of standard functions like power steering, air-conditioning, and window wipers. Today, some cars use as many as 1,000 semiconductor chips.

So the pandemic of COVID–19 demonstrated our vulnerability to our supply chains that made getting so many semiconductors impossible.

This wasn't just a problem for automakers; virtually every industry was impacted. In many ways, the global chip shortage served as a wake-up call—certainly to me and I believe other Members of Congress and the Senate who voted consistently to eliminate this vulnerability in our supply chains. It forced us to recognize the vulnerability of that supply chain and then to do something about it, which we are in the process of doing.

As bad as the chip-related shortages have been in the last 2 years, they pale in comparison to what could be coming if we don't act.

As I said, the vast majority of the world's chips are made in Asia, with the bulk coming from Taiwan. Sixty-three percent of the advanced semiconductors in the world are made in Taiwan. Even more concerning is that 92 percent of the world's most advanced semiconductors come from that country. So 62 percent—63 percent of semiconductors come from Taiwan, but 92 percent of the most advanced, the most powerful, the smallest semiconductors come from that same place. None, zero, zip, nada are made in America. None.

Taiwanese semiconductor firms make the chips used in our military's Joint Strike Fighter, the F–35, artificial intelligence, and other military-grade devices.

Now, if you have been paying attention to what President Xi and the People's Republic of China have been saying about Taiwan, they are saying they are going to unify the PRC with Taiwan either peacefully or by military action.

Again, I believe the risk of pandemic, natural disaster, or military intervention makes this risk simply unacceptable.

Last fall, I led a congressional delegation to visit Indochina, the INDOPACOM area of operations, to learn more about the threat of Chinese aggression when it comes to Taiwan. One of the leaders we met with was the commander of the Indo-Pacific Command, located in Hawaii, who described the current power dynamic rather succinctly. He said it is not a question of if China invades Taiwan but when.

We even have a rough idea of when that could happen. President Xi has made no secret of his desire to unify Taiwan with the mainland, saying he wants to be ready to do that by 2027, just 5 years from now. But, as we have learned from Putin's invasion of Ukraine, when one person makes a decision, you can't depend on any particular timeline because it could happen in the blink of an eye.

It is tough to overestimate the impact this lack of access to these advanced semiconductors would have on the United States and our allies. To be sure, our cars, televisions, refrigerators, and washing machines would be impacted, but that is only the beginning. Those would be mere inconveniences. How would we manufacture Javelin missiles that are used in Ukraine? Well, we couldn't because they all run on semiconductors. There is the Stinger that is being used so effectively by the Ukrainians to go after Russian tanks invading Ukraine. The Joint Strike Fighter, the F–35, our most advanced, fifth-generation, stealth aircraft, is chock-full of semiconductors that would be unavailable if our access was cut off for some reason.

Then just think about our critical infrastructure. Think about cell towers. Think about the energy grid. Where would we get the chips that are needed for modern farming equipment? Just as cars have become more and more automated, so have tractors and other farming equipment.

What would we do for the chips that we need to treat water to make sure it is clean and easily available?

So these aren't problems just for consumers; it is a major national security vulnerability.

Back in 1980, President Jimmy Carter gave his State of the Union Address in

which he spoke about the instability of the Persian Gulf and Soviet threats to the movement of oil through the Strait of Hormuz. That was back in the days when we depended almost entirely on imported oil into the United States. But Jimmy Carter said in 1980 that any attempt to gain control of the Strait of Hormuz and to block access to that essential energy source, he said, would be ''an assault on the vital interests of the United States of America.'' That would be a declaration of war.

I think the same argument applies to semiconductors today. In fact, some people have called semiconductors the new oil because it is so essential to our way of life, to our economy, and our security.

Just as the Soviets could have blocked the Strait of Hormuz and choked off the global oil supply back in 1980, the People's Republic of China could seize Taiwan's supply of chips and starve the rest of the world. Will they go into the ventilators and the other lifesaving medical equipment or provide homes with clean drinking water? These are important questions that many of us have been asking and looking to try to find ways to mitigate, if not to eliminate, our dependency on imported semiconductors.

So funding this program in this bill currently before the Senate will shore up domestic chip manufacturing to make sure that we meet the needs of our most critical industries. It would deliver economic benefits to our communities through new investments and jobs. It will strengthen our national security by providing chips that can make their way into markets around the world. It will ensure that we have a reliable supply of chips so we can outinnovate and outcompete any and every adversary, and that is a point worth stressing.

We know we are in competition with the People's Republic of China, but the way we will beat them is to outcompete them. The only way we will do that is with access to the most advanced electronics, including semiconductors, that are made anywhere on the planet, and we need to make them here in America so there can be trusted supply chains and readily available.

So I appreciate all of our colleagues who supported this legislation for the long and winding journey that has brought us here today, and I hope this bill will pass the Senate and the House next week and finally make its way to the President's desk.

I yield the floor.

The PRESIDING OFFICER. The Senator from Delaware.

NOMINATION OF REUBEN E. BRIGETY II

Mr. COONS. Mr. President, you and I have had the blessing of traveling to South Africa together, so I know you know, as I do, that it is a critical nation, not just on its own terms as a country of 70 million people of a multilingual, multifaith, multiethnic democracy working to achieve the incredible promise enshrined in its Constitution, working to achieve the vision of a liberation struggle, but it is also a country that is critical to regional security and for the path of the globe and to the security and stability of democracy in this century. This is why I stand to speak briefly on behalf of my friend, Reuben Brigety, the nominee to be our next Ambassador to South Africa, whose confirmation we will take up in just a few moments.

Reuben is someone I admire deeply. He attended the Naval Academy, served in the U.S. Navy, was Deputy Assistant Secretary of State both for African Affairs and for Population, Refugees, and Migration.

I met him as Ambassador to the African Union, knew him well as dean of the Elliott School at GW. He took on the challenge of service as the president of the University of the South, better known as Sewanee; and now our President has nominated him to represent us in South Africa.

As we have seen in recent votes and actions at the United Nations and in discussions and debates around the world, African countries—in this moment, during this war in Ukraine, in the face of Russia's aggression—are turning away from us. They are not believing the reality that it is Russian aggression that is causing food scarcity and fertilizer prices to spike, and they are more than not taking Russia's side on this.

We cannot take these relationships for granted. The United States, for decades, has been a close development and public health partner of South Africa. We have to send our best, and Ambassador Brigety is the right person at the right time to advance the critical relationship goals that we have between the United States and South Africa.

TRIBUTE TO ALEXANDRA DAVIS

Mr. President, one of the blessings of serving here in the Senate is getting to know natives of New Jersey, like yourself and like my foreign policy adviser, Allie Davis.

I will do my best to get through these next few minutes of remarks without being unduly emotional, but she deserves a catch in the throat and a tear in the eye because Allie is someone who from the moment she came to join my team 6 years ago has been a remarkable person—a person of great spirit and character, someone who also spent time in South Africa as a young person.

After graduating from the University of Delaware, a tour as a Fulbright in South Africa prepared her to join my team as a foreign policy fellow.

As she was just confessing to me in my office a few moments ago, she knew far less about governance and politics than I imagined. She carries herself with remarkable grace and confidence. She steadily has risen to be a legislative aide, a legislative assistant, and now my foreign policy adviser.

I don't have the time—but I wish I did—to detail all the pieces of significant and important legislation she has helped shepherd through to success. She has critically supported my leadership on the State and Foreign Operations Appropriations team. She has been critical as we have worked to address this moment of global hunger. She has helped get the Global Fragility Act from concept to enactment. She has helped make the Development Finance Corporation a powerful tool for development. She helped shape and craft the Nita M. Lowey Middle East Partnership for Peace Act, and she nearly single-handedly, at a time when I was confident this could not be done, got the Sudan Claims Resolution Act through this Congress and fundamentally changed the arc of the search for democracy in Sudan.

We had the chance to travel together on a Presidential mission to Ethiopia, during which she had truly memorable encounters with its head of state and an opportunity to see and participate and help drive diplomacy firsthand. We traveled together to so many other countries: from the UAE to France to Georgia to Italy and, perhaps most memorably, to Sudan, where I was honored to receive one of their leading national awards, which really was an award in recognition of her work on behalf of the Sudanese people.

She goes to serve the House Foreign Affairs Committee, whose chairman I accosted last night at an event, and said: You are causing great harm to me, and I resent deeply the fact that you are causing this most talented and skilled and trusted member to leave the Senate and go to the House.

But she joins as a member of their professional staff, a great team. And I know that we will continue to work hard and to work closely together in the years and decades ahead. A great friend, a great colleague, and someone to whom I wish great success in the many years ahead.

With that, I urge my colleagues to vote in support of the nomination of Reuben Brigety to be Ambassador, and I offer my greatest thanks to Allie Davis for her talented and skillful service on behalf of the people of Delaware.

I yield the floor.

## EXECUTIVE SESSION

### EXECUTIVE CALENDAR

The PRESIDING OFFICER. Under the previous order, the Senate will proceed to executive session to consider the following nomination, which the clerk will report.

The legislative clerk read the nomination of Reuben E. Brigety II, of Florida, to be Ambassador Extraordinary and Plenipotentiary of the United States of America to the Republic of South Africa.

VOTE ON BRIGETY NOMINATION

The PRESIDING OFFICER. Under the previous order, the question is, Will the Senate advise and consent to the Brigety nomination?

Mr. COONS. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The bill clerk called the roll.

Mr. DURBIN. I announce that the Senator from Vermont (Mr. LEAHY) and the Senator from Minnesota (Ms. SMITH) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. BLUNT), the Senator from North Dakota (Mr. CRAMER), and the Senator from Louisiana (Mr. KENNEDY).

The result was announced—yeas 55, nays 40, as follows:

[Rollcall Vote No. 266 Ex.]

YEAS—55

| | | |
|---|---|---|
| Baldwin | Hickenlooper | Romney |
| Bennet | Hirono | Rosen |
| Blumenthal | Kaine | Sanders |
| Booker | Kelly | Schatz |
| Brown | King | Schumer |
| Cantwell | Klobuchar | Shaheen |
| Cardin | Luján | Shelby |
| Carper | Manchin | Sinema |
| Casey | Markey | Stabenow |
| Collins | Menendez | Tester |
| Coons | Merkley | Van Hollen |
| Cortez Masto | Murkowski | Warner |
| Duckworth | Murphy | Warnock |
| Durbin | Murray | Warren |
| Feinstein | Ossoff | Whitehouse |
| Gillibrand | Padilla | Wyden |
| Graham | Peters | Young |
| Hassan | Portman | |
| Heinrich | Reed | |

NAYS—40

| | | |
|---|---|---|
| Barrasso | Grassley | Risch |
| Blackburn | Hagerty | Rounds |
| Boozman | Hawley | Rubio |
| Braun | Hoeven | Sasse |
| Burr | Hyde-Smith | Scott (FL) |
| Capito | Inhofe | Scott (SC) |
| Cassidy | Johnson | Sullivan |
| Cornyn | Lankford | Thune |
| Cotton | Lee | Tillis |
| Crapo | Lummis | Toomey |
| Cruz | Marshall | Tuberville |
| Daines | McConnell | Wicker |
| Ernst | Moran | |
| Fischer | Paul | |

NOT VOTING—5

| | | |
|---|---|---|
| Blunt | Kennedy | Smith |
| Cramer | Leahy | |

The nomination was confirmed.

The PRESIDING OFFICER (Mr. SCHATZ). Under the previous order, the motion to reconsider is considered made and laid upon the table, and the President will be immediately notified of the Senate's actions.

## LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will now resume legislative session.

The senior Senator from Connecticut.

UNANIMOUS CONSENT REQUEST—S. 4550

Mr. BLUMENTHAL. Mr. President, I am honored to appear with a group of my colleagues on behalf of the Expanding Access to Family Planning Act.

We are here to talk about this essential measure in the post-Roe world. That is a phrase I never thought I would ever utter anywhere, not to mention on the floor of the U.S. Senate. But we are living in the post-Roe world where reproductive rights are under assault as never before and critical reproductive healthcare services are more necessary and also are more at risk than ever before. That is why a consistent, strong source of funding for title X Family Planning Programs are absolutely critical and urgent. That is the purpose of the Expanding Access to Family Planning Act.

What it means for the State of Connecticut is, in the past, $2.5 million in title X funding, allowing patients, mostly women—45,000 of them—critical access to comprehensive family planning and preventive healthcare services. What we are talking about here is not only family planning but also testing and treatment for sexually transmitted diseases, lifesaving cancer screening, and other essential health services. And they are all now at risk.

What they need is the strong and consistent source of funding that this measure would provide, doubling—literally, almost doubling the number of dollars but also guaranteeing over a 10-year period that clinics will receive this funding.

In the State of Connecticut, most of this funding in the past has gone to Planned Parenthood of Southern New England. The Cornell Scott-Hill Health Center has received some. They have done absolutely extraordinary work in delivering health services, particularly to women who are uninsured, women who are of lower incomes, and women who are younger—under 30. And that is the primary patient pool that needs these services.

Let me be very blunt. If my Republican colleagues truly care about supporting families, they can show it by supporting this measure and funding title X. In the past, since its inception 50 years ago, it has been bipartisan because people agree that families ought to be a priority, that decisions about when and whether to have children are the most important that we make, that caring for families and particularly prenatal care, screening for sexually transmitted diseases, cancer screening—these health services are vital to all of us, whether we are the patient or not, and that they stay funded in the long run. Preventive healthcare is pound-wise, and it will save money.

We know that the Supreme Court's decision in Dobbs strips women of a vitally important freedom and puts it in the hands of government bureaucrats: the decision about when and whether to have children. The least we can do now is to fund the reproductive healthcare services that will save lives and save futures.

Dobbs has put women at risk. It has put reproductive healthcare in grave jeopardy. This measure is necessary to mitigate the effects of Dobbs—more necessary now than ever before. We will never stop fighting for a woman's right to choose when and whether to have children. We will never stop fighting to protect a woman's right to access healthcare that is vital to her own and her children's health.

In the face of mounting attacks on women's health, now is the time to strengthen title X, and that is why we need this legislation. Passing the Expanding Access to Family Planning Act will strengthen our entire healthcare system.

It is simply critical for this $500 million—providing birth control, cancer screening, other kinds of testing and treatment—to be passed. And if my Republican colleagues are serious about supporting families, they ought to be eager to join us. And I am proud to be supporting this measure, and I am eager to see it signed into law.

I yield the floor.

The PRESIDING OFFICER. The Senator from Hawaii.

Ms. HIRONO. Mr. President, I rise today in support of the Expanding Access to Family Planning Act, which will help ensure millions of Americans can continue receiving family planning services through the title X program.

For more than 40 years, title X has helped ensure hundreds of thousands of women—regardless of income, background, insurance status, or hometown—have access to basic reproductive healthcare, including wellness exams, cancer screenings, birth control, and testing and treatment for sexually transmitted diseases.

While this program, which was created with bipartisan support, has been around for decades, we have seen what happens when MAGA Republicans are in control. President Trump slashed funding for title X and imposed a dangerous domestic gag rule that banned doctors from telling people how they could access abortion services. The gag rule wreaked havoc across the country. It forced providers to decide whether they wanted to receive title X funding—knowing that healthcare providers wouldn't be able to provide women with accurate and comprehensive information—or say no to this critical family planning funding that supports women across the country through clinics like Planned Parenthood and other nonprofits.

In my home State of Hawaii, the entire network of title X clinics said no to this dangerous rule and rejected the funding, forcing our State to foot the bill. On the other hand, the State of Hawaii, the clinics in Hawaii, because they rejected this funding, could provide the full range of care for their clients, but ultimately the gag rule resulted in a loss of services to thousands of women.

Across the country, Trump's rule slashed title X's patient capacity in half, jeopardizing family planning and contraceptive care for 1.6 million patients nationwide. While President Biden reversed this rule, we can't take anything for granted.

As the rightwing Supreme Court and MAGA Republicans work to eliminate reproductive freedom, it is critical we protect and strengthen title X. That is

exactly what the Expanding Access to Family Planning Act will do. This bill will nearly double funding for title X family planning services by providing $500 million in mandatory funding for title X for each of the next 10 years. It will also ban title X providers from discriminating against patients and require pregnancy consulting services receiving title X funds to provide patients with all of the information about all their reproductive care options, including abortion.

Republicans have made clear they will do anything to get rid of our reproductive freedoms, so we must pass this bill to make sure this program isn't at the whim of those trying to strip us of our healthcare. While Republicans continue to attack our fundamental rights, Democrats are doing everything we can to protect them. That is why, in addition to this important bill, earlier this week, I introduced legislation to codify the right to contraception. All of this is about who gets to make decisions about our bodies—women or a bunch of rightwing politicians.

I believe—and the American people overwhelmingly agree—individuals, not politicians, should be making these deeply personal decisions.

Our Right to Contraception Act and the Expanding Access to Family Planning Act will help ensure they can.

I yield the floor.

The PRESIDING OFFICER. The Senator from Oregon.

Mr. WYDEN. Mr. President, I want to thank my colleague from Hawaii for making these very important remarks today with respect to expanding access to family planning.

And, Senator HIRONO, let me also, while you are on the floor, tell you how much I appreciate your leadership on the My Body, My Data Act. I am thrilled to be, I believe, one of your sponsors here in the Senate. It is hugely consequential, because we have known from even the draft Alito opinion that women were going to have their personal data weaponized against them.

I know you have a busy schedule, but I just wanted the body to know how extraordinarily important this is, because when we look at technology and, particularly, what technology can do today, what your legislation does—with our colleague from the House, Congresswoman JACOBS—is it gives us a chance to get back to the fundamental issue of privacy rights. We are going to start looking more at the contractual relationships between women and various companies because a lot of those privacy policies aren't worth the paper they are written on.

I just want you to know I am so honored to be your cosponsor on a very related piece of legislation. Your leadership has made a big difference.

The PRESIDING OFFICER. The Senator from Hawaii.

Ms. HIRONO. Mr. President, just very briefly.

Senator WYDEN, I am really glad to be able to sponsor the My Bodies, My Data bill with you, because, as we know, any time any of us presses the button and uses our internet, somebody is collecting data, all of this data. And can you imagine there are all of these clinics that purportedly provide information relating to contraception and whatever else relating to reproductive care—these entities are also collecting all kinds of information. And they are not there to make sure that women—mainly women but individuals who access their services—they do not know that these are not institutions that will give them all of the information they need; but, instead, they are collecting a lot of information that can be weaponized.

Thank you very much. This is yet another whole area of concern in this environment, in this climate, where individuals do not have control over our own bodies.

Mr. WYDEN. I just say to my colleague, sometimes it is a little difficult to figure out where a piece of legislation is going. That is not the case with your bill. My Body, My Data sums it up.

Again, thank you so much for your leadership.

UNANIMOUS CONSENT REQUEST—S. 4550

Mr. President, I also want to briefly touch on the important legislation that Senator SMITH—my Pacific Northwest colleague—Senator MURRAY, and Senator WARNER have recently introduced. They have an important proposal called the Expanding Access to Family Planning Act. I am proud to cosponsor this legislation. This is another area where Chair MURRAY and I work very closely together because a lot of these issues can often involve Medicaid, for example. And I just so appreciate my colleague bringing up her important bill with respect to family planning.

The proposition behind this is pretty straightforward. The Supreme Court overturned Roe against the will of the American people. States are criminalizing abortion. Many women and girls are now being forced to carry pregnancies to term and give birth. If they are going to stand by this forced-birth agenda, then you better guarantee basic health for women and families. That is really Senator MURRAY's challenge to Senate Republicans. You can't be pro-life and pro-family if you are against healthcare that saves lives and protects families.

The Murray legislation, with Senator SMITH and Senator WARREN—I am pleased to be for it today—is centered on a significant increase in what is known as title X funding, which goes to basic essential services like HIV tests, contraception, treatment for infections, and pregnancy counseling.

And one of those services is really so vitally important. I just want to mention it, and that is cancer screenings. Cancer screenings are a particularly important issue now that the Supreme Court has overturned Roe. Over the last few weeks there have been a wave of these horrendous stories, as Senator MURRAY knows better than anyone, about the chaos this radical Supreme Court ruling has unleashed on women's healthcare—drawn-out miscarriages, potentially fatal complications left untreated, physicians unsure of what treatments they are legally allowed to perform.

And we know one of the absolute nightmares for women living in forced-birth States is getting pregnant and having cancer at exactly the same time. And the question is: In a world where a miscarriage could lead to criminal charges, how do you treat a pregnant woman with cancer?

So we ought to think about that. And could getting chemo be a crime in a forced-birth State, Senator MURRAY? In forced-birth States, how many Americans are going to die because they waited too long to begin treatment for breast cancer or cervical cancer or because they didn't maybe get treated at all?

It is appalling that Americans are facing this kind of awful, I think, unthinkable situation, all because six Republicans on the Supreme Court threw 50 years of settled law on abortion rights into the dustbin.

In the parlance of the Senate, Senator MURRAY, I yield to you. I think your legislation is extraordinarily important.

Uh-oh. I have to reverse some parlance of the Senate and yield to Senator KLOBUCHAR, who also has been a champion of this issue. And I just want the Senate to know, because we are in the Pacific Northwest, we talk about these issues. People ought to make no mistake about it—Senator MURRAY has put years and years into the cause of women's health. And I really enjoy being junior partner in the whole effort and look forward to her leadership.

And I yield to Senator KLOBUCHAR.

The PRESIDING OFFICER. The Senator from Minnesota.

Ms. KLOBUCHAR. Mr. President, thank you so much. I join my colleagues. Thank you, Senator WYDEN, for your on-point remarks and, of course, Senator MURRAY, for her incredible leadership, not only of the committee but on taking this issue on and making clear to the State of Washington, yes, but also to the country that this should be a woman's decision, a woman and her doctor, family's decision, and not a decision made by politicians.

And part of this is making sure there is access to family planning. Since this decision has come out, I could not believe the number of women that have come up to me at home or in airports, flight attendants, saying things like: Is this really happening? You mean, I am going to have to go to another State just to get reproductive healthcare?

So how about contraception? There are people talking about contraception. People all over the country have realized how extreme this decision is. And one of the people who has been leading

this fight—and, in fact, has been leading this proposal on expanding access to family planning is my colleague TINA SMITH. And she is here in spirit today. She has a mild case of COVID. I know she is watching right now because she has been fighting for the rights of women to make their own decisions about their healthcare her entire life. She is the only Senator in the history of the U.S. Senate that actually worked at Planned Parenthood and has a firm understanding and has shown so much leadership in this area. So we thank her. I am speaking for my constituents, of course, to thank TINA SMITH for her work and her leadership.

As I noted, 26 days ago, the Supreme Court issued this rule shredding nearly five decades of precedent protecting a woman's right to make her own healthcare decisions. Now women are at the mercy of a patchwork of State laws governing their ability to access reproductive care, leaving them with fewer rights than their moms and their grandmas.

Last week, Senator MURRAY and I joined several of our Democratic colleagues, including Senator CORTEZ MASTO, who led this bill to preserve a woman's right to travel to other States to access reproductive care. Republicans blocked us. So we are back today because if the Supreme Court won't protect a woman's right to make her own healthcare decisions, if Congress can agree to put the protections of Roe v. Wade into law, then everyone in this Chamber has to decide whether they will protect women's healthcare or not. And that includes making sure women have a right to abortion services, but it includes having reliable access to family planning services.

Let's start by passing the Expanding Access to Family Planning Act to protect and expand funding for title X clinics, which support maternal health, cancer screening, contraception, and other essential healthcare.

In 2020 alone—get this number—1.5 million Americans received services through title X. But currently, Federal funding is not enough to serve the number of people who need care. And in the wake of the Supreme Court's ruling attacking the freedom and the autonomy of women, it is likely that there will be even more demand in the years ahead. That is why Expanding Access to Family Planning Act gives title X the funding needed to serve women and families for the next 10 years.

This legislation is far from radical. The title X program was actually created under a Republican administration. And the original bill passed with broad bipartisan support. This is about making sure women have a way to take care of themselves, especially when they are pregnant.

Right now, I am thinking about all the women in this country facing an unacceptably uncertain future. We should all be able to agree that, at the very least, we should make sure that they have access to the basic health services that title X provides—a provision that passed during a Republican administration, created under a Republican administration, that understood that women should be able to access to healthcare.

There is a better path forward: We pass this bill, fund family planning, and save women's lives. I call on my colleagues to join me in supporting this necessary and completely pragmatic and sensible legislation for the women of this country.

I yield the floor.

The PRESIDING OFFICER. The Senator from Washington.

Mrs. MURRAY. Mr. President, I want to thank my colleagues Senator KLOBUCHAR, Senator WYDEN, Senator HIRONO, and so many others who have been out here speaking on behalf of women and their ability to make their own healthcare decisions after the disastrous decision from the Supreme Court. And it has been now almost a month since the Supreme Court overturned Roe v. Wade, ended the right to abortion, and really upended healthcare for women across this country.

And every single day, women and providers and patients have been shouting from the rooftops about how damaging this is, how women's lives are now at risk. Every single day we are seeing the horrors caused by Republicans' oppression: women forced to stay pregnant and give birth when they don't want to; patients denied prescriptions that they need; a 10-year-old forced to travel across State lines to get an abortion after being raped; a woman experiencing a miscarriage left bleeding for 10 days as providers were not clear if they could treat her due to Republicans' extreme bans.

And all the while, Republicans have been trying to ignore the devastation that they have caused. And even more cruelly, they have been trying to distract us, telling us that what we are seeing isn't really happening. They have tried to say it won't undermine birth-control access, even as patients have been denied Plan B. They have tried to say we don't need to protect the right to travel for abortion care, even as some Republicans are already writing and introducing bills to take that right away.

They have even tried to say their extreme bans won't undermine care for ectopic pregnancies or miscarriages, even as providers have already been forced to change the standard of care because Republicans' dangerous abortion bans making them perform riskier, invasive surgeries than would otherwise be necessary or even sit on their hands until patients' vital signs drop before they can do what is needed to save lives.

It really is unconscionable. And despite what we have heard from Republicans, it is happening right now in this country. And I know I am not the only one who is entirely unconvinced by Republican words about wanting to support women and families.

I am skeptical when one Republican Senator said:

> We have to start thinking in terms of some of these things . . . to be more supportive of families and mothers.

I am skeptical when another one said:

> It's not just a matter of saying, ''We are pro-life.'' It's a matter . . . of promoting and allowing these people who are making very difficult decisions with their lives to make sure we can help.

I was, frankly, surprised when, just last week at a hearing that I chaired on how this Dobbs decision threatens women's health, the junior Senator from Kansas claimed he believes that ''family planning opportunities need to be expanded.'' He even promised to continue supporting ''robust funding.''

Here is the chance to match that rhetoric with action because Senator SMITH and Senator WARREN and I have a bill right here that would do exactly that. In fact, it is even called the Expanding Access to Family Planning Act. I know Senator SMITH cares a lot about this. While she can't be here right now due to COVID, I want to thank her for her leadership on this and explain what this bill does for her.

This bill is pretty simple. It almost couldn't be simpler. It takes our Nation's longstanding Family Planning Program, title X, and provides the strong mandatory funding title X needs now to support patients across the country. That is it. It is very easy. It is very straightforward.

If Republicans really mean what they are saying, if they are really serious about expanding access to family planning, there is no reason why we cannot get this done right now. After all, we are talking about a program that has a long history of bipartisan support. We are talking about a program that was signed into law by a Republican, President Nixon, way back in 1970. We are talking about a program that helps patients get the birth control they need, the STI testing and the treatment they count on, the cervical and breast cancer screenings that could save their lives, and the support they need to plan a family on their own terms.

This isn't just the popular thing to do, although helping patients get the birth control they need is an overwhelmingly popular thing to do; this is the right thing to do. Let's get this done. It should not be controversial. It simply expands our Nation's longstanding Family Planning Program—a program, I should note, that we included in our bipartisan funding bill earlier this year.

Just a few months ago, some Republicans were adamantly against any increases for this program, but now, as we hear, they are changing their tune and claiming they do want to support families. They do want to expand family planning services. They want to do exactly what this bill does—unless, of course, they don't mean it, and it is simply rhetoric or just another Republican distraction from the reality that has been ushered in.

Right now, the Republicans will have a chance to go on the record on whether they actually support family planning, whether they actually want to help people get birth control. And believe me, the same people Republicans have been trying to ignore—the same people who are having their healthcare undermined, their lives upended, their controls over their own bodies taken away—are going to be watching us closely, and they are not going to forget how much or how little Republicans' promises are worth.

Mr. President, I ask unanimous consent that the Committee on Health, Education, Labor, and Pensions be discharged from further consideration of S. 4550 and the Senate proceed to its immediate consideration, that the bill be considered read a third time and passed, and that the motions to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER (Mr. KING). Is there objection?

Ms. ERNST. Reserving the right to object.

The PRESIDING OFFICER. The Senator from Iowa.

Ms. ERNST. Mr. President, this bill is a wolf in sheep's clothing. While the language touts supporting access to family planning, in reality, it is likely a $5 billion gift for Planned Parenthood and other abortion-related providers.

Prior to the Trump administration's protect life rule, Planned Parenthood received nearly $60 million per year in title X funds. The Biden administration reversed this rule and has aggressively deployed title X funds to abortion providers like Planned Parenthood.

Under this bill, Planned Parenthood and other abortion providers would be allowed to use the funds to build clinics, and abortion counseling referrals would be mandatory. The bill would also force religious providers to violate their beliefs. Congress should not green light family planning dollars at the expense of family destruction.

For those reasons, I object.

The PRESIDING OFFICER. Objection is heard.

The Senator from Washington.

Mrs. MURRAY. Mr. President, there you have it—the real Republican position on expanding family planning summed up in two simple words: ''I object.''

As much as Republicans are talking now about supporting women's health, as hard as they might try to pretend that they do support family planning services, when they have been given a chance today to do exactly that—to expand a program with a long track record of helping women get the care they need; a long history, I remind all of us, of bipartisan support—they stood in the way.

Let's be clear. The bill that the Republicans blocked today does not fund abortion. The truth is, title X only provides services like birth control, STI testing, cancer screenings—services Republicans claim to support.

We are not proposing anything radical or groundbreaking; we are simply saying we should expand the national Family Planning Program that already exists, the one President Nixon signed into law decades ago, the one we have already funded before in a bipartisan way many times.

Title X is a program that is already providing patients family planning services and contraception, STI testing and treatment, screenings for breast cancer and cervical cancer, and more. I know that because I have met with title X providers and patients in my home State of Washington many times. I would strongly urge my colleagues who block this bill to do the same. Listen to those patients. Listen to the doctors. Listen to the nurses in their States. This is a program we already know helps so many people, and it can help more.

I can't say I am surprised by Republican objections today. I can't say this is the first time Republicans have said one thing about women's health and done the opposite, and I think we all know full well it won't be the last.

My message to the American people who are witnessing this: Pay attention. Pay attention. The Republican agenda is no to family planning, no to your right to travel for the healthcare you need, and no to your constitutional right to abortion.

Senate Democrats and I will not stop holding them accountable for empty promises or for the devastating harm their extreme abortion bans are now inflicting on so many patients and families.

I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

## FORMULA ACT

Mr. LEE. Mr. President, for months now, American babies have endured an unprecedented and prolonged formula shortage. Some doctors have called this the worst crisis of their careers. It has become so widespread that nearly everyone knows someone who has been personally affected. Desperate parents have scoured online marketplaces. They reached out to family and friends for help. They paid exorbitant markups just to feed their babies. In some worst-case scenarios, some have even resorted to dangerous homemade formulas. In the U.S.A., no parent should be left to wonder how they are going to feed their newborn baby.

After months of work and bipartisan collaboration with my colleagues in the House and the Senate, I rise to pass needed reforms that will finally provide relief to hungry babies. Today, we can take action to alleviate a crisis largely of the Federal Government's own creation.

Poor governance has crippled our domestic formula market. Tariffs and regulations have prevented safe foreign formulas from entering the United States, even while we are experiencing this acute shortage at home.

Currently, the government imposes a 17.5-percent minimum tariff on formula imports. This tariff has stifled competition. But it doesn't have to be that way. We can lift these substantial tariffs on the importation of baby formulas and reduce the costs borne by retailers to provide access to safe, affordable formula. Doing so will expand the severely limited formula options for American consumers. This modified version of the Formula Act does just that by waiving these tariffs through the end of this year.

While passing my bill won't provide immediate relief, our work is far from complete. I am committed to doing everything I can not only to provide this relief now but also to make the necessary permanent reforms to our system to ensure that a crisis like this never arises again.

We still have work to do, and we must further our efforts by allowing WIC recipients to buy whatever brand of formula might be available. We must make meaningful reforms to how the FDA regulates the formula industry. Passing this bill today is the first step. In the meantime, I am actively working on expanding the list of products to receive temporary relief from tariffs. While this is an important first step, it is certainly not the last.

This crisis is such that American babies cannot wait any longer than they already have. We have a moral obligation to these infants to say that we did everything we possibly could to fight for them.

Passing the Formula Act will be an incredible win for families and hungry babies everywhere. It will make meaningful headway that is so desperately needed today. By suspending the tariff on formula imports, we are providing cheaper access to individual consumers and to retailers alike. This relief has been long overdue and long overdue especially for Utahns, who have the largest families, the most children per capita, and the highest birth rate.

I am grateful for the countless hours of behind-the-scenes work and successful negotiations with my colleagues, Democrats and Republicans alike, in the House and in the Senate, which have resulted in a win for our most vulnerable Americans—babies. I look forward to continuing this important work with them.

Passing my Formula Act today is a victory for families and for babies everywhere.

Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of H.R. 8351.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will report the bill by title.

The senior assistant legislative clerk read as follows:

A bill (H.R. 8351) to amend the Harmonized Tariff Schedule of the United States to suspend temporarily rates of duty on imports of certain infant formula products, and for other purposes.

There being no objection, the Senate proceeded to consider the bill.

Mr. LEE. I ask unanimous consent that the bill be considered read a third time.

The PRESIDING OFFICER. Without objection, it is so ordered.

The bill was ordered to a third reading and was read the third time.

Mr. LEE. I know of no further debate on the bill.

The PRESIDING OFFICER. If there is no further debate on the bill, the bill having been read the third time, the question is, Shall the bill pass?

The bill (H.R. 8351) was passed.

Mr. LEE. I ask unanimous consent that the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Without objection, it is so ordered.

The PRESIDING OFFICER. The Senator from Indiana.

UNANIMOUS CONSENT REQUEST—S. RES. 687

Mr. BRAUN. Mr. President, I rise today to fix a troubling loophole in our earmark rules. Earmarks are something I strongly oppose. I believe they breed corruption, overspending, waste, and abuse.

There has been bipartisan concern about the earmarking process for decades. In 2007, the process got so out of control that even earmarking's biggest supporters decided we needed guardrails.

The Senate passed the Honest Leadership and Open Government Act. The bill created Senate standing rule 44, which requires the authors of any bill considered by the Chamber to do this: identify each earmark contained in the bill and ensure that the text is publicly available at least 48 hours prior to proceeding to the bill.

These two protections helped shine light on the earmarking process. There was significant bipartisan support for the protections in rule 44.

In 2007, on the Senate floor, Senator Hillary Clinton said that rule 44 would help curb wasteful spending by creating greater transparency "in the earmark process." It was nearly unanimous, including the two Senators from New Hampshire.

I want to read a portion of her comments.

> I believe we can improve accountability by mandating publication of the earmark for a minimum period of time prior to any vote on the underlying measure, ensuring that both other elected officials and the general public have the opportunity to scrutinize the sponsored outlay. Taking these common-sense steps would ensure that legislators are made to answer for the spending they cosponsor.

A quote from Hillary Clinton. I couldn't agree more, in this case. But the drafters of Senate rule 44 left something out. The rule does not apply to legislation brought to the floor as an amendment from the House.

This means that a determined majority can ignore the protections offered under the rule simply by using a common procedural mechanism.

The bill I seek to pass today closes this loophole. Senator DURBIN commented about how important it was back then as well.

Congress should abide by the rules it created for itself. We recently saw the consequences of this loophole. The Omnibus appropriations bill considered in March contained nearly 5,000 earmarks, totaling nearly $10 billion. The Senate passed the bill less than 48 hours after receiving the text, in violation of the spirit of rule 44.

As Dr. Tom Coburn used to say in this Chamber, earmarks are a "gateway drug." We must close this unintended loophole before the situation gets worse. In fiscal year 2010, the last year of earmarking before the congressional ban, Congress passed 11,000 earmarks at a sum of $32 billion. We cannot go back there.

Earmarks give Congress a personal incentive to vote for the huge spending bills that are dragging America into bankruptcy. I talked about it last night when I introduced my own budget to try to go the other direction.

Return of earmarks will mean the return of earmark scandals and earmark corruption much sooner than you think. Let's do the minimum to prevent this.

I ask unanimous consent that the Committee on Rules and Administration be discharged from further consideration and the Senate now proceed to S. Res. 687; further, that the resolution be agreed to and that the motion to reconsider be considered made and laid upon the table.

The PRESIDING OFFICER. Is there objection?

The Senator from New Hampshire.

Mrs. SHAHEEN. Reserving the right to object.

One of Congress's most basic jobs is the power of the purse. Americans rely on this body to provide Federal funds for programs that support national defense, small businesses, border defenses, conservation of public lands, food assistance for the poor, and so much more.

And as a longstanding member of the Appropriations Committee, I am proud of the work that the Appropriations Committee has done to meet the needs of this Nation. And as a senior Senator from New Hampshire, when I talk to small business owners, educators, healthcare professionals, community leaders across my State, it is unfortunate that not all of the needs of our State are being met.

And for years, New Hampshire, like most small States in this country, has received among the lowest apportionments in the country from formula grant programs that are administered by our Federal Agencies.

Congress has long used earmarks or congressionally directed spending to address funding gaps and inequities between the States. And, in fact, Senator Judd Gregg—whom I had the pleasure of serving with both when he was Governor and I was in the State senate and then when he was in the Senate and I got elected—was a big supporter of congressionally directed spending because he believed, like I do, that I know better how money should be spent in New Hampshire than a bureaucrat here who was making decisions about how to spend Federal dollars.

Congressionally directed spending levels the playing field for States like New Hampshire, and even for Indiana, to ensure that our communities can get their fair share to address our local needs.

Unfortunately, back in 2011, when Congress instituted a ban on congressionally directed spending, we ceded the power of the purse to unelected officials in the executive branch. And while I know that many of these individuals are dedicated bureaucrats, they are public servants. They don't necessarily understand the needs of New Hampshire in the same way that I do as somebody who has represented that State for decades.

So that is why I was very pleased that under the leadership of Chairman LEAHY and Ranking Member SHELBY, Congress once again passed a bipartisan bill to include congressionally directed spending in our budget process.

And when we did that, the Appropriations Committee instituted some major reforms to improve accountability and transparency in the process of congressionally directed spending.

I am going to talk about some of those reforms because while I appreciate the perspective of my colleague from Indiana, I think he has not pointed out the reforms that exist in the process of congressionally directed spending.

First of all, Members are required to certify that neither we nor any member of our immediate family would financially benefit from the requests that are made. Secondly, those congressionally directed spending requests have to be made in writing and posted online by the Member and the Appropriations Committee so that the public has every opportunity to view the name and location of the project, the intended recipient, and the purposes of that request. For example, the requests for fiscal year 2023 are available online right now before they would be available if this government, this administration, were determining how to spend that money.

So the Senator from Indiana doesn't have to wait until those Senate bills are posted to inspect congressionally directed spending projects.

The reforms also include a 1-percent cap on discretionary spending for CDS items and a ban on congressionally directed spending items to for-profit entities.

Finally, the Appropriations Committee requires the Government Accountability Office to audit a sample of enacted congressionally directed spending items to ensure that Congress is being held accountable for these projects.

The chair and ranking member instituted these reforms to restore the trust of the American people in the appropriations process, and I believe it is

working. And I can tell you, as I travel around New Hampshire, it is one of the things that I hear from people in our communities that they are interested in.

They want to know about the appropriations process, and they want to know what other opportunities are there to support initiatives that may not fit within some grant program, that they may not be able to raise money in the private sector for but that are very important for our communities.

The resolution sponsored by the Senator from Indiana would require the chair of the Senate Appropriations Committee to certify that not just Senate earmarks have been disclosed but that all House earmarks have been disclosed.

I think that bill is a solution in search of a problem. The House already has its own rule that governs congressionally directed spending items, and it is required to identify these items.

It knows what its Members have requested, and it is responsible for disclosing them. Requiring the Senate to confirm that the House has done its job before we can consider a message from the House is unnecessary, and it could stop consideration of appropriations bills before they ever get here.

The resolution sponsored by my colleague from Indiana would change Senate rule 44 in ways that could have unintended consequences and could delay critical funding for projects that are important in my home State of New Hampshire and in so many States across this country.

So given all of those concerns, I object.

The PRESIDING OFFICER. The objection is heard.

The Senator from Indiana.

Mr. BRAUN. Mr. President, with all due respect to the Senator from New Hampshire, Senator SHAHEEN, back in 2007, both New Hampshire Senators Gregg and Sununu as well as all 98 Senators who voted back then I think intended not only for the letter of the law but they wanted the spirit of the law to be aligned with it.

We now have a new way, something that can come over here that violates a standing rule of the Senate. I am guessing it will probably be used again down the road where we have to get something, we have no time to look at it. I think the spirit of the law would say that we need the 48 hours and the ability to know who is on it and who isn't.

And then in the bigger picture, I would ask this question—and the American public ought to listen, ask it themselves—is this place getting more responsible or are we giving better value to you? Do we budget? Do we use regular order? And most importantly, are we creating more and more deficit and more and more debt?

We know what the answer is. I talked about it for 15 minutes yesterday evening. We are doing everything we can to avoid the rules, pay attention to the spirit of the law. And in what we are delivering, it is a product I think that shows less and less responsibility out of a body that should not be making rules that make it easier to run deficits and go into debt. It ought to be the opposite.

And if we don't, I think future generations will hold us accountable for the things that we seem to do best, which are the gimmicks to get around budgeting, avoiding the rules on a technicality.

The American public deserves better.

I yield the floor.

The PRESIDING OFFICER. The Senator from New Hampshire.

UNANIMOUS CONSENT AGREEMENT—EXECUTIVE CALENDAR

Mrs. SHAHEEN. Mr. President, I ask unanimous consent that at 1:45 p.m., the Senate proceed to executive session and the Senate immediately vote on confirmation of Executive Calendar No. 902, the nomination of Shereef Elnahal.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

Mrs. SHAHEEN. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. TESTER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

NOMINATION OF SHEREEF M. ELNAHAL

Mr. TESTER. Mr. President, look, now more than ever, the Department of Veterans Affairs needs a steady hand to guide the Veterans Health Administration. This is the Nation's largest integrated healthcare system, and its job is to deliver quality and timely care to our veterans.

I rise today because in about 15 minutes, we are going to vote on the confirmation of Dr. Shereef Elnahal to run the Veterans Health Administration. He has an impressive record of leading healthcare systems and health agencies. Most recently, Dr. Elnahal served as president and CEO of University Hospital in Newark, NJ, and, previous to that, New Jersey's 21st health commissioner. But more importantly than that, Dr. Elnahal is committed to caring for the more than 9 million veterans in VA's care—a commitment he carried out as Assistant Deputy Under Secretary for Health for Quality, Safety, and Value at the Department.

It is no secret that VHA and healthcare systems and providers are going through a challenging time. The VA continues to battle the impacts of the COVID–19 pandemic, with veterans' cases and hospitalizations and deaths on the rise again. And VA staff are dealing with burnout and increased turnover.

In the past, this body has been able to rise above politics to install qualified individuals at the VA responsible for getting vets the healthcare and benefits they need today.

This is also very, very important because the VA is in the process of putting in an electronic health record. It is going to be transformational—not only for the VA, but once it is done, it is going to be transformational for the country, but we have to get it done in the VA first. There have been some challenges. We need somebody with a steady hand helping meet those challenges. Dr. Elnahal is that person.

Today, in about 12½ minutes, we need to act to confirm Dr. Elnahal as the VA's next Under Secretary for Health, and I would encourage everybody in this body to vote for him, get him in, hold him accountable, and make sure that we are living up to the promises we have made to our veterans for the healthcare they have earned.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant executive clerk proceeded to call the roll.

Mr. TESTER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. TESTER. Mr. President, I would ask that all time be yielded back and that we start the vote immediately on Dr. Elnahal.

The PRESIDING OFFICER. Without objection, it is so ordered.

## EXECUTIVE SESSION

## EXECUTIVE CALENDAR

The PRESIDING OFFICER. Under the previous order, the Senate will proceed to executive session to consider the following nomination, which the clerk will report.

The senior assistant executive clerk read the nomination of Shereef M. Elnahal, of New Jersey, to be Under Secretary for Health of the Department of Veterans Affairs.

VOTE ON ELNAHAL NOMINATION

The PRESIDING OFFICER. The question is, Will the Senate advise and consent to the Elnahal nomination?

Mr. TESTER. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There is a sufficient second.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Vermont (Mr. LEAHY), the Senator from Vermont (Mr. SANDERS), the Senator from Minnesota (Ms. SMITH), the Senator from Virginia (Mr. WARNER) and the Senator from Georgia (Mr. WARNOCK) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: The Senator from Missouri (Mr. BLUNT), the Senator

from North Dakota (Mr. CRAMER), the Senator from Louisiana (Mr. KENNEDY), the Senator from Oklahoma (Mr. LANKFORD), the Senator from South Carolina (Mr. SCOTT), and the Senator from North Carolina (Mr. TILLIS).

The result was announced—yeas 66, nays 23, as follows:

[Rollcall Vote No. 267 Ex.]

YEAS—66

| | | |
|---|---|---|
| Baldwin | Gillibrand | Murray |
| Bennet | Graham | Ossoff |
| Blackburn | Grassley | Padilla |
| Blumenthal | Hagerty | Peters |
| Booker | Hassan | Portman |
| Boozman | Heinrich | Reed |
| Brown | Hickenlooper | Rosen |
| Burr | Hirono | Rounds |
| Cantwell | Hoeven | Sasse |
| Capito | Kaine | Schatz |
| Cardin | Kelly | Schumer |
| Carper | King | Shaheen |
| Casey | Klobuchar | Sinema |
| Cassidy | Luján | Stabenow |
| Collins | Manchin | Tester |
| Coons | Markey | Toomey |
| Cornyn | McConnell | Van Hollen |
| Cortez Masto | Menendez | Warren |
| Duckworth | Merkley | Whitehouse |
| Durbin | Moran | Wicker |
| Feinstein | Murkowski | Wyden |
| Fischer | Murphy | Young |

NAYS—23

| | | |
|---|---|---|
| Barrasso | Hyde-Smith | Romney |
| Braun | Inhofe | Rubio |
| Cotton | Johnson | Scott (FL) |
| Crapo | Lee | Shelby |
| Cruz | Lummis | Sullivan |
| Daines | Marshall | Thune |
| Ernst | Paul | Tuberville |
| Hawley | Risch | |

NOT VOTING—11

| | | |
|---|---|---|
| Blunt | Leahy | Tillis |
| Cramer | Sanders | Warner |
| Kennedy | Scott (SC) | Warnock |
| Lankford | Smith | |

The nomination was confirmed.

The PRESIDING OFFICER (Mr. VAN HOLLEN). Under the previous order, the motion to reconsider is considered made and laid upon the table, and the President will be immediately notified of the Senate's action.

## LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will now resume legislative session.

The majority leader.

## SERGEANT FIRST CLASS HEATH ROBINSON HONORING OUR PROMISE TO ADDRESS COMPREHENSIVE TOXICS ACT OF 2022

Mr. SCHUMER. Mr. President, it is my understanding the Senate has received a message from the House of Representatives to accompany S. 3373.

The PRESIDING OFFICER. The Senator is correct.

Mr. SCHUMER. I ask the Chair to lay before the Senate the message to accompany S. 3373.

The PRESIDING OFFICER. The Chair lays before the Senate the message from the House.

The senior assistant legislative clerk read as follows:

Resolved, That the bill from the Senate (S. 3373) entitled ''An Act to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant.'', do pass with an amendment.

MOTION TO CONCUR

Mr. SCHUMER. I move to concur in the House amendment to S. 3373.

The PRESIDING OFFICER. The clerk will report the motion.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] moves to concur in the House amendment to S. 3373.

The PRESIDING OFFICER. Without objection, it is so ordered.

MOTION TO CONCUR WITH AMENDMENT NO. 5148

Mr. SCHUMER. I move to concur in the House amendment to S. 3373 with an amendment.

The PRESIDING OFFICER. The clerk will report the motion with an amendment.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] moves to concur in the House amendment to S. 3373 with an amendment numbered 5148.

The amendment is as follows:

(Purpose: To add an effective date)

At the end add the following:

**SEC. EFFECTIVE DATE.**

This Act shall take effect on the date that is 1 day after the date of enactment of this Act.

Mr. SCHUMER. I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SCHUMER. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

AMENDMENT NO. 5149 TO AMENDMENT NO. 5148

Mr. SCHUMER. I have an amendment at the desk.

The PRESIDING OFFICER. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] proposes an amendment numbered 5149 to amendment No. 5148.

The amendment is as follows:

(Purpose: To modify the effective date)

On page 1, line 3, strike ''1 day'' and insert ''2 days''.

Mr. SCHUMER. I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

MOTION TO REFER WITH AMENDMENT NO. 5150

Mr. SCHUMER. I move to refer S. 3373 to the Committee on Veterans' Affairs with instructions to report back forthwith with an amendment.

The PRESIDING OFFICER. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] moves to refer the bill to the Committee on Veterans' Affairs with instructions to report back forthwith with an amendment numbered 5150.

The amendment is as follows:

(Purpose: To add an effective date)

At the end add the following:

**SEC. EFFECTIVE DATE.**

This Act shall take effect on the date that is 3 days after the date of enactment of this Act.

Mr. SCHUMER. I ask unanimous consent that further reading of the motion be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SCHUMER. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

AMENDMENT NO. 5151 TO INSTRUCTIONS

Mr. SCHUMER. I have an amendment to the instructions at the desk.

The PRESIDING OFFICER. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] proposes an amendment numbered 5151 to the instructions of the motion to refer.

The amendment is as follows:

(Purpose: To modify the effective date)

On page 1, line 3, strike ''3'' and insert ''4''.

Mr. SCHUMER. I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SCHUMER. I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

AMENDMENT NO. 5152 TO AMENDMENT NO. 5151

Mr. SCHUMER. I have a second-degree amendment at the desk.

The PRESIDING OFFICER. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] proposes an amendment numbered 5152 to amendment No. 5151.

The amendment is as follows:

(Purpose: To modify the effective date)

On page 1, line 3, strike ''4'' and insert ''5''.

Mr. SCHUMER. I ask unanimous consent that further reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SCHUMER. I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant executive clerk proceeded to call the roll.

Mr. SULLIVAN. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Ms. CORTEZ MASTO). Without objection, it is so ordered.

TRIBUTE TO BETSY LAWER

Mr. SULLIVAN. Madam President, it is Thursday, and we are back at it with

our Alaskan of the Week series. We have been doing this for, geez, 6 years now, I think.

For the new pages, this is usually kind of the signal of the end of the week but also some really cool stories about Alaska. We know it is your favorite.

We think some of the reporters in town like it because it signals kind of the end of the week for them. But I want to talk about, first, what is kind of going on in Alaska. Right now, the sun is high in the sky through much of the day. Some places up north are getting 24 hours of sunlight; midnight sun, we call it.

In Anchorage, we are getting about 18 hours, but that starts to decline real quick. But even when the sun sets, it is more of a twilight look than real night. So you have got to come up and visit; you will love it. It has been pretty rainy in parts of the State. We needed that rain.

But it can't dampen the magnificent grandeur of Alaska. So, again, if you are watching on TV, you want to come up, have the vacation of a lifetime, do it. The fish are running. We are having a banner year for sockeye salmon. The rivers all across the State are choked with them.

Last weekend, actually, I partook at a particular unique Alaskan tradition with my wife and a couple buddies of mine. We went dipnetting—dipnetting. That is on the Kenai River. That is actually when there is so much fish you actually put a pole with a net at the end, and you just put it in the water—boom. You just start to catch them.

And you know, people go, Well, can you tell if there is a fish in your net? I am like, Oh, yeah, you can tell.

So my wife and I and our friends, we caught 36 beautiful sockeye salmon yesterday—or last weekend, about 5 hours of fishing. It was great. We just loved it.

So fishing, hunting, feeding our families from our land and waters is a big part of our life in Alaska. These traditions bind us. They keep us together as a State, as a community, as families.

Our longstanding businesses are also part of the fabric of our State, particularly the ones that have grown up with our State. When the State's done well, they have done well. When the State struggled, they struggled; but they have hung in there. And we want to celebrate these businesses and the families that have run them.

And the great Alaskan we are honoring today as our Alaskan of the week is Betsy Lawer. And she is part of an amazing family in an amazing business in Alaska—First National Bank of Alaska, which this year is celebrating its 100th anniversary.

So it started in 1922. This amazing financial institution has been part of the landscape of Alaska—good times, difficult times—for 100 years. Betsy has been at the helm, a strong, sturdy force helping to guide this incredible business and, by extension, other businesses and communities throughout the State, part of her family tradition—the Cuddy family—for 100 years.

So let's talk about Betsy and the family. She is the president of the First National Bank of Alaska and also part of a really impressive family that has run this bank for decades in Alaska.

So here is the beginning: Literally with a vault full of gold nuggets and untanned animal pelts, that was their original deposits. In 1922, First National was founded then in what was part of the rough-and-tumble tent city of Anchorage. Anchorage was referred to as a tent city.

In 1930, the patriarch of the Cuddy family, Warren Cuddy, began buying stock in the bank. By 1941, he purchased controlling interest, and Warren became the bank's president. Then, one of his sons, at that time, joined the bank's board—this is Dan Cuddy, the legendary Dan Cuddy, Betsy's dad. His service was remarkable. First, I would like to talk briefly about Dan Cuddy's service as an Alaskan veteran in World War II.

He served as a captain in the 1255th Engineer Combat Battalion, which was attached to General George Patton's Third Army. Dan fought in the Battle of the Bulge in Luxembourg and was one of the troops who assisted in the discovery and then closing of the Buchenwald concentration camp. This is an American hero.

And, by the way, throughout his entire career, I was so honored to meet with Dan Cuddy before he passed away in 2015. Throughout his incredible career, one thing he talked a lot about was the unspeakable atrocities that he saw in World War II, so it would never happen again.

So Dan Cuddy comes back from World War II—warrior patriot, war hero. He becomes a lawyer, and in 1951, he becomes the bank president. And the Cuddy family's involvement, again, throughout our State is legendary.

The bank thrived after that under Dan's leadership. It grew with the State. It helped Alaskans rebuild after the huge 1964 earthquake.

By the way, do you want to read about a huge earthquake? It was 9.2 on the Richter scale, one of the biggest earthquakes ever recorded. It destroyed cities, tsunamis. It lasted almost 5 minutes. Think about that, sitting through an earthquake for 5 minutes.

And the bank the whole time kept supporting communities, and it continues to do that. It was among the first in the Nation to distribute check image statements to its customers in the 1990s. The only bank in America to welcome dog mushers through drive-throughs. Yes, think about that image.

And it is probably certainly the only bank in America that has a branch that is bilingual both in English and Yupik. That is the branch in Bethel, 1 of 19 branches across America.

First National Bank of Alaska—100 years of service—has received so many accolades and awards, including being named one of the top banks in America, and it was recognized in 2013 as one of America's most trustworthy companies by Forbes magazine.

You can see the Cuddy family integrity in this institution. But the most important thing about First National Bank of Alaska's mission statement is that it is what drives the bank: Success depends on taking care of the community, employees, and customers. If the community isn't strong, businesses won't be strong, the bank won't be strong.

So, Betsy, one of Dan and Betti's six children, was raised on those tenets that I just talked about. She saw how they worked firsthand.

On Saturdays, she would join her father Dan while he went on his outings visiting customers. Sometimes those visits happened in Anchorage, where she would politely listen to business being discussed and then grab a late breakfast at Peggy's, a mainstay in Anchorage. Sometimes they would jump into a prop plane and head out to rural Alaska, where she learned so much about that part of our great State.

Betsy said she loved those visits and she learned, in the ways that children do, that helping people realize their hopes and their dreams is what her father did, what their business did, and why it was so important to so many Alaskan communities.

Jump forward to September 10, 1969. Betsy was a college student at Duke, spending her summers, as she always did, working at the bank as a secretary at the bank.

Just down the street from First National in downtown Anchorage, the Prudhoe Bay oil lease sale was underway. This is the giant oilfield in Alaska—oil and gasfield. The first big lease sale by the State. It was a huge event for our Nation, huge event for Alaska.

Back then, the country needed Alaska oil and gas, just like today our country needs Alaska oil and gas.

On that day in September 1969, Betsy remembers looking out the window of the bank. She said the streets were completely empty, like the ''Twilight Zone.'' Everybody was huddled in front of their radios, listening to the lease sale that would change Alaska and, in many ways, America forever.

First National Bank of Alaska—the Cuddy family's bank where she was working, her dad was president then—was assisting Bank of America on the lease sale.

After the sale, get this image, Betsy got a ride back to the east coast on a jet with bank executives headed to New York to directly deposit the $900 million check that was made out to the State of Alaska—that is about 7 billion in today's money—that got our State up and moving. She was on that plane depositing that money. Imagine the excitement that she felt then.

The first thing Betsy did after that when she got back to Duke was to

change majors from interior design to economics, which was probably a good move for a future bank president.

Two years later—she didn't even wait for her graduation ceremony—she came back to Alaska and immediately got to work. Now, because management programs back then were mostly for men, Betsy started from the bottom up—teller, clerk, secretary—which she said later in life gave her an advantage when she began processing loans for the bank because she knew exactly how it all worked and the people at every level in that bank. She knew the bones of the bank and the banking industry.

Throughout the years, as the bank has grown, our Alaskan of the Week, Betsy, has grown with it. She became president of the bank in 2013, CEO in 2018, and she is also the board president.

She is a mother, a wife, an active member of the community. She is a great community banker, and I will tell you this. During the pandemic, there was no financial institution that was more dedicated to getting the PPP loans out to small businesses in Alaska than First National Bank of Alaska and Betsy Lawer. They did an incredible job.

Betsy helps people in our State realize their hopes and dreams, and for Betsy, it all comes down to having a deep understanding and caring for the community—the many communities that they serve. ''You can't automate those relationships,'' she said.

So I want to thank Betsy, the Cuddy family, congratulate the First National Bank of Alaska—100 years of service to our great State, what an amazing record. And I want to congratulate Betsy on perhaps one of her most prestigious awards ever: being Alaskan of the Week.

CHIPS ACT OF 2022

Madam President, we have been discussing on the Senate floor the USICA bill, the America Competes bill, the bill that is supposed to focus on our ability to outcompete the Chinese communist economy, and I can think of very little legislation more important than this.

This is an issue that since I arrived in the Senate in 2015, I started talking about the importance of a broad-based strategy as it relates to China and outcompeting China and recognizing that they don't play fair, that they steal, that they subsidize, that they coerce, and yet they are a huge entity in the global economy so we need a strategy to deal with them.

And this bill that we are now debating on the Senate floor, the U.S. Innovation and Competition Act of 2021, USICA is something that I, with a number of other Senators, have worked hard on for literally over the last year and a half, and I want to thank a number of Senators who have put their heart and soul into this legislation, commend them: Senators YOUNG, SCHUMER, WICKER, CANTWELL, WARNER, CORNYN.

This is important legislation. As I mentioned, I have supported it and its Senate iterations when we passed it out of the Senate, out of committee in the Commerce Committee, but I have concerns. I have concerns, and I am going to mention a few of them briefly and then one concern that permeates so much of what has been happening here in the U.S. Senate over the last year and a half that is really important to me and my constituents. And I am asking my Senate colleagues—my Democratic Senate colleagues—to help me on something that I don't think a lot of them maybe even know that they are doing, but let me get to the concerns.

First, on the chips provision—this isn't a concern. This is what Senator WARNER, Senator CORNYN, and many others have focused on—really important to shore up semiconductor manufacturing in America.

Now, look, my State, unfortunately, is not one that is competing right now hard for a big fabrication plant. I understand that. We have other assets like energy I am going to talk about here in a minute, but wherever this government support for the chips industry is going to go in America, I think it is really important because this industry is like energy. It is so important to America, and we can't let China outcompete us in that area.

But let me talk about a couple concerns. First, on energy, one of the biggest areas that we can compete against China that they are scared about competing with us is our incredible natural resources, ''all of the above'' resources, all of our energy.

If you read the intel and you see what China's leadership is worried about, one thing they are worried about is American energy dominance.

So I have worked hard on this legislation for a year and a half to make sure that when we are looking at research—advanced research that this legislation is going to fund—it needs to include all energy.

It has been a struggle, I will admit. Some of my Democratic colleagues, certainly the Biden administration, have this thing where they don't like certain areas of energy—oil and gas in particular. They have targeted it. They want to put it out of business. It makes no sense. It is probably the biggest strategic blunder of the Biden administration across so many areas—targeting and unilaterally disarming American energy, when it is one of our greatest comparative advantages.

Unfortunately, some of the language coming back over from the House continues this trend, and I am very concerned that we would have a bill that could give Federal bureaucrats the opportunity to continue to target American energy, as opposed to help bolster it in our competition with China.

So that is one concern. It wasn't in the Senate bill. I made sure of that. But now after some of the far-left Members in the House got to put language in that came back over here, it is a concern, and it should concern every single American, every single Senator.

We need all of our strengths to compete with China, and to not use the strength of American energy—''all of the above'' energy—is nuts. Hopefully, this administration is waking up to that, but it hasn't been a great record at all in terms of that.

There is another provision, something that built on a provision that I tried to get that I did get in the original USICA bill that Senator PORTMAN has now put forward with Democrats and Republicans, a provision to make sure that all of these Federal dollars that are going to be in this bill do not go to Chinese researchers working in our facilities—in research facilities, in university facilities—and then take them back to China.

At a recent hearing, FBI Director Wray said this is one of the biggest threats our country faces, the counterintelligence perspective with regard to the Chinese Communist Party. He said:

> They are targeting our innovation, our trade secrets, our intellectual property on a scale that's unprecedented in history.

So if we are going to spend all these Federal dollars on American research at American research institutions and American universities, we need strong guardrails to make sure it doesn't fall into Chinese hands.

Senator PORTMAN has done a great job on this. It is a commonsense amendment. Apparently, some have had concerns that this amendment would be ''racist.'' That is ridiculous. We need to prevent China from stealing our intellectual property. Period. It is not racist; it is common sense. I hope we can make sure that amendment gets in.

But I want to go into a little detail on the final issue that I have with this bill. And to be honest, it is kind of shocking that a bill focused on competing with China—once again, from the Democratic side of the Senate or the House, I don't know where it comes from—has provisions that actually target in a negative way Alaska Natives. OK?

This is an issue that, to be honest, I am kind of flabbergasted. It comes up everywhere. It is discrimination. It is racial discrimination—good old-fashioned racial discrimination—that I thought we tried to get rid of in this country a long time ago, and it keeps popping up.

I am tired of it, and, remarkably, it popped up in the bill that competes against China. So I am sure a lot of you are saying: Well, jeez, how did that happen? I want to explain because I really want my colleagues, many of whom I am convinced have no idea what is going on, to understand what is happening. And it happens again and again, and to be honest, it shouldn't.

I hope some people in our media finally write about this. I think it is shameful.

But I am going to explain it here right now. Here is the issue. In Alaska, we have a very big indigenous population—wonderful people, incredible people, amazing people. It is almost 20 percent of the population of my State. They bring culture, heritage, values. By the way, they have been there for tens of thousands of years. This is really important to me and to Senator MURKOWSKI. Congress—Congress, not the Native people, the Congress of the United States—over the course of many years, essentially, has classified—we in the U.S. Senate have classified—Alaska Natives into two broad categories. There are Tribal members, which is this circle here, and there are members of Alaska Native Corporations. They are in this circle here.

Now, a lot of the indigenous people of Alaska are both Tribal members and an ANC members. Some are not both. Some are just Tribal members. Some are ANC members.

But we are talking about tens of thousands of indigenous people. So whenever we work on legislation that benefits the Alaska Native people—but American Indians, writ large—what we always try to do is say: Remember, Congress did this. The Native people didn't do this. So let's make sure that we cover everybody. Let's make sure everybody is included. You wouldn't want to discriminate against one of these groups. They are all indigenous people.

So that is what me, Senator MURKOWSKI, Ted Stevens—every Senator, every great Congressman, our great Congressman Don Young, whom we just lost—we have been doing that for decades.

All of a sudden this has become controversial to some Members, to some groups. This group, the ANC members, these are indigenous people of Alaska designated as ANC members, not by themselves but by the Congress, OK?

So here is what happened. Here is the beginning. It is sad, and I am going to talk about it. It shouldn't happen, and I really want my Democratic colleagues to help me stop this because if you put another minority group in and talked about what is happening to the Native people of Alaska, people would be shocked. The New York Times and the Washington Post would write front pages stories about official discrimination by the U.S. Senate against a minority population. But for whatever reason, it seems to be OK to do it against Alaska Natives. But it is not OK.

Here is what happened. In the CARES Act we had this historic funding, $8 billion for the Native people of America. We wrote a definition. I was very involved with it. Everybody cleared on it—Indian Affairs, majority, minority. That included all indigenous people of Alaska—OK, just like we include all indigenous people of Nevada and New Mexico. We wanted to cover with $8 billion in the CARES Act the very vulnerable populations, all the Native people.

Unfortunately—unfortunately—as opposed to being viewed as $8 billion, the biggest historic investment in Indian communities in history, there was a dispute, and certain groups said: Hey, we got this $8 billion, but we don't want this group to get anything. We don't want this group, ANC members, to get any of that $8 billion.

Remarkably, the majority leader in a tweet attacked the Assistant Secretary of the Interior, an Alaska Native woman of impeccable integrity, saying somehow that these members getting any of that money was corrupt. Of course, that was ridiculous. One of the Senate Democrats here, Senator Udall, launched an investigation of this incredible Assistant Secretary of the Interior, an Alaska Native woman, on this charge. It was refuted. It was ridiculous. It was sad.

By the way, Senator Udall apologized to her. Our Ambassador to New Zealand right now apologized to this incredible Alaska Native woman, saying: Do you know what? That was probably really bad. I am sorry.

It was bad.

So what happened is that you had a group saying: Let's exclude this group of tens of thousands of Alaska Natives from getting any CARES money.

Well, look, we wrote the language. We knew that the language was inclusive of everybody. So that, unfortunately, went all the way to the U.S. Supreme Court. The Trump administration and, to its credit, the Biden administration said: No, the language of the CARES Act included all Alaska Natives. Why would we discriminate one against the other?

So we won that. That was the way it was written. I had a lot to do with writing it. So I know. But that is just fair. OK, so that is what happened.

So then my Democratic colleagues write the American Recovery Act. The $2 trillion relief package, with $20 billion for American Tribes. But do you know what came out of that package? Express language written by my Democratic colleagues saying that of the $20 billion, every Native group in America gets some of that money, but this group—tens of thousands of ANC members in Alaska—we are going to make sure they don't get any of that.

That happened, right here on the Senate floor. I have no idea why.

Let me just pose a counterfactual. Imagine you had Congress say there are two groups of minorities. Let's say not two groups but Asian American minorities in New York, group A, group B—Congress categorized them, not themselves—or African Americans, group A, group B; or Hispanic Americans, group A, group B, in the State of New York—just in the State of New York. And a Republican Congress said we are going to do a giant relief package for that minority group across the country. But, group B in New York, we are going to expressly exclude you from getting any money.

What would you call that?

I would call that good old-fashioned racial discrimination.

If that happened, if a Republican Congress did that, to say a group of African Americans or Hispanic Americans or Asian Americans, the New York Times and the Washington Post would be going crazy—rightfully so, by the way.

This happened. This happened.

OK, I don't know why. I would love it if one of my Senate colleagues came down and said: Hey, Dan, here is why we went to great lengths to exclude tens of thousands of Alaska Native indigenous people from getting relief. Here is why we did that to you.

I would love for somebody to tell me that.

They haven't.

I think it is wrong. I think most people who know about it probably would be like: Jeez, I didn't know we had $20 billion for Tribes, but we specifically excluded this group. Was it because we were mad about the Supreme Court case?

I don't know. But here is the thing. Back to the USICA bill, there is a lot of money going to universities.

Mr. CARDIN. Madam President, I am wondering if my colleague would yield for 1 minute.

Mr. SULLIVAN. I am finishing up. So I am not going to yield. It is important to me, to my colleague from Maryland.

There is a lot of money going to universities.

This is really important to me, and I have been wanting to give this speech for a long time.

There is a lot of money going to institutions for research to compete against China. There are specific provisions that say: Hey, there is going to be money that goes to Native American groups. That is great. They have a lot to bring to this battle with China.

But that provision that came over from the House—guess what it did. It said: Not to this group. Not to this group.

So do you see where I am going with this?

I have no idea why Democrats in the House and Senate want to keep targeting this group of indigenous people. Imagine if Republicans did this to a minority group in Maryland or New York.

But it is happening, and it is happening even in this bill. So that is another big concern I have of this bill, this continuation of—I have no idea. I would love it for someone to come down and say: Hey, Dan, here is why we discriminate against tens of thousands of indigenous people in your State.

But it is happening. I sure hope my colleagues listen to this. Maybe the New York Times or the Washington Post would write about it once.

But just a ceasefire—when we are trying to help Native people in America, in Alaska we want to help them all. Remember, this is how Congress set up these groups, not the people. So all I ask is let's kind of do what we did

in the CARES Act for all legislation. But I and Senator MURKOWSKI are going to scrub every piece of darn legislation that comes out of here, and we are going to start calling out people, asking: Why are you discriminating against tens of thousands of people in my State who are indigenous?

Wrong. It is inexplicable, and it is even in the darn bill to compete with China. And I sure hope my colleagues will work with me to start making sure this doesn't happen anymore.

I yield the floor.

## SIGNING AUTHORITY

The PRESIDING OFFICER. The Senator from Maryland.

Mr. CARDIN. Madam President, I ask unanimous consent that Senators CORTEZ MASTO, CARDIN, and HICKENLOOPER be authorized to sign duly enrolled bills or joint resolutions from July 21, 2022, until July 25.

The PRESIDING OFFICER. Without objection, it is so ordered.

## ELECTORAL COUNT ACT WORKING GROUP

Mr. CARDIN. Madam President, for the past 6 months, I have been pleased to work with a bipartisan working group of about a dozen Senators for potential reforms of the Electoral Count Act and some related matters. I particularly want to thank our leaders of that bipartisan group, Senators COLLINS and MANCHIN, for organizing the group, keeping us focused on getting results, and leading to a process that has resulted in a positive outcome.

This week, we are unveiling our proposed legislation. Our legislation, the Electoral Count Reform and Presidential Transition Improvement Act of 2022 will reform and modernize the badly outdated 1887 ECA. In 1887, the Electoral Count Act was passed. It is in bad need of reform.

On July 18, 2022, the Wall Street Journal ran an editorial authored by former President Jimmy Carter and former Secretary of State Jim Baker, who had previously served as Chief of Staff for President Reagan. In this editorial they wrote:

> We stand on opposite sides of the partisan divide, but we believe it is better to search for solutions together than to remain divided. This is particularly true of a vexing problem that could wreak havoc during the 2024 presidential election: the inadequacy of the Electoral Count Act of 1887.
>
> The act is an antiquated, muddled and potentially unconstitutional law that allows uncertainty during a critical step in the peaceful transfer of power. . . . Weaknesses in the law started to become apparent after the 2000 election.

The editorial continues:

> In 2021, the ambiguities of that law helped lead to the violent assault on the U.S. Capitol as efforts were being made to toss out several states' slates of electoral votes. Fortunately, those efforts failed, and the rightful winners took office. But the threat of confusion remains. Left unclosed, loopholes in the act could allow a repeat of the same destructive path that occurred in 2021.

The Washington Post has written several editorials on this subject as well. The June 19, 2022, editorial in the Post entitled ''Fix the electoral count law now, before Trump tries to exploit it again'' reviewed the recent House committee hearings on the January 6 insurrection. The editorial wrote:

> The House committee investigating the Jan. 6, 2021, Capitol attack heard damning testimony detailing how President Donald Trump and a coterie of partisan lawyers advanced a dangerous argument: that the vice president has the legal authority to overturn a presidential election when Congress meets to count electoral college votes. Trump official after Trump official testified that they knew it was wrong. John Eastman, a lawyer who advocated for the theory, acknowledged as much in front of Mr. Trump on January 4, according to testimony from Greg Jacob, who was Vice President Mike Pence's general counsel. But Mr. Trump and his allies nevertheless waged a relentless public campaign to pressure Mr. PENCE to betray the Nation's democracy. Belief in this antidemocratic nonsense spurred the January 6 mob, which infamously chanted, ''Hang Mike Pence.''

The Post editorial continued:

> Americans went most of their history without having to worry seriously about arcane electoral college procedures. Even in closely fought, acrimonious presidential elections, losing candidates accepted their defeats with grace rather than seeking the vulnerabilities in the law to exploit. The country no longer has that luxury. Congress should have no higher priority than fixing the electoral college process.

The recommendations that are coming out of this bipartisan group would do just that—fix the Electoral Count Act.

I want to thank the work of the American Law Institute, which convened a bipartisan working group to consider possible ECA reforms. In particular, I want to thank cochairs Bob Bauer and Jack Goldsmith for their contributions to our efforts. I also want to thank the staff at Protect Democracy for their suggestions and work here.

Our legislation aims to ensure that Congress can accurately and correctly tally the electoral votes cast by the States, which should be consistent with each State's popular vote for President and Vice President of the United States. Our legislation clarifies some of the ambiguities in terms of the appropriate State and Federal roles in selecting the next President and Vice President of the United States as set forth in the U.S. Constitution.

In our constitutional system, election law, like many other areas of law, involves shared powers between the Federal Government on the one hand and State and local governments on the other. Article I, section 4 of the Constitution provides:

> The Times, Places, and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof.

That clause of the Constitution continues by concluding:

> But the Congress may at any time [by law] make or alter such Regulations.

We have the power here, and that is what the Electoral Count Act is about.

Article II, section 1 of the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress.

The Constitution also provides:

> The Congress may determine the Time of choosing of the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

The 12th Amendment to the Constitution, ratified in 1804, sets out a framework for Congress to tally and count the electoral votes from the States. Congress later passed the Electoral Count Act, the ECA, in 1887, in the aftermath of a contested Hayes-Tilden Presidential election of 1876 in which States sent competing slates of electors to Congress.

Our legislation takes several key steps to modernize the ECA and reduce the opportunity for constitutional mischief when it comes to Congress properly counting the electoral votes of the States.

First, the legislation helps to make it easier for Congress to identify a single, conclusive slate of electors from each State. The legislation requires each State's Governor as responsible for submitting the certificate of ascertainment identifying that State's electors. A State may designate another individual besides the Governor to carry out this function, such as the Secretary of State, if such an individual is named before the election day itself.

Again, the State executive official reporting their electoral votes to Congress must do such ''under and in pursuance of the laws of such State providing for such ascertainment enacted prior to election day.''

Our legislation, therefore, seeks to avoid circumstances in which a State attempts to change the rules after election day due to political pressure that may arise if a particular favored candidate loses the election.

Congress could not accept a slate of electors from an official not authorized to do so by State law enacted prior to election day. Our legislation provides that States following these rules will have their appointments of electors treated as conclusive by Congress subject to any subsequent State or Federal judicial relief granted prior to the date of the meeting of electors.

Our legislation states that the determination of the Federal courts shall be conclusive on questions arising under the Constitution or laws of the United States.

Second, the legislation modernizes the ''failed election'' language in the ECA to specify that a State could modify its period of voting on election day only as necessitated by ''extraordinary

and catastrophic'' events ''as provided under the laws of the State enacted prior to [the election day].''

This provision makes it clear, if a State legislature tries to override the popular vote in their State, that that would not be allowed.

Third, the legislation provides for the expedited judicial review of certain claims relating to a State's certificate identifying its electors. We have limited this special judicial review in our legislation to only be available to the aggrieved Presidential candidates. This special procedure allows for challenges made under Federal law and the U.S. Constitution to be resolved more efficiently by using a special three-judge panel with a direct and timely appeal to the U.S. Supreme Court.

Fourth, the legislation makes clear that the Vice President has a purely ministerial role in the joint session of Congress to count the States' electoral votes. In particular, our legislation states that the Vice President does not have the power to solely determine, accept, reject, or otherwise adjudicate disputes over electors. That specifically includes objections over the proper list of electors, the validity of electors, or the votes of the electors.

President Trump pressured the Vice President to use this illegal method in order to overturn the 2020 election results. Ultimately, this effort was rejected by Vice President Pence, in his capacity as President of the Senate, as he presided over the January 6, 2021, joint session.

Fifth, our legislation increases the threshold needed to lodge an objection to electors from one Senator and one Representative to one-fifth of the duly chosen and sworn Members of both the House and the Senate. Similarly, article I, section 5 of the Constitution provides ''the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those present, be entered on the Journal.''

This will reduce the risk and likelihood of frivolous objections being lodged, which requires a lengthy debate and vote in the separate Houses. The House has to vote separately; the Senate has to vote separately; and it takes a lot of time. For example, on January 6, 2021, the Senate voted to reject, by a vote of 6 to 93, the objection against the electors of Arizona and voted 7 to 92 on the objections raised as to the electors from Pennsylvania.

Sixth, our legislation clarifies that, if electors are not lawfully appointed or if an objection is sustained by Congress rejecting electors as not lawfully appointed, those electors would not be included in the denominator for determining the majority of the whole number of electors appointed.

That means we can reach a decision on the day that we count the votes.

The main focus of our work over the past 6 months has been on this sorely needed reform in the ECA, but our working group came up with a number of bipartisan reforms on some other matters related to elections.

The Presidential Transition Improvement Act would help promote the orderly transfer of power between Presidential administrations. As we saw in 2020, the failure of a timely ascertainment of the winner by the Administrator of the U.S. General Services Administration and the uncooperative attitude of the Trump administration led to a delay in providing transition resources to the incoming Biden administration. This legislation provides clearer guidelines for eligible candidates for President and Vice President to receive Federal resources to support their transitions, including allowing more than one candidate to receive these resources during the time period when the outcome of an election is in reasonable doubt.

The Postal Service Election Improvement Act seeks to improve the handling of mail-in ballots by the U.S. Postal Service and provides guidance and best practices to the States to improve their mail-in ballot processes if State law allows.

The Election Assistance Commission Reauthorization Act would reauthorize the Election Assistance Commission for 5 years. The EAC administers grants to States and develops nonbinding guidance and best practices for election officials in various areas, including cyber security, election audits, and voting accessibility.

What this legislation does not include is any substantive provision to strengthen voting rights in this country, which is desperately needed, and I am sorely disappointed by that omission. Our Nation has a long history of bipartisan work on voting rights issues. I repeatedly raised voting rights issues with our larger group as well as with our smaller subgroup on voting practices.

Let me take a moment to remind my colleagues of our voting rights history.

The Voting Rights Act of 1965 was approved by a broad bipartisan vote of 328 to 74 in the House and by a vote of 79 to 18 in the Senate, and Congress had a long bipartisan track record of clarifying its intent in response to restrictive Supreme Court decisions—that is, until recently.

In 1982, Congress amended section 2 of the Voting Rights Act after the Mobile v. Bolden decision in which the Supreme Court interpreted section 2 as prohibiting only purposeful discrimination. That was very restrictive, making the Voting Rights Act much less effective. Congress responded to that decision by clarifying that section 2 explicitly bans any voting practice that had a discriminatory result irrespective of whether the practice was enacted or operated for a discriminatory purpose. The 1982 amendments—these are the amendments that corrected the Supreme Court's restricted decision—passed the House by a vote of 389 to 24 and the Senate by a vote of 85 to 8. They were signed into law by President Reagan, a bipartisan action.

Over 20 years later, Congress acted to address two Supreme Court rulings to clarify congressional intent regarding section 5 of the Voting Rights Act. This reauthorization passed 390 to 33 in the House and 98 to 0 in the Senate. It was signed into law by President George W. Bush—again, a bipartisan action.

So, after the Supreme Court's decision in Shelby County v. Holder in 2013 and after Brnovich in 2021, Congress should have acted to clarify the intent of the Voting Rights Act, but it didn't, and now we are faced today with totally unnecessary partisan gridlock on voting rights. We saw this gridlock play out this January when the Senate refused to even take up and debate the Freedom to Vote: John R. Lewis Act.

Let me mention one section of the VRA in particular. Section 2 of the Voting Rights Act protects against discriminatory voting laws. It prohibits any jurisdiction from implementing a ''voting qualification or prerequisite to voting, or standard, practice, or procedure . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race,'' color, or language minority status.

For nearly 40 years, case law has interpreted section 2 to combat racial discrimination without partisan favor. Prior to the Brnovich case, the Supreme Court and several circuit courts had adopted a standard to ensure the effective implementation of these provisions consistent with the text and purpose of the Act as amended in 1982.

The Brnovich decision deviated from congressional intent behind section 2. The Court adopted an unduly narrow reading of section 2 and went beyond the statutory interpretation by courts for decades by outlining five new guideposts. The decision is not tethered to the statutory text and is inconsistent with the statute's purpose and historical usage.

It wasn't the first time the Court narrowed our law, but in previous efforts, we came together, Democrats and Republicans, to make sure that the Voting Rights Act was effective. So I am disappointed that we could not make progress in our working group to address the needed fix to section 2.

We should have also looked at the issue of the right of private action. Since the Voting Rights Act's enactment in 1965, Congress has intended that voters be able to sue directly to enforce the Voting Rights Act rather than depend entirely upon the U.S. Department of Justice, which has finite resources to protect voting rights.

I want to thank my colleague Senator MURKOWSKI for consistently raising this issue.

The Voting Rights Act's private right of action is settled law as Congress has repeatedly noted in its Voting Rights Act's amendments.

Even though the private right of action is clear and settled law, our group should have removed any ambiguity about its intent by proposing language making it more explicit the statute's existing right for private action. Just

as we resolved ambiguities in the ECA and its potential misinterpretation, we should have done the same with this critical right of private action under the Voting Rights Act—a missed opportunity.

As a recent report from the Brennan Center points out, State legislatures have been working to make it harder to vote after the 2020 elections, even after witnessing record turnout during the pandemic. The Brennan Center wrote that in 2022:

[S]tate lawmakers, who spent 2021 passing laws that made it harder to vote, have focused more intently on election interference, passing nine laws that could lead to tampering with how elections are run and how results are determined.

Election interference laws do two primary things. They open the door to partisan interference in elections, or they threaten the people and processes that make elections work. In many cases, these efforts are being justified as measures to combat baseless claims of widespread voter fraud and a stolen 2020 election.

The Brennan Center noted that in many of these same State legislatures, lawmakers have continued to introduce or enact laws that restrict access to the vote. Legislation is categorized as restrictive if it would make it harder for eligible Americans to register, stay on the rolls, and/or to vote as compared to existing State law.

Free and fair elections are fundamental to who we are as a nation. For this reason, I strongly support the bipartisan working group's proposal to reform and modernize the ECA. As we saw in the 2020 elections, different interpretations of the Electoral Count Act can lead down a dangerous path to another January 6-style insurrection, when former President Donald Trump and his enablers attempted to overturn a free and fair election won by President Joe Biden.

Congress's work will not be complete when we pass this bipartisan proposal. We still must take up and pass voting rights legislation in order to safeguard the right to vote, which should be a right guaranteed to all Americans, regardless of their race, wealth, or social status.

I yield the floor.

The PRESIDING OFFICER (Mr. HICKENLOOPER). The Senator from Maryland.

## EXECUTIVE SESSION

## EXECUTIVE CALENDAR

Mr. CARDIN. Mr. President, I ask unanimous consent that the Senate proceed to executive session to consider the following nominations en bloc: Calendar Nos. 1045, 1046, 1047, 1049, 1057, 1058, and all nominations on the Secretary's desk in the Foreign Service; that the Senate vote on the nominations en bloc without intervening action or debate; that the motions to reconsider be considered made and laid upon the table; that any statements related to the nominations be printed in the RECORD; that the President be immediately notified of the Senate's actions; and that the Senate resume legislative session.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

The question is, Will the Senate advise and consent to the nominations of Leslie N. Bluhm, of Illinois, to be a Member of the Board of Directors of the Corporation for National and Community Service for a term expiring October 6, 2023; Lisette Nieves, of New York, to be a Member of the Board of Directors of the Corporation for National and Community Service for a term expiring October 6, 2022; Lisette Nieves, of New York, to be a Member of the Board of Directors of the Corporation for National and Community Service for a term expiring October 6, 2027. (Reappointment); Deborah R. Coen, of Connecticut, to be a Member of the National Council on the Humanities for a term expiring January 26, 2028; Enix Smith III, of Louisiana, to be United States Marshal for the Eastern District of Louisiana for the term of four years; Adair Ford Boroughs, of South Carolina, to be United States Attorney for the District of South Carolina for the term of four years; PN1948 FOREIGN SERVICE nomination of Sara C. Schuman, which was received by the Senate and appeared in the CONGRESSIONAL RECORD of April 7, 2022; and PN1949 FOREIGN SERVICE nominations (3) beginning Alyce Camille Richardson, and ending Diane Jones, which nominations were received by the Senate and appeared in the CONGRESSIONAL RECORD of April 7, 2022, en bloc?

The nominations were confirmed en bloc.

## LEGISLATIVE SESSION

The PRESIDING OFFICER. The Senate will now resume legislative session.

## SUPPORTING THE GOALS AND IDEALS OF COUNTERING INTERNATIONAL PARENTAL CHILD ABDUCTION MONTH

Mr. CARDIN. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 411, S. Res. 568.

The PRESIDING OFFICER. The clerk will report the resolution by title.

The bill clerk read as follows:

A resolution (S. Res. 568) supporting the goals and ideals of ''Countering International Parental Child Abduction Month'' and expressing the sense of the Senate that Congress should raise awareness of the harm caused by international parental child abduction.

There being no objection, the Senate proceeded to consider the resolution, which had been reported from the Committee on Foreign Relations.

Mr. CARDIN. Mr. President, I know of no further debate on the resolution.

The PRESIDING OFFICER. The question is on agreeing to the resolution.

The resolution (S. Res. 568) was agreed to.

Mr. CARDIN. Mr. President, I further ask that the preamble be agreed to and that the motions to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

The preamble was agreed to.

(The resolution, with its preamble, is printed in the RECORD of March 30, 2022, under ''Submitted Resolutions.'')

## RECOGNIZING, HONORING, AND COMMENDING THE WOMEN OF UKRAINE WHO HAVE CONTRIBUTED TO THE FIGHT FOR FREEDOM AND THE DEFENSE OF UKRAINE

Mr. CARDIN. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 412, S. Res. 589.

The PRESIDING OFFICER. The clerk will report the resolution by title.

The legislative clerk read as follows:

A resolution (S. Res. 589) recognizing, honoring, and commending the women of Ukraine who have contributed to the fight for freedom and the defense of Ukraine.

There being no objection, the Senate proceeded to consider the resolution, which had been reported from the Committee on Foreign Relations, with an amendment to strike all after the resolving clause and insert the part in italic, and with an amendment to strike the preamble and insert the part printed in italic, as follows:

S. RES. 589

*Whereas, on February 24, 2022, Russian Federation President Vladimir Putin instigated an unprovoked, unjustified, and unlawful war violating the territorial integrity of the sovereign country of Ukraine;*

*Whereas, in response to this invasion, the people of Ukraine marshaled their will to defend their country and shared belief in a sovereign Ukraine in order to resist the imperialist ambitions of Vladimir Putin;*

*Whereas countless Ukrainian men, women, and children have done their part to defend democracy and freedom in Ukraine;*

*Whereas women have played a key role in defending Ukraine, keeping their families and innocent children safe and responding to the invasion by the Russian Federation;*

*Whereas, in the first 3 months of fighting in Ukraine, more than 6,100,000 Ukrainians, of which the majority are women and children, fled the country in response to Putin's war;*

*Whereas women play a critical role in facilitating the transit of children to safety, including by escorting the children of parents and guardians who cannot leave Ukraine so that such children are able to find safety in neighboring countries;*

*Whereas the women who remain in Ukraine contribute to all aspects of warfighting, including by fighting on the front lines and as part of the territorial defense, delivering supplies and weapons, and preparing cities for assaults by the Russian Federation;*

*Whereas between 15 and 17 percent of the armed forces of Ukraine are women;*

*Whereas the women of Ukraine have a long history of defending Ukraine and standing up for their rights and freedoms;*

*Whereas, following the 2014 invasion of the sovereign and independent state of Ukraine by the Russian Federation, the women of Ukraine joined the fight to preserve their independence;*

*Whereas, despite significant contributions to the war effort now and since 2014, outdated legislation in Ukraine classifies women as cooks, tailors, and administrative assistants;*

*Whereas women are an integral part of the armed forces of Ukraine and continue to defend their homes and their country;*

*Whereas, on March 9, the armed forces of the Russian Federation deliberately attacked civilian targets in Mariupol, Ukraine, which destroyed a hospital that served as both a maternity ward and a children's hospital, killing two women and a baby;*

*Whereas, following the devastating attack on the well-known and established hospital, the world watched in horror as pregnant women, mothers carrying newborn babies, and young children fled the rubble of what should have been a safe place;*

*Whereas the women at the hospital should have been celebrating new life and looking toward raising their children in peace and safety, instead, those women are seeking shelter in subways, giving birth in bunkers, and worrying for the safety of their children and the future of Ukraine;*

*Whereas the attack on the maternity ward and children's hospital in Mariupol was the fourth such attack on a maternity ward in Ukraine by the Russian Federation since the beginning of the invasion on February 24;*

*Whereas, according to Save the Children, more than 63,000 women have given birth since the start of the war, while the United Nations estimates that 80,000 Ukrainian women will give birth in between April and June of 2022;*

*Whereas all women, in every situation, have the right to a safe birth and access to crucial supplies necessary for the management of pregnancy complications, including oxygen and medical supplies, which are running dangerously low in Ukraine because of the ongoing violence and refusal on the part of the Russian Federation to allow for safe passage for humanitarian purposes;*

*Whereas, on March 17, 2022, Secretary of State Antony Blinken described the deliberate targeting of civilians in Ukraine as a war crime, which should be investigated as such;*

*Whereas, on March 23, 2022, Secretary Blinken announced that it was the assessment of the United States Government that ''members of Russia's forces have committed war crimes in Ukraine'' based on ''a careful review of available information from public and intelligence sources'';*

*Whereas the Russian Federation has deliberately attacked civilians and civilian infrastructure in Ukraine, including schools, hospitals, businesses, apartment buildings, and utility services;*

*Whereas the initial days of the invasion of Ukraine by the Russian Federation have resulted in a disproportionate number of women and children seeking safety outside of Ukraine;*

*Whereas Ukrainian women and girls, like women and girls in all humanitarian emergencies, including women and girls forced to leave their homes in conflict settings, face increased and exacerbated vulnerabilities to—*

*(1) gender-based violence, including rape, child marriage, domestic violence, and sexual exploitation and assault;*

*(2) all forms of human trafficking;*

*(3) disruptions in education and livelihood;*

*(4) lack of access to health care; and*

*(5) food insecurity and malnutrition;*

*Whereas the United Nations Security Council adopted United Nations Security Council Resolution 1325 on October 31, 2000, acknowledging the impact of conflict and security decisions on women and calling on all member states to include ''women at all decision-making levels in national, regional and international institutions and mechanisms for the prevention, management, and resolution of conflict'';*

*Whereas, according to the United Nations Entity for Gender Equality and the Empowerment of Women (commonly referred to as ''UN Women''), peace negotiations are more likely to end in a peace agreement when women and women's groups play a meaningful role in the negotiation process, and according to the International Peace Institute, a peace agreement is 35 percent more likely to last at least 15 years if women participate in the development of the peace agreement;*

*Whereas, in 2016, Ukraine adopted its first National Action Plan for the implementation of United Nations Security Council Resolution 1325, and, on October 28, 2020, Ukraine approved a new National Action Plan for 2021 through 2025 in order to address the impact on women of the aggression of the Russian Federation against Ukraine and to ensure gender equality in the security and defense sectors of Ukraine;*

*Whereas representation of women in politics in Ukraine has increased steadily since the first parliament of an independent Ukraine met in 1990;*

*Whereas more than 20 percent of seats in the ninth and current Verkhovna Rada are held by women, the most in Ukrainian history;*

*Whereas women across Ukraine have made political gains in recent years, including in local elections on October 25, 2020, where 38 percent of deputies elected were women; and*

*Whereas women in Ukraine should be involved at all levels and in all aspects of leadership, negotiation, conflict resolution, and peacekeeping in order to ensure the most enduring peace for Ukraine and the region: Now, therefore, be it*

*[Resolved,]*

*That the Senate—*

*(1) recognizes, honors, and commends the women of Ukraine who have contributed to the fight for freedom and the defense of Ukraine, including women who—*

*(A) are members of the Armed Forces and the Territorial Defense Forces of Ukraine;*

*(B) are volunteers, organizing and operating humanitarian organizations;*

*(C) are doctors, nurses, paramedics, and support personnel, providing life-saving services across Ukraine;*

*(D) have mobilized to assist the safe transfer of the children and other vulnerable individuals from Ukraine; and*

*(E) are public leaders, politicians, and diplomats;*

*(2) stands with the people of Ukraine in support of their fight for freedom against the Russian Federation;*

*(3) acknowledges the women who have risked their lives to travel through territory controlled by the Russian Federation, break siege tactics surrounding cities, and to ensure the safety of children and the elderly;*

*(4) commends—*

*(A) the bordering countries of Ukraine, including Poland, Romania, Slovakia, Hungary, and Moldova, who are accommodating more than 6,000,000 refugees; and*

*(B) the broader European Union for committing to provide support during the growing humanitarian crisis;*

*(5) calls on all countries to ensure that aid provided in support of refugees fleeing Ukraine and internally displaced persons within Ukraine takes into account the needs of women and the gender-specific risks that women face in seeking safety;*

*(6) acknowledges the important role women must play in resolving the conflict between Ukraine and the Russian Federation as outlined in United Nations Security Council Resolution 1325 (2016) and required by the laws of the United States and regulations of Ukraine;*

*(7) further calls on all countries to promote the meaningful inclusion of women in negotiations and decision-making at all levels, including security decisions; and*

*(8) commits to supporting the women of Ukraine wherever they are as they fight back against tyranny and work for the free and democratic future of Ukraine.*

Mr. CARDIN. I further ask that the committee-reported substitute amendment to the resolution be agreed to; the resolution, as amended, be agreed to; the committee-reported substitute amendment to the preamble be agreed to; the preamble, as amended, be agreed to; and the motion to reconsider be considered made and laid upon the table with no intervening action or debate.

The PRESIDING OFFICER. Without objection, it is so ordered.

The committee-reported amendment in the nature of a substitute was agreed to.

The resolution (S. Res. 589), as amended, was agreed to.

The committee-reported amendment to the preamble in the nature of a substitute was agreed to.

The preamble, as amended, was agreed to.

## MORNING BUSINESS

### 80TH ANNIVERSARY OF KXEL

Mr. GRASSLEY. Mr. President, I want to congratulate News Talk 1540 KXEL on celebrating 80 years of broadcasting to Iowans in the Waterloo and Cedar Falls area. When I was younger, I remember joining my father at the National Cattle Congress and was excited to see one of the early on-location broadcasts of the new KXEL radio station.

Iowans look to broadcasters at KXEL as trusted leaders in the community, relying on its programs each morning, noon, and night to stay up to date on local events, learn more about breaking news, and get critical information during emergencies. As an elected Representative, I particularly want to thank everyone at KXEL for their work to provide a way to communicate with constituents. I have the pleasure of speaking with Jeff Stein at least once a month, where I answer questions on any subject and update Iowans on how I am working on their behalf in Washington.

KXEL's work every single day to report the events that matter to listeners keeps Iowans safe, informed, and engaged. I look forward to my future conversations with KXEL to achieve this shared goal.

### 100TH ANNIVERSARY OF WMT

Mr. GRASSLEY. Mr. President, I want to congratulate AM 600 WMT-NewsRadio on celebrating 100 years of

broadcasting to Iowans in the Cedar Rapids area. Iowans look to broadcasters at WMT as trusted leaders in the community, relying on their programs each morning, noon, and night to stay up to date on local events, learn more about breaking news, and get critical information during emergencies.

As an elected Representative, I particularly want to thank everyone at WMT for their work to provide a way to communicate with constituents. I have the pleasure of speaking with Doug Wagner at least once a month, where I answer questions on any subject and update Iowans on how I am working on their behalf in Washington.

WMT's work every single day to report the events that matter to listeners keeps Iowans safe, informed, and engaged. I look forward to my future conversations with WMT to achieve this shared goal.

## NOTICE OF A TIE VOTE UNDER S. RES. 27

Mr. MANCHIN. Mr. President, I ask unanimous consent to print the following letter in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. SENATE, COMMITTEE ON ENERGY AND NATURAL RESOURCES,
*Washington, DC, July 21, 2022.*

*To the Secretary of the Senate:*

S. 2980, a bill to authorize the voluntary donation of grazing permits and leases in the State of New Mexico, and for other purposes, having been referred to the Committee on Energy and Natural Resources, the Committee, with a quorum present, has voted on the bill as follows—

On the question of reporting the bill favorably with the recommendation that the bill be passed, 10 ayes to 10 noes.

In accordance with section 3, paragraph (1)(A) of S. Res. 27 of the 117th Congress, I hereby give notice that the Committee has not reported the bill because of a tie vote and ask that this notice be printed in the RECORD pursuant to the resolution.

JOE MANCHIN III,
*Chairman.*

## NOTICE OF A TIE VOTE UNDER S. RES. 27

Mr. MANCHIN. Mr. President, I ask unanimous consent to print the following letter in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. SENATE, COMMITTEE ON ENERGY AND NATURAL RESOURCES,
*Washington, DC, July 21, 2022.*

*To the Secretary of the Senate:*

S. 387, a bill to protect, for current and future generations, the watershed, ecosystem, and cultural heritage of the Grand Canyon region in the State of Arizona, to provide for a study relating to the uranium stockpile in the United States, and for other purposes, having been referred to the Committee on Energy and Natural Resources, the Committee, with a quorum present, has voted on the bill as follows—

On the question of reporting the bill favorably with the recommendation that the bill be passed, 10 ayes to 10 noes.

In accordance with section 3, paragraph (1)(A) of S. Res. 27 of the 117th Congress, I hereby give notice that the Committee has not reported the bill because of a tie vote and ask that this notice be printed in the Record pursuant to the resolution.

JOE MANCHIN III,
*Chairman.*

## NOTICE OF A TIE VOTE UNDER S. RES. 27

Mr. MANCHIN. Mr. President, I ask unanimous consent to print the following letter in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. SENATE, COMMITTEE ON ENERGY AND NATURAL RESOURCES,
*Washington, DC, July 21, 2022.*

*To the Secretary of the Senate:*

S. 1493, a bill to sustain economic development and recreational use of National Forest System land in the State of Montana, to add certain land to the National Wilderness Preservation System, to designate new areas for recreation, and for other purposes, having been referred to the Committee on Energy and Natural Resources, the Committee, with a quorum present, has voted on the bill as follows—

On the question of reporting the bill favorably with the recommendation that the bill be passed, 10 ayes to 10 noes.

In accordance with section 3, paragraph (1)(A) of S. Res. 27 of the 117th Congress, I hereby give notice that the Committee has not reported the bill because of a tie vote and ask that this notice be printed in the Record pursuant to the resolution.

JOE MANCHIN III,
*Chairman.*

## VOTE EXPLANATION

Mr. SANDERS. Mr. President, I was necessarily absent for rollcall vote No. 267, Executive Calendar No. 902, confirmation of Shereef Elnahal as Under Secretary for Health of the Department of Veterans Affairs. If I was present, I would have voted in support.

## VOTE EXPLANATION

Mr. BLUMENTHAL. Mr. President, on July 11, 2022, I was absent for rollcall vote No. 243, Executive Calendar No. 599, the motion to invoke cloture on the nomination of Ashish S. Vazirani, of Maryland, to be a Deputy Under Secretary of Defense due to testing positive for COVID–19.

Had I been present, I would have voted yes to proceed with his nomination to be Deputy Under Secretary of Defense.

Mr. President, on July 12, 2022, I was absent for rollcall vote No. 244, Executive Calendar No. 599, the confirmation of the nomination of Ashish S. Vazirani, of Maryland, to be a Deputy Under Secretary of Defense due to testing positive for COVID–19.

Had I been present, I would have voted yes to confirm his nomination to be Deputy Under Secretary of Defense.

Mr. President, on July 12, 2022, I was absent for rollcall vote No. 245, Executive Calendar No. 1037, the motion to invoke cloture on the nomination of Steven M. Dettelbach to be Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives due to testing positive for COVID–19.

Had I been present, I would have voted yes to proceed with his nomination to be Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Mr. President, on July 12, 2022, I was absent for rollcall vote No. 246, Executive Calendar No. 1037, the confirmation of the nomination of Steven M. Dettelbach to be Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives due to testing positive for COVID–19.

Had I been present, I would have voted yes to confirm his nomination to be Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Mr. President, on July 12, 2022, I was absent for rollcall vote No. 247, Executive Calendar No. 975, the motion to invoke cloture on the nomination of Michael S. Barr, of Michigan, to be a Member of the Board of Governors of the Federal Reserve System for the unexpired term of fourteen years from February 1, 2018, due to testing positive for COVID–19.

Had I been present, I would have voted yes to proceed with his nomination to be a Member of the Board of Governors of the Federal Reserve System for the unexpired term of fourteen years from February 1, 2018.

Mr. President, on July 13, 2022, I was absent for rollcall vote No. 248, Executive Calendar No. 975, the confirmation of the nomination of Michael S. Barr, of Michigan, to be a Member of the Board of Governors of the Federal Reserve System for the unexpired term of fourteen years from February 1, 2018, due to testing positive for COVID–19.

Had I been present, I would have voted yes to confirm his nomination to be a Member of the Board of Governors of the Federal Reserve System for the unexpired term of fourteen years from February 1, 2018.

Mr. President, on July 13, 2022, I was absent for rollcall vote No. 249, Executive Calendar No. 976, the motion to invoke cloture on the nomination of Michael S. Barr, of Michigan, to be Vice Chairman for Supervision of the Board of Governors of the Federal Reserve System for a term of four years due to testing positive for COVID–19.

Had I been present, I would have voted yes to proceed with his nomination to be Vice Chairman for Supervision of the Board of Governors of the Federal Reserve System for a term of four years.

Mr. President, on July 13, 2022, I was absent for rollcall vote No. 250, Executive Calendar No. 976, the confirmation of the nomination of Michael S. Barr, of Michigan, to be Vice Chairman for Supervision of the Board of Governors of the Federal Reserve System for a term of four years due to testing positive for COVID–19.

Had I been present, I would have voted yes to confirm his nomination to be Vice Chairman for Supervision of the Board of Governors of the Federal Reserve System for a term of four years.

Mr. President, on July 13, 2022, I was absent for rollcall vote No. 251, Executive Calendar No. 676, the motion to invoke cloture on the nomination of Owen Edward Herrnstadt, of Maryland, to be a Member of the Board of Directors of the Export-Import Bank of the United States due to testing positive for COVID–19.

Had I been present, I would have voted yes to proceed with his nomination to be a Member of the Board of Directors of the Export-Import Bank of the United States.

Mr. President, on July 13, 2022, I was absent for rollcall vote No. 252, Executive Calendar No. 676, the confirmation of the nomination of Owen Edward Herrnstadt, of Maryland, to be a Member of the Board of Directors of the Export-Import Bank of the United States due to testing positive for COVID–19.

Had I been present, I would have voted yes to confirm his nomination to be a Member of the Board of Directors of the Export-Import Bank of the United States.

Mr. President, on July 13, 2022, I was absent for rollcall vote No. 253, Executive Calendar No. 908, the motion to invoke cloture on the nomination of Kate Elizabeth Heinzelman, of New York, to be General Counsel of the Central Intelligence Agency due to testing positive for COVID–19.

Had I been present, I would have voted yes to proceed with her nomination as General Counsel of the Central Intelligence Agency.

Mr. President, on July 14, 2022, I was absent for rollcall vote No. 254, Executive Calendar No. 908, the confirmation of the nomination of Kate Elizabeth Heinzelman, of New York, to be General Counsel of the Central Intelligence Agency due to testing positive for COVID–19.

Had I been present, I would have voted yes to confirm her nomination to be General Counsel of the Central Intelligence Agency.

Mr. President, on July 14, 2022, I was absent for rollcall vote No. 255, Executive Calendar No. 968, the motion to invoke cloture on the nomination of Julianna Michelle Childs, of South Carolina, to be United States Circuit Judge for the District of Columbia Circuit due to testing positive for COVID–19.

Had I been present, I would have voted yes to proceed with her nomination to be United States Circuit Judge for the District of Columbia Circuit.

## AFGHANISTAN

Mr. HAWLEY. Mr. President, following my submission yesterday, I ask unanimous consent to have printed in the RECORD the next part of an investigation directed by the U.S. Central Command concerning the Abbey Gate bombing in Afghanistan in August 2021.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

ACTS–SCK–DO

Subject: Findings and Recommendation—Attack Against U.S. Forces Conducting NEO at Hamid Karzai International Airport on 26 August 2021.

(b) Training.

(i) Prior to deploying to the CENTCOM AOR in the spring of 2021, the units assigned to the SPMAGTF completed typical pre-deployment training, focused on their core METs (exhibits 53, 55, 56, 57, 76, 77, 79, 80, 81). Additionally, 2/1 conducted training at the Infantry Immersion Trainer (IIT) at Camp Pendleton, where they trained on embassy reinforcement and crowd control operations (exhibits 76, 77, 86). While deployed, 2/1's companies were distributed throughout the AOR, and conducted various training events that would prove beneficial while operating at HKIA later in their deployment.

(ii) Echo Company, 2/1 conducted two Mission Rehearsal Exercises (MRXs), along with STP, CLD–21 and MWSD–373, at PSAB in July 2021, where they focused on ECC operations and security and response to a MASCAL event (exhibits 53, 54, 56, 57, 76). Echo Company, 2/1 also conducted non-lethal weapons training at PSAB and additional medical training in Kuwait (exhibit 82).

(iii) Golf Company, 2/1 deployed three platoons to Jordan, and one platoon initially to Djibouti, and then to PSAB, where it supported the Tactical Recovery of Aircraft and Personnel (TRAP) mission. In Jordan, Golf Company focused on its core METs, but had the unique opportunity to train alongside the U.K.'s 2 PARA, and the 77th Royal Jordanian Marine Battalion (77th RJMB). Training with 2 PARA helped build a level of interoperability and familiarity that proved useful when Golf Company, 2/1 served alongside 2 PARA at Abbey Gate, HKIA, whereas training with 77th RJMB helped Golf Company Marines grow accustomed to operating with non-native English speakers, a skill that also proved useful at HKIA (exhibits 53, 76, 77, 80, 86, 89, 90). Third Platoon, Golf Company, 2/1 received extensive medical training while serving as the TRAP platoon, to include Tactical Combat Casualty Care (TCCC), Combat Trauma Management (CTM) training, and Valkyrie walking blood bank training (exhibits 86, 98). The rest of Golf Company conducted Combat Life Saver (CLS) refresher training, TCCC refresher training, and MASCAL training in Jordan, while Golf Company's junior Hospital Corpsmen conducted CTM and Valkyrie training prior to deploying to HKIA in support of the NEO (exhibits 77, 98).

(iv) Fox Company, 2/1 deployed to the BEC, where the company executed fixed site security and crowd control operations, and trained on non-lethal weapons employment, all of which prepared them to operate at Abbey Gate (exhibit 81). All 2/1 companies discussed ROE and the importance of treating people at the gates of HKIA with empathy and respect prior to deploying to HKIA (exhibits 53, 54, 56, 57, 76, 77, 78, 81). The STP completed multiple MASCAL drills while deployed at Al Jaber, Kuwait and PSAB, prior to deploying to HKIA (exhibit 66).

e. Leadership.

(1) Key Finding. COMREL and Task Organization. The task organization worked. This was in large part due to pre-existing or quickly forged relationships among leaders at the highest echelons and adaptability at the lower echelons.

(a) The 82nd Airborne Division, led by MG Donahue, executed their mission with a clear chain of command (exhibits 10, 121, 124, 125). The Division rapidly adapted to the changing situation, as they were responsible for security of the airhead, support to the NEO, planning for the retrograde of all personnel and equipment, demilitarization of arms and equipment, and executing the JTE (exhibits 121, 125). In addition to security, the Division conducted initial screening and recovery of AMCITs, LPRs, locally hired embassy personnel, SIV applicants, and at risk Afghans at South and West Gates (exhibit 143). Once identified and screened, these evacuees were processed through the ECC for manifesting and departure from HKIA (exhibits 121, 125).

(b) General McKenzie established the NEO COMREL, and officially granted 82nd Airborne TACON of JTF–CR (exhibit 10, 11, 238). In reality, JTF–CR was TACON to USFOR–A FWD, and merely coordinated with the 82nd Airborne Division (exhibits 18, 21, 40, 125). This adjusted COMREL, along with the mixing of tactical responsibilities, resulted in the 82nd conducting airfield security and NEO for one sector, and JTF–CR conducting airfield security and NEO in another sector (exhibits 15, 121, 125, 143, 155). The senior officers made this division of tasks work under the circumstances with adjusted COMREL, mutual trust, and shared understanding.

(2) Engaged and Responsive Leaders.

(a) The leadership of the U.S. Forces tasked with conducting a NEO at HKIA worked collaboratively to adapt in an uncertain, chaotic, ambiguous, and high-threat environment. U.S. Forces experienced rapidly changing, complex relationships and compressed timelines to conduct a NEO. These leadership challenges were exacerbated by the reality that the Taliban, who could be described as a supporting effort, were operating under a unity of effort as opposed to a unity of command (exhibits 53, 125). This was demonstrated at each location around the perimeter of HKIA, where Taliban assistance ranged from actively supporting crowd control, to non-support, and even actively taunting the Marines (exhibits 23, 53, 100, 102, 125, 146). RADM Vasely, MG Donahue, and BGen Sullivan conducted Key Leader Engagements (KLE) to coordinate activities, ensure mission accomplishment, and protect the force (exhibits 21, 23, 125). Their coordination with the Taliban facilitated crowd control and force protection, and minimized the incidence of kinetic engagements between U.S. Forces, and Taliban (exhibits 53, 104, 125). While the ROE may not have been entirely clear at all times, due to the rapidly changing situation, U.S. Forces retained the right to self-defense, the ability to engage individuals committing hostile acts or demonstrating hostile intent, and the ability to utilize riot-control measures in defense to protect the force and civilians.

(b) Military leadership at every level was engaged and responsive, enabling security of the airhead, executing the NEO, and planning to execute the Joint Tactical Exfiltration (JTE). There were numerous examples of great leadership during an operation amounting to simultaneous combat, evacuation, and humanitarian tasks during a compressed time, with constrained resources, and severe restrictions on terrain. There are three examples to highlight, the first being how leadership engaged the NSU and Taliban forces to assist with inner and outer perimeter security and checkpoint screening. Another example was the emplacement of the Chevron obstacle at Abbey Gate, which in combination with outside influences, had a profound impact on the flow of evacuees. The last example was the battlefield rotations conducted before 26 August and immediately before the blast at Abbey Gate. It should be noted that several leaders and Marines interviewed stated operations at

HKIA were so chaotic, that even with the tremendous amounts of training conducted prior to deployment, no training would be able to prepare someone for what they faced (exhibits 107, 101 ). All of these examples tested leaders' ability to remain flexible in a dynamic environment and challenged them to rise above adversity.

(c) These challenges began when civilians breached the perimeter and started to occupy the southern area of HKIA on 15 August (exhibits 15, 53, 54, 56). This caused the JTF–CR to send 50 out of 53 personnel, emptying their JOC, to assist in pushing back the crowd (exhibit 15). It took almost everyone on the airfield to get the civilians off the runway in order to continue operations (exhibit 15, 53, 54, 56). Leadership recognized that they had to build and leverage relationships in order to provide better security and screening. This led to negotiations between RADM Vasely, the NSU, and the Taliban (exhibit 53). The NSU helped to clear the airfield and manned their gate, while MG Donahue instructed the Taliban regarding which areas they would need to control and clear to facilitate the NEO (exhibit 18, 21, 123, 125). The Taliban would later establish outer checkpoints and, more notably, provide security at the Chevron outside the outer corridor of Abbey Gate (exhibits 54, 77, 81, 84, 85 86, 89).

(d) The coordination to install the Chevron, which ultimately changed the dynamics at Abbey Gate, involved the U.K., Taliban and the Commander of Golf Company, 2/1 Marines, (TEXT REDACTED) The U.K. Forces devised the idea and the placement location, but were having trouble executing (TEXT REDACTED) and other members of the senior leadership were conducting KLEs with the Taliban to discuss security and future operations (exhibit 54, 18). (TEXT REDACTED) had the Taliban move the broken vehicles that were in the way and preventing the Chevron from being emplaced, and help to help to control Afghan civilians (exhibit 77). The Taliban would later provide security in front of and on top of the Chevron containers (exhibits 54, 77, 81, 84, 85 86, 89). (TEXT REDACTED) also coordinated with the MEU engineers to use their equipment to move jersey barriers and emplace the containers forming the Chevron (exhibits 54, 77, 81, 84, 85, 89, 103). This helped to create standoff between troops and the crowd and control the flow of personnel coming into the Abbey Gate for processing.

(e) Leadership, from USFOR–A FWD down to the company level, would visit the gates to ensure the Service members were cared for and to gather situational awareness of the rapidly changing environment. The USFOR–A FWD team would visit gates multiple times a day (exhibit 21, 22, 23). The USFOR–A FWD (TEXT REDACTED) would visit the gates to check on Marines/Soldiers and to provide reports on the current conditions and situation at the gates (exhibits 17, 21, 96). On 26 August, just before 1700, BGen Sullivan, (TEXT REDACTED) (all of JTF–CR) had visited Abbey Gate and left the area 20 minutes before the blast (exhibits 17, 19). (TEXT REDACTED) 3/10 IBCT, (TEXT REDACTED) 2/501 PIR, and (TEXT REDACTED) 1/8 visited Abbey Gate on 26 August as well (exhibits 104, 123, 126). The (TEXT REDACTED) of 2/1, (TEXT REDACTED) attended a meeting at the Barron Hotel with Taliban and U.K. Forces to discuss the impending closure of Abbey Gate at 1600 on 26 August. As he was leaving Abbey Gate, (TEXT REDACTED) was caught in the blast (exhibits 53, 90).

(f) Leaders on the ground engaged with their teams in order to work through the evolving situation. They were coordinating support with friendly units while also negotiating with the NSU and Taliban to provide security for gate operations and retrograde planning. Junior leaders were empowered to make and execute decisions, as demonstrated through the emplacement of the Chevron. Overall, military leaders executed the mission and protected their Marines and Soldiers to the best of their ability.

f. Medical Considerations.

(1) Key Finding. The wounds sustained by the KIA were so catastrophic none could be saved. Medical providers at multiple echelons stated access to additional advanced treatment and equipment would not have saved more lives. The capability at HKIA's Role II–E saved several Service Members who otherwise would have succumbed to their wounds. Providers stated the capability at HKIA was the most robust they had experienced in an operational setting. Every Service Member who could have been saved with medical treatment survived due to the medical capability at HKIA.

(2) Capabilities.

(a) Role II. Throughout the Afghanistan NEO, there were two Role II facilities at HKIA, one on North HKIA (NHKIA), referred to at times as the NATO Role II, Role II–E, or the Military Treatment Facility (MTF), had the most robust capability, while a second facility at Camp Alvarado was operated by 1/82 IBCT medical personnel (exhibits 66, 98, 128, 130, 131). The MTF hosted eight surgical teams, including three Army Forward Resuscitative Surgical Teams (FRST), one Army light surgical team, two U.S. SOSTs, one Norwegian SOST, and one U.K. surgical team. The MTF had two ORs, with the ability to surge to four patients simultaneously, and space for seven intensive care unit (ICU) and 14 ward patients, with the ability to surge on both. The MTF also had CT scanning and x-ray capability, a lab, a pharmacy, and an ER that operated 24 hours a day (exhibits 128, 131). According to multiple medical officers, the MTF at HKIA had more assets and capability than any field facility they had ever seen (exhibits 66, 128, 130, 131). The second Role II facility, located at Camp Alvarado, was operated by personnel from 1/82 IBCT and hosted an Army FRSD. The FRSD was capable of providing limited damage control surgery and resuscitation (exhibit 130).

(b) Role I. There were two Role I–E facilities at HKIA throughout the NEO. The 24th MEU's STP operated next to the PAX Terminal on NHKIA, while the SPMAGTF's STP operated out of a building between East Gate and Abbey Gate. The MEU STP had two physician assistants (PA), two nurses, and 15 corpsmen (exhibit 16). The SPMAGTF STP had two ER doctors, one PA, two nurses, and 12 corpsmen (exhibit 66). In addition to the two Role I–E facilities, the U.K. operated a Role I facility out of the Barron Hotel, in vicinity of Abbey Gate (exhibits 77, 98).

(3) MASCAL Plan. Prior to executing the NEO, the MASCAL plan for HKIA was not comprehensive, in that it did not incorporate every compound surrounding the airfield. Instead, the existing MASCAL plan only referred to NHKIA, where the aforementioned NATO Role II/MTF was located. Leading up to the NEO, TF MED leadership began refining the MASCAL plan, and attempted to designate CCPs and evacuation routes throughout the airfield (exhibit 128). The updated plan was not finalized prior to the beginning of the NEO, and as a result, during the NEO the MASCAL plan was reduced to, ''In the event of a MASCAL event, utilize all available vehicles to transport casualties to the MTF as quickly as possible (exhibits 66, 128, 130, 131)''. The lack of a comprehensive MASCAL plan caused some frustration and concern for units operating away from NHKIA (exhibit 66). Despite the lack of a comprehensive plan, each unit conducted internal MASCAL rehearsals that undoubtedly contributed to the rapid, successful response witnessed following the Abbey Gate attack of 26 August (exhibits 66, 98, 128, 130, 131).

(4) Medical Rules of Engagement (MEDROE). At the start of the NEO, the MEDROE were unclear among the various medical providers (exhibits 66, 130, 131). The SPMAGTF STP and 1/82 IBCT Role II were initially under the impression they were to adhere to the standing CENTCOM MEDROE, which was complicated by the fact that service members were coming into close, regular contact with large numbers of civilians at the HKIA gates (exhibits 66, 130). After operating for several days under an ambiguous MEDROE, TF MED's (TEXT REDACTED) passed guidance to all providers at HKIA stating that they were responsible for providing care to anyone within the gates of the airfield (exhibits 66, 130, 131). The lack of initial clarity regarding MEDROE presented a challenge for some medical providers, and served as a source of frustration (exhibit 66).

(5) MASCAL Preparations Prior to 26 August. Upon his arrival at HKIA, 82nd Airborne's Commander, MG Donahue, identified the likelihood of a MASCAL event during the course of the NEO, and tasked the 82nd's senior medical officer with preparing for a MASCAL (exhibit 125). In the days leading up to the attack on 26 August, units at all echelons conducted MASCAL rehearsals (exhibits 16, 18, 21, 66, 98, 128, 130, 131). In response to the increased threat leading up to 26 August, the SPMAGTF STP (TEXT REDACTED) ran MASCAL rehearsals in her clinic, and staged an ambulance with an en route care team inside the inner gate at Abbey Gate on the evening of 25 August (exhibit 66). Beginning on the morning of 26 August, Golf Company, 2/1 established a CCP inside the outer gate, and consolidated medical supplies, litters, and corpsmen at the CCP in anticipation of a potential attack and MASCAL event (exhibits 77, 98). Following a phone call from the USFOR–A FWD (TEXT REDACTED) at 1310 on 26 August warning of a likely attack, TF MED (TEXT REDACTED) consolidated all medical personnel at the MTF, and kept them on standby throughout the afternoon so that they were prepared to respond rapidly to a MASCAL (exhibit 131).

g. Chronology/Timeline of Events. See enclosure 9.

4. Recommendations.

a. TBI Screening. During the course of the investigation, it became apparent Service Members received inconsistent evaluation for concussion and TBI after the attack at Abbey Gate. Since the initial medical evacuation of the wounded, twelve Service Members have been added to the list of those wounded in action; many for TBI. I therefore recommend forwarding findings and recommendations to all CENTCOM Service Component Commanders for consideration that all Service Members at Abbey Gate during the attack, and present in any blast zone depicted in exhibit 137, slide 7, be evaluated for TBI.

b. Mental Health Evaluation. A consistent trend during interviews with young Marines were stories involving traumatic injuries and death of children, separation of families at gates, and outright rejection of evacuees culminating in their distraught return to the civilian population outside the gate. During the response to the attack at Abbey Gate, young Marines heroically recovered the wounded and rendered life-saving care. Others carried the bodies of their deceased friends away from the canal. In consideration of the mental and emotional strain placed on these young Marines and other Service Members, I recommend forwarding

the findings and recommendations to all CENTCOM Service Component Commanders. Recommend mental health evaluations and treatment options for all personnel executing entry control point operations at Abbey Gate from 17–26 August. Evaluations and treatment options should also be pursued for personnel involved in the medical response to the attack on Abbey Gate on 26 August.

c. Interagency NEO Doctrine. Many leaders observed planning and execution with interagency partners was difficult, because there was no shared understanding or baseline concepts common to the various entities involved in the execution of NEO. To address this shortcoming, I recommend forwarding this investigation to the Joint Staff for consideration in drafting and publication of interagency doctrine for Non-combatant Evacuation Operations.

d. Further Investigation. During an interview with Platoon Commanders of Golf Company, 2/1 Marines, a Platoon Commander stated a civilian was killed by a flash bang grenade. The investigator did not pursue the line of questioning, because of the group setting and potential for misconduct and a rights advisement. After speaking with my legal advisor, I assessed this line of inquiry was outside my scope to investigate and would incur a significant delay in meeting my timeline and mandate. I recommend forwarding exhibits 84 and 128 to MARCENT for potential investigation into statements made by the Platoon Commander from Golf Company, 2/1 Marines, concerning a possible civilian casualty caused by use of a flash bang grenade.

5. The point of contact for this memorandum is the undersigned at (TEXT REDACTED) or at (TEXT REDACTED) (TEXT REDACTED) LANCE G. CURTIS BG, USA Investigating Officer

## REMEMBERING CHARLES H. COOLIDGE AND HERSHEL W. ''WOODY'' WILLIAMS

Mrs. BLACKBURN. Mr. President, in its mission statement, the National Medal of Honor Heritage Center in Chattanooga, TN, highlights the values of patriotism, citizenship, courage, integrity, sacrifice, and commitment as central to the character of every Medal of Honor recipient. When put into action, these values culminate in uncommon acts of heroism.

Today, I have the privilege of recognizing two heroes whose valor on the battlefield earned them the Medal of Honor and the admiration of their countrymen: Charles H. Coolidge of Tennessee and Hershel W. ''Woody'' Williams of West Virginia. We lost Charles last year and Woody just a few weeks ago, but their legacies remain a celebration of the sacrifice, resilience, and service of the 16 million men and women who served in the Armed Forces during World War II and saved the world from the horrors of authoritarianism. The Senate came together and rallied around one final tribute to the era's Medal of Honor recipients, and on July 14, Woody Williams became just the seventh American to lay in honor in the rotunda of the U.S. Capitol. It was a lovely, fitting way to show our gratitude not only to Woody, but to all the World War II Medal of Honor recipients we lost before him.

I can think of no better way to keep this spirit of camaraderie alive than to put their legacies to work on behalf of younger generations who are just beginning to understand that the preservation of freedom for all humanity will require much more than bold words.

Liberty is not an act of sheer will, but a reflection within a people of the same values that prompted Charles and Woody to put themselves between their brothers in arms and enemy troops. On behalf of all Tennesseans, I thank these brave men for their commitment to the common cause of freedom and pray that all our Nation's leaders will endeavor to follow in their footsteps.

## TRIBUTE TO ELI DICKEN

Mr. YOUNG. Mr. President, I rise to formally express my gratitude for the heroic actions of my fellow Hoosier, Eli Dicken, at the Greenwood Park Mall.

On Sunday, July 17, 2022, in the midst of unimaginable tragedy, Eli boldly stepped forward into danger to save the lives of others. As a murderer committed a heinous act of violence at the Greenwood Park Mall, Eli, after directing others around him to get to safety, drew his own firearm, and fired upon the attacker, ultimately taking his life and saving the lives of countless innocent bystanders. Within 15 seconds, Eli was able to stop an even greater tragedy. As Chief James Ison of the Greenwood, IN, Police Department noted, Eli's actions ''were nothing short of heroic'' and ''many more people would have died . . . if it was not for his heroism.'' Eli's actions were possible due to this own bravery and because of actions taken by the State of Indiana to ensure that law-abiding citizens are freely able to exercise their constitutional right to keep and bear arms.

I mourn the three innocent lives that were taken and pray for the families and communities that this senseless tragedy has affected. I also pray for the continued recovery of those wounded in the attack, who were in part saved by Eli's decisive actions and also by the exceptional response and care of first responders. So today, I add my own voice to those honoring Eli and express my gratitude for his selfless courage.

## ADDITIONAL STATEMENTS

### 100TH ANNIVERSARY OF WDEL RADIO

● Mr. CARPER. Mr. President, I rise today on behalf of Delaware's congressional delegation in honor of the 100th anniversary of Delaware's first radio station, WDEL. The station was born on July 22, 1922, when amateur radio operator and shop owner Willard Wilson aired the first news reports and music out of his home in Wilmington, DE, on what was then WHAV. Over the years, the station changed its call letters to WDEL and moved out of Wilson's home to various spaces in downtown Wilmington, where listeners could tune in to hear many famous ''big bands'' live from the Gold Ballroom of the Hotel Du Pont. Today, the station has a home on Shipley Road and has grown to provide local news, talk and traffic reports, with thousands of listeners from Delaware and our surrounding States tuning in daily to hear from WDEL's recognizable voices on the airwaves.

Just like our home State's motto, WDEL has been ''first'' many times when it comes to broadcasting. In 1933, WDEL became one of the first radio affiliates for Major League Baseball, airing the Philadelphia A's games. Today, you can still catch the crack of the bat on its signals 101.7 FM or 1150 AM during the Philadelphia Phillies season. WDEL was also the first in Delaware to provide real-time, locally produced traffic reports, filling a need when other stations weren't covering the busy roads in the Delaware region. The station also was one of the first stations to hire women for on-air positions when it wasn't popular to do so.

Over the years, WDEL has covered many historic moments in Delaware, including Presidential visits from Harry Truman, John Kennedy, Lyndon Johnson, Richard Nixon, George W. Bush, Barack Obama, and, of course, Delaware's own Joe Biden. WDEL has also covered the moments that capture the cultural fabric of Delaware, including broadcasts from the Greek, Italian, and Polish festivals, as well as the Wilmington Flower Market, and has a long history of giving back to the community by supporting Nemours Children's Hospital, Ronald McDonald House, Sunday Breakfast Mission, and many other children's charities, shelters, and soup kitchens.

WDEL's dedication to its listeners was awarded numerous times over the years. WDEL was named Medium Market Station of the Year by the National Association of Broadcasters—NAB—named News Operation of the Year by the Chesapeake AP Broadcasters Association several times, and was honored with the Edward R. Murrow Award for Overall Excellence twice, and the NAB's prestigious Crystal Award for public service.

On behalf of both U.S. Senator CHRIS COONS and U.S. Representative LISA BLUNT ROCHESTER, I rise today to honor WDEL radio on a century of hard work and dedication to serving the community. The station that started as just one among 100 in the country has withstood a century of change and innovation and has been recognized as among the best in the Nation. We wish its employees and listeners many more years of this incredible news service on the airwaves.●

### TRIBUTE TO RALPH HIPP

● Mr. MARSHALL. Mr. President, I rise today to honor and recognize Mr. Ralph Hipp of Topeka, KS.

Mr. Ralph Hipp announced this week that he will be retiring September 2

after a 48-year career in broadcasting. He first joined the WIBW-TV team in April 1990 as an anchor for 13 NEWS at 10. He briefly left WIBW-TV in the fall of 1998 for his wife's job in Tennessee, but returned to his anchor desk in Topeka exactly 2 years later, and has remained a constant at 13 NEWS ever since.

Ralph first thought of retirement more than 2 years ago, but when the pandemic began, he gladly remained part of the 13 NEWS teams to help get everyone through the tough times. The last 2 years were the most challenging and rewarding of Ralph's entire career with WIBW-TV.

Throughout his career, Ralph has hosted various programs and segments loved by many in Northeast Kansas. He was a longtime host for the Sunday night scholastic quiz bowl program ''High Q,'' recognized exceptional students of all ages in the ''Good Kids'' Tuesday night segment, and has hosted hundreds of viewers from the famous red couch set since 2006. Hosting this program from the red couch has been a blessing and joy for him, especially throughout the pandemic. Helping people in their time of need is what the business is all about to Ralph, and the Red Couch Program provided him the opportunity to be able to help others.

I now ask my colleagues to join me in recognizing the wonderful impact Mr. Ralph Hipp has had on the WIBW-TV team and to honor him for his 30 years of serving the families of Northeast Kansas in what he calls ''the best job in the world.''●

## RECOGNIZING HOUSE DOCTORS HANDYMAN

● Mr. PAUL. Mr. President, as ranking member of the Senate Committee on Small Business and Entrepreneurship, each week I recognize an outstanding Kentucky small business that exemplifies the American entrepreneurial spirit. This week, it is my privilege to recognize House Doctors Handyman of Hardin County, in Elizabethtown, KY, as the Senate Small Business of the Week.

For most people, retirement is the clear choice following an illustrious career in their chosen field. Franko Antolovich, on the other hand, is not like most people. After serving in the U.S. Army for 35 years, including over 20 years in the Special Forces, Franko took the road less traveled. When many would have chosen retirement, Franko embarked on a new endeavor, swapping his combat boots for work boots by becoming the franchise owner of House Doctors Handyman of Hardin County, KY.

House Doctors provides top quality home repairs and maintenance to residents of central Kentucky and the surrounding areas. Franko ensures that his customers receive exemplary service by employing handymen who are the best at what they do, with most members of his team having years of experience in the realm of home repair. Franko understands that it takes a great amount of trust to employ someone to work on your own home. As the name House Doctors would imply, each employee of this successful franchise provides an unrivaled level of care because they understand that a house is more than just a roof over one's head. The repair men and women operating at House Doctors treat their customers' homes with as much respect as they would treat their own; that is the level of quality that Franko and his team are committed to providing to Central Kentucky.

House Doctors' services range from one-time maintenance repairs for home appliances, to small projects like drywall installation and repair, all the way up to full home remodels. Whatever the need may be, residents of central Kentucky can count on House Doctors to provide the services they need for quick and professional home repair. In addition to the wide array of services they perform, House Doctors offers a 1-year labor guarantee for each job they perform, proving their steadfast commitment to quality craftsmanship. This commitment extends beyond House Doctors' policy of a 1-year labor guarantee, as Franko ensures that all the handymen and women he employs are professional, insured, bonded, and trained. Residents of central Kentucky can achieve full peace of mind knowing that the job they have entrusted to House Doctors will be completed only after the highest standards of quality have been met.

I want to thank Frank Antolovich for the service he has paid to this country and commend him for his transition from Active Duty to being an active member in his central Kentucky community. After putting his mind and body to work for our country, he saw a franchise opportunity that allowed him to work towards the betterment and protection of central Kentucky homes. It is the level of dedication and service that has been a hallmark throughout Franko's life that makes his franchise thrive. Congratulations to Franko Antolovich and to the entire team at House Doctors Handyman of Central Kentucky. I look forward to watching your continued growth and success in Kentucky.●

## MESSAGES FROM THE PRESIDENT

Messages from the President of the United States were communicated to the Senate by Mr. Swann, one of his secretaries.

## EXECUTIVE MESSAGES REFERRED

As in executive session the Presiding Officer laid before the Senate messages from the President of the United States submitting sundry nominations which were referred to the appropriate committees.

(The messages received today are printed at the end of the Senate proceedings.)

## PRESIDENTIAL MESSAGE

### REPORT OF THE CONTINUATION OF THE NATIONAL EMERGENCY THAT WAS ORIGINALLY DECLARED IN EXECUTIVE ORDER 13581 OF JULY 24, 2011, WITH RESPECT TO SIGNIFICANT TRANSNATIONAL CRIMINAL ORGANIZATIONS—PM 36

The Presiding Officer laid before the Senate the following message from the President of the United States, together with an accompanying report; which was referred to the Committee on Banking, Housing, and Urban Affairs:

*To the Congress of the United States:*

Section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)) provides for the automatic termination of a national emergency unless, within 90 days prior to the anniversary date of its declaration, the President publishes in the *Federal Register* and transmits to the Congress a notice stating that the emergency is to continue in effect beyond the anniversary date. In accordance with this provision, I have sent to the *Federal Register* for publication the enclosed notice stating that the national emergency with respect to significant transnational criminal organizations that was declared in Executive Order 13581 of July 24, 2011, under which additional steps were taken in Executive Order 13863 of March 15, 2019, is to continue in effect beyond July 24, 2022.

The activities of significant transnational criminal organizations have reached such scope and gravity that they threaten the stability of international political and economic systems. Such organizations are becoming increasingly sophisticated and dangerous to the United States; they are increasingly entrenched in the operations of foreign governments and the international financial system, thereby weakening democratic institutions, degrading the rule of law, and undermining economic markets. These organizations facilitate and aggravate violent civil conflicts and increasingly facilitate the activities of other dangerous persons.

Significant transnational criminal organizations continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. Therefore, I have determined that it is necessary to continue the national emergency with respect to significant transnational criminal organizations declared in Executive Order 13581.

JOSEPH R. BIDEN, Jr.
THE WHITE HOUSE, *July 21, 2022.*

## MESSAGE FROM THE HOUSE

At 3:48 p.m., a message from the House of Representatives, delivered by Mrs. Alli, one of its reading clerks, announced that the House has passed the following bill, in which it requests the concurrence of the Senate:

H.R. 8373. An act to protect a person's ability to access contraceptives and to engage in contraception, and to protect a health care provider's ability to provide contraceptives, contraception, and information related to contraception.

ENROLLED BILL SIGNED

The message further announced that the Speaker pro tempore (Mr. RASKIN) has signed the following enrolled bill:

H.R. 8351. An act to amend the Harmonized Tariff Schedule of the United States to suspend temporarily rates of duty on imports of certain infant formula products, and for other purposes.

The enrolled bill was subsequently signed by the Acting President pro tempore (Ms. CORTEZ MASTO).

## MEASURES PLACED ON THE CALENDAR

The following bill was read the second time, and placed on the calendar:

H.R. 8404. An act to repeal the Defense of Marriage Act and ensure respect for State regulation of marriage, and for other purposes.

## EXECUTIVE AND OTHER COMMUNICATIONS

The following communications were laid before the Senate, together with accompanying papers, reports, and documents, and were referred as indicated:

EC–4647. A communication from the President of the United States, transmitting, pursuant to law, a report of the continuation of the national emergency with respect to the situation in Hong Kong that was declared in Executive Order 13936 of July 14, 2020; to the Committee on Foreign Relations.

EC–4648. A communication from the Assistant Secretary, Legislative Affairs, Department of State, transmitting, pursuant to section 36(c) of the Arms Export Control Act, the certification of a proposed license amendment for the export of defense articles, including technical data and defense services to the UAE in the amount of $50,000,000 or more (Transmittal No. DDTC 21–055); to the Committee on Foreign Relations.

EC–4649. A communication from the Acting Assistant Secretary of Defense (Legislative Affairs), transmitting additional legislative proposals relative to the ''National Defense Authorization Act for Fiscal Year 2023''; to the Committee on Foreign Relations.

EC–4650. A communication from the Assistant Secretary, Legislative Affairs, Department of State, transmitting, pursuant to law, a report entitled ''Determination Under Sections 506(a)(1) and 614(a)(1) of the Foreign Assistance Act of 1961 to Provide Military Assistance to Ukraine''; to the Committee on Foreign Relations.

EC–4651. A communication from the Assistant Secretary, Legislative Affairs, Department of State, transmitting, pursuant to law, a notification of intent to provide military assistance to Ukraine, including for self-defense and border security operations; to the Committee on Foreign Relations.

EC–4652. A communication from the Senior Bureau Official, Legislative Affairs, Department of State, transmitting, pursuant to law, a notification of intent to provide military assistance to Ukraine, including for self-defense and border security operations; to the Committee on Foreign Relations.

EC–4653. A communication from the Senior Bureau Official, Legislative Affairs, Department of State, transmitting, pursuant to law, a report entitled ''Determination Under Sections 506(a)(1) and 614(a)(1) of the Foreign Assistance Act of 1961 to Provide Military Assistance to Ukraine''; to the Committee on Foreign Relations.

EC–4654. A communication from the Senior Bureau Official, Legislative Affairs, Department of State, transmitting, pursuant to law, a notification of intent to provide military assistance to Ukraine, including for self-defense and border security operations; to the Committee on Foreign Relations.

EC–4655. A communication from the Senior Bureau Official, Legislative Affairs, Department of State, transmitting, pursuant to law, a report entitled ''Determination Under Sections 506(a)(1) and 614(a)(1) of the Foreign Assistance Act of 1961 to Provide Military Assistance to Ukraine''; to the Committee on Foreign Relations.

EC–4656. A communication from the Senior Bureau Official, Legislative Affairs, Department of State, transmitting, pursuant to law, a report entitled ''Semiannual Jackson-Vanik Compliance Report for Certain Independent States''; to the Committee on Foreign Relations.

EC–4657. A communication from the Senior Bureau Official, Legislative Affairs, Department of State, transmitting, pursuant to law, a report entitled ''U.S. Compliance with the Authorization for Use of Military Force in Iraq, from March 6, 2022 to May 5, 2022''; to the Committee on Foreign Relations.

EC–4658. A communication from the Assistant Legal Adviser for Treaty Affairs, Department of State, transmitting, pursuant to the Case-Zablocki Act, 1 U.S.C. 112b, as amended, the report of the texts and background statements of international agreements, other than treaties (List 2022–0105—2022–0118); to the Committee on Foreign Relations.

EC–4659. A communication from the Secretary to the Railroad Retirement Board, transmitting, pursuant to law, the 2022 annual report on the financial status of the railroad unemployment insurance system; to the Committee on Health, Education, Labor, and Pensions.

EC–4660. A communication from the Secretary to the Railroad Retirement Board, transmitting, pursuant to law, a report relative to the actuarial status of the railroad retirement system; to the Committee on Health, Education, Labor, and Pensions.

EC–4661. A communication from the Regulations Coordinator, Centers for Medicare and Medicaid Services, Department of Health and Human Services, transmitting, pursuant to law, the report of a rule entitled ''Clinical Laboratory Improvement Amendments of 1988 (CLIA) Proficiency Testing Regulations Related to Analytes and Acceptable Performance'' (RIN0938–AT55) received in the Office of the President of the Senate on July 12, 2022; to the Committee on Health, Education, Labor, and Pensions.

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. PETERS, from the Committee on Homeland Security and Governmental Affairs, with an amendment in the nature of a substitute:

S. 3502. A bill to establish an Office of Civil Rights, Equity, and Community Inclusion at the Federal Emergency Management Agency, and for other purposes (Rept. No. 117–133).

By Mr. PETERS, from the Committee on Homeland Security and Governmental Affairs, without amendment:

S. 3655. A bill to amend the Civil Rights Cold Case Records Collection Act of 2018 to extend the termination date of the Civil Rights Cold Case Records Review Board (Rept. No. 117–134).

By Mr. MENENDEZ, from the Committee on Foreign Relations, with an amendment in the nature of a substitute:

S. 552. A bill to direct the Administrator of the United States Agency for International Development to submit to Congress a report on the impact of the COVID–19 pandemic on global basic education programs.

H.R. 1036. An act to amend the State Department Basic Authorities Act of 1956 to authorize rewards under the Department of State's rewards program relating to information regarding individuals or entities engaged in activities in contravention of United States or United Nations sanctions, and for other purposes.

S. 3052. A bill to promote free and fair elections, democracy, political freedoms, and human rights in Cambodia, and for other purposes.

S. 3317. A bill to strengthen United States national security through the defense of democracy abroad and to address contemporary threats to democracy around the world, and for other purposes.

S. 4216. A bill to reauthorize the North Korean Human Rights Act of 2004, and for other purposes.

S. 4320. A bill to enhance security at United States diplomatic facilities, and for other purposes.

S. 4466. A bill to amend the Peace Corps Act by reauthorizing the Peace Corps, providing better support for current, returning, and former volunteers, and for other purposes.

By Mr. MENENDEZ, from the Committee on Foreign Relations, without amendment:

H.R. 4693. An act to advance targeted and evidence-based interventions for the prevention and treatment of global malnutrition and to improve the coordination of such programs, and for other purposes.

H.R. 6899. An act to prohibit the Secretary of the Treasury from engaging in transactions involving the exchange of Special Drawing Rights issued by the International Monetary Fund that are held by the Russian Federation or Belarus.

## EXECUTIVE REPORTS OF COMMITTEES

The following executive reports of nominations were submitted:

By Mr. REED for the Committee on Armed Services.

*Army nomination of Maj. Gen. Robert A. Rasch, Jr., to be Lieutenant General.

Army nominations beginning with Col. Sarah K. Albrycht and ending with Col. Kevin J. Lambert, which nominations were received by the Senate and appeared in the Congressional Record on May 12, 2022. (minus 32 nominees beginning with Col. Gail E. Atkins)

*Air Force nomination of Lt. Gen. Tony D. Bauernfeind, to be Lieutenant General.

*Air Force nomination of Maj. Gen. Donna D. Shipton, to be Lieutenant General.

*Army nomination of Maj. Gen. Andrew M. Rohling, to be Lieutenant General.

Navy nomination of Rear Adm. (lh) Thomas J. Anderson, to be Rear Admiral.

*Space Force nomination of Maj. Gen. Philip A. Garrant, to be Lieutenant General.

Air Force nominations beginning with Brig. Gen. Anne B. Gunter and ending with Brig. Gen. Aaron G. Vangelisti, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nominations beginning with Col. Michael P. Cruff and ending with Col. Dean

D. Sniegowski, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Army nominations beginning with Brig. Gen. Kevin D. Admiral and ending with Brig. Gen. David B. Womack, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Army nominations beginning with Brig. Gen. Isaac Johnson, Jr. and ending with Col. Noel F. Palmer, which nominations were received by the Senate and appeared in the Congressional Record on July 13, 2022.

Mr. REED. Mr. President, for the Committee on Armed Services I report favorably the following nomination lists which were printed in the RECORDS on the dates indicated, and ask unanimous consent, to save the expense of reprinting on the Executive Calendar that these nominations lie at the Secretary's desk for the information of Senators.

The PRESIDING OFFICER. Without objection, it is so ordered.

Air Force nominations beginning with Victoria D. Ables and ending with Ann M. Zenobia, which nominations were received by the Senate and appeared in the Congressional Record on May 12, 2022.

Air Force nomination of Judson C. Dressler, to be Colonel.

Air Force nominations beginning with Jimmy T. Addison and ending with Joanna J. Zemek, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nominations beginning with Timothy Jay Ablay and ending with James E. Yarnell, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nominations beginning with Daniel C. Abell and ending with Roque Zarate III, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nominations beginning with Daniel C. Adams and ending with Julia M. Ziegler, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nominations beginning with Michael Antoine Bradford and ending with Joseph R. Zito, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nominations beginning with Justin D. Atwood and ending with David J. Yu, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nominations beginning with Douglas D. Demaio and ending with Adria P. Zuccaro, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Air Force nomination of Keith A. Deering, to be Major.

Army nominations beginning with Bryan G. Adams and ending with D016618, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Army nominations beginning with Emer B. Bajuelos and ending with Connor W. Witty, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Army nomination of Leah M. Triolo, to be Colonel.

Army nomination of Joseph R. Yancey, to be Colonel.

Army nomination of Tannis D. Mittelbach, to be Colonel.

Army nomination of David M. Haynes, to be Colonel.

Army nomination of Daniel S. Rhoades, to be Lieutenant Colonel.

Army nomination of Stephen D. Ekblad, to be Major.

Army nomination of Scott F. Duncan, to be Lieutenant Colonel.

Army nominations beginning with Anna M. Arroyosantiago and ending with Zhibin Jiang, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Army nomination of Raymond A. Degennaro II, to be Colonel.

Army nomination of Kesler Weaver, Jr., to be Colonel.

Army nomination of William M. Harris, Jr., to be Colonel.

Army nomination of Lance M. Kunz, to be Colonel.

Army nominations beginning with John T. Aasman and ending with D016440, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Army nominations beginning with Sara R. A. Almcrantz and ending with Nichole M. Williams, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Army nominations beginning with Shanee E. Allen and ending with Douglas B. Yates, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Army nominations beginning with Jermaine Adams and ending with D016771, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Army nominations beginning with Frances K. Alfaro and ending with D016646, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Marine Corps nomination of Dominique B. Neal, to be Colonel.

Navy nomination of Steven D. Sideri, Jr., to be Lieutenant Commander.

Navy nominations beginning with Ruben Delpilar and ending with Steven C. Wang, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Jason S. Allen and ending with Michael J. Patterson, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Louise M. Anderson and ending with William E. Parthun, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Dillon J. Ambrose and ending with Kathryn M. Smith, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Obie A. Austin and ending with Susan O. Valentine, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Adam D. Guthrie and ending with Renee D. Whitsell, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with James D. Bach and ending with Donald R. Toso, Jr., which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Phillip I. Lieberman and ending with Frank T. Rupnik III, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Randell T. Buchanan and ending with Jason P. Wiese, which nominations were received by the Senate and appeared in the Congressional Record on June 22, 2022.

Navy nominations beginning with Timothy M. Flintoft and ending with Chad C. Temple, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Krystal M. Bauman and ending with Brookes A. Williams, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Andre M. Agraviador and ending with Michael Vallianos, Jr., which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Charlotte A. Benbow and ending with Ka Xiong, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Lindsay K. Barnes and ending with Sheivon A. Yuille, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Derek J. Anastasiades and ending with Scott C. Tollefson, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Michael A. Ammendola and ending with Laura C. Yoon, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nomination of William R. Fleming, to be Commander.

Navy nominations beginning with Alden Y. Argante and ending with Jason M. Setliff, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Brandon D. Carver and ending with Claiborn B. Thompson, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Eric L. Alexander and ending with John A. Woods, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Mario E. Canas and ending with Rafael M. Villarreal, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Kristin P. Acton and ending with Michael J. Zecca, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Jodi M. D. Biermann and ending with William C. Souder III, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Arthur D. Anderson III and ending with Christopher R. Tockey, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with William A. Bowen III and ending with Courtney R. Stalter, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Todd M. Anderson and ending with Jesse L. Whitfield, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Jessica B. Anderson and ending with Amelia E.

Umayam, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Thomas E. Arnold and ending with Joseph K. Spede, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Alan Cameron and ending with Leroy C. Young, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with John H. Beattie and ending with Benjamin V. Wainwright, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nomination of Javier Lopezmartinez, to be Captain.

Navy nominations beginning with Wendy A. Arnold and ending with Janet M. West, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Teresita Alston and ending with Donavon A. Yapshing, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nominations beginning with Clemia Anderson and ending with Charles R. Wilhite, which nominations were received by the Senate and appeared in the Congressional Record on July 11, 2022.

Navy nomination of Christopher J. Kane, to be Captain.

Space Force nomination of Christina N. Gillette, to be Lieutenant Colonel.

Space Force nomination of Daniel R. Hammer, to be Major.

By Mr. DURBIN for the Committee on the Judiciary.

Florence Y. Pan, of the District of Columbia, to be United States Circuit Judge for the District of Columbia Circuit.

Elizabeth Wilson Hanes, of Virginia, to be United States District Judge for the Eastern District of Virginia.

Carlos Felipe Uriarte, of California, to be an Assistant Attorney General.

Carlton W. Reeves, of Mississippi, to be Chair of the United States Sentencing Commission.

Carlton W. Reeves, of Mississippi, to be a Member of the United States Sentencing Commission for a term expiring October 31, 2027.

Laura E. Mate, of Iowa, to be a Member of the United States Sentencing Commission for a term expiring October 31, 2027.

Claire McCusker Murray, of Maryland, to be a Member of the United States Sentencing Commission for a term expiring October 31, 2025.

Luis Felipe Restrepo, of Pennsylvania, to be a Member of the United States Sentencing Commission for a term expiring October 31, 2025.

Claria Horn Boom, of Kentucky, to be a Member of the United States Sentencing Commission for a term expiring October 31, 2023.

John Gleeson, of New York, to be a Member of the United States Sentencing Commission for a term expiring October 31, 2023.

Candice C. Wong, of the District of Columbia, to be a Member of the United States Sentencing Commission for a term expiring October 31, 2027.

*Nomination was reported with recommendation that it be confirmed subject to the nominee's commitment to respond to requests to appear and testify before any duly constituted committee of the Senate.

(Nominations without an asterisk were reported with the recommendation that they be confirmed.)

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. PETERS (for himself and Mr. LANKFORD):

S. 4577. A bill to improve plain writing and public experience, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. MERKLEY (for himself, Mr. BLUMENTHAL, Mr. WYDEN, and Mr. BOOKER):

S. 4578. A bill to create a new Federal grant program that provides grants to State libraries to allow schools with summer lunch programs to keep their libraries open for student use during the summer months; to the Committee on Health, Education, Labor, and Pensions.

By Mr. HICKENLOOPER (for himself and Mr. BARRASSO):

S. 4579. A bill to amend the Energy and Water Development and Related Agencies Appropriations Act, 2015, to extend certain deadlines applicable to pilot projects to increase Colorado River System water to address effects of historic drought conditions, and for other purposes; to the Committee on Energy and Natural Resources.

By Ms. ROSEN (for herself and Ms. MURKOWSKI):

S. 4580. A bill to amend title 38, United States Code, to require a lactation space in each medical center of the Department of Veterans Affairs; to the Committee on Veterans' Affairs.

By Mr. MENENDEZ:

S. 4581. A bill to improve the public service loan forgiveness program under section 455(m) of the Higher Education Act of 1965, to improve loan forgiveness eligibility provisions under such Act for teachers, and for other purposes; to the Committee on Health, Education, Labor, and Pensions.

By Mr. VAN HOLLEN:

S. 4582. A bill to remove obstacles to the ability of law enforcement officers to enforce gun safety laws, and for other purposes; to the Committee on the Judiciary.

By Ms. HIRONO (for herself, Ms. SMITH, and Mr. MERKLEY):

S. 4583. A bill to amend title II of the Social Security Act and the Internal Revenue Code of 1986 to make improvements in the old-age, survivors, and disability insurance program, and to provide for Social Security benefit protection; to the Committee on Finance.

By Mr. MERKLEY (for himself, Mrs. FEINSTEIN, Mr. WHITEHOUSE, Mr. BOOKER, and Mr. WYDEN):

S. 4584. A bill to prohibit the use of M–44 devices, commonly known as "cyanide bombs", on public land, and for other purposes; to the Committee on Environment and Public Works.

By Mr. MARSHALL:

S. 4585. A bill to amend the Federal Insecticide, Fungicide, and Rodenticide Act to modify the pesticide registration process, and for other purposes; to the Committee on Agriculture, Nutrition, and Forestry.

By Mr. CRUZ (for himself and Mr. LANKFORD):

S. 4586. A bill to keep schools physically secure using unobligated Federal funds available to the Secretary of Education to respond to the coronavirus; to the Committee on Health, Education, Labor, and Pensions.

By Mrs. GILLIBRAND (for herself, Mr. SCHUMER, and Mr. CARDIN):

S. 4587. A bill to award a Congressional Gold Medal to Benjamin Berell Ferencz, in recognition of his service to the United States and international community during the post-World War II Nuremberg trials and lifelong advocacy for international criminal justice and rule of law; to the Committee on Banking, Housing, and Urban Affairs.

By Ms. ROSEN (for herself and Mrs. BLACKBURN):

S. 4588. A bill to establish a public-private partnership technology investment pilot program; to the Committee on Armed Services.

By Mr. GRASSLEY:

S. 4589. A bill to amend the Internal Revenue Code of 1986 to adjust certain credits and deductions for inflation; to the Committee on Finance.

By Mr. LUJÁN (for himself and Mr. BOOKER):

S. 4590. A bill to provide requirements relating to data caps on broadband internet access service, and for other purposes; to the Committee on Commerce, Science, and Transportation.

By Mr. BOOKER (for himself, Mr. WYDEN, Mr. SCHUMER, Mrs. MURRAY, and Mr. PETERS):

S. 4591. A bill to decriminalize and deschedule cannabis, to provide for reinvestment in certain persons adversely impacted by the War on Drugs, to provide expungement of certain cannabis offenses, and for other purposes; to the Committee on Finance.

By Ms. HASSAN (for herself and Mr. PORTMAN):

S. 4592. A bill to encourage the migration of Federal Government information technology systems to quantum-resistant cryptography, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. KELLY (for himself and Ms. SINEMA):

S. 4593. A bill to amend title XIX of the Social Security Act to require the Secretary of Health and Human Services to make certain information available on a public website relating to intermediate care facilities for individuals with intellectual disabilities certified for participation under the Medicaid program, and for other purposes; to the Committee on Finance.

By Mr. MARSHALL (for himself and Mr. CRUZ):

S. 4594. A bill to establish a National Regulatory Budget, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. CASEY (for himself, Mr. BOOKER, Ms. KLOBUCHAR, Ms. DUCKWORTH, Mr. BLUMENTHAL, Mr. BROWN, Mr. WYDEN, Mrs. GILLIBRAND, and Mr. PADILLA):

S. 4595. A bill to support local governments for jurisdictions that elect or appoint a person with a disability in providing the accommodations needed for the elected or appointed official to carry out their official work duties, and to build the capacity of local governments to have consistent and adequate funding for accommodations; to the Committee on Health, Education, Labor, and Pensions.

By Mr. LANKFORD (for himself, Mrs. CAPITO, Mr. INHOFE, Mr. CORNYN, Mr. BARRASSO, Mr. BLUNT, Mr. COTTON, Mr. HOEVEN, Mr. RISCH, Mr. CRAMER, Mr. DAINES, Mr. MARSHALL, and Ms. LUMMIS):

S. 4596. A bill to prohibit the Secretary of Energy, the Administrator of the Environmental Protection Agency, the Secretary of the Interior, the Secretary of Transportation, the Chair of the Council on Environmental Quality, and the Federal Energy Regulatory Commission from considering, in taking any action, the social cost of carbon, the social cost of methane, the social cost of

nitrous oxide, or the social cost of any other greenhouse gas, unless compliant with Office of Management and Budget guidance, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. CASEY (for himself, Ms. DUCKWORTH, Ms. KLOBUCHAR, Mr. BOOKER, Mr. PADILLA, Mr. BLUMENTHAL, Mr. WHITEHOUSE, Mr. WYDEN, and Ms. HIRONO):

S. 4597. A bill to allow individuals with disabilities to campaign for elected office without losing access to Federally supported benefits; to the Committee on Finance.

By Mr. BRAUN (for himself and Mr. SCOTT of Florida):

S. 4598. A bill to require the Executive Office of the President to provide an inflation estimate with respect to executive orders with a significant effect on the annual gross budget, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. PETERS (for himself and Mr. LANKFORD):

S. 4599. A bill to streamline the sharing of information among Federal disaster assistance agencies, to expedite the delivery of life-saving assistance to disaster survivors, to speed the recovery of communities from disasters, to protect the security and privacy of information provided by disaster survivors, and for other purposes; to the Committee on Homeland Security and Governmental Affairs.

By Mr. CRUZ (for himself and Mr. RUBIO):

S. 4600. A bill to require the reimposition of sanctions with respect to the FARC; to the Committee on Foreign Relations.

## SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Mr. SASSE (for himself and Mr. VAN HOLLEN):

S. Res. 715. A resolution expressing the sense of the Senate on the value of a tax agreement with Taiwan; to the Committee on Foreign Relations.

By Mr. WYDEN (for himself, Mr. CORNYN, Mr. KELLY, Mr. CRUZ, Ms. SINEMA, Mr. WARNOCK, Mr. MARKEY, Mr. VAN HOLLEN, Mrs. SHAHEEN, Ms. SMITH, Mr. BROWN, Mr. CARDIN, Mr. BLUMENTHAL, Ms. KLOBUCHAR, Mr. CASEY, Mr. KAINE, Mrs. FEINSTEIN, Ms. WARREN, Mrs. MURRAY, Mr. BOOKER, Mr. SANDERS, Mr. BENNET, Ms. BALDWIN, Mr. MERKLEY, Mr. SCHATZ, Mr. PETERS, Mr. PADILLA, Mr. COONS, Mr. HICKENLOOPER, Mr. DURBIN, and Mr. WHITEHOUSE):

S. Res. 716. A resolution calling for the immediate release of Brittney Griner, a citizen of the United States, who was wrongfully detained by the Government of the Russian Federation in February 2022; to the Committee on Foreign Relations.

By Mr. RUBIO (for himself, Mr. DURBIN, Mr. CRUZ, and Mr. MENENDEZ):

S. Res. 717. A resolution honoring the life and legacy of Oswaldo Paya Sardinas and his contributions to promote democracy and human rights in Cuba on the 10th anniversary of his death; to the Committee on Foreign Relations.

## ADDITIONAL COSPONSORS

S. 443

At the request of Mr. WHITEHOUSE, the name of the Senator from Arizona (Ms. SINEMA) was added as a cosponsor of S. 443, a bill to amend the Federal Election Campaign Act of 1971 to provide for additional disclosure requirements for corporations, labor organizations, Super PACs and other entities, and for other purposes.

S. 1888

At the request of Mr. BOOKER, the name of the Senator from Pennsylvania (Mr. CASEY) was added as a cosponsor of S. 1888, a bill to amend title 5, United States Code, to include certain Federal positions within the definition of law enforcement officer for retirement purposes, and for other purposes.

S. 2107

At the request of Mr. WYDEN, the names of the Senator from New York (Mr. SCHUMER) and the Senator from Texas (Mr. CRUZ) were added as cosponsors of S. 2107, a bill to amend the Internal Revenue Code of 1986 to establish the semiconductor manufacturing investment credit.

S. 2130

At the request of Mr. WHITEHOUSE, the names of the Senator from New York (Mrs. GILLIBRAND) and the Senator from Colorado (Mr. HICKENLOOPER) were added as cosponsors of S. 2130, a bill to modify the disposition of certain outer Continental Shelf revenues and to open Federal financial sharing to heighten opportunities for renewable energy, and for other purposes.

S. 2509

At the request of Mr. KAINE, the name of the Senator from South Carolina (Mr. GRAHAM) was added as a cosponsor of S. 2509, a bill to authorize the New Partnerships Initiative to expand and diversify the partner base of the United States Agency for International Development and to provide more entry points for organizations to work with USAID.

S. 2561

At the request of Mr. DAINES, the name of the Senator from Montana (Mr. TESTER) was added as a cosponsor of S. 2561, a bill to amend the Forest and Rangeland Renewable Resources Planning Act of 1974 and the Federal Land Policy and Management Act of 1976 to provide that a land resource management plan or land use plan approved, amended, or revised under those Acts shall not be considered to be a continuing Federal agency action or constitute a discretionary Federal involvement or control for a distinct Federal purpose, and for other purposes.

S. 3279

At the request of Mr. RUBIO, the name of the Senator from Illinois (Mr. DURBIN) was added as a cosponsor of S. 3279, a bill to extend duty-free treatment provided with respect to imports from Haiti under the Caribbean Basin Economic Recovery Act.

S. 3589

At the request of Mr. RUBIO, the name of the Senator from Delaware (Mr. COONS) was added as a cosponsor of S. 3589, a bill to require a United States security strategy for the Western Hemisphere, and for other purposes.

S. 3909

At the request of Mr. KAINE, the name of the Senator from Hawaii (Ms. HIRONO) was added as a cosponsor of S. 3909, a bill to amend the Internal Revenue Code of 1986 to make employers of spouses of military personnel eligible for the work opportunity credit.

S. 4156

At the request of Mr. TESTER, the name of the Senator from Pennsylvania (Mr. CASEY) was added as a cosponsor of S. 4156, a bill to improve the workforce of the Department of Veterans Affairs, and for other purposes.

S. 4202

At the request of Ms. COLLINS, the name of the Senator from Florida (Mr. SCOTT) was added as a cosponsor of S. 4202, a bill to require an annual budget estimate for the initiatives of the National Institutes of Health pursuant to reports and recommendations made under the National Alzheimer's Project Act.

S. 4208

At the request of Mr. SULLIVAN, the name of the Senator from Nevada (Ms. ROSEN) was added as a cosponsor of S. 4208, a bill to require the Secretary of Veterans Affairs to update the appraisal requirements for certain loans guaranteed by the Department of Veterans Affairs, and for other purposes.

S. 4432

At the request of Mr. MARKEY, the names of the Senator from New Jersey (Mr. BOOKER) and the Senator from Oklahoma (Mr. INHOFE) were added as cosponsors of S. 4432, a bill to require the Secretary of Commerce to establish the Sea Turtle Rescue Assistance Grant Program.

S. 4499

At the request of Mrs. BLACKBURN, the name of the Senator from Arkansas (Mr. COTTON) was added as a cosponsor of S. 4499, a bill to prohibit any requirement that a member of the National Guard receive a vaccination against COVID–19.

S. RES. 283

At the request of Mr. MENENDEZ, the name of the Senator from Pennsylvania (Mr. CASEY) was added as a cosponsor of S. Res. 283, a resolution reaffirming the importance of the United States to promoting the safety, health, and well-being of refugees and displaced persons.

S. RES. 646

At the request of Mr. RISCH, the name of the Senator from South Dakota (Mr. THUNE) was added as a cosponsor of S. Res. 646, a resolution expressing the Senate's support for Finland and Sweden's accession into the North Atlantic Treaty Organization (NATO) and the expedited ratification of accession protocols.

S. RES. 706

At the request of Mr. CARDIN, the name of the Senator from New Hampshire (Ms. HASSAN) was added as a cosponsor of S. Res. 706, a resolution remembering former Prime Minister of Japan Shinzo Abe.

S. RES. 713

At the request of Mr. RISCH, the name of the Senator from North Carolina (Mr. TILLIS) was added as a cosponsor of S. Res. 713, a resolution recognizing Russian actions in Ukraine as a genocide.

AMENDMENT NO. 5139

At the request of Mr. PORTMAN, the names of the Senator from West Virginia (Mrs. CAPITO), the Senator from Utah (Mr. ROMNEY), the Senator from Florida (Mr. RUBIO), the Senator from Mississippi (Mr. WICKER) and the Senator from Texas (Mr. CORNYN) were added as cosponsors of amendment No. 5139 intended to be proposed to H.R. 4346, a bill making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes.

## SUBMITTED RESOLUTIONS

### SENATE RESOLUTION 715—EXPRESSING THE SENSE OF THE SENATE ON THE VALUE OF A TAX AGREEMENT WITH TAIWAN

Mr. SASSE (for himself and Mr. VAN HOLLEN) submitted the following resolution; which was referred to the Committee on Foreign Relations:

S. RES. 715

Whereas Taiwan is a democratic success story, an economic success story, a key part of global technology supply chains, and a close security partner of the United States;

Whereas the United States has pursued a robust unofficial partnership with Taiwan within the context of the current one-China policy of the United States;

Whereas the Taiwan Relations Act (Public Law 96–8) has played an important role in promoting democracy and prosperity in Taiwan, peace and security in the Taiwan Strait, and close relations between the United States and Taiwan since 1979;

Whereas Taiwan is the eighth-largest trading partner of the United States, United States exports of goods and services to Taiwan support at least 188,000 American jobs, and Taiwan's cumulative investment in the United States is at least $13,700,000,000;

Whereas the United States has ongoing economic dialogues with Taiwan that cover a range of trade, technology, and investment issues through the Trade and Investment Framework Agreement Council led by the United States Trade Representative, the U.S.-Taiwan Economic Prosperity Partnership Dialogue led by the Department of State, and the Technology, Trade, and Investment Collaboration framework led by the Department of Commerce;

Whereas the Biden Administration announced the ''U.S.-Taiwan Initiative on 21st Century Trade'' on June 1, 2022;

Whereas the United States has income tax treaties with 66 countries, including the People's Republic of China, and has agreements with other parties, including Taiwan, related to taxation, such as facilitating implementation of the Foreign Account Tax Compliance Act;

Whereas Taiwan is the United States' largest trading partner with whom we do not have an income tax treaty;

Whereas Taiwan has income tax agreements with 34 countries, including countries that have trade agreements with the United States and do not maintain diplomatic relations with Taiwan;

Whereas the United States signed a transportation income tax agreement with Taiwan in 1988, under the auspices of the American Institute in Taiwan (AIT) and the Coordination Council for North American Affairs, which has since been renamed as the Taipei Economic and Cultural Representative Office (TECRO);

Whereas an income tax agreement between the United States and Taiwan could boost bilateral trade and investment by reducing double taxation and increasing economic efficiency and integration; and

Whereas the American Chamber of Commerce in Taipei in its ''2022 White Paper'' called for the United States and Taiwan to continue exploring an income tax agreement: Now, therefore, be it

*Resolved,* That the Senate—

(1) recognizes the importance of Taiwan's security and prosperity to the United States' own security and prosperity;

(2) encourages the President to begin negotiations on an income tax agreement with Taiwan;

(3) encourages the President and the House of Representatives to work with the Senate on a congressional-executive agreement to establish an income tax agreement between the United States and Taiwan, consistent with United States commitments under the Taiwan Relations Act; and

(4) encourages the President to proactively seek other ways to increase trade, technology, and investment ties between the United States and Taiwan.

### SENATE RESOLUTION 716—CALLING FOR THE IMMEDIATE RELEASE OF BRITTNEY GRINER, A CITIZEN OF THE UNITED STATES, WHO WAS WRONGFULLY DETAINED BY THE GOVERNMENT OF THE RUSSIAN FEDERATION IN FEBRUARY 2022

Mr. WYDEN (for himself, Mr. CORNYN, Mr. KELLY, Mr. CRUZ, Ms. SINEMA, Mr. WARNOCK, Mr. MARKEY, Mr. VAN HOLLEN, Mrs. SHAHEEN, Ms. SMITH, Mr. BROWN, Mr. CARDIN, Mr. BLUMENTHAL, Ms. KLOBUCHAR, Mr. CASEY, Mr. KAINE, Mrs. FEINSTEIN, Ms. WARREN, Mrs. MURRAY, Mr. BOOKER, Mr. SANDERS, Mr. BENNET, Ms. BALDWIN, Mr. MERKLEY, Mr. SCHATZ, Mr. PETERS, Mr. PADILLA, Mr. COONS, Mr. HICKENLOOPER, Mr. DURBIN, and Mr. WHITEHOUSE) submitted the following resolution; which was referred to the Committee on Foreign Relations.:

S. RES. 716

Whereas United States citizen Brittney Griner is a Women's National Basketball Association (referred to in this preamble as ''WNBA'') player;

Whereas Brittney Griner and her wife, Cherelle, are residents of Phoenix, Arizona, and are well respected leaders in that community;

Whereas Brittney Griner was raised in Houston, Texas, and many of her family members live in Texas;

Whereas after a prolific collegiate career at Baylor University, Brittney Griner was selected with the first overall pick in the 2013 WNBA draft by the Phoenix Mercury, where she has played her entire WNBA career;

Whereas during her WNBA career, Brittney Griner has been named the WNBA Defensive Player of the Year twice and has been a WNBA All Star 7 times;

Whereas Brittney Griner represented the United States as a member of the United States Women's National Basketball Team at 2 Olympics, where she helped Team USA win gold medals in each appearance;

Whereas Brittney Griner is an international figure who has played 7 seasons of professional basketball in Russia for UMMC Ekaterinburg during the WNBA off season;

Whereas Brittney Griner is a renowned leader in the LGBTQ+ community;

Whereas Brittney Griner has made a difference in the lives of many Arizonans, including through her annual ''BG's Heart and Sole Shoe Drive'', which has provided shoes to nearly 2,000 people who are experiencing homelessness in the Phoenix area;

Whereas the Phoenix Mercury and the Phoenix Rescue Mission are continuing this important effort to clothe the homeless in Brittney Griner's absence;

Whereas Brittney Griner was presumably detained by Russian authorities at Sheremetyevo Alexander S. Pushkin International Airport in Khimki, Russia, on February 17, 2022, and accused of carrying vape cartridges with hashish oil;

Whereas Russian authorities opened a criminal case against Brittney Griner for the alleged transportation of drugs, a crime which can carry a prison sentence of up to 10 years;

Whereas, on March 17, 2022, a Russian court denied a request for bail and house arrest for Brittney Griner, and has since extended her detention until July 2, 2022;

Whereas the Department of State has determined that Brittney Griner is ''wrongfully detained''; and

Whereas the Biden Administration has pledged to return Brittney Griner back to the United States as soon as possible: Now, therefore, be it

*Resolved*, That the Senate—

(1) calls on the Government of the Russian Federation to immediately release Brittney Griner;

(2) urges the United States, in all interactions with the Government of the Russian Federation, to raise the case of Brittney Griner and to press for her release;

(3) expresses the continued support for Paul Whelan and all prisoners unjustly imprisoned in the Russian Federation;

(4) urges the Government of the Russian Federation to provide consular access to Brittney Griner while she remains in detention;

(5) urges the Government of the Russian Federation to respect the human rights of Brittney Griner; and

(6) expresses support to the family of Brittney Griner and a commitment to bringing her home.

### SENATE RESOLUTION 717—HONORING THE LIFE AND LEGACY OF OSWALDO PAYA SARDINAS AND HIS CONTRIBUTIONS TO PROMOTE DEMOCRACY AND HUMAN RIGHTS IN CUBA ON THE 10TH ANNIVERSARY OF HIS DEATH

Mr. RUBIO (for himself, Mr. DURBIN, Mr. CRUZ, and Mr. MENENDEZ) submitted the following resolution; which

was referred to the Committee on Foreign Relations:

S. RES. 717

Whereas the revolution led by Fidel Castro in Cuba in 1959 started 63 years of an ongoing dictatorship that systematically violates the human rights of the Cuban people, including denying them the basic freedoms of press, religion, assembly, and association;

Whereas Oswaldo Payá Sardiñas was born in Havana, Cuba, in 1952 and became a nonviolent critic of the communist regime as a teenager, resulting in 3 years of imprisonment in 1969 at a work camp, formerly known as ''Isla de Pinos'', in Cuba;

Whereas Oswaldo Payá Sardiñas forewent a chance to escape Cuba in the 1980 Mariel boatlift, deciding instead to continue the fight for democracy in Cuba, saying, ''This is what I am supposed to be, this is what I have to do.'';

Whereas, in 1988, Oswaldo Payá Sardiñas founded the Christian Liberation Movement that called for peaceful civil disobedience against the rule of the communist party of Cuba and advocated for civil liberties and human rights in Cuba;

Whereas, in 1992, Oswaldo Payá Sardiñas announced his intention to run for the National Assembly of Popular Power of Cuba and collected hundreds of signatures to support his candidacy, and 2 days before the election, was detained by police at his home and informed by communist party officials to be ineligible to run for office and threatened that ''blood will run'' if he ran;

Whereas, in 1998, Oswaldo Payá Sardiñas and other leaders of the Christian Liberation Movement initiated the Varela Project, the largest civil society-led petition in the history of Cuba, in order to circulate a legal proposal to advocate for democratic political change within Cuba, including ''convert[ing] into law, the right of freedom of speech, the freedom of press and freedom of enterprise'';

Whereas, in May 2002, the Varela Project delivered 11,020 signatures from eligible citizens of Cuba to the National Assembly of Popular Power, calling for an end to 4 decades of one-party rule, to which the communist regime responded by beginning its own forced collection of signatures in violation of its own rules to make Cuba's socialist system ''irrevocable'', and an additional 14,000 signatures were added to the Varela Project petition in 2003, and 10,000 more signatures were added in 2016;

Whereas, in March 2003, the crackdown on Cuban dissidents by the communist regime in Cuba, referred to as the ''Black Spring'', led to the imprisonment of 75 individuals, including 40 leaders of the Varela Project and 25 members of the Christian Liberation Movement, and the formation of the Ladies in White movement by the wives of the imprisoned activists;

Whereas, in 2003, Oswaldo Payá Sardiñas developed a Call for the National Dialogue, which collected the contributions of thousands of Cubans inside and outside of Cuba;

Whereas, in 2006, Oswaldo Payá Sardiñas published the ''Todos Cubanos'' program, produced as a result of the National Dialogue among Cubans, to achieve peaceful changes, to propose a referendum to institutionalize human rights, to ensure that the economic and social rights of the people of Cuba are respected, to ensure that the people of Cuba are not excluded in Cuba, and to establish a rule of law;

Whereas, in 2007, Oswaldo Payá Sardiñas called on the National Assembly of People's Power to grant amnesty to nonviolent political prisoners and to allow the people of Cuba to travel freely without a government permit;

Whereas, in 2011, Oswaldo Payá Sardiñas denounced the communist regime of Cuba's false liberalization for not recognizing human rights and proposed to directly carry out a Binding Plebiscite to change the system towards democracy and establish a rule of law;

Whereas, on July 22, 2012, Oswaldo Payá Sardiñas and Harold Cepero, a fellow pro-democracy activist, died in a troubling car crash in Granma Province, Cuba, after being followed by regime agents of Cuba;

Whereas the communist regime of Cuba has failed to conduct a credible investigation into the car crash that led to the death of Oswaldo Payá Sardiñas;

Whereas, according to a report published in 2015 by the Human Rights Foundation, the best available evidence strongly suggests that the communist regime of Cuba is directly responsible for the deaths of Oswaldo Payá Sardiñas and Harold Cepero, evidence that was deliberately ignored by the judiciary system of Cuba;

Whereas the trial and conviction of Angel Carromero, a youth leader of the People's Party who was visiting Cuba and driving the car at the time of the crash, did not include testimony from key witnesses, and did not resolve questions about whether another car was involved or whether Mr. Carromero was coerced by the communist regime of Cuba into signing a false statement of guilt;

Whereas, in 2013, a number of United States Senators and the Department of State called for an impartial, third-party investigation by the Inter-American Commission on Human Rights of the Organization of American States into the circumstances surrounding the death of Oswaldo Payá Sardiñas;

Whereas Oswaldo Payá Sardiñas has been formally recognized in the past for his dedication to the promotion of human rights and democracy, including by receiving the Homo Homini Award in 1999, the Sakharov Prize for Freedom of Thought in 2002, the W. Averell Harriman Democracy Award from the United States National Democratic Institute for International Affairs in 2003, and being nominated for the Nobel Peace Prize by Válclav Havel, the former President of the Czech Republic, in 2005;

Whereas, in 2012, the United States Senate unanimously passed Senate Resolution 525, 112th Congress, agreed to July 31, 2012, honoring the life and legacy of Oswaldo Payá Sardiñas;

Whereas, in 2018, the United States Senate unanimously passed Senate Resolution 224, 115th Congress, agreed to April 11, 2018, recognizing the 6th anniversary of the death of Oswaldo Payá Sardiñas, and commemorating his legacy and commitment to democratic values and principles;

Whereas, in 2021, the United States Senate unanimously passed Senate bill 2045, 117th Congress, agreed to July 30, 2021, to designate the area between the intersections of 16th Street, Northwest and Fuller Street, Northwest and 16th Street, Northwest and Euclid Street, Northwest in Washington, District of Columbia, as ''Oswaldo Payá Way'';

Whereas, on July 14, 2022, the City of Miami, Florida agreed to designate the area of LeJeune Avenue, between 11th and 14th streets, as ''Oswaldo Payá Sardiñas Way'' on the eve of the 10th anniversary of his death, July 22, 2022;

Whereas, throughout his life and since his death, Oswaldo Payá Sardiñas, his family, and friends endured years of harassment and intimidation from the communist regime of Cuba for his peaceful, political activism; and

Whereas, on July 11, 2021, thousands of people in Cuba raised their voices against the 63-year rule of the communist regime and called for the same freedoms Oswaldo Payá Sardiñas dedicated his life to: Now, therefore, be it

*Resolved*, That the Senate—

(1) recognizes and honors the life and legacy of Oswaldo Payá Sardiñas on the 10th anniversary of his death on July 22, 2022;

(2) offers heartfelt condolences to the family, friends, and loved ones of Oswaldo Payá Sardiñas on this painful anniversary;

(3) in memory of Oswaldo Payá Sardiñas, calls on the United States to continue policies that promote respect for the fundamental principles of religious freedom, democracy, and human rights in Cuba, in a manner consistent with the aspirations of the people of Cuba;

(4) urges the Inter-American Commission on Human Rights of the Organization of American States to continue reporting on human rights issues in Cuba, and to issue a favorable decision in the case of Oswaldo Payá Sardiñas and Harold Cepero that recognizes evidence which establishes the culpability of the communist regime of Cuba in their deaths;

(5) calls on the communist regime in Cuba to allow an impartial, third-party investigation into the circumstances surrounding the death of Oswaldo Payá Sardiñas; and

(6) calls on the communist regime in Cuba to cease violating human rights and to begin providing democratic political freedoms to Cuban citizens, including freedom of association, freedom of speech, freedom of the press, free elections, freedom to start private businesses, and amnesty for political prisoners.

## AMENDMENTS SUBMITTED AND PROPOSED

SA 5144. Mr. HAGERTY (for himself, Mr. KING, Mr. CORNYN, Mr. WICKER, Mr. YOUNG, Ms. SINEMA, and Mr. KELLY) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table.

SA 5145. Mr. SANDERS (for himself and Ms. WARREN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5146. Mr. JOHNSON submitted an amendment intended to be proposed by him to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5147. Mr. GRAHAM submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5148. Mr. SCHUMER proposed an amendment to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant.

SA 5149. Mr. SCHUMER proposed an amendment to amendment SA 5148 proposed by Mr. SCHUMER to the bill S. 3373, supra.

SA 5150. Mr. SCHUMER proposed an amendment to the bill S. 3373, supra.

SA 5151. Mr. SCHUMER proposed an amendment to amendment SA 5150 proposed by Mr. SCHUMER to the bill S. 3373, supra.

SA 5152. Mr. SCHUMER proposed an amendment to amendment SA 5151 proposed by Mr. SCHUMER to the amendment SA 5150 proposed by Mr. SCHUMER to the bill S. 3373, supra.

SA 5153. Mr. MANCHIN (for himself and Mrs. SHAHEEN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R.

4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table.

SA 5154. Mrs. CAPITO (for herself, Mr. WICKER, Mr. TILLIS, and Mr. CORNYN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5155. Mr. RUBIO submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5156. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5157. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill H.R. 4346, supra; which was ordered to lie on the table.

## TEXT OF AMENDMENTS

**SA 5144.** Mr. HAGERTY (for himself, Mr. KING, Mr. CORNYN, Mr. WICKER, Mr. YOUNG, Ms. SINEMA, and Mr. KELLY) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the end of division A, add the following:

**SEC. 10_____. FEDERAL PERMITTING IMPROVEMENT.**

Section 41001(6)(A) of the FAST Act (42 U.S.C. 4370m(6)(A)) is amended, in the matter preceding clause (i), by inserting ''semiconductors, artificial intelligence and machine learning, high-performance computing and advanced computer hardware and software, quantum information science and technology, data storage and data management, cybersecurity,'' after ''manufacturing,''.

**SA 5145.** Mr. SANDERS (for himself and Ms. WARREN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the end of division A, add the following:

**SEC. 108. TERMS AND CONDITIONS OF ASSISTANCE.**

(a) CHIPS ASSISTANCE.—

(1) REQUIRED AGREEMENT.—A covered entity to which the Secretary of Commerce awards Federal financial assistance under section 9902 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (15 U.S.C. 4652) or section 102 or 103 of this Act with amounts appropriated under this Act shall enter into an agreement that specifies that, during the 5-year period immediately following the award of the Federal financial assistance—

(A) the covered entity will not—

(i) repurchase an equity security that is listed on a national securities exchange of the covered entity or any parent company of the covered entity, except to the extent required under a contractual obligation that is in effect as of the date of enactment of this Act;

(ii) outsource or offshore jobs to a location outside of the United States; or

(iii) abrogate existing collective bargaining agreements; and

(B) the covered entity will remain neutral in any union organizing effort.

(2) FINANCIAL PROTECTION OF GOVERNMENT.—

(A) IN GENERAL.—The Secretary of Commerce may not award Federal financial assistance to a covered entity under section 9902 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (15 U.S.C. 4652) or under section 102 or 103 of this Act with amounts appropriated under this Act, unless—

(i)(I) the covered entity has issued securities that are traded on a national securities exchange; and

(II) the Secretary of the Treasury receives a warrant or equity interest in the covered entity; or

(ii) in the case of any covered entity other than a covered entity described in clause (i), the Secretary of the Treasury receives, in the discretion of the Secretary of the Treasury—

(I) a warrant or equity interest in the covered entity; or

(II) a senior debt instrument issued by the covered entity.

(B) TERMS AND CONDITIONS.—The terms and conditions of any warrant, equity interest, or senior debt instrument received under subparagraph (A) shall be set by the Secretary of Commerce and shall meet the following requirements:

(i) PURPOSES.—Such terms and conditions shall be designed to provide for a reasonable participation by the Secretary of Commerce, for the benefit of taxpayers, in equity appreciation in the case of a warrant or other equity interest, or a reasonable interest rate premium, in the case of a debt instrument.

(ii) AUTHORITY TO SELL, EXERCISE, OR SURRENDER.—For the primary benefit of taxpayers, the Secretary of Commerce may sell, exercise, or surrender a warrant or any senior debt instrument received under this paragraph. The Secretary of Commerce shall not exercise voting power with respect to any shares of common stock acquired under this paragraph.

(iii) SUFFICIENCY.—If the Secretary of Commerce determines that a covered entity cannot feasibly issue warrants or other equity interests as required by this paragraph, the Secretary of Commerce may accept a senior debt instrument in an amount and on such terms as the Secretary of Commerce determines appropriate.

(b) APPLICATION TO ADVANCED MANUFACTURING INVESTMENT CREDIT.—

(1) FINANCIAL PROTECTION OF GOVERNMENT.—Subsection (c) of section 48D of the Internal Revenue Code of 1986 (as added by this Act) is amended to read as follows:

''(c) ELIGIBLE TAXPAYER.—

''(1) IN GENERAL.—For purposes of this section, the term 'eligible taxpayer' means any taxpayer which—

''(A) is not a foreign entity of concern (as defined in section 9901(6) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021),

''(B) has not made an applicable transaction (as defined in section 50(a)) during the taxable year,

''(C) has not performed a prohibited activity (as defined in section 50(a)) for the portion of the taxable year after investment credit property has been placed in service, and

''(D) meets the requirements of paragraph (2).

''(2) FINANCIAL PROTECTION REQUIREMENTS.—

''(A) IN GENERAL.—A taxpayer meets the requirements of this paragraph if—

''(i)(I) the taxpayer has issued securities that are traded on a national securities exchange; and

''(II) the Secretary of the Treasury receives a warrant or equity interest in the covered entity; or

''(ii) in the case of taxpayer other than a taxpayer described in subparagraph (A), the Secretary receives, in the discretion of the Secretary—

''(I) a warrant or equity interest in the taxpayer; or

''(II) a senior debt instrument issued by the taxpayer.

''(B) TERMS AND CONDITIONS.—The terms and conditions of any warrant, equity interest, or senior debt instrument received under subparagraph (A) shall be set by the Secretary, in consultation with the Secretary of Commerce, and shall meet the following requirements:

''(i) PURPOSES.—Such terms and conditions shall be designed to provide for a reasonable participation by the Secretary, for the benefit of taxpayers, in equity appreciation in the case of a warrant or other equity interest, or a reasonable interest rate premium, in the case of a debt instrument.

''(ii) AUTHORITY TO SELL, EXERCISE, OR SURRENDER.—For the primary benefit of taxpayers, the Secretary may sell, exercise, or surrender a warrant or any senior debt instrument received under this clause. The Secretary shall not exercise voting power with respect to any shares of common stock acquired under this subparagraph.

''(iii) SUFFICIENCY.—If the Secretary determines that a taxpayer cannot feasibly issue warrants or other equity interests as required by this paragraph, the Secretary may accept a senior debt instrument in an amount and on such terms as the Secretary determines appropriate.''.

(2) RECAPTURE OF CREDIT IN CERTAIN CASES.—

(A) IN GENERAL.—Section 50(a) of the Internal Revenue Code of 1986, as amended by this Act, is amended redesignating paragraphs (4) through (6) as paragraphs (5) through (7), respectively, and by inserting after paragraph (3) the following new paragraph:

''(4) CERTAIN REQUIREMENTS FOR ADVANCED MANUFACTURING FACILITIES.—If there is a prohibited activity by an applicable taxpayer before the close of the 5-year period beginning on the date such taxpayer placed in service investment credit property which is eligible for the advanced manufacturing investment credit under section 48D(a), then the tax under this chapter for the taxable year in which such transaction occurs shall be increased by 100 percent of the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from reducing to zero any credit determined under section 46 which is attributable to the advanced manufacturing investment credit under section 48D(a) with respect to such property.''.

(B) PROHIBITED ACTIVITY.—Section 50(a)(7) of the Internal Revenue Code of 1986, as amended redesignated by the preceding provisions of this Act, is amended adding at the end the following new subparagraph:

''(E) PROHIBITED ACTIVITY.—For purposes of this subsection, the term 'prohibited activity' means, with respect to any applicable taxpayer, any of the following:

''(i) the repurchase an equity security that is listed on a national securities exchange of the taxpayer or any parent company of the taxpayer, except to the extent required under a contractual obligation that is in effect as of the date of enactment of this subparagraph;

''(ii) the outsourcing or offshoring of jobs to a location outside of the United States;

''(iii) the abrogation of existing collective bargaining agreements; or

''(iv) the failure of the taxpayer to remain neutral in any union organizing effort.''.

(C) CONFORMING AMENDMENTS.—

(i) Section 50(a)(5) of the Internal Revenue Code of 1986, as redesignated by the preceding provisions of this Act, is amended—

(I) by striking ''or any applicable transaction to which paragraph (3)(A) applies'' and inserting ''any applicable transaction to which paragraph (3)(A) applies, or any prohibited transaction to which paragraph (4) applies'', and

(II) by striking ''or applicable transaction'' and inserting '', applicable transaction, or prohibited transaction''.

(ii) Section 50(a)(7)(C) of such Code, as amended and redesignated the preceding provisions of this Act, is amended by striking ''or (3)'' and inserting ''(3), or (4)''.

(iii) Section 1371(d)(1) of such Code, as amended by this Act, is amended by striking ''section 50(a)(5)'' and inserting ''section 50(a)(6)''.

---

**SA 5146.** Mr. JOHNSON submitted an amendment intended to be proposed by him to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. _____. OFFSET OF COSTS USING UNOBLIGATED FUNDS FROM THE AMERICAN RESCUE PLAN ACT OF 2021 AND THE CARES ACT.**

(a) DEFINITION.—In this section, the term ''total cost of this Act'' means the sum, as determined by the Director of OMB, of the amounts appropriated under any division of this Act or an amendment made by any division of this Act and the amounts authorized to be appropriated under any division of this Act or an amendment made by any division of this Act.

(b) RESCISSIONS.—Effective on the date of enactment of this Act, there is rescinded, on a pro rata basis—

(1) of the unobligated balances made available under the American Rescue Plan Act of 2021 (Public Law 117–2; 135 Stat. 4), the amount necessary to reduce the total amount of such unobligated balances by an amount equal to the total cost of this Act; and

(2) if the unobligated balances described in paragraph (1) are less than the total cost of this Act, of the unobligated balances made available under the CARES Act (Public Law 116–136; 134 Stat. 281), the amount necessary to reduce the total amount of such unobligated balances by an amount equal to the difference between the amount rescinded under paragraph (1) and the total cost of this Act.

---

**SA 5147.** Mr. GRAHAM submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

On page 31, lines 9 and 10, strike ''or semiconductor manufacturing equipment'' and insert ''semiconductor manufacturing equipment, or substantial or essential components of semiconductor manufacturing equipment''.

On page 34, lines 5 and 6, strike ''or semiconductor manufacturing equipment'' and insert ''semiconductor manufacturing equipment, or substantial or essential components of semiconductor manufacturing equipment''.

---

**SA 5148.** Mr. SCHUMER proposed an amendment to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

At the end add the following:

**SEC. EFFECTIVE DATE**

This Act shall take effect on the date that is 1 day after the date of enactment of this Act.

---

**SA 5149.** Mr. SCHUMER proposed an amendment to amendment SA 5148 proposed by Mr. SCHUMER to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

On page 1, line 3, strike ''1 day'' and insert ''2 days''.

---

**SA 5150.** Mr. SCHUMER proposed an amendment to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

At the end add the following:

**SEC. EFFECTIVE DATE.**

This Act shall take effect on the date that is 3 days after the date of enactment of this Act.

---

**SA 5151.** Mr. SCHUMER proposed an amendment to amendment SA 5150 proposed by Mr. SCHUMER to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

On page 1, line 3, strike ''3'' and insert ''4''.

---

**SA 5152.** Mr. SCHUMER proposed an amendment to amendment SA 5151 proposed by Mr. SCHUMER to the amendment SA 5150 proposed by Mr. SCHUMER to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

On page 1, line 3, strike ''4'' and insert ''5''.

---

**SA 5153.** Mr. MANCHIN (for himself and Mrs. SHAHEEN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

On page 790, on line 4, insert ''In selecting recipients, the Secretary shall consider for prioritization severely distressed eligible areas, in addition to other factors.'' after ''recipients.''

---

**SA 5154.** Mrs. CAPITO (for herself, Mr. WICKER, Mr. TILLIS, and Mr. CORNYN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

Beginning on page 776, strike line 18 and all that follows through page 790, line 4.

---

**SA 5155.** Mr. RUBIO submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

Beginning on page 40, strike line 5 and all that follows through line 23 on page 42, and insert the following:

''(ii) UPDATES.—

''(I) APPROPRIATE CONGRESSIONAL COMMITTEES.—For purposes of this clause, the term 'appropriate congressional committees' means—

''(aa) the Committee on Commerce, Science and Transportation, the Select Committee on Intelligence, and the Committee on Armed Services of the Senate; and

''(bb) the Committee on Energy and Commerce, the Permanent Select Committee on Intelligence, and the Committee on Armed Services of the House of Representatives.

''(II) IN GENERAL.—Subject to subclause (III), not later than 2 years after the date of enactment of the CHIPS Act of 2022, and not less frequently than once every 2 years thereafter for the 8-year period after the last award under this section is made, the Secretary, after public notice and an opportunity for comment and if applicable and necessary, shall issue a public notice identifying any additional semiconductor technology included in the meaning of the term 'legacy semiconductor' under clause (i).

''(III) NOTICE TO THE APPROPRIATE CONGRESSIONAL COMMITTEES.—

''(aa) NOTICE.—Not later than 10 days after the Secretary determines that any additional semiconductor technology should be included in the meaning of the term 'legacy semiconductor' under clause (i) and before the Secretary issues the initial public notice described in subclause (II), the Secretary—

''(AA) shall notify the appropriate congressional committees of that determination; and

''(BB) shall not issue the initial public notice described in subclause (II) unless each of the appropriate congressional committees affirmatively agrees in writing in accordance with item (bb) to the proposed inclusion of the additional semiconductor technology in the meaning of the term 'legacy semiconductor'.

''(bb) AGREEMENT.—Upon receipt of a notice described in item (aa) by an appropriate congressional committee, the appropriate congressional committee—

''(AA) shall review the notice; and

''(BB) if the appropriate congressional committee agrees to the inclusion, not later than 30 days after the date of receipt of the notice, shall submit to the Secretary a written affirmative agreement that the relevant additional semiconductor technology should be included in the meaning of the term 'legacy semiconductor'.

''(iii) FUNCTIONS OF THE SECRETARY.—The functions of the Secretary under this paragraph shall not be subject to sections 551, 553 through 559, and 701 through 706 of title 5, United States Code.

''(iv) CONSULTATION.—In carrying out clause (ii), the Secretary shall consult with the Director of National Intelligence and the Secretary of Defense.

''(v) CONSIDERATIONS.—In carrying out clause (ii), the Secretary shall consider—

''(I) state-of-the-art semiconductor technologies in the United States and internationally, including in foreign countries of concern; and

''(II) consistency with export controls relating to semiconductors.

''(B) DEFINITION OF SEMICONDUCTOR MANUFACTURING.—In this paragraph, the term 'semiconductor manufacturing'—

''(i) has the meaning given the term by the Secretary, in consultation with the Secretary of Defense and the Director of National Intelligence; and

''(ii) includes front-end semiconductor fabrication.

''(C) REQUIRED AGREEMENT.—

''(i) IN GENERAL.—On or before the date on which the Secretary awards Federal financial assistance to a covered entity under this section, the covered entity shall enter into an agreement with the Secretary specifying that, during the 10-year period beginning on the date of the award, subject to clause (ii), the covered entity may not engage in any transaction, as defined in the agreement, involving the expansion of semiconductor manufacturing capacity in the People's Republic of China or any other foreign country of concern.

''(ii) EXCEPTIONS.—

''(I) APPROPRIATE CONGRESSIONAL COMMITTEES.—For purposes of this clause, the term 'appropriate congressional committees' means—

''(aa) the Committee on Commerce, Science, and Transportation, the Select Committee on Intelligence, and the Committee on Armed Services of the Senate; and

''(bb) the Committee on Energy and Commerce, the Permanent Select Committee on Intelligence, and the Committee on Armed Services of the House of Representatives.

''(II) APPLICATION OF EXCEPTIONS.—The prohibition in the agreement required under clause (i) shall not apply to—

''(aa) existing facilities or equipment of a covered entity for manufacturing legacy semiconductors; or

''(bb) significant transactions involving the material expansion of semiconductor manufacturing capacity that—

''(AA) produces legacy semiconductors; and

''(BB) predominately serves the market of a foreign country of concern.

''(III) NOTIFICATION.—If the Secretary grants an exception or otherwise becomes aware of any facility, equipment, or significant transaction that qualifies for an exception under subclause (II), the Secretary shall submit notice of the exception to the appropriate congressional committees not later than 10 days after the date on which the Secretary grants or becomes aware of the exception.''.

---

**SA 5156.** Mr. RUBIO submitted an amendment intended to be proposed by him to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. _____. ADDITIONAL "RIP AND REPLACE" FUNDING.**

Section 4(k) of the Secure and Trusted Communications Networks Act of 2019 (47 U.S.C. 1603(k)) is amended by striking ''$1,900,000,000'' and inserting ''$4,980,000,000''.

---

**SA 5157.** Mr. RUBIO submitted an amendment intended to be proposed by him to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place in division B, insert the following:

**SEC. _____. COUNTERINTELLIGENCE AND NATIONAL SECURITY PROTECTIONS.**

(a) COUNTERINTELLIGENCE SCREENING PROCESS.—

(1) ESTABLISHMENT.—The Director of National Intelligence, the Director of the National Counterintelligence and Security Center, and the Director of the Federal Bureau of Investigation shall jointly establish a counterintelligence screening process to protect the United States against efforts of China and other foreign entities to engage in economic espionage and to misappropriate United States intellectual property, research and development, and innovation efforts.

(2) FUNCTIONS.—Subject to the joint direction and control of the Director of National Intelligence, the Director of the National Counterintelligence and Security Center, and the Director of the Federal Bureau of Investigation, the counterintelligence screening process established under paragraph (1) shall assess and screen all funds provided under this Act (including grants awarded under this Act) for potential national security threats.

(3) FUNDING.—Amounts required to carry out the process established under paragraph (1) shall be derived from amounts appropriated to carry out this Act.

(b) PROTECTIONS.—

(1) CERTIFICATION REQUIRED FOR RECEIPT OF AMOUNTS.—Notwithstanding any other provision of this Act, no person may receive any amount (including an amount as part of a grant awarded under this Act) or purchase, lease, or otherwise obtain any intellectual property developed through a grant awarded under this Act, unless the Director of National Intelligence, the Director of the National Counterintelligence and Security Center, and the Director of the Federal Bureau of Investigation jointly certify that the person has sufficient protections in place to protect against misappropriation of United States intellectual property, research and development, and innovation efforts, and other threats from foreign governments and other entities.

(2) CERTIFICATION REQUIREMENTS.—Notwithstanding any other provision of this Act, no certification may be made under paragraph (1) with respect to a person unless such person discloses to the Director of National Intelligence, the Director of the National Counterintelligence and Security Center, and the Director of the Federal Bureau of Investigation the following:

(A) Any funding received by the person from a foreign source during the most recent 10-year period.

(B) Any financial or in-kind support received by the person from any entity—

(i) owned or controlled by the Government of the People's Republic of China; or

(ii) in which the Government of the People's Republic of China has an ownership interest.

(C) Any participation of the person in a foreign government talent recruitment program, consistent with sections 10631 and 10632.

---

## AUTHORITY FOR COMMITTEES TO MEET

Mr. CARDIN. Mr. President, I have five requests for committees to meet during today's session of the Senate. They have the approval of the Majority and Minority Leaders.

Pursuant to Rule XXVI, paragraph 5(a), of the Standing Rules of the Senate, the following committees are authorized to meet during today's session of the Senate:

COMMITTEE ON ARMED SERVICES

The Committee on Armed Services is authorized to meet during the session of the Senate on Thursday, July 21, 2022, at 9:30 a.m., to conduct a hearing on nominations.

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

The Committee on Banking, Housing, and Urban Affairs is authorized to meet during the session of the Senate on Thursday, July 21, 2022, at 10 a.m., to conduct a hearing.

COMMITTEE ON ENERGY AND NATURAL RESOURCES

The Committee on Energy and Natural Resources is authorized to meet during the session of the Senate on Thursday, July 21, 2022, at 10 a.m., to conduct a business meeting.

COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

The Committee on Homeland Security and Governmental Affairs is authorized to meet during the session of the Senate on Thursday, July 21, 2022, at 10:15 a.m., to conduct a hearing on a nomination.

COMMITTEE ON THE JUDICIARY

The Committee on the Judiciary is authorized to meet during the session of the Senate on Thursday, July 21, 2022, at 9 a.m., to conduct an executive business meeting.

---

## PRIVILEGES OF THE FLOOR

Mrs. BLACKBURN. Mr. President, I ask unanimous consent that the following interns from my office be granted floor privileges for the remainder of the Congress: Isabella Andrews-Zachry and Eliza Roddy.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## ORDERS FOR MONDAY, JULY 25, 2022

Mr. CARDIN. Mr. President, I ask unanimous consent that when the Senate completes its business today, it adjourn until 3 p.m., Monday, July 25, and that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, and morning business be closed; that upon the conclusion of morning business, the Senate resume consideration of the House message to accompany S. 3373; further, that the cloture motion filed during yesterday's session ripen at 5:30 p.m. and that the mandatory quorum call be waived.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

## ADJOURNMENT UNTIL MONDAY, JULY 25, 2022, AT 3 P.M.

Mr. CARDIN. Mr. President, if there is no further business to come before the Senate, I ask that it stand adjourned under the previous order.

There being no objection, the Senate, at 4:21 p.m., adjourned until Monday, July 25, 2022, at 3 p.m.

## NOMINATIONS

Executive nominations received by the Senate:

DEPARTMENT OF ENERGY

JEFFREY MATTHEW MAROOTIAN, OF THE DISTRICT OF COLUMBIA, TO BE AN ASSISTANT SECRETARY OF ENERGY (ENERGY EFFICIENCY AND RENEWABLE ENERGY), VICE DANIEL SIMMONS.

DEPARTMENT OF TRANSPORTATION

SHAILEN P. BHATT, OF MICHIGAN, TO BE ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION, VICE NICOLE R. NASON.

CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD

STEPHEN A. OWENS, OF ARIZONA, TO BE CHAIRPERSON OF THE CHEMICAL SAFETY AND HAZARD INVESTIGATION BOARD FOR A TERM OF FIVE YEARS, VICE KATHERINE ANDREA LEMOS, RESIGNING.

## CONFIRMATIONS

Executive nominations confirmed by the Senate July 21, 2022:

DEPARTMENT OF VETERANS AFFAIRS

SHEREEF M. ELNAHAL, OF NEW JERSEY, TO BE UNDER SECRETARY FOR HEALTH OF THE DEPARTMENT OF VETERANS AFFAIRS.

CORPORATION FOR NATIONAL AND COMMUNITY SERVICE

LESLIE N. BLUHM, OF ILLINOIS, TO BE A MEMBER OF THE BOARD OF DIRECTORS OF THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE FOR A TERM EXPIRING OCTOBER 6, 2023.

LISETTE NIEVES, OF NEW YORK, TO BE A MEMBER OF THE BOARD OF DIRECTORS OF THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE FOR A TERM EXPIRING OCTOBER 6, 2022.

LISETTE NIEVES, OF NEW YORK, TO BE A MEMBER OF THE BOARD OF DIRECTORS OF THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE FOR A TERM EXPIRING OCTOBER 6, 2027.

NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

DEBORAH R. COEN, OF CONNECTICUT, TO BE A MEMBER OF THE NATIONAL COUNCIL ON THE HUMANITIES FOR A TERM EXPIRING JANUARY 26, 2028.

DEPARTMENT OF STATE

REUBEN E. BRIGETY II, OF FLORIDA, TO BE AMBASSADOR EXTRAORDINARY AND PLENIPOTENTIARY OF THE UNITED STATES OF AMERICA TO THE REPUBLIC OF SOUTH AFRICA.

DEPARTMENT OF JUSTICE

ENIX SMITH III, OF LOUISIANA, TO BE UNITED STATES MARSHAL FOR THE EASTERN DISTRICT OF LOUISIANA FOR THE TERM OF FOUR YEARS.

ADAIR FORD BOROUGHS, OF SOUTH CAROLINA, TO BE UNITED STATES ATTORNEY FOR THE DISTRICT OF SOUTH CAROLINA FOR THE TERM OF FOUR YEARS.

FOREIGN SERVICE

FOREIGN SERVICE NOMINATION OF SARA C. SCHUMAN.

FOREIGN SERVICE NOMINATIONS BEGINNING WITH ALYCE CAMILLE RICHARDSON AND ENDING WITH DIANE JONES, WHICH NOMINATIONS WERE RECEIVED BY THE SENATE AND APPEARED IN THE CONGRESSIONAL RECORD ON APRIL 7, 2022.

# EXHIBIT 4

4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table.

SA 5154. Mrs. CAPITO (for herself, Mr. WICKER, Mr. TILLIS, and Mr. CORNYN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5155. Mr. RUBIO submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5156. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill H.R. 4346, supra; which was ordered to lie on the table.

SA 5157. Mr. RUBIO submitted an amendment intended to be proposed by him to the bill H.R. 4346, supra; which was ordered to lie on the table.

## TEXT OF AMENDMENTS

**SA 5144.** Mr. HAGERTY (for himself, Mr. KING, Mr. CORNYN, Mr. WICKER, Mr. YOUNG, Ms. SINEMA, and Mr. KELLY) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the end of division A, add the following:

**SEC. 10_____. FEDERAL PERMITTING IMPROVEMENT.**

Section 41001(6)(A) of the FAST Act (42 U.S.C. 4370m(6)(A)) is amended, in the matter preceding clause (i), by inserting ''semiconductors, artificial intelligence and machine learning, high-performance computing and advanced computer hardware and software, quantum information science and technology, data storage and data management, cybersecurity,'' after ''manufacturing,''.

---

**SA 5145.** Mr. SANDERS (for himself and Ms. WARREN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the end of division A, add the following:

**SEC. 108. TERMS AND CONDITIONS OF ASSISTANCE.**

(a) CHIPS ASSISTANCE.—

(1) REQUIRED AGREEMENT.—A covered entity to which the Secretary of Commerce awards Federal financial assistance under section 9902 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (15 U.S.C. 4652) or section 102 or 103 of this Act with amounts appropriated under this Act shall enter into an agreement that specifies that, during the 5-year period immediately following the award of the Federal financial assistance—

(A) the covered entity will not—

(i) repurchase an equity security that is listed on a national securities exchange of the covered entity or any parent company of the covered entity, except to the extent required under a contractual obligation that is in effect as of the date of enactment of this Act;

(ii) outsource or offshore jobs to a location outside of the United States; or

(iii) abrogate existing collective bargaining agreements; and

(B) the covered entity will remain neutral in any union organizing effort.

(2) FINANCIAL PROTECTION OF GOVERNMENT.—

(A) IN GENERAL.—The Secretary of Commerce may not award Federal financial assistance to a covered entity under section 9902 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (15 U.S.C. 4652) or under section 102 or 103 of this Act with amounts appropriated under this Act, unless—

(i)(I) the covered entity has issued securities that are traded on a national securities exchange; and

(II) the Secretary of the Treasury receives a warrant or equity interest in the covered entity; or

(ii) in the case of any covered entity other than a covered entity described in clause (i), the Secretary of the Treasury receives, in the discretion of the Secretary of the Treasury—

(I) a warrant or equity interest in the covered entity; or

(II) a senior debt instrument issued by the covered entity.

(B) TERMS AND CONDITIONS.—The terms and conditions of any warrant, equity interest, or senior debt instrument received under subparagraph (A) shall be set by the Secretary of Commerce and shall meet the following requirements:

(i) PURPOSES.—Such terms and conditions shall be designed to provide for a reasonable participation by the Secretary of Commerce, for the benefit of taxpayers, in equity appreciation in the case of a warrant or other equity interest, or a reasonable interest rate premium, in the case of a debt instrument.

(ii) AUTHORITY TO SELL, EXERCISE, OR SURRENDER.—For the primary benefit of taxpayers, the Secretary of Commerce may sell, exercise, or surrender a warrant or any senior debt instrument received under this paragraph. The Secretary of Commerce shall not exercise voting power with respect to any shares of common stock acquired under this paragraph.

(iii) SUFFICIENCY.—If the Secretary of Commerce determines that a covered entity cannot feasibly issue warrants or other equity interests as required by this paragraph, the Secretary of Commerce may accept a senior debt instrument in an amount and on such terms as the Secretary of Commerce determines appropriate.

(b) APPLICATION TO ADVANCED MANUFACTURING INVESTMENT CREDIT.—

(1) FINANCIAL PROTECTION OF GOVERNMENT.—Subsection (c) of section 48D of the Internal Revenue Code of 1986 (as added by this Act) is amended to read as follows:

''(c) ELIGIBLE TAXPAYER.—

''(1) IN GENERAL.—For purposes of this section, the term 'eligible taxpayer' means any taxpayer which—

''(A) is not a foreign entity of concern (as defined in section 9901(6) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021),

''(B) has not made an applicable transaction (as defined in section 50(a)) during the taxable year,

''(C) has not performed a prohibited activity (as defined in section 50(a)) for the portion of the taxable year after investment credit property has been placed in service, and

''(D) meets the requirements of paragraph (2).

''(2) FINANCIAL PROTECTION REQUIREMENTS.—

''(A) IN GENERAL.—A taxpayer meets the requirements of this paragraph if—

''(i)(I) the taxpayer has issued securities that are traded on a national securities exchange; and

''(II) the Secretary of the Treasury receives a warrant or equity interest in the covered entity; or

''(ii) in the case of taxpayer other than a taxpayer described in subparagraph (A), the Secretary receives, in the discretion of the Secretary—

''(I) a warrant or equity interest in the taxpayer; or

''(II) a senior debt instrument issued by the taxpayer.

''(B) TERMS AND CONDITIONS.—The terms and conditions of any warrant, equity interest, or senior debt instrument received under subparagraph (A) shall be set by the Secretary, in consultation with the Secretary of Commerce, and shall meet the following requirements:

''(i) PURPOSES.—Such terms and conditions shall be designed to provide for a reasonable participation by the Secretary, for the benefit of taxpayers, in equity appreciation in the case of a warrant or other equity interest, or a reasonable interest rate premium, in the case of a debt instrument.

''(ii) AUTHORITY TO SELL, EXERCISE, OR SURRENDER.—For the primary benefit of taxpayers, the Secretary may sell, exercise, or surrender a warrant or any senior debt instrument received under this clause. The Secretary shall not exercise voting power with respect to any shares of common stock acquired under this subparagraph.

''(iii) SUFFICIENCY.—If the Secretary determines that a taxpayer cannot feasibly issue warrants or other equity interests as required by this paragraph, the Secretary may accept a senior debt instrument in an amount and on such terms as the Secretary determines appropriate.''.

(2) RECAPTURE OF CREDIT IN CERTAIN CASES.—

(A) IN GENERAL.—Section 50(a) of the Internal Revenue Code of 1986, as amended by this Act, is amended redesignating paragraphs (4) through (6) as paragraphs (5) through (7), respectively, and by inserting after paragraph (3) the following new paragraph:

''(4) CERTAIN REQUIREMENTS FOR ADVANCED MANUFACTURING FACILITIES.—If there is a prohibited activity by an applicable taxpayer before the close of the 5-year period beginning on the date such taxpayer placed in service investment credit property which is eligible for the advanced manufacturing investment credit under section 48D(a), then the tax under this chapter for the taxable year in which such transaction occurs shall be increased by 100 percent of the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from reducing to zero any credit determined under section 46 which is attributable to the advanced manufacturing investment credit under section 48D(a) with respect to such property.''.

(B) PROHIBITED ACTIVITY.—Section 50(a)(7) of the Internal Revenue Code of 1986, as amended redesignated by the preceding provisions of this Act, is amended adding at the end the following new subparagraph:

''(E) PROHIBITED ACTIVITY.—For purposes of this subsection, the term 'prohibited activity' means, with respect to any applicable taxpayer, any of the following:

''(i) the repurchase an equity security that is listed on a national securities exchange of the taxpayer or any parent company of the taxpayer, except to the extent required under a contractual obligation that is in effect as of the date of enactment of this subparagraph;

''(ii) the outsourcing or offshoring of jobs to a location outside of the United States;

''(iii) the abrogation of existing collective bargaining agreements; or

''(iv) the failure of the taxpayer to remain neutral in any union organizing effort.''.

(C) CONFORMING AMENDMENTS.—

(i) Section 50(a)(5) of the Internal Revenue Code of 1986, as redesignated by the preceding provisions of this Act, is amended—

(I) by striking ''or any applicable transaction to which paragraph (3)(A) applies'' and inserting ''any applicable transaction to which paragraph (3)(A) applies, or any prohibited transaction to which paragraph (4) applies'', and

(II) by striking ''or applicable transaction'' and inserting '', applicable transaction, or prohibited transaction''.

(ii) Section 50(a)(7)(C) of such Code, as amended and redesignated the preceding provisions of this Act, is amended by striking ''or (3)'' and inserting ''(3), or (4)''.

(iii) Section 1371(d)(1) of such Code, as amended by this Act, is amended by striking ''section 50(a)(5)'' and inserting ''section 50(a)(6)''.

---

**SA 5146.** Mr. JOHNSON submitted an amendment intended to be proposed by him to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

At the appropriate place, insert the following:

**SEC. _____. OFFSET OF COSTS USING UNOBLIGATED FUNDS FROM THE AMERICAN RESCUE PLAN ACT OF 2021 AND THE CARES ACT.**

(a) DEFINITION.—In this section, the term ''total cost of this Act'' means the sum, as determined by the Director of OMB, of the amounts appropriated under any division of this Act or an amendment made by any division of this Act and the amounts authorized to be appropriated under any division of this Act or an amendment made by any division of this Act.

(b) RESCISSIONS.—Effective on the date of enactment of this Act, there is rescinded, on a pro rata basis—

(1) of the unobligated balances made available under the American Rescue Plan Act of 2021 (Public Law 117–2; 135 Stat. 4), the amount necessary to reduce the total amount of such unobligated balances by an amount equal to the total cost of this Act; and

(2) if the unobligated balances described in paragraph (1) are less than the total cost of this Act, of the unobligated balances made available under the CARES Act (Public Law 116–136; 134 Stat. 281), the amount necessary to reduce the total amount of such unobligated balances by an amount equal to the difference between the amount rescinded under paragraph (1) and the total cost of this Act.

---

**SA 5147.** Mr. GRAHAM submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

On page 31, lines 9 and 10, strike ''or semiconductor manufacturing equipment'' and insert ''semiconductor manufacturing equipment, or substantial or essential components of semiconductor manufacturing equipment''.

On page 34, lines 5 and 6, strike ''or semiconductor manufacturing equipment'' and insert ''semiconductor manufacturing equipment, or substantial or essential components of semiconductor manufacturing equipment''.

---

**SA 5148.** Mr. SCHUMER proposed an amendment to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

At the end add the following:

**SEC. EFFECTIVE DATE**

This Act shall take effect on the date that is 1 day after the date of enactment of this Act.

---

**SA 5149.** Mr. SCHUMER proposed an amendment to amendment SA 5148 proposed by Mr. SCHUMER to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

On page 1, line 3, strike ''1 day'' and insert ''2 days''.

---

**SA 5150.** Mr. SCHUMER proposed an amendment to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

At the end add the following:

**SEC. EFFECTIVE DATE.**

This Act shall take effect on the date that is 3 days after the date of enactment of this Act.

---

**SA 5151.** Mr. SCHUMER proposed an amendment to amendment SA 5150 proposed by Mr. SCHUMER to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

On page 1, line 3, strike ''3'' and insert ''4''.

---

**SA 5152.** Mr. SCHUMER proposed an amendment to amendment SA 5151 proposed by Mr. SCHUMER to the amendment SA 5150 proposed by Mr. SCHUMER to the bill S. 3373, to improve the Iraq and Afghanistan Service Grant and the Children of Fallen Heroes Grant; as follows:

On page 1, line 3, strike ''4'' and insert ''5''.

---

**SA 5153.** Mr. MANCHIN (for himself and Mrs. SHAHEEN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

On page 790, on line 4, insert ''In selecting recipients, the Secretary shall consider for prioritization severely distressed eligible areas, in addition to other factors.'' after ''recipients.''

---

**SA 5154.** Mrs. CAPITO (for herself, Mr. WICKER, Mr. TILLIS, and Mr. CORNYN) submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

Beginning on page 776, strike line 18 and all that follows through page 790, line 4.

---

**SA 5155.** Mr. RUBIO submitted an amendment intended to be proposed to amendment SA 5135 proposed by Mr. SCHUMER to the bill H.R. 4346, making appropriations for Legislative Branch for the fiscal year ending September 30, 2022, and for other purposes; which was ordered to lie on the table; as follows:

Beginning on page 40, strike line 5 and all that follows through line 23 on page 42, and insert the following:

''(ii) UPDATES.—

''(I) APPROPRIATE CONGRESSIONAL COMMITTEES.—For purposes of this clause, the term 'appropriate congressional committees' means—

''(aa) the Committee on Commerce, Science and Transportation, the Select Committee on Intelligence, and the Committee on Armed Services of the Senate; and

''(bb) the Committee on Energy and Commerce, the Permanent Select Committee on Intelligence, and the Committee on Armed Services of the House of Representatives.

''(II) IN GENERAL.—Subject to subclause (III), not later than 2 years after the date of enactment of the CHIPS Act of 2022, and not less frequently than once every 2 years thereafter for the 8-year period after the last award under this section is made, the Secretary, after public notice and an opportunity for comment and if applicable and necessary, shall issue a public notice identifying any additional semiconductor technology included in the meaning of the term 'legacy semiconductor' under clause (i).

''(III) NOTICE TO THE APPROPRIATE CONGRESSIONAL COMMITTEES.—

''(aa) NOTICE.—Not later than 10 days after the Secretary determines that any additional semiconductor technology should be included in the meaning of the term 'legacy semiconductor' under clause (i) and before the Secretary issues the initial public notice described in subclause (II), the Secretary—

''(AA) shall notify the appropriate congressional committees of that determination; and

''(BB) shall not issue the initial public notice described in subclause (II) unless each of the appropriate congressional committees affirmatively agrees in writing in accordance with item (bb) to the proposed inclusion of the additional semiconductor technology in the meaning of the term 'legacy semiconductor'.

''(bb) AGREEMENT.—Upon receipt of a notice described in item (aa) by an appropriate congressional committee, the appropriate congressional committee—

''(AA) shall review the notice; and

''(BB) if the appropriate congressional committee agrees to the inclusion, not later than 30 days after the date of receipt of the notice, shall submit to the Secretary a written affirmative agreement that the relevant additional semiconductor technology should be included in the meaning of the term 'legacy semiconductor'.

''(iii) FUNCTIONS OF THE SECRETARY.—The functions of the Secretary under this paragraph shall not be subject to sections 551, 553 through 559, and 701 through 706 of title 5, United States Code.

''(iv) CONSULTATION.—In carrying out clause (ii), the Secretary shall consult with the Director of National Intelligence and the Secretary of Defense.

''(v) CONSIDERATIONS.—In carrying out clause (ii), the Secretary shall consider—

''(I) state-of-the-art semiconductor technologies in the United States and internationally, including in foreign countries of concern; and

''(II) consistency with export controls relating to semiconductors.

# EXHIBIT 5

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

*Administration of Joseph R. Biden, Jr., 2022*

## Executive Order 14080—Implementation of the CHIPS Act of 2022

*August 25, 2022*

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to effectively implement the incentives for semiconductor research, development, and manufacturing provided by division A of H.R. 4346 (the "Act"), it is hereby ordered as follows:

*Section 1. Background*. The Act, known as the Creating Helpful Incentives to Produce Semiconductors (CHIPS) Act of 2022, will make transformative investments to restore and advance our Nation's leadership in the research, development, and manufacturing of semiconductors. These investments will strengthen our Nation's manufacturing and industrial base; create well-paying, high-skilled jobs in construction, manufacturing, and maintenance; catalyze regional economic development throughout the country; bolster United States technology leadership; and reduce our dependence on critical technologies from China and other vulnerable or overly concentrated foreign supply chains.

Meeting these objectives will require effective implementation of the Act by my Administration, in collaboration with State, local, Tribal, and territorial governments; the private sector; institutions of higher education; workforce development organizations; labor unions and other worker organizations; and allied and partner countries.

*Sec. 2. Implementation Priorities*. In implementing the Act, all agencies (as described in section 3502(1) of title 44, United States Code, except for the agencies described in section 3502(5) of title 44) shall, as appropriate and to the extent consistent with law, prioritize:

(a) protecting taxpayer resources, including by ensuring strong compliance and accountability measures for funding recipients;

(b) meeting economic, sustainability, and national security needs, including by building domestic manufacturing capacity that reduces reliance on vulnerable or overly concentrated foreign production for both leading-edge and mature microelectronics;

(c) ensuring long-term leadership in the microelectronics sector, including by establishing a dynamic, collaborative network for microelectronics research and innovation to enable long-term United States leadership in critical industries;

(d) catalyzing private-sector investment, including by reducing risk and maximizing large-scale private investment in production, breakthrough technologies, and worker and workforce development;

(e) generating benefits—such as well-paying, high-skilled union jobs and opportunities for startups; small businesses; and minority-owned, veteran-owned, and women-owned businesses—for a broad range of stakeholders and communities, including by investing in disadvantaged communities and by partnering with State, local, Tribal, and territorial governments and with institutions of higher education; and

(f) strengthening and expanding regional manufacturing and innovation ecosystems, including by investing in suppliers, manufacturers, workforce development, basic and translational research, and related infrastructure and cybersecurity throughout the microelectronics supply chain, and by facilitating the expansion, creation, and coordination of semiconductor clusters.

*Sec. 3. CHIPS Implementation Steering Council*. (a) There is established within the Executive Office of the President the CHIPS Implementation Steering Council (Steering Council). The function of the Steering Council is to coordinate policy development to ensure the effective implementation of the Act within the executive branch.

(b) The Assistant to the President for Economic Policy, the Assistant to the President for National Security Affairs, and the Director of the Office of Science and Technology Policy shall serve as Co-Chairs of the Steering Council.

(c) In addition to the Co-Chairs, the Steering Council shall consist of the following members:

(i) the Secretary of State;

(ii) the Secretary of the Treasury;

(iii) the Secretary of Defense;

(iv) the Secretary of Commerce;

(v) the Secretary of Labor;

(vi) the Secretary of Energy;

(vii) the Director of the Office of Management and Budget;

(viii) the Administrator of the Small Business Administration;

(ix) the Director of National Intelligence;

(x) the Assistant to the President for Domestic Policy;

(xi) the Chair of the Council of Economic Advisers;

(xii) the National Cyber Director;

(xiii) the Director of the National Science Foundation; and

(xiv) the heads of such other executive departments, agencies, and offices as the Co-Chairs may from time to time invite to participate.

(d) The Co-Chairs may create and coordinate subgroups consisting of Steering Council members or their designees, as appropriate.

(e) The Co-Chairs may consult with leaders from industry, labor unions and other worker organizations, institutions of higher education, research institutions, and civil society, as appropriate and consistent with law, to provide individual perspectives and advice to the Steering Council on the effective implementation of the Act.

(f) The Co-Chairs may consult with the President's Council of Advisors on Science and Technology, as appropriate and consistent with law, to provide advice to the Steering Council.

*Sec. 4. Effective and Efficient Stewardship and Oversight of Taxpayer Resources*. The Director of the Office of Management and Budget shall take appropriate actions to promote and monitor, with respect to execution of the Act, the effective and efficient stewardship and oversight of taxpayer resources, in collaboration with the Steering Council and the heads of agencies responsible for implementing the Act.

*Sec. 5. General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN, JR.

The White House,
August 25, 2022.

[Filed with the Office of the Federal Register, 8:45 a.m., August 29, 2022]

NOTE: This Executive order was published in the *Federal Register* on August 30.

*Categories:* Executive Orders : CHIPS Act of 2022, implementation.

*Subjects:* Business and industry : Manufacturing industry :: Advanced manufacturing, promotion efforts.

*DCPD Number:* DCPD202200729.

# EXHIBIT 6

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☑ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 28, 2025

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ________ to ________

Commission File Number: 000-06217

# INTEL CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 94-1672743 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 2200 Mission College Boulevard, Santa Clara, California | 95054-1549 |
| (Address of principal executive offices) | (Zip Code) |

(408) 765-8080

(Registrant's telephone number, including area code)

N/A

(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.001 par value | INTC | Nasdaq Global Select Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|
| ☑ | ☐ | ☐ | ☐ | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of July 18, 2025, the registrant had outstanding 4,377 million shares of common stock.

# Table of Contents

## Organization of Our Form 10-Q

The order and presentation of content in our Form 10-Q differs from the traditional SEC Form 10-Q format. Our format is designed to improve readability and better present how we organize and manage our business. See "Form 10-Q Cross-Reference Index" within Risk Factors and Other Key Information for a cross-reference index to the traditional SEC Form 10-Q format.

We have defined certain terms and abbreviations used throughout our Form 10-Q in "Key Terms" within the Consolidated Condensed Financial Statements and Supplemental Details.


| | Page |
|---|---|
| Forward-Looking Statements | 1 |
| Availability of Company Information | 2 |
| Consolidated Condensed Financial Statements and Supplemental Details | |
| Consolidated Condensed Statements of Operations | 3 |
| Consolidated Condensed Statements of Comprehensive Income (Loss) | 4 |
| Consolidated Condensed Balance Sheets | 5 |
| Consolidated Condensed Statements of Cash Flows | 6 |
| Consolidated Condensed Statements of Stockholders' Equity | 7 |
| Notes to Consolidated Condensed Financial Statements | 8 |
| Key Terms | 25 |
| Management's Discussion and Analysis (MD&A) | |
| Operating Segments Trends and Results | 27 |
| Consolidated Condensed Results of Operations | 31 |
| Liquidity and Capital Resources | 37 |
| Critical Accounting Estimates | 38 |
| Risk Factors and Other Key Information | |
| Risk Factors | 41 |
| Quantitative and Qualitative Disclosures About Market Risk | 42 |
| Controls and Procedures | 42 |
| Issuer Purchases of Equity Securities | 43 |
| Rule 10b5-1 Trading Arrangements | 43 |
| Disclosure Pursuant to Section 13(r) of the Securities Exchange Act of 1934 | 43 |
| Amendment and Restatement of the 2006 Equity Incentive Plan | 43 |
| Exhibits | 44 |
| Form 10-Q Cross-Reference Index | 45 |

## Forward-Looking Statements

This Form 10-Q contains forward-looking statements that involve a number of risks and uncertainties. Words such as "accelerate", "achieve", "aim", "ambitions", "anticipate", "believe", "committed", "continue", "could", "designed", "estimate", "expect", "forecast", "future", "goals", "grow", "guidance", "intend", "likely", "may", "might", "milestones", "next generation", "objective", "on track", "opportunity", "outlook", "pending", "plan", "position", "possible", "potential", "predict", "progress", "ramp", "roadmap", "seek", "should", "strive", "targets", "to be", "upcoming", "will", "would", and variations of such words and similar expressions are intended to identify such forward-looking statements, which may include statements regarding:

- our business plans and strategy and anticipated benefits therefrom, including with respect to our intentions and expectations for Intel 14A, our IDM strategy, our Smart Capital strategy, our partnerships with Apollo and Brookfield, our internal foundry model, our updated reporting structure, and our AI strategy;
- projections of our future financial performance, including future revenue, gross profits, capital expenditures, and cash flows;
- projected costs and yield trends;
- future cash requirements, the availability, uses, sufficiency, and cost of capital resources, and sources of funding, including for future capital and R&D investments and for returns to stockholders, such as stock repurchases and dividends, and credit ratings expectations;
- future products, services, and technologies, and the expected goals, timeline, ramps, progress, availability, production, regulation, and benefits of such products, services, and technologies, including future process nodes and packaging technology, product roadmaps, schedules, future product architectures, expectations regarding process performance, per-watt parity, and metrics, and expectations regarding product and process leadership;
- investment plans and impacts of investment plans, including in the US and abroad;
- internal and external manufacturing plans, including future internal manufacturing volumes, manufacturing expansion plans and the financing therefor, and external foundry usage;
- future production capacity and product supply;
- supply expectations, including regarding constraints, limitations, pricing, and industry shortages;
- plans and goals related to Intel's foundry business, including with respect to anticipated customers, future manufacturing capacity and service, technology, and IP offerings;
- expected timing and impact of acquisitions, divestitures, and other significant transactions, including the agreed-upon sale of a controlling interest of Altera;
- expected completion and impacts of restructuring activities and cost-saving or efficiency initiatives;
- future social and environmental performance goals, measures, strategies, and results;
- our anticipated growth, future market share, customer demand, and trends in our businesses and operations;
- projected growth and trends in markets relevant to our businesses;
- anticipated trends and impacts related to industry component, substrate, and foundry capacity utilization, shortages, and constraints;
- expectations regarding government incentives, policies, and priorities;
- future technology trends and developments, such as AI;
- future macro environmental and economic conditions;
- geopolitical tensions and conflicts, including with respect to international trade policies in areas such as tariffs and export controls, and their potential impact on our business;
- tax- and accounting-related expectations;
- expectations regarding our relationships with certain sanctioned parties; and
- other characterizations of future events or circumstances.

Such statements involve many risks and uncertainties that could cause our actual results to differ materially from those expressed or implied, including those associated with:

- the high level of competition and rapid technological change in our industry;
- the significant long-term and inherently risky investments we are making in R&D and manufacturing facilities that may not realize a favorable return;
- the complexities and uncertainties in developing and implementing new semiconductor products and manufacturing process technologies;
- our ability to time and scale our capital investments appropriately and successfully secure favorable alternative financing arrangements and government grants;
- a potential pause or discontinuation of our pursuit of Intel 14A and other next generation leading-edge process technologies if we are unable to secure a significant external customer for Intel 14A;

- implementing new business strategies and investing in new businesses and technologies;
- changes in demand for our products;

- macroeconomic conditions and geopolitical tensions and conflicts, including geopolitical and trade tensions between the US and China, the impacts of Russia's war on Ukraine, tensions and conflict affecting Israel and the Middle East, and rising tensions between mainland China and Taiwan;
- the evolving market for products with AI capabilities;
- our complex global supply chain supporting our manufacturing facilities and incorporating external foundries, including from disruptions, delays, trade tensions and conflicts, or shortages;
- recently elevated geopolitical tensions, volatility and uncertainty with respect to international trade policies, including tariffs and export controls, impacting our business, the markets in which we compete and the world economy;
- product defects, errata and other product issues, particularly as we develop next-generation products and implement next-generation manufacturing process technologies;
- potential security vulnerabilities in our products;
- increasing and evolving cybersecurity threats and privacy risks;
- IP risks including related litigation and regulatory proceedings;
- the need to attract, retain, and motivate key talent;
- strategic transactions and investments;
- sales-related risks, including customer concentration and the use of distributors and other third parties;
- our significantly reduced return of capital in recent years;
- our debt obligations and our ability to access sources of capital;
- complex and evolving laws and regulations across many jurisdictions;
- fluctuations in currency exchange rates;
- changes in our effective tax rate and applicable tax regimes;
- catastrophic events;
- environmental, health, safety, and product regulations;
- our initiatives and new legal requirements with respect to corporate responsibility matters; and
- other risks and uncertainties described in this report, our 2024 Form 10-K and our other filings with the SEC.

Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. Readers are urged to carefully review and consider the various disclosures made in this Form 10-Q and in other documents we file from time to time with the SEC that disclose risks and uncertainties that may affect our business.

Unless specifically indicated otherwise, the forward-looking statements in this Form 10-Q do not reflect the potential impact of any divestitures, mergers, acquisitions, or other business combinations that have not been completed as of the date of this filing. In addition, the forward-looking statements in this Form 10-Q are based on management's expectations as of the date of this filing, unless an earlier date is specified, including expectations based on third-party information and projections that management believes to be reputable. We do not undertake, and expressly disclaim any duty, to update such statements, whether as a result of new information, new developments, or otherwise, except to the extent that disclosure may be required by law.

## Availability of Company Information

We use our Investor Relations website, *www.intc.com,* as a routine channel for distribution of important, and often material, information about us, including our quarterly and annual earnings results and presentations, press releases, announcements, information about upcoming webcasts, analyst presentations, and investor days, archives of these events, financial information, corporate governance practices, and corporate responsibility information. We also post our filings on this website the same day they are electronically filed with, or furnished to, the SEC, including our annual and quarterly reports on Forms 10-K and 10-Q and current reports on Form 8-K, our proxy statements, and any amendments to those reports. All such information is available free of charge. Our Investor Relations website allows interested persons to sign up to automatically receive e-mail alerts when we post financial information and issue press releases, and to receive information about upcoming events. We encourage interested persons to follow our Investor Relations website in addition to our filings with the SEC to timely receive information about the company.

*Intel, the Intel logo, Intel Core, Gaudi, and Altera are trademarks of Intel Corporation or its subsidiaries in the US and/or other countries.*

** Other names and brands may be claimed as the property of others.*

# Consolidated Condensed Statements of Operations

| (In Millions, Except Per Share Amounts; Unaudited) | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | Jun 28, 2025 | Jun 29, 2024 | Jun 28, 2025 | Jun 29, 2024 |
| **Net revenue** | **$ 12,859** | **$ 12,833** | **$ 25,526** | **$ 25,557** |
| Cost of sales | 9,317 | 8,286 | 17,312 | 15,793 |
| **Gross profit** | **3,542** | **4,547** | **8,214** | **9,764** |
| Research and development | 3,684 | 4,239 | 7,324 | 8,621 |
| Marketing, general, and administrative | 1,144 | 1,329 | 2,321 | 2,885 |
| Restructuring and other charges | 1,890 | 943 | 2,046 | 1,291 |
| **Operating expenses** | **6,718** | **6,511** | **11,691** | **12,797** |
| **Operating income (loss)** | **(3,176)** | **(1,964)** | **(3,477)** | **(3,033)** |
| Gains (losses) on equity investments, net | 502 | (120) | 390 | 85 |
| Interest and other, net | (95) | 80 | (268) | 225 |
| **Income (loss) before taxes** | **(2,769)** | **(2,004)** | **(3,355)** | **(2,723)** |
| Provision for (benefit from) taxes | 255 | (350) | 556 | (632) |
| **Net income (loss)** | **(3,024)** | **(1,654)** | **(3,911)** | **(2,091)** |
| Less: net income (loss) attributable to non-controlling interests | (106) | (44) | (172) | (100) |
| **Net income (loss) attributable to Intel** | **$ (2,918)** | **$ (1,610)** | **$ (3,739)** | **$ (1,991)** |
| **Earnings (loss) per share attributable to Intel—basic** | **$ (0.67)** | **$ (0.38)** | **$ (0.86)** | **$ (0.47)** |
| **Earnings (loss) per share attributable to Intel—diluted** | **$ (0.67)** | **$ (0.38)** | **$ (0.86)** | **$ (0.47)** |
| Weighted average shares of common stock outstanding: | | | | |
| **Basic** | **4,369** | **4,267** | **4,356** | **4,254** |
| **Diluted** | **4,369** | **4,267** | **4,356** | **4,254** |

*See accompanying notes.*

# Consolidated Condensed Statements of Comprehensive Income (Loss)

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| **(In Millions; Unaudited)** | **Jun 28, 2025** | **Jun 29, 2024** | **Jun 28, 2025** | **Jun 29, 2024** |
| **Net income (loss)** | **$ (3,024)** | **$ (1,654)** | **$ (3,911)** | **$ (2,091)** |
| Changes in other comprehensive income (loss), net of tax: | | | | |
| Net unrealized holding gains (losses) on derivatives | 550 | (153) | 775 | (481) |
| Actuarial valuation and other pension benefits (expenses), net | — | — | 1 | — |
| Translation adjustments and other | 1 | (1) | — | — |
| **Other comprehensive income (loss)** | **551** | **(154)** | **776** | **(481)** |
| **Total comprehensive income (loss)** | **(2,473)** | **(1,808)** | **(3,135)** | **(2,572)** |
| Less: comprehensive income (loss) attributable to non-controlling interests | (106) | (44) | (172) | (100) |
| **Total comprehensive income (loss) attributable to Intel** | **$ (2,367)** | **$ (1,764)** | **$ (2,963)** | **$ (2,472)** |

*See accompanying notes.*

# Consolidated Condensed Balance Sheets

| (In Millions; Unaudited) | Jun 28, 2025 | Dec 28, 2024 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 9,643 | $ 8,249 |
| Short-term investments | 11,563 | 13,813 |
| Accounts receivable, net | 2,360 | 3,478 |
| Inventories | 11,377 | 12,198 |
| Other current assets | 8,432 | 9,586 |
| **Total current assets** | **43,375** | **47,324** |
| **Property, plant, and equipment, net of accumulated depreciation of $103,572 ($102,193 as of December 28, 2024)** | **109,510** | **107,919** |
| **Equity investments** | **5,383** | **5,383** |
| **Goodwill** | **23,912** | **24,693** |
| **Identified intangible assets, net** | **3,057** | **3,691** |
| **Other long-term assets** | **7,283** | **7,475** |
| **Total assets** | **$ 192,520** | **$ 196,485** |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 10,666 | $ 12,556 |
| Accrued compensation and benefits | 4,249 | 3,343 |
| Short-term debt | 6,731 | 3,729 |
| Income taxes payable | 887 | 1,756 |
| Other accrued liabilities | 12,433 | 14,282 |
| **Total current liabilities** | **34,966** | **35,666** |
| **Debt** | **44,026** | **46,282** |
| **Other long-term liabilities** | **7,777** | **9,505** |
| **Contingencies (Note 13)** | | |
| Stockholders' equity: | | |
| Common stock and capital in excess of par value, 4,377 issued and outstanding (4,330 issued and outstanding as of December 28, 2024) | 52,334 | 50,949 |
| Accumulated other comprehensive income (loss) | 65 | (711) |
| Retained earnings | 45,484 | 49,032 |
| **Total Intel stockholders' equity** | **97,883** | **99,270** |
| **Non-controlling interests** | **7,868** | **5,762** |
| **Total stockholders' equity** | **105,751** | **105,032** |
| **Total liabilities and stockholders' equity** | **$ 192,520** | **$ 196,485** |

*See accompanying notes.*

# Consolidated Condensed Statements of Cash Flows

| (In Millions; Unaudited) | Six Months Ended Jun 28, 2025 | Six Months Ended Jun 29, 2024 |
|---|---|---|
| **Cash and cash equivalents, beginning of period** | **$ 8,249** | **$ 7,079** |
| Cash flows provided by (used for) operating activities: | | |
| Net income (loss) | (3,911) | (2,091) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Depreciation | 5,213 | 4,403 |
| Share-based compensation | 1,348 | 1,959 |
| Restructuring and other charges | 382 | 219 |
| Amortization of intangibles | 474 | 717 |
| (Gains) losses on equity investments, net | (390) | (84) |
| Deferred taxes | 106 | (1,339) |
| Impairments and net (gain) loss on retirement of property, plant, and equipment | 482 | 126 |
| Changes in assets and liabilities: | | |
| Accounts receivable | 1,004 | 272 |
| Inventories | 99 | (116) |
| Accounts payable | 114 | 181 |
| Accrued compensation and benefits | 1,022 | (1,015) |
| Income taxes | (1,338) | (835) |
| Other assets and liabilities | (1,742) | (1,328) |
| **Total adjustments** | **6,774** | **3,160** |
| **Net cash provided by (used for) operating activities** | **2,863** | **1,069** |
| Cash flows provided by (used for) investing activities: | | |
| Additions to property, plant, and equipment | (8,733) | (11,652) |
| Proceeds from capital-related government incentives | 964 | 699 |
| Purchases of short-term investments | (5,730) | (17,634) |
| Maturities and sales of short-term investments | 8,575 | 17,214 |
| Proceeds from divestitures | 1,935 | — |
| Other investing | 984 | (355) |
| **Net cash provided by (used for) investing activities** | **(2,005)** | **(11,728)** |
| Cash flows provided by (used for) financing activities: | | |
| Issuance of commercial paper, net of issuance costs | 3,493 | 5,804 |
| Repayment of commercial paper | (1,496) | (2,609) |
| Partner contributions | 2,238 | 11,861 |
| Additions to property, plant, and equipment | (1,962) | — |
| Issuance of long-term debt, net of issuance costs | — | 2,975 |
| Repayment of debt | (1,500) | (2,288) |
| Proceeds from sales of common stock through employee equity incentive plans | 491 | 631 |
| Payment of dividends to stockholders | — | (1,063) |
| Other financing | (678) | (444) |
| **Net cash provided by (used for) financing activities** | **586** | **14,867** |
| **Net increase (decrease) in cash and cash equivalents** | **1,444** | **4,208** |
| **Cash and cash equivalents, end of period[1]** | **$ 9,693** | **$ 11,287** |
| Non-cash supplemental disclosures: | | |
| Acquisition of property, plant, and equipment[2] | $ 5,155 | $ 5,544 |
| Recognition of capital-related government incentives | $ 1,452 | $ 1,281 |
| Cash paid during the period for: | | |
| Interest, net of capitalized interest | $ 514 | $ 488 |
| Income taxes, net of refunds | $ 1,793 | $ 1,555 |

1. *Includes cash recorded within other current assets on the Consolidated Condensed Balance Sheets relating to Altera cash held for sale. Refer to "Note 9: Divestitures" for additional information.*
2. *Includes $960 million with extended payment terms of greater than 90 days in the six months ended June 28, 2025.*

*See accompanying notes.*

# Consolidated Condensed Statements of Stockholders' Equity

| (In Millions, Except Per Share Amounts; Unaudited) | Common Stock and Capital in Excess of Par Value | | Accumulated Other Comprehensive Income (Loss) | Retained Earnings[1] | Non-Controlling Interests | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Three Months Ended** | | | | | | |
| **Balance as of March 29, 2025** | $ 4,362 | $ 51,920 | $ (486) | $ 48,322 | $ 6,657 | $ 106,413 |
| Net income (loss) | — | — | — | (2,918) | (106) | (3,024) |
| Other comprehensive income (loss) | — | — | 551 | — | — | 551 |
| Net proceeds from partner contributions | — | — | — | — | 1,283 | 1,283 |
| Partner distributions | — | — | — | — | (33) | (33) |
| Employee equity incentive plans and other | 20 | — | — | — | — | — |
| Share-based compensation | — | 597 | — | — | 67 | 664 |
| Restricted stock unit withholdings | (5) | (183) | — | 80 | — | (103) |
| **Balance as of June 28, 2025** | $ 4,377 | $ 52,334 | $ 65 | $ 45,484 | $ 7,868 | $ 105,751 |
| **Balance as of March 30, 2024** | $ 4,257 | $ 38,291 | $ (542) | $ 68,224 | $ 4,783 | $ 110,756 |
| Net income (loss) | — | — | — | (1,610) | (44) | (1,654) |
| Other comprehensive income (loss) | — | — | (154) | — | — | (154) |
| Net proceeds from partner contributions | — | 11,012 | — | — | 426 | 11,438 |
| Employee equity incentive plans and other | 26 | 5 | — | — | — | 5 |
| Share-based compensation | — | 740 | — | — | 40 | 780 |
| Restricted stock unit withholdings | (7) | (285) | — | 82 | — | (203) |
| Cash dividends declared ($0.13 per share of common stock) | — | — | — | (534) | — | (534) |
| **Balance as of June 29, 2024** | $ 4,276 | $ 49,763 | $ (696) | $ 66,162 | $ 5,205 | $ 120,434 |
| **Six Months Ended** | | | | | | |
| **Balance as of December 28, 2024** | $ 4,330 | $ 50,949 | $ (711) | $ 49,081 | $ 5,762 | $ 105,081 |
| Net income (loss) | — | — | — | (3,739) | (172) | (3,911) |
| Other comprehensive income (loss) | — | — | 776 | — | — | 776 |
| Net proceeds from partner contributions | — | (2) | — | — | 2,240 | 2,238 |
| Partner distributions | — | — | — | — | (91) | (91) |
| Employee equity incentive plans and other | 56 | 491 | — | — | — | 491 |
| Share-based compensation | — | 1,219 | — | — | 129 | 1,348 |
| Restricted stock unit withholdings | (9) | (323) | — | 142 | — | (181) |
| **Balance as of June 28, 2025** | $ 4,377 | $ 52,334 | $ 65 | $ 45,484 | $ 7,868 | $ 105,751 |
| **Balance as of December 30, 2023** | $ 4,228 | $ 36,649 | $ (215) | $ 69,156 | $ 4,375 | $ 109,965 |
| Net income (loss) | — | — | — | (1,991) | (100) | (2,091) |
| Other comprehensive income (loss) | — | — | (481) | — | — | (481) |
| Net proceeds from partner contributions | — | 11,012 | — | — | 849 | 11,861 |
| Employee equity incentive plans and other | 58 | 631 | — | — | — | 631 |
| Share-based compensation | — | 1,878 | — | — | 81 | 1,959 |
| Restricted stock unit withholdings | (10) | (407) | — | 60 | — | (347) |
| Cash dividends declared ($0.25 per share of common stock) | — | — | — | (1,063) | — | (1,063) |
| **Balance as of June 29, 2024** | $ 4,276 | $ 49,763 | $ (696) | $ 66,162 | $ 5,205 | $ 120,434 |

1. *The retained earnings balance as of December 28, 2024 includes an opening balance adjustment made as a result of the adoption of a new accounting standard in 2025.*

*See accompanying notes.*

# Notes to Consolidated Condensed Financial Statements

## Note 1 : Basis of Presentation

We prepared our interim Consolidated Condensed Financial Statements that accompany these notes in conformity with US GAAP, consistent in all material respects with those applied in our 2024 Form 10-K.

We have made estimates and judgments affecting the amounts reported in our Consolidated Condensed Financial Statements and the accompanying notes. The actual results that we experience may differ materially from our estimates. The interim financial information is unaudited, and reflects all normal adjustments that are, in our opinion, necessary to provide a fair statement of results for the interim periods presented. This report should be read in conjunction with our 2024 Form 10-K, which includes additional information on our significant accounting policies, as well as the methods and assumptions used in our estimates. The critical accounting estimates discussed in this Form 10-Q supplement the significant accounting policies outlined in "Note 2: Accounting Policies" within Notes to Consolidated Financial Statements within our Annual Report on Form 10-K for the fiscal year ended December 28, 2024.

We made certain reclassifications within our Consolidated Condensed Financial Statements, and, in certain cases, adjusted prior periods to conform to the current period presentation. These reclassifications had no impact on previously reported net income (loss), cash flows, or stockholders' equity.

## Note 2 : Operating Segments

In the first quarter of 2025, we made an organizational change to integrate our Networking and Edge (NEX) business into CCG and DCAI and modified our segment reporting to align to this and certain other business reorganizations. All prior period segment data has been retrospectively adjusted to reflect the way our CODM internally receives information and manages and monitors our operating segment performance starting in fiscal year 2025. There are no changes to our Consolidated Financial Statements for any prior periods.

We organize and manage our business as follows:

- Intel Products:
  - Client Computing Group (CCG)
  - Data Center and AI (DCAI)
- Intel Foundry
- All Other
  - Altera
  - Mobileye
  - Other

CCG, DCAI, and Intel Foundry qualify as reportable operating segments. When we enter into federal contracts, they are aligned to the sponsoring operating segment.

The accounting policies applied to our segments follow those applied to Intel as a whole. A summary of the basis for which we report our operating segment revenues and operating margin is as follows:

### Intel Products: CCG and DCAI

- Segment revenue: Consists of revenues from external customers. Our Intel Products operating segments represent most of Intel consolidated revenue and are derived from our principal products that incorporate various components and technologies, including a microprocessor and chipset, a stand-alone SoC, or a multichip package, which are based on Intel architecture.
- Segment expenses: Consists of intersegment charges for product manufacturing and related services from Intel Foundry, external foundry and other manufacturing expenses, product development costs, allocated expenses as described below, and direct operating expenses.

### Intel Foundry

- Segment revenue: Consists substantially of intersegment product and services revenue for wafer fabrication, substrates and other related products, and services sold to Intel Products, Altera, and certain other Intel internal businesses. We recognize intersegment revenue based on the completion of performance obligations. Product revenue is recognized upon transfer of ownership, which is generally at the completion of wafer sorting. Backend service revenue is recognized upon the completion of assembly and test milestones, which approximates the recognition of revenue over the service period. Intersegment sales are recorded at prices that

are intended to approximate market pricing. Intel Foundry also includes certain third-party foundry and assembly and test revenues from external customers that totaled $22 million in the three months ended June 28, 2025 and $53 million in the first six months of 2025, compared to $39 million in the three months ended June 29, 2024, and $52 million in the first six months of 2024.

- Segment expenses: Consists of direct expenses for technology development, product manufacturing and services provided by Intel Foundry to internal and external customers, allocated expenses as described below, and direct operating expenses. Direct expenses for product manufacturing include excess capacity charges, if any.

## All Other

Our "all other" category includes the results of operations from other non-reportable segments not otherwise presented, including our Altera and Mobileye businesses, our IMS business, start-up businesses that support our initiatives, and historical results of operations from divested businesses. The financial results of our all other category include intersegment product and services revenue and intersegment expenses primarily between our Altera and Intel Foundry segments. On April 14, 2025, we entered into an agreement to sell 51% of all issued and outstanding common stock of Altera, a wholly owned subsidiary. The transaction is expected to close in the second half of 2025, subject to regulatory approvals and other customary closing conditions. See "Note 9: Divestitures" within Notes to Consolidated Condensed Financial Statements for further information.

We allocate operating expenses from our sales and marketing group to the Intel Products operating segments and allocate substantially all our operating expenses from our general and administration groups to our reportable operating segments.

We estimate that the substantial majority of our consolidated depreciation expense in the first six months of 2025 and 2024 was incurred by Intel Foundry. Intel Foundry depreciation expense is substantially included in overhead cost pools and then combined with other costs, and subsequently absorbed into inventory as each product passes through the manufacturing process and is sold to Intel Products or other customers. As a result, it is impracticable to determine the total depreciation expense included as a component of each Intel Products operating segment's operating income (loss).

We do not allocate the following corporate operating expenses to our operating segments:

- restructuring and other charges;
- share-based compensation;
- certain impairment charges; and
- certain acquisition-related costs, including amortization and any impairment of acquisition-related intangibles and goodwill.

We do not allocate the following non-operating items to our operating segments:

- gains and losses from equity investments;
- interest and other income; and
- income taxes.

Our Chief Executive Officer is our CODM. The CODM uses segment revenue and segment operating income (loss) to evaluate each segment's performance and allocate resources. These financial measures are utilized during our budgeting and forecasting process to assess profitability and enable decision making regarding strategic initiatives, capital investments, and personnel across all operating segments. Segment operating results regularly reviewed by our CODM also include total cost of sales and operating expenses directly attributable to each segment. Prior to the second quarter of 2025, our CODM regularly reviewed cost of sales and operating expenses, on a discrete basis, attributable to each segment. We have recast prior period segment operating results to reflect the significant segment-level expenses as currently reviewed by our CODM. We centrally manage all procurement, treasury, and asset management functions across the enterprise and do not maintain separate balance sheets by segment within our systems of record, nor does our CODM receive total asset information by segment for purposes of assessing segment performance and allocating resources.

Intersegment eliminations: Intersegment sales and related gross profit on inventory recorded at the end of the period or sold through to third-party customers is eliminated for consolidation purposes. The Intel Products operating segments and Intel Foundry are meant to reflect separate fabless semiconductor and foundry companies, respectively. Thus, certain intersegment activity is captured within the intersegment eliminations upon consolidation and presented at the Intel consolidated level. This activity primarily relates to inventory reserves, which are determined and recorded based on our accounting policies for Intel as a whole but are only recorded by the Intel Products operating segments upon transfer of inventory from Intel Foundry. If a reserve is identified which relates to neither Intel Products operating segments nor Intel Foundry, the reserve is recognized as activity within the intersegment eliminations for Intel on a consolidated basis.

Reporting units and goodwill reallocation: As a result of modifying our segment reporting in the first quarter of 2025, we reallocated goodwill among our affected reporting units, which generally align to our operating segment structure, on a relative fair value basis. We performed a goodwill impairment assessment for each of our reporting units immediately before and after our business reorganization, concluding that goodwill was not impaired.

As a result of modifying our segment reporting in the first quarter of 2024, we reallocated goodwill among our affected reporting units on a relative fair value basis. We performed a quantitative goodwill impairment assessment for each of our reporting units immediately before and after our business reorganization. We concluded based on our pre-reorganization impairment test that goodwill was not impaired. As a result of our post-reorganization impairment test, we recognized a non-cash goodwill impairment loss of $222 million in the first quarter of 2024 related to our new Intel Foundry reporting unit as the estimated fair value of the new reporting unit was lower

than the assigned carrying value. Intel Foundry had no remaining allocated goodwill as of March 30, 2024, or for any subsequent reporting period.

Net revenue, cost of sales and operating expenses, and operating income (loss) for each period were as follows:

| (In Millions) | Three Months Ended Jun 28, 2025 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Intel Products | | | | | | | |
| | CCG | DCAI | Total Intel Products | Intel Foundry | All Other | Corporate Unallocated | Intersegment Eliminations | Total Consolidated |
| **Revenue** | $ 7,871 | $ 3,939 | $ 11,810 | $ 4,417 | $ 1,053 | $ — | $ (4,421) | $ 12,859 |
| Cost of sales and operating expenses | 5,818 | 3,306 | 9,124 | 7,585 | 984 | 2,755 | (4,413) | 16,035 |
| **Operating income (loss)** | $ 2,053 | $ 633 | $ 2,686 | $ (3,168) | $ 69 | $ (2,755) | $ (8) | $ (3,176) |

| (In Millions) | Three Months Ended Jun 29, 2024 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Intel Products | | | | | | | |
| | CCG | DCAI | Total Intel Products | Intel Foundry | All Other | Corporate Unallocated | Intersegment Eliminations | Total Consolidated |
| **Revenue** | $ 8,143 | $ 3,805 | $ 11,948 | $ 4,282 | $ 881 | $ — | $ (4,278) | $ 12,833 |
| Cost of sales and operating expenses | 5,502 | 3,563 | 9,065 | 7,084 | 927 | 1,708 | (3,987) | 14,797 |
| **Operating income (loss)** | $ 2,641 | $ 242 | $ 2,883 | $ (2,802) | $ (46) | $ (1,708) | $ (291) | $ (1,964) |

| (In Millions) | Six Months Ended Jun 28, 2025 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Intel Products | | | | | | | |
| | CCG | DCAI | Total Intel Products | Intel Foundry | All Other | Corporate Unallocated | Intersegment Eliminations | Total Consolidated |
| **Revenue** | $ 15,500 | $ 8,065 | $ 23,565 | $ 9,084 | $ 1,996 | $ — | $ (9,119) | $ 25,526 |
| Cost of sales and operating expenses | 11,086 | 6,857 | 17,943 | 14,572 | 1,824 | 4,015 | (9,351) | 29,003 |
| **Operating income (loss)** | $ 4,414 | $ 1,208 | $ 5,622 | $ (5,488) | $ 172 | $ (4,015) | $ 232 | $ (3,477) |

| (In Millions) | Six Months Ended Jun 29, 2024 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Intel Products | | | | | | | |
| | CCG | DCAI | Total Intel Products | Intel Foundry | All Other | Corporate Unallocated | Intersegment Eliminations | Total Consolidated |
| **Revenue** | $ 16,416 | $ 7,633 | $ 24,049 | $ 8,638 | $ 1,524 | $ — | $ (8,654) | $ 25,557 |
| Cost of sales and operating expenses | 10,953 | 6,974 | 17,927 | 13,881 | 1,740 | 3,895 | (8,853) | 28,590 |
| **Operating income (loss)** | $ 5,463 | $ 659 | $ 6,122 | $ (5,243) | $ (216) | $ (3,895) | $ 199 | $ (3,033) |

## Corporate Unallocated Expenses

Corporate unallocated expenses include certain operating expenses not allocated to specific operating segments. The nature of these expenses may vary, but primarily consist of restructuring and other charges, share-based compensation, certain impairment charges, and certain acquisition-related costs.

| (In Millions) | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | Jun 28, 2025 | Jun 29, 2024 | Jun 28, 2025 | Jun 29, 2024 |
| Acquisition-related costs | $ 119 | $ 265 | $ 270 | $ 530 |
| Share-based compensation | 664 | 780 | 1,348 | 1,959 |
| Restructuring and other charges[1] | 1,890 | 943 | 2,046 | 1,291 |
| Other | 82 | (280) | 351 | 115 |
| **Total corporate unallocated expenses** | **$ 2,755** | **$ 1,708** | **$ 4,015** | **$ 3,895** |

[1] *See "Note 6: Restructuring and Other Charges" within Notes to Consolidated Condensed Financial Statements for further information.*

## Note 3 : Non-Controlling Interests

| | Non-Controlling Ownership % | |
|---|---|---|
| | Jun 28, 2025 | Jun 29, 2024 |
| Ireland SCIP | 49 % | 49 % |
| Arizona SCIP | 49 % | 49 % |
| Mobileye | 13 % | 12 % |
| IMS | 32 % | 32 % |

| (In Millions) | Ireland SCIP | Arizona SCIP | Mobileye | IMS | Total |
|---|---|---|---|---|---|
| **Non-controlling interests as of Dec 28, 2024** | **$ 61** | **$ 3,888** | **$ 1,672** | **$ 141** | **$ 5,762** |
| Partner contributions | — | 2,240 | — | — | 2,240 |
| Partner distributions | (91) | — | — | — | (91) |
| Changes in equity of non-controlling interest holders | — | — | 129 | — | 129 |
| Net income (loss) attributable to non-controlling interests | 98 | (232) | (19) | (19) | (172) |
| **Non-controlling interests as of Jun 28, 2025** | **$ 68** | **$ 5,896** | **$ 1,782** | **$ 122** | **$ 7,868** |

| (In Millions) | Ireland SCIP | Arizona SCIP | Mobileye | IMS | Total |
|---|---|---|---|---|---|
| **Non-controlling interests as of Dec 30, 2023** | **$ —** | **$ 2,359** | **$ 1,838** | **$ 178** | **$ 4,375** |
| Partner contributions | — | 849 | — | — | 849 |
| Changes in equity of non-controlling interest holders | — | — | 81 | — | 81 |
| Net income (loss) attributable to non-controlling interests | 6 | (56) | (33) | (17) | (100) |
| **Non-controlling interests as of Jun 29, 2024** | **$ 6** | **$ 3,152** | **$ 1,886** | **$ 161** | **$ 5,205** |

## Semiconductor Co-Investment Program

### Ireland SCIP

We consolidate the results of an Irish limited liability company (Ireland SCIP), a VIE, into our Consolidated Condensed Financial Statements because we are the primary beneficiary. Generally, distributions will be received from Ireland SCIP based on each investor's respective ownership of Ireland SCIP, of which Intel's is 51%. Ireland SCIP has rights to factory output of an Intel owned wafer fabrication plant in Ireland (Fab 34) and rights to resell the factory output to us. We retain sole ownership of Fab 34 and we are engaged as the Fab 34 operator in exchange for variable payments from Ireland SCIP based on the related factory output. We are required to substantially complete construction of Fab 34 in accordance with contractual parameters and timelines or we will be required to pay delay-related liquidated damages to Apollo, the other investor, beginning in 2026, not to exceed $1.1 billion in total. Though we expect certain construction delays in the near term, we intend to complete construction of Fab 34. We will be required to purchase minimum quantities of the related factory output from Ireland SCIP, or we will be subject to certain volume-related damages payable to Ireland SCIP, beginning at the earlier of when construction is complete or the third quarter of 2027. As of June 28, 2025, other than cash and cash equivalents held by Ireland SCIP, most of the remaining assets and liabilities of Ireland SCIP were eliminated in our Consolidated Condensed Balance Sheets.

### Arizona SCIP

We consolidate the results of an Arizona limited liability company (Arizona SCIP), a VIE, into our Consolidated Condensed Financial Statements because we are the primary beneficiary. Generally, contributions will be made to, and distributions will be received from Arizona SCIP based on our and Brookfield's proportional ownership of Arizona SCIP; we will be the sole operator and main beneficiary of two new chip factories that are being constructed by Arizona SCIP; and we will be required to both operate Arizona SCIP at minimum production levels (measured in wafer starts per week) and limit excess inventory held on site or we will be subject to certain volume-related damages payable to Arizona SCIP. The assets held by Arizona SCIP, which are not available to us as they can be used only to settle obligations of the VIE and substantially consisted of property, plant, and equipment, were $15.5 billion as of June 28, 2025 ($11.5 billion as of December 28, 2024). The remaining assets and liabilities of Arizona SCIP were eliminated in our Consolidated Condensed Balance Sheets.

### Mobileye

On July 11, 2025, we converted 113.7 million of our Mobileye Class B shares into Class A shares. We subsequently sold 57.5 million of the Class A shares in a secondary offering, representing 7% of Mobileye's outstanding capital stock, for $16.50 per share and received net proceeds of $922 million. Concurrently, we sold 6.2 million of the Class A Shares directly to Mobileye. As we will continue to consolidate the results of Mobileye, the impact of their share repurchase was eliminated in our Consolidated Condensed Financial Statements.

## Note 4 : Earnings (Loss) Per Share

We computed basic earnings (loss) per share of common stock based on the weighted average number of shares of common stock outstanding during the period. We computed diluted earnings (loss) per share of common stock based on the weighted average number of shares of common stock outstanding plus potentially dilutive shares of common stock outstanding during the period, if applicable.

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| **(In Millions, Except Per Share Amounts)** | **Jun 28, 2025** | **Jun 29, 2024** | **Jun 28, 2025** | **Jun 29, 2024** |
| **Net income (loss)** | **$ (3,024)** | **$ (1,654)** | **$ (3,911)** | **$ (2,091)** |
| Less: net income (loss) attributable to non-controlling interests | (106) | (44) | (172) | (100) |
| **Net income (loss) attributable to Intel** | **$ (2,918)** | **$ (1,610)** | **$ (3,739)** | **$ (1,991)** |
| **Weighted average shares of common stock outstanding—basic** | **4,369** | **4,267** | **4,356** | **4,254** |
| **Weighted average shares of common stock outstanding—diluted** | **4,369** | **4,267** | **4,356** | **4,254** |
| **Earnings (loss) per share attributable to Intel—basic** | **$ (0.67)** | **$ (0.38)** | **$ (0.86)** | **$ (0.47)** |
| **Earnings (loss) per share attributable to Intel—diluted** | **$ (0.67)** | **$ (0.38)** | **$ (0.86)** | **$ (0.47)** |

Potentially dilutive shares of common stock from employee equity incentive plans are determined by applying the treasury stock method to the assumed exercise of outstanding stock options, the assumed vesting of outstanding RSUs, and the assumed issuance of common stock under the stock purchase plan. The potentially dilutive impact from the assumed issuance of common stock associated with a contractual conversion feature is determined by applying the if-converted method to the assumed exercise of the outstanding conversion feature.

Due to our net losses in the three and six months ended June 28, 2025 and June 29, 2024, the assumed exercise of outstanding stock options, the assumed vesting of outstanding RSUs, the assumed issuance of common stock under the stock purchase plan, and the assumed issuance of common stock associated with a contractual conversion feature, as applicable, had anti-dilutive effects on diluted loss per share and were excluded from the computations of diluted loss per share. In the three months ended June 28, 2025, securities that would have been anti-dilutive were insignificant and in the six months ended June 28, 2025, 158 million anti-dilutive shares were excluded from the computation of earnings (loss) per share. In the three and six months ended June 29, 2024, securities that would have been anti-dilutive were insignificant.

## Note 5 : Other Financial Statement Details

### Accounts Receivable

We sell certain of our accounts receivable on a non-recourse basis to third-party financial institutions. We record these transactions as sales of receivables and present cash proceeds as *cash provided by operating activities* in the Consolidated Condensed Statements of Cash Flows. Accounts receivable sold under non-recourse factoring arrangements were $1.6 billion during the first six months of 2025 ($1.0 billion during the first six months of 2024). After the sale of our accounts receivable, we expect to collect payment from the customers and remit it to the third-party financial institution.

### Inventories

| (In Millions) | Jun 28, 2025 | Dec 28, 2024 |
|---|---|---|
| Raw materials | $ 1,194 | $ 1,344 |
| Work in process | 6,484 | 7,432 |
| Finished goods | 3,699 | 3,422 |
| **Total inventories** | **$ 11,377** | **$ 12,198** |

### Property, Plant, and Equipment

We invest in and deploy manufacturing assets in response to manufacturing capacity requirements based upon short- and long-term demand forecasts and economic returns relative to capital outlays. We regularly monitor, evaluate, and adjust our manufacturing capacity footprint in response to a number of volatile factors that impact our business, including demand for our products and services and the state of the semiconductor industry as a whole. In connection with the preparation of our Consolidated Condensed Financial Statements for the second quarter of 2025, we evaluated our current process technology node capacities relative to projected market demand for our products and services, concluding that our manufacturing asset portfolio exceeded manufacturing capacity requirements. Upon performing a re-use assessment, we impaired and accelerated depreciation for certain manufacturing assets. In total, we recorded non-cash impairments and accelerated depreciation charges of $460 million and $337 million, respectively, in the second quarter of 2025, net of certain items. All charges were recognized in *cost of sales* within our Intel Foundry operating segment.

We also incurred $416 million of other non-cash asset impairment and accelerated depreciation charges as a direct result of the 2025 Restructuring Plan (see "Note 6: Restructuring and Other Charges" within Notes to Consolidated Condensed Financial Statements). These charges were included as a component of "corporate unallocated expenses" within the *restructuring and other* category presented in "Note 2: Operating Segments" within Notes to Consolidated Condensed Financial Statements.

### Other Accrued Liabilities

*Other accrued liabilities* include deferred compensation of $3.0 billion as of June 28, 2025 ($3.3 billion as of December 28, 2024).

## Interest and Other, Net

| (In Millions) | Three Months Ended Jun 28, 2025 | Three Months Ended Jun 29, 2024 | Six Months Ended Jun 28, 2025 | Six Months Ended Jun 29, 2024 |
|---|---|---|---|---|
| Interest income | $ 210 | $ 320 | $ 455 | $ 643 |
| Interest expense | (227) | (294) | (526) | (552) |
| Other, net | (78) | 54 | (197) | 134 |
| **Total interest and other, net** | **$ (95)** | **$ 80** | **$ (268)** | **$ 225** |

*Interest expense* is net of $368 million of interest capitalized in the second quarter of 2025 and $680 million in the first six months of 2025 ($374 million in the second quarter of 2024 and $737 million in the first six months of 2024).

*Other, net* includes a $94 million charge in the first six months of 2025 related to the sale of our NAND memory business (refer to "Note 9: Divestitures" within Notes to Consolidated Condensed Financial Statements).

## Government Incentives

In the first six months of 2025, we recognized $890 million in grants under the CHIPS Act, of which capital-related incentives reduced gross property, plant and equipment by $742 million, and operating-related incentives benefited operating income by $148 million, substantially all of which was recorded in *cost of sales.* Of the $148 million operating grants recognized in the first six months of 2025, $60 million was recognized in the second quarter of 2025*.* Additionally, in the first six months of 2025 we recognized an advanced manufacturing investment tax credit of $759 million ($1.3 billion in the first six months of 2024), which may be refunded to us in cash to the extent it exceeds our outstanding income tax liabilities.

# Note 6 : Restructuring and Other Charges

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| **(In Millions)** | **Jun 28, 2025** | **Jun 29, 2024** | **Jun 28, 2025** | **Jun 29, 2024** |
| Employee severance and benefit arrangements | $ 1,466 | $ 165 | $ 1,607 | $ 294 |
| Litigation charges and other | 8 | 778 | 20 | 778 |
| Asset impairment charges | 416 | — | 419 | 219 |
| **Total restructuring and other charges** | **$ 1,890** | **$ 943** | **$ 2,046** | **$ 1,291** |

In the second quarter of 2025, we announced and commenced the 2025 Restructuring Plan, which was subsequently approved and committed to by our management. This initiative is intended to lower expenses, streamline our organizational structure and reduce management layers across functions while reallocating resources toward our core client and server businesses by reducing lower-priority programs and initiatives. Restructuring charges are primarily comprised of employee severance and benefit arrangements, non-cash asset impairment and accelerated depreciation charges resulting from exit activities, as well as impairment charges relating to real estate exits and consolidations. These charges were included as "corporate unallocated expenses" within the restructuring and other category presented in "Note 2: Operating Segments" within Notes to Consolidated Condensed Financial Statements. We expect to recognize total charges of approximately $1.9 billion under the 2025 Restructuring Plan, the substantial majority of which will be cash settled in future periods. The cumulative cost of the 2025 Restructuring Plan as of June 28, 2025 was $1.8 billion. Any changes to our estimates or timing will be reflected in our results of operations in future periods. We expect actions pursuant to the 2025 Restructuring Plan to be substantially complete by the fourth quarter of 2025, which is subject to change.

In the third quarter of 2024, the 2024 Restructuring Plan was announced and a series of cost and capital reduction initiatives was implemented. We have incurred total charges of approximately $3.0 billion under the 2024 Restructuring Plan, which was substantially complete in the second quarter of 2025.

*Employee severance and benefit arrangements* included net charges of $1.4 billion during the three months ended June 28, 2025 related to the 2025 Restructuring Plan and the remaining charges for the three and six months ended June 28, 2025 primarily related to the 2024 Restructuring Plan. Additionally, we incurred charges of $165 million and $294 million during the three and six months ended June 29, 2024 related to other actions taken to streamline operations and reduce costs.

Restructuring activities related to employee severance and benefit arrangements under the 2025 Restructuring Plan and 2024 Restructuring Plan were as follows:

| **(In Millions)** | **2025 Restructuring Plan** | **2024 Restructuring Plan** |
|---|---|---|
| **Accrued restructuring balance as of December 28, 2024** | **$ —** | **$ 302** |
| Accruals and adjustments | 1,361 | 195 |
| Cash payments | (11) | (417) |
| **Accrued restructuring balance as of June 28, 2025** | **$ 1,350** | **$ 80** |

The accrued restructuring balance as of June 28, 2025 and December 28, 2024 was recorded as a current liability within *accrued compensation and benefits* on the Consolidated Condensed Balance Sheets.

*Litigation charges and other* included a charge of $780 million in the second quarter of 2024 arising out of the R2 litigation. Refer to "Note 19: Commitments and Contingencies" within Notes to Consolidated Financial Statements as included in our Annual Report on Form 10-K for the year ended December 28, 2024 for further information.

*Asset impairment charges* in the first six months of 2025 primarily included non-cash charges associated with the 2025 Restructuring Plan resulting from the exit of certain non-core lines of business and the consolidation and exit of certain real estate properties. In

addition, we also incurred a goodwill impairment loss of $222 million in the first six months of 2024 related to our Intel Foundry reporting unit (refer to "Note 2: Operating Segments" within Notes to Consolidated Condensed Financial Statements for further information).

## Note 7 : Income Taxes

| ($ In Millions) | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | Jun 28, 2025 | Jun 29, 2024 | Jun 28, 2025 | Jun 29, 2024 |
| Income (loss) before taxes | $ (2,769) | $ (2,004) | $ (3,355) | $ (2,723) |
| Provision for (benefit from) taxes | $ 255 | $ (350) | $ 556 | $ (632) |
| Effective tax rate | (9.2)% | 17.5 % | (16.6)% | 23.2 % |

In the three and six months ended June 28, 2025, our provision for income taxes was determined using our estimated annual effective tax rate applied to our year-to-date ordinary income (loss) before taxes, adjusted for discrete items. We were also not able to benefit our current year loss before taxes due to the domestic valuation allowance first recorded in Q3 2024.

In the three and six months ended June 29, 2024, due to our inability to reliably forecast our annual income, our benefit from income taxes was determined using a three and six month actual annual effective tax rate, respectively, adjusted for discrete items.

On July 4, 2025, the One Big Beautiful Bill Act ("the Act") was signed into law. The Act makes permanent key elements of the Tax Cuts and Jobs Act, including 100% bonus depreciation and domestic research cost expensing, increases the Advanced Manufacturing Investment Credit to 35 percent from 25 percent, and makes modifications to the international tax framework. We are currently evaluating the impact of the Act upon our future effective tax rate, tax liabilities, and cash taxes.

## Note 8 : Investments

### Short-term Investments

Short-term investments include marketable debt investments in corporate debt, government debt, and financial institution instruments, and are recorded within *cash and cash equivalents* and *short-term investments* on the Consolidated Condensed Balance Sheets. Government debt includes instruments such as non-US government bills and bonds and US agency securities. Financial institution instruments include instruments issued or managed by financial institutions in various forms, such as fixed- and floating-rate bonds, money market fund deposits, and time deposits. As of June 28, 2025 and December 28, 2024, substantially all time deposits were issued by institutions outside the US.

For certain of our marketable debt investments, we economically hedge market risks at inception with a related derivative instrument or the marketable debt investment itself is used to economically hedge currency exchange rate risk from remeasurement. These hedged investments are reported at fair value with gains or losses from the investments and the related derivative instruments recorded in *interest and other, net*. The fair value of our economically hedged marketable debt investments was $11.1 billion as of June 28, 2025 ($13.5 billion as of December 28, 2024). For hedged investments still held at the reporting date, we recorded net gains of $329 million in the second quarter of 2025 and net gains of $491 million in the first six months of 2025 ($139 million of net losses in the second quarter of 2024 and net losses of $366 million in the first six months of 2024).

Our remaining unhedged marketable debt investments are reported at fair value, with unrealized gains or losses, net of tax, recorded in *accumulated other comprehensive income (loss)* and realized gains or losses recorded in *interest and other, net*. The adjusted cost of our unhedged investments was $6.1 billion as of June 28, 2025 ($5.2 billion as of December 28, 2024), which approximated the fair value at these dates.

The fair value of marketable debt investments, by contractual maturity, as of June 28, 2025, was as follows:

| (In Millions) | Fair Value |
|---|---|
| Due in 1 year or less | $ 5,580 |
| Due in 1–2 years | 2,979 |
| Due in 2–5 years | 5,314 |
| Due after 5 years | 234 |
| Instruments not due at a single maturity date[1] | 3,165 |
| **Total** | **$ 17,272** |

[1] *"Instruments not due at a single maturity date" is comprised of money market fund deposits, which are classified as either short-term investments or cash and cash equivalents.*

## Equity Investments

| (In Millions) | Jun 28, 2025 | Dec 28, 2024 |
|---|---|---|
| Marketable equity investments[1] | $ 467 | $ 848 |
| Non-marketable equity investments | 4,916 | 4,535 |
| **Total** | **$ 5,383** | **$ 5,383** |

[1] *Substantial majority of our marketable equity investments are subject to trading-volume or market-based restrictions, which limit the number of shares we may sell in a specified period of time, impacting our ability to liquidate these investments. Certain of the trading volume restrictions generally apply for as long as we own more than 1% of the outstanding shares. Market-based restrictions result from the rules of the respective exchange.*

The components of gains (losses) on equity investments, net for each period were as follows:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| (In Millions) | Jun 28, 2025 | Jun 29, 2024 | Jun 28, 2025 | Jun 29, 2024 |
| Unrealized gains (losses) on marketable equity investments | $ (58) | $ (222) | $ (350) | $ 30 |
| Unrealized gains (losses) on non-marketable equity investments[1] | 473 | 24 | 473 | 48 |
| Impairment charges | (51) | (91) | (156) | (159) |
| **Unrealized gains (losses) on equity investments, net** | **364** | **(289)** | **(33)** | **(81)** |
| Realized gains (losses) on sales of equity investments, net | 138 | 169 | 423 | 166 |
| **Gains (losses) on equity investments, net** | **$ 502** | **$ (120)** | **$ 390** | **$ 85** |

[1] *Unrealized gains (losses) on non-marketable investments includes observable price adjustments and our share of equity method investee gains (losses) and certain distributions.*

In the second quarter of 2025, we recognized upward observable price adjustments of $469 million within *gains (losses) on equity investments, net,* of which $396 million related to a single investee.

# Note 9 : Divestitures

## NAND Memory Business

We sold our NAND memory technology and manufacturing business to SK hynix Inc. (SK hynix) which we deconsolidated upon closing the first phase of the transaction on December 29, 2021. On March 27, 2025, we closed the second phase of the transaction, collected the outstanding receivable, and recorded proceeds of $1.9 billion within *cash and cash equivalents,* net of certain adjustments.

In connection with the second closing, we entered into a final release and settlement agreement with SK hynix primarily related to certain penalties associated with the manufacturing and sale agreement between us and SK hynix, recognizing a net charge of $94 million within *Interest and other, net* for the amount paid to SK hynix during the first quarter of 2025.

## Altera FPGA Business

On April 14, 2025, we signed a transaction agreement with SLP VII Gryphon Aggregator, L.P., an affiliate of Silver Lake Partners (SLP), to sell 51% of all issued and outstanding common stock of Altera, a wholly owned subsidiary. The transaction is expected to close in the second half of 2025, subject to regulatory approvals and other customary closing conditions, and is expected to result in the receipt of net cash proceeds of approximately $4.4 billion, after adjusting for certain amounts that we bear responsibility for pursuant to the transaction agreement, including the separation costs described below. Pursuant to the transaction agreement, $1.0 billion of the purchase price will be deferred and payable to us in two equal $500 million installments no later than December 31, 2026 and December 31, 2027. Receipt of the deferred consideration is not subject to any contingencies. Upon closing the transaction, we will retain a 49% minority investment in Altera.

Contemporaneously with the execution of the transaction agreement, we entered into a separation agreement with SLP that sets forth the terms for the completion of the separation of Altera from Intel to operate on a standalone basis, including our agreement to fund separation costs and expenses up to an aggregate amount of $277 million. In connection with the transaction, we anticipate entering into certain ancillary agreements that govern, among other things, intellectual property rights, employee matters, government contracting, and a wafer manufacturing and sale agreement pursuant to which we will provide semiconductor wafer manufacturing services to Altera.

Based on the terms of the transaction agreement, we have concluded that upon transaction close, Altera will be a VIE for which we are not the primary beneficiary because the governance structure of the entity does not allow us to direct the activities that would most

significantly impact Altera's economic performance. At transaction close, we will deconsolidate Altera from our consolidated financial statements, record the cash proceeds received and a receivable of up to $1.0 billion of deferred cash proceeds, and recognize our remaining minority investment in Altera at fair value and prospectively apply the equity method of accounting for the investment.

The carrying amounts of the major classes of Altera's assets and liabilities held for sale, which are classified as *other current assets* and *other current liabilities*, respectively, within the Consolidated Condensed Balance Sheets, included the following:

| (In Millions) | Jun 28, 2025 |
|---|---|
| **Assets** | |
| Cash and cash equivalents | $ 50 |
| Inventories | 711 |
| Property, plant and equipment, net | 197 |
| Identified intangible assets, net | 394 |
| Goodwill | 781 |
| Other assets | 177 |
| **Total assets held for sale** | $ 2,310 |
| **Liabilities** | |
| Accrued compensation and benefits | $ 131 |
| Other liabilities | 173 |
| **Total liabilities held for sale** | $ 304 |

In the second quarter of 2025, we ceased recording depreciation and amortization on property, plant, and equipment and identified intangible assets as of the date the assets were designated as held for sale.

## Note 10 : Borrowings

In the first quarter of 2025, we amended our 364-day $8.0 billion credit facility agreement to $5.0 billion, and the maturity date was extended by one year to January 2026. Neither of our revolving credit facilities had borrowings outstanding as of June 28, 2025 or December 28, 2024.

We have an ongoing authorization from our Board of Directors to borrow up to $10.0 billion under our commercial paper program. In the first six months of 2025, we borrowed $3.5 billion and settled $1.5 billion of our commercial paper and had $2.0 billion of 4.60% commercial paper outstanding as of June 28, 2025 (no commercial paper outstanding as December 28, 2024). Borrowings under the commercial paper program are unsecured general obligations.

## Note 11 : Fair Value

### Assets and Liabilities Measured and Recorded at Fair Value on a Recurring Basis

| | Jun 28, 2025 | | | | Dec 28, 2024 | | | |
|---|---|---|---|---|---|---|---|---|
| | Fair Value Measured and Recorded at Reporting Date Using | | | | Fair Value Measured and Recorded at Reporting Date Using | | | |
| **(In Millions)** | **Level 1** | **Level 2** | **Level 3** | **Total** | **Level 1** | **Level 2** | **Level 3** | **Total** |
| **Assets** | | | | | | | | |
| Cash equivalents: | | | | | | | | |
| Corporate debt | $ — | $ 1,125 | $ — | $ 1,125 | $ — | $ — | $ — | $ — |
| Financial institution instruments[1] | 3,017 | 1,567 | — | 4,584 | 4,121 | 743 | — | 4,864 |
| Reverse repurchase agreements | — | 3,204 | — | 3,204 | — | 2,654 | — | 2,654 |
| Short-term investments: | | | | | | | | |
| Corporate debt | — | 6,112 | — | 6,112 | — | 5,365 | — | 5,365 |
| Financial institution instruments[1] | 148 | 3,165 | — | 3,313 | 195 | 3,356 | — | 3,551 |
| Government debt[2] | 44 | 2,094 | — | 2,138 | 33 | 4,864 | — | 4,897 |
| Other current assets: | | | | | | | | |
| Derivative assets | 143 | 836 | — | 979 | 348 | 733 | — | 1,081 |
| Marketable equity investments | 467 | — | — | 467 | 848 | — | — | 848 |
| Other long-term assets: | | | | | | | | |
| Derivative assets | — | 4 | — | 4 | — | 1 | — | 1 |
| **Total assets measured and recorded at fair value** | **$ 3,819** | **$18,107** | **$ —** | **$21,926** | **$ 5,545** | **$17,716** | **$ —** | **$23,261** |
| **Liabilities** | | | | | | | | |
| Other accrued liabilities: | | | | | | | | |
| Derivative liabilities | $ — | $ 390 | $ 124 | $ 514 | $ — | $ 562 | $ 134 | $ 696 |
| Other long-term liabilities: | | | | | | | | |
| Derivative liabilities[3] | — | 188 | 755 | 943 | — | 416 | 755 | 1,171 |
| **Total liabilities measured and recorded at fair value** | **$ —** | **$ 578** | **$ 879** | **$ 1,457** | **$ —** | **$ 978** | **$ 889** | **$ 1,867** |

[1] *Level 1 investments consist of money market funds. Level 2 investments consist primarily of time deposits, notes, and bonds issued by financial institutions.*
[2] *Level 1 investments consist primarily of US Treasury securities. Level 2 investments consist primarily of non-US government debt.*
[3] *Level 3 derivative liabilities include liquidated damage provisions related to our Ireland SCIP arrangement.*

### Assets Measured and Recorded at Fair Value on a Non-Recurring Basis

Our non-marketable equity investments, equity method investments, and certain non-financial assets—such as intangible assets, goodwill, and property, plant, and equipment—are recorded at fair value only if an impairment or observable price adjustment is recognized in the current period. If an observable price adjustment or impairment is recognized on our non-marketable equity investments during the period, we classify these assets as Level 3. Similarly, impairments recognized on our goodwill, intangible assets, and property, plant, and equipment are categorized as Level 3 within the fair value hierarchy as we utilize unobservable inputs such as prospective financial information, market segment growth rates, and discount rates in the fair value measurement process.

### Financial Instruments Not Recorded at Fair Value on a Recurring Basis

Financial instruments not recorded at fair value on a recurring basis include non-marketable equity investments and equity method investments that have not been remeasured or impaired in the current period, grants receivable, and issued debt.

We classify the fair value of grants receivable as Level 2. The estimated fair value of these financial assets approximates their carrying value. The aggregate carrying value of grants receivable as of June 28, 2025, was $853 million (the aggregate carrying value of grants receivable as of December 28, 2024, was $1.7 billion).

We classify the fair value of issued debt (excluding any commercial paper) as Level 2. The fair value of these instruments was $43.3 billion as of June 28, 2025 ($43.5 billion as of December 28, 2024).

Table of Contents

# Note 12 : Derivative Financial Instruments

## Volume of Derivative Activity

Total gross notional amounts for outstanding derivatives (recorded at fair value) at the end of each period were as follows:

| (In Millions) | Jun 28, 2025 | Dec 28, 2024 |
|---|---|---|
| Foreign currency contracts | $ 18,123 | $ 25,472 |
| Interest rate contracts | 18,236 | 17,899 |
| Other | 2,467 | 2,593 |
| **Total** | **$ 38,826** | **$ 45,964** |

The total notional amount of outstanding pay-variable, receive-fixed interest rate swaps was $12.0 billion as of June 28, 2025 and December 28, 2024.

## Fair Value of Derivative Instruments in the Consolidated Condensed Balance Sheets

| | Jun 28, 2025 | | Dec 28, 2024 | |
|---|---|---|---|---|
| (In Millions) | Assets[1] | Liabilities[2] | Assets[1] | Liabilities[2] |
| Derivatives designated as hedging instruments: | | | | |
| Foreign currency contracts[3] | $ 392 | $ 11 | $ 40 | $ 405 |
| Interest rate contracts | — | 335 | — | 582 |
| **Total derivatives designated as hedging instruments** | **$ 392** | **$ 346** | **$ 40** | **$ 987** |
| Derivatives not designated as hedging instruments: | | | | |
| Foreign currency contracts[3] | $ 343 | $ 279 | $ 510 | $ 100 |
| Interest rate contracts | 105 | 77 | 184 | 25 |
| Equity contracts | 143 | — | 348 | — |
| Other[4] | — | 755 | — | 755 |
| **Total derivatives not designated as hedging instruments** | **$ 591** | **$ 1,111** | **$ 1,042** | **$ 880** |
| **Total derivatives** | **$ 983** | **$ 1,457** | **$ 1,082** | **$ 1,867** |

*1 Derivative assets are recorded as other assets, current and long-term.*
*2 Derivative liabilities are recorded as other liabilities, current and long-term.*
*3 A substantial majority of these instruments mature within 12 months.*
*4 Embedded derivative related to our Ireland SCIP arrangement.*

## Amounts Offset in the Consolidated Condensed Balance Sheets

Agreements subject to master netting arrangements with various counterparties, and cash and non-cash collateral posted under such agreements at the end of each period were as follows:

| | Jun 28, 2025 | | | | | |
|---|---|---|---|---|---|---|
| | | | | Gross Amounts Not Offset in the Balance Sheet | | |
| (In Millions) | Gross Amounts Recognized | Gross Amounts Offset in the Balance Sheet | Net Amounts Presented in the Balance Sheet | Financial Instruments | Cash and Non-Cash Collateral Received or Pledged | Net Amount |
| Assets: | | | | | | |
| Derivative assets subject to master netting arrangements | $ 858 | $ — | $ 858 | $ (391) | $ (467) | $ — |
| Reverse repurchase agreements | 3,204 | — | 3,204 | — | (3,204) | — |
| **Total assets** | **$ 4,062** | **$ —** | **$ 4,062** | **$ (391)** | **$ (3,671)** | **$ —** |
| Liabilities: | | | | | | |
| Derivative liabilities subject to master netting arrangements | $ 677 | $ — | $ 677 | $ (391) | $ (269) | $ 17 |
| **Total liabilities** | **$ 677** | **$ —** | **$ 677** | **$ (391)** | **$ (269)** | **$ 17** |

| | Dec 28, 2024 | | | | | |
|---|---|---|---|---|---|---|
| | | | | Gross Amounts Not Offset in the Balance Sheet | | |
| (In Millions) | Gross Amounts Recognized | Gross Amounts Offset in the Balance Sheet | Net Amounts Presented in the Balance Sheet | Financial Instruments | Cash and Non-Cash Collateral Received or Pledged | Net Amount |
| Assets: | | | | | | |
| Derivative assets subject to master netting arrangements | $ 948 | $ — | $ 948 | $ (269) | $ (679) | $ — |
| Reverse repurchase agreements | 2,654 | — | 2,654 | — | (2,654) | — |
| **Total assets** | **$ 3,602** | **$ —** | **$ 3,602** | **$ (269)** | **$ (3,333)** | **$ —** |
| Liabilities: | | | | | | |
| Derivative liabilities subject to master netting arrangements | $ 1,084 | $ — | $ 1,084 | $ (269) | $ (745) | $ 70 |
| **Total liabilities** | **$ 1,084** | **$ —** | **$ 1,084** | **$ (269)** | **$ (745)** | **$ 70** |

We obtain and secure available collateral from counterparties against obligations, including securities lending transactions and reverse repurchase agreements, when we deem it appropriate.

## Derivatives in Cash Flow Hedging Relationships

The before-tax net gains or losses attributed to the effective portion of cash flow hedges recognized in other comprehensive income (loss) were $533 million net gains in the second quarter of 2025 and $713 million net gains in the first six months of 2025 ($227 million net losses in the second quarter of 2024 and $658 million net losses in the first six months of 2024).

## Derivatives in Fair Value Hedging Relationships

The effects of derivative instruments designated as fair value hedges, recognized in *interest and other, net* for each period were as follows:

| | Gains (Losses) on Derivatives Recognized in Consolidated Condensed Statements of Operations | | | |
|---|---|---|---|---|
| | Three Months Ended | | Six Months Ended | |
| **(In Millions)** | **Jun 28, 2025** | **Jun 29, 2024** | **Jun 28, 2025** | **Jun 29, 2024** |
| Interest rate contracts | $ 106 | $ 24 | $ 247 | $ (120) |
| Hedged items | (106) | (24) | (247) | 120 |
| **Total** | **$ —** | **$ —** | **$ —** | **$ —** |

The amounts recorded on the Consolidated Condensed Balance Sheets related to cumulative basis adjustments for fair value hedges for each period were as follows:

| **Line Item in the Consolidated Condensed Balance Sheets in Which the Hedged Item is Included** | **Carrying Amount of the Hedged Item Assets/(Liabilities)** | | **Cumulative Amount of Fair Value Hedging Adjustment Included in the Carrying Amount Assets/(Liabilities)** | |
|---|---|---|---|---|
| **(In Millions)** | **Jun 28, 2025** | **Dec 28, 2024** | **Jun 28, 2025** | **Dec 28, 2024** |
| Short-term debt | $ (3,227) | $ (2,214) | $ 23 | $ 36 |
| Long-term debt | (8,435) | (9,201) | 312 | 546 |
| **Total** | **$ (11,662)** | **$ (11,415)** | **$ 335** | **$ 582** |

## Derivatives Not Designated as Hedging Instruments

The effects of derivative instruments not designated as hedging instruments on the Consolidated Condensed Statements of Operations for each period were as follows:

| | | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|---|
| **(In Millions)** | **Location of Gains (Losses) Recognized in Income on Derivatives** | **Jun 28, 2025** | **Jun 29, 2024** | **Jun 28, 2025** | **Jun 29, 2024** |
| Foreign currency contracts | Interest and other, net | $ (19) | $ 190 | $ (104) | $ 536 |
| Interest rate contracts | Interest and other, net | (28) | 34 | (85) | 151 |
| Other | Various | 199 | 56 | 42 | 193 |
| **Total** | | **$ 152** | **$ 280** | **$ (147)** | **$ 880** |

# Note 13 : Contingencies

## Legal Proceedings

We are regularly party to various ongoing claims, litigation, and other proceedings, including those noted in this section. As of June 28, 2025, we have accrued a charge of $1.0 billion related to litigation involving VLSI and a charge of $401 million related to an EC-imposed fine, both as described below. Excluding the VLSI claims described below, management at present believes that the ultimate outcome of these proceedings, individually and in the aggregate, will not materially harm our financial position, results of operations, cash flows, or overall trends; however, legal proceedings and related government investigations are subject to inherent uncertainties, and unfavorable rulings, excessive verdicts, or other events could occur. Unfavorable resolutions could include substantial monetary damages, fines, or penalties. Certain of these outstanding matters include speculative, substantial, or indeterminate monetary awards. In addition, in matters for which injunctive relief or other conduct remedies are sought, unfavorable resolutions could include an injunction or other order prohibiting us from selling one or more products at all or in particular ways, precluding particular business practices, or requiring other remedies. An unfavorable outcome may result in a material adverse impact on our business, results of operations, financial position, and overall trends. We might also conclude that settling one or more such matters is in the best interests of our stockholders, employees, and customers, and any such settlement could include substantial payments. Unless specifically described below, we have not concluded that settlement of any of the legal proceedings noted in this section is appropriate at this time.

## European Commission Competition Matter

In 2009, the EC found that we had used unfair business practices to persuade customers to buy microprocessors in violation of Article 82 of the EC Treaty (later renumbered Article 102) and Article 54 of the European Economic Area Agreement. In general, the EC found that we violated Article 82 by offering alleged "conditional rebates and payments" that required customers to purchase all or most of their x86 microprocessors from us and by making alleged "payments to prevent sales of specific rival products." The EC ordered us to end the alleged infringement referred to in its decision and imposed a €1.1 billion fine, which we paid in the third quarter of 2009.

We appealed the EC decision to the European Court of Justice in 2014, after the General Court (then called the Court of First Instance) rejected our appeal of the EC decision in its entirety. In September 2017, the Court of Justice sent the case back to the General Court to examine whether the rebates at issue were capable of restricting competition. In January 2022, the General Court annulled the EC's 2009 findings against us regarding rebates, as well as the €1.1 billion fine imposed on Intel, which was returned to us in February 2022. The General Court's January 2022 decision did not annul the EC's 2009 finding that we made payments to prevent sales of specific rival products.

In April 2022, the EC appealed the General Court's findings regarding rebates to the Court of Justice. In October 2024, the Court of Justice dismissed the EC's appeal, upholding the judgment of the General Court.

In September 2023, the EC imposed a €376 million ($401 million) fine against us based on its 2009 finding that we made payments to prevent sales of specific rival products. We have appealed the EC's decision. We have accrued a charge for the fine and are unable to make a reasonable estimate of the potential loss or range of losses in excess of this amount given the procedural posture and the nature of these proceedings.

## Litigation Related to Security Vulnerabilities

In June 2017, a Google research team notified Intel and other companies that it had identified security vulnerabilities, the first variants of which are now commonly referred to as "Spectre" and "Meltdown," that affect many types of microprocessors, including our products. As is standard when findings like these are presented, we worked together with other companies in the industry to verify the research and develop and validate software and firmware updates for impacted technologies. In January 2018, information on the security vulnerabilities was publicly reported, before software and firmware updates to address the vulnerabilities were made widely available.

Consumer class action lawsuits against us were pending in the US and Canada. The plaintiffs, who purport to represent various classes of purchasers of our products, generally claim to have been harmed by our actions and/or omissions in connection with Spectre, Meltdown, and other variants of this class of security vulnerabilities that have been identified since 2018, and assert a variety of common law and statutory claims seeking monetary damages and equitable relief. In the US, class action suits filed in various jurisdictions between 2018 and 2021 were consolidated for all pretrial proceedings in the US District Court for the District of Oregon, which entered final judgment in favor of Intel in July 2022 based on plaintiffs' failure to plead a viable claim. The Ninth Circuit Court of Appeals affirmed the district court's judgment in November 2023, ending the litigation. In November 2023, new plaintiffs filed a consumer class action complaint in the US District Court for the Northern District of California with respect to a further vulnerability variant disclosed in August 2023 and commonly referred to as "Downfall." In August 2024, the district court dismissed plaintiffs' complaint for failure to plead a viable claim. Plaintiffs filed an amended complaint in September 2024, which we moved to dismiss in October 2024. In Canada, an initial status conference has not yet been scheduled in one case relating to Spectre and Meltdown pending in the Superior Court of Justice of Ontario, and a stay of a second case pending in the Superior Court of Justice of Quebec is in effect. Additional lawsuits and claims may be asserted seeking monetary damages or other related relief. Given the procedural posture and the nature of these cases, including that the pending proceedings are in the early stages, that alleged damages have not been specified, that uncertainty exists as to the likelihood of a class or classes being certified or the ultimate size of any class or classes if certified, and that there are significant factual and legal issues to be resolved, we are unable to make a reasonable estimate of the potential loss or range of losses, if any, that might arise from these matters.

## Litigation Related to Segment Reporting and Internal Foundry Model

A securities class action lawsuit was filed in the US District Court for the Northern District of California in May 2024 against us and certain officers following the modification of our segment reporting in the first quarter of 2024 to align to our new internal foundry operating model. In August 2024, the court ordered the case consolidated with a second, similar lawsuit, and in October 2024 plaintiffs filed an amended consolidated complaint generally alleging that defendants violated the federal securities laws by making false or misleading statements about the growth and prospects of the foundry business and seeking monetary damages on behalf of all persons and entities that purchased or otherwise acquired our common stock or purchased call options or sold put options on our common stock from January 25, 2024 through August 1, 2024. In early March 2025, the court granted defendants' motion to dismiss the amended consolidated complaint. The court granted plaintiffs leave to amend, and in late March 2025 plaintiffs filed a second amended complaint. In April 2025 defendants filed a motion to dismiss the second amended complaint. In July 2025, the court granted defendant's motion to dismiss without granting plaintiffs leave to amend their complaint. Given the procedural posture of the case, including that the plaintiffs may appeal the district court's decision, we are unable to make a reasonable estimate of the potential loss or range of losses, if any, that might arise from the matter.

Stockholder derivative lawsuits have been filed in Delaware state and federal courts alleging that our directors and certain officers breached their fiduciary duties and violated the federal securities laws by making or allowing the statements that are challenged in the securities class action lawsuit. The plaintiffs in the derivative lawsuits seek to recover damages from the defendants on behalf of Intel.

By stipulation of the parties, the Delaware state and federal courts have ordered the cases before them stayed pending certain developments in the securities class action lawsuit.

## Litigation Related to Patent and IP Claims

We have had IP infringement lawsuits filed against us, including but not limited to those discussed below. Most involve claims that certain of our products, services, and technologies infringe others' IP rights. Adverse results in these lawsuits may include awards of substantial fines and penalties, costly royalty or licensing agreements, or orders preventing us from offering certain features, functionalities, products, or services. As a result, we may have to change our business practices, and develop non-infringing products or technologies, which could result in a loss of revenue for us and otherwise harm our business. In addition, certain agreements with our customers require us to indemnify them against certain IP infringement claims, which can increase our costs as a result of defending such claims, and may require that we pay significant damages, accept product returns, or supply our customers with non-infringing products if there were an adverse ruling in any such claims. In addition, our customers and partners may discontinue the use of our products, services, and technologies, as a result of injunctions or otherwise, which could result in loss of revenue and adversely affect our business.

### VLSI Technology LLC v. Intel

In October 2017, VLSI Technology LLC (VLSI) filed a complaint against us in the US District Court for the Northern District of California alleging that various Intel FPGA and processor products infringe eight patents VLSI acquired from NXP Semiconductors, N.V. (NXP). VLSI sought damages, attorneys' fees, costs, and interest. Intel prevailed on all eight patents and the court entered final judgment in April 2024. VLSI appealed the Court's judgment of non-infringement as to one of the eight patents. In April 2019, VLSI filed three infringement suits against us in the US District Court for the Western District of Texas accusing various of our processors of infringement of eight additional patents it had acquired from NXP:

- The first Texas case went to trial in February 2021, and the jury awarded VLSI $1.5 billion for literal infringement of one patent and $675 million for infringement of another patent under the doctrine of equivalents. In April 2022, the court entered final judgment, awarding VLSI $2.2 billion in damages and approximately $162 million in pre-judgment and post-judgment interest. We appealed the judgment to the Federal Circuit Court of Appeals, including the court's rejection of Intel's claim to have a license from Fortress Investment Group's acquisition of Finjan. The Federal Circuit Court heard oral argument in October 2023. In December 2023, the Federal Circuit reversed the finding of infringement as to the patent for which VLSI was awarded $675 million. The Federal Circuit affirmed the finding of infringement as to the patent for which VLSI had been awarded $1.5 billion, but vacated the damages award and sent the case back to the trial court for further damages proceedings on that patent. The Federal Circuit also ruled that Intel can advance the defense that it is licensed to VLSI's patents. In December 2021 and January 2022 the Patent Trial and Appeal Board (PTAB) instituted Inter Partes Reviews (IPR) on the claims found to have been infringed in the first Texas case, and in May and June 2023 found all of those claims unpatentable; VLSI has appealed the PTAB's decisions. In April 2024, Intel moved to add the defense that it is licensed to VLSI's patents. The motion remains pending.

- The second Texas case went to trial in April 2021, and the jury found that we do not infringe the asserted patents. VLSI had sought approximately $3.0 billion for alleged infringement, plus enhanced damages for willful infringement. In September 2024, the court denied VLSI's motion for a new trial. Other post-trial motions remain pending, and the court has not yet entered final judgment.

- The third Texas case went to trial in November 2022, with VLSI asserting one remaining patent. The jury found the patent valid and infringed, and awarded VLSI approximately $949 million in damages, plus interest and a running royalty. The court has not yet entered final judgment. In February 2023, we filed motions for a new trial and for judgment as a matter of law notwithstanding the verdict on various grounds. Further appeals are possible. In April 2024, Intel moved to add the defense that it is licensed to VLSI's patents, and the court granted Intel's motion that same month. In May 2025, the court held a trial on an underlying factual question relating to Intel’s license defense. The jury returned a verdict in Intel's favor. Post-trial briefing is ongoing, and the court will now address the ultimate legal issue of whether Intel obtained a license to the asserted VLSI patent through Intel’s license agreement with Finjan when Fortress Investments acquired Finjan.

In May 2019, VLSI filed a case in Shenzhen Intermediate People's Court against Intel, Intel (China) Co., Ltd., Intel Trading (Shanghai) Co., Ltd., and Intel Products (Chengdu) Co., Ltd. VLSI asserted one patent against certain Intel Core processors. Defendants filed an invalidation petition in October 2019 with the China National Intellectual Property Administration (CNIPA) which held a hearing in September 2021. The Shenzhen court held trial proceedings in July 2021 and September 2023. VLSI sought an injunction as well as RMB 1.3 million in costs and expenses, but no damages. In September 2023, the CNIPA invalidated every claim of the asserted patent. In November 2023, the trial court dismissed VLSI's case.

In May 2019, VLSI filed a case in Shanghai Intellectual Property Court against Intel (China) Co., Ltd., Intel Trading (Shanghai) Co., Ltd., and Intel Products (Chengdu) Co., Ltd. asserting one patent against certain Intel core processors. The Shanghai court held trial hearings in December 2020 and in May 2022, where VLSI requested expenses (RMB 300 thousand) and an injunction. In October 2023, the Shanghai court issued a decision finding no infringement and dismissing all claims. In November 2023, VLSI appealed the finding of non-infringement to the Supreme People's Court. The Supreme People's Court held an evidentiary hearing in October 2024, and a trial in November 2024.

In parallel in December 2022, we had filed a petition to invalidate the patent at issue in the Shanghai proceeding. In February 2024, the patent was found not invalid, and Intel appealed the decision in May 2024. After the Beijing Intellectual Property Court upheld the validity of the patent in May 2025, we filed a further appeal to the Supreme People's Court in June 2025. Both VLSI's appeal of the noninfringement decision and our appeal of the validity decision before the Supreme People's Court remain pending.

In July 2024, Intel filed suit against VLSI in US District Court for the District of Delaware requesting the court find Intel is licensed to VLSI's patents. In September 2024, VLSI filed motions requesting that Intel's complaint be dismissed, transferred, or stayed. In December 2024, the Delaware court stayed the case and deferred the pending motions until May 31, 2025.

As of June 28, 2025, we have accrued a charge of approximately $1.0 billion related to the VLSI litigation. We are unable to make a reasonable estimate of losses in excess of recorded amounts.

### Eire Og Innovations v IBM et. al.

Between April and present, EireOg Innovations Ltd. has filed eleven separate complaints in the Eastern and Western Districts of Texas against Intel and AMD customers alleging that various products with Intel and AMD CPUs infringe numerous patents. EireOg seeks compensatory damages, future royalties, attorneys' fees, costs, and interest. Intel is indemnifying Acer, Amazon Web Services (AWS), Cisco, Dell, HPE, HPI, IBM, Lenovo, and Oracle in connection with Intel CPUs accused of infringing four patents. Cisco and IBM filed their answers in June 2024. In these cases, a Markman hearing is scheduled for August 2025, and trial is scheduled for February 2026. Dell, HPI and Oracle filed their answers in June, August and September 2024, respectively. The Markman hearing in those matters was held in May 2025, and trial is scheduled for June 2026. Lenovo filed a motion to dismiss for lack of jurisdiction in July 2024, which was denied, and it subsequently filed an answer in October 2024. HPE and Acer filed their answers in July and September 2024, respectively. The Markman hearing for the Lenovo, HPE and Acer matters is scheduled for September 2025, and trial in those matters is scheduled for March 2026. AWS moved to dismiss the complaint in June 2025, and EireOg responded with an amended complaint. Given the procedural posture and the nature of these cases, including that the pending proceedings are in the early stages, that alleged damages have not been specified, and that there are significant factual and legal issues to be resolved, we are unable to make a reasonable estimate of the potential loss or range of losses, if any, that might arise from these matters.

# Key Terms

We use terms throughout our document that are specific to Intel or that are abbreviations that may not be commonly known or used. Below is a list of these terms used in our document.

| Term | Definition |
|---|---|
| 2024 Restructuring Plan | Cost and capital reduction initiatives approved by management, the board of directors or the Audit & Finance Committee of the board of directors designed to adjust spending to current business trends and achieve objectives announced in Q3 2024 with respect to reducing operating expenses, reducing capital expenditures and reducing cost of sales while enabling Intel's new operating model and continuing to fund investments in Intel's core strategy |
| 2025 Restructuring Plan | Transformational initiative approved by our management to lower expenses, streamline our organizational structure and reduce management layers across functions while reallocating resources toward our core client and server businesses by reducing investment in lower-priority programs and initiatives |
| AI | Artificial intelligence |
| Apollo | Apollo Global Management, Inc. |
| ASP | Average selling price |
| Brookfield | Brookfield Asset Management |
| CCG | Client Computing Group operating segment |
| CHIPS Act | Creating Helpful Incentives to Produce Semiconductors for America Act |
| CODM | Chief operating decision maker |
| CPU | Processor or central processing unit |
| DCAI | Data Center and Artificial Intelligence operating segment |
| EC | European Commission |
| EPS | Earnings per share |
| 2024 Form 10-K | Annual Report on Form 10-K for the year ended December 28, 2024 |
| FPGA | Field-programmable gate array |
| IDM | Integrated device manufacturer, a semiconductor company that both designs and builds chips |
| IMS | IMS Nanofabrication GmbH, a business within Intel Foundry that develops and produces electron-beam systems for the semiconductor industry |
| IP | Intellectual property |
| MD&A | Management's Discussion and Analysis |
| MG&A | Marketing, general, and administrative |
| NAND | NAND flash memory |
| NEX | Networking and Edge operating segment |
| R&D | Research and development |
| RSU | Restricted stock unit |
| SCIP | Semiconductor Co-Investment Program |
| SEC | US Securities and Exchange Commission |
| Smart Capital | Our Smart Capital approach accelerates progress on our strategy. This approach is designed to enable us to adjust quickly to opportunities in the market, while managing our margin structure and capital spending. The elements of Smart Capital include capacity investments, government incentives, customer commitments, continued use of external foundries |
| SoC | System on a chip, which integrates most of the components of a computer or other electronic system into a single silicon chip. We offer a range of SoC products in CCG, DCAI, and NEX. Our DCAI and NEX businesses offer SoCs across many market segments for a variety of applications, including products targeted for 5G base stations and network infrastructure |
| US | United States |
| US GAAP | US Generally Accepted Accounting Principles |
| VIE | Variable interest entity |

# Management's Discussion and Analysis

This report should be read in conjunction with our 2024 Form 10-K where we include additional information on our business, operating segments, risk factors, critical accounting estimates, policies, and the methods and assumptions used in our estimates, among other important information. The Critical Accounting Estimates discussed in this Form 10-Q supplement the significant accounting policies outlined in "Note 2: Accounting Policies" within Notes to Consolidated Financial Statements within our Annual Report on Form 10-K for the fiscal year ended December 28, 2024.

In Q2 2025, we initiated an enterprise-wide initiative to fundamentally transform our culture and the way in which we operate, which is designed to simplify the way we do business and drive transparency and accountability across the company. As part of this transformation, we implemented the 2025 Restructuring Plan to lower expenses, streamline our organizational structure and reduce management layers across functions while reallocating resources toward our core client and server businesses by reducing investment in lower-priority programs and initiatives. We expect these headcount reduction initiatives will reduce our core Intel workforce by 15% by the end of fiscal 2025. As a result of initiating and deploying the 2025 Restructuring Plan, and substantially completing the 2024 Restructuring Plan, we recognized restructuring charges of $1.9 billion in Q2 2025, primarily comprised of the following:

- cash-based employee severance and related employee exit charges of $1.5 billion; and
- non-cash asset impairment charges of $416 million resulting from the exit of certain non-core lines of business and the consolidation and exit of certain real estate properties.

Our Q2 2025 results of operations were also affected by an impairment charge and accelerated depreciation related to certain manufacturing assets that were determined to have no remaining operational use. This determination was based on an evaluation of our current process technology node capacities relative to projected market demand for our products and services. These non-cash charges of $797 million, net of certain items, were recorded to cost of sales in Q2 2025, impacting the results for our Intel Foundry segment.

As part of the transformation of the company, we have begun implementing a more disciplined approach to the deployment of capital. The design, development, and manufacturing of leading-edge semiconductor manufacturing process technologies, or nodes, is risky and capital-intensive, and it takes years for capital investments to yield a return. Under our more disciplined approach, we intend to invest capital in future node development and additional or upgraded manufacturing facilities only where we have a clear line of sight to an acceptable return on that capital. We expect to release the first SKU of our first products manufactured on our new leading-edge node, Intel 18A, by the end of 2025, and continue to develop its derivative node, Intel 18A-P, designed for future Intel products and external customers. We are focused on the continued development of Intel 14A, the next generation node beyond Intel 18A and Intel 18A-P, and on securing a significant external customer for such node. However, if we are unable to secure a significant external customer and meet important customer milestones for Intel 14A, we face the prospect that it will not be economical to develop and manufacture Intel 14A and successor leading-edge nodes on a go-forward basis. In such event, we may pause or discontinue our pursuit of Intel 14A and successor nodes and various of our manufacturing expansion projects. While we continue to evaluate Intel 14A for use in future Intel products and our plan includes an initial product designed to utilize Intel 14A, at present we are maintaining the option to design future Intel products requiring nodes with performance beyond Intel 18A and Intel 18A-P to be produced internally or by an external foundry. If we were to discontinue development of Intel 14A and successor nodes, we expect that a majority of our products would continue to be manufactured in our own facilities utilizing our nodes up to Intel 18A-P through at least 2030. By focusing on our customers and delivering the best semiconductor products to the market, manufactured on the most appropriate internal or external node from a performance and cost perspective, and only deploying capital on new nodes and manufacturing facilities where we believe they will yield an attractive return, we believe we can improve the competitiveness of our products business, and the overall financial results for the company.

Separately, in recent months, hostilities in Israel and the surrounding region escalated significantly with direct military actions between Israel and Iran and military strikes by the United States against Iran. There can be no assurance that any existing or future ceasefire agreements will be respected or remain in force, and additional hostilities and escalations remain possible at any time. We continue to monitor the impact this geopolitical conflict could have on our operations in Israel, including potential disruption of our wafer fabrication facility and our product development centers. To date, we have not had a material interruption in either our manufacturing operations or our product development centers. As a significant portion of our revenues are generated from products on Intel 7 manufactured at our fabrication facility in Israel and we are not insured for business interruptions resulting from war or political violence, a disruption of that facility could have a significant adverse impact on our business. Additionally, our property, plant, and equipment assets in Israel are self-insured for losses resulting from war or political violence and could be impacted by the conflict.

In Q1 2025, we made an organizational change to integrate NEX into CCG and DCAI and modified our segment reporting to align to this and certain other business reorganizations. All prior period segment data has been retrospectively adjusted to reflect the way our CODM internally receives information and manages and monitors our operating segment performance. There were no changes to our consolidated financial statements for any prior periods. Our discussion regarding our segments' results of operations presented below excludes the $1.9 billion of restructuring and other charges in Q2 2025 and similar charges for the other periods presented, as our CODM receives, views and uses information for decision making purposes based upon segment results that exclude such items. "Note 2: Operating Segments" within Notes to Consolidated Condensed Financial Statements of this Form 10-Q provides additional information about our operating segments, including the nature of segment revenues and expenses, and reconciles our segment

revenues presented below to our total consolidated net revenues and our segment operating income (loss) presented below to our total consolidated operating income (loss) for each of the periods presented.

# Operating Segments Trends and Results

## Intel Products

Intel Products consists substantially of the design, development, marketing, sale, support, and servicing of CPUs and related solutions for third-party customers. The manufacturing of our Intel Products' offerings is performed by Intel Foundry and, to a lesser extent, certain third party manufacturers. Intel Products is comprised of two operating segments: CCG and DCAI. CCG delivers platforms and processors that power personal computers, enabling enhanced performance, connectivity and user experiences. DCAI provides high-performance computing, AI acceleration, and infrastructure solutions, supporting data centers, cloud providers, and enterprises in meeting the growing demand for data processing and AI workloads.

### Intel Products Financial Performance[1]

| ($ in Millions) | Three Months Ended Jun 28, 2025 | | | Six Months Ended Jun 28, 2025 | | |
|---|---|---|---|---|---|---|
| | CCG | DCAI | Total | CCG | DCAI | Total |
| **Revenue** | **$ 7,871** | **$ 3,939** | **$ 11,810** | **$ 15,500** | **$ 8,065** | **$ 23,565** |
| Cost of sales and operating expenses | 5,818 | 3,306 | 9,124 | 11,086 | 6,857 | 17,943 |
| **Operating income** | **$ 2,053** | **$ 633** | **$ 2,686** | **$ 4,414** | **$ 1,208** | **$ 5,622** |
| Operating margin % | 26 % | 16 % | 23 % | 28 % | 15 % | 24 % |

| ($ in Millions) | Three Months Ended Jun 29, 2024 | | | Six Months Ended Jun 29, 2024 | | |
|---|---|---|---|---|---|---|
| | CCG | DCAI | Total | CCG | DCAI | Total |
| **Revenue** | **$ 8,143** | **$ 3,805** | **$ 11,948** | **$ 16,416** | **$ 7,633** | **$ 24,049** |
| Cost of sales and operating expenses | 5,502 | 3,563 | 9,065 | 10,953 | 6,974 | 17,927 |
| **Operating income** | **$ 2,641** | **$ 242** | **$ 2,883** | **$ 5,463** | **$ 659** | **$ 6,122** |
| Operating margin % | 32% | 6% | 24% | 33% | 9% | 25% |

*[1] Operating segment results include intersegment financial activity; refer to "Note 2: Operating Segments" for a reconciliation between our operating segment and consolidated financial results for the periods presented.*

### Operating Segment Revenue Summary

#### Q2 2025 vs. Q2 2024

Total Intel Products revenue was $11.8 billion in Q2 2025, down $138 million from Q2 2024.

- CCG revenue decreased $272 million from Q2 2024. Client revenue (collectively notebook and desktop) was $6.6 billion in Q2 2025, down $390 million from Q2 2024, primarily due to lower Q2 2025 client volume resulting from incremental customer incentives offered to certain customers in Q2 2024. Client ASPs in Q2 2025 were roughly flat with Q2 2024. Other CCG revenue was $1.3 billion, up $118 million from Q2 2024.
- DCAI revenue increased $134 million from Q2 2024, primarily driven by higher Q2 2025 server revenue due to higher hyperscale customer-related demand which contributed to an increase in server volume of 13% . Server ASPs decreased 8% from Q2 2024, primarily due to pricing actions taken in a competitive environment.

#### YTD 2025 vs. YTD 2024

Total Intel Products revenue was $23.6 billion in YTD 2025, down $484 million from YTD 2024.

- CCG revenue decreased $916 million from YTD 2024. Client revenue (collectively notebook and desktop) was $13.2 billion in YTD 2025, down $988 million from YTD 2024, primarily due to lower YTD 2025 client volume resulting from incremental customer incentives offered to certain customers in YTD 2024. Client ASPs in YTD 2025 were roughly flat with YTD 2024. Other CCG revenue was $2.3 billion, up $72 million from YTD 2024.
- DCAI revenue increased $432 million from YTD 2024, primarily driven by higher server revenue due to higher hyperscale customer-related demand which contributed to an increase in server volume of 15%. Server ASPs decreased by 9% from YTD

2024, primarily due to pricing actions taken in a competitive environment. Other DCAI product revenue also increased from YTD 2024 driven by higher edge processing unit demand.

### Segment Operating Income Summary

#### Q2 2025 vs. Q2 2024

Total Intel Products operating income was $2.7 billion in Q2 2025, down $197 million from Q2 2024.

- CCG operating income decreased $588 million from Q2 2024, primarily due to $831 million of unfavorable impacts attributable to lower product profit due to lower revenue in Q2 2025, and higher period charges related to higher inventory reserves and one-time period costs of $188 million. These decreases to operating income in Q2 2025 were partially offset by the Q2 2025 favorable impacts of lower operating expenses of $243 million, primarily driven by lower payroll-related expenditures resulting from headcount reductions taken under the 2024 Restructuring Plan and the effects of various other cost-reduction measures.
- DCAI operating income increased $391 million from Q2 2024, primarily due to the favorable impacts of lower operating expenses of $524 million that were primarily driven by lower payroll-related expenditures resulting from headcount reductions taken under the 2024 Restructuring Plan and the effects of various other cost-reduction measures.

#### YTD 2025 vs. YTD 2024

Total Intel Products operating income was $5.6 billion in YTD 2025, down $500 million from YTD 2024.

- CCG operating income decreased $1.0 billion from YTD 2024, primarily due to $1.5 billion of unfavorable impacts attributable to lower product profit due to lower revenue in YTD 2025, as well as higher period charges related to higher inventory reserves and higher one-time period charges of $188 million. These unfavorable YTD 2025 impacts were partially offset by YTD 2025 favorable impacts of lower operating expenses of $406 million due to lower payroll-related expenditures as a result of headcount reductions taken under the 2024 Restructuring Plan and the effects of various other cost-reduction measures.
- DCAI operating income increased $549 million from YTD 2024, primarily due to $998 million of favorable impacts related to lower operating expenses, driven by lower payroll-related expenditures as a result of headcount reductions taken under the 2024 Restructuring Plan and the effects of various other cost-reduction measures. These favorable YTD 2025 impacts were partially offset by unfavorable impacts to operating income, primarily due to period charges of $361 million related to Gaudi AI Accelerator inventory-related charges recognized in YTD 2025.

## Intel Foundry

Intel Foundry, comprising technology development, manufacturing and foundry services, seeks to deliver the best systems foundry capabilities to support Intel Products and external customers. We are working to innovate and advance world-class silicon process and advanced packaging technologies and to strengthen the resilience of the global semiconductor supply chain by investing in geographically balanced and more sustainable manufacturing capacity.

### Intel Foundry Financial Performance[1]

| ($ in Millions) | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | Jun 28, 2025 | Jun 29, 2024 | Jun 28, 2025 | Jun 29, 2024 |
| **Revenue** | **$ 4,417** | **$ 4,282** | **$ 9,084** | **$ 8,638** |
| Cost of sales and operating expenses | 7,585 | 7,084 | 14,572 | 13,881 |
| **Operating loss** | **$ (3,168)** | **$ (2,802)** | **$ (5,488)** | **$ (5,243)** |
| Operating loss % | (72)% | (65)% | (60)% | (61)% |

[1] *Operating segment results include intersegment financial activity; refer to "Note 2: Operating Segments" for a reconciliation between our operating segment and consolidated financial results for the periods presented.*

### Operating Segment Revenue Summary

#### Q2 2025 vs. Q2 2024

Revenue was $4.4 billion in Q2 2025, up $135 million from Q2 2024. Intersegment revenue was $4.4 billion, up $152 million from Q2 2024, primarily due to higher back-end services revenue and higher expedite fees, partially offset by lower intersegment sample revenue. External revenue was $22 million, down $17 million from Q2 2024.

#### YTD 2025 vs. YTD 2024

Revenue was $9.1 billion in YTD 2025, up $446 million from YTD 2024. Intersegment revenue was $9.0 billion, up $445 million from YTD 2024, primarily due to higher back-end services revenue, higher expedite fees, and higher wafer volume from our Intel 3 and Intel 4 process nodes, partially offset by lower intersegment sample revenue. External revenue was $53 million, roughly flat with YTD 2024.

### Segment Operating Loss Summary

#### Q2 2025 vs. Q2 2024

Operating loss was $3.2 billion in Q2 2025, compared to an operating loss of $2.8 billion in Q2 2024, primarily driven by non-cash asset impairment and accelerated depreciation charges of $797 million recognized in Q2 2025 related to certain manufacturing assets that were determined to have no remaining operational use based on an evaluation of our current process technology node capacities relative to projected market demand for our products and services. This increase in operating loss in Q2 2025 was partially offset by the favorable impacts of higher intersegment revenue and a $185 million benefit from lower operating expenses in Q2 2025, primarily due to lower payroll-related expenditures as a result of headcount reductions taken under the 2024 Restructuring Plan and the effects of various cost-reduction measures.

#### YTD 2025 vs. YTD 2024

Operating loss was $5.5 billion in YTD 2025, compared to an operating loss of $5.2 billion in YTD 2024, primarily driven by non-cash asset impairment and accelerated depreciation charges of $797 million related to certain manufacturing assets that were determined to have no remaining operational use based on an evaluation of our current process technology node capacities relative to projected market demand for our products and services. This increase in operating loss in YTD 2025 was partially offset by the favorable impacts of higher intersegment revenue and a $323 million benefit from lower operating expenses in YTD 2025, primarily due to lower payroll-related expenditures as a result of headcount reductions taken under the 2024 Restructuring Plan and the effects of various cost-reduction measures.

## All Other

Our "all other" category includes the results of operations from other non-reportable segments not otherwise presented, including our Altera and Mobileye businesses, our IMS business, start-up businesses that support our initiatives, and historical results of operations from divested businesses. Altera offers programmable semiconductors, primarily FPGAs, and related products, for a broad range of applications across our embedded, communications, cloud, enterprise, and defense and aerospace market segments. On April 14, 2025, we entered into an agreement with SLP VII Gryphon Aggregator, L.P., an affiliate of Silver Lake Partners, to sell 51% of all issued and outstanding common stock of Altera. The transaction is expected to close in the second half of 2025, subject to customary closing conditions and regulatory approvals. Upon closing, we expect to deconsolidate Altera from our financial results as a consolidated subsidiary and begin to account for our minority investment in Altera under the equity method of accounting. Mobileye is a global leader in driving assistance and self-driving solutions, with a product portfolio designed to encompass the entire stack required for assisted and autonomous driving, including compute platforms, computer vision, and machine learning-based perception, mapping and localization, driving policy, and active sensors in development. IMS specializes in developing and manufacturing multi-beam mask writing tools.

### All Other Financial Performance[1]

| ($ in Millions) | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | Jun 28, 2025 | Jun 29, 2024 | Jun 28, 2025 | Jun 29, 2024 |
| **Revenue** | **$ 1,053** | **$ 881** | **$ 1,996** | **$ 1,524** |
| Cost of sales and operating expenses | 984 | 927 | 1,824 | 1,740 |
| **Operating income (loss)** | **$ 69** | **$ (46)** | **$ 172** | **$ (216)** |
| Operating margin (loss) % | 7 % | (5)% | 9 % | (14)% |

[1] *Operating segment results include intersegment financial activity; refer to "Note 2: Operating Segments" for a reconciliation between our operating segment and consolidated financial results for the periods presented.*

## Operating Segment Revenue Summary

### Q2 2025 vs. Q2 2024

All other revenue was $1.1 billion, up $172 million from Q2 2024. Mobileye revenue was $507 million, up $68 million from Q2 2024, primarily driven by higher demand for EyeQ® products. Altera revenue was $448 million, up $87 million from Q2 2024, primarily driven by higher demand for FPGA products.

### YTD 2025 vs. YTD 2024

All other revenue was $2.0 billion, up $472 million from YTD 2024. Mobileye revenue was $945 million, up $267 million from YTD 2024 as customer inventory levels improved compared to higher levels in YTD 2024. Altera revenue was $816 million, up $113 million from YTD 2024, primarily driven by higher demand for FPGA products.

## Segment Operating Income (Loss) Summary

### Q2 2025 vs. Q2 2024

Total all other operating income was $69 million, up $115 million from Q2 2024, primarily driven by higher Mobileye and Altera revenue.

### YTD 2025 vs. YTD 2024

Total all other operating income was $172 million, up $388 million from YTD 2024, primarily driven by higher Mobileye and Altera revenue.

# Consolidated Condensed Results of Operations

| | Three Months Ended | | | | Six Months Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | Jun 28, 2025 | | Jun 29, 2024 | | Jun 28, 2025 | | Jun 29, 2024 | |
| **(In Millions, Except Per Share Amounts)** | **Amount** | **% of Net Revenue** | **Amount** | **% of Net Revenue** | **Amount** | **% of Net Revenue** | **Amount** | **% of Net Revenue** |
| **Net revenue** | **$ 12,859** | **100.0 %** | **$ 12,833** | **100.0 %** | **$ 25,526** | **100.0 %** | **$ 25,557** | **100.0 %** |
| Cost of sales | 9,317 | 72.5 % | 8,286 | 64.6 % | 17,312 | 67.8 % | 15,793 | 61.8 % |
| **Gross profit** | **3,542** | **27.5 %** | **4,547** | **35.4 %** | **8,214** | **32.2 %** | **9,764** | **38.2 %** |
| Research and development | 3,684 | 28.6 % | 4,239 | 33.0 % | 7,324 | 28.7 % | 8,621 | 33.7 % |
| Marketing, general, and administrative | 1,144 | 8.9 % | 1,329 | 10.4 % | 2,321 | 9.1 % | 2,885 | 11.3 % |
| Restructuring and other charges | 1,890 | 14.7 % | 943 | 7.3 % | 2,046 | 8.0 % | 1,291 | 5.1 % |
| **Operating income (loss)** | **(3,176)** | **(24.7)%** | **(1,964)** | **(15.3)%** | **(3,477)** | **(13.6)%** | **(3,033)** | **(11.9)%** |
| Gains (losses) on equity investments, net | 502 | 3.9 % | (120) | (0.9)% | 390 | 1.5 % | 85 | 0.3 % |
| Interest and other, net | (95) | (0.7)% | 80 | 0.6 % | (268) | (1.0)% | 225 | 0.9 % |
| **Income (loss) before taxes** | **(2,769)** | **(21.5)%** | **(2,004)** | **(15.6)%** | **(3,355)** | **(13.1)%** | **(2,723)** | **(10.7)%** |
| Provision for (benefit from) taxes | 255 | 2.0 % | (350) | (2.7)% | 556 | 2.2 % | (632) | (2.5)% |
| **Net income (loss)** | **(3,024)** | **(23.5)%** | **(1,654)** | **(12.9)%** | **(3,911)** | **(15.3)%** | **(2,091)** | **(8.2)%** |
| Less: net income (loss) attributable to non-controlling interests | (106) | (0.8)% | (44) | (0.3)% | (172) | (0.7)% | (100) | (0.4)% |
| **Net income (loss) attributable to Intel** | **$ (2,918)** | **(22.7)%** | **$ (1,610)** | **(12.5)%** | **$ (3,739)** | **(14.6)%** | **$ (1,991)** | **(7.8)%** |
| **Earnings (loss) per share attributable to Intel—diluted** | **$ (0.67)** | | **$ (0.38)** | | **$ (0.86)** | | **$ (0.47)** | |

Table of Contents

# Consolidated Revenue

Consolidated Revenue Walk $B[1]




## Q2 2025 vs. Q2 2024

Our Q2 2025 revenue was $12.9 billion, roughly flat with Q2 2024. Intel Products revenue decreased 1% primarily due to lower CCG revenue, partially offset by higher DCAI revenue. CCG revenue decreased 3% from Q2 2024, primarily due to lower client revenue driven by lower Q2 2025 client volumes that were primarily attributable to the reduction of incremental purchasing incentives offered to certain customers in Q2 2024. DCAI revenue increased 4% from Q2 2024, primarily driven by higher server revenue due to higher hyperscale customer-related demand. All other revenue increased 21% from Q2 2024, primarily driven by higher Altera revenue and higher Mobileye revenue.

Incentives offered to certain customers to accelerate purchases and to strategically position our products with customers for market segment share purposes, particularly in CCG, contributed approximately $1.3 billion to our revenue during Q2 2024. These incentives were insignificant in Q2 2025.

## YTD 2025 vs. YTD 2024

Our YTD 2025 revenue was $25.5 billion, roughly flat with YTD 2024. Intel Products revenue decreased 2% from YTD 2024 primarily due to lower CCG revenue, partially offset by higher DCAI revenue. CCG revenue decreased 6% from YTD 2024 primarily due to lower client revenue driven by lower YTD 2025 client volumes that were primarily attributable to the reduction of incremental purchasing incentives offered to certain customers in YTD 2024. DCAI revenue increased 6% from YTD 2024 primarily due to higher server revenue due to higher hyperscale customer-related demand and higher product revenue from increased edge processing unit demand. All other revenue increased 31% from YTD 2024, driven by higher Altera revenue and higher Mobileye revenue.

[1] *Excludes intersegment revenue; totals may not sum due to rounding.*

## Consolidated Gross Profit

We derived a majority of our consolidated gross profit in Q2 2025 and in YTD 2025 from our Intel Products business sales through our CCG and DCAI operating segments.

### Gross Profit $B

(Percentages in chart indicate gross profit as a percentage of total revenue)




#### Q2 2025 vs. Q2 2024

Our consolidated gross profit in Q2 2025 decreased by $1.0 billion, or 22%, compared to Q2 2024, primarily driven by asset impairment and accelerated depreciation charges related to certain manufacturing assets that were determined to have no remaining operational use. This determination was based on an evaluation of our current process technology node capacities relative to projected market demand for our products and services. These non-cash charges of $797 million were recorded to cost of sales in Q2 2025, impacting the results of our Intel Foundry segment. Consolidated gross profit also decreased in Q2 2025 due to higher one-time period charges of $209 million, and higher period charges related to Gaudi AI accelerator inventory reserves taken in Q2 2025.

#### YTD 2025 vs. YTD 2024

Our consolidated gross profit in YTD 2025 decreased by $1.6 billion, or 16%, compared to YTD 2024, primarily driven by asset impairment and accelerated depreciation charges related to certain manufacturing assets that were determined to have no remaining operational use. This determination was based on an evaluation of our current process technology node capacities relative to projected market demand for our products and services. These non-cash charges of $797 million were recorded to cost of sales in Q2 2025, impacting the results of our Intel Foundry segment. Consolidated gross profit also decreased in YTD 2025 due to higher period charges of $361 million related to Gaudi AI accelerator inventory reserves taken in YTD 2025 and higher one time period charges of $209 million.

# Consolidated R&D and MG&A Expenses

Total R&D and MG&A expenses for Q2 2025 were $4.8 billion, down 13% from Q2 2024, and $9.6 billion for YTD 2025, down 16% from YTD 2024. These expenses represent 37.5% of revenue for Q2 2025 and 43.4% of revenue for Q2 2024, and 37.8% of revenue for YTD 2025 and 45.0% of revenue for YTD 2024. In support of our strategy, described in our 2024 Form 10-K, we continue to make investments to advance our process technology roadmap. As a result of our 2025 Restructuring Plan, 2024 Restructuring Plan, and related cost-reduction measures, we expect a decrease in total R&D and MG&A expenses in 2025 relative to recent historical periods as we focus investments in R&D and create capacity for sustained investment in technology and manufacturing.

Research and Development $B

Marketing, General, and Administrative $B

(Percentages in chart indicate operating expenses as a percentage of total revenue)




## Research and Development

### Q2 2025 vs. Q2 2024

R&D decreased by $555 million, or 13%, compared to Q2 2024 primarily driven by lower payroll-related expenditures resulting from headcount reductions taken under the 2024 Restructuring Plan, the effects of various other cost-reduction measures, and lower share-based compensation, partially offset by higher incentive-based cash compensation.

### YTD 2025 vs. YTD 2024

R&D decreased by $1.3 billion, or 15%, primarily driven by lower payroll-related expenditures resulting from headcount reductions taken under the 2024 Restructuring Plan, the effects of various other cost-reduction measures, and lower shared-based compensation, partially offset by higher incentive-based cash compensation.

## Marketing, General, and Administrative

### Q2 2025 vs. Q2 2024

MG&A decreased by $185 million, or 14%, compared to Q2 2024 primarily driven by lower payroll-related expenditures resulting from headcount reductions taken under the 2024 Restructuring Plan, and the effects of various other cost-reduction measures, partially offset by higher incentive-based cash compensation.

### YTD 2025 vs. YTD 2024

MG&A decreased by $564 million, or 20%, primarily driven by lower payroll-related expenditures resulting from headcount reductions taken under the 2024 Restructuring Plan, the effects of various other cost-reduction measures, and lower share-based compensation, partially offset by higher incentive-based cash compensation.

# Restructuring and Other Charges

| (In Millions) | Three Months Ended Jun 28, 2025 | Three Months Ended Jun 29, 2024 | Six Months Ended Jun 28, 2025 | Six Months Ended Jun 29, 2024 |
|---|---|---|---|---|
| Employee severance and benefit arrangements | $ 1,466 | $ 165 | $ 1,607 | $ 294 |
| Litigation charges and other | 8 | 778 | 20 | 778 |
| Asset impairment charges | 416 | — | 419 | 219 |
| **Total restructuring and other charges** | **$ 1,890** | **$ 943** | **$ 2,046** | **$ 1,291** |

In Q2 2025, we announced and commenced the 2025 Restructuring Plan, which is expected to streamline our organizational structure, enabling us to focus on our core businesses and resulting in lower overall operating expenses (see "Note 6: Restructuring and Other Charges" within Notes to Consolidated Condensed Financial Statements). We expect actions pursuant to the 2025 Restructuring Plan to be substantially complete by Q4 2025, which is subject to change. Any changes to the estimates or timing will be reflected in our results of operations.

The 2024 Restructuring Plan, which we initiated in Q3 2024, was substantially complete in Q2 2025.

*Employee severance and benefit arrangements* in Q2 2025 includes charges of $1.4 billion relating to the 2025 Restructuring Plan and the remaining charges primarily related to the 2024 Restructuring Plan. In YTD 2025, we incurred charges of $1.4 billion relating to the 2025 Restructuring Plan and $213 million relating to the 2024 Restructuring Plan. Charges of $165 million in Q2 2024 and $294 million in YTD 2024 are primarily related to other restructuring actions taken to streamline operations and to reduce costs.

*Litigation charges and other* includes a charge of $780 million in Q2 2024 arising out of the R2 litigation. Refer to "Note 19: Commitments and Contingencies" within Notes to Consolidated Financial Statements as included in our Annual Report on Form 10-K for the year ended December 28, 2024 for further information.

*Asset impairment charges* of $416 million in Q2 2025 primarily include non-cash charges related to the exit of certain non-core lines of business and the consolidation and exit of certain real estate properties in connection with the 2025 Restructuring Plan. In addition, we also incurred a goodwill impairment loss of $222 million in the first six months of 2024 related to our Intel Foundry reporting unit (refer to "Note 2: Operating Segments" within Notes to Consolidated Condensed Financial Statements for further information).

## Gains (Losses) on Equity Investments and Interest and Other, Net

| (In Millions) | Three Months Ended Jun 28, 2025 | Three Months Ended Jun 29, 2024 | Six Months Ended Jun 28, 2025 | Six Months Ended Jun 29, 2024 |
|---|---|---|---|---|
| Unrealized gains (losses) on marketable equity investments | $ (58) | $ (222) | $ (350) | $ 30 |
| Unrealized gains (losses) on non-marketable equity investments[1] | 473 | 24 | 473 | 48 |
| Impairment charges | (51) | (91) | (156) | (159) |
| **Unrealized gains (losses) on equity investments, net** | **364** | **(289)** | **(33)** | **(81)** |
| Realized gains (losses) on sales of equity investments, net | 138 | 169 | 423 | 166 |
| **Gains (losses) on equity investments, net** | **$ 502** | **$ (120)** | **$ 390** | **$ 85** |
| **Interest and other, net** | **$ (95)** | **$ 80** | **$ (268)** | **$ 225** |

*[1] Unrealized gains (losses) on non-marketable investments includes observable price adjustments and our share of equity method investee gains (losses) and certain distributions.*

In Q2 2025, *gains (losses) on equity investments, net* were primarily driven by *unrealized gains (losses) on non-marketable equity investments* which included $469 million of upward observable price adjustments, of which $396 million related to a single investee. In YTD 2025, *gains (losses) on equity investments, net* were driven by upward observable price adjustments and *realized gains on sales of equity investments, net*, partially offset by *unrealized losses on marketable equity investments* and *impairment charges*.

In Q2 2024, *gains (losses) on equity investments, net* were primarily driven by unrealized losses on our marketable equity investment in Astera Labs, Inc. In YTD 2024, *gains (losses) on equity investments, net* includes higher *realized gains on sales of equity investments, net* and a $336 million initial fair value adjustment upon Astera Labs, Inc. shares becoming marketable within *unrealized gains (losses) on marketable equity investments*, which were partially offset by other mark-to-market losses, as well as *impairment charges*.

In Q2 2025, *interest and other, net* decreased to a net expense primarily driven by unfavorable foreign currency movements and a decrease in interest income.

In YTD 2025, *interest and other, net* decreased to a net expense primarily driven by a $94 million charge related to the sale of our NAND memory business (refer to "Note 9: Divestitures" within Notes to Consolidated Condensed Financial Statements), unfavorable foreign currency movements, and a decrease in interest income.

## Provision for (Benefit from) Taxes

| ($ In Millions) | Three Months Ended Jun 28, 2025 | Three Months Ended Jun 29, 2024 | Six Months Ended Jun 28, 2025 | Six Months Ended Jun 29, 2024 |
|---|---|---|---|---|
| Income (loss) before taxes | $ (2,769) | $ (2,004) | $ (3,355) | $ (2,723) |
| Provision for (benefit from) taxes | $ 255 | $ (350) | $ 556 | $ (632) |
| Effective tax rate | (9.2)% | 17.5 % | (16.6)% | 23.2 % |

In Q2 2025 and YTD 2025, our provision for income taxes was determined using our estimated annual effective tax rate, applied to our year-to-date ordinary income (loss) before taxes, adjusted for discrete items. We were also not able to benefit our Q2 2025 and YTD 2025 losses before taxes due to the domestic valuation allowance established in Q3 2024.

In Q2 2024 and YTD 2024, due to our inability to reliably forecast our annual income, our benefit from income taxes was determined using a three and six month actual annual effective tax rate, respectively, adjusted for discrete items.

On July 4, 2025, the One Big Beautiful Bill Act ("the Act") was signed into law. The Act makes permanent key elements of the Tax Cuts and Jobs Act, including 100% bonus depreciation, domestic research cost expensing, increases the Advanced Manufacturing Investment Credit to 35 percent from 25 percent, and makes modifications to the international tax framework. We are currently evaluating the impact of the Act upon our future effective tax rate, tax liabilities, and cash taxes.

## Liquidity and Capital Resources

We consider the following when assessing our liquidity and capital resources:

| (In Millions) | Jun 28, 2025 | Dec 28, 2024 |
|---|---|---|
| Cash and cash equivalents | $ 9,643 | $ 8,249 |
| Short-term investments | 11,563 | 13,813 |
| **Total cash and short-term investments** | **$ 21,206** | **$ 22,062** |
| **Total debt** | **$ 50,757** | **$ 50,011** |

We believe we have sufficient sources of funding to meet our business requirements for the next 12 months and in the longer term. Cash generated by operations, and *total cash and short-term investments* as shown in the preceding table, are our primary sources of liquidity for funding our strategic business requirements. These sources are further supplemented by our committed credit facilities and other borrowing capacity and certain other Smart Capital initiatives that we have undertaken. Our short-term funding requirements include capital expenditures for worldwide manufacturing and assembly and test, including investments in our process technology roadmap; investments in our product roadmap; working capital requirements including cash outlays associated with the 2025 Restructuring Plan; partner distributions to our non-controlling interest holders; and strategic investments. Our long-term funding requirements incrementally contemplate investments in manufacturing expansion plans and investments to advance our process technology. These plans include expanding existing operations in Arizona, New Mexico, and Oregon, investing in a new leading-edge manufacturing facility in Ohio, and may also include longer-term projects.

In November 2024, we signed a Direct Funding Agreement with the US Department of Commerce for the award of $7.9 billion in government incentives pursuant to the CHIPS Act, from which we have received $2.2 billion of cash to date, $1.1 billion of which was received in Q1 2025. We expect to continue to benefit from government incentives, though recent US government actions create uncertainty as to whether the US government will fulfill its obligation under our CHIPS Act agreements, and support future awards in the US. These government incentives typically require that we make significant capital investments in new facilities or expand existing facilities, and our related workforce, prior to submitting a claim for reimbursement. As of the end of Q2 2025, we have submitted claims for $850 million pursuant to our Direct Funding Agreement for which we have not received reimbursement. To the extent we delay or cancel capital investments or otherwise are unable or fail to comply with the terms of the agreements, there may be a delay in our receipt of, or we may forfeit or be required to repay, the associated government incentives.

In Q1 2025, we closed the second phase of our NAND memory business divestiture and received $1.9 billion of cash proceeds, net of certain adjustments. See "Note 9: Divestitures" within Notes to Consolidated Condensed Financial Statements for further information.

In Q2 2025, we signed a transaction agreement with SLP VII Gryphon Aggregator, L.P., an affiliate of Silver Lake Partners, to sell 51% of all issued and outstanding common stock of Altera, a wholly owned subsidiary, which is expected to result in receipt of net cash proceeds of $4.4 billion at closing, which is expected to occur in the second half of 2025, with an additional $1.0 billion of the purchase price deferred and payable in two equal $500 million installments no later than December 31, 2026 and December 31, 2027. See "Note 9: Divestitures" within Notes to Consolidated Condensed Financial Statements for further information.

In July 2025, we received net proceeds of $922 million from the net sale of 57.5 million of our Mobileye Class A shares. See "Note 3: Non-Controlling Interests" within Notes to Consolidated Condensed Financial Statements.

Our total cash and short-term investments and related cash flows may be affected by certain discretionary actions we may take with customers and suppliers to accelerate or delay certain cash receipts or payments to manage liquidity, among other factors, for our strategic business requirements. These actions can include, among others, negotiating with suppliers to optimize our payment terms and conditions, adjusting the amounts and timing of cash flows associated with customer sales programs and collections, managing inventory levels and purchasing practices, and selling certain of our accounts receivables on a non-recourse basis to third-party financial institutions. While such actions have benefited, and may further benefit, cash flow in the near term, we may experience a corresponding detriment to cash flow in future periods as these actions cease or as the impacts of these actions reverse or normalize.

In Q1 2025, we amended our 364-day $8.0 billion credit facility agreement to $5.0 billion and the maturity date was extended by one year to January 2026. Additionally, we have access to our $7.0 billion revolving credit facility, which remains available until February 2029. We have other potential sources of liquidity including our commercial paper program and our automatic shelf registration statement on file with the SEC, pursuant to which we may offer an unspecified amount of debt, equity, and other securities. Under our commercial paper program, we have an ongoing authorization from our Board of Directors to borrow up to $10.0 billion. As of June 28, 2025, we had $2.0 billion of commercial paper obligations outstanding and no outstanding borrowings on the revolving credit facilities. See "Note 10: Borrowings" within Notes to Consolidated Condensed Financial Statements for further information. As part of our ongoing capital management strategy to optimize our debt portfolio and reduce interest expense, we may utilize make-whole provisions, tender offers or open market repurchases to repurchase our debt prior to maturity. In YTD 2025 and YTD 2024, we did not extinguish any debt prior to maturity.

We maintain a diverse investment portfolio that we continually analyze based on issuer, industry, and country. Substantially all of our investments in debt instruments were in investment-grade securities.

Cash flows from operating, investing, and financing activities were as follows:

| (In Millions) | Six Months Ended Jun 28, 2025 | Six Months Ended Jun 29, 2024 |
|---|---|---|
| Net cash provided by (used for) operating activities | $ 2,863 | $ 1,069 |
| Net cash provided by (used for) investing activities | (2,005) | (11,728) |
| Net cash provided by (used for) financing activities | 586 | 14,867 |
| **Net increase (decrease) in cash and cash equivalents** | **$ 1,444** | **$ 4,208** |

### Operating Activities

Operating cash flows consist of net income (loss) adjusted for certain non-cash items and changes in certain assets and liabilities.

Cash provided by operations in the first six months of 2025 was higher compared to the first six months of 2024 primarily due to more favorable changes in working capital. In addition, we incurred higher favorable operating cash flow adjustments for non-cash items that impacted our higher net loss in the first six months of 2025 compared to the first six months of 2024.

### Investing Activities

Investing cash flows consist primarily of capital expenditures; investment purchases, sales, maturities, and disposals; proceeds from divestitures; and proceeds from capital-related government incentives.

Cash used for investing activities in the first six months of 2025 was lower compared to the first six months of 2024 primarily due to lower purchases of short-term investments, lower capital expenditures, proceeds from the divestiture of our NAND memory business, and other cash-favorable investing activity in the first six months of 2025. These cash-favorable movements were partially offset by lower maturities and sales of short-term investments in the first six months of 2025 compared to the first six months of 2024.

### Financing Activities

Financing cash flows consist primarily of proceeds from strategic initiatives including partner contributions and equity-related issuances, issuance and repayment of short-term and long-term debt, and financing for capital expenditures with extended payment terms.

Cash provided by financing activities in the first six months of 2025 was lower compared to the first six months of 2024 primarily due to lower partner contributions, a net cash decrease in debt-related proceeds, and higher capital expenditures with extended payment terms. These unfavorable cash movements were partially offset by the cash favorable impacts of lower debt-related repayments and no dividend payments in the first six months of 2025 compared to the first six months of 2024.

## Critical Accounting Estimates

Our consolidated financial statements are prepared in accordance with US GAAP, which requires us to make certain estimates, judgments and assumptions that can affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosures. Critical accounting estimates are those estimates that involve a significant level of estimation uncertainty and have had, or are reasonably likely to have, a material impact on our financial condition or results of operations. We believe that the estimates, judgments and assumptions upon which we rely are reasonable based upon information available to us at the time such estimates, judgments and assumptions are made. To the extent that there are differences between these estimates, judgments or assumptions and actual results, our financial statements could be affected. We have critical accounting estimates in the areas of inventories, property, plant and equipment, goodwill, and loss contingencies. The discussion provided below supplements the significant accounting policies disclosures provided within "Note 2: Accounting Policies" of Notes to Consolidated Financial Statements included in our Annual Report on Form 10-K for the fiscal year ended December 28, 2024.

▪ Inventories— inventory is valued at the lower of cost or net realizable value and includes assumptions about future demand and market conditions. The valuation of inventory requires us to estimate obsolete and excess inventory, as well as inventory that is not of saleable quality. We use a demand forecast to develop our short-term manufacturing plans to enable consistency between inventory valuations and build decisions. Significant assumptions and estimates, which evolve each forecast cycle, that are utilized in our demand forecast and obsolete and excess inventory reserves process include:

- customer and product-related factors, including a review of our customer base, the stage of the product life cycle, including limitations to demand forecasting for new products with minimal historical data, variations in market pricing, and an assessment of selling price in relation to product cost;
- market and economic factors, including cyclical changes in market conditions, the introduction of new or alternative products in the marketplace, and the associated pricing environment; and
- other factors, including tariff and export controls.

Each reporting period, we compare our demand forecast estimate to work-in-process and finished goods inventory levels to determine the amount, if any, of obsolete or excess inventory, which would be reflected in cost of sales and result in a negative impact to our gross profit in that period. If our assumptions and estimates for our demand forecast materially fluctuate and we fail to adjust manufacturing output accordingly or such assumptions and estimates are materially inaccurate, the related obsolete and excess inventory reserves can be materially impacted and result in reduced inventory values for products that we estimate have substantial sales risk. Our estimates for obsolete and excess inventory reserves were materially consistent with actual results in the first half of 2025, in 2024 and in 2023; however, our assumptions and estimates are inherently uncertain, and our gross profit would be adversely affected if future demand is less favorable than forecasted.

- Property, plant and equipment—at least annually, we evaluate the period over which we expect to recover the economic value of our property, plant, and equipment, considering factors such as the process technology cadence between node transitions, changes in machinery and equipment technology, and re-use of machinery and tools across each generation of process technology. As we make manufacturing process conversions and other factory planning decisions, we use assumptions involving the use of management judgments regarding the remaining useful lives of assets, primarily process-specific semiconductor manufacturing tools and building improvements. When we determine that the useful lives of assets are shorter or longer than we had originally estimated, we adjust the rate of depreciation to reflect the assets' revised useful lives. In the second quarter of 2025 and in 2024, we evaluated our current process technology node capacities relative to projected market demand for our products and services, and concluded that our manufacturing asset portfolio exceeded manufacturing capacity requirements, which resulted in us shortening the useful lives of certain placed-in-service equipment and recording accelerated depreciation charges of $337 million and $992 million, respectively. In 2023, we determined that the estimated useful lives of certain production-related machinery and equipment should be increased from 5 to 8 years and, when compared to the estimated useful life in place as of the end of 2022, we estimated this change increased gross profit in 2023 by approximately $2.5 billion and decreased R&D expense by approximately $400 million and decreased ending inventory values by approximately $1.3 billion.

Our property, plant and equipment are subject to periodic impairment reviews. Factors that we consider in deciding when to perform an impairment review include significant changes or planned changes in our use and fungibility of certain property, plant and equipment, significant under-performance of a business or product line in relation to expectations for which property, plant and equipment relate, and significant negative industry or economic trends. To perform an impairment review, our property, plant and equipment are grouped and evaluated for impairment at the lowest level of identifiable cash flows, which requires management judgment to form asset groupings and to estimate expected cash flows that are attributable to asset groupings, among other factors. If an indicator of impairment is identified at the asset grouping level, we measure the recoverability of the assets by comparing the carrying value of the asset grouping to our estimate of the related total future undiscounted net cash flows arising from the use of that asset grouping. If an asset grouping carrying value is not determined to be recoverable through this undiscounted cash flows analysis, the asset grouping is considered to be impaired. The resulting charge is classified to expense, which is typically to cost of sales in a similar manner as the corresponding depreciation expense and results in a negative impact to our gross profit in that period. In the second quarter of 2025 and in 2024, we determined certain property and equipment, which had not yet been placed in service, exceeded our projected capacity requirements and incurred non-cash charges of $460 million and $2.3 billion, respectively.

- Goodwill—We perform an annual impairment assessment of goodwill at the reporting unit level in the fourth quarter of each year, or more frequently if indicators of potential impairment exist. We have eight reporting units with allocated goodwill, which generally align to our operating segments. We reevaluate our identified reporting units annually or when triggered, such as upon reorganization of our operating segments or due to business reasons that result in material changes as to how our reporting units are organized and managed. Impairment assessments may be qualitative or quantitative in nature. A quantitative assessment is required if we determine, based on a qualitative assessment, that it is more likely than not that a reporting unit’s fair value is less than its carrying value, or if there are material changes to the structure of our reporting units. The reporting unit's carrying value used in an impairment assessment represents the allocation of various assets and liabilities, excluding certain corporate assets and liabilities, such as cash, investments, and debt. While a substantial majority of our allocable assets, primarily property, plant and equipment, are attributable to our Intel Foundry reporting unit, that reporting unit has no remaining allocated goodwill.

Our qualitative assessment considers industry and market considerations, overall financial performance, and other relevant events and factors affecting our reporting units or Intel as a whole. More specifically, qualitative factors may include a sustained decrease in our consolidated market capitalization or one of our reporting units’ market capitalization relative to each’s respective net book value; significant company specific actions, including changes to the structure of our reporting units; and current, historical or projected deterioration of our financial performance. We may also perform a quantitative analysis to support the qualitative factors by applying sensitivities to assumptions and inputs used in measuring a reporting unit's fair value.

Our quantitative impairment assessment considers both the income approach and the market approach to estimate a reporting unit's fair value. The income approach estimates fair value using discounted future cash flows for a reporting unit primarily using the following major assumptions and inputs: revenue, based on assumed market segment growth rates and our assumed market segment share; estimated costs; and appropriate discount rates based on a reporting unit's weighted average cost of capital. Our quantitative impairment assessment is sensitive to changes in underlying estimates and assumptions, the most sensitive of which is the discount rate. The major inputs and assumptions used in estimating discounted cash flows are derived from historical data, various internal estimates, and a variety of external sources, which are similar to those used in our business planning and forecasting processes. We test the reasonableness of the inputs and outcomes of our discounted cash flow analysis against available market data. Our estimates

and assumptions are inherently uncertain and change over time based on operating results, market conditions, and other factors and could materially affect the determination of the fair value and potential goodwill impairment for each reporting unit.

The market approach estimates fair value using financial multiples and transaction prices of comparable companies.

To corroborate our fair value conclusions, we combine the estimated fair values for all reporting units and perform a market capitalization reconciliation as of the goodwill assessment date to validate the reasonableness of the implied control premium.

In the fourth quarter of 2024, as a part of our annual goodwill impairment assessment, we determined that the estimated fair value of each reporting unit substantially exceeded the assigned carrying value, with the exception of one reporting unit with a significant amount of assigned goodwill: Mobileye. In the third quarter of 2024, we recognized a non-cash goodwill impairment charge of $2.8 billion, substantially all of which related to our Mobileye reporting unit, as the estimated fair value of the reporting unit was lower than the assigned carrying value. As of June 28, 2025, our Mobileye reporting unit had $8.2 billion in recorded goodwill. Mobileye's market capitalization has increased substantially since the third quarter of 2024 and, while no additional impairment was recognized within the first half of 2025, we continue to closely monitor the Mobileye reporting unit's financial performance, business forecasts, and market capitalization. As of June 28, 2025, the estimated fair value of the Mobileye reporting unit substantially exceeded the carrying value. Should our estimates change based on Mobileye's operating results, market conditions, or other factors in our forecast, including changes in the discount rate, the Mobileye reporting unit may become subject to further impairment in future periods. For example, a 1% increase in the discount rate would have resulted in an additional impairment of our Mobileye reporting unit's goodwill of approximately $1.5 billion in the third quarter of 2024.

- Loss contingencies—we are subject to loss contingencies, including various legal and regulatory proceedings, asserted and potential claims, liabilities related to repair or replacement of parts in connection with product defects, as well as product warranties that arise in the ordinary course of business and are subject to change, including due to sudden or rapid developments in proceedings or claims. An estimated loss from such contingencies is recognized as a charge to income if it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. We evaluate developments that could affect prior disclosures or previously accrued liabilities, and make adjustments as appropriate. Significant judgment is required to determine both the likelihood of there being, and the estimated amount of, a loss related to such matters. Certain factors have resulted in significant changes to our judgments and estimates that we made regarding these matters in previous quarters based on updated information that became available. If one or more of these matters were resolved against us for amounts in excess of management's estimates of losses, our results of operations and financial condition could be materially adversely affected.

# Risk Factors and Other Key Information

## Risk Factors

The risks described in "Risk Factors" within Risk Factors and Other Key Information in our 2024 Form 10-K and in our Q1 2025 Form 10-Q could materially and adversely affect our business, financial condition, and results of operations, and the trading price of our common stock could decline. These risk factors do not identify all risks that we face—our operations could also be affected by factors that are not presently known to us or that we currently consider to be immaterial to our operations. Due to risks and uncertainties, known and unknown, our past financial results may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods. In addition to the other information set forth in this Form 10-Q, including in the Forward-Looking Statements, MD&A, and the Consolidated Condensed Financial Statements and Supplemental Details sections, we have provided an additional risk factor below regarding uncertainties surrounding our pursuit of next generation leading-edge process technologies and the impact they could have on our financial results.

**If we are unable to secure a significant external foundry customer for Intel 14A, our next generation semiconductor manufacturing process technology, we may pause or discontinue our pursuit of next generation leading-edge process technologies, which may have significant strategic business, financial, operational and reputational risks and repercussions.**

As an integrated design manufacturer (IDM) with a products business that depends on access to leading-edge semiconductor manufacturing process technologies, or nodes, to produce competitive products, we have historically invested significant capital resources to continually develop new generations of leading-edge nodes and foundry capacity to produce such nodes. However, the design, development, and manufacturing of leading-edge nodes is risky and capital-intensive, and it takes years for capital investments to yield a return. If we are unable to secure a significant external customer for our Intel 14A node, we may pause or discontinue development of Intel 14A and subsequent next generation leading-edge nodes. While we remain focused on continued development of Intel 14A and securing such a significant external customer, we have taken steps to reduce our overall investment and have further slowed down the construction of the new leading-edge fabrication facilities we are building in Ohio. In addition, while we continue to evaluate Intel 14A for use in future Intel products and our plan includes an initial product designed to utilize Intel 14A, at present we are maintaining the option to design future Intel products requiring nodes with performance beyond Intel 18A and Intel 18A-P to be produced internally or by an external foundry. We have been unsuccessful to date in securing any significant external foundry customers for any of our nodes and our prospects for securing a significant external foundry customer for Intel 14A are uncertain.

If we were to pause or discontinue the design, development, and manufacturing of Intel 14A and other next generation leading-edge nodes, we would be subject to a number of significant strategic business, financial, operational and reputational risks and repercussions including, but not limited to:

- *Dependence on Third-Party Foundries:* Our products business would, over time, become dependent on third-party foundries, particularly TSMC, as we develop products for nodes beyond Intel 18A and Intel 18A-P. We have no long-term contract with TSMC, and if we are unable to secure and maintain sufficient capacity on favorable pricing terms, we may be unable to manufacture our products in sufficient volume and at a cost that supports the continued success of our products business. Further, most of our competitors have longer and more established relationships with TSMC and other third-party foundries than we do, which may put us at a competitive disadvantage. There are few foundries capable of producing the leading-edge and near-leading-edge nodes needed for our products – currently only TSMC and Samsung. To the extent our competitors are more successful than us in securing capacity with those foundries than we are, our product roadmap, market position, and customer relationships would be materially adversely impacted.
- *Losses with respect to our Investments in R&D and Manufacturing Facilities and Equipment*: We had over $100 billion of property, plant, and equipment, net on our balance sheet as of June 28, 2025, the substantial majority of which we estimate relate to our foundry business. While the significant majority of this relates to our existing and in-development nodes, including Intel 18A and Intel 18A-P, with each transition to a new node we continue to utilize some R&D and manufacturing assets from prior nodes. If we were to pause or discontinue the design, development, and manufacturing of Intel 14A and other next generation leading-edge nodes, we would expect to incur significant material impairments with respect to foundry assets that may impact our results of operations. For example, we would likely discontinue the new leading-edge fabrication facilities we are building in Ohio. We also would expect to incur additional costs and expenses as we wind down other projects and facilities and reduce headcount.
- *Loss of Eligibility for Government Incentives*: In November 2024, we signed a Direct Funding Agreement with the US Department of Commerce for the award of $7.9 billion in government incentives. We have also entered into other government incentive arrangements with local, regional, and national governments, both US and non-US. If we were to pause or discontinue the design, development, and manufacturing of Intel 14A, we may lose eligibility for various incentives contemplated by these arrangements, and we may be required to repay amounts already received under these arrangements.
- *Potential Penalty Payments Under our SCIP Agreements*: To support our capital investments in recent years, we pursued alternative financing arrangements including our 2022 joint investment with Brookfield in the manufacturing expansion of our Arizona campus and our 2024 joint investment with Apollo related to Fab 34 in Ireland. Our potential pause or discontinuation of the design, development, and manufacture of Intel 14A may accelerate our move to third-party foundry services for our

products and result in our inability to satisfy construction and/or wafer demand and purchase commitments in those arrangements, potentially requiring substantial additional payments to our SCIP partners.

- *Loss of Talent*: Historically, as one of the only companies in the world, and the only company in the U.S., pursuing the design, development and manufacturing of next generation leading-edge nodes, we have benefitted from being in a unique position as an employer to hire and retain scientists, engineers, and other technical talent interested in being on the cutting edge of semiconductor innovation. If we were to pause or discontinue leading-edge node design, development, and manufacturing, or any perception that we may do so in the future, may materially adversely impact our ability to hire and retain key talent across our foundry organization and the company more broadly, and we risk substantial loss of historical, technical, and other expertise.
- *Limited External Foundry Potential*: We have been unsuccessful to date in attracting significant customers to our external foundry business. If we were to pause or discontinue our pursuit of Intel 14A and successor nodes, it is highly uncertain whether we would be able to develop this business. Among other things, our existing nodes (Intel 7, Intel 4 and Intel 3) were designed for Intel products, and if potential customers for our upcoming Intel 18A-P node believe we are no longer committed to continued development of next generation leading-edge nodes (Intel 14A and beyond), they may be inclined to remain with their current foundry partners and unwilling to make the significant investments of time and resources needed to develop products on our nodes.
- *Other Significant Financial, Operational, and Reputational Risks*: If we pause or discontinue the design, development and manufacture of Intel 14A and future leading-edge nodes, it may give rise to additional material risks that we are not able to foresee or that are more significant than we anticipate, including, but not limited to, adverse impacts to our relationships and the terms of our engagements with customers, suppliers, and strategic partners, potential credit rating risk, and diminished investor confidence and increased stock price volatility. It is also uncertain what actions, if any, may be taken by the U.S. and other governments to the extent they view a potential discontinuation of our leading-edge process technology design, development, and manufacturing as a strategic risk from a national economic or defense perspective.

Any of the foregoing could have a material adverse impact on our revenue, operations, financial position, cash flows, access to financing, cost structure, competitiveness, reputation, profitability, and prospects and could exacerbate other risks discussed in our 2024 Form 10-K and Q1 2025 Form 10-Q. Further, given the decades of significant continuous investments in R&D, talent accumulation, intellectual property, state-of-the-art facilities, and technical know-how needed to compete in leading-edge node design, development and manufacturing, any decision to pause or discontinue our pursuit of Intel 14A and successor leading-edge process technologies may be effectively irreversible.

# Quantitative and Qualitative Disclosures About Market Risk

We are affected by changes in currency exchange and interest rates, as well as equity and commodity prices. Our risk management programs are designed to reduce, but may not entirely eliminate, the impacts of these risks. We performed an evaluation of these risks to our financial positions as of December 28, 2024, and updated that analysis as of June 28, 2025, to determine whether material changes in market risks pertaining to currency and interest rates or equity and commodity prices have occurred as a result of the changes in international trade policies, including tariffs and export controls. No material revisions were noted since disclosing "Quantitative and Qualitative Disclosures About Market Risk" within MD&A, in our 2024 Form 10-K. Risks related to changes in international trade policies, including tariffs and export controls, particularly those involving the United States and China are described under "Risk Factors" within Risk Factors and Other Key Information in our 2024 Form 10-K and in our Q1 2025 Form 10-Q.

# Controls and Procedures

## Inherent Limitations on Effectiveness of Controls

Our management, including the principal executive officer and principal financial officer, does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent or detect all errors and all fraud. A control system, no matter how well-designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. The design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, have been detected.

## Evaluation of Disclosure Controls and Procedures

Based on management's evaluation (with the participation of our principal executive officer and principal financial officer), as of the end of the period covered by this report, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)), were effective to provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

## Changes in Internal Control Over Financial Reporting

There were no changes to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the quarter ended June 28, 2025 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Issuer Purchases of Equity Securities

We have an ongoing authorization, originally approved by our Board of Directors in 2005 and subsequently amended, to repurchase shares of our common stock in open market or negotiated transactions. No shares were repurchased during the quarter ending June 28, 2025. As of June 28, 2025, we were authorized to repurchase up to $110.0 billion, of which $7.2 billion remained available.

We issue RSUs as part of our equity incentive plans. In our Consolidated Condensed Financial Statements, we treat shares of common stock withheld for tax purposes on behalf of our employees in connection with the vesting of RSUs as common stock repurchases because they reduce the number of shares that would have been issued upon vesting. These withheld shares of common stock are not considered common stock repurchases under our authorized common stock repurchase program.

## Rule 10b5-1 Trading Arrangements

Our directors and officers (as defined in Rule 16a-1 under the Exchange Act) may from time to time enter into plans or other arrangements for the purchase or sale of our shares that are intended to satisfy the affirmative defense conditions of Rule 10b5–1(c) or may represent a non-Rule 10b5-1 trading arrangement under the Exchange Act. During the quarter ended June 28, 2025, no such plans or arrangements were adopted or terminated, including by modification.

## Disclosure Pursuant to Section 13(r) of the Securities Exchange Act of 1934

Section 13(r) of the Exchange Act requires an issuer to disclose certain information in its periodic reports if it or any of its affiliates knowingly engaged in certain activities, transactions, or dealings with individuals or entities subject to specific US economic sanctions during the reporting period, even when the activities, transactions, or dealings are conducted in compliance with applicable law. On March 2, 2021, the US Secretary of State designated the Federal Security Service of the Russian Federation (FSB) as a party subject to one such sanction. Though Intel has suspended sales in Russia, there may be a need to file documents or engage with FSB as Intel winds up our local Russian offices. All such dealings are explicitly authorized by General License 1B issued by the US Department of the Treasury's Office of Foreign Assets Control (OFAC), and there are no gross revenues or net profits directly associated with any such dealings by us with the FSB.

On April 15, 2021, the US Department of the Treasury designated Pozitiv Teknolodzhiz, AO (Positive Technologies), a Russian IT security firm, as a party subject to one of the sanctions specified in Section 13(r). Prior to the designation, we communicated with Positive Technologies regarding its IT security research and coordinated disclosure of security vulnerabilities identified by the firm. Based on a license issued by OFAC, we resumed such communications. There are no gross revenues or net profits directly associated with any such activities. We plan to continue these communications in accordance with the terms and conditions of the OFAC license.

## Amendment and Restatement of 2006 Equity Incentive Plan

As previously disclosed in our Form 8-K dated May 9, 2025, the Company's stockholders approved an amendment and restatement of the Company's 2006 Equity Incentive Plan (the "EIP") at the 2025 Annual Stockholders' Meeting held on May 6, 2025 (the "Annual Meeting"). The amended and restated EIP became effective upon stockholder approval and, among other changes, extended the term of the plan for an additional one year and increased by 150 million the number of shares available under the EIP, as described under Proposal 4 of the Company's definitive proxy statement filed on Schedule 14A with the Securities and Exchange Commission on March 27, 2025.

# Exhibits

| | | Incorporated by Reference | | | | |
|---|---|---|---|---|---|---|
| Exhibit Number | Exhibit Description | Form | File Number | Exhibit | Filing Date | Filed or Furnished Herewith |
| 3.1 | Corrected Third Restated Certificate of Incorporation of Intel Corporation, dated October 23, 2023 | 10-Q | 000-06217 | 3.1 | 10/27/2023 | |
| 3.2 | Intel Corporation Bylaws, as amended and restated on November 29, 2023 | 8-K | 000-06217 | 3.2 | 12/5/2023 | |
| 10.1 | Transaction Agreement, dated April 14, 2025, by and among Intel Corporation, Intel Americas, Inc., Altera Corporation, and SLP VII Gryphon Aggregator, L.P. | | | | | X |
| 10.2 | Form of Limited Partnership Agreement to be entered into by and among Intel Corporation, Intel Americas, Inc., Altera Corporation, and SLP VII Gryphon Aggregator, L.P. | | | | | X |
| 10.3† | Intel Corporation 2006 Equity Incentive Plan as Amended and Restated Effective May 6, 2025 | | | | | X |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) of the Exchange Act | | | | | X |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) of the Exchange Act | | | | | X |
| 32.1 | Certification of the Chief Executive Officer and the Chief Financial Officer pursuant to Rule 13a-14(b) of the Exchange Act and 18 U.S.C. Section 1350 | | | | | X |
| 101 | Inline XBRL Document Set for the consolidated condensed financial statements and accompanying notes in Consolidated Condensed Financial Statements and Supplemental Details | | | | | X |
| 104 | Cover Page Interactive Data File - formatted in Inline XBRL and included as Exhibit 101 | | | | | X |

† *Management contracts or compensation plans or arrangements in which directors or executive officers are eligible to participate.*

# Form 10-Q Cross-Reference Index


| Item Number | Item | |
|---|---|---|
| **Part I - Financial Information** | | |
| **Item 1.** | **Financial Statements** | Pages 3 - 24 |
| **Item 2.** | **Management's Discussion and Analysis of Financial Condition and Results of Operations** | |
| | Liquidity and capital resources | Pages 37 - 40 |
| | Results of operations | Pages 26 - 36 |
| | Critical accounting estimates | Page 26, 38 |
| **Item 3.** | **Quantitative and Qualitative Disclosures About Market Risk** | Page 42 |
| **Item 4.** | **Controls and Procedures** | Page 42 |
| **Part II - Other Information** | | |
| **Item 1.** | **Legal Proceedings** | Pages 21 - 24 |
| **Item 1A.** | **Risk Factors** | Page 41 |
| **Item 2.** | **Unregistered Sales of Equity Securities and Use of Proceeds** | Page 43 |
| **Item 3.** | **Defaults Upon Senior Securities** | Not applicable |
| **Item 4.** | **Mine Safety Disclosures** | Not applicable |
| **Item 5.** | **Other Information** | |
| | Rule 10b5-1 Trading Arrangements | Page 43 |
| | Disclosure Pursuant to Section 13(r) of the Securities Exchange Act of 1934 | Page 43 |
| | Amendment and Restatement of 2006 Equity Incentive Plan | Page 43 |
| **Item 6.** | **Exhibits** | Page 44 |
| **Signatures** | | Page 46 |

## Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INTEL CORPORATION
(Registrant)

| | | | |
|---|---|---|---|
| Date: | July 24, 2025 | By: | /s/ DAVID ZINSNER<br>David Zinsner<br>Executive Vice President, Chief Financial Officer, and Principal Financial Officer |
| Date: | July 24, 2025 | By: | /s/ SCOTT GAWEL<br>Scott Gawel<br>Corporate Vice President, Chief Accounting Officer, and Principal Accounting Officer |

# EXHIBIT 7

THE HILL

Live: Trump Dover Trending: Trump-Ossoff Sen. Mark Kelly Pete Hegseth Sponsored: Conter

LIVE: Trump attends dignified transfer ceremony of soldiers killed amid Iran war

SENATE

# GOP author of CHIPS Act says law did not intend government stake in Intel

BY ALEXANDER BOLTON - 08/26/25 3:43 PM ET




Listen to audio version of this article

Instaread

Advertisement

THE HILL

Sen. Todd Young (Ind.), the Republican senator who drafted the legislation that became the foundation of the CHIPS and Science Act, said the law was never intended to let the federal government take a major stake in Intel or any other major company.

"For those of us who voted for the legislation, I don't know of anyone who thought this was allowed under the law," he said when asked about President Trump's deal to take a 10 percent stake in Intel in exchange for the roughly $11 billion in federal subsidies the company has received.

The legislation provided federal subsidies to domestic semiconductor manufacturers, part of a push to protect the domestic industry.

Trump has argued it is right for the government to get a stake in Intel given the subsidies that were provided to business through the legislation.

But Young said those voting for the bill would not have anticipated the government taking stakes in companies.

"There are clear concerns about precedent here and also concerns about what is allowed under the law. The intent was not for this to happen under the law," Young said, noting he played a central role in drafting the legislation.

The Indiana senator said he will take up the administration's offer to more fully explain its rationale.

"The administration's made themselves available to explain their thinking to me on this matter and I look forward to taking them up on it," he said.

Young said he's glad Trump has signaled he's interested in ensuring Intel's success as one of the United States's biggest domestic semiconductor manufacturing, citing the national security stakes in the company's future.

"I am glad that the administration is focused on Intel's success because we do need manufacturing capacity for our war fighters and for our broader economic security and I share that objective," he said.

Asked about criticisms from fellow Republicans that giving the federal government a stake in the company might end up hurting its competitiveness in the marketplace, Young responded: "It remains to be seen."

as Sen. Rand Paul (R-Ky.) that it's a "step toward socialism."

Lutnick argued in an interview with Fox News's "The Ingraham Angle" that it's "fair and smart" to give American taxpayers "equity" in Intel in return for billions of dollars in investment.

"Come on, let's take care of the American taxpayer," he said. "That is not socialism. I will tell you what that is. That's the best businessman in the United States of America in the Oval Office doing fair things for us."

Kevin Hassett, the director of the National Economic Council, explained in a CNBC interview Monday that the federal government would receive non-voting shares of the company and would not dictate business decisions.

"The equity is not voting so there's not going to be government intrusion into the business of Intel. It's more like a down-payment on a sovereign wealth fund, which many, many countries have," he told CNBC's "Squawk Box."

Some prominent Republicans have balked at the federal government taking a large stake in a major tech company.

Sen. Thom Tillis (R-N.C.) told journalist Major Garrett he feels "uncomfortable" about Trump's use of federal power to influence decision-making not just at Intel but at other major companies.

"I don't care if it's a dollar or a billion-dollar stake," Tillis said. "That starts feeling like a semi state-owned enterprise a la CCCP," referring to the acronym for the former Soviet Union.

Former vice president Mike Pence told Bloomberg he has "great concerns" about the U.S. government having "golden shares" in Nippon Steel or "taking a percent of Intel."

**ADD AS PREFERRED SOURCE ON GOOGLE**

**TAGS** HOWARD LUTNICK KEVIN HASSETT MAJOR GARRETT MIKE PENCE RAND PAUL THOM TILLIS TODD YOUNG

Copyright 2026 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

CONTENT CONTINUES BELOW SURVEY

## What Do You Think?

**Do you support or oppose the federal government taking a 10% stake in Intel in exchange for subsidies?**

- Support
- Oppose
- I'm not sure
- Other / No opinion

* By clicking "NEXT" I submit my answers and consent to the use of cookies for research and advertising purposes; I have read and agree to the CivicScience Privacy Policy and Terms of Service

NEXT *

# Conversation

FOLLOW

LOG IN | SIGN UP

Start the conversation

ALL COMMENTS

NEWEST

Start the conversation

ACTIVE CONVERSATIONS



5 takeaways from Hegseth, Caine hearing on…

96



Trump rivalry with Ossoff looms over visit to Georgia

35

Powered by viafoura

# EXHIBIT 8

SENATE

# Todd Young says Trump's federal Intel stake violates the CHIPS Act he wrote

By Ramsey Touchberry

Published August 26, 2025 4:41pm ET

Add Washington Examiner on Google

A Republican coauthor of the bipartisan law President Donald Trump used to authorize the federal government to acquire a 10% stake in tech giant Intel said Tuesday that the move violated the legislation's original intent.

Sen. Todd Young (R-IN) criticized Trump's use of the Biden-era Creating Helpful Incentives to Produce Semiconductors and Science Act, crafted in 2022 to boost U.S. semiconductor manufacturing, to take an equity stake in the chipmaker — worth nearly $9 billion — in exchange for unpaid federal CHIPS grants.


**RECOMMENDED STORIES**



**Fox News's favorite Democrat? Fetterman has appeared on the network 56 times this year**



**Democrats resist Trump's push to add Iran to bipartisan Russia sanctions bill**



**Fetterman says 'no evidence' of Trump administration's noncitizen voting allegations**


"The intent was not for this to happen under the law, as someone who drafted the legislation," Young told reporters at the U.S. Capitol.


Choose Your Plan

BEST OFFER!

Digital

# EXHIBIT 9

# AMENDED NOTICE OF FUNDING OPPORTUNITY (NOFO)

## CHIPS Incentives Program – Facilities for Semiconductor Materials and Manufacturing Equipment

## EXECUTIVE SUMMARY

- **Federal Agency Name:** National Institute of Standards and Technology (NIST), United States Department of Commerce

- **Funding Opportunity Title:** CHIPS Incentives Program – Facilities for Semiconductor Materials and Manufacturing Equipment

- **Announcement Type:** Amendment

- **Funding Opportunity Number**: 2023-NIST-CHIPS-SMME-01

- **Assistance Listing (CFDA Number):** 11.037 – CHIPS Incentives Program

- **Dates:**
    - This amendment re-opens and extends the period of acceptance of applications, which was originally open from December 1, 2023, through February 1, 2024, so that concept plans will now be accepted through November 1, 2026.
    - For applications that are invited to advance to the full application phase, the CHIPS Program Office will communicate full application submission dates to applicants individually upon notifying them of their advancement.

  The Department of Commerce may amend this NOFO at any time. It may also close the funding opportunity with at least 60 days' notice.

- **Application Submission Address:** https://applications.chips.gov

**Funding Opportunity Description:** The CHIPS Incentives Program aims to catalyze long-term economically sustainable growth in the domestic semiconductor industry in support of U.S. economic and national security. This is an amendment to the second Notice of Funding Opportunity under this program. It seeks applications for projects for the construction, expansion, or modernization of commercial facilities for semiconductor materials and manufacturing equipment.

**Table of Contents**


**I. Program Description ..... 3**

A. Program Objectives ..... 3

B. Program Summary ..... 4

C. Program Priorities ..... 8

**II. Federal Award Information ..... 11**

A. Funding Instrument ..... 11

B. Funding Availability ..... 12

C. Award Amount ..... 12

D. Period of Performance ..... 12

**III. Eligibility Information ..... 12**

A. Eligible Applicants ..... 12

**IV. Application and Submission Information ..... 13**

A. How to Access an Application Package ..... 13

B. Submission Dates and Times ..... 13

C. Confidential Information ..... 14

D. False Statements ..... 16

E. Application Requirements ..... 16

F. Requirements for Attachments Submitted through the CHIPS Incentives Program Application Portal ..... 16

G. Content and Form of Concept Plan ..... 16

H. Content and Form of Full Application Submission ..... 19

I. Funding Restrictions ..... 26

J. Prohibition on Profit and Fees. ..... 26

**V. Application Review Information ..... 27**

A. Concept Plan Evaluation Criteria ..... 27

B. Selection Factors ..... 28

C. Full Application Evaluation Criteria ..... 28

D. Review and Selection Process ..... 29

E. Responsibility / Qualification Records on SAM.gov ..... 31

F. Additional Information ..... 31

**VI. Federal Award Administration Information ..... 31**

A. Federal Awarding Agency Contacts ..... 32

**VII. Appendix ..... 32**

A. Definitions ..... 32

## FULL ANNOUNCEMENT TEXT

## I. Program Description

This Notice of Funding Opportunity (NOFO) seeks applications for the CHIPS Incentives Program, authorized by Title XCIX—Creating Helpful Incentives to Produce Semiconductors for America of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Pub. L. 116-283, referred to as the CHIPS Act or Act), as amended by the CHIPS Act of 2022 (Division A of Pub. L. 117-167). The CHIPS Incentives Program is administered by the CHIPS Program Office (CPO) within the National Institute of Standards and Technology (NIST) of the United States Department of Commerce (Department).

This NOFO seeks applications for CHIPS Incentives Awards that will support investments in the construction, expansion, or modernization of commercial facilities in the United States for semiconductor materials and semiconductor manufacturing equipment. Awards made pursuant to this NOFO will be in a form consistent with the CHIPS Act.

### A. Program Objectives

The CHIPS Incentives Program aims to strengthen U.S. economic and national security, including economic resilience and competitiveness. The CHIPS Act sets forth multiple dimensions of this overriding objective:

- Strengthening the security and resilience of the semiconductor supply chain, including by mitigating gaps and vulnerabilities
- Providing a supply of secure semiconductors relevant for national security
- Strengthening the leadership of the United States in semiconductor technology
- Growing the economy of the United States and supporting job creation in the United States
- Bolstering the semiconductor and skilled technical workforces in the United States
- Improving the resilience of the semiconductor supply chains of critical manufacturing industries[1]

For the CHIPS Incentives Program to be successful on these many dimensions, it must lay the groundwork for long-term growth and economic sustainability in the domestic semiconductor industry and promote the secure and resilient supply chains on which the sector relies. The industry must have a robust and skilled workforce and a diverse base of suppliers for semiconductor production. It must support research and development (R&D) that will drive innovation in design, materials, and processes that will accelerate the industries of the future. And it must support the broader U.S. economy, propelling American workers into high wage careers, upholding the dignity of hard work, and delivering the talent businesses need to power the nation's economic resurgence.

[1] *See* 15 U.S.C.§ 4652(d).

In addition, for the CHIPS Incentives Program to succeed, the Federal funds invested must serve as a catalyst to galvanize private, state, and local investment in the semiconductor industry. That is, the program funds are a supplement to, not a replacement for, other sources of capital.

The CHIPS Incentives Program seeks to fund applicants that demonstrate a commitment to investment in the United States for the long term and projects that maximize private sources of capital. Only private industry can marshal the resources necessary to make the sustaining investments needed in the decades that follow to maintain a resilient, economically viable, and growing U.S. semiconductor industry.

## B. Program Summary

The CHIPS Incentives Program is intended to fund a variety of projects to achieve its economic and national security objectives. Projects will vary in technology, scale, cost, location, risk, workforce needs, and other factors. To fund any project, the Department must determine that the project is in the economic and national security interests of the United States and satisfies the CHIPS Act's eligibility requirements, as well as the amount of funding appropriate for the investment.[2]

This NOFO describes considerations and procedures the Department will use to make these determinations. This section summarizes, in a question-and-answer format, certain eligibility and procedural requirements for applications under this NOFO.

### 1. What projects are eligible for funding under this NOFO?

This NOFO seeks applications for the construction, expansion, or modernization of commercial facilities in the United States in the following categories.

**Semiconductor Materials Facilities** for the manufacture or production, including growth or extraction, of materials used to manufacture semiconductors, which are the chemicals, gases, raw and intermediate materials, and other consumables used in semiconductor manufacturing.

**Semiconductor Manufacturing Equipment Facilities** for the physical production of specialized equipment integral to the manufacturing of semiconductors and subsystems that enable or are incorporated into the manufacturing equipment.

Note that the Department will not fund applications that lack sufficient scale to meaningfully contribute to the objectives outlined in this NOFO. The Department expects that projects with capital investments below $20 million are unlikely to meet this standard. If a sub-$20 million project does meet this standard, the Department generally expects other stakeholders—including chipmakers, larger suppliers, and state and local entities—to make the project viable without CHIPS funding.

[2] *See* 15 U.S.C. §§ 4652(a)(2)(C)(i)(I)-(II), 4652(a)(3)(A).

### 2. What are the eligibility requirements for funding under this NOFO?

The CHIPS Act imposes several eligibility requirements for funding.

First, funding is available only to "covered entities."[3] This term includes private entities or consortia of private and public entities with a demonstrated ability to substantially finance, construct, expand, or modernize a facility relating to fabrication, assembly, testing, advanced packaging, production, or research and development of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment.[4] Section III.A describes this requirement in more detail.

Second, funding is available to covered entities "to incentivize investment in facilities and equipment in the United States" for the production of materials used to manufacture semiconductors or semiconductor manufacturing equipment.[5] An applicant must demonstrate how the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the CHIPS Incentives.

Third, funding must be for the construction, expansion, or modernization of facilities of the kind described in Section I.B.1.[6] For the purposes of this NOFO, construction means the construction of a new facility. Expansion or modernization includes, for example, significantly enlarging an existing facility, increasing the capacity of an existing facility via a material capital investment, such as by adding a new production line, and upgrading an existing facility, such as converting a facility from another use. Both expansions and modernizations will be evaluated on the materiality of the investment relative to existing production. Projects that involve relocating a material amount of equipment, facilities, or production from one facility in the United States to another facility, new or expanded, are disfavored. Such projects will be deemed nonresponsive to this NOFO absent a compelling economic or national security justification.[7]

Fourth, the CHIPS Act specifies that the covered entity must have a documented interest in constructing, expanding, or modernizing an eligible facility.[8] With respect to such construction, expansion, or modernization, the CHIPS Act requires that the covered entity shall:

- Have been offered a covered incentive from a state or local jurisdiction (state or local incentive) where the project is located, for the purposes of attracting the construction, expansion, or modernization of the facility[9]

[3] *See* 15 U.S.C. § 4652(a)(1).
[4] *See* 15 U.S.C. § 4651(2).
[5] *See* 15 U.S.C. § 4652(a)(1).
[6] *See* 15 U.S.C. § 4652(a)(4)(A).
[7] 15 U.S.C. § 4652(a)(2)(C)(iv).
[8] 15 U.S.C. § 4652(a)(2)(B)(i).
[9] 15 U.S.C. § 4652(a)(2)(B)(ii)(I); 15 U.S.C. § 4651(3)(A).

- Make commitments to worker and community investment, including through training and education benefits paid by the covered entity and programs to expand employment opportunities for economically disadvantaged individuals[10]
- Secure commitments from regional educational and training entities and institutions of higher education to provide workforce training, including programming for training and job placement of economically disadvantaged individuals[11]
- Have an "executable plan," i.e., a plan reasonably capable of successful implementation, to sustain the facility without additional funding from the CHIPS Incentives Program[12]
- Have documented its workforce needs and produced a strategy to meet such workforce needs as well as the aforementioned commitments to worker and community investment[13]
- Have determined the types of semiconductor technology it will produce at the proposed facility, and the customers, or categories of customers, to whom the items will be sold,[14] and
- Have developed an "executable plan" to identify and mitigate relevant semiconductor supply chain security risks.[15]

The Department has designed this NOFO, including the application requirements and review process, to ensure that these statutory requirements will be met for projects receiving CHIPS Incentives.

### 3. What constitutes a project for purposes of an application?

For the purposes of an application, a "project" is a set of capital expenditures for the construction, expansion, or modernization of a facility. A project also includes any related workforce development or operating expense costs for the facility that the applicant proposes to cover with CHIPS Incentives funds.

### 4. May applicants apply for funding under this NOFO as part of a consortium, and if so, how?

Yes, applicants may apply for funding under this NOFO as part of a consortium. The Department will award funding on a per-project basis to consortium members proposing to construct, expand, or modernize a facility eligible under this NOFO.

The Department expects the entity submitting the application to be the for-profit entity within the consortium that will own and/or operate the project facility. These applicants must also submit a consortium narrative detailing the other members of the consortium and the overall strategic vision of the consortium, among other relevant information.

---

[10] 15 U.S.C. § 4652(a)(2)(B)(ii)(II)(aa)-(bb).
[11] 15 U.S.C. § 4652(a)(2)(B)(ii)(III).
[12] 15 U.S.C. § 4652(a)(2)(B)(ii)(IV).
[13] 15 U.S.C. § 4652(a)(2)(B)(ii)(VI).
[14] 15 U.S.C. § 4652(a)(2)(B)(ii)(V).
[15] 15 U.S.C. § 4652(a)(2)(B)(iii).

Under this NOFO, consortia do not need to have an umbrella organization or other formal legal structure. Consortium members must, however, actively collaborate and align on the content of each application submitted as part of the consortium. In evaluating projects submitted as part of a consortium, the Department will consider the extent to which the consortium's strategic vision advances economic and national security, and the extent to which a given project is necessary for achieving that vision. Thus, the Department strongly encourages consortia to be selective in choosing projects.

### 5. How can CHIPS Incentives funds be used?

Funds made available under the CHIPS Incentives Program may be spent only on eligible uses, which include the costs to:

- finance the construction, expansion, or modernization of a facility, or equipment for that facility
- support site development and modernization for a facility
- support workforce development for a facility
- pay reasonable operating expenses for a facility, as determined by the Department.[16]

Not all of the applicant's activities within a project may be eligible to receive program funds. However, as described in Sections IV.G.3 and IV.H.4, the applicant must clearly describe any activities within its proposed project that may be eligible uses for CHIPS Incentives.

Certain purposes are ineligible uses for CHIPS Incentives. See Section IV.I for more details.

### 6. How does the application process work?

The application process includes two primary phases. In the first phase, applicants will be asked to submit a concept plan describing how their proposed project addresses core program priorities. The Department will then invite the most promising applicants to the second phase, where they will have the opportunity to submit a full application. The Department will communicate full application submission dates to those applicants selected to advance, and may work with applicants selected to advance as they shape their concept paper into a full application. Applicants that advance in the process will be subject to due diligence prior to award. For more information on the application process, see Section V.D.

**If an applicant is applying as part of a consortium:** Each member of a consortium that seeks CHIPS Incentives for a project to construct, expand, or modernize a facility eligible for funding under this NOFO must submit a separate concept plan and, if invited to the second phase, a separate full application. Each project will be evaluated on its own merits. Consortium applicants will be required to provide details about their consortium in a separate consortium narrative. In evaluating an individual project proposed as part of a consortium, the Department will consider

[16] *See* 15 U.S.C. § 4652(a)(4).

the strength of the consortium's overall strategic vision and the extent to which an individual project is necessary to advance that vision. For more information, see Sections V.C. and V.D.

## C. Program Priorities

The CHIPS Incentives Program seeks to further priorities relating to economic and national security, workforce, and other matters. This section provides information about the program's priorities. Applicants should develop their applications with these priorities in mind, as they relate to various requirements and evaluative criteria that will form the basis for the Department's application review process. Applications that do not meet program priorities will not receive funding. The Department will not fund applications that lack sufficient scale to meaningfully contribute to the objectives outlined in this NOFO. The Department expects projects with capital investments below $20 million are unlikely to meet this standard. If a sub-$20 million project does meet this standard, the Department generally expects other stakeholders—including chipmakers, larger suppliers, and state and local entities— make the project viable without CHIPS funding.

### 1. Economic and National Security Objectives

Advancing U.S. economic and national security is the principal objective of the CHIPS Incentives Program. With respect to economic security, this NOFO contains a particular focus on incentivizing the development of vibrant, sustainable semiconductor clusters. These clusters are critical to creating a robust semiconductor ecosystem in the United States.

In addition, the Department seeks to invest in operationally secure projects employing appropriate cybersecurity practices, as well as implementing plans to promote supply chain security and risk management. Projects must be protected from internal and external risks ranging from insider threats to disaster recovery and ensure their supply chain is resilient to disruption. Moreover, projects should generally be capable of continued operations for a period of time without access to non-U.S. facilities and personnel.

#### a. Economic Security Objectives

The Department has laid out three objectives for its investments in semiconductor materials and manufacturing equipment facilities: (1) strengthening supply chain resilience, (2) advancing U.S. technology leadership in semiconductor materials and manufacturing equipment, and (3) supporting vibrant U.S. fab clusters.

Through this amended NOFO, the Department is particularly focused on the third goal: supporting vibrant U.S. fab clusters. The Department seeks applications for semiconductor material and equipment facilities that advance clusters by closing critical gaps in the U.S. supplier landscape, for example by reducing the burdens associated with transporting critical supply chain inputs.

With respect to strengthening supply chain resilience, the Department seeks projects that address chokepoint risks flowing from geographic concentration and reduce the risks of production disruptions due to chronic shortages of critical supply chain inputs.

With respect to advancing U.S. technology leadership, the Department seeks projects that advance U.S. technology leadership by reinforcing existing supply chain strengths and/or developing new and innovative capabilities in the United States. The Department encourages major U.S. semiconductor manufacturing equipment and materials suppliers to increase their footprints in the United States, and aims to attract non-U.S. suppliers of the world's most advanced semiconductor manufacturing equipment, materials, and subsystems to establish large-scale footprints in the United States.

Ultimately, the Department recognizes that all three objectives are self-reinforcing: supporting vibrant U.S. fab clusters, for example, can generate efficiencies and innovation that end up strengthening supply chain resilience and/or technology leadership. The Department welcomes projects that support one or more of these objectives.

#### b. National Security Objectives

As foundational components to U.S. defense and critical infrastructure systems, semiconductors are vital to U.S. national security. The government organizations and contractors that fulfill national security missions require stable, long-term onshore access to semiconductors, which in turn requires a robust, secure domestic semiconductor supply chain. As relevant, CPO encourages applicants to identify the national security programs and platforms the project supports, any customers in the defense industrial base, and any government points-of-contact who can validate that the project will advance national security.

The Department also acknowledges that the risk of malicious disruptions to semiconductors and their supply chains has risen in concert with increased chip complexity, process separation, and outsourcing. The evolving threat landscape, coupled with today's digitized world, provides a large attack surface for adversaries to steal, compromise, alter, or destroy sensitive information that is critical to economic and national security. The Department seeks applicants that have made themselves resilient to these attacks, such as by establishing a strategy to protect intellectual property and by assuring the security of their product quality and supply chain to prevent tampering, counterfeiting, and other security issues. The Department will also evaluate projects based on their ability to mitigate additional operational and cybersecurity risks, including those posed by insider threats, external influence from foreign entities of concern, dependence on foreign-owned or sourced inputs or equipment, and espionage.

Supply chain security is critical to ensure safe and continued production of semiconductors. The Department seeks projects with demonstrated resilience measures through the protection of physical infrastructure and the supplier ecosystem, and risk management strategies—such as regular supply chain mapping—to avoid supply chain exploitation or the theft of intellectual property.

The Department will also consider the national security risks of the location of any upstream or downstream steps in the semiconductor material or equipment manufacturing process.

### 2. Commercial Viability

Long-term commercial viability is an essential component of any successful application. Commercially viable projects will be grounded on a sound business case providing reliable cash flows that are sufficient to maintain continuity of operations and continued investment in the facility.

Each applicant must describe the type of semiconductor material or equipment the proposed project will produce, where in the semiconductor manufacturing process the technology is used, and key semiconductor- and non-semiconductor-related end markets.[17] A strong application will present a sophisticated understanding, backed by evidence, of the demand for a project's output and other sources of existing and potential future supply. Each applicant must also identify the customers, or categories of customers, for a project's output, and strong applications will include evidence of offtake commitments or other evidence of specific customer demand.[18] The Department encourages proposals that attract more private capital and induce larger-scale, private domestic investments. The Department also encourages purchase commitments and collaborations across the supply chain to clarify future demand, improve transparency and trust, and mitigate the risk of future supply chain shortages or oversupply.

### 3. Financial Strength

The CHIPS Incentives Program does not provide enough funding on its own to create the capacity needed to meet the program's economic and national security objectives. Applicants should structure the finances of their project in a way that maximizes private-sector contributions and minimizes the need for government incentives. The Department may decline to award CHIPS Incentives if the applicant has not demonstrated sufficient efforts to maximize the use of private-sector funds. The Department will evaluate the degree to which the applicant, through its funding request, leverages private investment, incentives provided by state and local governments, and the Investment Tax Credit (to the extent applicable) to increase scale and lower the need for CHIPS Incentives. The Department will also ask applicants to submit a financial model, which will inform a comprehensive assessment of a project's finances.

### 4. Project Technical Feasibility and Readiness

Timely construction and effective operation of facilities is crucial to the overall success of the CHIPS Incentives Program. Project technical feasibility includes the ability of the applicant to construct, equip, and operate the proposed project. To demonstrate technical feasibility, applicants will be asked to provide a construction plan, including a construction schedule and a list of key partners, contractors, and suppliers.

---

[17] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(V)(aa).
[18] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(V)(bb).

Activities funded under this NOFO will be subject to various Federal, state, and local environmental and permitting requirements. The Department intends to prioritize applications that demonstrate a clear path to meeting these requirements in a timely manner.

### 5. Workforce Development

A strong, long-term workforce strategy is critical to achieving the economic and national security goals of the CHIPS Act. Each applicant will therefore lay out their strategy to recruit, train, hire, retain, and upskill a workforce consistent with Executive Order 14278: Preparing Americans for High Paying Skilled Trade Jobs of the Future, and Executive Order 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity. All applicants must comply with all applicable Federal labor and employment laws, including but not limited to Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act, the Occupational Safety and Health Act, and the National Labor Relations Act, which protects employees' right to bargain collectively and engage in concerted activities for the purpose of workers' mutual aid or protection.

To be eligible for CHIPS funding, applicants must secure "commitments from regional educational and training entities and institutions of higher education to provide workforce training, including programming for training and job placement of economically disadvantaged individuals."[19] Applicants are strongly encouraged to work with such partners to articulate their approach to meeting their facility and construction workforce needs through training and recruitment of American workers. For both their facility and construction workforce, applicants must provide a workforce needs assessment; outline evidence-informed strategies for recruitment, training, and retention; and describe their approach to ensuring job quality.

The Department strongly encourages the use of project labor agreements in connection with construction projects when those agreements are practicable and cost effective.

All laborers and mechanics employed by contractors or subcontractors on a construction project that receives financial assistance under the CHIPS Incentives Program shall be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, commonly referred to as the "Davis-Bacon Act."

## II. Federal Award Information

### A. Funding Instrument

CHIPS Incentives will be provided through this NOFO, as appropriate, in a form consistent with the CHIPS Act. The final composition and structure of any financial assistance awards made under this program will be determined during the review and selection process.

---

[19] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(III).

### B. Funding Availability

The amounts awarded under this NOFO will depend on program priorities and the quality of applications received.

### C. Award Amount

The total amount of a CHIPS award will vary by project.

### D. Period of Performance

The specific period of performance will vary depending on the size and complexity of the project and the specific activities funded and will be negotiated with the applicant and reflected in the award documents. The conclusion of an award's period of performance does not signify the end of a recipient's obligations related to a CHIPS Incentives Award.

## III. Eligibility Information

### A. Eligible Applicants

#### 1. Covered Entity Requirement

An applicant must be a "covered entity" to receive CHIPS Incentives. For purposes of this NOFO, a "covered entity" means a nonprofit entity; a private-sector entity; a consortium of private-sector entities; or a consortium of nonprofit, public, and private-sector entities with a demonstrated ability to substantially finance, construct, expand, or modernize a facility relating to the fabrication, assembly, testing, advanced packaging, production, or research and development of semiconductors, materials used to manufacture semiconductors, or semiconductor manufacturing equipment.

With respect to consortium applications, the Department will award funds on a per-project basis to each private-sector, domestic legal entity responsible for constructing, expanding, or modernizing a facility eligible for CHIPS funding under this NOFO.[20] A recipient will assume legal and financial responsibility for the CHIPS Incentives received, including any funds provided to subrecipients and contractors.

The Department may require that the parent or affiliated entities of the recipient provide commitments or guarantees for the benefit of the Federal government or to advance program priorities.

[20] Multiple recipients or a nondomestic recipient may be permitted, at the sole discretion of the Department, in exceptional cases, such as in cases of applications involving more than one member of an affiliated group, i.e. a corporate parent and one or more of its subsidiaries. Such exceptions will only be granted if consistent with applicable law and where providing for multiple recipients would further program or project objectives and would not undermine the ability of the Department to evaluate an application and monitor and enforce compliance with the terms of any resulting CHIPS Incentives Award. Multiple recipients will not be permitted where the recipients are not part of the same affiliated group. After the submission of a concept plan, a submitter may seek guidance on whether a multiple recipient or nondomestic recipient option may be available for its potential application.

### 2. Foreign Entities of Concern and Foreign Capital

Foreign entities of concern[21] are not eligible to receive CHIPS Incentives.[22] In addition, the Department will review applications for involvement of foreign entities of concern and will not approve any applications where a foreign entity of concern—through control,[23] access to information, or other mechanisms—poses an undue risk to a project or U.S. national security interests. Applicants are required to provide information via the SF-328 form at the time of full application to enable an initial assessment of these issues. Additional information, beyond the scope of the SF-328 form, may be required in due diligence, to further identify and, if necessary, mitigate potential risks to national security.

CHIPS Incentives Awards will also involve requirements to enable identification and mitigation of national security risks posed by involvement of foreign entities of concern that may arise after an application is approved.

### 3. Cost Sharing or Matching

Cost sharing or matching funds, as governed by 2 CFR § 200.306, are not legally required for this NOFO. Each applicant must be able to demonstrate that they have sufficient resources available to complete the proposed project, when combined with the requested CHIPS Incentives.

## IV. Application and Submission Information

### A. How to Access an Application Package

Application forms and instructions are available on the CHIPS Incentives Program application portal. FAQs, guides and templates are available at https://www.chips.gov.

### B. Submission Dates and Times

This amendment re-opens and extends the period of acceptance of applications, which was originally open from December 1, 2023, through February 1, 2024, so that concept plans will now be accepted through November 1, 2026.

For applicants that are invited to advance to the full application phase, the CHIPS Program Office will communicate full application submission dates to applicants individually upon notifying them of their advancement.

---

[21] *See* 15 C.F.R. Part 231

[22] 15 U.S.C. § 4657.

[23] The term "control" for this purpose is defined as any direct or indirect investment in a corporate entity that provides the investor with the means to influence important matters affecting the project. The term "means to influence important matters" includes membership or observer rights on, or the right to nominate an individual to a position on, the board of directors or equivalent governing body of the corporate entity; any involvement, other than through voting of shares, in substantive decision-making by the corporate entity; and consultation rights with respect to technology licensing to third parties.

The Department may amend this NOFO at any time. It may also close the funding opportunity with at least 60 days' notice.

## C. Confidential Information

CPO recognizes the importance of protecting confidential business information from public disclosure. CPO and the Department will follow applicable laws, including, for example, the CHIPS Act, the Trade Secrets Act, and the Freedom of Information Act (FOIA), to protect such information.

### 1. Statutes Applicable to Confidential Business Information

Subject to certain exceptions, Section 4652 of the CHIPS Act provides that "any information derived from records or necessary information disclosed by a covered entity to the Secretary under this section" is exempt from disclosure under FOIA and "shall not be made public."[24]

All Federal employees are also bound by the Trade Secrets Act, which makes Federal employees criminally liable for the unauthorized disclosure of "information [that] concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association."[25] Violations of the Trade Secrets Act may result in the loss of employment, fines, or imprisonment.

Finally, FOIA requires Federal agencies, including CPO and the Department, to disclose agency records requested by a member of the public, including information received from outside parties, unless FOIA specifically exempts the information from disclosure. Information that "shall not be made public" under Section 4652 of the CHIPS Act "shall be exempt from disclosure under section 552(b)(3) of title 5,"[26] making it exempt from disclosure under FOIA.[27] In addition, FOIA exempts from disclosure information submitted by an applicant that constitutes trade secrets or is privileged or confidential commercial or financial information.[28] The Department will apply these exemptions, in accordance with the law and the Department's FOIA regulations,[29] to FOIA requests.

---

[24] 15 U.S.C. § 4652(a)(6)(G)(i). The exceptions are for information 1) relevant to any administrative or judicial action or proceeding, 2) that a covered entity has consented to be disclosed to third parties, or 3) necessary to fulfill the congressional notification requirement specified under Section 4652(a)(6)(H). "Covered entity" is defined at 15 U.S.C. § 4651(2). The Department interprets "information disclosed by a covered entity to the Secretary under this section" to include information disclosed by a covered entity as part of the application process under this NOFO.
[25] 18 U.S.C. § 1905.
[26] 15 U.S.C. § 4652(a)(6)(G)(i).
[27] *See* 5 U.S.C. § 552(b)(3).
[28] 5 U.S.C. § 552(b)(4).
[29] *See* 15 C.F.R. Part 4.

### 2. Instructions for Marking Confidential Business Information

To assist the Department in protecting trade secrets or privileged or confidential commercial or financial information, applicants should follow these guidelines in submitting information via a concept plan or full application.

First, the following legend should appear on the first page of any document containing trade secrets or privileged or confidential commercial or financial information:

> This document contains trade secrets or commercial or financial information that is privileged or confidential and is exempt from public disclosure. Such information shall be used or disclosed only in accordance with the CHIPS Incentives Program NOFO or as otherwise authorized or required by law. The information subject to these restrictions is contained on all pages of the document except for pages [insert page number or other identification of pages that contain no restricted information.]
>
> (End of Legend)

Second, the following legend should appear on each page of the document that contains information the applicant seeks to designate as trade secrets or privileged or confidential commercial or financial information:

> Use or disclosure of information contained on this sheet is subject to the restriction on the title page of this document.
>
> (End of Legend)

The use of any other legend may constitute grounds for removing the application from further consideration without assuming any liability for inadvertent disclosure. Each applicant must also use good faith when designating information as trade secrets or commercial or financial information that is privileged or confidential.

### 3. Use of Information

Any person or entity submitting information under this NOFO acknowledges and understands that information and data contained in or submitted in connection with statements of interest[30], concept plans, full applications, or due diligence under this NOFO (together, "applicant information and data") may be accessed and used by Federal employees and their contractors for the purposes of this NOFO and carrying out the government's responsibilities in connection with the CHIPS Incentives Program, or as otherwise required by law. By submitting applicant information and data, the applicant, potential applicant, or an entity submitting a concept plan consents to the disclosure of such applicant information and data to consultants and contractors for these purposes, consistent with Federal law.

[30] Applicants that have not already submitted a statement of interest to the Department are not required to do so before submitting a concept plan under this NOFO, but may still do so if desired.

The Department may publish information concerning the award of incentives at stages through the review, selection, and award process. The Department may inform and, to the extent required by law, seek consent from applicants of any such disclosures. In addition, as will be set forth in the terms and conditions of a CHIPS Incentives Award, successful applicants will be expected to support program and project reviews, audits, and program evaluation activities, including by submitting required financial and performance information and data in an accurate and timely manner, making available documents and other records related to the award project upon request, and by cooperating with Department and external program evaluators, including, for non-program evaluation activities, the Office of the Inspector General. Certain post-award progress reporting may also be made public.

The Department may also publish aggregated information from statements of interest, concept plans, and applications.

### D. False Statements

It is a crime to knowingly make false statements to a Federal agency. Misrepresentation of material facts may be the basis for denial of an application. Penalties upon conviction may include fine and imprisonment. For details, please refer to 18 U.S.C. § 1001.

### E. Application Requirements

Application forms and instructions are available on the CHIPS Incentives Program application portal. FAQs, guides, and templates are available at https://www.chips.gov. Applicants will provide information to the CHIPS Incentives Program application portal via web forms, populating required templates, and uploading narrative documents and other required or supporting attachments. The following sections describe the information that will be required as part of the submissions for concept plans and full applications.

All application materials must be submitted electronically via the CHIPS Incentives Program application portal. In addition to the requirements set forth below, during the application review process the Department may request additional records and information necessary for fulfilling the purposes of this NOFO.

### F. Requirements for Attachments Submitted through the CHIPS Incentives Program Application Portal

Requirements for attachments submitted through the CHIPS Incentives Program Application Portal can be found at chips.gov.

### G. Content and Form of Concept Plan

The concept plan allows the Department to evaluate proposed projects and invite those most likely to receive an award to advance to the full application phase.

Each member of a consortium that seeks CHIPS Incentives for a project to construct, expand, or modernize a facility eligible for funding under this NOFO must submit an individual concept

plan. Consortium applicants will be required to provide details about their consortium in a separate consortium narrative.

Concept plans must be submitted through https://applications.chips.gov.

The concept plan includes information input via web forms on the CHIPS Incentives Program application portal and the following information:

### 1. Cover Page

The cover page will be input directly via a web form on the CHIPS Incentives Program application portal.

### 2. Consortium Narrative (if applicable)

Consortium members must also upload a separate consortium narrative of no more than 5 pages. The consortium narrative must include the following information, and each member is responsible for ensuring consistency across all related applications:

- The individual entities that are members or proposed members of the consortium and the roles of each entity[31]
- A narrative description of the consortium's overall strategic vision; how that vision aligns with the Department's economic and national security objectives; and the relevance of each proposed project to that vision
  - Include an explanation of why the proposed projects are necessary to advance the consortium's vision, and why CHIPS funding is necessary to incentivize the relevant investment
- The structure of the consortium, including how members intend to coordinate and/or collaborate with one another

### 3. Concept Plan Details

Each applicant must submit a project plan of no more than 15 pages that describes the project for which CHIPS Incentives funds are being requested. Attachments such as the Project Sources and Uses of Funds spreadsheet are not included in this page limit.

The project plan must contain the following information:

- <u>Description of Project</u>: A description of the construction, expansion, or modernization activities proposed, including a description of the facility location and existing or required infrastructure. This description should include the products that the facility produces or will produce and their end market application, along with information on the scale, size, and capacity of production.

---

[31] The Department will not require consortia to be fully formed at the concept plan phase. Consortium applicants should simply list the members or proposed members that are part of the consortium's current plan. If a consortium wishes to add additional member(s) after they have submitted their concept plan, they should indicate any additions in the full application consortium narrative.

- Applicant Profile: A brief description of the applicant, including identification of its headquarters, primary officers, ownership (publicly traded or privately held, including main shareholders), main business lines, and main countries of operation. For applicants that are a subsidiary of another entity, this information should be provided for the ultimate corporate parent as well.
- CHIPS Incentives Justification: A summary narrative explaining how the CHIPS Incentives requested will incentivize the applicant to make investments in the facility and equipment in the United States that would not occur in the absence of the incentives. If relevant, include other ways that the requested incentives would change the nature, scale, or speed of the investment.
- Economic and National Security: A narrative description of how the proposed project will further the economic and national security objectives of the United States, as described in Section I.C.1. Applicants should describe, in particular, how the proposed project will help strengthen supply chain resilience, advance U.S. technology leadership, and/or support vibrant U.S. fab clusters.
- Commercial Viability: A narrative description of the demand drivers for the output of the facility with as much specificity as is available on end markets and customer demand. Evidence of customer demand could include key off-take agreements, letters of reference or intent, or a list of top customers for each major product and associated volumes (any such items should be included in an appendix). The narrative should also explain how the project will reach sufficient scale to be commercially viable over the long term.
- Project Feasibility and Readiness: A narrative description explaining why the proposed project is technically feasible, including a notional construction schedule; an explanation of the experience and qualifications of key management personnel, including experience with projects of similar size and scope; a list of any comparable facilities previously commissioned by the applicant or its parent companies; and any evidence that the applicant has the ability to effectively manage the environmental review process.
- Availability of Funds: Provide the information listed below about capital investment and capital sources via the Project Sources and Uses of Funds spreadsheet template available on the CHIPS Incentives Program application portal. In addition, provide a narrative that details specific, credible evidence of the availability of the listed sources of funds. That evidence could include, for example, company financials demonstrating the availability of cash; commitment letters; or other approaches to accessing the required funding.
    - Capital Investment: The costs required to complete the construction, expansion, or modernization of the project and initiate operation, broken down by category such as land, construction (e.g., labor and material), equipment, infrastructure improvements (e.g., utility plants, access to infrastructure, or wastewater treatment plants), and administrative expenses directly attributable to the construction, expansion, or modernization (e.g., legal, engineering, and permitting fees).
    - Project Capital Sources: Total project capital sources should be greater than the capital investment costs described above (in the full application, the Department will expect total project capital sources to equal the sum of capital investment, operating losses and other cash outflows until cash flow breakeven, and

workforce development costs), and should include, for example, CHIPS Incentives; equity from the applicant, its parent, and any third parties; debt financing from the applicant or corporate parents; state and local government incentives; the Investment Tax Credit; and any other sources of funds, such as customer pre-payments.

### H. Content and Form of Full Application Submission

This section provides instructions and details for submission of full applications to the CHIPS Incentives Program. Based on the review of concept plans, the Department will invite selected applicants to submit a full application. Applicants not invited to submit a full application will be notified that they have been eliminated from consideration in this competition.

The full application includes a series of sections, each described below. Page limits are provided where applicable. Sections should be accompanied by relevant attachments that substantiate information in the narrative section, which do not count toward the page limit. All application materials must be submitted through the CHIPS Incentives Program application portal.

Each member of a consortium that seeks CHIPS Incentives for a project to construct, expand, or modernize a facility eligible for funding under this NOFO must submit a separate application. Consortium applicants will be required to provide details about their consortium in a separate consortium narrative.

Applicants should make efforts to complete the process of registering for the System for Award Management (SAM.gov), including obtaining a Unique Entity Identifier (UEI), prior to submitting a full application. For consortium applicants, SAM.gov registrations are required for all members seeking CHIPS Incentives for the construction, expansion, or modernization of a facility eligible for funding under this NOFO.

Applicants are strongly encouraged to begin the process of registering for SAM.gov as early as possible. While this process ordinarily takes between three days and two weeks, in some circumstances it can take six or more months to complete due to information verification requirements. The Department is unable to issue a CHIPS Incentives Award to an entity that lacks an active SAM.gov registration.

A summary table of the application structure is provided below:

1. Cover Page
2. Consortium Narrative (if applicable)
3. Covered Incentive
4. Description of Project
5. Applicant Profile
6. Alignment with Economic and National Security Objectives
7. Commercial Strategy
8. Financial Information
9. Project Technical Feasibility

10. Workforce and Community Investments
11. Standard Forms

### 1. Cover Page

The cover page will be input directly via a web form on the CHIPS Incentives Program application portal.

### 2. Consortium Narrative (if applicable)

Consortium members must also upload a separate consortium narrative of no more than 8 pages. The consortium narrative must include the following information, and each member is responsible for ensuring consistency across all related applications. If there have been no updates, consortium members may simply resubmit the narrative they submitted as part of the concept plan:

- The individual entities that are members of the consortium and the roles of each entity
- A narrative description of the consortium's overall strategic vision; how that vision aligns with the Department's economic and national security objectives; and the relevance of each proposed project to that vision
  - Include an explanation of why each proposed project within the consortium is necessary to advance the consortium's vision, and why CHIPS funding is necessary to incentivize the relevant investment
- The structure of the consortium, including how members intend to coordinate and/or collaborate with one another
- If applicable, any documentation and evidence of the planned operating model, such as the governance structure, decision-making authority/rights, contractual obligations, financial obligations, roles and responsibilities, and any memoranda of understanding

Letters of commitment must be attached from all entities responsible for executing portions of the proposed scope of work. For consortium applicants, this includes letters from other applicants in the consortium confirming their participation in the consortium.

### 3. Covered Incentive

Each applicant must provide a letter from a state or local government entity offering a qualifying covered incentive, indicating the estimated size and nature of the incentive.[32] For consortium applicants, the covered incentive requirement may be satisfied by one offer letter that names all facilities in the consortium applying for CHIPS Incentives funding.

[32] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(I). The offer of a covered incentive may be contingent; if so, any contingencies need to clearly be specified in the letter. Further, prior to receiving a CHIPS Incentives Award, the applicant may be required to provide additional information demonstrating to the Department's satisfaction that the covered incentive has been or will be received.

### 4. Description of Project

The applicant must submit a detailed description of the project proposed in the application. The description should be no longer than 3 pages and contain the following information:

- Description of Project: A description of the construction, expansion, or modernization activities proposed, including a description of the facility location and existing or required infrastructure. This description should include the products that the facility produces or will produce and the end market application and top customers for those products, along with information on the scale, size, and capacity of production.
- Project Timeline: A detailed description of the overall timeline and key milestones inclusive for the project, for both the capital expenditure components of the project and the workforce development and/or operational cost components of the project.

### 5. Applicant Profile

Provide the following information for the applicant. If the applicant is a subsidiary, this information should be provided for the applicant, its ultimate corporate parent, and any key intermediate entities:

- Descriptive Information About the Applicant: Information related to the applicant's businesses, including but not limited to company name, corporate form, jurisdiction of formation, description of key business activities, year established, headquarters country/state/city, countries/U.S. states of operation, and number of employees. In addition, the application should include a brief description of the applicant's and (if applicable) its parent company's business profile, key products manufactured, end markets, and competitors, as well as any existing or planned business operations in foreign countries of concern.
- Ownership, Legal Entity, and Organizational Structure: The applicant should provide a formal legal entity and organizational structure detailing all parent companies, subsidiaries, and affiliates and other relevant entities, including associated ownership of those entities, up to the top shareholder(s) and the ultimate corporate parent (if applicable). In addition, the applicant should outline recent and upcoming organizational changes, including mergers and acquisitions and any recent or proposed changes to corporate structure. Applicants should provide this information in the form of detailed charts and accompanying narrative explaining the legal entity and organizational structure.
- Past Project History: A summary of any facilities comparable to the proposed project facility commissioned by the applicant or its parent companies in the last five years, including details on type of production and output, years in operation, location, project cost, and summary financials.
- Covered Entity Status: An explanation of how the applicant qualifies as a "covered entity," including a demonstration of the applicant's ability to substantially finance, construct, expand, or modernize the facility proposed.[33] Such a showing could include,

[33] *See* 15 U.S.C. § 4651(2).

for example, evidence of prior experience successfully managing and completing comparable projects, expertise of a scientific and technical nature that is applicable to the proposed project, or sufficient committed financing for the project outside of CHIPS Incentive Request.

- Company Financials: If available, audited consolidated financial statements at fiscal year-end for each of the last two years, and interim financial statements for the current fiscal year.[34]
- Equity Capital Structure: Information on major shareholders, number of shares outstanding, share price history, and market valuation (or estimated private valuation) at year-end for the last two years, if available.
- Outstanding Debt: Schedule listing outstanding debt, lines of credit, other material indebtedness, guarantees, or (material) off-balance sheet liabilities, along with the expected cost for those liabilities.

### 6. Alignment with Economic and National Security Objectives

Describe how the project meets economic and national security objectives in no more than 10 pages. Consistent with the program priorities set forth in Section I.C.1, this should include how the project will (a) support vibrant U.S. clusters and/or the broader U.S. ecosystem, (b) strengthen supply chain resilience, and/or (c) advance U.S. technology leadership.

In addition, applicants should specifically discuss the following aspects of their project:

- **Cybersecurity**. Applicants should review the NIST Framework for Improving Critical Infrastructure Cybersecurity[35] and describe their cybersecurity practices. Applicants should cite applicable laws, regulations, standards, NIST guidance or Cybersecurity and Infrastructure Security Agency (CISA) recommendations and cybersecurity performance goals.[36] The applicant should provide a brief assessment of any major risks identified, including mitigation strategies (e.g., access control, network segmentation, contingency planning, disaster recovery plans, redundant capacity, cyber insurance, employee training, and continuous monitoring).

  Applicants should also detail operational security measures and efforts to continuously assess and protect data.

- **Supply Chain Resilience and Risk Management**. An application must demonstrate, with respect to the project proposed, that the applicant has an executable plan to identify and mitigate relevant supply chain security risks, such as risks associated with access, availability, confidentiality, integrity, and a lack of geographic diversification in its supply chain.[37] This plan should provide information addressing its organizational

---

[34] If an applicant does not have access to audited consolidated financial statements, they must explain why not.
[35] NIST, U.S. Dep't of Commerce, Version 1.1, Framework for Improving Critical Infrastructure Cybersecurity (2018).
[36] Cross-Sector Cybersecurity Performance Goals.
[37] *See* 15 U.S.C. § 4652(a)(2)(B)(iii).

approach to managing supply chain risk, resilience, and security, and how this will support the proposed project. The applicant should demonstrate its ability to continue operating in the United States without access to non-U.S. facilities and personnel. The applicant should also identify key suppliers; demonstrate access to power, water, air strips, and material transportation channels; and list its risk management strategies to minimize and mitigate adversarial attempts to degrade, exploit, or compromise the supply chain, including the introduction of counterfeit and/or malicious items into the supply chain.

The applicant should also identify its corporate approach to managing supply chain risk, resilience, and security, including any senior executive leaders responsible for managing supply chain risk. The applicant should also include information about its relationship with suppliers (such as long-term contracts and/or mechanisms for information-sharing) to prevent and promote agile response to unexpected situations.

- **Foreign Control**. Each applicant should identify any foreign entity[38] that exercises control over the applicant or a proposed project or has access to confidential information about the proposed project. The applicant should also identify any potential transactions occurring during the application process that could result in such control by a foreign entity or sharing of confidential information with a foreign entity.

### 7. Commercial Strategy

An application must demonstrate that the applicant has an executable plan to sustain the proposed facility without additional CHIPS Incentives.[39] A sound commercial strategy is a component of having an executable plan. Each applicant must describe its commercial strategy, including information on customer and end-market demand, volume growth, pricing dynamics, competitive positioning, and supply dynamics, for the proposed project. This strategy must identify the type of semiconductor materials or equipment the applicant will produce at the project facility and the customers, or categories of customers, for those materials or equipment.[40] In no more than 3 pages, this section should discuss the following topics:

- End-Market Demand: Information on end market industries and projected growth. Specify what percentage of the project's output will serve the semiconductor industry, and explicitly reference the top customers for each major product and associated volumes (to the extent known). In an appendix, provide any concrete evidence of customer demand, such as off-take agreements, letters of reference or intent, or other pre-purchase commitments.
- Market Position and Competitor Landscape: Include an assessment of key competitors, market dynamics (including the applicant's relative place in the market), supply and

[38] *See* 15 U.S.C. § 4651(6).
[39] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(IV).
[40] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(V).

demand dynamics over time, and pricing trends and exposure to pricing pressure during downturns.

### 8. Financial Information

A sound financial plan is also a component of having an executable plan to sustain the proposed facility without additional CHIPS Incentives.[41] Each applicant must provide a financial plan in no more than 5 pages (excluding attachments and appendices). The plan should include sources and uses of funds, cash flow projections, key return and debt service metrics, and the amount of the CHIPS Incentives request. The applicant should also provide supporting evidence for any key assumptions.

- Project Sources and Uses of Funds: Provide the information listed below about project costs and capital sources via a descriptive narrative and by filling out and uploading the Project Sources and Uses of Funds spreadsheet template available on the CHIPS Incentives Program application portal.
    - Project Costs: Project costs should include, but are not limited to:
        - Capital Investment: Costs required to complete construction of the project and initiate operation, broken down by category such as land, construction, equipment, infrastructure improvements, and administrative expenses directly attributable to the project construction.
        - Operating Losses and Other Cash Outflows until Cash Flow Breakeven: Estimated operating losses/cash outflows, including upgrade investments, maintenance, interest expenses, and working capital once the project is operationalized until cash flow breakeven.
        - Workforce Development Costs: Spending by the applicant on workforce development activities to support the proposed project.
    - Project Capital Sources: Total project capital sources should equal the project costs described above and should include, as applicable, any sponsor equity; debt funding; third-party equity; state and local government incentives; the Investment Tax Credit; CHIPS Incentives; and any other sources of funds, such as from customers or suppliers.
- Financial Model: Applicants may submit their own financial model but have the option of using the Full Application Example Financial Model available on CHIPS.gov. Financial models must include a summary of the expected revenues (broken down by number of units sold and price per unit), costs, and cash flows for the project, including key income statement, cash flow statement, and balance sheet information. Also provide a summary narrative and supporting evidence for key assumptions underlying these projections.
- CHIPS Incentives Request:
    - Provide a narrative description for how the financial information submitted for the project supports a conclusion that a CHIPS award will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the incentives.

[41] *See* 15 U.S.C. § 4652(a)(2)(B)(ii)(IV).

- Provide a description of specific efforts to date to bring other capital (debt, state and local incentives, other private capital) into the project and how the CHIPS Incentives request would enable and not displace those other funding sources.

### 9. Project Technical Feasibility

The applicant must demonstrate the technical feasibility of the proposed project. In no more than 8 pages (excluding attachments to support details), the applicant should include the following:

- A description of the product to be made and the applicant's relevant experience and expertise to support successful execution at the scale envisioned in the application

- A construction plan, including the location of project facilities, a detailed description of the major engineering, construction, and site preparation activities linked to specified cost and other milestones and performance guarantees; a construction schedule; a list of key management personnel, partners, contractors, and suppliers; and an inventory of all Federal, state, and local permits, licenses, and approvals required to site, construct, implement, and operate the facility. The applicant should include one-page resumes for (a) all key construction management personnel and (b) all key personnel of contractors and any other entities that will play substantial roles in the construction of the project.

- An operation management plan, including a description of the managerial oversight and governance for the operation of the project from the completion of construction through the life of the facility. Include an organizational chart of management and other key personnel for the facility, including contractors and any other entities that will play substantial roles in operating the proposed project. List the experience and qualifications of key management personnel, including experience with projects of similar size and scope.

- A description of whether and how they intend to utilize domestically produced iron, steel, and construction materials as part of their projects.

### 10. Workforce and Community Investment Plan

Applicants must demonstrate commitments to workforce recruitment, training, and community investment consistent with 15 U.S.C. § 4652(a)(2)(B)(ii).

The workforce strategy should be consistent with Executive Order 14278: Preparing Americans for High Paying Skilled Trade Jobs of the Future, and Executive Order 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity.

### 11. Standard Forms

All applicants should submit standard forms as follows:

- SF-328, Certificate Pertaining to Foreign Interests
- CD-511, Certification Regarding Lobbying. Enter "2023-NIST-CHIPS-SMME-01" in the Award Number field. Enter the title of the application, or an abbreviation of that title, in the Project Name field
- SF-LLL, Disclosure of Lobbying Activities (if applicable)

In addition, applicants may be required to submit additional standard forms, such as the SF-424 and SF-424A/C/D, during the application review process.

## I. Funding Restrictions

Funds made available under the CHIPS Incentives Program may be spent only on eligible uses. See Section I.B.5. In addition, funds made available under the CHIPS Incentives Program may not be used to:

- construct, modify, or improve a facility outside of the United States[42]
- physically relocate existing facility infrastructure to another jurisdiction in the United States, unless the project is in the interest of the United States, as determined by the Department[43]
- purchase an equity security that is listed on a national securities exchange of an award recipient or any parent company of such recipient or to pay dividends or make other capital distributions with respect to the common stock (or equivalent interest) of the recipient or any parent company of such recipient[44]
- pay off any Federal direct or guaranteed loan or any other form of Federal debt

Project budgets may not include indirect costs. Applicants with a negotiated indirect cost rate agreement must ensure all uses of Federal funds are charged as direct costs in the categories listed in Section I.B.5.

The failure to mention a particular use of funds above does not imply that such use is either allowable or unallowable. Final determinations on the allowability of particular uses of funds is at the sole discretion of the Department.

## J. Prohibition on Profit and Fees.

Recipients and subrecipients of CHIPS Incentives may not charge, as part of the project budget, profits, fees, or other incremental charges above the actual costs incurred in executing the award's approved scope of work.

---

[42] 15 U.S.C. § 4562(i).
[43] 15 U.S.C. § 4652(a)(2)(C).
[44] *See* CHIPS Act of 2022, Pub. L. No. 117-167, § 102(g)(1), 136 Stat. 1366, 1378-1379 (2022).

This restriction does not impact an award recipient's ability to earn profits by selling products produced or manufactured at facilities supported by Federal financial assistance in the ordinary course of business.

## V. Application Review Information

There will be two primary stages of review: the concept plan and the full application.

The Department will score concept plans using a point system and use the Selection Factors in Section V.B to advance the most promising potential applicants to the full application phase. At the full application phase, review will be qualitative and based on (1) an assessment of projects against the evaluation criteria laid out in Section V.C, and (2) application of the Selection Factors in Section V.B.

### A. Concept Plan Evaluation Criteria

Concept plans will be scored based on the evaluation criteria described below. Subject to the Selection Factors listed in Section V.B, the Department will invite a subset of concept plan submissions to advance to the full application phase.

- The extent to which a project advances U.S. economic and national security by supporting vibrant U.S. fab clusters, strengthening supply chain resilience, and/or advancing U.S. technology leadership
    - If the project is proposed as part of a consortium, the Department will evaluate the strength of the consortium's strategic vision and the extent to which the project is necessary to achieve that vision.
    - Given the scale of projects eligible under this funding opportunity and the importance of chips clusters for U.S. competitiveness, the Department expects that most projects will justify their request for funding by outlining their role in supporting self-sustaining U.S. fab clusters. The Department also welcomes project proposals that meaningfully contribute to strengthening supply chain resilience and/or advancing U.S. technology leadership, as well as projects that advance more than one of these objectives.
- A project's long-term commercial viability, including the extent to which the concept plan demonstrates robust customer demand for the proposed project output
- The strength and plausibility of the applicant's justification for why the CHIPS Incentives requested will incentivize the applicant to make investments in facilities and equipment in the United States that would not occur in the absence of the incentives
- The likelihood that the applicant will successfully execute the proposed projects, including an assessment of the experiences of the applicant and the extent to which the applicant has a viable plan to complete the required construction and manage the environmental review process
- The availability and credibility of non-CHIPS funding sources for the project.

## B. Selection Factors

The selection factors the Department will use to (1) advance the most promising applicants to the full application phase and (2) select full applications for funding, are:

- The mix and breadth of strategic objectives being advanced at the project and/or portfolio level
- The likelihood that the proposed project would proceed in substantially similar form without CHIPS funding
- The extent to which the project's risk profile impacts the program's overall portfolio risk profile
- The extent to which the project meaningfully contributes to the development or sustainability of a U.S. fab cluster
- The extent to which the project duplicates other projects funded by the Department or other Federal agencies
- Whether the applicant, or a corporate affiliate of the applicant, has previously received financial assistance in this program
- The extent to which awards in the program contribute to a diversified portfolio, to include awards based on geographic location of facilities receiving support
- For consortium applicants, whether the consortium maximizes inclusion of and resources from relevant stakeholders

## C. Full Application Evaluation Criteria

Full applications will be evaluated holistically and qualitatively based on the evaluation criteria described below. The Department will use these criteria, in addition to the Selection Factors listed in Section V.B, to determine whether to recommend an application for award.

- The extent to which an application advances economic and national security by supporting vibrant U.S. clusters, strengthening supply chain resilience, and/or advancing U.S. technology leadership
- The extent to which an application addresses national security considerations, including cybersecurity, operational security, and supply chain resilience
- The extent to which there is a reasonable market environment and demand for the project's output, and the extent to which the project serves the semiconductor industry
- The extent of a project's financial strength, including the comprehensiveness and reasonableness of the projected capital expenditures; the likelihood that the project will generate sustainable earnings; and the degree to which the applicant has committed private investment and/or attracted third-party investment
- The degree to which the request for CHIPS Incentives is necessary to make the project viable in the United States
- The degree to which a project is feasible to execute, including the extent to which the applicant and key partners have the necessary experience to complete and operate the project; the extent to which the applicant has a viable construction plan; and the

likelihood and extent to which the project could face regulatory delays, such as in a permitting or environmental review process
- The completeness, cohesiveness, and feasibility of the applicant's plans for workforce and community investment, including the strength of the applicant's strategy for investing in the project's facility and construction workforce.

### D. Review and Selection Process

Independent reviewers will score concept plans and an Investment Committee will use those scores and the selection factors to make the final determination regarding which applicants to advance. Once full applications have been submitted, the Investment Committee will conduct a merit review and consider whether to advance applications through the process or deny applications. If the Investment Committee determines that an application is sufficiently meritorious to be eligible to receive a CHIPS Incentives Award, it will make a recommendation to a selecting official. The selecting official must approve an application prior to issuance of a CHIPS Incentives Award. The following sections describe this process in greater detail.

#### 1. Concept Plan Review

Concept plans will receive an initial review upon receipt for eligibility, completeness, and responsiveness to this NOFO, including the program priorities (see Section I.C). Concept plans determined to be ineligible, incomplete, or nonresponsive will be rejected. However, the Department, in its sole discretion, may continue the review process for a concept plan that is missing non-substantive information, the absence of which may easily be rectified during the review process.

A minimum of three independent reviewers will conduct an individual merit assessment of each concept plan that passes the initial review using the point system in Section V.A. The review process may include consultation with outside contractors or experts if deemed necessary to assist in the merit assessment.

An Investment Committee shall use those scores, in addition to any Selection Factors (Section V.B), to make a written determination that:

- A concept plan should advance to the full application phase
- A concept plan should not advance to the full application phase, which shall be a final and non-appealable decision[45]

#### 2. Full Application Review

Full applications will receive an initial review upon receipt for eligibility, completeness, and responsiveness to this NOFO, including the program priorities (see Section I.C). Full applications determined to be ineligible, incomplete, or nonresponsive will be returned to the applicant. However, the Department, in its sole discretion, may continue the review process for a

[45] Further submissions by the same applicant for the project proposed in a concept plan the Department chooses not to advance will not be reviewed or considered.

full application that is missing non-substantive information, the absence of which may easily be rectified during the review process.

An Investment Committee will conduct a qualitative merit assessment of each full application that passes the initial review against the evaluation criteria in Section V.C. The Department may contact applicants at any point during the process to obtain additional or clarifying information. The review process may include interviews with applicants and consultation with outside contractors or experts if deemed necessary to assist in the merit assessment.

The Investment Committee will make a written determination, based on the qualitative assessment, the program requirements, the evaluation criteria (Section V.C) and one or more of the prioritization and selection factors (Section V.B), that:

- The application appears eligible for an award and should advance to the due diligence phase
- The application appears eligible for an award and should be held for further consideration
- The application should be denied, which shall be a final and non-appealable decision

The Department may work with applicants throughout the review and selection process to maximize the chance of achieving the program's economic and national security objectives, including, for example, through discussing changes to application scope.

### 3. Due Diligence

Before entering into a final award for funding, the Department will conduct due diligence of the full application for—including, but not limited to—national security risks, financial and commercial information, environmental impacts, and other issues, to inform a final determination on whether to make a CHIPS Incentives Award and on what terms.

An invitation to the due diligence phase is not an assurance of funding. During the diligence phase, the Department will work directly with applicants to obtain all information required at this stage. Due diligence may also include obtaining information from sources other than the applicant. The Investment Committee may receive updates throughout this process. The Department may use the services of financial, commercial, technical, environmental, or other consultants or contractors and outside legal counsel in the due diligence phase. Applicants may be required to contribute to payment for these services. Information about the services and their costs will be provided to applicants upon or before entering the due diligence phase. Applicants may withdraw their application if they are asked to pay for these services and do not agree to do so.

When the due diligence phase is substantially complete, the Department and the applicant will negotiate the applicable terms of the CHIPS Incentives Award.

### 4. Award Preparation and Issuance

After the due diligence phase, the Investment Committee may recommend an application to the selecting official, who must approve any applications for funding under this NOFO. The selecting official may accept, modify, or reject a recommendation of the Investment Committee, or return the recommendation for further evaluation, negotiation, or due diligence. In considering a recommendation, the selecting official may consider any information available.

The awarding of the CHIPS Incentives Award occurs upon the issuance of Form CD-450 or comparable award form by a NIST authorizing officer. The award decisions of the NIST authorizing officer are final and may not be appealed.

The Department will provide any notice to Congress required under the CHIPS Act.[46]

### E. Responsibility / Qualification Records on SAM.gov

In considering applications, the Department will consider the record of the applicant, as well as of its corporate parent, in executing programs or activities under Federal grants, cooperative agreements, procurement awards, and other transactions, as well as its integrity and business ethics. As part of this consideration, prior to making a CHIPS Incentives Award, the Department will review and consider the non-publicly available information about that applicant in the designated integrity and performance system accessible through Responsibility / Qualification Records on SAM.gov (formally the Federal Awardee Performance and Integrity Information System (FAPIIS)). This review may also include the applicant's corporate parent or affiliates that are under common ownership and control. Each applicant, at its option, may review information in the designated integrity and performance system accessible through SAM and comment on any information about itself that a Federal awarding agency previously entered and is currently in the designated integrity and performance system accessible through SAM. The Department will consider any comments by the applicant, in addition to the other information in the designated integrity and performance system, in making a judgment about the applicant's integrity, business ethics, and record of performance under Federal awards.

### F. Additional Information

Any decision by the Department to deny an application shall be final and non-appealable. Unsuccessful applicants will be notified of a denial by e-mail. Unsuccessful applications will be retained in accordance with Department of Commerce recordkeeping requirements.

## VI. Federal Award Administration Information

Information regarding federal award notices, administrative and national policy requirements, funding availability and limitation of liability, and reporting requirements may be found on chips.gov, which is incorporated by reference into this NOFO.

---

[46] *E.g.*, 15 U.S.C. § 4652(a)(2)(C)(i)(III).

### A. Federal Awarding Agency Contacts

**Please direct programmatic inquiries to:**

Bill Frauenhofer
Director, CHIPS Program Office
CHIPS Program Office
National Institute of Standards and Technology
Herbert C. Hoover Building
1401 Constitution Ave, NW
Washington, D.C. 20230
Phone: (301) 975-2000
Email: AskChips@chips.gov

**Please direct media inquiries to:**

Kristen Eichamer
Press Secretary
U.S. Department of Commerce
Herbert C. Hoover Building
1401 Constitution Ave, NW
Washington, D.C. 20230
Phone: (630) 901-5889
Email: KEichamer@doc.gov

## VII. Appendix

### A. Definitions

- covered incentive – an incentive offered by a governmental entity to (A) a covered entity, for the purposes of constructing within the jurisdiction of the governmental entity, or expanding an existing facility within that jurisdiction, a facility described under "covered entity;" and (B) a workforce-related incentive (including a grant agreement relating to workforce training or vocational education), any concession with respect to real property, funding for research and development with respect to semiconductors, and any other incentive determined appropriate by the Secretary, in consultation with the Secretary of State.
- materials used to manufacture semiconductors – the chemicals, gases, raw and intermediate materials, and other consumables used in either the front- or back-end fabrication of semiconductors.
- Secretary – the Secretary of Commerce.
- semiconductor – an integrated electronic device or system, most commonly manufactured using materials such as, but not limited to, silicon, silicon carbide, or III-V compounds, and processes such as, but not limited to, lithography, deposition,

and etching. Such devices and systems include but are not limited to analog and digital electronics, power electronics, and photonics, for memory, processing, sensing, actuation, and communications applications.

- semiconductor manufacturing equipment – specialized equipment integral to the manufacturing of semiconductors and subsystems that enable or are incorporated into the manufacturing equipment.
- supply chain – a system of organizations, people, activities, information, and resources, possibly international in scope, that provides products or services to consumers in the private and public sectors. For the purposes of this NOFO, the scope of this definition encompasses any organization that directly contributes to the lifecycle of a semiconductor, especially focusing on the design, manufacturing, and packaging processes.