**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RICHARD D. PAISNER,<br><br>Plaintiff,<br><br>v.<br><br>LIP-BU TAN, *et al.*,<br><br>Defendants. | Civil Action No. 1:26-cv-00414-RGA |

**COMMERCE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

Filed: August 19, 2026


BRETT A. SHUMATE
Assistant Attorney General

BENJAMIN L. WALLACE
United States Attorney

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director

DYLAN J. STEINBERG
Assistant United States Attorney

JAMES R. POWERS (TX Bar No. 24092989)
Chief Litigation Counsel
U.S. Department of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543

*Counsel for the Commerce Defendants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

ARGUMENT ........................................................................ 2

I. THE CHIPS ACT AUTHORIZES THE STOCK AGREEMENT. ........................................ 2

II. THE CHIPS ACT IS CONSTITUTIONAL. ........................................ 8

III. SOVEREIGN IMMUNITY BARS PLAINTIFF'S CLAIM. ........................................ 11

IV. THE CHIPS ACT PREEMPTS PLAINTIFF'S STATE-LAW CLAIMS FOR EQUITABLE RELIEF AGAINST THE STOCK AGREEMENT. ........................................ 12

V. PLAINTIFF'S CLAIMS FAIL TO SATISFY BASIC FEDERAL PLEADING STANDARDS ........................................ 12

CONCLUSION ........................................................................ 13

## TABLE OF AUTHORITIES

**Cases**

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 7

*Bostock v. Clayton Cty., Ga.*,
590 U.S. 644 (2020) .......... 5

*Bristol Myers Squibb Co. v. Secretary*,
155 F.4th 245 (3d Cir. 2025) .......... 9, 10, 11

*Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
836 F.2d 173 (3d Cir. 1988) .......... 8

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018) .......... 5

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 5

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 8

*Gentile v. SEC*,
974 F.3d 311 (3d Cir. 2020) .......... 11

*Gundy v. United States*,
588 U.S. 128 (2019) .......... 8

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 3

*In re Yellow Corp.*,
152 F.4th 491 (3d Cir. 2025) .......... 6

*Landor v. Louisiana Department of Corrections & Public Safety*,
146 S. Ct. 1931 (2026) .......... 9, 10

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 7

*Malhan v. Sec'y U.S. Dep't of State*,
938 F.3d 453 (3d Cir. 2019) .......... 13

*Martin v. Hadix*,
527 U.S. 343 (1999) .......... 6

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ... 10

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012) ... 9

*New York v. United States*,
505 U.S. 144 (1992) ... 10

*Olson v. Ako*,
724 F. App'x 160 (3d Cir. 2018) ... 8

*Pulsifer v. United States*,
601 U.S. 124 (2024) ... 4

*South Dakota v. Dole*,
483 U.S. 203 (1987) ... 9, 10, 11

*T. M. v. Univ. of Md. Med. Sys. Corp.*,
146 S. Ct. 1739 (2026) ... 13

*Union Bank v. Wolas*,
502 U.S. 151 (1991) ... 5

*United States v. Safehouse*,
985 F.3d 225 (3d Cir. 2021) ... 5

*United States v. Velasquez*,
885 F.2d 1076 (3d Cir. 1989) ... 7

*West Virginia v. EPA*,
597 U.S. 697 (2022) ... 6, 7

*Yates v. United States*,
574 U.S. 528 (2015) ... 6

**Statutes**

5 U.S.C. § 701(a)(2) ... 11, 13

12 U.S.C. § 5223(d)(1) ... 6

15 U.S.C. § 4652 ... *passim*

15 U.S.C. § 4659 ... *passim*

15 U.S.C. § 9042(d) ... 6

22 U.S.C. § 9621(c)(1) ... 6

U.S. Const. art. I ........................................................................................................ 10

**Rules**

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 12

Fed. R. Civ. P. 23.1 ................................................................................................ 12

## INTRODUCTION

Plaintiff's Complaint should be dismissed in full for failure to state a claim and lack of jurisdiction; nothing in Plaintiff's response brief, D.I. 34 ("Opp'n"), compels a contrary result. The CHIPS Act's plain text authorizes the Stock Agreement: It gives the Secretary of Commerce ("the Secretary") express, discretionary transaction authority to require Intel, as a CHIPS funding recipient, to make "payments"—including in the form of stock and warrants—"as a condition for receiving support through an award of assistance or other transaction." 15 U.S.C. § 4659(a)(3). The Secretary has used that authority here to execute a deal that promotes the CHIPS Act's objectives of national and economic security, doing so in a manner that provides enormous financial value to the American public. Plaintiff's atextual reading of the statute, coupled with irrelevant appeals to legislative history and the major-questions doctrine, does not change that reality. Rather than accept the plain text, Plaintiff instead implores this Court to hold the CHIPS Act unconstitutional, appealing to the rarely satisfied non-delegation doctrine and limits on Congress's power under the Spending Clause. Both these arguments are improperly raised and meritless as a matter of law.

This Court, however, need not even reach these issues. At the threshold, Plaintiff has failed to satisfy his basic pleading obligations, including the requirement as a shareholder derivative plaintiff to plead demand futility with particularity. Nor can Plaintiff show that this Court has jurisdiction over the Commerce Defendants, because there is no applicable waiver of sovereign immunity. And Plaintiff cannot obtain state law-based equitable relief against any Defendant to enjoin or impair the Stock Agreement, which is authorized by supreme federal law. For each of these reasons, Plaintiff's Complaint should be dismissed with prejudice.

## ARGUMENT

### I. THE CHIPS ACT AUTHORIZES THE STOCK AGREEMENT.

The CHIPS Act grants the Secretary wide latitude in entering into agreements and transacting with CHIPS awardees and in negotiating the relevant terms and modes of payment. *See* Commerce Defs.' Mem. in Supp. of Their Mot. to Dismiss at 8–10, 13–14, D.I. 29 ("MTD"). Specifically, section 4659(a) provides the Secretary with broad discretion to "enter into agreements . . . and other transactions" with a funding recipient like Intel, pursuant to "procedures as [he] considers appropriate," and to require payment from such awardees "as a condition for receiving support through an award of assistance or other transaction." 15 U.S.C. § 4659(a)(1), (3), (7). And under section 4652(a)(3)(A), "[t]he Secretary shall determine the appropriate amount and funding type for each financial assistance award" under the statute. As the Commerce Defendants have explained, *see* MTD at 8–10, the plain terms of this deferential statutory scheme authorize the Stock Agreement, in which the Secretary "require[d]" Intel "to make" a form of "payment"—shares of stock and warrants—as a condition for receiving accelerated CHIPS Act funding. Plaintiff fails to circumvent this plain statutory text.

To begin, Plaintiff repeatedly asserts that the CHIPS Act does not "contain[] express language authorizing . . . [Commerce] to take equity or warrants from a company that receives" CHIPS funding. Opp'n at 16. But here, the question is not whether Congress specifically referenced "equity" or "warrants" in the text; rather, it is whether stock and warrants fall within the plain meaning of the term "payment" in section 4659(a)(3). As the Commerce Defendants have explained, they unquestionably do: Intel's stock and warrants are "things of value" provided in exchange for modifying the Funding Agreement, thus falling within the ordinary meaning of the relevant statutory term. MTD at 9–10. Nowhere does Plaintiff's opposition brief offer an

alternative definition of "payment" under the CHIPS Act, and thus, Plaintiff provides no textual authority for excluding shares of stock or warrants from the scope of section 4659(a)(3). *Compare* Opp'n at 16–20, *with* MTD at 9–10. Indeed, Plaintiff even concedes that it is "unremarkable" that the term "payment may include stock or warrants in some circumstances," but he asserts that this ordinary definition should not apply here. Opp'n at 20. In support, he presents only two text-based arguments, both of which are unavailing.

*First*, Plaintiff argues that the statutory authorization for the Secretary to require payment from awardees is limited to "requir[ing] applicants to pay the consultant, expert and maintenance fees incurred by [Commerce] in implementing the application process and monitoring a recipient's compliance with the CHIPS Act." *Id.* at 18 (citing 15 U.S.C. § 4659(a)(4)). The CHIPS Act contains no such textual limitation, though. Instead, as discussed, section 4659(a)(3) provides that the Secretary may require entities to make payments "as a condition for receiving support through an award of assistance or other transaction." 15 U.S.C. § 4659(a)(3). Nothing in the text confines these payments to the Secretary's "procure[ment]" of services from "experts and consultants," *see id.* § 4659(a)(4). Indeed, section 4659(a)(7) broadly authorizes the Secretary to "establish such . . . procedures as [he] considers appropriate." It is not this Court's "role to redesign the statute" or "engraft . . . exceptions onto the statutory text" about the purposes for which the Secretary may require payment from funding recipients. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 64 (2019).

Moreover, Congress *separately* authorized retention of experts and consultants in section 4659(a)(4), which expressly authorizes the Secretary to "procure temporary and intermittent services of experts and consultants in accordance with section 3109 of Title 5." 15 U.S.C. § 4659(a)(4). Plaintiff's reading of section 4659(a)(3) would render that provision duplicative of

subsection (a)(4) thus violating the bedrock interpretative canon that a court must give effect to every provision in a statute. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024).

*Second*, Plaintiff argues that the Commerce Defendants' plain-text reading of the CHIPS Act renders the statutory clawback provision mere surplusage. Opp'n at 19 (citing 15 U.S.C. § 4652(a)(5)). Not so. Under section 4652(a), the CHIPS Act generally requires the Secretary to claw back disbursed award funds if, *inter alia*, the awardee "does not commence or complete" the project within time periods set by the Secretary at the time of the award, *see* 15 U.S.C. § 4652(a)(5)(A)–(B), or the awardee knowingly engages in prohibited joint research or technology licensing with foreign entities of concern. *See id.* Every CHIPS award—including Intel's award—contains provisions implementing these statutory clawback mechanisms. *See, e.g.*, Compl. Ex. A (Nov. 2024 DFA) at INTEL_000445, D.I. 21-2 (Art. 9, § 9.1.1, implementing statutory clawback requirements); *id.* at INTEL_000500–501. Were an awardee to violate one of these provisions, Commerce would have a statutory and contractual right to recoup disbursed award funds and also retain the payments (in whatever permissible form) that the awardee has already provided. *See, e.g.*, 15 U.S.C. § 4652(a)(5)(B) (providing that "[i]f the project does not commence and complete by the set target dates . . . , the Secretary shall progressively recover up to the full amount of an award provided to a[n] [awardee] under this subsection"). The clawback provision thus merely supplies a recourse for a funding recipient's failure to meet certain conditions on disbursed funds. It has no bearing on the types of transactions that Commerce may enter in the first instance, including whether to require payment from an awardee under section 4659(a)(3) and, if so, what type. Simply put, the statutory payment and clawback provisions operate independently, and each are given full effect in the award documents here.

Aside from these meritless textual arguments, Plaintiff principally relies on legislative

history as a basis to reject the plain terms of the statute, referencing two failed votes on a proposed amendment to the CHIPS Act in the Senate and certain pre- and post-enactment remarks by three Senators. Opp'n at 16–17. These materials are neither relevant nor persuasive to the question presented here because "legislative history can never defeat unambiguous statutory text," *Bostock v. Clayton Cty., Ga.*, 590 U.S. 644, 674 (2020). Courts do not "psychoanalyze lawmakers" or consider their "statements," as only "[t]he words on the page, not the intent of any legislator, go through bicameralism and presentment and become law." *United States v. Safehouse*, 985 F.3d 225, 238–39 (3d Cir. 2021); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[W]e do not inquire what the legislature meant; we ask only what the statute means."). Indeed, Plaintiff essentially argues that because few Senators allegedly "expected" this "*result*" of the CHIPS Act's plain terms, this Court "should not dare to admit that it follows ineluctably from the statutory text." *Bostock*, 590 U.S. at 675–76. "That is exactly the sort of reasoning [the Supreme] Court has long rejected" because it "impermissibly seeks to displace the plain meaning of the law in favor of something lying beyond it." *Id.* at 676; *see also Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018) ("Even if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading." (citing *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991)). The text of the CHIPS Act is unambiguous, and it controls.

Plaintiff also argues that the term "payment" cannot encompass stock or warrants because other statutes enacted prior to the CHIPS Act specifically reference the possibility of agencies taking equity in companies. Opp'n at 16. Plaintiff speculates that Congress would have used the explicit language employed in those statutes if it intended to allow this form of payment here. Given the broad grant of authority to the Secretary, there is no reason for the CHIPS Act to also

include a specific grant of authority. In fact, had Congress wanted to limit the scope of payments to cash or particular financial instruments, it could have done so. It did not. MTD at 10.

The cited statutes, moreover, do not provide any illumination of what "payment" means in the CHIPS Act because none of those other statutes use that term in the cited subsections. *See* 12 U.S.C. § 5223(d)(1); 22 U.S.C. § 9621(c)(1); 15 U.S.C. § 9042(d). And even if they did, these unrelated statutes on different subjects, enacted years earlier, do not provide any guidance for interpreting the CHIPS Act. *Cf. Yates v. United States*, 574 U.S. 528, 537–38 (2015) (plurality op.) ("We have several times affirmed that identical language may convey varying content when used in different statutes . . . ." (citing cases)). To the contrary, even disparate language in two sections within the *same* statute provides little interpretive guidance where the two sections "address wholly distinct subject matters." *See Martin v. Hadix*, 527 U.S. 343, 355, 356 (1999).[1]

Plaintiff last invokes the major questions doctrine to challenge the Commerce Defendants' interpretation. That argument has no purchase here. The major questions doctrine stands for the "general proposition" that an "agency cannot take action that results in a 'transformative expansion' of its authority—especially over issues of 'vast economic and political significance'—without express permission from Congress." *In re Yellow Corp.*, 152 F.4th 491, 504–05 (3d Cir. 2025), *cert. denied sub nom.*, No. 25-986, 2026 WL 1855134 (U.S. June 29, 2026) (quoting *West*

[1] Plaintiff's observation that neither the November 2024 Direct Funding Agreement (DFA) nor the initial NOFO expressly references payment in the form of equity or warrants, Opp'n at 19–20, proves nothing about what Congress enacted in sections 4652(a)(3)(A) and 4659(a)(1), (3), and (7). The NOFO is not a source of statutory meaning and cannot alter or narrow authority Congress expressly delegated to the Secretary under the CHIPS Act, particularly where it was issued *after* the CHIPS Act was enacted. *Contra id.* at 19. The November 2024 DFA likewise could not alter Commerce's statutory authority to require Intel to make payments in the form of stock and warrants as a condition of receiving support under its award. That Commerce did not exercise that discretion through the November 2024 DFA (a negotiated contract) says nothing about whether it *could* have done so under its expressly delegated CHIPS Act authority.

*Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022)). That proposition is not applicable to this case, where Congress has *recently and expressly* conferred on the Secretary the authority to distribute federal funding to incentivize semiconductor manufacturing, as well as the discretion to enter into agreements, negotiate terms, and require payments in doing so. *Contra West Virginia*, 597 U.S. at 724 (deeming a statutory reading to conflict with the doctrine where EPA "claimed to discover in a long-extant statute an unheralded power" in the "vague language of an ancillary provision" that had "rarely been used in the preceding decades"); *see also Learning Res., Inc. v. Trump*, 607 U.S. 229, 242–46 (2026) (plurality op. as to part II.A.2).[2]

Nor does the scale of the authority conferred by the CHIPS Act's "payment" provision bear any resemblance to the recent major questions cases from the Supreme Court. For example, *West Virginia* involved the regulation of pollution in a way that would necessitate the closure of large numbers of power plants, *see* 597 U.S. at 707–714, while *Biden v. Nebraska*, 600 U.S. 477 (2023), involved the cancellation of *hundreds of billions of dollars* in student loan debt based on tenuous statutory language, *see id.* at 482–88, 502–03. Here, in contrast, there is neither a dispute that the CHIPS Act permits the Secretary to distribute billions of dollars in federal assistance, nor any question that he may enter agreements with private companies in doing so, nor even that he may require payment as part of such transactions. The only dispute is whether he may require payment of a *particular type* as part of those transactions. And section 4659(a)(1) and (3) speaks *directly*

---

[2] Plaintiff's opposition repeatedly cites part II.A.2 of Chief Justice Roberts' opinion in *Learning Resources*, which concerns the major questions doctrine. *See* 607 U.S. at 242–48. This portion of the opinion was joined by only two other justices and, as such, it is neither an opinion of the Court nor binding precedent. *See United States v. Velasquez*, 885 F.2d 1076, 1085 (3d Cir. 1989). In any event, the major questions doctrine has no bearing on this case for the reasons discussed above and as confirmed by Chief Justice Roberts's plurality opinion as to this issue in *Learning Resources*. *See* 607 U.S. at 242–46 (explaining that the doctrine applies to "extraordinary delegations of Congress's powers" through a reading of "ambiguous statutory text" that is inconsistent with longstanding congressional and Executive practice).

to this disputed textual issue. That is a far cry from a "major question" as the Supreme Court has defined it.

## II. THE CHIPS ACT IS CONSTITUTIONAL.

Plaintiffs' opposition also asserts two arguments that challenge the constitutionality of the CHIPS Act, contending that the statute—as construed by the Commerce Defendants—effects an unconstitutional delegation of legislative authority to the Executive Branch and violates restrictions on Congress's powers under the Spending Clause. Opp'n at 21–25. These arguments are improperly raised and should be disregarded. The Complaint contains no claim challenging the constitutionality of the CHIPS Act, let alone on these grounds, and it is "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) (quoting *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)). Accordingly, the Court should not consider these un-pleaded challenges at all.

On top of that, Plaintiff's arguments are meritless.

*First*, non-delegation. The Supreme Court has only twice overturned federal statutes on this basis, both times nearly a century ago. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 683 (2025). That rarity is because Congress need only articulate an "intelligible principle" in providing authority to the Executive Branch, which merely requires that Congress make "clear both 'the general policy' that the agency must pursue and the 'boundaries of its delegated authority.'" *Id.* at 673 (citation omitted). In practice, this test is "not demanding," and the Court has "over and over upheld even very broad delegations." *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality op.). Indeed, statutes have only failed this test where they "establish[] no criterion" and "declar[e] no policy" to guide executive discretion. *Consumers'*

*Rsch.*, 606 U.S. at 683 (citation omitted).

The CHIPS Act contains numerous provisions reflecting the "general policy" that Congress wished for Commerce to apply and the "boundaries" of the agency's delegated authority in doing so. Section 4652(a)(2)(B) establishes numerous requirements that applicants must satisfy before they can be selected for an award. Section 4652(a)(2)(C) mandates that the Secretary consider various matters before approving an award. Section 4652(a)(2)(D) requires the Secretary to prioritize awards based on specified criteria. And section 4652(d) further articulates the "sense of Congress" as to the policies that should guide the Secretary in making CHIPS Act awards. These provisions far surpass the low bar set for permissible delegations by Congress to the Executive.

*Second*, the CHIPS Act does not run afoul of limits on congressional authority under the Spending Clause. Plaintiff contends that the Stock Agreement, and thus the CHIPS Act authorizing it, is an unconstitutionally coercive condition on federal funding that contravenes the Spending Clause test established in *South Dakota v. Dole*, 483 U.S. 203 (1987), and *Landor v. Louisiana Department of Corrections & Public Safety*, 146 S. Ct. 1931 (2026). Opp'n at 21–23. But those cases are inapposite, as shown by recent Third Circuit precedent. In *Bristol Myers Squibb Co. v. Secretary*, 155 F.4th 245 (3d Cir. 2025), two pharmaceutical companies challenged the constitutionality of the Medicare Drug Price Negotiation Program, under which the Government was directed by law to "negotiate prices over a subset of covered drugs" in the Medicare Part D voluntary prescription drug benefit program. *Id.* at 252. The companies argued, *inter alia*, that the program was an improperly coercive use of federal funding under *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*), another Spending Clause case referenced in Plaintiff's brief. The Third Circuit rejected that argument, explaining that the Spending Clause coercion analysis from *NFIB* was based on a "focus on federalism and

the States' role as distinct sovereigns." *Bristol Myers*, 155 F.4th at 259. Although the Tenth Amendment and "[f]ederalism prohibits the federal government from trampling on a State's prerogatives," such "concerns are simply not present here, where the federal government contracts with private parties." *Id.* The Court's Spending Clause analysis in *Dole* and *NFIB* has no bearing where, as here, Commerce has "contract[ed] with [a] private part[y]." *See id.*

Indeed, it has long been recognized that the Constitution "confers upon Congress the power to regulate individuals, not States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 472 (2018) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). Nonetheless, Congress retains the authority under the Spending Clause to offer "financial inducement[s]" to states, through the "conditional grant of federal funds," in pursuit of "objectives not thought to be within Article I's 'enumerated legislative fields.'" *Dole*, 483 U.S. at 207, 211; *see also Landor*, 146 S. Ct. at 1938 (discussing that Congress conditions various categories of federal funds on states' agreement to act consistent with federal policy). The test established in *Dole* exists to police the line between proper congressional inducement of sovereign states and impermissible federal regulation of them. *See Dole*, 483 U.S. at 207 (requiring that "if Congress desires to condition *the States*' receipt of federal funds, it must do so unambiguously" (citation omitted, emphasis added)).

Here, Congress made no such attempt to induce states or to otherwise act upon a subject beyond federal regulatory authority. Indeed, Congress's Article I authority to regulate interstate and foreign commerce amply supports the CHIPS Act's provisions authorizing Commerce to contract with private parties. U.S. Const. art. I, § 8, cl. 3. Plaintiff's arguments about the limitations on the spending power are thus irrelevant.

Even if the *Dole* test applied, it is met in this case. The use of federal funds under the Stock Agreement is "in pursuit of the general welfare," and Plaintiff does not even contend otherwise.

*Dole*, 483 U.S. at 207. The plain text of the CHIPS Act authorizes the Stock Agreement, *see supra*, meaning that the funding arrangement it effectuates is "unambiguously expressed" in the statute. *See Dole*, 483 U.S. at 207. The use of federal funds is also related "to the federal interest" in incentivizing domestic semiconductor investment. *See id.*[3] Finally, there is no possible form of coercion here where the acceptance of CHIPS Act funding by Intel is voluntary. *See Bristol Myers*, 155 F.4th at 257–58, 263 (explaining that although a choice to "accept federal reimbursements for selected drugs on less lucrative terms" "may provide a strong incentive" to accept the Government's terms, such a choice is "not a taking" and is "voluntary").

## III. SOVEREIGN IMMUNITY BARS PLAINTIFF'S CLAIM.

This Court, however, can dismiss the Complaint without determining the scope or constitutionality of the CHIPS Act. Plaintiff's claim against the Commerce Defendants also fails because it is barred by sovereign immunity, precluding this Court's jurisdiction. MTD at 10–14. Plaintiff responds by citing the waiver of sovereign immunity at section 702 of the APA, but that waiver is unavailable. The Third Circuit holds that "two exceptions apply to the APA's waiver of sovereign immunity," the second of which "prevents judicial review of 'agency action that is committed to agency discretion by law.'" *Gentile v. SEC*, 974 F.3d 311, 316–17 (3d Cir. 2020) (quoting 5 U.S.C. § 701(a)(2)). The CHIPS Act commits the decision to enter the Stock Agreement to agency discretion. MTD at 10–14.

Plaintiff has little to say in response beyond rehashing his arguments that the Commerce Defendants' interpretation of the CHIPS Act is wrong. Opp'n at 35–36. He does not respond substantively as to the application of section 701(a)(2) to statutes conferring the kind of broad

---

[3] *See also* 15 U.S.C. § 4652(a)(1) (directing the Secretary to "provide[] Federal financial assistance to" awardees "to incentivize investment in facilities and equipment in the United States for the fabrication, assembly, [etc.] of semiconductors . . . .").

discretion contained in the CHIPS Act. Thus, insofar as the Court agrees with the Commerce Defendants that the CHIPS Act provides broad discretion to the Secretary, and that this discretion encompasses the terms of the Stock Agreement, Plaintiff has not satisfied his burden to establish the Court's jurisdiction as to the Commerce Defendants. His claim against the Government should be dismissed under Federal Rule of Civil Procedure 12(b)(1).

## IV. THE CHIPS ACT PREEMPTS PLAINTIFF'S STATE-LAW CLAIMS FOR EQUITABLE RELIEF AGAINST THE STOCK AGREEMENT.

Plaintiff's state-law claims seeking equitable relief to impair or unwind the Stock Agreement also fail because they are preempted by the CHIPS Act. MTD at 14–17. Plaintiff responds by disclaiming any intent to use state law in a manner that could run afoul of the CHIPS Act, arguing that his claim rises or falls based on whether federal law authorizes the Stock Agreement. Opp'n at 36–37. Thus, Plaintiff essentially concedes this point: If the Stock Agreement is authorized by the CHIPS Act, this Court should not issue any equitable relief against the Commerce Defendants *or* the Intel Defendants that would impair the Stock Agreement.

## V. PLAINTIFF'S CLAIMS FAIL TO SATISFY BASIC FEDERAL PLEADING STANDARDS.

Plaintiff's claims also fail for a host of pleading-related reasons. First and foremost, Plaintiff fails to plead demand futility, as he must under Fed. R. Civ. P. 23.1. MTD at 18; Intel Defs.' Opening Br. in Supp. of Mot. to Dismiss Compl. at 8–20, D.I. 27. The Intel Defendants address Plaintiffs' response in their reply and the Commerce Defendants join in those arguments and incorporate them here by reference. Plaintiff must meet his demand futility pleading obligation before even engaging with his CHIPS Act arguments. He has not and the Court can dismiss the Complaint in full for this reason alone, without considering any merits-related argument described above.

Separately, Plaintiff's claims against the Commerce Defendants also fail because Plaintiff alleges no cause of action against them and improperly attempts to invoke alleged breaches of fiduciary duties by the Intel Defendants to deprive the Government of its statutorily authorized, bargained-for benefits under the Stock Agreement. MTD at 18–20. On the latter point, Plaintiff simply concedes it has not pleaded any aiding-and-abetting claim against the Commerce Defendants and barely acknowledges the authorities cited in their opening brief. The upshot is that, again, Plaintiff can only obtain relief if the Stock Agreement violates federal law. It does not.

As to the lack of a cause of action, Plaintiff concedes that the Complaint "does not rely on the Declaratory Judgment Act." Opp'n at 37. Plaintiff nonetheless argues that his claim presents a justiciable case-or-controversy under the test established in the declaratory judgement context. *Id.* at 37–38. That is beside the point: "[T]he Declaratory Judgment Act is procedural only, and presupposes the existence of a judicially remediable right. It creates a remedy, not rights." *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 457 n.3 (3d Cir. 2019) (internal quotation marks and citations omitted)), *abrogated on other grounds by T. M. v. Univ. of Md. Med. Sys. Corp.*, 146 S. Ct. 1739 (2026). The only cause of action under a separate statute that Plaintiff points to is the one provided in section 702 of the APA. Opp'n at 38. But the Complaint pleads no such cause of action, and Plaintiff's opposition brief cannot amend the Complaint. *See supra*. Nor would that cause of action state a claim. As discussed with respect to sovereign immunity, the decision to execute the Stock Agreement is committed to agency discretion by law and, thus, Plaintiff lacks an APA cause of action under section 701(a)(2).

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice.

Dated: August 19, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

BENJAMIN L. WALLACE
United States Attorney

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director

DYLAN J. STEINBERG
Assistant United States Attorney

*/s/ James R. Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Chief Litigation Counsel
U.S. Department of Justice,
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-0543
Fax: (202) 616-8460
Email: james.r.powers@usdoj.gov

*Counsel for the Commerce Defendants*